# EXHIBIT "A"

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2                  MIAMI DIVISION

 3            CASE NO.: 1:18-cv-23329

 4

 5
    STATE FARM MUTUAL AUTOMOBILE
 6  INSURANCE COMPANY

 7     Plaintiff,

 8  v.

 9  MANUEL V. FEIJOO; and MANUEL V.
    FEIJOO, M.D., P.A., a Florida
10  professional association,

11     Defendants.
    _____/
12

13  VIDEO DEPOSITION OF:  Anielka Castillo

14  DATE TAKEN:           May 29, 2019

15  TIME:                 9:17 A.M. to 4:39 P.M.

16  TAKEN BY:             Kenneth P. Hazouri, Esquire
                          Counsel for the Plaintiff
17
    PLACE:                Orange Legal
18                        6303 Blue Lagoon Drive
                          Suite 380
19                        Miami, Florida 33126

20  REPORTED BY:          Martha Rodriguez, FPR
                          Court Reporter and Notary Public
21                        State of Florida at Large

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1                   A P P E A R A N C E S:

 2   KENNETH P. HAZOURI, ESQUIRE
     OF:  DSK Law
 3        332 North Magnolia Avenue
          Orlando, Florida 32801
 4        khazouri@dsklawgroup.com

 5        Counsel for the Plaintiff

 6

 7

 8   JEROME A. PIVNIK, ESQUIRE
     OF:  The Pivnik Law Firm
 9        7700 North Kendall Drive
          Suite 703
10        Miami, Florida 33156
          pivniklaw@aol.com
11
     KENNETH B. SCHURR, ESQUIRE
12   OF:  Law Offices of Kenneth B. Schurr, P.A.
          2030 South Douglas Road
13        Suite 105
          Coral Gables, Florida 33134
14        counselken@schurrlaw.com

15        Counsel for the Defendants

16

17

18    ALSO PRESENT:

19        GEORGE RODRIGUEZ, Videographer

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                                      3

```
 1                  I N D E X (VOLUME I)

 2  TESTIMONY OF ANIELKA CASTILLO

 3  Direct Examination by Mr. Hazouri. . . . . . . . . .6

 4  CERTIFICATE OF OATH. . . . . . . . . . . . . . .146

 5  CERTIFICATE OF REPORTER. . . . . . . . . . . . .147

 6  ERRATA SHEET (VOLUME I). . . . . . . . . . . . .148

 7  NOTIFICATION LETTER. . . . . . . . . . . . . . .149

 8

 9                      E X H I B I T S

10  PLAINTIFF'S EXHIBIT NO. 1. . . . . . . . . . . . . 54
    (CMS 1500 FORM)
11
    PLAINTIFF'S EXHIBIT NO. 2. . . . . . . . . . . . . 82
12  (Handwritten Document Entitled Initial Orthopedic
    Evaluation)
13
    PLAINTIFF'S EXHIBIT NO. 3. . . . . . . . . . . . . 86
14  (Document Entitled Range of Motion Report)

15  PLAINTIFF'S EXHIBIT NO. 4. . . . . . . . . . . . .101
    (Typed-out Document Entitled Initial Orthopedic
16  Evaluation)

17  PLAINTIFF'S EXHIBIT NO. 5. . . . . . . . . . . . .121
    (Document Entitled Studies Request)
18
    PLAINTIFF'S EXHIBIT NO. 6. . . . . . . . . . . . .123
19  (A Copy of a Page Out of the CPT 2017 Book)

20
```

```
21                  S T I P U L A T I O N S

22      It is hereby stipulated and agreed by and between

23  counsel present for the respective parties, and the

24  deponent, that the reading and signing of the deposition

25  are hereby reserved.
```



**Orange Legal**
**800-275-7991**

```
 1                    P R O C E E D I N G S

 2                        (VOLUME I)

 3             THE VIDEOGRAPHER:  Here begins the videotaped

 4     deposition of Anielka Castillo taken in the matter of

 5     Case 1:18-cv-23329, State Farm Mutual versus Manuel V.

 6     Feijoo, M.D., to be heard in the U.S. District Court for

 7     the Southern District of Florida.  The deposition is

 8     being held at Orange Legal - Miami, 6303 Blue Lagoon

 9     Drive, Suite 380, Miami, Florida 33126.  Today's date is

10     May 29, 2019.  The time is 9:17 a.m.  The court reporter

11     is Martha Rodriguez and the video specialist is George

12     William Rodriguez on behalf of Orange Legal.

13             Would counsel and all present please introduce

14     yourselves after which the court reporter will swear in

15     the witness?

16             MR. HAZOURI:  Ken Hazouri, attorney for the

17     Plaintiff, State Farm Mutual.

18             MR. PIVNIK:  Jerry Pivnik for the Defendants,

19     Manuel Feijoo and Dr. Feijoo's medical practice.

20             MR. SCHURR:  Should I make an appearance?

21             MR. HAZOURI:  If you want.

22             MR. SCHURR:  Ken Schurr for both Defendants.

23             THE COURT REPORTER:  Okay.  Thank you.  Please

24     raise your right hand.  State your name for the record.

25             THE WITNESS:  Anielka Maria Castillo Martinez.
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                     5

```
 1              THE COURT REPORTER:  Do you solemnly swear or

 2   affirm the testimony you're about to give is the truth,

 3   the whole truth and nothing but the truth?

 4              THE WITNESS:  Yes, I do.

 5              THE COURT REPORTER:  Thank you.

 6                    ANIELKA CASTILLO,

 7   after having been first duly sworn, was examined and

 8   testified under oath as follows:

 9              MR. HAZOURI:  Jerry, do you want to say what

10   you wanted to say?

11              MR. PIVNIK:  Okay.  Thank you, Ken.  As we

12   discussed just before the start of this deposition, the

13   Defendants object to the use of any of the transcripts

14   that were identified on the Plaintiff's initial or

15   amended disclosures because they haven't been produced.

16   We have requested them and we've had some email

17   discussions about that.  So, we would object to the use

18   of those transcripts for impeachment purposes or the use

19   for this deposition at trial for impeachment purposes to

20   the extent of those depositions --

21              MR. HAZOURI:  All right.

22              MR. PIVNIK:  -- and transcripts.  Thank you.

23              MR. HAZOURI:  And we disagree with that

24   objection and preserve all arguments and responses --

25   arguments in opposition and responses thereto.  And
```

 1  also, not -- some of the transcripts you do have.  You

 2  had said all of those listed in the disclosure.  So, we

 3  don't have to go into it, but I just wanted to clarify

 4  that.

 5          MR. SCHURR:  There's 15 identified, including

 6  two affidavits.  So, there's 13 transcripts.  You

 7  produced four.  I made an attempt to find others

 8  unsuccessful because the information provided in

 9  disclosure was insufficient for me to track down those

10  transcripts.

11          MR. HAZOURI:  Okay.  And you are counsel of

12  record in the cases that it was -- I don't want to go

13  down a long road on this, but you're counsel of record

14  and you attended every one of the depositions --

15          MR. SCHURR:  And I'm not the attorney that

16  ordered the transcripts, paid for the transcripts or has

17  the relationship with the court reporters or the court

18  reporter subcontractors, which we advised you, and then

19  you still refused to produce any of those transcripts.

20                    DIRECT EXAMINATION

21  BY MR. HAZOURI:

**22      Q.   Okay.  Could you please state your name --**

**23  your full name?**

24      A.   Anielka Maria Castillo Martinez.

**25      Q.   And what city do you live in?**



```
 1      A.   Miami, Florida.

 2      Q.   Do you sometimes go by the name Anie?

 3      A.   Yes.

 4      Q.   Okay.  Is that common for people to call you

 5  Anie?

 6      A.   Yeah, because it's very difficult to mention

 7  Anielka.

 8      Q.   Okay.

 9      A.   I have to short; Anie.

10      Q.   Okay.  And have you given your deposition

11  before?

12      A.   Yes, sir.

13      Q.   On how many occasions?

14      A.   I don't know exactly, but a couple ones.

15      Q.   Would it be more -- I'm going to just try and

16  give you some numbers.  Would it be more than five times

17  that you've given?

18      A.   Yes.

19      Q.   More than 10 times?

20      A.   Yes.

21      Q.   More than 15?

22      A.   Probably.

23      Q.   It starts getting fuzzy at 15?  More than 20?

24      A.   I don't know.

25      Q.   Okay.  So, somewhere in between 10 and 20
```



 1  would be --

 2      A.    Correct.

 3      Q.    That would be your best estimate?

 4      A.    (Non-verbal response).

 5      Q.    Okay.  And in what type of cases did you give

 6  your deposition?

 7      A.    PIP.

 8      Q.    Exclusively, all those depositions were PIP

 9  cases?

10      A.    Auto accident cases.

11      Q.    Yeah.

12      A.    Yes.

13      Q.    And did you give deposition testimony as a

14  corporate representative of Manuel V. Feijoo, M.D., P.A.

15  --

16      A.    Yes, sir.

17      Q.    -- in those other depositions?

18      A.    Yes.

19      Q.    And that is the medical clinic that you work

20  for, correct?

21      A.    Correct.

22      Q.    Just to help with terminology during this

23  deposition, if I call Manuel -- or I intend to call

24  Manuel V. Feijoo, M.D, P.A., Feijoo, P.A. for short.  Do

25  you understand?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                9

```
 1     A.   Yes.

 2     Q.   So, when I use the term Feijoo, P.A., that's

 3   the clinic.  I'm referring to your employer.  Okay?

 4     A.   Okay.

 5     Q.   All right.  Let me go through some -- I know

 6   you're probably familiar with them, but let me go

 7   through some ground rules that'll hopefully make the

 8   deposition go smoothly today.  I'm going to ask you

 9   questions on the case that we're here on today.  If my

10   question confuses you or you don't understand it for any

11   reason, please tell me that and I will try and rephrase

12   it for you in a way that you understand.  Okay?

13     A.   Correct.

14     Q.   If you don't tell me that you're confused or

15   you don't understand, I'm going to assume that you

16   understood the question.  So, please tell me if you

17   don't.  Okay?

18     A.   I understand.

19     Q.   Thank you.  Also, you're doing a good job of

20   it now.  I need you to answer out loud with a yes or a

21   no and any explanation you want to give as opposed to

22   uh-huh, uh-uh or a head nod or head shake.  Even though

23   we do have a video today, the court reporter's taking a

24   transcript and when you say yes or no, it makes it very

25   clear what your answer is.  Okay?
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                10

```
 1       A.    I understand.

 2       Q.    Thank you.  And the other thing you're doing a

 3  good job with is -- if you and I were just sitting at

 4  lunch having a conversation and asking each other

 5  questions, a lot of times we can anticipate what the

 6  question's going to be before the person's done speaking

 7  it and start answering.  In this case, again, because

 8  the court reporter's taking a transcript, it will make

 9  everything a lot easier for her and it'll make a lot

10  clearer transcript if you, even if you know what I'm

11  asking you, let me finish the question completely before

12  you answer it, and I will make a concerted effort to let

13  you finish your answer before I ask the next question.

14  Do you understand?

15       A.    I understand.

16       Q.    If we start talking over each other a little

17  bit by not doing that, me or you, I'll try and remind us

18  to let me finish the question or, I'm sorry, I'll let

19  you finish your answer and we'll try and keep it

20  straight like that.  Okay?

21       A.    Okay.

22       Q.    Thank you.  Did you meet with anyone to

23  prepare for your deposition today?

24       A.    Just talked to my attorney.

25       Q.    Which attorney was that?
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    11

```
 1      A.   Jerry.

 2      Q.   Jerry Pivnik?

 3      A.   Yeah.

 4      Q.   Mr. Pivnik, who's sitting right here?

 5      A.   (Non-verbal response.)

 6      Q.   When did you meet with Mr. Pivnik?

 7      A.   Yesterday.

 8      Q.   And for how long?

 9           MR. PIVNIK:  I'm going to object and instruct

10   the witness not to answer.  Even the amount of time that

11   we meet is part of work product and attorney-client

12   privilege.

13           MR. HAZOURI:  Andrew Barrata asked the same

14   question of our witness and they answered it.

15           MR. SCHURR:  You could've objected.

16           MR. HAZOURI:  You're going to instruct the

17   witness not to answer on the amount of time?

18           MR. PIVNIK:  You know, I'll withdraw the

19   objection in this case.  You can go ahead and answer.

20      A.   About 30 minutes.

21   BY MR. HAZOURI:

22      Q.   Okay.  And so, you didn't meet with anybody

23   else to prepare your deposition --

24      A.   No.

25      Q.   -- prepare for your deposition?
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    12

```
 1                 Did you discuss your deposition with Dr.

 2    Feijoo?

 3        A.   No.

 4        Q.   Did you review any documents in preparation

 5    for your deposition?

 6                 MR. PIVNIK:  You can answer that one, but

 7    we're going to object to the documents that are reviewed

 8    on the basis of work product privilege.

 9    BY MR. HAZOURI:

10        Q.   Okay.  Did you review any documents in

11    preparation for your deposition?

12        A.   What type of documents?

13        Q.   I'm just asking you if you -- for -- based on

14    -- I don't agree with the objection, but for right now

15    your attorney is letting you answer, basically, yes or

16    no.  Did you look at any documents in preparation for

17    your deposition?

18        A.   No.

19        Q.   No?  Okay.  Solves that objection.

20                 Could you give me your educational background

21    starting with high school, please?

22        A.   I did high school only.

23        Q.   When did you graduate from high school?

24        A.   I didn't finish high school.  I just got into

25    high school.
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    13

```
 1      Q.    Okay.  Where did you go to high school?

 2      A.    Miami High.

 3      Q.    Do you hold any medical licenses?

 4      A.    No, sir.

 5      Q.    You do have some training in medical billing.

 6  Is that correct?

 7      A.    Correct.

 8      Q.    Could you describe for me the training you've

 9  received in medical billing?

10      A.    Besides the years of experience I have, I

11  received different seminars through Medicare, through

12  different office that they provide with any changes of

13  seminars.

14      Q.    You said Medicare seminars?

15      A.    Yes.

16      Q.    Okay.  And when was the last time you attended

17  a Medicare seminar?

18      A.    Maybe a few years back.  Currently, I did one,

19  but it was not a Medicare one.  It was just the one that

20  was provided for changes.

21      Q.    Okay.  So, let me see if I understand your

22  testimony.  You have on-the-job experience working as a

23  billing -- medical billing person for a number of years?

24      A.    Correct.

25      Q.    And you've attended some Medicare seminars,
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    14

```
 1  seminars put on by Medicare, and other seminars related

 2  to medical billing.  Is that fair?

 3        A.   That's correct.

 4        Q.   Okay.  So, we have those two items.  Other

 5  than that, do you have any other training in medical

 6  billing?

 7        A.   No, sir.

 8        Q.   I don't even know if they exist.  I'm just

 9  going to ask you.  Are there --

10             THE WITNESS:  Sorry.  Excuse me.

11             (Brief interruption.)

12  BY MR. HAZOURI:

13        Q.   Do you hold any credentials or designations in

14  medical billing, like certificates that you may have

15  received for any type of training?

16        A.   Well, they used to give you one like for the

17  class that you pass or something, but it's not like they

18  certify for -- as a billing.  It's just that you did

19  that class.

20        Q.   Yeah.  You took a seminar and they gave you a

21  certificate of completion?

22        A.   Exactly.

23        Q.   Okay.  Thank you.  Other than that, nothing

24  else?

25        A.   No, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                15

```
 1       Q.    Okay.  And you are currently employed by

 2   Feijoo, P.A.?

 3       A.    Correct.

 4       Q.    How long have you been employed by Feijoo,

 5   P.A.?

 6       A.    I start working with him since 2001.

 7       Q.    I'm going to ask you about that, but let's go

 8   backwards in time from there.  Okay?

 9       A.    Okay.

10       Q.    Where did you work before -- if you did,

11   before you worked with -- started with Feijoo, P.A.?

12       A.    Primary Medical Service, Inc.

13       Q.    Primary?

14       A.    Primary Medical Service, Inc.

15       Q.    And what did that company do?

16       A.    Medical billing.

17       Q.    Where is that company located?

18       A.    It was located at Ponce De Leon.

19       Q.    Ponce De Leon?

20       A.    Yes.

21       Q.    In Miami?

22       A.    Correct.

23       Q.    And were you an employee of that company?

24       A.    That's correct.

25       Q.    What were your duties?
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    16

```
 1        A.    I was office manager.

 2        Q.    That was your title.  What did you do as

 3   office manager?

 4        A.    I was in charge of six different employees,

 5   responsible for seven different physicians, billing,

 6   reviewing.

 7        Q.    So, you did medical billing -- well, first of

 8   all, let's take a step back.  My fault here.  Primary

 9   Medical Service, Inc., what was its business?  What did

10   it do?

11        A.    Medical billing.

12        Q.    Okay.  So, it was a billing company?

13        A.    Correct.

14        Q.    For physician's offices?

15        A.    That's correct.

16        Q.    And you managed that company and that

17   business?

18        A.    That's correct.

19        Q.    And you said -- the company did billing for

20   seven physicians, did you say?

21        A.    Yes.

22        Q.    Were they in the same practice or different

23   practices?

24        A.    No, different -- different doctors.

25        Q.    Okay.  And was this your company, Primary
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                17

```
 1   Medical Service?

 2       A.   No, sir.

 3       Q.   Okay.  You were just employee, not an owner of

 4   the company?

 5       A.   Exactly.

 6       Q.   Okay.  And you had said you were working there

 7   before you started with Feijoo, P.A. in 2001.  When did

 8   you start at Primary?

 9       A.   I was 16 years old when I started.

10       Q.   Okay.  Well, I don't want to date you --

11       A.   I know.

12       Q.   -- but --

13       A.   So, I don't know exactly.  I'm 42 now, so I'm

14   not sure.

15       Q.   That's a lot of math.  Well, I guess --

16       A.   I worked with her like about 10 -- almost 10

17   years.

18       Q.   Okay.  So, let's just call it about 10 years.

19   Is that good?

20       A.   Yeah.

21       Q.   Okay.  And you started when you were 16?

22       A.   Yes.

23       Q.   So, you've been doing medical billing, working

24   in that field, since you were 16?

25       A.   Correct, sir.
```



1       Q.    Before that, you were in high school, I take

2    it?

3       A.    Yes.

4       Q.    Okay.  So, you've had essentially two jobs

5    your entire work life, correct?

6       A.    That's correct.

7       Q.    So have I, by the way.  It's nice to not move

8    around.

9       A.    I know.

10      Q.    Isn't it?  It's nice when it works out like

11   that.

12            All right.  So, let's go back to -- well, let

13   me ask you.  Why did you -- or how did your relationship

14   with Primary or employment relationship come to an end?

15      A.    She got married.  She moved to New York.  And

16   that's how she let me -- because we -- she knew I was a

17   good employee, so she let me start my own business.  She

18   helped me to start my own business before she left and

19   that's how I started doing billing.

20      Q.    Okay.  And you do have a billing company right

21   now, I believe, correct?

22      A.    Yes, sir.

23      Q.    Okay.  What is the name of your billing

24   company?

25      A.    Well, right now it's under Best Choice Medical



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                     19

```
 1   Billing.
 2       Q.   Was it different back then when --
 3       A.   Yes.  It was Best Quality Medical Billing.
 4       Q.   Is it the same entity and you changed the name
 5   or different entities?
 6       A.   I changed -- it's different tax ID.
 7       Q.   Okay, it's different.  Best Quality Billing
 8   Services?
 9       A.   Services.
10       Q.   Inc.?
11       A.   Yes.
12       Q.   So, you started that around 2001?
13       A.   Yeah, 2000.
14       Q.   2000?  Okay.
15       A.   Mm-hmm.
16       Q.   And ultimately, you changed the entity from
17   Best Quality Medical Services to Best Choice Medical
18   Billing?
19       A.   Yeah.
20       Q.   When did that happen?
21       A.   Well, I -- originally, it was a personal
22   matter and that's the reason I changed it to High
23   Standard, and recently was Best Choice.
24       Q.   You changed to Best Choice --
25       A.   Yes.
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                20

```
 1        Q.    -- for personal reasons?

 2        A.    Yeah.

 3        Q.    Okay.  When did that change occur?

 4        A.    Well, Best Choice, it's been almost a year and

 5   a half or two.

 6        Q.    Oh, only a year and a half or two --

 7        A.    Yes.

 8        Q.    -- ago?  Okay.

 9              Okay.  So, your former employer at Primary

10   moves to New York.  You open Best Quality Billing

11   Services in or about 2000?

12        A.    Correct.

13        Q.    How did your relationship with Dr. Feijoo come

14   about, you know, a year -- within a year or so?

15        A.    Well, when she left, she left me -- she talked

16   to the doctors that we were doing billing.  Some decide

17   to look for another billing company, some decide to stay

18   with me.  At that point, I stay with one of the doctor,

19   which is Ricardo Torres --

20        Q.    Okay.

21        A.    -- and he was the one who said that Dr. Feijoo

22   was looking for billing.

23        Q.    So, Ricardo Torres referred you to Dr. Feijoo

24   or referred Dr. Feijoo to you?

25        A.    Well, both.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                21

```
 1      Q.    Both?

 2      A.    Yeah.  He talk about me and then he asked me

 3  to call them.

 4      Q.    He put you two in touch?

 5      A.    Exactly.

 6      Q.    Again, right around 2001 --

 7      A.    Correct.

 8      Q.    -- time period?  And did you start doing Dr.

 9  Feijoo's billing?

10      A.    Correct.

11      Q.    Through Best Quality Billing Services?

12      A.    Yes, sir.

13      Q.    In 2001?

14      A.    Yes, sir.

15      Q.    And recognizing the change in the companies

16  from Best Quality to Best Choice, accepting that -- and

17  I'm just really talking about you -- since 2001, have

18  your companies and you continuously done the billing for

19  Dr. Feijoo's office?

20      A.    That's correct.

21      Q.    Let's go back in time to -- let's just say

22  2014 forward -- January 1st, 2014 forward.  Do you

23  understand?

24      A.    Okay.

25      Q.    Is -- are -- you and your medical billing
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    22

```
 1   companies -- it would've been Best Quality and then Best

 2   Choice -- during that time period, did you do billing

 3   work for any other physicians?

 4      A.   From 2014?

 5      Q.   Forward, yes.

 6      A.   No, only for Dr. Feijoo.

 7      Q.   Only for Dr. Feijoo.

 8      A.   Now, in addition to doing -- well, strike

 9   that.

10          You told me that -- okay.  So, you have your

11   own billing company, which is now called Best Choice

12   Medical Billing, correct?

13      A.   Correct.

14      Q.   But you also told me that you were employee --

15   you were an employee of Feijoo, P.A.  Is that correct

16   too?

17      A.   Yes.

18      Q.   Okay.  So, do you have other duties and

19   responsibilities as an employee of Feijoo, P.A., other

20   than doing the billing?

21      A.   Yes, sir.

22      Q.   Could you describe those for me, please?

23      A.   I'm in charge of medical records.  Also, I'm

24   office manager; in charge of the employees, employees'

25   duty, any documentation they request for records,
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                           23

```
 1   subpoenas.

 2        Q.   Serving all roles as an office manager for Dr.

 3   Feijoo.  Fair?

 4        A.   That's correct.

 5        Q.   Your current billing company, Best Choice

 6   Medical Billing, Inc., were you the sole owner of that?

 7        A.   No, sir.

 8        Q.   Who else is an owner?

 9        A.   It's under my sister name.

10        Q.   What's your sister's name, please?

11        A.   Stephanie Castillo.

12        Q.   Can you spell the last name?

13        A.   Castillo, C-A-S-T-I-L --

14        Q.   Same as yours.  Sorry.  Got it.

15             And what about Best Quality Billing Services?

16        A.   It was under my name and my sister.

17        Q.   So, let me just stop you.  So, Best Quality

18   Billing Services, the owners were you and your sister?

19        A.   That's correct.

20        Q.   Is that correct?  Best Choice Medical Billing,

21   your sister is the sole shareholder?

22        A.   That's correct.

23        Q.   That was part of the change that was made?

24        A.   But Best Quality is under Dora Castillo, not

25   Stephanie.
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                              24

```
 1      Q.   Oh, a different sister?

 2      A.   Yeah.

 3      Q.   Oh, okay.  So, Best Quality Billing Services

 4  was owned by you and Dora Castillo?

 5      A.   Correct.

 6      Q.   When the change happened and you opened Best

 7  Choice Medical Billing Services, your other sister,

 8  Stephanie, was the sole shareholder -- became the sole

 9  shareholder?

10      A.   Correct.

11      Q.   Your other sister's name is Dora Castillo?

12      A.   Yes.

13      Q.   Okay.  I'm going to ask you some more

14  questions about Feijoo, P.A.  Do you understand?

15      A.   Correct.

16      Q.   Okay.  Where -- what's the address of Feijoo,

17  P.A.?

18      A.   8370 Southwest 8th Street, Miami, Florida,

19  33144.

20      Q.   How long has the office been located at that

21  address?

22      A.   Probably eight years.

23      Q.   Eight years?

24      A.   Yeah.  We've been in the same billing.  We had

25  a different suite before.
```



```
 1       Q.    And is it -- so, you kind of answered my

 2   question.  I was going to ask you, is it a standalone

 3   office, Feijoo, P.A.?  Is it a -- you know, is it its

 4   own building or is there multiple suites?

 5       A.    Multiple suite.

 6       Q.    And so, is it like a strip center that it's

 7   in?

 8       A.    It's like a shopping center.

 9       Q.    Shopping center?

10       A.    Yeah.

11       Q.    Okay.  And who owns Feijoo, P.A.?

12       A.    I believe it's owned by Dr. Manuel V. Feijoo.

13       Q.    Do you have an ownership interest in Feijoo,

14   P.A.?

15       A.    No, sir.

16       Q.    You said you managed the staff members and

17   employees of Feijoo, P.A.?

18       A.    That's correct.

19       Q.    How many are there presently?

20       A.    Right now, we have about five.

21       Q.    Five?

22       A.    (Non-verbal response.)

23       Q.    And can you just describe for me the various

24   positions?

25       A.    We have a filing clerk --
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                          26

```
 1        Q.   Okay.

 2        A.   -- front desk, verifications, and the ones

 3    that they do medical record, like pulling the files and

 4    --

 5        Q.   So, you have a filing clerk, and then are you

 6    saying the other staff members help with medical records

 7    --

 8        A.   Well, there's two front desk.

 9        Q.   Okay.  Okay.  Go ahead.

10        A.   Two front desk like because we have

11    consultation in the morning and the night.  So, one do

12    in the morning and another one in the night.

13        Q.   Oh, I see.  There's two front desk

14    receptionists?

15        A.   Correct.

16        Q.   And they split shifts?

17        A.   That's correct.

18        Q.   One in the morning, one at night.  So, that's

19    two.  And then you have a file clerk.  Is that right?

20        A.   I have two filing.

21        Q.   Two file clerks.  So, that's four.

22        A.   And then one, they do verification.

23        Q.   What's verification?

24        A.   Like they verify the insurance.

25        Q.   Okay.  So, there is -- is there not a medical
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                          27

```
 1   professional such as a nurse that works with Dr. Feijoo?

 2        A.   No, sir.

 3        Q.   So, what I'd like you to do for me, please, is

 4   just walk me through step by step the process that a

 5   patient goes through when he or she comes to Feijoo,

 6   P.A., checks in, gets the exam and then leaves.  Could

 7   you just kind of walk me through the various places they

 8   go to and what happens?

 9        A.   Okay.  Patients come in.  We don't give

10   appointment.  It's by order of arrival.  Patients come

11   in.  We give them a form to fill out.  If it's a

12   Medicare patient, accident or private insurance, they

13   fill out a form.  They wait.  Once they done, we make

14   copies of their IDs and whatever insurance they have.

15   Then they sit and wait for the doctor to see them.

16   After the doctor see them, he come back.  He give us the

17   file.  And that's how it goes.

18        Q.   Okay.  So, let me follow up on some of that.

19   The patient comes in the front door.

20        A.   Correct.

21        Q.   And you said you don't take appointments.

22   It's all walk-in --

23        A.   Yes.

24        Q.   -- patients.  So, a patient walks in and, I

25   assume, comes to the front desk.  Fair?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    28

```
 1        A.   Correct.

 2        Q.   And the patient says -- let's just take --

 3   since we're here on an auto accident, you know, claims,

 4   let's just say it's an auto accident patient.  Do you

 5   understand?

 6        A.   Yes.

 7        Q.   So, a patient walks in and says something to

 8   the effect of, I've been in an auto accident and I'm

 9   looking for a medical consultation.  Is that -- or

10   treatment.

11        A.   Yes.

12        Q.   Is that correct?  And the patient says that to

13   the receptionist?

14        A.   To the front desk.

15        Q.   To the front desk.  And that's one of the two

16   employees that you described for me, the receptionist

17   that mans the front desk?

18        A.   That's correct.

19        Q.   Okay.  And so, then the receptionist gives the

20   appropriate forms.  There are forms that the clinic

21   uses, correct?

22        A.   That's correct.  Intake.

23        Q.   Intake.  And -- for the patient to fill out

24   and the patient fills out the forms?

25        A.   Correct.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                29

```
 1        Q.    And there's a waiting room, I assume, that the

 2   patient sits in and fills out the forms.

 3        A.    That's correct.

 4        Q.    Okay.  So, then after the patient fills out

 5   the forms, I assume the patient gives them back to the

 6   receptionist.

 7        A.    Yes.

 8        Q.    And then Dr. Feijoo is somehow alerted that he

 9   has another patient or a new patient to see?

10        A.    Well, they go by order of arrival.  So --

11        Q.    Okay.

12        A.    -- the files get put by the order that they

13   get in.

14        Q.    All right.

15        A.    Dr. Feijoo will pull out the patient depending

16   on the order they arrive.

17        Q.    So, then what appears to happen is the

18   paperwork is given back to the receptionist, then it's

19   put into a file folder, correct?

20        A.    Correct.

21        Q.    And then that file folder is put into a stack

22   ordered by the time that the patients arrived?

23        A.    Correct?

24        Q.    Right?  And Dr. Feijoo -- that stack's

25   available to Dr. Feijoo and he just works his way
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                30

```
 1   through the stack?

 2        A.   That's correct.

 3        Q.   Okay.  Where does the stack sit, just out of

 4   curiosity?

 5        A.   On the front.

 6        Q.   On the front desk?  So, Dr. Feijoo will walk

 7   out, take the top --

 8        A.   Call the patient.

 9        Q.   -- call the -- takes the top folder, looks at

10   the name, calls the patient, says, come with me?

11        A.   Yes.

12        Q.   Okay.  And where does Dr. Feijoo take the

13   patient at that point?

14        A.   To his office.

15        Q.   Okay.  So, Dr. Feijoo has an office within the

16   bigger office?  He has his own office?

17        A.   Yes.

18        Q.   And the patient goes into Dr. Feijoo's office

19   with him?

20        A.   Correct.

21        Q.   And you previously told me there's no other

22   medical professional, like a nurse, that joins them,

23   correct?

24        A.   No, sir.

25        Q.   Does he close the door when he brings the
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                          31

 1  patient in there?

 2      A.   Sometimes.

 3      Q.   Sometimes, sometimes not?

 4      A.   Correct.

 5      Q.   Okay.  Generally speaking, do you go and watch

 6  his examinations while they are occurring?

 7      A.   No, sir.  I'm next to him.  Like I'm in the

 8  office next to him.

 9      Q.   Okay.  So, he has his own office, which has

10  walls and a door, and you have your own office next to

11  him that has walls and a door?

12      A.   Yes.

13      Q.   And while all this process is going on that

14  I've described, you're usually in your office working.

15  Is that fair?

16      A.   That's correct.

17      Q.   And maybe walking around, but you're working,

18  doing your duties?

19      A.   That's correct.

20      Q.   Okay.  So, Dr. Feijoo brings the patient into

21  his office and -- you know, I think it's fair to say

22  that what were the medical services that we're here on

23  today are medical examinations and evaluations performed

24  by Dr. Feijoo.  Do you agree with that?

25      A.   Yes.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo

```
 1      Q.   Is that primarily what he does --

 2      A.   Yes.

 3      Q.   -- in his practice?

 4      A.   That's correct.

 5      Q.   Okay.  So, the -- describe for me, if you

 6   would, Dr. Feijoo's office, his own office within the

 7   office.

 8      A.   Describe how it look or --

 9      Q.   Yes.

10      A.   -- how do you get there?

11      Q.   No, how -- what's inside of the office?

12      A.   Oh, his desk; his chair; two chairs extra for

13   patient; the equipment that he use to review x-rays; any

14   equipment to put injection or take out liquid; his

15   prescription pad.  That's it.  And then there he have a

16   checking room.

17      Q.   A what?  I'm sorry.

18      A.   To check the patients, like if he need to do

19   casts or he need to take out liquid.

20      Q.   Okay.  So, let me follow up on that.  He has a

21   desk, correct?

22      A.   Yes.

23      Q.   And he has his own chair behind the desk?

24      A.   Correct.

25      Q.   And then on the other side of the desk, I take
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo

```
 1   it there's two chairs that patients can sit in?

 2        A.   Yes, sir.

 3        Q.   Okay.  Is there an exam table in the office?

 4        A.   Yes, sir.

 5        Q.   Where is the exam table?

 6        A.   Next to that office.

 7        Q.   You mean it's in another room?

 8        A.   In another room.

 9        Q.   Okay.  I'm just talking about his office right

10   now.

11        A.   Okay, no.

12        Q.   Okay.  So, his office does not have an exam

13   table?

14        A.   No.

15        Q.   All right.  And you did say there is -- I

16   guess we would call it a light box for him to look at x-

17   rays?

18        A.   Yes, sir.

19        Q.   So, it's where you take the x-ray film and you

20   put it up on the box?

21        A.   That's correct.

22        Q.   And the light shows through it so he can see

23   the x-ray?

24        A.   That's correct.

25        Q.   That's on the wall?
```



```
 1      A.   Yes, sir.

 2      Q.   Okay.  And then you said he has various

 3  supplies.  I know I've seen he does do injections

 4  sometimes.  He has injection supplies there so if the

 5  patient -- if he prescribes an injection for the

 6  patient, he can do it right there in his office?

 7      A.   What he usually do is Kenalog injection.  It's

 8  like if the patient have severe pain and they want to

 9  inject it right and then, he will do it.

10      Q.   Right there in the office?

11      A.   Yes.

12      Q.   Okay.  Is there any other furniture in the

13  office other than what we've talked about?

14      A.   Like a tiny one where he have samples of

15  pills, like Tylenol, Aleve.

16      Q.   A little cabinet?

17      A.   Yeah.

18      Q.   Medicine cabinet?  Okay.  Anything -- any

19  other furniture or --

20      A.   Beside picture frame?

21      Q.   I guess we can call --

22      A.   Flower.  There's a small table with a flower.

23      Q.   That's nice.  I think, technically, we call

24  those -- the table would be furniture.  I think

25  everything else would be fixtures, but I think you --
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Anielka Castillo                                                          35

```
 1      A.    Okay.

 2      Q.    -- you've described it to me pretty fully,

 3  right?

 4      A.    Okay.

 5      Q.    Right?  I mean --

 6      A.    I did.

 7      Q.    Okay.  Thank you.  All right.  And so, that's

 8  where he performs his examinations, is in that room?

 9      A.    Yes.

10      Q.    All right.  Now, you did tell me there is a

11  separate exam room.

12      A.    Yes, sir.

13      Q.    And is that next to his office?

14      A.    Yes.

15      Q.    What's in the exam room?

16      A.    The exam table.  There's a -- like a file --

17  it's not a cabinet -- like it's a furniture in the

18  bottom and then one in the top where he have more

19  medications or where he have the casts.  They have the -

20  - where he put the needles.  And what else he have?  He

21  have where to wash his hand.

22      Q.    Oh, there's a sink --

23      A.    A sink.

24      Q.    -- so he can wash his hands?

25      A.    Yeah.
```



```
 1      Q.   So, it's medical supplies?

 2      A.   Yeah.

 3      Q.   What you'd expect to see --

 4      A.   Exactly.

 5      Q.   -- in an exam room?  So, when does he use the

 6   exam room or what for?

 7      A.   It could be that he do the examination -- that

 8   he bring the patient and do the examination or he may

 9   inject the patient there or he may do casts in there.

10      Q.   You're saying cast, like what you put on a

11   broken bone?

12      A.   Yeah, exactly.

13      Q.   Yeah.  So, that makes sense.  You go to the

14   exam room to do the cast --

15      A.   Exactly.

16      Q.   -- or sometimes injections, right?

17      A.   Yes, sir.

18      Q.   Okay.  Are there any other exam rooms?

19      A.   No, sir.

20      Q.   We've talked about the reception area with the

21   desk, Dr. Feijoo's office, your office and the exam

22   room.  Are there -- I'm sure there's a restroom.  Other

23   than that, are there any other rooms in the office?

24      A.    In that office, there's like a room for

25   supply, like office supply.
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    37

```
 1        Q.    Okay, got you.  Any other rooms?

 2        A.    Well, what we did is we united two office.

 3        Q.    Okay.

 4        A.    Meaning we have 8370 and 8328 or 38.  I'm not

 5   really sure now.  So, we use one office just for the

 6   medical and then we have the other office.  They have

 7   about -- one, two, three, four -- five office just for

 8   work, just like file cabinet.

 9        Q.    Administrative --

10        A.    Exactly.

11        Q.    -- stuff.  So, all the medical services happen

12   in the first office that we were talking about?

13        A.    Yes, sir.

14        Q.    And the other suite is for records and storage

15   and administrative work?

16        A.    That's correct.

17        Q.    All right.  Are there lots of files stored in

18   the other next-door office?

19        A.    Yes, sir.

20        Q.    Okay.  You've produced medical charts in this

21   case.  Do you recall doing that, getting medical charts

22   together and giving them to us?

23        A.    Yes, sir.

24        Q.    Okay.  Did those -- were those medical charts

25   in the office next door?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                     38

```
 1      A.   Not all of them.
 2      Q.   Some of them were in offsite storage?
 3      A.   That's correct.
 4      Q.   Okay.  Do you know how many were in each
 5 place, approximately?  Like --
 6      A.   No, sir.
 7      Q.   All right.  By the way, how -- are there --
 8 are you still looking for medical charts at this point?
 9      A.   Yes, sir.
10      Q.   Okay.  Do you know how many you're still
11 looking for?
12      A.   About 40 or 50.
13      Q.   Okay.  Why do you think it is you haven't been
14 able to find them so far?
15      A.   Well, unfortunately, we work with a lot of
16 paper.  We're not paperless.  So, we have files that
17 they're like by years.  So, sometimes it could be by
18 mistake that the girl file like -- if the patient come
19 on 2014, but the visit ended on 2015, they may file it
20 on 2015 instead of 2014.  I usually require for them to
21 file it in boxes by the year or the first date of the
22 visit, but sometimes they made a mistake and they file
23 it by the end of the visit, which is maybe another year.
24      Q.   I see.
25      A.   So, I have to go through all those year like
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                          39

```
 1  to make sure.  Like right now, we did and we find a lot,
 2  but there's still some that we -- I need to go by other
 3  years than the one that they're supposed to be in.
 4      Q.   Okay.  So -- and your best estimate is you're
 5  still looking for 40 to 50 --
 6      A.   Correct.
 7      Q.   -- of the medical charts?  And I assume you've
 8  looked in the suite that is next door to the main
 9  medical office that you described.  Is that correct?
10      A.   Yes, sir.
11      Q.   Have you exhausted the search of that suite?
12      A.   Well, I did in the way of -- it'll be
13  organized.  Now I have to go through all the years.
14  Like I have to --
15      Q.   Like you described?
16      A.   It could be -- it may be filed incorrectly or
17  inappropriate in a year that it was not supposed to.
18  So, now I have to go like that, year by year.
19      Q.   Okay.  And then you said there's offsite
20  storage also.
21      A.   Yeah.  That's more difficult because they're
22  by boxes.
23      Q.   So, did you do -- have you exhausted the
24  search of the offsite storage or do you have to go back
25  there too?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                40

```
 1       A.   I have to go back there.
 2       Q.   So, if I understand you correctly, you've
 3  exhausted, what I'll call using your word, the organized
 4  search of looking where you think the file should be in
 5  both the suite and the outside storage unit, correct?
 6       A.   That's correct.
 7       Q.   And so, now you have to go to basically a more
 8  manual search of looking through everything for records
 9  that might've been misfiled in both places?
10       A.   That's correct.
11       Q.   Okay.  Are you actively working on that?
12       A.   Not really.
13       Q.   Why not?
14       A.   Well, we -- due to the work that we did
15  looking for the ones that were find, I got a little bit
16  behind on my actually work.  So, I needed to put that
17  up-to-date.  So, I'm working on that after this week.
18       Q.   Okay.  Well, I'm just going to tell you so you
19  can hear it from me.  There is a sense of urgency from
20  our side to get these records because -- and you can
21  talk to your attorneys about it, but the case is getting
22  -- we're hitting deadlines and what have you.  So, we
23  have a real sense of urgency.  So, anything you can do
24  to really try and get those done --
25       A.   I understand.
```



```
 1      Q.   -- I'm asking you to do it.

 2      A.   I understand.  We have been doing a very hard

 3  job to do it.

 4      Q.   I understand and I just ask you to keep up

 5  your efforts.  So, thank you.

 6           You -- I'm going to ask you a couple more

 7  questions about Dr. Feijoo's -- where he does his exams

 8  and then we'll move on.  You've told me he -- generally,

 9  he brings the patient into his office and they sit

10  across the desk from him, correct?

11      A.   Yes.

12      Q.   Sometimes they may go into the exam room if

13  they need an injection or a cast or some sort of service

14  that's appropriate for the exam room, right?

15      A.   That's correct.

16      Q.   All of the exams start in his office, correct?

17      A.   That's correct.

18      Q.   And is it fair to say that most of the exams

19  happen exclusively in his office?  They don't go to the

20  exam room?

21      A.   I would not be able to say the amount that

22  they do it in the office and -- because it's depending

23  on the patient need.

24      Q.   Okay.  And you are not normally in the room

25  with Dr. Feijoo when he performs the examination?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                          42

```
 1      A.   No, sir.
 2      Q.   You don't see it with your own eyes?
 3      A.   No, sir.
 4      Q.   And other than the patient, there's nobody
 5 else in the room with Dr. Feijoo unless it's a parent or
 6 somebody related to the patient, correct?
 7      A.   That's correct.
 8      Q.   So, Dr. Feijoo is the only person who sees his
 9 own exams with his own eyes and knows exactly what he's
10 doing, correct?
11      A.   Exactly.
12      Q.   All right.  Have you heard of personal injury
13 protection insurance -- PIP?
14      A.   PIP?  Yes.
15      Q.   You've heard of PIP?
16      A.   Yeah.
17      Q.   It stands for personal injury protection.  If
18 I call it PIP insurance or PIP coverage, you understand
19 what that is?
20      A.   Yes.  Yes.
21      Q.   Okay.  Could you describe for me your
22 understanding of what PIP insurance is, please?
23      A.   It's the insurance who cover the personal
24 injury of the patients.
25      Q.   In auto accidents, correct?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    43

```
 1      A.    Correct.

 2      Q.    You understand it is an auto accident?

 3      A.    It's an auto accident.

 4      Q.    Yeah.  I should say, you understand it's an

 5  auto accident coverage, correct?

 6      A.    Correct.

 7      Q.    And Feijoo, P.A. commonly bills PIP insurance?

 8      A.    That's correct.

 9      Q.    Do you understand that PIP coverage pays 80%

10  of the charge, you know, reasonable, related and

11  necessary charge, and there's generally a 20% copay

12  requirement?

13      A.    That's correct.

14      Q.    Under PIP.

15      A.    That's correct.

16      Q.    Okay.  And so, does Feijoo, P.A. collect the

17  20% copay from patients who have PIP-only policies?

18      A.    We bill the patients.

19      Q.    Okay.  Oh, you know what, let me ask -- let's

20  finish that line of questioning.  You bill the patient.

21  So, explain to me how that happens.

22      A.    We don't charge the copay right then.  We

23  advise the patient they will be having either a copay or

24  a deductible.  Once we bill the insurance, we don't know

25  if we're going to be applied the deductible and they are
```



1   responsible for the whole balance, but they're going to

2   be responsible for the 20%.  So, what I do is when --

3   once I get payment or denial from the insurance, I

4   submit bill to the patient or to the patient's attorney.

5        Q.   Okay.  So, let me back up on that.  Let's set

6   aside the issue of a deductible.  I understand that the

7   patient may be responsible for 100% of the bill if it's

8   within the deductible, correct?

9        A.   Correct.

10       Q.   Let's just set aside the deductible issue and

11  just talk about the PIP policy with no deductible -- a

12  PIP policy with no deductible.  Do you understand?

13       A.   Very few.

14       Q.   Well, just -- just take that as that's what

15  we're talking about.  Okay?  So, when the patient checks

16  out, you do not collect -- I'm sorry, Feijoo, P.A. does

17  not collect the 20% copay at that time?

18       A.   At that time, no.

19       Q.   Okay.  Why not?

20       A.   Like I explained you before, we're not sure if

21  we're going to be paid the whole amount, like part of

22  the amount, if they're going to apply it to the

23  deductible, that the benefit, they're going to be

24  exhausted.  So, I will not bill something that I'm not

25  sure how much it's going to be.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                45

 1       Q.   Okay.  If -- let's go back to the deductible.

 2  If there's a deductible, the patient's going to owe 100%

 3  of the charge, right?

 4       A.   That's correct.

 5       Q.   So, if it's PIP -- if it's a PIP policy, the

 6  patient owes 20% of the charge, right?

 7       A.   Yes.

 8       Q.   So, if you're concerned about the patient

 9  having a deductible, why wouldn't you collect the 20% on

10  site and then, if the patient ends up owing a

11  deductible, send them a bill for the other 80%?

12       A.   Like I said before, I don't want to bill the

13  patient something that I'm not sure how much it's going

14  to be.  Sometimes the insurance company don't pay.

15  Sometimes the insurance company deny the bill.  So, I

16  wait for the Explanation of Benefit in order for me to

17  submit the bills.

18       Q.   Okay.  So, your testimony is if the insurance

19  company reduces Feijoo, P.A.'s bill, you apply an equal

20  reduction to the 20% copay?

21            MR. PIVNIK:  Objection to form.

22       A.   If the policy -- if the policy have -- comply

23  and they're allowed to reduce it to 200% of Medicare.

24  BY MR. HAZOURI:

25       Q.   Okay.  What if that's not the case?



Orange Legal
800-275-7991

```
 1      A.   It may be benefit exhausted and I would have

 2  to bill the whole amount.

 3      Q.   Right.  So, why wouldn't you collect the 20%

 4  first and then bill the balance?

 5           MR. PIVNIK:  Objection, asked and answered.

 6      A.   I have --

 7           MR. PIVNIK:  You can go ahead and answer.

 8  BY MR. HAZOURI:

 9      Q.   You can answer.

10      A.   I have to -- I have -- I want to make sure

11  that when I submit the billing, I'm billing the patient

12  correctly.  I don't want the patient come back and argue

13  about that I'm billing something that his insurance is

14  supposed to be paying.

15      Q.   Okay.  So, a couple more questions, then we'll

16  move on.  Let's just say that the benefits -- PIP

17  benefits are exhausted.  You referenced that, correct?

18      A.   Correct.

19      Q.   And do you understand there's $10,000 in PIP

20  benefits available to a patient following an accident?

21      A.   That's correct.

22      Q.   And what you mean by exhausted is, if all

23  $10,000 get used with other medical providers, there's

24  no more left at Feijoo, P.A.?

25      A.   That's correct.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                      47

1      Q.   So, is it Feijoo, P.A.'s position and policy

2   that if the patient's benefits are exhausted, it's not

3   going to -- if the patient's PIP benefits are exhausted,

4   it doesn't bill and collect the 20% copay?

5      A.   Collect the whole amount.

6      Q.   The whole 20% amount?

7      A.   The whole amount --

8      Q.   The whole amount.  Okay.  I go back to this.

9   So, if the benefits are exhausted and you're going to

10   try and collect 100% from the patient, why wouldn't you

11   at least get 20% upfront pursuant to the copay?

12           MR. PIVNIK:  Same objection.

13      A.   It's just like I explained.  It's a procedure

14   that I -- we use in the office to make sure that we

15   collect the patient with the correct amount.  We have

16   issues -- and I think I even have one case in -- with

17   your insurance where I had to refund the attorneys, that

18   we overbilled the patient.  So, we ended up returning

19   the money to the attorney that is responsible for the BI

20   case.

21   BY MR. HAZOURI:

22      Q.   Sure.  You're trying to avoid that.

23      A.   Exactly.

24      Q.   I get that.  Okay.

25      A.   So, we want to make sure when we send a bill,



Orange Legal
800-275-7991

 1  we're sending the billing like it is.

 2       Q.   Okay.  But you do send bills to the patients

 3  for the 20% copay once you have that number correct in

 4  your -- in Feijoo, P.A.'s mind, if you will?

 5       A.   That's correct.

 6       Q.   Once the clinic confirms the amount of the 20%

 7  copay, the bill is sent to the patient?

 8       A.   Yes.  That's part of our procedure.

 9       Q.   Okay.  And is the -- is that bill -- does it

10  go out like as a paper bill to the patient?

11       A.   Yes, sir.

12       Q.   Is that bill included in the patient's medical

13  chart?

14       A.   Sometimes.

15       Q.   Okay.  Why only sometimes?

16       A.   It could be that they didn't make copy and

17  they just submit the bills.

18       Q.   Okay.  So, let me ask you, is it supposed to

19  be included in the patient's medical chart?  Is that the

20  procedure?

21       A.   That's the procedure.

22       Q.   Okay.  So, if everything's done correctly, the

23  bill -- the 20 -- the bill for the 20% copay issued to

24  the patient is in the medical chart?

25       A.   Yes, sir.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo

1     Q.   And when I said I wanted to back up, we kind

2   of have covered some of it, but you recall I was asking

3   you questions about how the patient goes through the

4   office from start to finish?

5     A.   Yes, sir.

6     Q.   Okay.  So, I want to pick back up with that

7   and finish that line of questioning because we had

8   talked about the patient going into Dr. Feijoo's office

9   for the exam.  Do you remember that?

10     A.   Yes, sir.

11     Q.   And then I kind of -- we started talking about

12   copays.  So, let's go back to the patient is in with Dr.

13   Feijoo in his office and the patient gets his or her

14   exam, correct?

15     A.   That's correct.

16     Q.   And Dr. Feijoo has conversations with the

17   patient about the exam?

18     A.   That's correct.

19     Q.   All right.  The patient then leaves Dr.

20   Feijoo's office, right?

21     A.   Yes.

22     Q.   And so, what happens next inside the office

23   with the patient?

24     A.   Oh, well, Dr. Feijoo will give the

25   prescription for the girls or to anyone that is in the



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                          50

```
 1  front to make copies so it can stay in the file.  He

 2  will give the file back.  If he have any notation or

 3  have to give me any information that I'm -- I need to be

 4  aware, he will let me know and he will put the file and

 5  continue with the next patient.

 6       Q.   Okay.  And the patient -- does the patient

 7  check out at the front desk or just walk out the door?

 8       A.   He just walk out.

 9       Q.   Okay.  How does the patient know they might

10  get a bill for the 20% copay?

11       A.   In our intake, there's a form that they fill

12  in saying that they need to be responsible if their

13  insurance doesn't pay; if the insurance apply to the

14  deductible, they will be responsible for the bill.

15       Q.   So, Feijoo, P.A. relies on the form to advise

16  the patient of that requirement?

17       A.   That's correct.

18       Q.   There's no conversation with the patient about

19  it?

20       A.   Well, when the patient sign, they -- usually,

21  when they see that they're responsible, the payment,

22  they come and ask why we are responsible if we have an

23  insurance company to pay.  So, we explain them, you

24  know, you -- you're responsible for the 20 or deductible

25  or, in case the insurance doesn't pay, you will be
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                              51

 1   responsible; if you have an attorney, we bill your

 2   attorney for the bills.

 3        Q.   So, if the patient asks a question upon

 4   reading the form, then there's a conversation?

 5        A.   Yeah, but he usually is always there.

 6        Q.   It happens a lot?

 7        A.   Yeah.

 8        Q.   But if the patient doesn't ask a question,

 9   then Feijoo, P.A. relies on the form to advise the

10   patient?

11        A.   Yes.  The form is -- I believe it's in English

12   and Spanish.

13        Q.   Okay.  And then going back then, so the

14   patient walks out the door after the exam, right?

15        A.   Yes.

16        Q.   And then going back to what Dr. Feijoo does,

17   he takes the -- any prescription that he's written out

18   for the patient and he puts it in the folder?

19        A.   Correct.

20        Q.   He takes the folder back out to the front desk

21   --

22        A.   Yes.

23        Q.   -- and sets it down there.  Is that right?

24        A.   Yes, sir.

25        Q.   And you said he might have conversations with



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                              52

 1   you?

 2       A.   Yes.

 3       Q.   **How does that work?  He walks to your office?**

 4       A.   He walk to my -- he pass by my office to go

 5   get the next file.  So, I'm always there.

 6       Q.   **Okay.  And then he may --**

 7       A.   Comment or say something about whatever if

 8   it's needed.

 9       Q.   **Okay.  Does that happen -- just put a**

10   **percentage -- how often does he actually talk to you**

11   **about an exam that just happened as opposed to just**

12   **moving on to the next exam without talking to you?**

13       A.   You say day by day or --

14       Q.   **Well, a percentage.  Does it happen half the**

15   **time in your experience, less than that?  You know,**

16   **however you can ballpark it.**

17       A.   It depend.  It depend on the cases that he's

18   seeing; if it's a lot of Medicare patient or if it's

19   accident.  It all depend, but yeah, a couple times.

20       Q.   **Okay.  If -- we're talking about auto accident**

21   **patients.  So, does he usually talk to you after**

22   **examining -- about the exam after examining an auto**

23   **accident patient?**

24       A.   Unless he want to make a comment in specific

25   about a patient.  Like he will come to me and tell me.



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                        53

```
 1       Q.    If he wants to, he will?

 2       A.    If he have.

 3       Q.    If he has to --

 4       A.    If he has to, yeah.

 5       Q.    -- he will; otherwise, he won't?

 6       A.    No, sir.

 7       Q.    So, what I'm trying to find out is, in a

 8   percentage terms or a majority terms, does he usually

 9   come and talk to you after an exam or does he usually

10   not come and talk to you after an exam?  How about that?

11       A.    It's depending on the consultation day.  So,

12   sometimes he will, sometimes he will not.

13       Q.    I'm just asking you, based on your general

14   experience of being there since 2001, what happens more

15   often; he talks to you or he doesn't?

16       A.    He does.

17       Q.    He does?  Okay.  And he just describes for you

18   what happened in the exam?

19       A.    No.  He may say, Anie, make sure that you

20   review it, I did an injection or I did this, or he just

21   make a comment about --

22       Q.    Okay.  And do you make a notation when he says

23   that or you just remember it?

24       A.    No, sometimes I write it down on my -- on like

25   a post-it pad or something.
```



1       Q.   Okay.  So, we have completed the review of

2    what a patient does and what Dr. Feijoo does generally

3    through the whole process when the patient walks in the

4    door, gets the exam and leaves, correct?

5       A.   Correct.

6            MR. PIVNIK:  Objection to form.

7    BY MR. HAZOURI:

8       Q.   I'm handing you what's been marked as Exhibit

9    1 to your deposition, if you can take a look at that,

10   please.

11           (Plaintiff's Exhibit 1 was marked for

12   identification.)

13   BY MR. HAZOURI:

14      Q.   Okay.  First, I want to show you something.

15   You see this little number in the corner, 11844?

16      A.   Correct.

17      Q.   We call that bates numbers.  Have you ever

18   heard of that before?

19      A.   No, sir.

20      Q.   Okay.  This wasn't originally on this form.

21   What happens is -- this form has been produced to us in

22   discovery in this case.  It was one of the -- it came

23   out of one of the medical charts that you located

24   pursuant to our request.  And what happens is every page

25   that gets produced gets a bates number put on it so



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                        55

```
 1   everybody can keep track of what's been produced and you

 2   can identify documents.  Do you understand?

 3       A.   Okay.

 4       Q.   So, I may refer to a bates number.  You know,

 5   if it was this one, I'd say 11844, and you can look down

 6   in the corner and you can make sure you're looking at

 7   the right document.

 8       A.   Okay.

 9       Q.   Do you understand?

10       A.   Yes, sir.

11       Q.   Okay.  So, again, this has a bates number on

12   it.  So, I will represent to you that this was a medical

13   record produced to us in discovery in this case by the

14   clinic.

15       A.   Okay.

16       Q.   Okay.  And as you'll see --

17            MR. PIVNIK:  Oh, Ken, since you have now

18   marked it as an exhibit, let me just make one statement.

19   Since -- if you do file this with the Court or do

20   anything with it, you know, we'd ask that all the

21   identifying information for the patient be redacted.

22   And this one not only has his home address, but also his

23   home phone number.

24            MR. HAZOURI:  Okay.  That was my goal.  I

25   missed the address and the phone number.  I will -- we
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                  56

 1  will redact.  That's a good point.  You can see I took

 2  the name out.  So, I was trying to do that.

 3          MR. PIVNIK:  I can probably still read it if I

 4  hold it up to the light, but --

 5          MR. HAZOURI:  You probably could, but once it

 6  gets copied or scanned --

 7          MR. PIVNIK:  Yeah.

 8          MR. HAZOURI:  -- you won't be able to.  So,

 9  that was the goal here.  Certainly, if we need to pick

10  up some other redactions, we will do that.  Thank you

11  for that.

12  BY MR. HAZOURI:

13      **Q.   Okay.  So, generally speaking, do you**

14  **recognize what this form is?**

15      A.   Yes, sir.

16      **Q.   Could you describe for me what it is?**

17      A.   It's a 1500 Form.  We call it like that.  It's

18  a claim form where you -- we use to submit the bill.

19      **Q.   You used the number.  It's a 1500 Form?**

20      A.   Yes.

21      **Q.   It's a CMS 1500?**

22      A.   Correct.

23      **Q.   All right.  And CMS is Center for Medicare**

24  **Services?**

25      A.   Correct.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                           57

```
 1        Q.   And it also says at the top, "Health Insurance

 2   Claim Form"?

 3        A.   Yes, sir.

 4        Q.   And you use that term too, right?

 5        A.   Correct.

 6        Q.   And sometimes that's called HCFA?  Have you --

 7        A.   HCFA.

 8        Q.   Have you heard of that?  You started to cut in

 9   on me just a little bit.  Let me make sure I can finish

10   my question.  Okay?  So -- and simply put, this is a

11   medical bill?

12        A.   Correct.

13        Q.   And this was a medical bill that was submitted

14   to State Farm Insurance, correct?

15        A.   That's correct.

16        Q.   And does -- and it was a medical bill

17   submitted to State Farm Insurance for PIP benefits,

18   right?

19        A.   Yes, sir.

20        Q.   So, does Feijoo, P.A., as a matter of practice

21   and procedure, use CMS 1500 or HCFA forms to submit

22   bills to PIP insurers like State Farm Mutual?

23        A.   Yes, sir.

24        Q.   And why is that?

25        A.   That's how we submit the bills.
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    58

```
 1      Q.    Okay.  Any other reason?

 2      A.    That's the -- how they require.

 3      Q.    Okay.  Any other reasons?

 4      A.    Not that I'm aware.

 5      Q.    Okay.  Now, you can see the date of this bill

 6   is -- it's down here in the corner -- March 7, 2017 for

 7   a January 26, 2017 date of service, correct?

 8      A.    Yes, sir.

 9      Q.    So, would you have prepared this bill on

10   behalf of Feijoo, P.A.?

11      A.    Yes, sir.

12      Q.    And just to be clear, I'm saying you.  So,

13   individually, you, Anie Castillo, would've prepared this

14   bill yourself?

15      A.    That's correct.

16      Q.    All right.  Let me direct you to box 31.  Do

17   you see that?

18      A.    Yes, sir.

19      Q.    It says, "Signature of physician or supplier,

20   including degrees or credentials".  Do you see that?

21      A.    Yes, sir.

22      Q.    There's no signature in the box.  Why didn't

23   Dr. Feijoo sign this?

24      A.    He usually don't sign it.

25      Q.    Why not?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                      59

```
 1      A.   His name is in there and his license is in

 2   there.

 3      Q.   And so, Feijoo, P.A. feels that's sufficient

 4   for box 31?

 5      A.   Well, it hasn't been a requirement that he

 6   needs to sign it.

 7      Q.   When you say it hasn't been a requirement,

 8   whose requirement?

 9      A.   Like we haven't -- any -- we don't hear any

10   law saying that he needs to sign the --

11      Q.   Okay.  So, it's Feijoo, P.A.'s position that

12   he doesn't have to sign it, correct?

13      A.   Well, it's not Feijoo, P.A.  It just -- that's

14   the practice that we use.  We submit the bill without

15   his signature.

16      Q.   Okay.  Does -- I'm sorry.  Go ahead.

17      A.   His signature is already in the transcriber

18   report.

19      Q.   Does he review the bills, such as this one,

20   before they go out the door?

21      A.   Not all the time.

22      Q.   Sometimes?

23      A.   Sometimes, if I want to double check something

24   with him, he will.

25      Q.   So, if there's something you need to run past
```



**Orange Legal**
**800-275-7991**

1   him, talk to him about regarding a bill, you'll show it

2   to him and he'll look at it?

3       A.   Yes, sir.

4       Q.   If that doesn't happen and you're comfortable

5   with the bill, it generally goes out the door without

6   Dr. Feijoo looking at it?

7       A.   Yes, sir.

8       Q.   All right.  And, again, taking you back to the

9   middle there, we -- you see the rows here, one and two?

10      A.   Yes, sir.

11      Q.   We already -- let's just reconfirm that.

12  There's a date of 1/26/17 -- January 1st -- I'm sorry,

13  January 26, 2017.  That was the date that Dr. Feijoo

14  provided services to this patient?

15      A.   That's correct.

16      Q.   All right.  And then in rows one and two next

17  to the dates of service, there's two numbers, 99204 and

18  95851, correct?

19      A.   Correct.

20      Q.   All right.  What are those numbers?

21      A.   The first one, 99204, is an initial office

22  consultation and the 95851 is the range of motion.

23      Q.   All right.  So, let me take a step back.

24  These are called CPT codes, correct?

25      A.   Correct.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    61

```
 1        Q.    And the CPT codes come out of a book published

 2   by the American Medical Association called the CPT book.

 3   Is that your understanding?

 4        A.    Yes, sir.

 5        Q.    And the purpose of these CPT codes is to

 6   describe the medical service that was performed by the

 7   provider, in this case, Dr. Feijoo?

 8        A.    That's correct.

 9        Q.    And you agree it's important for the CPT code

10   chosen to accurately describe the medical service

11   performed by Dr. Feijoo on the patient?

12        A.    That's correct.

13        Q.    Okay.  Do you have a copy of the CPT -- AMA

14   CPT book at your office?

15        A.    We usually have it inside the system.  We pay

16   for getting the CD uploaded in the computer.

17        Q.    So, you have it in electronic format?

18        A.    Correct.

19        Q.    You get the actual book that describes the

20   codes?

21        A.    That's correct.

22        Q.    And do you get it each year for the new year?

23        A.    Yes, sir.

24        Q.    And do you reference it yourself, being the

25   billing person at the clinic?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Anielka Castillo                                                                            62

```
 1        A.    If I have to.

 2        Q.    You know, let's just say on a monthly basis.

 3   You know, within a month, how often do you usually look

 4   at the CPT book that you have at your office?

 5        A.    Well, every time that I go enter the CPT code,

 6   I'm reviewing that it's -- that's the code that I'm

 7   entering.  But in terms that I -- if there's any

 8   changes, only if there's a new code or a new diagnosis

 9   that I'm not aware, I will go ahead and review it.

10        Q.    Okay.  So, you said something that confused me

11   a little bit.  You said the software -- the electronic

12   software you use, you go in there and choose the code

13   for the bill.  Is that correct?

14        A.    Correct.

15        Q.    Was that the same electronic software that you

16   were testifying to regarding the AMA CPT book?

17        A.    The software where I -- you do the billing?

18        Q.    Yes.

19        A.    Yes, sir.

20        Q.    Okay.  So, I didn't bring a copy of it.  I

21   didn't bring a copy of the actual book, the AMA CPT

22   book, but you've seen it before, right?

23        A.    Yes, sir.

24        Q.    Okay.  So, the software that you use to do the

25   billing, does -- are you saying it also has a copy of
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 63

 1    the book embedded in the software?

 2         A.    Yeah.   Like I -- when we did -- when we do it,

 3    we pay every year for any updates and for them -- any

 4    changes, let's say if it's 2018, to be installed in the

 5    software.

 6         Q.    Okay.   So, let me ask you then.   I think I

 7    understand you.   Let's just work with 99204 since we

 8    have it on this bill.

 9         A.    Okay.

10         Q.    If you go into the software that you're

11    speaking of, you can go to 99204?

12         A.    Yes, sir.

13         Q.    And does it provide a description?

14         A.    Correct.

15         Q.    That you understand to be the description out

16    of the AMA CPT book?

17         A.    It is from the CPT book.

18         Q.    Okay.   So, it's available for you to look at

19    when you are choosing the code?

20         A.    That's correct.

21         Q.    That's true for all the CPT codes that go into

22    the bills?

23         A.    That's correct.

24         Q.    All right.   So, that's why you said, you know,

25    you're at least --- it's coming up every time you bill?



```
 1      A.   Exactly.

 2      Q.   But it's fair to say you don't sit there and

 3  read the explanation every time because you've used

 4  these codes a lot?  You're saying if there's a new code

 5  or a change, you might look at it?

 6      A.   Yeah.  Our practice is based on like very few

 7  code.

 8      Q.   Right.

 9      A.   So, we don't common use a lot of different

10  code.

11      Q.   So, you're familiar with those few codes that

12  you use?

13      A.   That's correct.

14      Q.   All right.  Have you ever heard of a

15  publication called The CPT Assistant?

16      A.   I heard about it.

17      Q.   Yeah.  By the way you answered that, I get the

18  impression you're not very familiar with it.  Is that

19  fair to say?

20      A.   It's fair to say.

21      Q.   You don't have a copy, either paper or

22  electronic, or a subscription to The CPT Assistant at

23  Feijoo, P.A.?

24      A.   Not that I'm aware, no.

25      Q.   Do you know what it is?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Anielka Castillo                                                                65

```
 1      A.   Is that like a -- an addition of the CPT code

 2  for more described --

 3      Q.   If I understood you correctly, it provides

 4  further descriptions of the CPT codes?

 5      A.   That's what I understand, yes.

 6      Q.   And it sounds like you don't really ever

 7  reference The CPT Assistant because you don't have

 8  access to it.  Is that fair?

 9      A.   I don't usually do it, no.

10      Q.   When was the last time you looked at a CPT

11  Assistant article?

12      A.   I think when I had an issue with a Progressive

13  case about a CPT code.  That's how -- I remember that

14  they mentioned about that.

15      Q.   The CPT Assistant?

16      A.   Yes, sir.

17      Q.   How long ago was that?

18      A.   Probably two years.

19      Q.   And that was Progressive who brought up The

20  CPT Assistant?

21      A.   Well, yeah, and -- not they brought in.  They

22  say that -- they mentioned about it, if I have review it

23  and --

24      Q.   And?

25      A.   -- I went and review it.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                        66

```
 1       Q.    Okay.  So, Progressive brought it up?

 2       A.    Yes.

 3       Q.    And then you went and found The CPT Assistant

 4  article Progressive was talking about?

 5       A.    Yes, sir.

 6       Q.    And you reviewed it?

 7       A.    Yes, sir.

 8       Q.    And that was about two years ago, correct?

 9       A.    Correct.

10       Q.    And that was the last time you looked at The

11  CPT Assistant?

12       A.    That I recall, yes.

13       Q.    That you can recall.  Okay.  I asked you

14  before if it was important that the CPT codes chosen by

15  Feijoo, P.A. accurately reflect the medical services

16  provided by Dr. Feijoo and you said it was.  Do you

17  recall that?

18       A.    Yes, sir.

19       Q.    Slightly different questions -- question, is

20  it mandatory?  Is it required that the CPT codes

21  accurately reflect the medical services provided by Dr.

22  Feijoo?

23             MR. PIVNIK:  Objection to form.

24       A.    Yes, sir.

25  BY MR. HAZOURI:
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                67

```
 1        Q.    And do you take steps to ensure that the CPT
 2   codes chosen to be put in Feijoo, P.A.'s bills
 3   accurately reflect the medical services provided by Dr.
 4   Feijoo?
 5        A.    That's correct.
 6        Q.    Okay.  What are the steps that you take to
 7   ensure that occurs?
 8        A.    I review what he's done to the patient.  If I
 9   have a question, I will come to him and question.  I
10   make sure the description of the CPT code I'm using is
11   what he has done.
12        Q.    Okay.  Anything else you do to help ensure the
13   accuracy of the CPT codes chosen for Feijoo, P.A.'s
14   bills?
15        A.    That's what I do.  The step that I do is
16   mostly that.
17        Q.    That's all you can remember at this time?
18   Okay.  So, you did say you review -- in order to do your
19   best to ensure that Feijoo, P.A.'s bills include the
20   correct CPT codes, you stated that you review what Dr.
21   Feijoo has done for the patient.
22        A.    Correct.
23        Q.    What do you review to get that information?
24        A.    His note.
25        Q.    We're going to look at some more records.  So,
```



 1    I think I can help you with that.  But other than

 2    reviewing his note, is there any other documents that

 3    you look at or information you receive?

 4        A.    No, more like his note, what he has done on --

 5    to the patient, if it have any comments by him saying

 6    the time he spent with the patient or -- that's it.

 7        Q.    Okay.  So, again -- and I think I'm going to

 8    show you what would be his note in a minute.  So, I

 9    don't want to go too far down -- but his -- when you

10    talk about his note, you're talking about a record that

11    he fills out while he's meeting with the patient during

12    the exam.  Is that fair?  Is that what you're referring

13    to?

14        A.    I look both, transcriber and the handwriting

15    note.

16        Q.    Okay.  So, you look at both.  There's --

17    first, there's a handwritten note, then there's a

18    transcribed note, correct?

19        A.    Correct.

20        Q.    And you look at both of those?

21        A.    Yes, sir.

22        Q.    And this -- again, this is my question of how

23    do you ensure that the CPT codes are accurate and

24    reflect what Dr. Feijoo -- what service Dr. Feijoo

25    provided to the patient.  So, you look at the



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                          69

```
 1   handwritten note and the transcribed note and then you

 2   mentioned if there were any comments by him and you

 3   mentioned amount of time spent with the patient.  Do you

 4   recall that testimony?

 5        A.   Yes, sir.

 6        Q.   So, were you speaking of oral comments or

 7   written comments?

 8        A.   It could be both.  He dictate his notes.  So,

 9   it could be both.

10        Q.   So, you could see a notation in his note or in

11   the transcribed note about -- the transcribed report

12   about how much time he spent with the patient?

13        A.   Not always, but sometimes he would just put a

14   sticky note in the files for us to review.

15        Q.   Okay.  So, it could be a sticky note?

16        A.   Yes.

17        Q.   Or he could come by your office and make a

18   statement to you?

19        A.   That's correct.

20        Q.   All right.  As far as the time goes, 40 -- you

21   know, 45 minutes, whatever the time is, 25 minutes, is

22   it standard for him to come by your office and orally

23   tell you how much time he spent with the patient?

24        A.   Not really, sir, because I'm there.  So, I'm

25   able to see more or less how long he take with each
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                    70

 1   patient.
 2        Q.   So, you rely on your own observations,
 3   generally speaking, to know how long he spent with the
 4   patient?
 5        A.   No, sir, I didn't say that.
 6        Q.   Okay.
 7        A.   I said that that's part of what I see.  I'm
 8   there.  So, I know more or less -- and I've been there
 9   like for many years and I know more or less how he spend
10   with the initial consultation patient.
11        Q.   Okay.  That's fine.  So, what you're saying is
12   based on your experience, you have a general -- and
13   being there for that many years, you have a general idea
14   of how long he's going to generally spend with the
15   patient --
16        A.   Correct.
17        Q.   -- in an initial exam.  And how long is that?
18        A.   About 45 minutes or more.
19        Q.   That's face to face time with Dr. Feijoo in
20   his office?
21        A.   Yeah.  If it's an initial patient, sometimes
22   it will be that.
23        Q.   What about for follow-up exams?
24        A.   Sometimes 30, 35 minutes.
25        Q.   Face to face with Dr. Feijoo?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Anielka Castillo                                                                  71

1     A.    Correct.

2     Q.    Just to be clear, not talking about when the

3 patient's waiting in the waiting room, right?

4     A.    I understand.  Face to face.

5     Q.    I am correct, right?

6     A.    Correct.

7     Q.    Okay.  Okay.  So, again, the question that

8 kind of got us down this road is, what do you do to

9 ensure that -- or that Feijoo, P.A.'s bills accurately -

10 - the CPT codes put into Feijoo, P.A.'s bills accurately

11 reflect the medical services provided by Dr. Feijoo?

12 You told me you look at his hand-written note, you look

13 at the written report, maybe a sticky note given to you

14 and you may have some conversations with Dr. Feijoo.

15 Fair?

16    A.    That's correct.

17    Q.    Is there anything else that you can think of

18 that you do to try and ensure that the bills that go out

19 the door with the CPT codes have accurate CPT codes?

20    A.    No, sir.

21    Q.    Are there any paper documents used in the

22 office, maybe called travel cards or superbills?  Have

23 you ever heard of those types of documents?

24    A.    Yes, sir.

25    Q.    Are those used in the office?



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                72

```
 1      A.   No, sir.
 2      Q.   All right.  So, let's go back to 99204 in
 3  Exhibit 1.
 4      A.   Yes.
 5      Q.   All right.  And I believe when I -- I was -- I
 6  wanted to ask you generally what CPT codes were and you
 7  told me more specifically that you understood 99204 to
 8  be an initial office consultation evaluation
 9  examination.
10      A.   Yes, sir.
11      Q.   Is that correct?  All right.  So, there's a 4
12  at the end of the number, correct, 99204?
13      A.   Yes.
14      Q.   And do you understand that is a level 4?
15  There are different levels?
16      A.   Correct.
17      Q.   How many levels are there?
18      A.   Five.
19      Q.   So, 4 is the second highest level?
20      A.   Correct.
21      Q.   And it's fair to say that the higher the level
22  -- in Feijoo, P.A's practice, the higher the level of
23  exam, you know, 1 going to 2, going 3, going to 4, going
24  5, the higher it is, the more the clinic charges for it,
25  correct?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 73

```
 1      A.   Yes, sir.

 2      Q.   What is the clinic's charge for 99205?

 3      A.   I'm not really sure.

 4      Q.   99204, we have it here, $475?

 5      A.   Yes, sir.

 6      Q.   Is that correct?  What about 99203?

 7      A.   I believe it's $375.

 8      Q.   99202?

 9      A.   I don't recall.

10      Q.   201?

11      A.   I don't recall.

12      Q.   Is -- the reason that you recall 04 and 03 is

13   because those are the ones the clinic uses mostly?

14      A.   Mostly, yes.

15      Q.   And that holds true for auto accident patients

16   too?

17      A.   And Medicare.

18      Q.   But also for auto accident patients?

19      A.   That's correct.

20      Q.   Okay.  So, what are the required components of

21   an initial medical evaluation by Dr. Feijoo that allows

22   Feijoo, P.A. to properly bill it as a 99204?

23      A.   I don't know by memory, but I know they're

24   like medical history, current medical history, past

25   medical history, diagnosis and treatment.
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 74

```
 1       Q.   Okay.  So, have you told me everything you can

 2  recall about the required components --

 3       A.   Yes, sir.

 4       Q.   -- of 99204?

 5       A.   Yes, sir.

 6       Q.   All right.  Let's talk about the second CPT

 7  code on Exhibit 1, which is 95851.  Do you see that?

 8       A.   Yes, sir.

 9       Q.   And let me ask you again.  What does that

10  medical -- I'm sorry, what does that CPT code describe?

11       A.   Range of motion.

12       Q.   And you said range of motion.  It's range of

13  motion testing?

14       A.   Testing.

15       Q.   Fair?  And what is range of motion testing?

16       A.   It's just a service that he does.

17       Q.   Okay.  I appreciate that and assume that.

18  Could you give me a description of your understanding of

19  what Dr. Feijoo does that is billed as range of motion

20  testing?

21       A.   I believe he does -- look for limitations on

22  the patient.

23       Q.   Limitations of range of motion?

24       A.   Yes, sir.

25       Q.   Okay.  So, let me try and help.  Okay.  So, do
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Anielka Castillo                                                                    75

1   you understand that range of motion is the range that

2   somebody can move a body part?  I'm twisting -- the

3   camera can't see me, but I'm twisting my torso back and

4   forth.  I have a range of motion from left to right.

5        A.   Correct.

6        Q.   I can bend at the waist and I have a range of

7   motion there, correct?

8        A.   Correct.

9        Q.   I can bend backwards and I have a range of

10  motion there.

11       A.   That's correct.

12       Q.   Right?  I could, you know, lift my arm above

13  my head and I have a range of motion, which isn't very

14  far, by the way, like that, right?

15       A.   Yes.

16       Q.   Okay.  So -- and everything I just described,

17  that's muscle and spine and ligament range of motion,

18  correct?

19       A.   Correct.

20            MR. PIVNICK:  Objection to form and

21  foundation.

22  BY MR. HAZOURI:

23       Q.   Okay.  And so, Dr. -- that's the type of range

24  of motion testing that Dr. Feijoo does, his orthopedic

25  range of motion, the type of ranges -- I'm not saying



```
 1   exactly, but the type of range of motions that I

 2   described?

 3        A.   Yes, sir.

 4        Q.   That's your understanding?  And he's looking

 5   for restricted range of motion.  Is that correct?

 6        A.   Yes, sir.

 7        Q.   Okay.  Is he looking for anything else other

 8   than restricted range of motion, based on your

 9   understanding?

10             MR. PIVNIK:  Objection, form and foundation.

11   Overbroad.

12             MR. HAZOURI:  Okay.  That's fine.

13   BY MR. HAZOURI:

14        Q.   You can answer.

15        A.   Well, yeah, he use that to make sure if the

16   patient have a limitation other than the area he's

17   complaining.

18        Q.   Oh, so, meaning he might check other areas

19   that the patient's not complaining about?

20        A.   Yes, sir.

21        Q.   Okay.  But it's -- wherever he checks range of

22   motion, he's looking for a restriction of range of

23   motion?  That's your understanding?

24        A.   Yes, sir.

25        Q.   All right.  And is it your understanding that
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                77

1  a medical provider such as Dr. Feijoo and his clinic may

2  bill 95851 anytime the doctor performs range of motion

3  testing on the patient?

4      A.   Yes, sir.

5      Q.   It's your understanding that Feijoo, P.A. can

6  bill 95851 as a separate charge for $100 for range of

7  motion testing that was done as part of the initial

8  evaluation by Dr. Feijoo?

9      A.   Can you repeat your question?

10     Q.   Yes.  Is it your understanding that Feijoo,

11 P.A. can bill 95851, the CPT code for range of motion

12 testing, when Dr. Feijoo performed the range of motion

13 testing as part of his initial evaluation of the

14 patient?

15     A.   Yeah.  He had performed the test.  Yes.

16     Q.   So, you're understanding is that is proper

17 billing --

18     A.   Correct.

19     Q.   -- by Feijoo, P.A.?  And what do you base that

20 understanding on?

21     A.   Well, once we see -- review the CPT code, it

22 say range of motion with separate report.  He always do

23 separate report.

24     Q.   Okay.  So, he always does a separate report?

25     A.   (Non-verbal response.)



1      Q.    So, now, let me take a step back.  It sounds

2  like you've included a requirement of a separate report

3  in order to bill 95851.  Is that your understanding?

4      A.    Yes, sir.

5      Q.    Okay.  So, now, modifying what you said

6  before, and correct me if I'm wrong, you understand that

7  if Dr. Feijoo performs range of motion testing as part

8  of his initial evaluation of the patient and issues a

9  separate report for the range of motion testing, the

10  clinic can bill $100 for 95851.  Is that fair?

11      A.    Yes, sir.

12      Q.    Okay.  Are there any other requirements that

13  you're aware of for the clinic to bill 95851 properly?

14      A.    Not that I'm aware.

15      Q.    And do you have an understanding -- I want to

16  distinguish my prior question.  I was asking you what

17  range of motion testing was and if Dr. Feijoo did that.

18  What I want to ask you here is, how does he perform the

19  range of motion testing, your understanding, if you

20  know?  What does he do to perform it?

21      A.    Well, I'm not usually in the office when he do

22  it, but I know he have his equipment and I know he have

23  his experience.  So, I'm not really sure how he do it.

24  It's all dependent on each patient.

25      Q.    Okay.  So, you don't know exactly how he does



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                          79

```
 1   it because you're not in the room with him?

 2       A.    Exactly.

 3             THE WITNESS:  Can I --

 4             MR. HAZOURI:  Yeah.  Do you want to take a

 5   break?

 6             THE WITNESS:  No.  Can I get like something to

 7   drink?

 8             MR. HAZOURI:  I'm a little thirsty.  Let's

 9   take a quick break.  I should've told you, you know,

10   this isn't an endurance contest.  If you need any break,

11   you let me know.

12             THE WITNESS:  Okay.  Thank you.

13             THE VIDEOGRAPHER:  We are going off the

14   record.  The time is 10:29 a.m.

15             (Brief recess was held.)

16             (Videotaped Deposition resumed.)

17             THE VIDEOGRAPHER:  This is media two.  We are

18   back on the record.  The time is 10:43 a.m.

19   BY MR. HAZOURI:

20       Q.    Okay.  I understand from your attorney that he

21   just wants to clarify one of your answers and I've

22   agreed that he can just do that on the record.

23             MR. PIVNIK:  Thank you, Ken.  So, earlier in

24   the deposition, Mr. Hazouri asked you if you had

25   reviewed any documents in preparation for your
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    80

 1  deposition.  I think I may have jumped the gun on my

 2  objection.  So, that would include anything that Mr.

 3  Schurr sent you, whether it was -- and if -- you don't

 4  know if it was for the deposition or if it was just

 5  something he wanted you to look at, but if you could

 6  just answer whether you have reviewed any documents

 7  shortly before or within the couple days before your

 8  deposition without answering what documents you may have

 9  reviewed.

10          THE WITNESS:  But it was records sent to me,

11  but not related to the deposition, you're saying?

12          MR. PIVNIK:  Whether you reviewed anything

13  that was sent by Mr. Schurr regarding this case.

14          THE WITNESS:  Yes, sir.

15          MR. PIVNIK:  Okay.

16          THE WITNESS:  But it was not like a

17  preparation for my depo.  It was just for me to review

18  those documents.

19          MR. PIVNIK:  All right.

20  BY MR. HAZOURI:

21      **Q.   Okay.  So, your answer remains the same that**

22  **you do not believe you reviewed any documents?  It**

23  **wasn't your understanding that you were reviewing**

24  **documents in preparation for this deposition?**

25      A.   Yes, sir.  I reviewed what he sent me, but I



 1  didn't know that it was for getting prepared for the

 2  deposition.

 3      Q.   Okay.  I want to follow up on some questions I

 4  asked you about CPT -- the amount that the clinic,

 5  Feijoo, P.A., charges for CPT codes.

 6      A.   Yes, sir.

 7      Q.   First of all, do you recall your testimony --

 8  you gave me, you know, numbers for 99204, 99203 and then

 9  you didn't remember, if I recall, 05, 02 or 01.  Do you

10  remember that testimony?

11      A.   Yes, sir.

12      Q.   So, the number -- the amounts that you gave me

13  of the charges, I had asked you what the clinic was

14  charging right now.  Does that remain the same, you

15  know, back -- going back in time, the same charges?

16      A.   We changed the price code and the way of

17  billing back on 2001 or '02 and we change the amount.

18      Q.   In when?  I'm sorry.

19      A.   I believe it was 2002.

20      Q.   So, the amounts that you gave me have been --

21  for 99204, 99203 have been the same since 2002?

22      A.   Correct, sir.

23      Q.   All right.  And I also want to ask you --

24  well, I'll tell you what, we'll hold on that.  Thank

25  you.  I'll ask you about the other codes when I get



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 82

```
 1   there.

 2           I'm handing you what has been marked as

 3   Exhibit 2 to your deposition.

 4           (Plaintiff's Exhibit 2 was marked for

 5   identification.)

 6           MR. SCHURR:  Thank you, sir.

 7           MR. HAZOURI:  You're welcome.

 8   BY MR. HAZOURI:

 9       Q.   And I'll go ahead and just represent to you

10   ahead of time that all the medical records I'm going to

11   show you are for the same patient, H.P.

12       A.   Thank you very much.

13       Q.   Okay.

14       A.   I wanted to make sure because I was like

15   trying to compare.

16       Q.   Yes.

17       A.   Okay.

18       Q.   Yeah.  So, every -- the medical records that

19   we're going to go through -- at the end, there may be

20   some different ones, but I'll tell you about -- but,

21   generally speaking, are all from the chart that was

22   produced to us on this patient, H.P.

23       A.   On this specific patient.  Okay.

24       Q.   Yes, ma'am.  So, I've handed you what we've

25   marked as Exhibit 2 to your deposition.  It's a document
```



**Orange Legal**
**800-275-7991**

```
 1  at the top entitled, "Initial Orthopedic Evaluation".

 2  Do you see that?

 3      A.   Yes, sir.

 4      Q.   Could you describe for me, please, what this

 5  document is?

 6      A.   This is the doctor handwriting note when he do

 7  his initial evaluation.

 8      Q.   Okay.  And that's Dr. Feijoo?

 9      A.   Correct.

10      Q.   So, what happens is, based on your prior

11  testimony, the patient comes into his office for the

12  examination, right --

13      A.   Yes.

14      Q.   -- Dr. Feijoo?

15      A.   Yes.

16      Q.   And Dr. Feijoo fills out this form with his

17  handwriting, setting forth his findings and any comments

18  he wants to make relating to the examination?

19      A.   Correct.

20      Q.   So, at the top here, it looks like the writing

21  might be different.  Is that something that's filled out

22  by an administrative person?

23      A.   Just the first -- where it say, "Today's date"

24  and "Patient name".

25      Q.   "Today's date", "Name", so just there is
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                          84

 1  filled out by an administrative assistant, in other

 2  words, to get the form ready for Dr. Feijoo?

 3       A.   That's correct.

 4       Q.   All the other writing in here, in this Exhibit

 5  2, do you understand to be Dr. Feijoo's handwriting?

 6       A.   Yes, sir.

 7       Q.   And so, he -- these are, again, notes he's

 8  making while examining the patient?

 9       A.   Yes, sir.

10       Q.   And when you testified earlier that when

11  you're taking steps to ensure that the CPT codes that go

12  on the bills accurately reflect the services provided by

13  Dr. Feijoo, you said you looked at his note?

14       A.   Yes, sir.

15       Q.   There's a typed note, but the handwritten note

16  is this document, Exhibit 2?

17       A.   That's correct.

18       Q.   Correct?  Okay.  At the bottom, where it says

19  "Witness" and there's a signature, is that Dr. Feijoo's

20  signature?

21       A.   Yes, sir.

22       Q.   So, in other words, he's just signing off on

23  the report he was there?

24       A.   Yes, sir.

25       Q.   At the last page, there's a doctor's



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    85

1   signature.  Is that also his signature?

2       A.   That's Dr. Feijoo's signature.

3       Q.   So, he's just signing off in two places,

4   essentially?

5       A.   Yes.

6       Q.   Okay.  We won't -- again, won't talk about the

7   patient's signature because we're keeping that

8   confidential.  And is -- this initial orthopedic

9   evaluation form that we've marked as Exhibit 2 that Dr.

10  Feijoo filled out for patient H.P., is this the standard

11  form that Dr. Feijoo uses to make his notations during

12  the exam?

13      A.   Yes, sir.

14      Q.   Where did the form come from?  In other words,

15  the templated information on here that he fills out.

16  Where did you get that from or where'd the clinic get

17  that from?

18      A.   I'm not sure.  When I started working with

19  them, they already had it.

20      Q.   This form was in place when you started all

21  the way back in 2001?

22      A.   Yes, sir.

23      Q.   And I think I've beaten this horse, but I'll

24  beat it a little more.  These are contemporaneous notes;

25  in other words, he's writing as he's with the patient,



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                     86

```
 1   correct?

 2        A.   Yes, sir.

 3        Q.   I'm handing you what's been marked as Exhibit

 4   3 to your deposition.

 5             (Plaintiff's Exhibit 3 was marked for

 6   identification.)

 7   BY MR. HAZOURI:

 8        Q.   This is a document -- at the top, it says,

 9   "Range of Motion Report", correct?

10        A.   Correct.

11        Q.   And is this a standard document that's used by

12   the clinic?

13        A.   Yes, sir.

14        Q.   What is this document?

15        A.   It's just -- the doctor use to -- when he's

16   performing the test, he write it down, the limitations

17   of the patient.

18        Q.   Okay.  So, let me follow up on that and try

19   and clarify.  The document, again, is called "Range of

20   Motion Report", right?

21        A.   Correct.

22        Q.   And so, is this a report -- or, you know,

23   report, a document that's filled out that documents Dr.

24   Feijoo's findings upon performing range of motion

25   testing on the patient?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    87

```
 1       A.    That's correct.
 2       Q.    Same question; where did this form, the
 3   templated information, come from?
 4       A.    It was there when I got in.
 5       Q.    It was there in 2001?
 6       A.    Yes, sir.
 7       Q.    I think I asked you, but it is a standard form
 8   that's used?
 9       A.    Yes, sir.
10       Q.    Okay.  And the first -- and what's going on
11   here is we have a report and we have body regions --
12   various body regions listed down the left side of the
13   report.  Do you agree?
14       A.    Yes, sir.
15       Q.    And so, are those the body region -- do you
16   understand those to be the body regions that Dr. Feijoo
17   may perform range of motion testing on?
18       A.    Yes, sir.
19       Q.    So, the first body region listed is cervical
20   spine, correct?
21       A.    Correct.
22       Q.    What is the cervical spine?
23       A.    What do you mean what is it?
24       Q.    What is it?  Do you have an understanding of
25   what the cervical spine is?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    88

```
 1      A.   It's your cervical.

 2      Q.   Where is your cervical?

 3      A.   In the back.

 4      Q.   Okay.  What part of the back?

 5      A.   The lower back.

 6      Q.   No.  It's actually your neck, but --

 7      A.   Yeah.

 8      Q.   -- you didn't know that.  That's okay.  I'm

 9 just trying to find out if you knew that.  So, I'll

10 represent to you the cervical spine is your neck.  Okay?

11      A.   Okay.

12      Q.   Do you know what it says?  Can you read Dr.

13 Feijoo's writing next to the cervical spine there?

14      A.   No, sir.

15      Q.   Okay.  All right.  And then it says a fancy

16 word here, "thoracolumbar spine".  Do you see that?

17      A.   Yes, sir.

18      Q.   Do you know what regions of the spine are

19 thoracolumbar?

20      A.   Not really.

21           MR. PIVNIK:  Objection, form.  Foundation.

22 BY MR. HAZOURI:

23      Q.   Okay.  It looks to me like next to

24 thoracolumbar spine, it says 40%.  Do you see that?

25      A.   Yes, sir.
```



```
 1        Q.    Do you understand what that 40% means?

 2        A.    I believe so.  It's the limitation on the

 3   patient.

 4        Q.    So, you understand that Dr. Feijoo's

 5   documenting a 40% limitation in range of motion on the

 6   patient?

 7        A.    Yes, sir.

 8        Q.    Now, do you understand what region of the body

 9   Dr. Feijoo is documenting that limitation on?

10        A.    On the thoracolumbar spine.

11        Q.    Okay.  Do you know whether thoracolumbar is

12   one region of the body or two -- one region of the spine

13   or two?

14        A.    No, I don't know.

15        Q.    Do you know why the circle is around part of

16   the word "lumbar" and the word "spine"?

17        A.    No, sir.

18        Q.    Is this range of motion report something you

19   would look at to help ensure that the CPT codes that Dr.

20   Feijoo billed for this patient -- this patient's office

21   visit on January 26, 2017 are accurate?

22        A.    Yes, sir.

23        Q.    You had mentioned -- when I was asking you

24   about the 95851, you had mentioned the need for a

25   separate report.  Do you recall that testimony?
```



```
 1      A.   Yes, sir.

 2      Q.   Is this the separate report that you believe

 3   satisfies the requirement of a separate report?

 4      A.   Well, that's the separate report that he use.

 5      Q.   Okay.  But I'm asking you as the person who

 6   bills the codes.  You use 95851 quite regularly, right?

 7      A.   Yes, sir.

 8      Q.   And you've testified you understand that 95851

 9   requires a separate report, correct?

10      A.   Correct.

11      Q.   And you testified you try to make sure to the

12   best of your ability that the CPT codes that Feijoo,

13   P.A. uses accurately reflect the services provided by

14   Dr. Feijoo.

15      A.   That's correct.

16      Q.   So, is -- this document that we've marked as

17   Exhibit 3, is this the document that, in your mind, you

18   understand is a separate report that allows the clinic

19   to bill for 95851?

20      A.   Yes, sir.  That's an indication the doctor

21   performed the range of motion.

22      Q.   Okay.  And -- but this piece of paper is the

23   separate report?  There's no other separate report that

24   you're aware of?

25      A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo

```
 1      Q.   All right.  Let me ask you if you could put

 2  side by side Exhibit 2 and Exhibit 3 because I'm going

 3  to talk about them together.  So, the two there.  Could

 4  you turn to the second page of Exhibit 2?  Are you

 5  there?

 6      A.   Yes, sir.

 7      Q.   Okay.  So, again, just to help orient you,

 8  we're on the second page.  It's called, "Physical

 9  Examination".  Do you see that?

10      A.   Yes, sir.

11      Q.   And the bates number that was stamped onto

12  this is 11893, to make sure we're in the same place.  Do

13  you see that down here in the corner?

14      A.   Yes, sir.

15      Q.   Okay.  So, there's a section called "Cervical

16  Pain", right?

17      A.   Yes, sir.

18      Q.   Do you see that?  And if you look over at

19  Exhibit 3, there's -- you know, similar, there's a

20  section that says "Cervical Spine", correct, on Exhibit

21  3, right here?

22      A.   Yes.

23      Q.   You see that?  Okay.  And then there's a --

24  below "Cervical Pain", it says, "Thoracic Pain", and

25  below "Thoracic Pain", it says, "Lumbar Pain".  Do you
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    92

```
 1   see that?

 2      A.   Yes, sir.

 3      Q.   So, this form doesn't say thoracolumbar.  It

 4   says thoracic and lumbar pain.  Do you see that?

 5      A.   Yes, sir.

 6      Q.   Do you understand that thoracolumbar means the

 7   thoracic spine and the lumbar spine?  Do you know that?

 8           MR. PIVNIK:  Objection, form.

 9   BY MR. HAZOURI:

10      Q.   Do you know that terminology?

11      A.   No, sir.

12      Q.   Okay.  So, at any rate, let's look at the

13   thoracic pain section.  Do you see that on Exhibit 2?

14      A.   Yes.

15      Q.   The handwritten notes.  Two line items below

16   "Thoracic Pain", it says, "ROM", correct?

17      A.   Yes.

18      Q.   And that means range of motion, right?

19      A.   Yes.

20      Q.   And then when you go to the right of the range

21   of motion, it says, "Extension flexion, right/left, both

22   lateral flexion or rotation limited to 20%, 30%, 40%,

23   50%, 60%, 70%, 80% of normal with/without pain".  Do you

24   see that?  Did I read it correctly?

25      A.   And you're understanding the doctor
```



**Orange Legal**
**800-275-7991**

```
 1  handwriting note?

 2      Q.   No.  I'm walking you through the type -- the

 3  typewritten -- templated information.

 4      A.   Okay.

 5      Q.   Okay.  So, let's do it -- let me walk you

 6  through it again.  You see the "ROM", all capital

 7  letters?

 8      A.   Okay.

 9      Q.   Right?

10      A.   Yes.

11      Q.   That means range of motion, right?

12      A.   Okay.

13      Q.   And then I'm going to the right and I'm

14  talking about the typed information, not the handwritten

15  --

16      A.   Okay.

17      Q.   -- stuff.  Okay?  It says,

18  "Extension/flexion".  Do you see that?

19      A.   I see it.  Okay.

20      Q.   Do you understand what extension/flexion is?

21      A.   Yes.

22      Q.   What is it?

23      A.   What he make the patients do, like up, down.

24      Q.   Yeah.  It's a direction that he asks the

25  patient to move, in this case the thoracic spine, to
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                  94

     1   test range of motion, correct?

     2       A.   Correct.

     3       Q.   And then it says, "Right, left, both lateral

     4   flexion or rotation".  So, that's more range of motion

     5   that Dr. Feijoo would ask the patient to do.  Is that

     6   fair?  You're understanding.

     7       A.   Yes, sir.

     8       Q.   Okay.  And then it says, "Limited to".  Do you

     9   see that?

    10       A.   Yes.

    11       Q.   So, it's going to -- it provides a place for

    12   Dr. Feijoo to write the limitations on these range of

    13   motions in the thoracic spine, correct?

    14       A.   Correct.

    15       Q.   All right.  And then it says -- it has

    16   numbers, "20%, 30%, 40%, 50%, 60%, 70%, 80% of normal".

    17   So, do you understand that Dr. Feijoo can circle, you

    18   know, any one of these numbers?  In this case, if he saw

    19   a 40% limitation on normal, he could circle 40%?  That's

    20   what this is here for, correct?

    21       A.   Yes.

    22       Q.   All right.  And then it says, "Of normal with

    23   or without pain".  So, then Dr. Feijoo can document

    24   whether the range of motion, you know, restriction has

    25   pain or doesn't have pain, correct?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    95

```
 1      A.    Okay.

 2      Q.    Do you agree?

 3            MR. PIVNIK:  Objection.

 4      A.    Yes.

 5            MR. PIVNIK:  Form.  Foundation.

 6  BY MR. HAZOURI:

 7      Q.    And, again, these are -- these are

 8  typewritten, you know, words and numbers that he can

 9  circle to reflect his findings, correct?

10      A.    Correct.

11      Q.    All right.  So, wouldn't you agree with me

12  that if you compare Exhibit 2, this thoracic pain

13  section, to Exhibit 3, there's more information

14  available for Dr. Feijoo to fill out regarding the

15  restrictions on the range of motion in the Exhibit 2,

16  his handwritten notes, correct?

17            MR. PIVNIK:  Objection, form and foundation.

18      A.    Yes.

19            MR. PIVNIK:  Document speaks for itself.

20  BY MR. HAZOURI:

21      Q.    So, explain to me why -- your understanding of

22  why Dr. Feijoo wouldn't just fill out these range of

23  motion findings in Exhibit 2 since they're here

24  available for his use as opposed to using Exhibit 3.

25      A.    This is the patient (sic) that he use for
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                     96

```
 1   consultations.  Not all the patient have range of

 2   motion.  So, he will use a report for the range of

 3   motion if the patient require the range of motion, if he

 4   does the range of motion.

 5        Q.   Okay.  Well, let's walk through two different

 6   patients.  Okay?  One patient comes in and needs range

 7   of motion testing -- both of these patients have been in

 8   auto accidents.  Okay?

 9        A.   Okay.

10        Q.   Do you understand?  One comes in and Dr.

11   Feijoo performs range of motion testing on that patient.

12   You follow me?

13        A.   Yes.

14        Q.   Okay.  And let's just -- we're talking about

15   the thoracic area.  So, he performs range of motion

16   testing on the thoracic spine.  Do you understand?

17        A.   Okay.

18        Q.   Okay.  You would agree with me that he could

19   simply fill out the information here that's on Exhibit 2

20   to document the findings for the range of motion testing

21   for that patient, correct?

22             MR. PIVNIK:  Before you answer, let me just

23   object.  Objection to form, foundation, speculation and

24   improper hypotheticals, maybe insufficient facts.

25   BY MR. HAZOURI:
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                97

```
 1        Q.    Okay.  So, you can answer.

 2        A.    Well, the description is there.

 3        Q.    Right.  So, he could fill it out.  He could --

 4   for example, this patient that we're looking at, H.P.,

 5   he found 40%.  He could circle 40% and he could circle

 6   where the restriction was and he could even write his

 7   own handwritten notes, providing more information right

 8   here in Exhibit 2, correct?

 9        A.    Correct.

10        Q.    Okay.  So, why -- for the patient that is

11   getting range of motion testing, what is the point of

12   having this separate Exhibit 3 if all the information

13   that Dr. Feijoo needs to document his range of motion

14   testing is included within the initial orthopedic

15   evaluation that we've marked as Exhibit 2?

16              MR. PIVNIK:  Objection, form and foundation.

17        A.    I'm not really sure.  I guess that would be a

18   question to him.

19   BY MR. HAZOURI:

20        Q.    So, what is your understanding of the point of

21   using Exhibit 3, the range of motion report, when, once

22   again, all the information that Dr. Feijoo needs to

23   document his range of motion testing is here and

24   available in Exhibit 2, the initial orthopedic

25   evaluation?
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                98

```
 1              MR. PIVNIK:  Objection to form and foundation.

 2       A.   Well, that was my understanding, that he don't

 3  do range of motion to all the patients.  So, when he do

 4  the range of motion, he do the report -- separate report

 5  --

 6  BY MR. HAZOURI:

 7       Q.   Okay.  But if he --

 8       A.   -- that it shows range of motion report.

 9       Q.   Right.  But if he does the range of motion,

10  we've established that he could've filled out the range

11  of motion templated information in Exhibit 2, right?

12              MR. PIVNIK:  Same objection.

13       A.   I guess, yes.

14  BY MR. HAZOURI:

15       Q.   So, then my question is, what is the point of

16  having this Exhibit 3 and having a separate document for

17  the range of motion reports?

18              MR. PIVNIK:  Same objection.  Asked and

19  answered.

20       A.   That's -- like I say before, my understanding

21  is that when he perform the range of motion, he does the

22  separate report to allow us knowing that he had done a

23  separate report -- a range of motion for that patient.

24  BY MR. HAZOURI:

25       Q.   Okay.  Well -- all right.  Any other
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                  99

```
 1   explanation?

 2       A.   Well, that's my understanding.  I'm not sure

 3   if he -- that would be a question that we need to ask

 4   him.

 5       A.   Okay.  Well, let me ask, is the reason that

 6   the separate report is reviewed or used -- the separate

 7   piece of paper that we marked as Exhibit 3, is that an

 8   effort to justify the clinic's billing of 95851 by

 9   calling this a separate report?

10           MR. PIVNIK:  Objection, form.  Foundation.

11   Augmentative.

12       A.   I'm not saying that.

13   BY MR. HAZOURI:

14       Q.   Okay.  I'm asking you.  Is it?

15       A.   Okay.

16       Q.   Is that the reason?

17       A.   That's your opinion?

18       Q.   No.  I'm asking you.  Is that the reason?

19       A.   No.  I'm -- that's -- like I say, that's

20   something you need to ask him, but my understanding is

21   that he does separate report to identify the patient

22   when he has performed a range of motion.  Not all the

23   patient have range of motion.

24       Q.   Okay.  And let me go back to that.  If he did

25   not -- I was talking about two patients from auto
```



**Orange Legal**
**800-275-7991**

 1    accidents.  Remember?  And the first one had range of

 2    motion testing, right?

 3         A.   Yes, sir.

 4         Q.   So, let's talk about the second patient, who

 5    doesn't have range of motion testing.  He could simply

 6    write on this Exhibit 2 in the range of motion section,

 7    not performed, not applicable, not needed, right?

 8         A.   That's correct.

 9              MR. PIVNIK:  Objection, form, foundation,

10    speculation and improper hypothetical.

11    BY MR. HAZOURI:

12         Q.   All right.  Does -- when Feijoo, P.A. sends

13    its bills to PIP insurers like State Farm Mutual, it

14    will send some records along with the bill in order to

15    document the services provided in the -- I'm sorry, the

16    services that are included within the bills in the CPT

17    codes.

18         A.   That's correct.

19         Q.   Correct?  I know -- or at least I believe -- I

20    think I've seen that one document that the -- that

21    Feijoo, P.A. will routinely send to the insurer -- PIP

22    insurer, like State Farm Mutual, along with its bill is

23    the typed-out orthopedic report, initial or follow up.

24         A.   Yes, sir.

25         Q.   Or final.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                101

```
 1      A.    Correct.

 2      Q.    Right?  Is the range of -- is it Feijoo,

 3   P.A.'s procedure to send this document if it exists in

 4   the chart, the range of motion report, to the PIP

 5   insurer when submitting the bill?

 6      A.    No, sir.

 7      Q.    Why not?

 8      A.    We usually don't send his handwriting note.

 9   We used to do it before, but it was like a waste of

10   time.  They would not understand the doctor's

11   handwriting note.  So, we started transcriber and

12   sending everything transcribed.

13      Q.    Okay.  And that's because the transcribed

14   report that you send contains all the information --

15      A.    Yes, sir.

16      Q.    -- that the insurer needs?

17      A.    Yes, sir.

18      Q.    Including the range of motion testing?

19      A.    Yes, sir.

20      Q.    Okay.  Okay.  It's a nice segue to my next

21   document.  I'm handing you what's been marked as Exhibit

22   4 to your deposition.

23            (Plaintiff's Exhibit 4 was marked for

24   identification.)

25            MR. SCHURR:  Thank you.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                            102

```
 1              MR. HAZOURI:  You're welcome.

 2   BY MR. HAZOURI:

 3       Q.    Okay.  Again, this is a document relating to

 4   patient H.P. that was produced to us in discovery.  You

 5   can see the bates stamp there.

 6       A.    Yes, sir.

 7       Q.    And it's a document -- it's a typed-out

 8   document entitled, "Initial Orthopedic Evaluation",

 9   correct?

10       A.    Correct.

11       Q.    This -- it's this type of typed-out document

12   that's sent to a PIP insurer like State Farm Mutual --

13   I'm sorry, that Feijoo, P.A. sends to a PIP insurer like

14   State Farm Mutual along with the bill --

15       A.    Correct.

16       Q.    -- to document the services that were provided

17   and billed for in the bill?

18       A.    Yes, sir.

19       Q.    Could you please explain for me -- strike

20   that.

21              The typewritten initial orthopedic evaluation

22   is basically a report that transcribes the handwritten

23   findings that Dr. Feijoo made that we marked in Exhibit

24   2, correct?

25       A.    Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                              103

```
 1       Q.    It puts them in typed form so they're easy to

 2   read and understand?

 3       A.    Correct.

 4       Q.    Okay.  Who performs the transcription?

 5       A.    Gisela Medrano.

 6       Q.    Could you spell that for us?

 7       A.    Gisela is G-I-S-E-L-A.  Medrano is M-E-D-R-A-

 8   N-O.

 9       Q.    Okay.  And you gave to me the -- earlier in

10   the deposition, the various employees, their positions -

11   - you gave me their positions at the clinic.  What is

12   her position, or is she not employed by the clinic?

13       A.    She is employed by the clinic, but all the

14   transcription is separate.

15       Q.    Okay.  What's her -- what is her position of

16   employment with the clinic?

17       A.    Like she does -- she also do consultation.

18   She fax documentations to the clinics, like the reports

19   that they've been done, like things -- office stuff.

20       Q.    Administrative work?

21       A.    Yes.

22       Q.    The only thing that threw me off on the

23   administrative work is you said consultation.  What type

24   of consultation does she do?

25       A.    Like she is in the front too.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 104

```
 1        Q.    Oh, receptionist?

 2        A.    Receptionist.

 3        Q.    She greets the patients --

 4        A.    Yes.

 5        Q.    -- gives them the initial paperwork?  Okay.

 6   But then as a separate job or duty, if you will, she

 7   transcribes Dr. Feijoo's reports?

 8        A.    Correct.

 9        Q.    And she just -- does she do that as like an

10   independent contractor?  Does she have a company?  Do

11   you know?

12        A.    Yeah, she does have a company.

13        Q.    Okay.  What's her company name?  Do you know?

14        A.    Professional Transcription, I believe.

15        Q.    All right.

16        A.    I'm not sure, but I think.

17        Q.    That's your best understanding?

18        A.    Yes.

19        Q.    Okay.  And so, do you understand the process

20   of how -- I'm sorry.  I know her first name is Gisela.

21   What's her last name?

22        A.    Gisela Medrano.

23        Q.    Medrano.  Do you have an understanding of how

24   Ms. Medrano converts Dr. Feijoo's handwritten note into

25   a typewritten report?
```



 1      A.   Yes, sir.

 2      **Q.   Could you describe that for me, please?**

 3      A.   After the consultation is over and by the end

 4  of the consultation, Dr. Feijoo will take the files and

 5  dictate the note and also provide her with the

 6  handwritten note, which she understand.

 7      **Q.   Okay.  So, Dr. Feijoo takes his handwritten**

 8  **initial orthopedic evaluation, the one we've marked as**

 9  **Exhibit 2, and he uses that and he uses a Dictaphone and**

10  **he dictates out what would be the typewritten report?**

11      A.   Yes, sir.

12      **Q.   And he gives that tape -- or if it's an**

13  **electronic recording, whatever the case may be -- the**

14  **recording to Ms. Medrano along with the handwritten note**

15  **so she can reference it to?**

16      A.   Yes, sir.

17      **Q.   And she uses those two pieces of information,**

18  **the dictation and the note, to create what we have here**

19  **and we've marked as Exhibit 4 --**

20      A.   4.

21      **Q.   -- to your deposition, correct?**

22      A.   Yes, sir.

23          MR. PIVNIK:  Ken, I'll also point out that her

24  -- the patient's name is not redacted on page 2 of

25  Exhibit 4 in the bottom under "Recommendations", under



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                                106

```
 1   number 5.

 2            MR. HAZOURI:  Oh, you're right.  What we can

 3   do is I'll take --

 4            MR. PIVNIK:  Only if you file it with the

 5   Court, you know --

 6            MR. HAZOURI:  But what I'm going to do is,

 7   with your -- you can watch.  With the ones that we're

 8   marking as exhibits, I'll go ahead and redact it while

 9   we're here if you have a Sharpie we can use, and that

10   way the ones that are going with the court reporter will

11   be fully redacted.

12            MR. PIVNIK:  Okay.

13            MR. HAZOURI:  You okay with that?

14            MR. PIVNIK:  I'm okay with that just with the

15   other provision that if you do file the exhibits with

16   the Court that you just double check to make sure

17   they're -- they are fully redacted --

18            MR. HAZOURI:  It is our goal to file fully and

19   appropriately redacted documents if we do so and any --

20   if you catch anything else, please tell me.  So, thank

21   you for that.

22   BY MR. HAZOURI:

23       Q.   Okay.  So, if everything goes as it's supposed

24   to, the initial orthopedic evaluation that's typewritten

25   that we marked as Exhibit 4 accurately reflects the
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                               107

 1   information that Dr. Feijoo wrote into Exhibit 2 while

 2   he was with the patient and accurately reflects the

 3   services that Dr. Feijoo provided to the patient and his

 4   findings and conclusions.  Is that correct?

 5        A.   Correct.

 6        Q.   Okay.  I'm looking at this particular written

 7   report.  Patient H.P. is a fourth grader, correct?  Do

 8   you see that?  First page.

 9        A.   Okay.

10        Q.   Do you see where it said --

11        A.   Yeah.

12        Q.   -- "Occupation"?

13        A.   Yes.

14        Q.   Her occupation is a school child, right, which

15   is -- sometimes I want to go back --

16        A.   Mm-hmm.

17        Q.   -- but that's -- she's a fourth grader,

18   correct?

19        A.   Yes.

20        Q.   All right.  Now, if you could turn to the

21   second page of the exhibit, there is three headings, if

22   you will; one says "Cervical Spine", one says "Thoracic

23   Spine" and one says "Lumbosacral Spine".  Do you see

24   that?

25        A.   Yes, sir.



**Orange Legal**
**800-275-7991**

```
 1        Q.   All right.  And under "Cervical Spine", the

 2   last thing that it says is that there was a slight

 3   limited range of motion of the normal range.  Do you see

 4   that?

 5        A.   Yes, sir.

 6        Q.   That's a range of motion finding made by Dr.

 7   Feijoo, correct?

 8        A.   Correct.

 9        Q.   Okay.  In the thoracic spine, it says, "There

10   is limited range of motion to the last 40% of the normal

11   range, but not painful", correct?

12        A.   Yes, sir.

13        Q.   All right.  Could you again pull out Exhibit

14   3, the range of motion report?  Right there.  His

15   finding of 40% of the normal range is -- in the thoraco

16   or thoracic spine is consistent with him writing 40%

17   next to "Thoraco Lumbar Spine" on the range of motion

18   report that we marked as Exhibit 3, correct?

19             MR. PIVNIK:  Objection, form.  Speculation.

20        A.   Can you repeat your question?

21   BY MR. HAZOURI:

22        Q.   Yes.  It says thoracic spine -- I'm sorry.

23   Looking at Exhibit 4, the -- the typed report -- are you

24   there?

25        A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    109

1      Q.    Okay.  It says there is limited range of

2   motion to the last 40% of the normal range, but not

3   painful.  So, he has made -- Dr. Feijoo has made a

4   finding of limited range of motion to the last 40% of

5   the thoracic spine.  That's your understanding, right?

6      A.    Okay.

7      Q.    Do you agree?

8      A.    Yes, sir.

9      Q.    And then if you go back to Exhibit 3, which is

10  the handwritten range of motion report, we established

11  earlier that 40% is written next to the words

12  "Thoracolumbar Spine".  Do you see that?

13     A.    Yes, sir.

14     Q.    So, the two findings appear to be consistent,

15  both 40% in the thoracic spine area?

16     A.    Yes, sir.

17     Q.    All right.  And then the lumbosacral spine,

18  again, going to the end without reading the whole thing,

19  it says, "There is limited range of motion to 40% of the

20  normal range."  Do you see that?

21     A.    Yes, sir.

22     Q.    And it also says -- the first part of the

23  sentence says, "There is pain on the lumbosacral region

24  at flexion extension, lateral flexion and rotation to

25  the right and the left with tenderness at palpation of



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                110

```
 1   the paralumbar muscles with limited range of motion to

 2   40% of the normal range."  Did I read that correctly?

 3        A.   Yes, sir.

 4        Q.   So, this is a range of motion finding by Dr.

 5   Feijoo that he found on his initial evaluation of H.P.,

 6   correct?

 7             MR. PIVNIK:  Objection, form.  Foundation.

 8        A.   Correct.

 9   BY MR. HAZOURI:

10        Q.   And he made these range of motion findings in

11   the thoracic and lumbar spine that we're looking at in

12   Exhibit 4 while performing the initial evaluation and

13   examination of the patient?

14             MR. PIVNIK:  Same objection.

15   BY MR. HAZOURI:

16        Q.   Correct?

17        A.   You're asking me if he do it both at the same

18   time?  That's what you're saying?

19        Q.   No.  I'm asking you -- we've confirmed that he

20   has findings -- and I'm summarizing -- you know, 40%

21   restriction of range of motion in the thoracic and the

22   lumbosacral spine.  That's what it says in this written

23   report.

24        A.   Yes, sir.

25        Q.   You agree with that, right?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                    111

```
 1      A.   Yes.
 2      Q.   So, my question to you is, did he perform the
 3  testing -- the range of motion testing and come to those
 4  conclusions of the 40% restriction based on that testing
 5  during the initial evaluation and examination of the
 6  patient in his office?
 7           MR. PIVNIK:  And again, form, foundation.
 8      A.   Yes.
 9           MR. PIVNIK:  Witness is not a doctor.
10      A.   In the same date of service.
11  BY MR. HAZOURI:
12      Q.   Same date of service.
13      A.   Yes, sir.
14      Q.   While he has the patient in, right, in his
15  office -- and I'm not trying to trick you with office
16  versus exam room or anything like that, but he's with
17  the patient and he has the patient do range of motion
18  movements, correct?
19      A.   Correct.
20      Q.   And this patient -- according to Exhibit 4, he
21  saw 40% restriction of range of motion movements on the
22  patient H.P. on January 26, 2017 when he was examining
23  her, correct?
24      A.   Correct.
25           MR. PIVNIK:  Objection, form.  Foundation.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                     112

```
 1  BY MR. HAZOURI:

 2      Q.   And so, these findings in Exhibit 4, these

 3  range of motion findings he got from doing his initial

 4  evaluation of that patient on January 26, 2017?

 5           MR. PIVNIK:  Same objection.

 6      A.   Yes, sir.  The tenderness at palpation was

 7  during the consultation and the range of motion was

 8  during the range of motion test.

 9  BY MR. HAZOURI:

10      Q.   All in the same office visit, same date of

11  service?

12      A.   Yes, sir.

13      Q.   And it's the same findings that are noted in

14  the range of motion report at 40%?

15           MR. PIVNIK:  Same objection.

16      A.   Correct.

17  BY MR. HAZOURI:

18      Q.   Okay.  And looking at the findings on the

19  thoracic spine in Exhibit 4, again, it says, "There is

20  limited range of motion to the last 40% of the normal

21  range, but not painful."  Do you see that?

22      A.   Yes, sir.

23      Q.   So, Dr. Feijoo made a finding that while

24  patient H.P. had limitations in her thoracic range of

25  motion to the last 40% of the normal range, she didn't
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    113

 1  have pain in those restrictions.  Is that your

 2  understanding?

 3      A.   Yes, sir.

 4           MR. PIVNIK:  Objection, form and foundation.

 5  BY MR. HAZOURI:

 6      Q.   Okay.  Now, looking at Exhibit 3, the separate

 7  range of motion report, do you see any documentation of

 8  there being pain or no pain on the thoracic or lumbar

 9  spine range of motion testing?

10           MR. PIVNIK:  Objection, foundation.  Document

11  speaks for itself.

12      A.   The range of motion is done separate.  That's

13  the range of motion test.  The tenderness and palpation

14  are when the doctor's examining the patient.

15  BY MR. HAZOURI:

16      Q.   Okay.  So, you don't understand -- let me --

17  are you done?  Do you want to add to it?

18      A.   I want to add it.

19      Q.   Okay.  Go ahead.

20      A.   The reason that you see them together is

21  because she's transcribing the report.  She's getting

22  the tenderness and palpations from the consultation,

23  where he examined the patient and did the consultation,

24  and then she getting the range of motion from the report

25  of the range of motion part.



1        Q.   Okay.  So, let me ask you this question then

2   based on your testimony that you just gave.  I'm going

3   to read the thoracic spine finding in Exhibit 4 again,

4   okay, if you want to follow along with me.  "There is

5   limited range of motion to the last 40% of the normal

6   range, but not painful."  Do you see that?

7        A.   Yes, sir.

8        Q.   Based on your testimony, it's your

9   understanding that the finding of no pain is unrelated

10   to the range of motion testing?

11             MR. PIVNIK:  Objection, form and foundation.

12        A.   I didn't say that.  What I'm saying is the

13   reason that he didn't put range of motion or maybe he

14   didn't put the pain in there is because he's doing the

15   tender and palpations during his consultation.  He find

16   out where the patient have pain.

17   BY MR. HAZOURI:

18        Q.   Okay.  Well, you understand that palpate --

19   you said tenderness and palpation, right?

20        A.   Yes.

21        Q.   That was your words?

22        A.   Yes.

23        Q.   Describe for me what that exam is.

24        A.   The doctor examine the patient --

25             MR. PIVNIK:  Same objection.



1      A.    -- where the -- where he hurt.  If -- he goes

2  area by area.

3  BY MR. HAZOURI:

4      Q.    Right.  What the doctor does, he or she places

5  his hand on the patient and presses.  Palpates, that's

6  called.  And if it elicits pain from the patient, the

7  patient says, yes, that hurts, and the doctor makes a

8  notation.

9      A.    Correct.

10         MR. PIVNIK:  Objection to form.

11  BY MR. HAZOURI:

12     Q.    That's different than range of motion testing,

13  is it not?

14     A.    Yes, sir.

15     Q.    So, then my question is, going back to the

16  thoracic spine, "There is limited range of motion to the

17  last 40% of the normal range, but not painful", if

18  you're telling me that you understand that it's only

19  palpation testing that is leading to these pain -- or a

20  diagnosis of no pain, then you're telling me that that's

21  a separate test and a separate conclusion from the range

22  of motion report because it's done on palpation, not

23  range of motion?

24         MR. PIVNIK:  Objection, form and foundation.

25  BY MR. HAZOURI:



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    116

```
 1      Q.   Do you understand?

 2      A.   Not really.

 3      Q.   Let's try again.  We talked about range of

 4  motion testing and what that is, and you have the

 5  patient move in different directions.  And I'll ask Dr.

 6  Feijoo --

 7      A.   I understand.

 8      Q.   Okay.  And we talked about palpation testing,

 9  which is separate testing from range of motion.

10      A.   Correct.

11      Q.   All right.  If I understood your testimony

12  correctly before, you said that the reason there's no

13  reference to pain in Exhibit 3 is because the pain

14  testing is done by palpation and that's a separate test

15  from range of motion.  Am I correct on that, on what

16  you're saying?

17      A.   I'm giving you based on my knowledge that I've

18  been with him for many years.  When he does range of

19  motion, the patient -- you see the patient limitation,

20  but not necessarily the patient have pain in his

21  limitation.  He just limited himself on putting his arm

22  up, but not necessarily have to have pain.

23      Q.   Right.

24      A.   So, he knows when the patient have pain when

25  he's doing his examination.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                            117

1      Q.   Right.  So, let's follow up on that.  You were

2  -- I don't want to get in the camera, but you were doing

3  an arm raise range of motion, correct?

4      A.   Correct.

5      Q.   And this is perfect for me because my left

6  shoulder really hurts.  So, when I start next to my hip

7  and I lift up to here, I get pain in my shoulder.

8      A.   Okay.

9      Q.   So, I have range of motion -- he could test my

10  range of motion, right, from here to here?  Correct?

11      A.   Okay.

12      Q.   And when I get to the top of the range of

13  motion, it hurts.  Okay?  He could ask me that, right?

14      A.   Yes, sir.  He will.

15      Q.   He would.

16      A.   Of course.

17      Q.   Right?  And so, that would be pain that was

18  caused by getting to the end of my range of motion,

19  correct?

20      A.   Correct.

21      Q.   In other words, he's not palpating me.  He's

22  not touching me.  He just asked me to move my arm up,

23  right?

24      A.   Yes.

25      Q.   So --



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    118

 1            MR. PIVNIK:  Objection, form and foundation.

 2   Possible conflict for medical advice to opposing

 3   counsel.

 4            MR. HAZOURI:  Okay.  That was funny.

 5   BY MR. HAZOURI:

 6       Q.   So, Dr. Feijoo, part of what he's doing in a

 7   range of motion testing is seeing if the range of motion

 8   elicits pain from the patient.

 9       A.   Yes.

10       Q.   Right?

11       A.   Yes, sir.

12       Q.   Right.  So, we've confirmed that.  So, now

13   let's go back to where -- Exhibit 4, "Thoracic Spine".

14   "There is limited range of motion to the last 40% of the

15   normal range, but not painful."  Don't you understand

16   that to be Dr. Feijoo saying yes, the patient is limited

17   in range of motion, but the patient is not experiencing

18   pain when going through that range of motion?

19       A.   Yeah.

20       Q.   Is that your understanding?

21       A.   Yes, sir.

22            MR. PIVNIK:  Objection, form and foundation.

23   This time it's been asked about five times, Counsel.

24   BY MR. HAZOURI:

25       Q.   So, that is part of the range of motion



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    119

```
 1   testing as documented in Exhibit 4, the typewritten

 2   report, the lack of pain -- the absence of pain?

 3        A.   Well, it's in the description, typed report,

 4   but we don't know if he got it from his range of motion

 5   testing or from his consultation at the time he was

 6   examining --

 7        Q.   Okay.

 8        A.   -- the patient.

 9        Q.   Okay.  The fact that it's in the same sentence

10   as, "Limited range of motion to the last 40% of the

11   normal range, but not painful", that doesn't tell you,

12   in your mind, that he made this finding based on range

13   of motion testing?

14        A.   Well, I'm answering your question because you

15   asked me why in the range of motion doesn't say pain.

16        Q.   Right.

17        A.   So, I'm saying I don't know if he got it from

18   the range of motion, the pain, or from the -- or the

19   examination that he did.

20        Q.   Okay.  That's your best answer of why Exhibit

21   3 doesn't reference the --

22        A.   Yes, sir.

23        Q.   -- the lack of pain?  Okay.

24             And the lumbosacral spine, where -- on Exhibit

25   4, where it says, "There is pain on the lumbosacral
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    120

```
 1  region at flexion extension", you understand flexion

 2  extension to be a range of motion?

 3       A.   Yes, sir.

 4       Q.   All right.  "Lateral flexion and rotation to

 5  the right and left".  Right?

 6       A.   Yes.

 7       Q.   You see that?  And then it says, "With

 8  tenderness at palpation".  So, he specifically

 9  referenced palpation there, right?

10       A.   Yes, sir.

11       Q.   "Of the paralumbar muscles with limited range

12  of motion to 40% of the normal range".  Right?

13       A.   Yes, sir.

14       Q.   So, he says there is pain on the lumbosacral

15  region at flexion extension and lateral flexion and

16  rotation to the right and the left, right?

17       A.   Yes.

18       Q.   So, you understand that to be he's finding

19  pain when the patient is going through the range of

20  motions that are referenced here?

21            MR. PIVNIK:  Objection, form and foundation.

22  BY MR. HAZOURI:

23       Q.   Right?  That's your understanding?

24       A.   Yes, sir.

25       Q.   But none of those pain findings are documented
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                             121

 1  in Exhibit 3, correct?

 2          MR. PIVNIK:  Same objection.

 3      A.   No.  There's no -- there's only limitations.

 4  BY MR. HAZOURI:

 5      Q.   And if I ask you why those pain -- your

 6  understanding of why there's no reference to these pain

 7  findings in Exhibit 3, would your answer remain the same

 8  as to what it was for the thoracic spine?

 9      A.   Yes, sir.

10      Q.   Let's see here.  I'm handing you what's been

11  marked as Exhibit 5 to your deposition.

12          (Plaintiff's Exhibit 5 was marked for

13  identification.)

14          MR. PIVNIK:  Thank you.

15          MR. HAZOURI:  You're welcome.

16  BY MR. HAZOURI:

17      Q.   This is a document from the medical chart on

18  H.P.  At the top, it says, "Studies Request", right?

19      A.   Yes, sir.

20      Q.   Is this a standard form used by the clinic?

21      A.   Yes.

22      Q.   What is this form?

23      A.   It's an order for x-rays.

24      Q.   So, the form in general, is it a form that Dr.

25  Feijoo would fill out if he wants some diagnostic



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                          122

```
 1   testing done, studies?

 2       A.   Yes, sir.

 3       Q.   And in this case, over in the spine section

 4   here, he checked "Cervical" and "Thoracic".  So, do you

 5   understand that to be -- and that's under the heading of

 6   "X-ray Studies".  So, do you understand that to be Dr.

 7   Feijoo is requesting that cervical and lumbar x-rays be

 8   performed on this patient?

 9       A.   Yes, sir.

10       Q.   Next to "Cervical", there's some handwriting

11   there.  Can you -- do you understand what that

12   handwriting says?

13       A.   Just the first; "Four view".

14       Q.   "Four view".  So, that's four views of the

15   cervical spine?

16       A.   That's what I understand.

17       Q.   Sure.  Let's accept your interpretation.  If

18   it's -- if it means four views, I'm just trying to get

19   at what four views is.  That's four different x-rays of

20   the cervical spine?

21       A.   Correct.

22       Q.   Different --

23       A.   View.

24       Q.   From different views, different sides --

25       A.   Correct.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                              123

 1      Q.   -- et cetera?  And you can't read what's next
 2  to that?

 3      A.   No, sir.

 4      Q.   And then "Lumbar", also, it looks like it says
 5  "4V" next to it.

 6      A.   Yes, sir.

 7      Q.   And so, we can at least interpret it looks
 8  like Dr. Feijoo was asking for x-rays, four views of
 9  both the cervical and the lumbar spine?

10      A.   That's correct.

11      Q.   Now, is there an x-ray machine at Feijoo,
12  P.A.?

13      A.   No, sir.

14      Q.   So, if Dr. Feijoo wants clinics -- or, I'm
15  sorry, wants x-rays, he needs to request those be
16  performed by an outside facility?

17      A.   Yes, sir.

18      Q.   And that's what this form is for?

19      A.   Yes.

20      Q.   Okay.  I'm handing you what we've marked as
21  Exhibit 6 to your deposition.

22           (Plaintiff's Exhibit 6 was marked for
23  identification.)

24  BY MR. HAZOURI:

25      Q.   In the top right corner of Exhibit 6, you can



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                   124

```
 1   see it says, "CPT 2017".  Do you see that?

 2        A.   Yes, sir.

 3        Q.   So, I'll represent to you -- and you see these

 4   spiral holes and the spiral bound?

 5        A.   Yes.

 6        Q.   I'll represent to you this is a copy of a page

 7   out of the CPT 2017 book.

 8        A.   I understand.

 9        Q.   Do you have any -- you've seen the CPT book.

10   This looks like it, right?

11        A.   Yes, sir.

12        Q.   Okay.  So, then on the left-hand side, about a

13   third of the way down, it says 99204.  Do you see that?

14        A.   Yes, sir.

15        Q.   Right here.

16        A.   Yes.

17        Q.   Now, if you could, please, just read the

18   language next to 99204 describing what it is to yourself

19   and let me know when you're done reading it, please.

20   Done?

21        A.   Yes.

22        Q.   Thank you.  So, I'm going to read it for the

23   record, at least the first part.  "Office or other

24   outpatient visit for the evaluation and management of a

25   new patient".  Let's stop there.  You previously
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                    125

```
 1   testified that the 99204 that Dr. Feijoo uses is for an
 2   evaluation and management -- I don't think you used the
 3   word management, but you said an evaluation, examination
 4   of a new patient, a first time patient at Feijoo, P.A.
 5       A.   Yes, sir.
 6       Q.   Correct?  So, that statement is consistent.
 7       A.   Yes, sir.
 8       Q.   Right?  Okay.  So, let me start over again.
 9   "Office or other outpatient visit for the evaluation and
10   management of a new patient which requires these three
11   key components:  A comprehensive history, a
12   comprehensive examination and medical decision-making of
13   moderate complexity".  Did I read that correctly?
14       A.   Yes, sir.
15       Q.   And do you agree that the initial evaluations
16   and examinations that Dr. Feijoo is performing on
17   patients for which the clinic is billing 99204 must meet
18   these three requirements?
19       A.   Yes, sir.
20       Q.   Okay.  Now, if you could please pull out again
21   -- you can use them any way you want for reference --
22   Exhibits 2, Exhibits 3 and Exhibit 4.  Exhibit 2 is Dr.
23   Feijoo's handwritten notes.  Exhibit 3 is the range of
24   motion report and Exhibit 4 is the typed-out report.
25   Right?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                      126

1       A.   Yes, sir.

2       Q.   Okay.  So, I want you to reference those as

3   you need to, to answer my questions, please.  And my

4   first question to you is -- I'm sorry.  My first

5   question is, please explain to me how Dr. Feijoo's

6   January 26, 2017 office visit with the patient H.P.

7   included a comprehensive history.

8       A.   Like you want me to detail what he did?

9       Q.   Well, let's put it this way.  There was a 9 --

10  the Feijoo, P.A. billed a 99204 for this office visit.

11      A.   Okay.

12      Q.   Right?

13      A.   Yes, sir.

14      Q.   For January 26, 2017 with patient H.P.,

15  correct?

16      A.   Yes, sir.

17      Q.   Okay.  And so, you -- and you prepared that

18  bill and sent it out the door.

19      A.   Correct.

20      Q.   So, you wouldn't have done that unless you

21  understood that the three requirements for 99204 as set

22  forth in Exhibit 6 were met, correct?

23      A.   Yes.

24      Q.   And the way you determine whether the three

25  requirements are met are you look at the records that



 1  Dr. Feijoo and the office prepared for that office

 2  visit, correct?

 3       A.   Yes, sir.

 4       Q.   Okay.  So, I would like for you then to

 5  perform that exercise and tell me where in these

 6  records, if at all, it's reflected that Dr. Feijoo

 7  performed a comprehensive history on the patient.

 8       A.   Well, he did the past history.

 9       Q.   Okay.

10       A.   He did the current medical exam.

11       Q.   Okay.  Ma'am, one second.  Can you tell me

12  what you're looking at so I can follow along with you?

13       A.   The report.

14       Q.   The written -- you're using the written report

15  --

16       A.   Yes.

17       Q.   -- that we marked as Exhibit 4.  Okay.  I'll

18  tell you what, you tell me all the places where you see

19  that requirement being met or part of meeting that

20  requirement and I'm going to note them down.

21       A.   He have the history of present illness, the

22  past history, the diagnosis, the medication, the

23  treatment that he rendered and the examination that he

24  did.

25       Q.   Okay.  Let me help here.  Do you understand



 1    what a history is?

 2         A.    Yes.

 3         Q.    What is a history?

 4         A.    The history of what is the records of the

 5    patient, current or past.

 6         Q.    Yeah.  What's the patient's medical history in

 7    the past and also the presenting problem?

 8         A.    Yes, sir.

 9         Q.    Right?  So, you said you reference things like

10    the diagnosis and the treatment.  That doesn't have

11    anything to do with history.  That's diagnosis and

12    treatment, correct?

13              MR. PIVNIK:  Objection to form.

14         A.    Well, we're talking about the present and

15    past.  He may have back pain in the past and back pain

16    in the present.  It's still a diagnosis.  It's still

17    part of his history.

18    BY MR. HAZOURI:

19         Q.    Okay.  So, I understand your answer.  So,

20    history of present illness in Exhibit 4, do you see

21    that, that entry?

22         A.    Yes, sir.

23         Q.    Okay.  Does that -- is that a comprehensive

24    history that meets the requirements of 99204?

25         A.    That's what he's typing.  Let me see what he



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                129

```
 1   put in his handwritten note.  Well, in the typed report

 2   you can just see that, but in his handwriting note he

 3   ask several question where -- like previous accident,

 4   surgery, allergy, habit, et cetera, et cetera.

 5        Q.   Okay.  So, you've -- could you -- you kind of

 6   said that quickly.  Could you -- you're reading his

 7   handwritten report.  Could you read --

 8        A.   Because you're saying that in -- if -- you're

 9   basing yourself and you say if what it show in the

10   report is comprehensive medical history, but it's

11   limited.  Like whatever she transcribed, she put no

12   previous accident, but in his handwriting note, he have

13   comprehensive when he ask the patient his previous

14   accident, his surgery, his allergy, his habit.

15        Q.   Okay.  Help me out here.  Direct me to where

16   you're looking in the handwritten note.

17        A.    In the handwritten note, where it say, "Past

18   Medical History".

19        Q.   Okay.  So, right here on the first page?

20        A.   Correct.

21        Q.   And it says, "Previous Accidents" -- it looks

22   like N/A, is that right, no -- or no?

23        A.   Oh, no, I'm not sure.

24        Q.   Do you understand the entry to be that there's

25   no previous accidents?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 130

```
 1        A.   Correct.

 2        Q.   All right.  "Surgeries, no".

 3        A.   Yes, sir.

 4        Q.   "Allergies, no"?

 5        A.   Yes, sir.

 6        Q.   "Habits, no"?  Right?

 7        A.   Yes.

 8        Q.   Is the patient taking medications currently,

 9   there's something there.  Can you read that?

10        A.   No, sir.

11        Q.   Okay.  And then it says, "Diseases", "Other",

12   and there's no diseases, right?  Next to "Other", it

13   says, "No"?

14        A.   There's nothing.

15        Q.   Right.  Okay.  So, that's -- in fact, then you

16   go -- and then there's a signature there.  You go to the

17   next page and we're in the physical examination, right?

18        A.   Correct.

19        Q.   All right.  So, let me -- and I told you look

20   at all of these documents, you know, all three of them

21   that you wanted to look at.  So, let's take those

22   entries; the past medical history on Exhibit 2.  We'll

23   take the history of present illness on Exhibit 4, the no

24   past medical history.  It says no previous accident.

25        A.   Mm-hmm.
```



**Orange Legal**
**800-275-7991**

 1        Q.    Right?   Illnesses, none; allergies, none;

 2   social habits.   And then there's the medication,

 3   Diclofenac --

 4        Q.    Diclofenac.

 5        A.    For pain, right?

 6        Q.    Right.   And so, that's -- that transcription

 7   is pretty consistent with what's in the written report

 8   that you just read from, right?

 9        A.    Yes, sir.

10        Q.    Okay.   So, let's take all that information

11   that historical information that I just went through

12   with you.   Is it your testimony here that that

13   constitutes a comprehensive history sufficient for

14   Feijoo, P.A. to bill a 99204 for this office visit?

15        A.    Based on my experience, yes, it is.

16        Q.    Okay.   Where it says, "Comprehensive History",

17   do you understand the term "comprehensive"?   Can you

18   define that for me as it's used in the book -- the CPT

19   book?

20        A.    Like --

21              MR. PIVNIK:   Objection, form and foundation

22   and speculation.

23        A.    -- very detailed.

24   BY MR. HAZOURI:

25        Q.    Very detailed?   Okay.   Any further explanation



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                    132

 1   that you can provide?

 2        A.   No.

 3        Q.   Okay.  All right.  So, then the second -- and

 4   so, it's your testimony here today that you feel that

 5   this history that's reflected in the records is

 6   sufficient for Feijoo, P.A. to bill a 99204?

 7        A.   Well, that's what we've been billing and we've

 8   been getting paid.  I have not get no objection that I

 9   did something less.

10        Q.   Okay.  Well, regardless of what other people

11   are doing with 99204, that's your testimony, that this

12   history that we've looked at in this particular patient

13   is a comprehensive history sufficient for billing 99204?

14        A.   And to my understanding.  Yes, sir.

15        Q.   All right.  And you've told me all the reasons

16   you can think of why it's a sufficient comprehensive

17   history?

18        A.   That I can recall, yes.

19        Q.   Right.  Okay.  So, then the next component is

20   a comprehensive examination, right, under 99204?

21        A.   Yes, sir.

22        Q.   You see that?  What's the -- do you have an

23   understanding of the term "comprehensive" as used in

24   this component, "comprehensive examination"?

25        A.   The same thing as previous.  It's a detailed



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    133

 1  of -- examine on the patient.

 2       Q.   A detailed examination of the patient?

 3       A.   Yes.

 4       Q.   Do you have any further understanding of the

 5  definition of comprehensive examination as used here in

 6  the CPT book?

 7       A.   When you're saying I don't have any --

 8       Q.   No, I'm saying do you have any more.  Can you

 9  provide me -- if not, we'll move on, but you're just

10  saying it's a detailed examination?

11       A.   Yeah.  It's like a --

12            MR. PIVNIK:  Very detailed, she said.

13       A.   -- comprehensive examination.

14  BY MR. HAZOURI:

15       Q.   Okay.  Well -- okay.  I get that it's a

16  comprehensive examination.  It says that right here, but

17  what I'm wondering is, do you -- you've told me that you

18  believe that's a very detailed examination, right?

19       A.   Yes, sir.

20       Q.   Okay.  Do you have any other explanation or

21  understanding of what a comprehensive examination is

22  under 99204?

23       A.   That's my understanding.

24       Q.   Okay.  So, again, if you would, please, look

25  at Exhibits 2, 3 and 4 and show me -- my question is,



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                  134

 1  please explain how Dr. Feijoo's January 26, 2017 office

 2  visit with the patient H.P. included a comprehensive

 3  examination.

 4       A.   Well, he did examination, the physical

 5  examination on his whole body.

 6       Q.   So, are you saying the fact that he did an

 7  examination means -- or you said he did an examination

 8  of the whole body.  Is that what you said?

 9            MR. PIVNIK:  Objection, form.

10       A.   Yes, sir.

11  BY MR. HAZOURI:

12       Q.   Well, he really only examined the cervical

13  spine, thoracic spine, lumbosacral spine, upper

14  extremities and lower extremities.  Isn't that correct?

15       A.   No, sir.

16            MR. PIVNIK:  Yeah.  Objection to form --

17  BY MR. HAZOURI:

18       Q.   Okay.

19            MR. PIVNIK:  -- and mischaracterizes.

20  BY MR. HAZOURI:

21       Q.   Okay.  Show me where there's -- show me what

22  you're looking at that is -- that you're getting the

23  description of exam -- of his examination.

24       A.   Well, that's what he performed.  And I -- like

25  I said, I was years with him and I know -- and I've been



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    135

 1  patient on him.  I also was patient.  But he do

 2  everything.  He just write his finding.  That's

 3  different.

 4      Q.   Okay.  So, if I understand you correctly, you

 5  are telling me that Dr. Feijoo does more in -- of his

 6  examinations of these patients than are reflected in his

 7  initial orthopedic evaluation?

 8      A.   Correct.

 9      Q.   Okay.  Well, why doesn't he reflect everything

10  that he does in his examination in the report?

11           MR. PIVNIK:  Are we -- are you talking about

12  the transcribed report or the handwritten notes?

13           MR. HAZOURI:  Well, I want to talk about all

14  three because I don't want to --

15           THE WITNESS:  Either/or.

16           MR. PIVNIK:  Because then you're

17  mischaracterizing -- if you're talking about the initial

18  physical examination report, I think you

19  mischaracterized what it says on the physical

20  examination.

21           MR. HAZOURI:  Well, okay.

22  BY MR. HAZOURI:

23      Q.   Let's work through this.  Let's start with

24  Exhibit 2, okay, or the handwritten notes.

25      A.   Yes, sir.



 1      Q.    Okay.  And there is a section called "Physical

 2  Examination".

 3      A.    Yes, sir.

 4      Q.    Right?  The first section is called

 5  "Headache", correct?

 6      A.    Yes, sir.

 7      Q.    So, as part of his examination, it appears

 8  that Dr. Feijoo would ask this patient and his patients

 9  who come in for auto accidents whether they have a

10  headache?

11      A.    Yes, sir.

12      Q.    Headaches, plural, you know.  Right?

13      A.    Yes, sir.

14      Q.    And then there's the section on cervical pain

15  that has findings, correct?

16      A.    Yes.

17      Q.    "Thoracic Pain".

18      A.    Yes, sir.

19      Q.    "Lumbar Pain".

20      A.    Correct.

21      Q.    Those are all areas of the spine, right?  You

22  understand that?

23      A.    Yes, sir.

24      Q.    Right?  Then there's, "Extremities", and it

25  has, "Shoulder, Elbow, Wrist, Hand, Knee", that type of



 1    thing.  Do you see that?

 2         A.  Yes, sir.

 3         Q.  And so, this one is blank, so we don't know

 4    exactly what he did.  But he could examine those various

 5    areas?

 6         A.  That's correct.

 7         Q.  Okay.

 8         A.  He will do it.

 9         Q.  He would?

10         A.  Yes, sir.

11         Q.  Okay.  So, if the patient comes in with a

12    complaint of a neck injury, is Dr. Feijoo going to

13    examine the patient's knee?

14         A.  Yes, sir.

15         Q.  Why?

16         A.  He had different occasion where the patient is

17    complaining about an area and he say it could be

18    reflected in a different way.  Let's say he talk about

19    his neck and then that can go to his lower back or in

20    different way.  Like he -- he had a patient where he

21    came and he was blinking a lot.  It's nothing to do with

22    an accident, but he was blinking a lot and he ask, that

23    happen after your accident?  And the patient say yes,

24    and he was -- he had to send to an emergency room.

25         Q.  Sure.  Yeah.  That's a neurological condition



1  if your eyes are blinking, right --

2      A.   Of course.  But what I'm trying to explain

3  you, that he got into his eye and it's not supposed to

4  be a part of his procedure, review a patient's eye.

5      Q.   I see what you're saying.  Okay.  But -- and

6  would you expect that to be documented in his records,

7  that he saw the patient's eyes fluttering?

8      A.   It could be because the patient got surgery

9  and it was like something very serious.

10      Q.   Okay.  So, I've walked you through the

11  handwritten notes and what the examination appears to

12  document, the areas.  We can look at the second page

13  too.  There's knee, you know, and it talks about other

14  areas.  And then we looked at, before, the written note,

15  which has the cervical, thoracic, lumbosacral, upper

16  extremity, lower extremity, right?

17      A.   Yes, sir.

18      Q.   Okay.  And, again, the hand -- the typewritten

19  report is derived or made from the handwritten notes of

20  Dr. Feijoo?

21      A.   And transcription -- and dictated.  I'm sorry.

22      Q.   Right.  Right.  But Exhibit 2 and Exhibit 3,

23  the handwritten initial orthopedic evaluation and the

24  range of motion report, are the basis for Exhibit 4, the

25  type-written report?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                        139

```
 1        A.   Yes, sir.

 2             MR. PIVNIK:  Objection.  Mischaracterizes

 3   witness' testimony.  She said transcribed too.

 4             MR. HAZOURI:  You don't have to -- just short,

 5   succinct objection, please.

 6   BY MR. HAZOURI:

 7        Q.   Okay.  I get that the transcriptionist

 8   transcribes it, but these records are the basis -- the

 9   two handwritten records are the basis for the written

10   report, right?

11        A.   And the dictation.

12        Q.   Okay.  Well -- okay.  And the dictation.  But

13   Dr. Feijoo uses these to do his dictation, correct?

14        A.   Not -- maybe he also put an additional note.

15        Q.   Okay.  So, then -- so, let me see if I

16   understand.  The initial orthopedic evaluation is based

17   on both these records, Exhibit 2 and 3, and Dr. Feijoo's

18   dictation, which could contain additional information?

19        A.   Correct.

20        Q.   So, then the document that should have the

21   most information is the type-written initial orthopedic

22   evaluation because it has both the information from the

23   two handwritten records and anything that Dr. Feijoo

24   wants to add orally?

25        A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                          140

1       Q.    Right?  So, the type-written document is the

2   most comprehensive document, or should be, documenting

3   what Dr. Feijoo did with the patient?

4       A.    Correct.

5             MR. PIVNIK:  Objection, form.

6   BY MR. HAZOURI:

7       Q.    Okay.  So, based on that then, again, I'd like

8   you to look at these documents and tell me how what Dr.

9   Feijoo did represents a comprehensive examination

10  appropriate for billing 99204.

11            MR. PIVNIK:  Objection, asked and answered.

12  You can answer it though.

13      A.    I already explain you that.  I already told

14  you that he did the three components and he also spent

15  more than 40 minutes with the patient face to face.

16  BY MR. HAZOURI:

17      Q.    Okay.  We haven't been through the three

18  components yet.  We've only been through history and

19  we're working on comprehensive examinations.  Let me

20  rephrase for you what I understood you to say and you

21  correct me if I'm wrong.  You -- I asked you why this

22  qualifies as a comprehensive examination sufficient for

23  billing 99204 and I believe you said something to the

24  effect of, well, he examined various parts of the body.

25  Is that a fair statement of your testimony?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                      141

```
 1      A.   Not really.

 2      Q.   Okay.  Then tell me.  Why -- tell me again,

 3 please, your understanding of why this is a

 4 comprehensive examination.

 5      A.   Because he did the three components of the

 6 office visit and he also spend the time face to face

 7 with the patient.

 8      Q.   Okay.  You're not hearing my question.  The

 9 three components are a comprehensive history, number 1,

10 a comprehensive examination, number 2, and medical

11 decision-making of moderate complexity, number 3, right?

12      A.   Yeah.

13      Q.   Okay.  I'm not asking you about a

14 comprehensive history anymore.  We talked about that.

15 And I haven't gotten to medical decision-making yet.

16 I'm only asking you about the second component, a

17 comprehensive examination and what I'd like for you to

18 tell me is your best understanding, your best knowledge

19 of why the services that Dr. Feijoo provided to this

20 patient H.P. on January 26, 2017 include a comprehensive

21 examination.

22      A.   Because he did a comprehensive examination.

23 He did it to the patient.

24      Q.   Okay.  Do you see that when I say why is this

25 a comprehensive examination and you answer me by saying
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                    142

```
 1   because he did a comprehensive examination, we're kind

 2   of going in a circle?  Do you see that?

 3       A.   I don't understand what you expect me to say

 4   and my understanding, that he did the comprehensive

 5   examination.

 6       Q.   Okay.  Well, I want to know your understanding

 7   of what is included in an examination that makes it

 8   comprehensive.  That's what I want to know.  Do you

 9   think -- if he just came in and said, patient raise your

10   arm up and down, and that was it, was that -- would that

11   be comprehensive?

12       A.   He did a complete examination on the patient.

13       Q.   That's not what I said.  Let's just assume a

14   patient came in, okay, and Dr. Feijoo says -- and I'm

15   not saying this happened -- raise your arm up and raise

16   your arm down, and the patient does that and that's the

17   entirety of the examination.  Is that a comprehensive

18   examination?

19       A.   It will not be.

20       Q.   Okay.  So, you understand that there has to be

21   more done by Dr. Feijoo than that for it to be a

22   comprehensive examination?

23       A.   Correct.

24       Q.   Okay.  So, what I want to know is your

25   understanding of what does he have to do, what has to be
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                143

 1  included in his actual examination of the patient to

 2  make it comprehensive for purposes of 99204 and properly

 3  billing that code.

 4      A.   Doing a complete examination on the patient.

 5      Q.   And how do you define a complete examination

 6  on the patient?

 7      A.   Well, that's something that he needs to

 8  answer, how he do it exactly like part by part of the

 9  body, but he does do a comprehensive examination.  Like

10  he spend time with the patient to find out his illness

11  and his diagnosis.

12      Q.   Okay.  Have you now given me your best

13  understanding of why this is a comprehensive

14  examination?

15      A.   Yes, sir.

16      Q.   Okay.  Let's move to the third element.  I'm

17  looking right here so you can follow along with me.

18  "Medical decision-making of moderate complexity".  Do

19  you see that?

20      A.   Yes, sir.

21      Q.   Okay.  Could you look the records from Dr.

22  Feijoo's January 26, 2017 appointment with patient H.P.

23  and explain to me how they reflect medical decision-

24  making of moderate complexity?

25      A.   Well, he was -- he diagnosed the patient.  He



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                144

```
 1   send the patient to do x-ray.  He also show patients

 2   what he's limited to.

 3        Q.   What their limitations are?

 4        A.   Yes, sir.  And refer him for treatment.

 5        Q.   Have you now told me all the reasons you

 6   believe that Dr. Feijoo's January 26, 2017 office visit

 7   with the patient H.P. included medical decision-making

 8   of moderate complexity?

 9        A.   Yes, sir.

10             MR. HAZOURI:  Does anybody need a break?  Want

11   to keep charging ahead?  I saw you looking at your

12   watch.

13             MR. SCHURR:  We're right at lunch time.

14             MR. PIVNIK:  Yeah.  That's what we're thinking

15   if you have a lot more.

16             MR. HAZOURI:  Oh, yeah, we were going to -- if

17   you guys want to eat lunch, we'll need to take a lunch

18   break.  I'm not -- we'll get done today, but it's not

19   anytime particularly soon.

20             MR. PIVNIK:  We could take a short lunch.

21             MR. HAZOURI:  Yeah.  Why don't we go off the

22   record?

23             MR. PIVNIK:  Yeah.

24             THE VIDEOGRAPHER:  We're going off the record.

25   The time is 11:53 p.m. -- a.m.
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    145

 1    (Brief recess was held.)

 2    (End of Volume I.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                           CERTIFICATE OF OATH

2

     STATE OF FLORIDA
3    COUNTY OF MIAMI-DADE

4

5        I, Martha Rodriguez, FPR, Notary Public, State of
     Florida, certify that Anielka Castillo personally
6    appeared before me and was duly sworn/affirmed.

7        WITNESS my hand and official seal this 29th day
     of May, 2019.
8

9

10

11

12

13

14

15                              *Martha Rodriguez*
                                _____
16                              Martha Rodriguez, FPR
                                Notary Public
                                State of Florida
17                              My Commission: GG097851
                                Expires: 05/20/2021
18

19

20

21

22

23

24

25



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    147

```
 1                    CERTIFICATE OF REPORTER

 2
     STATE OF FLORIDA
 3   COUNTY OF MIAMI-DADE

 4

 5        I, Martha Rodriguez, FPR, Court Reporter, do
     hereby certify that I was authorized to and did report
 6   the videotaped deposition of Anielka Castillo; that a
     review of the transcript was requested; that the
 7   foregoing transcript, pages 4 through 145, is a true
     and accurate record of the above-mentioned
 8   proceedings; and that said record has been transcribed
     by me or under my direction.
 9
          I further certify that I am not a relative,
10   employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
11   attorney or counsel connected with the action, nor am
     I financially interested in the action.
12
          DATED this 24th day of June, 2019.
13

14

15

16

17

18

19
                              Martha Rodriguez
20                            _____
                              Martha Rodriguez, FPR
21                            Court Reporter

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1              ERRATA SHEET (VOLUME I)

 2    DO NOT WRITE ON THIS TRANSCRIPT - ENTER CHANGES HERE

 3    IN RE:      STATE FARM MUTUAL AUTOMOBILE INSURANCE
                  COMPANY V. MANUEL V. FEIJOO and MANUEL V.
 4                FIEJOO, M.D., P.A.
      CASE NO.:  1:18-cv-23329
 5    DATE:      MAY 29, 2019
      DEPONENT:  ANIELKA CASTILLO
 6

 7    PAGE   LINE        CORRECTION & REASON

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22
      Under penalties of perjury, I declare that I have read
23    the foregoing document and that the facts stated are
      true.
24    _____

25    DATE                         DEPONENT NAME
```



**Orange Legal**
**800-275-7991**

```
 1                                          JUNE 24, 2019
     ANIELKA CASTILLO
 2   c/o Jerome A. Pivnik, Esquire
     The Pivnik Law Firm
 3   7700 North Kendall Drive
     Suite 703
 4   Miami, Florida 33156
     pivniklaw@aol.com
 5
     In Re:    May 29, 2019 Videotaped Deposition of
 6             Anielka Castillo
               State Farm Mutual Automobile Insurance
 7             Company v. Manuel V. Feijoo and Manuel V.
               Fiejoo, M.D., P.A.
 8
     Dear Madam:
 9
          This letter is to advise that the transcript of
10   the above-referenced deposition has been completed and
     is available for review. Please contact our office at
11   (800) 275-7991 to make arrangements to read and sign
     or sign below to waive the review of this transcript.
12
          It is suggested that the review of this
13   transcript be completed within 30 days of your receipt
     of this letter, as considered reasonable under Federal
14   Rules*; however, there is not Florida Statute to this
     regard.
15
          The original of this transcript has been
16   forwarded to the ordering party, and your errata, once
     received, will be forwarded to all ordering parties.
17
                                  Sincerely,
18
                                  Martha Rodriguez, FPR
19                                Orange Legal, Inc.

20   cc:   Kenneth P. Hazouri, Esquire

21
     WAIVER:
22   I, _____, hereby waive the reading
     and signing of my deposition transcript.
23
     _____      _____
24   Deponent Signature                    Date
     *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)
```



**$**

**$10,000** 46:19,23

**$100** 77:6 78:10

**$375** 73:7

**$475** 73:4

**0**

**01** 81:9

**02** 81:9,17

**03** 73:12

**04** 73:12

**05** 81:9

**1**

**1** 54:9,11 72:3,23 74:7 141:9

**1/26/17** 60:12

**10** 7:19,25 17:16,18

**100%** 44:7 45:2 47:10

**10:29** 79:14

**10:43** 79:18

**11844** 54:15 55:5

**11893** 91:12

**11:53** 144:25

**13** 6:6

**15** 6:5 7:21,23

**1500** 56:17,19,21 57:21

**16** 17:9,21,24

**1:18-cv-23329** 4:5

**1st** 21:22 60:12

**2**

**2** 72:23 82:3,4,25 84:5,16 85:9 91:2,4 92:13 95:12,15,23 96:19 97:8,15,24

98:11 100:6 102:24 105:9,24 107:1 125:22 130:22 133:25 135:24 138:22 139:17 141:10

**20** 7:23,25 48:23 50:24

**20%** 43:11,17 44:2, 17 45:6,9,20 46:3 47:4,6,11 48:3,6,23 50:10 92:22 94:16

**200%** 45:23

**2000** 19:13,14 20:11

**2001** 15:6 17:7 19:12 21:6,13,17 53:14 81:17 85:21 87:5

**2002** 81:19,21

**201** 73:10

**2014** 21:22 22:4 38:19,20

**2015** 38:19,20

**2017** 58:6,7 60:13 89:21 111:22 112:4 124:1,7 126:6,14 134:1 141:20 143:22 144:6

**2018** 63:4

**2019** 4:10

**25** 69:21

**26** 58:7 60:13 89:21 111:22 112:4 126:6, 14 134:1 141:20 143:22 144:6

**29** 4:10

**3**

**3** 72:23 86:4,5 90:17 91:2,19,21 95:13,24 97:12,21 98:16 99:7 108:14,18 109:9 113:6 116:13 119:21 121:1,7 125:22,23 133:25 138:22 139:17 141:11

**30** 11:20 70:24

**30%** 92:22 94:16

**31** 58:16 59:4

**33126** 4:9

**33144** 24:19

**35** 70:24

**38** 37:4

**380** 4:9

**4**

**4** 72:11,14,19,23 101:22,23 105:19, 20,25 106:25 108:23 110:12 111:20 112:2,19 114:3 118:13 119:1,25 125:22,24 127:17 128:20 130:23 133:25 138:24

**40** 38:12 39:5 69:20 140:15

**40%** 88:24 89:1,5 92:22 94:16,19 97:5 108:10,15,16 109:2, 4,11,15,19 110:2,20 111:4,21 112:14,20, 25 114:5 115:17 118:14 119:10 120:12

**42** 17:13

**45** 69:21 70:18

**4V** 123:5

**5**

**5** 72:24 106:1 121:11, 12

**50** 38:12 39:5

**50%** 92:23 94:16

**6**

**6** 123:21,22,25 126:22

**60%** 92:23 94:16

**6303** 4:8

**7**

**7** 58:6

**70%** 92:23 94:16

**8**

**80%** 43:9 45:11 92:23 94:16

**8328** 37:4

**8370** 24:18 37:4

**8th** 24:18

**9**

**9** 126:9

**95851** 60:18,22 74:7 77:2,6,11 78:3,10,13 89:24 90:6,8,19 99:8

**99202** 73:8

**99203** 73:6 81:8,21

**99204** 60:17,21 63:7, 11 72:2,7,12 73:4,22 74:4 81:8,21 124:13, 18 125:1,17 126:10, 21 128:24 131:14 132:6,11,13,20 133:22 140:10,23 143:2

**99205** 73:2

**9:17** 4:10

**A**

**a.m.** 4:10 79:14,18 144:25

**ability** 90:12

**absence** 119:2

**accept** 122:17

**accepting** 21:16

**access** 65:8

**accident** 8:10 27:12 28:3,4,8 43:2,3,5 46:20 52:19,20,23 73:15,18 129:3,12, 14 130:24 137:22,23

**accidents** 42:25 96:8 100:1 129:21, 25 136:9

**accuracy** 67:13

**accurate** 68:23 71:19 89:21

**accurately** 61:10 66:15,21 67:3 71:9, 10 84:12 90:13 106:25 107:2

**actively** 40:11

**actual** 61:19 62:21 143:1

**add** 113:17,18 139:24

**addition** 22:8 65:1

**additional** 139:14, 18

**address** 24:16,21 55:22,25

**administrative** 37:9,15 83:22 84:1 103:20,23

**advice** 118:2

**advise** 43:23 50:15 51:9

**advised** 6:18

**affidavits** 6:6

**affirm** 5:2

**agree** 12:14 31:24 61:9 87:13 95:2,11 96:18 109:7 110:25 125:15

**agreed** 79:22

**ahead** 11:19 26:9 46:7 59:16 62:9 82:9,10 106:8 113:19 144:11

**alerted** 29:8

**Aleve** 34:15



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo
Index: allergies..catch

**allergies** 130:4
131:1

**allergy** 129:4,14

**allowed** 45:23

**AMA** 61:13 62:16,
21 63:16

**amended** 5:15

**American** 61:2

**amount** 11:10,17
41:21 44:21,22 46:2
47:5,6,7,8,15 48:6
69:3 81:4,17

**amounts** 81:12,20

**Andrew** 11:13

**Anie** 7:2,5,9 53:19
58:13

**Anielka** 4:4,25 5:6
6:24 7:7

**answering** 10:7
80:8 119:14

**answers** 79:21

**anticipate** 10:5

**anymore** 141:14

**anytime** 77:2 144:19

**appearance** 4:20

**appears** 29:17 136:7
138:11

**applicable** 100:7

**applied** 43:25

**apply** 44:22 45:19
50:13

**appointment** 27:10
143:22

**appointments**
27:21

**appropriately**
106:19

**approximately**
38:5

**area** 36:20 76:16
96:15 109:15 115:2
137:17

**areas** 76:18 136:21
137:5 138:12,14

**argue** 46:12

**arguments** 5:24,25

**arm** 75:12 116:21
117:3,22 142:10,15,
16

**arrival** 27:10 29:10

**arrive** 29:16

**arrived** 29:22

**article** 65:11 66:4

**asks** 51:3 93:24

**assistant** 64:15,22
65:7,11,15,20 66:3,
11 84:1

**Association** 61:2

**assume** 9:15 27:25
29:1,5 39:7 74:17
142:13

**attempt** 6:7

**attended** 6:14
13:16,25

**attorney** 4:16 6:15
10:24,25 12:15 44:4
47:19 51:1,2 79:20

**attorney-client**
11:11

**attorneys** 40:21
47:17

**Augmentative**
99:11

**auto** 8:10 28:3,4,8
42:25 43:2,3,5
52:20,22 73:15,18
96:8 99:25 136:9

**avoid** 47:22

**aware** 50:4 58:4
62:9 64:24 78:13,14
90:24

**B**

**back** 13:18 16:8
18:12 19:2 21:21
27:16 29:5,18 39:24

40:1 44:5 45:1 46:12
47:8 49:1,6,12 50:2
51:13,16,20 60:8,23
72:2 75:3 78:1 79:18
81:15,17 85:21 88:3,
4,5 99:24 107:15
109:9 115:15 118:13
128:15 137:19

**background** 12:20

**backwards** 15:8
75:9

**balance** 44:1 46:4

**ballpark** 52:16

**Barrata** 11:13

**base** 77:19

**based** 12:13 53:13
64:6 70:12 76:8
83:10 111:4 114:2,8
116:17 119:12
131:15 139:16 140:7

**basically** 12:15 40:7
102:22

**basing** 129:9

**basis** 12:8 62:2
138:24 139:8,9

**bates** 54:17,25 55:4,
11 91:11 102:5

**beat** 85:24

**beaten** 85:23

**begins** 4:3

**behalf** 4:12 58:10

**bend** 75:6,9

**benefit** 44:23 45:16
46:1

**benefits** 46:16,17,20
47:2,3,9 57:17

**BI** 47:19

**bigger** 30:16

**bill** 43:18,20,24 44:4,
7,24 45:11,12,15,19
46:2,4 47:4,25 48:7,
9,10,12,23 50:10,14
51:1 56:18 57:11,13,
16 58:5,9,14 59:14
60:1,5 62:13 63:8,25

73:22 77:2,6,11
78:3,10,13 90:19
100:14,22 101:5
102:14,17 126:18
131:14 132:6

**billed** 74:19 89:20
102:17 126:10

**billing** 13:5,9,23
14:2,6,14,18 15:16
16:5,7,11,12,19
17:23 18:19,20,23
19:1,3,7,18 20:10,
16,17,22 21:9,11,18,
25 22:2,11,12,20
23:5,6,15,18,20
24:3,7,24 46:11,13
48:1 61:25 62:17,25
77:17 81:17 99:8
125:17 132:7,13
140:10,23 143:3

**bills** 43:7 45:17 48:2,
17 51:2 57:22,25
59:19 63:22 67:2,14,
19 71:9,10,18 84:12
90:6 100:13,16

**bit** 10:17 40:15 57:9
62:11

**blank** 137:3

**blinking** 137:21,22
138:1

**Blue** 4:8

**body** 75:2 87:11,12,
15,16,19 89:8,12
134:5,8 140:24
143:9

**bone** 36:11

**book** 61:1,2,14,19
62:4,16,21,22 63:1,
16,17 124:7,9
131:18,19 133:6

**bottom** 35:18 84:18
105:25

**bound** 124:4

**box** 33:16,20 58:16,
22 59:4

**boxes** 38:21 39:22

**break** 79:5,9,10
144:10,18

**bring** 36:8 62:20,21

**brings** 30:25 31:20
41:9

**broken** 36:11

**brought** 65:19,21
66:1

**building** 25:4

**business** 16:9,17
18:17,18

**C**

**C-A-S-T-I-L** 23:13

**cabinet** 34:16,18
35:17 37:8

**call** 7:4 8:23 17:18
21:3 30:8,9 33:16
34:21,23 40:3 42:18
54:17 56:17

**called** 22:11 57:6
60:24 61:2 64:15
71:22 86:19 91:8,15
115:6 136:1,4

**calling** 99:9

**calls** 30:10

**camera** 75:3 117:2

**capital** 93:6

**cards** 71:22

**case** 4:5 9:9 10:7
11:19 37:21 40:21
45:25 47:16,20
50:25 54:22 55:13
61:7 65:13 80:13
93:25 94:18 105:13
122:3

**cases** 6:12 8:5,9,10
52:17

**cast** 36:10,14 41:13

**Castillo** 4:4,25 5:6
6:24 23:11,13,24
24:4,11 58:13

**casts** 32:19 35:19
36:9

**catch** 106:20



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 Index: caused..correct

caused 117:18

CD 61:16

center 25:6,8,9
56:23

certificate 14:21

certificates 14:14

certify 14:18

cervical 87:19,22,25
88:1,2,10,13 91:15,
20,24 107:22 108:1
122:4,7,10,15,20
123:9 134:12 136:14
138:15

cetera 123:1 129:4

chair 32:12,23

chairs 32:12 33:1

change 20:3 21:15
23:23 24:6 64:5
81:17

changed 19:4,6,16,
22,24 81:16

charge 16:4 22:23,
24 43:10,11,22 45:3,
6 73:2 77:6

charges 72:24 81:5,
13,15

charging 81:14
144:11

chart 48:13,19,24
82:21 101:4 121:17

charts 37:20,21,24
38:8 39:7 54:23

check 32:18 50:7
59:23 76:18 106:16

checked 122:4

checking 32:16

checks 27:6 44:15
76:21

child 107:14

Choice 18:25 19:17,
23,24 20:4 21:16
22:2,11 23:5,20 24:7

choose 62:12

choosing 63:19

chosen 61:10 66:14
67:2,13

circle 89:15 94:17,19
95:9 97:5 142:2

city 6:25

claim 56:18 57:2

claims 28:3

clarify 6:3 79:21
86:19

class 14:17,19

clear 9:25 58:12
71:2

clearer 10:10

clerk 25:25 26:5,19

clerks 26:21

clinic 8:19 9:3 28:20
48:6 55:14 61:25
72:24 73:13 77:1
78:10,13 81:4,13
85:16 86:12 90:18
103:11,12,13,16
121:20 125:17

clinic's 73:2 99:8

clinics 103:18
123:14

close 30:25

CMS 56:21,23 57:21

code 61:9 62:5,6,8,
12 63:19 64:4,7,10
65:1,13 67:10 74:7,
10 77:11,21 81:16
143:3

codes 60:24 61:1,5,
20 63:21 64:4,11
65:4 66:14,20 67:2,
13,20 68:23 71:10,
19 72:6 81:5,25
84:11 89:19 90:6,12
100:17

collect 43:16 44:16,
17 45:9 46:3 47:4,5,
10,15

comfortable 60:4

comment 52:7,24

53:21

comments 68:5
69:2,6,7 83:17

common 7:4 64:9

commonly 43:7

companies 21:15,18
22:1

company 15:15,17,
23 16:12,16,19,25
17:4 18:20,24 20:17
22:11 23:5 45:14,15,
19 50:23 104:10,12,
13

compare 82:15
95:12

complaining 76:17,
19 137:17

complaint 137:12

complete 142:12
143:4,5

completed 54:1

completely 10:11

completion 14:21

complexity 125:13
141:11 143:18,24
144:8

comply 45:22

component 132:19,
24 141:16

components 73:20
74:2 125:11 140:14,
18 141:5,9

comprehensive
125:11,12 126:7
127:7 128:23
129:10,13 131:13,
16,17 132:13,16,20,
23,24 133:5,13,16,21
134:2 140:2,9,19,22
141:4,9,10,14,17,20,
22,25 142:1,4,8,11,
17,22 143:2,9,13

computer 61:16

concerned 45:8

concerted 10:12

conclusion 115:21

conclusions 107:4
111:4

condition 137:25

confidential 85:8

confirmed 110:19
118:12

confirms 48:6

conflict 118:2

confused 9:14 62:10

confuses 9:10

consistent 108:16
109:14 125:6 131:7

constitutes 131:13

consultation 26:11
28:9 53:11 60:22
70:10 72:8 103:17,
23,24 105:3,4 112:7
113:22,23 114:15
119:5

consultations 96:1

contemporaneous
85:24

contest 79:10

continue 50:5

continuously 21:18

contractor 104:10

conversation 10:4
50:18 51:4

conversations
49:16 51:25 71:14

converts 104:24

copay 43:11,17,22,
23 44:17 45:20 47:4,
11 48:3,7,23 50:10

copays 49:12

copied 56:6

copies 27:14 50:1

copy 48:16 61:13
62:20,21,25 64:21
124:6

corner 54:15 55:6

58:6 91:13 123:25

corporate 8:14

correct 8:2,20,21
9:13 13:6,7,24 14:3
15:3,22,24 16:13,15,
18 17:25 18:5,6,21
20:12 21:7,10,20
22:12,13,15 23:4,19,
20,22 24:5,10,15
25:18 26:15,17
27:20 28:1,12,18,21,
22,25 29:3,19,20,23
30:2,20,23 31:4,16,
19 32:4,21,24 33:21,
24 37:16 38:3 39:6,9
40:5,6,10 41:10,15,
16,17 42:6,7,10,25
43:1,5,6,8,13,15
44:8,9 45:4 46:17,
18,21,25 47:15 48:3,
5 49:14,15,18 50:17
51:19 54:4,5,16
56:22,25 57:5,12,14,
15 58:7,15 59:12
60:15,18,19,24,25
61:8,12,18,21 62:13,
14 63:14,20,23
64:13 66:8,9 67:5,
20,22 68:18,19
69:19 70:16 71:1,5,
6,16 72:11,12,16,20,
25 73:6,19 75:5,7,8,
11,18,19 76:5 77:18
78:6 81:22 83:9,19
84:3,17,18 86:1,9,
10,21 87:1,20,21
90:9,10,15 91:20
92:16 94:1,2,13,14,
20,25 95:9,10,16
96:21 97:8,9 100:8,
18,19 101:1 102:9,
10,15,24 103:3
104:8 105:21 107:4,
5,7,18 108:7,8,11,18
110:6,8,16 111:18,
19,23,24 112:16
115:9 116:10,15
117:3,4,10,19,20
121:1 122:21,25
123:10 125:6
126:15,19,22 127:2
128:12 129:20
130:1,18 134:14
135:8 136:5,15,20
137:6 139:13,19



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                    Index: correctly..ends

140:4,21 142:23

**correctly** 40:2 46:12
48:22 65:3 92:24
110:2 116:12 125:13
135:4

**could've** 11:15
98:10

**counsel** 4:13 6:11,13
118:3,23

**couple** 7:14 41:6
46:15 52:19 80:7

**court** 4:6,10,14,23
5:1,5 6:17 9:23 10:8
55:19 106:5,10,16

**cover** 42:23

**coverage** 42:18
43:5,9

**covered** 49:2

**CPT** 60:24 61:1,2,5,
9,13,14 62:4,5,16,21
63:16,17,21 64:15,
22 65:1,4,7,10,13,15,
20 66:3,11,14,20
67:1,10,13,20 68:23
71:10,19 72:6 74:6,
10 77:11,21 81:4,5
84:11 89:19 90:12
100:16 124:1,7,9
131:18 133:6

**create** 105:18

**credentials** 14:13
58:20

**curiosity** 30:4

**current** 23:5 73:24
127:10 128:5

**cut** 57:8

## D

**date** 4:9 17:10 38:21
58:5,7 60:12,13
83:23,25 111:10,12
112:10

**dates** 60:17

**day** 52:13 53:11

**days** 80:7

**De** 15:18,19

**deadlines** 40:22

**decide** 20:16,17

**decision-** 143:23

**decision-making**
125:12 141:11,15
143:18 144:7

**deductible** 43:24,25
44:6,8,10,11,12,23
45:1,2,9,11 50:14,24

**Defendants** 4:18,22
5:13

**define** 131:18 143:5

**definition** 133:5

**degrees** 58:20

**denial** 44:3

**deny** 45:15

**depend** 52:17,19

**dependent** 78:24

**depending** 29:15
41:22 53:11

**depo** 80:17

**deposition** 4:4,7
5:12,19 7:10 8:6,13,
23 9:8 10:23 11:23,
25 12:1,5,11,17 54:9
79:16,24 80:1,4,8,
11,24 81:2 82:3,25
86:4 101:22 103:10
105:21 121:11
123:21

**depositions** 5:20
6:14 8:8,17

**derived** 138:19

**describe** 13:8 22:22
25:23 32:5,8 42:21
56:16 61:6,10 74:10
83:4 105:2 114:23

**describes** 53:17
61:19

**describing** 124:18

**description** 63:13,
15 67:10 74:18 97:2
119:3 134:23

**descriptions** 65:4

**designations** 14:13

**desk** 26:2,8,10,13
27:25 28:14,15,17
30:6 32:12,21,23,25
36:21 41:10 50:7
51:20

**detail** 126:8

**detailed** 131:23,25
132:25 133:2,10,12,
18

**determine** 126:24

**diagnosed** 143:25

**diagnosis** 62:8
73:25 115:20 127:22
128:10,11,16 143:11

**diagnostic** 121:25

**Diclofenac** 131:3,4

**Dictaphone** 105:9

**dictate** 69:8 105:5

**dictated** 138:21

**dictates** 105:10

**dictation** 105:18
139:11,12,13,18

**didn't** 12:24 62:20

**difficult** 7:6 39:21

**direct** 6:20 58:16
129:15

**direction** 93:24

**directions** 116:5

**disagree** 5:23

**disclosure** 6:2,9

**disclosures** 5:15

**discovery** 54:22
55:13 102:4

**discuss** 12:1

**discussed** 5:12

**discussions** 5:17

**diseases** 130:11,12

**distinguish** 78:16

**District** 4:6,7

**doctor** 20:18 27:15,
16 77:2 83:6 86:15
90:20 92:25 111:9
114:24 115:4,7

**doctor's** 84:25
101:10 113:14

**doctors** 16:24 20:16

**document** 55:7
82:25 83:5 84:16
86:8,11,14,19,23
90:16,17 94:23
95:19 96:20 97:13,
23 98:16 100:15,20
101:3,21 102:3,7,8,
11,16 113:10 121:17
138:12 139:20
140:1,2

**documentation**
22:25 113:7

**documentations**
103:18

**documented** 119:1
120:25 138:6

**documenting** 89:5,
9 140:2

**documents** 12:4,7,
10,12,16 55:2 68:2
71:21,23 79:25 80:6,
8,18,22,24 86:23
106:19 130:20 140:8

**doesn't** 50:25
119:15

**don't** 17:13 58:24
135:14 139:4 144:21

**door** 27:19 30:25
31:10,11 37:25 39:8
50:7 51:14 54:4
59:20 60:5 71:19
126:18

**Dora** 23:24 24:4,11

**double** 59:23 106:16

**drink** 79:7

**Drive** 4:9

**due** 40:14

**duly** 5:7

**duties** 15:25 22:18
31:18

**duty** 22:25 104:6

## E

**earlier** 79:23 84:10
103:9 109:11

**easier** 10:9

**easy** 103:1

**eat** 144:17

**educational** 12:20

**effect** 28:8 140:24

**effort** 10:12 99:8

**efforts** 41:5

**Either/or** 135:15

**Elbow** 136:25

**electronic** 61:17
62:11,15 64:22
105:13

**element** 143:16

**elicits** 115:6 118:8

**email** 5:16

**embedded** 63:1

**emergency** 137:24

**employed** 15:1,4
103:12,13

**employee** 15:23
17:3 18:17 22:14,15,
19

**employees** 16:4
22:24 25:17 28:16
103:10

**employees'** 22:24

**employer** 9:3 20:9

**employment** 18:14
103:16

**end** 18:14 38:23
72:12 82:19 105:3
109:18 117:18 145:2

**ended** 38:19 47:18

**ends** 45:10



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                 Index: endurance..flexion

**endurance** 79:10

**English** 51:11

**ensure** 67:1,7,12,19 68:23 71:9,18 84:11 89:19

**enter** 62:5

**entering** 62:7

**entire** 18:5

**entirety** 142:17

**entities** 19:5

**entitled** 83:1 102:8

**entity** 19:4,16

**entries** 130:22

**entry** 128:21 129:24

**equal** 45:19

**equipment** 32:13,14 78:22

**essentially** 18:4 85:4

**established** 98:10 109:10

**estimate** 8:3 39:4

**evaluation** 72:8 73:21 77:8,13 78:8 83:1,7 85:9 97:15,25 102:8,21 105:8 106:24 110:5,12 111:5 112:4 124:24 125:2,3,9 135:7 138:23 139:16,22

**evaluations** 31:23 125:15

**everything's** 48:22

**exam** 27:6 33:3,5,12 35:11,15,16 36:5,6, 14,18,21 41:12,14,20 49:9,14,17 51:14 52:11,12,22 53:9,10, 18 54:4 68:12 70:17 72:23 85:12 111:16 114:23 127:10 134:23

**examination** 6:20 36:7,8 41:25 72:9 83:12,18 91:9

110:13 111:5 116:25 119:19 125:3,12 127:23 130:17 132:20,24 133:2,5, 10,13,16,18,21 134:3,4,5,7,23 135:10,18,20 136:2, 7 138:11 140:9,22 141:4,10,17,21,22,25 142:1,5,7,12,17,18, 22 143:1,4,5,9,14

**examinations** 31:6, 23 35:8 125:16 135:6 140:19

**examine** 114:24 133:1 137:4,13

**examined** 5:7 113:23 134:12 140:24

**examining** 52:22 84:8 111:22 113:14 119:6

**exams** 41:7,16,18 42:9 70:23

**exclusively** 8:8 41:19

**Excuse** 14:10

**exercise** 127:5

**exhausted** 39:11,23 40:3 44:24 46:1,17, 22 47:2,3,9

**exhibit** 54:8,11 55:18 72:3 74:7 82:3,4,25 84:4,16 85:9 86:3,5 90:17 91:2,4,19,20 92:13 95:12,13,15,23,24 96:19 97:8,12,15,21, 24 98:11,16 99:7 100:6 101:21,23 102:23 105:9,19,25 106:25 107:1,21 108:13,18,23 109:9 110:12 111:20 112:2,19 113:6 114:3 116:13 118:13 119:1,20,24 121:1,7, 11,12 123:21,22,25 125:22,23,24 126:22 127:17 128:20 130:22,23 135:24

138:22,24 139:17

**exhibits** 106:8,15 125:22 133:25

**exist** 14:8

**exists** 101:3

**expect** 36:3 138:6 142:3

**experience** 13:10,22 52:15 53:14 70:12 78:23 131:15

**experiencing** 118:17

**explain** 43:21 50:23 95:21 102:19 126:5 134:1 138:2 140:13 143:23

**explained** 44:20 47:13

**explanation** 9:21 45:16 64:3 99:1 131:25 133:20

**extension** 92:21 109:24 120:1,2,15

**extension/flexion** 93:18,20

**extent** 5:20

**extra** 32:12

**extremities** 134:14 136:24

**extremity** 138:16

**eye** 138:3,4

**eyes** 42:2,9 138:1,7

---

**F**

**face** 70:19,25 71:4 140:15 141:6

**facility** 123:16

**fact** 119:9 130:15 134:6

**facts** 96:24

**fair** 14:2 23:3 27:25 31:15,21 41:18 64:2, 19,20 65:8 68:12

71:15 72:21 74:15 78:10 94:6 140:25

**familiar** 9:6 64:11, 18

**fancy** 88:15

**Farm** 4:5,17 57:14, 17,22 100:13,22 102:12,14

**fault** 16:8

**fax** 103:18

**feel** 132:4

**feels** 59:3

**Feijoo** 4:6,19 8:14, 24 9:2 12:2 15:2,4, 11 17:7 20:13,21,23, 24 22:6,7,15,19 23:3 24:14,16 25:3,11,12, 13,17 27:1,5 29:8, 15,24,25 30:6,12,15 31:20,24 41:25 42:5, 8 43:7,16 44:16 45:19 46:24 47:1 48:4 49:13,16,24 50:15 51:9,16 54:2 57:20 58:10,23 59:3, 11,13 60:6,13 61:7, 11 64:23 66:15,16, 22 67:2,4,13,19,21 68:24 70:19,25 71:9, 10,11,14 72:22 73:21,22 74:19 75:24 77:1,5,8,10, 12,19 78:7,17 81:5 83:8,14,16 84:2,13 85:10,11 87:16 89:9, 20 90:12,14 94:5,12, 17,23 95:14,22 96:11 97:13,22 100:12,21 101:2 102:13,23 105:4,7 107:1,3 108:7 109:3 110:5 112:23 116:6 118:6,16 121:25 122:7 123:8,11,14 125:1,4,16 126:10 127:1,6 131:14 132:6 135:5 136:8 137:12 138:20 139:13,23 140:3,9 141:19 142:14,21

**Feijoo's** 4:19 21:9,

19 30:18 32:6 36:21 41:7 49:8,20 84:5,19 85:2 86:24 88:13 89:4 104:7,24 125:23 126:5 134:1 139:17 143:22 144:6

**field** 17:24

**file** 26:19,21 27:17 29:19,21 35:16 37:8 38:18,19,21,22 40:4 50:1,2,4 52:5 55:19 106:4,15,18

**filed** 39:16

**files** 26:3 29:12 37:17 38:16 69:14 105:4

**filing** 25:25 26:5,20

**fill** 27:11,13 28:23 50:11 95:14,22 96:19 97:3 121:25

**filled** 83:21 84:1 85:10 86:23 98:10

**fills** 28:24 29:2,4 68:11 83:16 85:15

**film** 33:19

**final** 100:25

**find** 6:7 38:14 39:1 40:15 53:7 88:9 114:15 143:10

**finding** 108:6,15 109:4 110:4 112:23 114:3,9 119:12 120:18 135:2

**findings** 83:17 86:24 95:9,23 96:20 102:23 107:4 109:14 110:10,20 112:2,3, 13,18 120:25 121:7 136:15

**fine** 70:11 76:12

**finish** 10:11,13,18, 19 12:24 43:20 49:4, 7 57:9

**fixtures** 34:25

**flexion** 92:21,22 94:4 109:24 120:1,4, 15



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                    Index: Florida..incorrectly

**Florida** 4:7,9 7:1 24:18

**flower** 34:22

**fluttering** 138:7

**folder** 29:19,21 30:9 51:18,20

**follow** 27:18 32:20 81:3 86:18 96:12 100:23 114:4 117:1 127:12 143:17

**follow-up** 70:23

**form** 27:11,13 45:21 50:11,15 51:4,9,11 54:6,20,21 56:14,17, 18,19 57:2 66:23 75:20 76:10 83:16 84:2 85:9,11,14,20 87:2,7 88:21 92:3,8 95:5,17 96:23 97:16 98:1 99:10 100:9 103:1 108:19 110:7 111:7,25 113:4 114:11 115:10,24 118:1,22 120:21 121:20,22,24 123:18 128:13 131:21 134:9,16 140:5

**format** 61:17

**forms** 28:20,24 29:2, 5 57:21

**forward** 21:22 22:5

**found** 66:3 97:5 110:5

**foundation** 75:21 76:10 88:21 95:5,17 96:23 97:16 98:1 99:10 100:9 110:7 111:7,25 113:4,10 114:11 115:24 118:1,22 120:21 131:21

**fourth** 107:7,17

**frame** 34:20

**front** 26:2,8,10,13 27:19,25 28:14,15, 17 30:5,6 50:1,7 51:20 103:25

**full** 6:23

**fully** 35:2 106:11,17, 18

**funny** 118:4

**furniture** 34:12,19, 24 35:17

**fuzzy** 7:23

**G**

**G-I-S-E-L-A** 103:7

**gave** 14:20 81:8,12, 20 103:9,11 114:2

**general** 53:13 70:12, 13 121:24

**generally** 31:5 41:8 43:11 54:2 56:13 60:5 70:3,14 72:6 82:21

**George** 4:11

**girl** 38:18

**girls** 49:25

**Gisela** 103:5,7 104:20,22

**give** 5:2 7:16 8:5,13 9:21 12:20 14:16 27:9,11,16 49:24 50:2,3 74:18

**giving** 37:22 116:17

**goal** 55:24 56:9 106:18

**good** 9:19 10:3 17:19 18:17 56:1

**grader** 107:7,17

**graduate** 12:23

**greets** 104:3

**ground** 9:7

**guess** 17:15 33:16 34:21 97:17 98:13

**gun** 80:1

**guys** 144:17

**H**

**H.P.** 82:11,22 85:10

**habit** 129:4,14

**habits** 130:6 131:2

**half** 20:5,6 52:14

**hand** 4:24 35:21 115:5 136:25 138:18

**hand-written** 71:12

**handed** 82:24

**handing** 54:8 82:2 86:3 101:21 121:10 123:20

**hands** 35:24

**handwriting** 68:14 83:6,17 84:5 93:1 101:8,11 122:10,12 129:2,12

**handwritten** 68:17 69:1 84:15 92:15 93:14 95:16 97:7 102:22 104:24 105:6,7,14 109:10 125:23 129:1,7,16, 17 135:12,24 138:11,19,23 139:9, 23

**happen** 19:20 29:17 37:11 41:19 52:9,14 60:4 137:23

**happened** 24:6 52:11 53:18 142:15

**hard** 41:2

**haven't** 59:9

**Hazouri** 4:16,21 5:9,21,23 6:11,21 11:13,16,21 12:9 14:12 45:24 46:8 47:21 54:7,13 55:24 56:5,8,12 66:25 75:22 76:12,13 79:4, 8,19,24 80:20 82:7,8 86:7 88:22 92:9 95:6,20 96:25 97:19 98:6,14,24 99:13 100:11 102:1,2

**97**:4 102:4 107:7 110:5 111:22 112:24 121:18 126:6,14 134:2 141:20 143:22 144:7

**habit** 129:4,14

**106**:2,6,13,18,22 108:21 110:9,15 111:11 112:1,9,17 113:5,15 114:17 115:3,11,25 118:4,5, 24 120:22 121:4,15, 16 123:24 128:18 131:24 133:14 134:11,17,20 135:13,21,22 139:4, 6 140:6,16 144:10, 16,21

**HCFA** 57:6,7,21

**he'll** 60:2

**head** 9:22 75:13

**headache** 136:5,10

**Headaches** 136:12

**heading** 122:5

**headings** 107:21

**Health** 57:1

**hear** 40:19 59:9

**heard** 4:6 42:12,15 54:18 57:8 64:14,16 71:23

**hearing** 141:8

**held** 4:8 79:15 145:1

**helped** 18:18

**high** 12:21,22,23,24, 25 13:1,2 18:1 19:22

**higher** 72:21,22,24

**highest** 72:19

**hip** 117:6

**historical** 131:11

**history** 73:24,25 125:11 126:7 127:7, 8,21,22 128:1,3,4,6, 11,17,20,24 129:10, 18 130:22,23,24 131:13,16 132:5,12, 13,17 140:18 141:9, 14

**hitting** 40:22

**hold** 13:3 14:13 56:4 81:24

**holds** 73:15

**holes** 124:4

**home** 55:22,23

**horse** 85:23

**hurt** 115:1

**hurts** 115:7 117:6,13

**hypothetical** 100:10

**hypotheticals** 96:24

**I**

**ID** 19:6

**idea** 70:13

**identification** 54:12 82:5 86:6 101:24 121:13 123:23

**identified** 5:14 6:5

**identify** 55:2 99:21

**identifying** 55:21

**IDS** 27:14

**illness** 127:21 128:20 130:23 143:10

**Illnesses** 131:1

**impeachment** 5:18, 19

**important** 61:9 66:14

**impression** 64:18

**improper** 96:24 100:10

**inappropriate** 39:17

**include** 67:19 80:2 141:20

**included** 48:12,19 78:2 97:14 100:16 126:7 134:2 142:7 143:1 144:7

**including** 6:5 58:20 101:18

**incorrectly** 39:16



**independent** 104:10

**indication** 90:20

**individually** 58:13

**information** 6:8 50:3 55:21 67:23 68:3 85:15 87:3 93:3,14 95:13 96:19 97:7,12,22 98:11 101:14 105:17 107:1 131:10,11 139:18, 21,22

**initial** 5:14 60:21 70:10,17,21 72:8 73:21 77:7,13 78:8 83:1,7 85:8 97:14,24 100:23 102:8,21 104:5 105:8 106:24 110:5,12 111:5 112:3 125:15 135:7, 17 138:23 139:16,21

**inject** 34:9 36:9

**injection** 32:14 34:4,5,7 41:13 53:20

**injections** 34:3 36:16

**injury** 42:12,17,24 137:12

**inside** 32:11 49:22 61:15

**installed** 63:4

**instruct** 11:9,16

**insufficient** 6:9 96:24

**insurance** 26:24 27:12,14 42:13,18, 22,23 43:7,24 44:3 45:14,15,18 46:13 47:17 50:13,23,25 57:1,14,17

**insurer** 100:21,22 101:5,16 102:12,13

**insurers** 57:22 100:13

**intake** 28:22,23 50:11

**intend** 8:23

**interest** 25:13

**interpret** 123:7

**interpretation** 122:17

**interruption** 14:11

**introduce** 4:13

**isn't** 79:10 134:14

**issue** 44:6,10 65:12

**issued** 48:23

**issues** 47:16 78:8

**items** 14:4 92:15

### J

**January** 21:22 58:7 60:12,13 89:21 111:22 112:4 126:6, 14 134:1 141:20 143:22 144:6

**Jerry** 4:18 5:9 11:1, 2

**job** 9:19 10:3 41:3 104:6

**jobs** 18:4

**joins** 30:22

**jumped** 80:1

**justify** 99:8

### K

**keeping** 85:7

**Ken** 4:16,22 5:11 55:17 79:23 105:23

**Kenalog** 34:7

**key** 125:11

**kind** 25:1 27:7 49:1, 11 71:8 129:5 142:1

**knee** 136:25 137:13 138:13

**knew** 18:16 88:9

**knowing** 98:22

**knowledge** 116:17

141:18

### L

**lack** 119:2,23

**Lagoon** 4:8

**language** 124:18

**lateral** 92:22 94:3 109:24 120:4,15

**law** 59:10

**leading** 115:19

**leaves** 27:6 49:19 54:4

**left** 18:18 20:15 46:24 75:4 87:12 94:3 109:25 117:5 120:5,16

**left-hand** 124:12

**Legal** 4:8,12

**Leon** 15:18,19

**letters** 93:7

**letting** 12:15

**level** 72:14,19,21,22

**levels** 72:15,17

**license** 59:1

**licenses** 13:3

**life** 18:5

**lift** 75:12 117:7

**ligament** 75:17

**light** 33:16,22 56:4

**limitation** 76:16 89:2,5,9 94:19 116:19,21

**limitations** 74:21,23 86:16 94:12 112:24 121:3 144:3

**limited** 92:22 94:8 108:3,10 109:1,4,19 110:1 112:20 114:5 115:16 116:21 118:14,16 119:10 120:11 129:11 144:2

**liquid** 32:14,19

**listed** 6:2 87:12,19

**live** 6:25

**located** 15:17,18 24:20 54:23

**long** 6:13 11:8 15:4 24:20 65:17 69:25 70:3,14,17

**looked** 39:8 65:10 66:10 84:13 132:12 138:14

**lot** 10:5,9 17:15 38:15 39:1 51:6 52:18 64:4,9 137:21, 22 144:15

**lots** 37:17

**loud** 9:20

**lower** 88:5 134:14 137:19 138:16

**lumbar** 89:16 91:25 92:4,7 108:17 110:11 113:8 122:7 123:4,9 136:19

**lumbosacral** 107:23 109:17,23 110:22 119:24,25 120:14 134:13 138:15

**lunch** 10:4 144:13, 17,20

### M

**M-E-D-R-A-** 103:7

**M.d** 8:24

**M.D.** 4:6 8:14

**machine** 123:11

**made** 6:7 23:23 38:22 102:23 108:6 109:3 110:10 112:23 119:12 138:19

**main** 39:8

**majority** 53:8

**make** 4:20 9:7 10:8, 9,12 27:13 39:1 46:10 47:14,25

48:16 50:1 52:24 53:19,21,22 55:6,18 57:9 67:10 69:17 76:15 82:14 83:18 85:11 90:11 91:12 93:23 106:16 143:2

**makes** 9:24 36:13 115:7 142:7

**making** 84:8 143:24

**managed** 16:16 25:16

**management** 124:24 125:2,3,10

**manager** 16:1,3 22:24 23:2

**mandatory** 66:20

**mans** 28:17

**manual** 40:8

**Manuel** 4:5,19 8:14, 23,24 25:12

**March** 58:6

**Maria** 4:25 6:24

**marked** 54:8,11 55:18 82:4,4,25 85:9 86:3,5 90:16 97:15 99:7 101:21,23 102:23 105:8,19 106:25 108:18 121:11,12 123:20,22 127:17

**marking** 106:8

**married** 18:15

**Martha** 4:11

**Martinez** 4:25 6:24

**math** 17:15

**matter** 4:4 19:22 57:20

**meaning** 37:4 76:18

**means** 89:1 92:6,18 93:11 122:18 134:7

**media** 79:17

**medical** 4:19 8:19 13:3,5,9,23 14:2,5, 14 15:12,14,16 16:7,



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                    Index: Medicare..organized

9,11 17:1,23 18:25
19:3,17 21:25 22:12,
23 23:6,20 24:7
26:3,6,25 28:9 30:22
31:22,23 36:1 37:6,
11,20,21,24 38:8
39:7,9 46:23 48:12,
19,24 54:23 55:12
57:11,13,16 61:2,6,
10 66:15,21 67:3
71:11 73:21,24,25
74:10 77:1 82:10,18
118:2 121:17 125:12
127:10 128:6
129:10,18 130:22,24
141:10,15 143:18,23
144:7

**Medicare** 13:11,14,
17,19,25 14:1 27:12
45:23 52:18 56:23
73:17

**medication** 127:22
131:2

**medications** 35:19
130:8

**Medicine** 34:18

**Medrano** 103:5,7
104:22,23,24 105:14

**meet** 10:22 11:6,11,
22 125:17

**meeting** 68:11
127:19

**meets** 128:24

**members** 25:16
26:6

**memory** 73:23

**mention** 7:6

**mentioned** 65:14,22
69:2,3 89:23,24

**met** 126:22,25
127:19

**Miami** 4:8,9 7:1
13:2 15:21 24:18

**middle** 60:9

**might've** 40:9

**mind** 48:4 90:17
119:12

**minute** 68:8

**minutes** 11:20 69:21
70:18,24 140:15

**mischaracterized**
135:19

**mischaracterizes**
134:19 139:2

**mischaracterizing**
135:17

**misfiled** 40:9

**missed** 55:25

**mistake** 38:18,22

**Mm-hmm** 19:15
107:16 130:25

**moderate** 125:13
141:11 143:18,24
144:8

**modifying** 78:5

**money** 47:19

**month** 62:3

**monthly** 62:2

**morning** 26:11,12,
18

**motion** 60:22 74:11,
12,13,15,19,23 75:1,
4,7,10,13,17,24,25
76:5,8,22,23 77:2,7,
11,12,22 78:7,9,17,
19 86:9,20,24 87:17
89:5,18 90:21 92:18,
21 93:11 94:1,4,24
95:15,23 96:2,3,4,7,
11,15,20 97:11,13,
21,23 98:3,4,8,9,11,
17,21,23 99:22,23
100:2,5,6 101:4,18
108:3,6,10,14,17
109:2,4,10,19 110:1,
4,10,21 111:3,17,21
112:3,7,8,14,20,25
113:7,9,12,13,24,25
114:5,10,13 115:12,
16,22,23 116:4,9,15,
19 117:3,9,10,13,18
118:7,14,17,18,25
119:4,10,13,15,18
120:2,12 125:24
138:24

**motions** 76:1 94:13
120:20

**move** 18:7 41:8
46:16 75:2 93:25
116:5 117:22 133:9
143:16

**moved** 18:15

**movements** 111:18,
21

**moves** 20:10

**moving** 52:12

**multiple** 25:4,5

**muscle** 75:17

**muscles** 110:1
120:11

**Mutual** 4:5,17 57:22
100:13,22 102:12,14

---

# N

**N-O** 103:8

**N/a** 129:22

**necessarily** 116:20,
22

**neck** 88:6,10 137:12,
19

**needed** 40:16 52:8
100:7

**needles** 35:20

**neurological** 137:25

**next-door** 37:18

**nice** 18:7,10 34:23
101:20

**night** 26:11,12,18

**nod** 9:22

**non-verbal** 8:4 11:5
25:22 77:25

**normal** 92:23 94:16,
19,22 108:3,10,15
109:2,20 110:2
112:20,25 114:5
115:17 118:15
119:11 120:12

**notation** 50:2 53:22
69:10 115:8

**notations** 85:11

**note** 67:24 68:2,4,8,
10,15,17,18 69:1,10,
11,14,15 71:12,13
83:6 84:13,15 93:1
101:8,11 104:24
105:5,6,14,18
127:20 129:1,2,12,
16,17 138:14 139:14

**noted** 112:13

**notes** 69:8 84:7
85:24 92:15 95:16
97:7 125:23 135:12,
24 138:11,19

**number** 13:23 48:3
54:15,25 55:4,11,23,
25 56:19 72:12
81:12 91:11 106:1
141:9,10,11

**numbers** 7:16 54:17
60:17,20 81:8 94:16,
18 95:8

**nurse** 27:1 30:22

---

# O

**oath** 5:8

**object** 5:13,17 11:9
12:7 96:23

**objected** 11:15

**objection** 5:24
11:19 12:14,19
45:21 46:5 47:12
54:6 66:23 75:20
76:10 80:2 88:21
92:8 95:3,17 96:23
97:16 98:1,12,18
99:10 100:9 108:19
110:7,14 111:25
112:5,15 113:4,10
114:11,25 115:10,24
118:1,22 120:21
121:2 128:13 131:21
132:8 134:9,16
139:2,5 140:5,11

**observations** 70:2

**occasion** 137:16

**occasions** 7:13

**occupation** 107:12,
14

**occur** 20:3

**occurring** 31:6

**occurs** 67:7

**office** 13:12 16:1,3
21:19 22:24 23:2
24:20 25:3 30:14,15,
16,18 31:8,9,10,14,
21 32:6,7,11 33:3,6,
9,12 34:6,10,13
35:13 36:21,23,24,
25 37:2,5,6,7,12,18,
25 39:9 41:9,16,19,
22 47:14 49:4,8,13,
20,22 52:3,4 60:21
61:14 62:4 69:17,22
70:20 71:22,25 72:8
78:21 83:11 89:20
103:19 111:6,15
112:10 124:23 125:9
126:6,10 127:1
131:14 134:1 141:6
144:6

**offices** 16:14

**offsite** 38:2 39:19,24

**on-the-job** 13:22

**open** 20:10

**opened** 24:6

**opinion** 99:17

**opposed** 9:21 52:11
95:24

**opposing** 118:2

**opposition** 5:25

**oral** 69:6

**orally** 69:22 139:24

**Orange** 4:8,12

**order** 27:10 29:10,
12,16 45:16 67:18
78:3 100:14 121:23

**ordered** 6:16 29:22

**organized** 39:13
40:3



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo

**orient** 91:7

**originally** 19:21 54:20

**orthopedic** 75:24 83:1 85:8 97:14,24 100:23 102:8,21 105:8 106:24 135:7 138:23 139:16,21

**outpatient** 124:24 125:9

**overbilled** 47:18

**Overbroad** 76:11

**owe** 45:2

**owes** 45:6

**owing** 45:10

**owned** 24:4 25:12

**owner** 17:3 23:6,8

**owners** 23:18

**ownership** 25:13

**owns** 25:11

---

**P**

**P.a's** 72:22

**P.A.** 8:14,24 9:2 15:2,5,11 17:7 22:15,19 24:14,17 25:3,11,14,17 27:6 43:7,16 44:16 46:24 50:15 51:9 57:20 58:10 59:3,13 64:23 66:15 73:22 77:5,11, 19 81:5 90:13 100:12,21 102:13 123:12 125:4 126:10 131:14 132:6

**P.a.'s** 45:19 47:1 48:4 59:11 67:2,13, 19 71:9,10 101:3

**p.m.** 144:25

**pad** 32:15 53:25

**paid** 6:16 44:21 132:8

**pain** 34:8 91:16,24, 25 92:4,13,16,23

94:23,25 95:12 109:23 113:1,8 114:9,14,16 115:6, 19,20 116:13,20,22, 24 117:7,17 118:8, 18 119:2,15,18,23,25 120:14,19,25 121:5, 6 128:15 131:5 136:14,17,19

**painful** 108:11 109:3 112:21 114:6 115:17 118:15 119:11

**palpate** 114:18

**Palpates** 115:5

**palpating** 117:21

**palpation** 109:25 112:6 113:13 114:19 115:19,22 116:8,14 120:8,9

**palpations** 113:22 114:15

**paper** 38:16 48:10 64:21 71:21 90:22 99:7

**paperless** 38:16

**paperwork** 29:18 104:5

**paralumbar** 110:1 120:11

**parent** 42:5

**part** 11:11 23:23 44:21 48:8 70:7 75:2 77:7,13 78:7 88:4 89:15 109:22 113:25 118:6,25 124:23 127:19 128:17 136:7 138:4 143:8

**parts** 140:24

**pass** 14:17 52:4

**past** 59:25 73:24 127:8,22 128:5,7,15 129:17 130:22,24

**patient** 27:5,12,19, 24 28:2,4,7,12,23,24 29:2,4,5,9,15 30:8, 10,13,18 31:1,20 32:13 34:5,6,8 36:8,

9 38:18 41:9,23 42:4,6 43:20,23 44:4,7,15 45:6,8,10, 13 46:11,12,20 47:10,15,18 48:7,10, 24 49:3,8,12,13,17, 19,23 50:5,6,9,16,18, 20 51:3,8,10,14,18 52:18,23,25 54:2,3 55:21 60:14 61:11 67:8,21 68:5,6,11,25 69:3,12,23 70:1,4, 10,15,21 74:22 76:16 77:3,14 78:8, 24 82:11,22,23 83:11,24 84:8 85:10, 25 86:17,25 89:3,6, 20 93:25 94:5 95:25 96:1,3,6,11,21 97:4, 10 98:23 99:21,23 100:4 102:4 107:2,3, 7 110:13 111:6,14, 17,20,22 112:4,24 113:14,23 114:16,24 115:5,6,7 116:5,19, 20,24 118:8,16,17 119:8 120:19 122:8 124:25 125:4,10 126:6,14 127:7 128:5 129:13 130:8 132:12 133:1,2 134:2 135:1 136:8 137:11,16,20,23 138:8 140:3,15 141:7,20,23 142:9, 12,14,16 143:1,4,6, 10,22,25 144:1,7

**patient's** 44:4 45:2 47:2,3 48:12,19 71:3 76:19 85:7 89:20 105:24 128:6 137:13 138:4,7

**patients** 27:9,10,24 29:22 32:18 33:1 42:24 43:17,18 48:2 52:21 73:15,18 93:23 96:6,7 98:3 99:25 104:3 125:17 135:6 136:8 144:1

**pay** 45:14 50:13,23, 25 61:15 63:3

**paying** 46:14

**payment** 44:3 50:21

**pays** 43:9

**people** 7:4 132:10

**percentage** 52:10, 14 53:8

**perfect** 117:5

**perform** 78:18,20 87:17 98:21 111:2 127:5

**performed** 31:23 61:6,11 77:12,15 90:21 99:22 100:7 122:8 123:16 127:7 134:24

**performing** 86:16, 24 110:12 125:16

**performs** 35:8 41:25 77:2 78:7 96:11,15 103:4

**period** 21:8 22:2

**person** 13:23 42:8 61:25 83:22 90:5

**person's** 10:6

**personal** 19:21 20:1 42:12,17,23

**phone** 55:23,25

**physical** 91:8 130:17 134:4 135:18,19 136:1

**physician** 58:19

**physician's** 16:14

**physicians** 16:5,20 22:3

**pick** 49:6 56:9

**picture** 34:20

**piece** 90:22 99:7

**pieces** 105:17

**pills** 34:15

**PIP** 8:7,8 42:13,14, 15,18,22 43:7,9,14 44:11,12 45:5 46:16, 19 47:3 57:17,22 100:13,21 101:4 102:12,13

**PIP-ONLY** 43:17

**PIVNICK** 75:20

**Pivnik** 4:18 5:11,22 11:2,4,6,9,18 12:6 45:21 46:5,7 47:12 54:6 55:17 56:3,7 66:23 76:10 79:23 80:12,15,19 88:21 92:8 95:3,5,17,19 96:22 97:16 98:1,12, 18 99:10 100:9 105:23 106:4,12,14 108:19 110:7,14 111:7,9,25 112:5,15 113:4,10 114:11,25 115:10,24 118:1,22 120:21 121:2,14 128:13 131:21 133:12 134:9,16,19 135:11,16 139:2 140:5,11 144:14,20, 23

**place** 38:5 85:20 91:12 94:11

**places** 27:7 40:9 85:3 115:4 127:18

**Plaintiff** 4:17

**plaintiff's** 5:14 54:11 82:4 86:5 101:23 121:12 123:22

**plural** 136:12

**point** 20:18 30:13 38:8 56:1 97:11,20 98:15 105:23

**policies** 43:17

**policy** 44:11,12 45:5, 22 47:1

**Ponce** 15:18,19

**position** 47:1 59:11 103:12,15

**positions** 25:24 103:10,11

**post-it** 53:25

**practice** 4:19 16:22 32:3 57:20 59:14 64:6 72:22



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                                     Index: practices..relating

**practices** 16:23

**preparation** 12:4, 11,16 79:25 80:17, 24

**prepare** 10:23 11:23,25

**prepared** 58:9,13 81:1 126:17 127:1

**prescribes** 34:5

**prescription** 32:15 49:25 51:17

**present** 4:13 127:21 128:14,16,20 130:23

**presenting** 128:7

**presently** 25:19

**preserve** 5:24

**presses** 115:5

**pretty** 35:2 131:7

**previous** 129:3,12, 13,21,25 130:24 132:25

**previously** 30:21 124:25

**price** 81:16

**primarily** 32:1

**Primary** 15:12,13, 14 16:8,25 17:8 18:14 20:9

**prior** 78:16 83:10

**private** 27:12

**privilege** 11:12 12:8

**problem** 128:7

**procedure** 47:13 48:8,20,21 57:21 101:3 138:4

**process** 27:4 31:13 54:3 104:19

**produce** 6:19

**produced** 5:15 6:7 37:20 54:21,25 55:1, 13 82:22 102:4

**product** 11:11 12:8

**professional** 27:1 30:22 104:14

**Progressive** 65:12, 19 66:1,4

**proper** 77:16

**properly** 73:22 78:13 143:2

**protection** 42:13,17

**provide** 13:12 63:13 105:5 132:1 133:9

**provided** 6:8 13:20 60:14 66:16,21 67:3 68:25 71:11 84:12 90:13 100:15 102:16 107:3 141:19

**provider** 61:7 77:1

**providers** 46:23

**providing** 97:7

**provision** 106:15

**publication** 64:15

**published** 61:1

**pull** 29:15 108:13 125:20

**pulling** 26:3

**purpose** 61:5

**purposes** 5:18,19 143:2

**pursuant** 47:11 54:24

**put** 14:1 21:4 29:12, 19,21 32:14 33:20 35:20 36:10 40:16 50:4 52:9 54:25 57:10 67:2 69:13 71:10 91:1 114:13, 14 126:9 129:1,11 139:14

**puts** 51:18 103:1

**putting** 116:21

**Q**

**qualifies** 140:22

**Quality** 19:3,7,17

20:10 21:11,16 22:1 23:15,17,24 24:3

**question** 9:10,16 10:11,13,18 11:14 25:2 51:3,8 57:10 66:19 67:9 68:22 71:7 77:9 78:16 87:2 97:18 98:15 99:3 108:20 111:2 114:1 115:15 119:14 126:4,5 129:3 133:25 141:8

**question's** 10:6

**questioning** 43:20 49:7

**questions** 9:9 10:5 24:14 41:7 46:15 49:3 66:19 81:3 126:3

**quick** 79:9

**quickly** 129:6

**R**

**raise** 4:24 117:3 142:9,15

**range** 60:22 74:11, 12,15,19,23 75:1,4,6, 9,13,17,23,25 76:1,5, 8,21,22 77:2,6,11,12, 22 78:7,9,17,19 86:9,19,24 87:17 89:5,18 90:21 92:18, 20 93:11 94:1,4,12, 24 95:15,22 96:1,2, 3,4,6,11,15,20 97:11, 13,21,23 98:3,4,8,9, 10,17,21,23 99:22,23 100:1,5,6 101:2,4,18 108:3,6,10,11,14,15, 17 109:1,2,4,10,19, 20 110:1,2,4,10,21 111:3,17,21 112:3,7, 8,14,20,21,24,25 113:7,9,12,13,24,25 114:5,6,10,13 115:12,16,17,21,23 116:3,9,15,18 117:3, 9,10,12,18 118:7,14, 15,17,18,25 119:4, 10,11,12,15,18 120:2,11,12,19

125:23 138:24

**ranges** 75:25

**rate** 92:12

**rays** 33:17

**read** 56:3 64:3 88:12 92:24 103:2 110:2 114:3 123:1 124:17, 22 125:13 129:7 130:9 131:8

**reading** 51:4 109:18 124:19 129:6

**ready** 84:2

**real** 40:23

**reason** 9:11 19:22 58:1 73:12 99:5,16, 18 113:20 114:13 116:12

**reasonable** 43:10

**reasons** 20:1 58:3 132:15 144:5

**recall** 37:21 49:2 66:12,13,17 69:4 73:9,11,12 74:2 81:7,9 89:25 132:18

**receive** 68:3

**received** 13:9,11 14:15

**recently** 19:23

**reception** 36:20

**receptionist** 28:13, 16,19 29:6,18 104:1, 2

**receptionists** 26:14

**recess** 79:15 145:1

**recognize** 56:14

**recognizing** 21:15

**Recommendations** 105:25

**reconfirm** 60:11

**record** 4:24 6:12,13 26:3 55:13 68:10 79:14,18,22 124:23 144:22,24

**recording** 105:13,14

**records** 22:23,25 26:6 37:14 40:8,20 67:25 80:10 82:10, 18 100:14 126:25 127:6 128:4 132:5 138:6 139:8,9,17,23 143:21

**redact** 56:1 106:8

**redacted** 55:21 105:24 106:11,17,19

**redactions** 56:10

**reduce** 45:23

**reduces** 45:19

**reduction** 45:20

**refer** 55:4 144:4

**reference** 61:24 65:7 105:15 116:13 119:21 121:6 125:21 126:2 128:9

**referenced** 46:17 120:9,20

**referred** 20:23,24

**referring** 9:3 68:12

**reflect** 66:15,21 67:3 68:24 71:11 84:12 90:13 95:9 135:9 143:23

**reflected** 127:6 132:5 135:6 137:18

**reflects** 106:25 107:2

**refund** 47:17

**refused** 6:19

**region** 87:15,19 89:8,12 109:23 120:1,15

**regions** 87:11,12,16 88:18

**regularly** 90:6

**related** 14:1 42:6 43:10 80:11

**relating** 83:18 102:3



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo
Index: relationship..sir

**relationship** 6:17
18:13,14 20:13

**relies** 50:15 51:9

**rely** 70:2

**remain** 81:14 121:7

**remains** 80:21

**remember** 49:9
53:23 65:13 67:17
81:9,10 100:1

**remind** 10:17

**rendered** 127:23

**repeat** 77:9 108:20

**rephrase** 9:11
140:20

**report** 59:18 69:11
71:13 77:22,23,24
78:2,9 84:23 86:9,
20,22,23 87:11,13
89:18,25 90:2,3,4,9,
18,23 96:2 97:21
98:4,8,22,23 99:6,9,
21 100:23 101:4,14
102:22 104:25
105:10 107:7
108:14,18,23 109:10
110:23 112:14
113:7,21,24 115:22
119:2,3 125:24
127:13,14 129:1,7,
10 131:7 135:10,12,
18 138:19,24,25
139:10

**reporter** 4:10,14,23
5:1,5 6:18 106:10

**reporter's** 9:23 10:8

**reporters** 6:17

**reports** 98:17
103:18 104:7

**represent** 55:12
82:9 88:10 124:3,6

**representative** 8:14

**represents** 140:9

**request** 22:25 54:24
121:18 123:15

**requested** 5:16

**requesting** 122:7

**require** 38:20 58:2
96:3

**required** 66:20
73:20 74:2

**requirement** 43:12
50:16 59:5,7,8 78:2
90:3 127:19,20

**requirements** 78:12
125:18 126:21,25
128:24

**requires** 90:9
125:10

**response** 8:4 11:5
25:22 77:25

**responses** 5:24,25

**responsibilities**
22:19

**responsible** 16:5
44:1,2,7 47:19
50:12,14,21,22,24
51:1

**restricted** 76:5,8

**restriction** 76:22
94:24 97:6 110:21
111:4,21

**restrictions** 95:15
113:1

**restroom** 36:22

**resumed** 79:16

**returning** 47:18

**review** 12:4,10
32:13 53:20 54:1
59:19 62:9 65:22,25
67:8,18,20,23 69:14
77:21 80:17 138:4

**reviewed** 12:7 66:6
79:25 80:6,9,12,22,
25 99:6

**reviewing** 16:6 62:6
68:2 80:23

**Ricardo** 20:19,23

**right/left** 92:21

**road** 6:13 71:8

**Rodriguez** 4:11,12

**roles** 23:2

**ROM** 92:16 93:6

**room** 29:1 32:16
33:7,8 35:8,11,15
36:5,6,14,22,24
41:12,14,20,24 42:5
71:3 79:1 111:16
137:24

**rooms** 36:18,23 37:1

**rotation** 92:22 94:4
109:24 120:4,16

**routinely** 100:21

**rows** 60:9,16

**rules** 9:7

**run** 59:25

---

**S**

**samples** 34:14

**satisfies** 90:3

**scanned** 56:6

**school** 12:21,22,23,
24,25 13:1 18:1
107:14

**Schurr** 4:20,22 6:5,
15 11:15 80:3,13
82:6 101:25 144:13

**search** 39:11,24
40:4,8

**section** 91:15,20
92:13 95:13 100:6
122:3 136:1,4,14

**sees** 42:8

**segue** 101:20

**seminar** 13:17 14:20

**seminars** 13:11,13,
14,25 14:1

**send** 45:11 47:25
48:2 100:14,21
101:3,8,14 137:24
144:1

**sending** 48:1 101:12

**sends** 100:12 102:13

**sense** 36:13 40:19,23

**sentence** 109:23
119:9

**separate** 35:11 77:6,
22,23,24 78:2,9
89:25 90:2,3,4,9,18,
23 97:12 98:4,16,22,
23 99:6,9,21 103:14
104:6 113:6,12
115:21 116:9,14

**service** 15:12,14
16:9 17:1 41:13 58:7
60:17 61:6,10 68:24
74:16 111:10,12
112:11

**services** 19:8,9,17
20:11 21:11 23:15,
18 24:3,7 31:22
37:11 56:24 60:14
66:15,21 67:3 71:11
84:12 90:13 100:15,
16 102:16 107:3
141:19

**Serving** 23:2

**set** 44:5,10 126:21

**sets** 51:23

**setting** 83:17

**severe** 34:8

**shake** 9:22

**shareholder** 23:21
24:8,9

**Sharpie** 106:9

**shifts** 26:16

**shopping** 25:8,9

**short** 7:9 8:24 139:4
144:20

**shortly** 80:7

**shoulder** 117:6,7
136:25

**should've** 79:9

**show** 54:14 60:1
68:8 82:11 129:9
133:25 134:21 144:1

**shows** 33:22 98:8

**sic** 95:25

**side** 32:25 40:20
87:12 91:2 124:12

**sides** 122:24

**sign** 50:20 58:23,24
59:6,10,12

**signature** 58:19,22
59:15,17 84:19,20
85:1,2,7 130:16

**signing** 84:22 85:3

**similar** 91:19

**simply** 57:10 96:19
100:5

**sink** 35:22,23

**sir** 7:12 8:16 13:4
14:7,25 17:2,25
18:22 21:12,14
22:21 23:7 25:15
27:2 30:24 31:7
33:2,4,18 34:1 35:12
36:17,19 37:13,19,
23 38:6,9 39:10
42:1,3 48:11,25
49:5,10 51:24 53:6
54:19 55:10 56:15
57:3,19,23 58:8,11,
18,21 60:3,7,10
61:4,23 62:19,23
63:12 65:16 66:5,7,
18,24 68:21 69:5,24
70:5 71:20,24 72:1,
10 73:1,5 74:3,5,8,
24 76:3,6,20,24 77:4
78:4,11 80:14,25
81:6,11,22 82:6 83:3
84:6,9,14,21,24
85:13,22 86:2,13
87:6,9,14,18 88:14,
17,25 89:7,17,22
90:1,7,20,25 91:6,
10,14,17 92:2,5,11
94:7 100:3,24 101:6,
15,17,19 102:6,18,25
105:1,11,16,22
107:25 108:5,12,25
109:8,13,16,21
110:3,24 111:13
112:6,12,22 113:3
114:7 115:14 117:14
118:11,21 119:22
120:3,10,13,24



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                                          Index: sister..thoracic

121:9,19 122:2,9
123:3,6,13,17 124:2,
11,14 125:5,7,14,19
126:1,13,16 127:3
128:8,22 130:3,5,10
131:9 132:14,21
133:19 134:10,15
135:25 136:3,6,11,
13,18,23 137:2,10,14
138:17 139:1,25
143:15,20 144:4,9

**sister** 23:9,16,18,21
24:1,7

**sister's** 23:10 24:11

**sit** 27:15 30:3 33:1
41:9 64:2

**site** 45:10

**sits** 29:2

**sitting** 10:3 11:4

**slight** 108:2

**Slightly** 66:19

**small** 34:22

**smoothly** 9:8

**social** 131:2

**software** 62:11,12,
15,17,24 63:1,5,10

**sole** 23:6,21 24:8

**solemnly** 5:1

**Solves** 12:19

**sort** 41:13

**sounds** 65:6 78:1

**Southern** 4:7

**Southwest** 24:18

**Spanish** 51:12

**speaking** 10:6 31:5
56:13 63:11 69:6
70:3 82:21

**speaks** 95:19 113:11

**specialist** 4:11

**specific** 52:24 82:23

**specifically** 72:7
120:8

**speculation** 96:23
100:10 108:19
131:22

**spell** 23:12 103:6

**spend** 70:9,14 141:6
143:10

**spent** 68:6 69:3,12,
23 70:3 140:14

**spine** 75:17 87:20,
22,25 88:10,13,16,
18,24 89:10,12,16
91:20 92:7 93:25
94:13 96:16 107:22,
23 108:1,9,16,17,22
109:5,12,15,17
110:11,22 112:19
113:9 114:3 115:16
118:13 119:24 121:8
122:3,15,20 123:9
134:13 136:21

**spiral** 124:4

**split** 26:16

**stack** 29:21 30:1,3

**stack's** 29:24

**staff** 25:16 26:6

**stamp** 102:5

**stamped** 91:11

**standalone** 25:2

**standard** 19:23
69:22 85:10 86:11
87:7 121:20

**stands** 42:17

**start** 5:12 10:7,16
15:6 17:8 18:17,18
21:8 41:16 49:4
117:6 125:8 135:23

**started** 15:11 17:7,9,
21 18:19 19:12
49:11 57:8 85:18,20
101:11

**starting** 12:21

**starts** 7:23

**state** 4:5,17,24 6:22
57:14,17,22 100:13,
22 102:12,14

**stated** 67:20

**statement** 55:18
69:18 125:6 140:25

**stay** 20:17,18 50:1

**step** 16:8 27:4 60:23
67:15 78:1

**Stephanie** 23:11,25
24:8

**steps** 67:1,6 84:11

**sticky** 69:14,15
71:13

**stop** 23:17 124:25

**storage** 37:14 38:2
39:20,24 40:5

**stored** 37:17

**straight** 10:20

**Street** 24:18

**strike** 22:8 102:19

**strip** 25:6

**studies** 121:18
122:1,6

**stuff** 37:11 93:17
103:19

**subcontractors**
6:18

**submit** 44:4 45:17
46:11 48:17 56:18
57:21,25 59:14

**submitted** 57:13,17

**submitting** 101:5

**subpoenas** 23:1

**subscription** 64:22

**succinct** 139:5

**sufficient** 59:3
131:13 132:6,13,16
140:22

**suite** 4:9 24:25 25:5
37:14 39:8,11 40:5

**suites** 25:4

**summarizing**
110:20

**superbills** 71:22

**supplier** 58:19

**supplies** 34:3,4 36:1

**supply** 36:25

**supposed** 39:3,17
46:14 48:18 106:23
138:3

**Surgeries** 130:2

**surgery** 129:4,14
138:8

**swear** 4:14 5:1

**sworn** 5:7

**system** 61:15

― T ―

**table** 33:3,5,13
34:22,24 35:16

**takes** 30:9 51:17,20
105:7

**taking** 9:23 10:8
60:8 84:11 130:8

**talk** 21:2 40:21
44:11 52:10,21 53:9,
10 60:1 68:10 74:6
85:6 91:3 100:4
135:13 137:18

**talked** 10:24 20:15
34:13 36:20 49:8
116:3,8 141:14

**talking** 10:16 21:17
33:9 37:12 44:15
49:11 52:12,20 66:4
68:10 71:2 93:14
96:14 99:25 128:14
135:11,17

**talks** 53:15 138:13

**tape** 105:12

**tax** 19:6

**technically** 34:23

**telling** 115:18,20
135:5

**templated** 85:15
87:3 93:3 98:11

**tender** 114:15

**tenderness** 109:25
112:6 113:13,22
114:19 120:8

**term** 9:2 57:4 131:17
132:23

**terminology** 8:22
92:10

**terms** 53:8 62:7

**test** 77:15 86:16 94:1
112:8 113:13 115:21
116:14 117:9

**testified** 5:8 84:10
90:8,11 125:1

**testifying** 62:16

**testimony** 5:2 8:13
13:22 45:18 69:4
81:7,10 83:11 89:25
114:2,8 116:11
131:12 132:4,11
139:3 140:25

**testing** 74:13,14,15,
20 75:24 77:3,7,12,
13 78:7,9,17,19
86:25 87:17 96:7,11,
16,20 97:11,14,23
100:2,5 101:18
111:3,4 113:9
114:10 115:12,19
116:4,8,9,14 118:7
119:1,5,13 122:1

**that'll** 9:7

**that's** 19:22 30:2
41:15 62:6 76:12,23
87:8 142:13 144:14

**thereto** 5:25

**thing** 10:2 103:22
108:2 109:18 132:25
137:1

**things** 103:19 128:9

**thinking** 144:14

**thirsty** 79:8

**thoracic** 91:24,25
92:4,7,13,16 93:25
94:13 95:12 96:15,
16 107:22 108:9,16,
22 109:5,15 110:11,



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Anielka Castillo                                                        Index: thoraco..wrote

21 112:19,24 113:8
114:3 115:16 118:13
121:8 122:4 134:13
136:17 138:15

**thoraco** 108:15,17

**thoracolumbar**
88:16,19,24 89:10,
11 92:3,6 109:12

**threw** 103:22

**time** 4:10 11:10,17
13:16 15:8 21:8,21
22:2 29:22 44:17,18
52:15 59:21 62:5
63:25 64:3 65:10
66:10 67:17 68:6
69:3,12,20,21,23
70:19 79:14,18
81:15 82:10 101:10
110:18 118:23 119:5
125:4 141:6 143:10
144:13,25

**times** 7:16,19 10:5
52:19 118:23

**tiny** 34:14

**title** 16:2

**today** 9:8,9,23 10:23
31:23 132:4 144:18

**Today's** 4:9 83:23,
25

**told** 22:10,14 30:21
41:8 71:12 72:7 74:1
79:9 130:19 132:15
133:17 140:13 144:5

**top** 30:7,9 35:18 57:1
83:1,20 86:8 117:12
121:18 123:25

**Torres** 20:19,23

**torso** 75:3

**touch** 21:4

**touching** 117:22

**track** 6:9 55:1

**training** 13:5,8 14:5,
15

**transcribed** 68:18
69:1,11 101:12,13
129:11 135:12 139:3

**transcriber** 59:17
68:14 101:11

**transcribes** 102:22
104:7 139:8

**transcribing** 113:21

**transcript** 9:24
10:8,10

**transcription**
103:4,14 104:14
131:6 138:21

**transcriptionist**
139:7

**transcripts** 5:13,18,
22 6:1,6,10,16,19

**travel** 71:22

**treatment** 28:10
73:25 127:23
128:10,12 144:4

**trial** 5:19

**trick** 111:15

**true** 63:21 73:15

**truth** 5:2,3

**turn** 91:4 107:20

**twisting** 75:2,3

**Tylenol** 34:15

**type** 8:5 12:12 14:15
75:23,25 76:1 93:2
102:11 103:23
136:25

**type-written** 138:25
139:21 140:1

**typed** 84:15 93:14
103:1 108:23 119:3
129:1

**typed-out** 100:23
102:7,11 125:24

**types** 71:23

**typewritten** 93:3
95:8 102:21 104:25
105:10 106:24 119:1
138:18

**typing** 128:25

———————

**U**

———————

**U.S.** 4:6

**uh-huh** 9:22

**uh-uh** 9:22

**ultimately** 19:16

**understand** 8:25
9:10,12,15,18 10:1,
14,15 13:21 21:23
24:14 28:5 40:2,25
41:2,4 42:18 43:2,4,
9 44:6,12 46:19
55:2,9 63:7,15 65:5
71:4 72:14 75:1 78:6
79:20 84:5 87:16
89:1,4,8 90:8,18
92:6 93:20 94:17
96:10,16 101:10
103:2 104:19 105:6
113:16 114:18
115:18 116:1,7
118:15 120:1,18
122:5,6,11,16 124:8
127:25 128:19
129:24 131:17 135:4
136:22 139:16
142:3,20

**understanding**
42:22 61:3 74:18
76:4,9,23,25 77:5,
10,16,20 78:3,15,19
80:23 87:24 92:25
94:6 95:21 97:20
98:2,20 99:2,20
104:17,23 109:5
113:2 114:9 118:20
120:23 121:6
132:14,23 133:4,21,
23 141:3,18 142:4,6,
25 143:13

**understood** 9:16
65:3 72:7 116:11
126:21 140:20

**unit** 40:5

**united** 37:2

**unrelated** 114:9

**unsuccessful** 6:8

**up-to-date** 40:17

**updates** 63:3

**upfront** 47:11

**uploaded** 61:16

**upper** 134:13 138:15

**urgency** 40:19,23

———————

**V**

———————

**verification** 26:22,
23

**verifications** 26:2

**verify** 26:24

**versus** 4:5 111:16

**video** 4:11 9:23

**view** 122:13,14,23

**views** 122:14,18,19,
24 123:8

**visit** 38:19,22,23
89:21 112:10 124:24
125:9 126:6,10
127:2 131:14 134:2
141:6 144:6

**volume** 4:2 145:2

———————

**W**

———————

**waist** 75:6

**wait** 27:13,15 45:16

**waiting** 29:1 71:3

**walk** 27:4,7 30:6
50:7,8 52:4 93:5
96:5

**walk-in** 27:22

**walked** 138:10

**walking** 31:17 93:2

**walks** 27:24 28:7
51:14 52:3 54:3

**wall** 33:25

**walls** 31:10,11

**wanted** 5:10 6:3
49:1 72:6 80:5 82:14
130:21

**wash** 35:21,24

**waste** 101:9

**watch** 31:5 106:7
144:12

**week** 40:17

**We've** 24:24

**where'd** 85:16

**William** 4:12

**with/without** 92:23

**withdraw** 11:18

**witness'** 139:3

**wondering** 133:17

**word** 40:3 88:16
89:16 125:3

**words** 84:2,22
85:14,25 95:8
109:11 114:21
117:21

**work** 8:19 11:11
12:8 15:10 18:5 22:3
37:8,15 38:15 40:14,
16 52:3 63:7 103:20,
23 135:23

**worked** 15:11 17:16

**working** 13:22 15:6
17:6,23 31:14,17
40:11,17 85:18
140:19

**works** 18:10 27:1
29:25

**would've** 22:1 58:13

**Wrist** 136:25

**write** 53:24 86:16
94:12 97:6 100:6
135:2

**writing** 83:20 84:4
85:25 88:13 108:16

**written** 51:17 69:7
71:13 107:6 109:11
110:22 127:14 131:7
138:14 139:9

**wrong** 78:6 140:21

**wrote** 107:1



**X**

**x-** 33:16

**x-ray** 33:19,23 122:6
123:11 144:1

**x-rays** 32:13 121:23
122:7,19 123:8,15

**Y**

**year** 20:4,6,14 38:21,
23,25 39:17,18
61:22 63:3

**years** 13:10,18,23
17:9,17,18 24:22,23
38:17 39:3,13 65:18
66:8 70:9,13 116:18
134:25

**Yesterday** 11:7

**York** 18:15 20:10



```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION

 3                 CASE NO.: 1:18-cv-23329

 4

 5
    STATE FARM MUTUAL AUTOMOBILE
 6  INSURANCE COMPANY

 7     Plaintiff,

 8  v.

 9  MANUEL V. FEIJOO; and MANUEL V.
    FEIJOO, M.D., P.A., a Florida
10  professional association,

11     Defendants.
    _____/
12

13  VIDEO DEPOSITION OF:  Anielka Castillo

14  DATE TAKEN:           May 29, 2019

15  TIME:                 9:17 A.M. to 4:39 P.M.

16  TAKEN BY:             Kenneth P. Hazouri, Esquire
                          Counsel for the Plaintiff
17
    PLACE:                Orange Legal
18                        6303 Blue Lagoon Drive
                          Suite 380
19                        Miami, Florida 33126

20  REPORTED BY:          Martha Rodriguez, FPR
                          Court Reporter and Notary Public
21                        State of Florida at Large

22

23

24

25
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                151

```
 1                    A P P E A R A N C E S:

 2   KENNETH P. HAZOURI, ESQUIRE
     OF:  DSK Law
 3        332 North Magnolia Avenue
          Orlando, Florida 32801
 4        khazouri@dsklawgroup.com

 5        Counsel for the Plaintiff

 6

 7

 8   JEROME A. PIVNIK, ESQUIRE
     OF:  The Pivnik Law Firm
 9        7700 North Kendall Drive
          Suite 703
10        Miami, Florida 33156
          pivniklaw@aol.com
11
     KENNETH B. SCHURR, ESQUIRE
12   OF:  Law Offices of Kenneth B. Schurr, P.A.
          2030 South Douglas Road
13        Suite 105
          Coral Gables, Florida 33134
14        counselken@schurrlaw.com

15        Counsel for the Defendants

16

17

18    ALSO PRESENT:

19        GEORGE RODRIGUEZ, Videographer

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

1                    I N D E X (VOLUME II)

2    TESTIMONY OF ANIELKA CASTILLO

3    Continued Direct Examination by Mr. Hazouri. . . . .155

4    CERTIFICATE OF OATH. . . . . . . . . . . . . . . .296

5    CERTIFICATE OF REPORTER. . . . . . . . . . . . . .297

6    ERRATA SHEET (VOLUME II). . . . . . . . . . . . . 298

7    NOTIFICATION LETTER. . . . . . . . . . . . . . . .299

8

9

10                    E X H I B I T S

11   PLAINTIFF'S EXHIBIT NO. 7. . . . . . . . . . . . .155
     (Copies out of the 2017 CPT Book)
12
     PLAINTIFF'S EXHIBIT NO. 8. . . . . . . . . . . . .173
13   (Bill Prepared for Date of Service February 20,
     2017 for Patient H.P.)
14
     PLAINTIFF'S EXHIBIT NO. 9. . . . . . . . . . . . .181
15   (Handwritten Document Entitled Follow-Up Orthopedic
     Evaluation for Patient H.P.)
16
     PLAINTIFF'S EXHIBIT NO. 10. . . . . . . . . . . . 183
17   (Range of Motion Report for the February 20th,
     2017 Office Visit of H.P.)
18
     PLAINTIFF'S EXHIBIT NO. 11. . . . . . . . . . . . 185
19   (Transcribed Report for the February 20th, 2017
     Office Visit of H.P.)
20
     PLAINTIFF'S EXHIBIT NO. 12. . . . . . . . . . . . 191
21   (Reports of X-rays Performed on Patient H.P.)

22   PLAINTIFF'S EXHIBIT NO. 13. . . . . . . . . . . . 204
     (A Fax Cover Sheet)
23
     PLAINTIFF'S EXHIBIT NO. 14. . . . . . . . . . . . 216
24   (A Bill Prepared for a March 20th, 2017 Office Visit
     with H.P.)
25



 1            I N D E X (VOLUME II) (CONTINUED)

 2                    E X H I B I T S

 3    PLAINTIFF'S EXHIBIT NO. 15. . . . . . . . . . . 218
      (Dr. Feijoo's Handwritten Note from the March 20,
 4    2017 Office Visit with H.P.)

 5    PLAINTIFF'S EXHIBIT NO. 16. . . . . . . . . . . 224
      (Final Orthopedic Evaluation Performed on March 20,
 6    2017 of Patient H.P.)

 7    PLAINTIFF'S EXHIBIT NO. 17. . . . . . . . . . . 234
      (A Fax Cover Sheet Under Which the Clinic Sent
 8    the March 20th, 2017 Orthopedic Evaluation to Silver
      Medical Center)
 9
      PLAINTIFF'S EXHIBIT NO. 18. . . . . . . . . . . 243
10    (The Assignment of Benefits from H.P.'s Patient
      Chart)
11
      PLAINTIFF'S EXHIBIT NO. 19. . . . . . . . . . . 259
12    (A List of Lawsuits for PIP Benefits)

13    PLAINTIFF'S EXHIBIT NO. 20. . . . . . . . . . . 271
      (A HCFA for Patient S.B. for Date of Service
14    July 2nd, 2015)

15    PLAINTIFF'S EXHIBIT NO. 21. . . . . . . . . . . 271
      (A HCFA for Patient J.B. for Date of Service
16    July 2nd, 2015)

17    PLAINTIFF'S EXHIBIT NO. 22. . . . . . . . . . . 272
      (Adjuster's Notes)
18
      PLAINTIFF'S EXHIBIT NO. 23. . . . . . . . . . . 275
19    (Explanation of Review for Patient S.B.)

20    PLAINTIFF'S EXHIBIT NO. 24. . . . . . . . . . . 275
      (Explanation of Review for Patient J.B.)
21
      PLAINTIFF'S EXHIBIT NO. 25. . . . . . . . . . . 277
22    (A Demand for the Insured, S.B.)

23    PLAINTIFF'S EXHIBIT NO. 26. . . . . . . . . . . 278
      (A Demand for the Insured, J.B.)
24

25



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    154

```
 1              I N D E X (VOLUME II) (CONTINUED)

 2                      E X H I B I T S

 3   PLAINTIFF'S EXHIBIT NO. 27. . . . . . . . . . . . 290
     (A Medical Bill and Related Documentation
 4   Submitted to State Farm)

 5

 6

 7

 8                 S T I P U L A T I O N S

 9        It is hereby stipulated and agreed by and between

10   counsel present for the respective parties, and the

11   deponent, that the reading and signing of the deposition

12   are hereby reserved.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                         (VOLUME II)

 3        (Videotaped deposition resumed at 12:45 p.m.)

 4            THE VIDEOGRAPHER:  This is media three.

 5   We're on the record.  The time is 12:46 p.m.

 6             CONTINUED DIRECT EXAMINATION

 7   BY MR. HAZOURI:

 8        Q.  Okay.  So, we've had a lunch break and we're

 9   going to continue with your deposition.  I'm handing you

10   what has been marked as Exhibit 7 to your deposition.

11             (Plaintiff's Exhibit 7 was marked for

12   identification.)

13   BY MR. HAZOURI:

14        Q.  And if you look at the top left-hand corner,

15   you'll see it says "CPT 2017" right here.

16        A.  Yes, sir.

17        Q.  So, I'll represent to you this is just -- and

18   you see the spiral bound?  These are copies out of the

19   2017 CPT book.  Okay?

20        A.  I understand.

21        Q.  Okay.  So, let's start -- and this is

22   evaluation and management codes.  You understand those

23   are the 992 codes we've been talking about?

24        A.  Yes, sir.

25        Q.  Okay.  So, let's start within -- with the new
```

 1    patient codes at the top.  The first one listed is

 2    99201, correct?

 3         A.   Correct.

 4         Q.   And remember we talked about the levels,

 5    levels 1, 2, 3, 4 and 5?

 6         A.   Yes, sir.

 7         Q.   And you see how it goes to 99203, 9920 -- I'm

 8    sorry, 99202, 99203 -- next page -- 04 and 05?  Do you

 9    see that?

10         A.   Yes, sir.

11         Q.   So, you agree that that's increased -- those

12    are the increasing levels of E&M codes?

13         A.   Correct.

14         Q.   Correct?  Okay.  So, under 99201, when it's

15    setting forth the components of a 99291, it says, "A

16    problem-focused history".  Do you see that?

17         A.   Yes, sir.

18         Q.   Do you understand what a problem-focused

19    history is?

20              MR. PIVNIK:  Objection, form and foundation.

21         A.   I guess focus on the illness of the patient.

22    BY MR. HAZOURI:

23         Q.   Is that your answer?

24         A.   Yeah.

25         Q.   Okay.  So, when Dr. Feijoo is focusing -- or



 1   examining, you know, auto injury complaints, neck, back

 2   pain, what have you, is that a problem-focused history?

 3      A.   Well, it's part of the consultation.

 4      Q.   Okay.  And then 99202, moving down to a higher

 5   level -- right?  You see that?

 6      A.   Yes.

 7      Q.   It says, "An expanded problem-focused

 8   history".  Do you see that?

 9      A.   Yes.

10      Q.   Okay.  What is an expanded problem-focused

11   history?

12           MR. PIVNIK:  Objection, form and foundation.

13   BY MR. HAZOURI:

14      Q.   Strike that.

15           What is your understanding of what an expanded

16   problem-focused history is?

17      A.   He may focus a little bit more on the patient

18   history and condition.

19      Q.   A little more than what?

20      A.   He will expand himself like a little bit more

21   about his history and the medical condition.

22      Q.   You mean -- so, when you say expand, you mean

23   expand from the problem-focused, go past the specific

24   problem to something a little bit broader?

25      A.   Yes, sir.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          158

```
 1        Q.    Okay.  Is that what Dr. Feijoo did with

 2   patient H.P.?

 3        A.    He did a comprehensive visit.

 4        Q.    Okay.  So, we'll get to that.  Then 99203

 5   carries on to the next page.  You see that?  Next page.

 6   That says, "A detailed history".  Do you see that?

 7        A.    Yes, sir.

 8        Q.    So, what is a detail -- what's your

 9   understanding of what a detailed history is as used in

10   the CPT book?

11        A.    It's a part of the consultation.  They go in

12   detail in their history, detail in the examination.

13        Q.    Is that your best understanding?

14        A.    Yes, sir.

15        Q.    Okay.  And then we get to 99204, which is what

16   we've been talking about.

17        A.    Yes, sir.

18        Q.    Right?  That's what the clinic billed for

19   patient H.P., correct?

20        A.    Yes, sir.

21        Q.    And we talked about a comprehensive history,

22   right?

23        A.    Yes, sir.

24        Q.    And you've already told me what your

25   understanding of a comprehensive history is.
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        159

1      A.    Correct.

2      Q.    **Correct?  Okay.  Explain to me your**

3  **understanding of the difference between a comprehensive**

4  **history as listed under 99204 and a detailed history as**

5  **listed under 99203, please.**

6            MR. PIVNIK:   Objection, form and foundation.

7      A.    Besides that they take more time face to face

8  for the patient, the doctors go more details in the

9  comprehensive history, take more time to examine the

10 patient or learn about his history or his complaints.

11 BY MR. HAZOURI:

12     Q.    **Anything else to articulate your**

13 **understanding?**

14     A.    Not that I come to my mind right now.

15     A.    Okay.  So, I wrote down there's more details

16 in a comprehensive history for 99204 and there's more

17 time with the patient that the doctor spends.

18     A.    Face to face, yes.

19     Q.    **Is that correct?**

20     A.    Yes, sir.

21     Q.    **Okay.  So, I understand the face to face time.**

22 **I get your answer there, what you're saying, more time.**

23 **Are you capable of being any more specific about what**

24 **the -- as far as the matters that are discussed or asked**

25 **about in the history as to what's the difference between**



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
160

```
 1  a comprehensive history and a detailed history?

 2       A.   It come out to be about the same.

 3       Q.   It's about the same?

 4       A.   Yes, sir.

 5       Q.   So, other than the amount of time spent with

 6  the patient, your understanding is that a detailed

 7  history is essentially the same as a comprehensive

 8  history?

 9            MR. PIVNIK:  Objection, form.

10       A.   It's -- they require the three component.  The

11  difference is that he will spend more time as a

12  comprehensive history examination to find out the

13  findings on the accidents or the illness that the

14  patient may have.

15  BY MR. HAZOURI:

16       Q.   So, you went back to time, which I understand

17  you're saying that a comprehensive history takes more

18  time than a detailed history, but what I'm asking you is

19  the actual matters that are discussed and considered by

20  the physician in a 99203 detailed history as opposed to

21  a 9920 -- or as compared to a 99204 comprehensive

22  history.  The actual, you know, matters that are

23  discussed and that the doctor looks into regarding the

24  patient, are you capable of telling me what the

25  differences are?
```



1            MR. PIVNIK:  Objection to form and foundation.

2  BY MR. HAZOURI:

3       Q.    Do you understand what the differences are, I

4  should say?

5            MR. PIVNIK:  Same objection.

6       A.    Well, like I said before, it's -- the 99204 is

7  more comprehensive.  He take more time to understand the

8  need of the patient illness or the treatment.  Detailed

9  history or explanation, it will be less time and not

10  more comprehensive.

11  BY MR. HAZOURI:

12       Q.    All right.  And that's your best answer as to

13  the difference between a comprehensive history under

14  99204 and a detailed history under 99203?

15       A.    Yes, sir.

16       Q.    Okay.  Let's go back to 99201 and the second -

17  - on the first page there.  The second element there is

18  a problem-focused examination.  Do you see that?

19       A.    Yes, sir.

20       Q.    Do you have an understanding of what a

21  problem-focused examination is?

22       A.    It come out to be the same consultation.  They

23  examine the patient, the problem, the diagnosis, the

24  history.

25       Q.    Okay.  That's what Dr. Feijoo did, right?



```
 1      A.   More comprehensive.

 2      Q.   More comprehensive.  Okay.

 3      A.   Yeah.  It would not take 10 minute in an

 4 accident case.

 5      Q.   Okay.  You keep going back to time, I notice,

 6 and I see here -- it says here typically 10 minutes are

 7 spent face to face with the patient.  That's --

 8      A.   Correct.

 9      Q.   -- that's what you were referencing?

10      A.   Yes, sir.

11      Q.   Is it your understanding that time is the

12 determinative factor?

13      A.   It's not, but it's part.

14      Q.   Okay.  It's part?  Okay.  So, every time you

15 answer -- and if you want to put it in your answer,

16 that's fine, but I get that you're distinguishing

17 between the levels based on time.  I understand that.

18 Again, you're free to put that in your answer, but I

19 just want to tell you I understand that.  So, I'm kind

20 of trying to ask about other factors or components of it

21 that you may understand.  But I'm just letting you know

22 that's not a question.

23      A.   Okay.

24      Q.   Okay?  So, problem-focused examination, again,

25 can you tell me your best understanding of what that is
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                              163

 1  for 99201?

 2          MR. PIVNIK:  Objection, form and foundation.

 3  Asked and answered.

 4      A.   It's just -- well, the same.  It's a history

 5  and resolving the problem with the patient.

 6  BY MR. HAZOURI:

 7      Q.   **When you say the same, that's where I'm**

 8  **getting confused.  The same as what?**

 9      A.   It's just a consultation with the patient face

10  to face.  The determine of if it's a problem or expanded

11  is the time that you take to examine the patient.

12      Q.   **So, again, you're going back to time.**

13      A.   And when I'm saying time, it's just -- if

14  there's a problem, you can just write down and take your

15  examination and that's it, but when you expanding your

16  time or you do comprehensive, you're trying to find out

17  what's the best diagnosis and treatment for your

18  patient.

19      Q.   **Well, isn't any doctor that meets with the**

20  **patient always trying to figure out what the best**

21  **diagnosis and treatment of the patient is?**

22      A.   That's part of the -- of being a doctor.

23      Q.   **Right.  So, that happens in every examination.**

24      A.   Exactly.

25      Q.   **But every examination is not a 99204, correct?**



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                      164

```
 1      A.   No.

 2      Q.   Right?  So -- okay.  Well, let's move to

 3   99202.  Can you tell me your best understanding of what

 4   an expanded problem-focused examination is?

 5      A.   The same thing that I have answered before.

 6      Q.   Well, I haven't asked you about this one

 7   before, so I need you to tell me.

 8      A.   It's part of a consultation.

 9      Q.   Okay.  Is that your best answer as to --

10      A.   Yes, sir.

11      Q.   I'm sorry.  Please let me finish.  Is that a

12   best answer -- your best answer as to what an expanded

13   problem-focused examination as listed under 99202 is?

14      A.   Yes, sir.

15      Q.   So, let's move to 99203.  99203 is a detailed

16   examination.  Could you please tell me what your

17   understanding is of a detailed examination under 99203?

18           MR. PIVNIK:  Objection, form and foundation.

19      A.   It's a medical examination detailing the

20   history and detailing the examination.

21   BY MR. HAZOURI:

22      Q.   How is it different from an expanded problem-

23   focused examination as listed under 99202?

24      A.   I'm not really sure.

25      Q.   All right.  Have you told me your best
```



1   understanding of what a detailed examination is under

2   99203?

3        A.   Yes, sir.

4        Q.   Okay.  So, we've talked about 99204, which is

5   a comprehensive examination, correct?

6        A.   Correct.

7        Q.   Okay.  What is your understanding of the

8   difference between a comprehensive examination as listed

9   under 99204 and a detailed examination as listed under

10  99203?

11       A.   I believe I already explain you that before.

12  Dr. Feijoo, on this case, when we billed 99204, he take

13  more time in the history and the examination and the

14  decision on the treatment and diagnostic.

15       Q.   Okay.  We did talk about what Dr. Feijoo did

16  with this patient H.P. and it was a 99204 that the

17  clinic billed for, but I have not asked you before and

18  you haven't previously told me your understanding of the

19  difference between a comprehensive examination as listed

20  in 99204 and a detailed examination as listed under

21  99203.  So, what I'd like to know is, what's your

22  understanding of the difference between those two types

23  of examinations?

24            MR. PIVNIK:  Objection, asked and answered.

25       A.   It's one is less comprehensive than the other



 1   one and less time.

 2   BY MR. HAZOURI:

 3       Q.   Is that your best answer?

 4       A.   Yes, sir.

 5       Q.   Okay.  And then finally, let's go back to

 6   99201.  The last bullet-point there or component is,

 7   "Straightforward medical decision-making".  Do you see

 8   that?

 9       A.   Yes, sir.

10       Q.   Could you explain for me please your

11   understanding of the meaning of straightforward medical

12   decision-making as listed under 99201?

13           MR. PIVNIK:  Same objection.  Form and

14   foundation.

15    A.   I'm sorry.  I didn't understand the question.

16   BY MR. HAZOURI:

17       Q.   I'm just asking you the same question; your

18   understanding of the meaning of straightforward medical

19   decision-making as listed under 99201.

20       A.   It will be the description that he's taking

21   and determination on the medical decision.

22       Q.   I'm sorry, I did not understand you.  Could

23   you say that again, please?

24       A.   That he will make a decision on the patient

25   about his condition.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        167

```
 1       Q.   "He" is the doctor --

 2       A.   Yeah.

 3       Q.   -- you're referring to?

 4       A.   Any doctor.

 5       Q.   Okay.  So, if any doctor makes a decision on

 6   the patient's condition, that's straightforward medical

 7   decision-making in your understanding?

 8            MR. PIVNIK:  Objection, form and foundation.

 9       A.   Yes.

10   BY MR. HAZOURI:

11       Q.   Okay.  99202 is the same, so I'm not going to

12   ask you about it again.  So, let's go to 99203.  It

13   carries on to the next page.  The third component of a

14   99203 is medical decision-making of low complexity.  Do

15   you see that?

16       A.   Yes, sir.

17       Q.   Could you please tell me your understanding of

18   the term "medical decision-making of low complexity" as

19   used or listed under 99203 here?

20            MR. PIVNIK:  Objection, form and foundation.

21       A.   Something not -- maybe not -- a diagnosis or

22   treatment not too complicated for the patient.

23   BY MR. HAZOURI:

24       Q.   Is that your best understanding?

25       A.   Yes.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                                    168

```
 1      Q.   All right.  And then we looked at 99204

 2   before, which was medical decision-making of moderate

 3   complexity, right?

 4      A.   Yes, sir.

 5      Q.   Okay.  And so, could you explain for me please

 6   your understanding of the difference between medical

 7   decision-making of moderate complexity as listed under

 8   99204 and medical decision-making of low complexity as

 9   listed under 99203?

10         MR. PIVNIK:  Same objection.  Form and

11   foundation.

12      A.   It's just the determination that they do in

13   the treatment and diagnosis of the patient and the

14   decision of the treatment that is being performed.

15   BY MR. HAZOURI:

16      Q.   Okay.  But I didn't hear you.  You said it was

17   a determination of the treatment that's being performed.

18   What I'm asking for is the difference between the two,

19   the difference between medical decision-making of

20   moderate complexity and medical decision-making of low

21   complexity, your understanding of the difference.

22         MR. PIVNIK:  Objection, form and foundation.

23      A.   The medical complexity -- moderate complexity

24   is more expanded to the treatment.

25   BY MR. HAZOURI:
```



1      Q.    Okay.  So, it's a higher level?

2      A.    Correct.

3      Q.    Right?

4      A.    Yes, sir.

5      Q.    Okay.  But are you -- other than saying that

6   moderate -- medical decision-making of moderate

7   complexity is a higher level than medical decision-

8   making of low complexity, are you capable of explaining

9   any more the differences between the two?

10     A.    No, sir.

11     Q.    All right.  And then if we go down to 99205,

12  on the left-hand side it has medical decision-making of

13  high complexity.  Do you see that?

14     A.    Yes, sir.

15     Q.    And while we're at it, by the way, let's look

16  at -- on the next page, 99215.  It's on the very next

17  page on the bottom left-hand corner.  There's also

18  medical decision-making of high complexity there,

19  correct?

20     A.    Yes, sir.

21     Q.    Could you please explain for me your

22  understanding of the phrase "medical decision-making of

23  high complexity" as used under 99215?

24     A.    It's decision on the treatment that the

25  patient has been performed.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
170

```
 1      Q.    Okay.  You said it was a decision on the
 2  treatment of the patient.  Doctors always make decisions
 3  on the treatment of patients.  That's what they do,
 4  correct?
 5      A.    Yeah.  Sometimes they're moderate.  Sometimes
 6  they're high complexity --
 7      Q.    Okay.
 8      A.    -- in this case.
 9      Q.    Right.  Okay.  So, are you -- is that your
10  best answer of what a medical decision-making of high
11  complexity is?
12      A.    Yes, sir.
13      Q.    Okay.  And what is your understanding of the
14  difference between medical decision-making of moderate
15  complexity and medical decision -- as listed under 99204
16  and 99214 and medical decision-making of high complexity
17  as listed under 99215?
18          MR. PIVNIK:  Objection, form.  Foundation.
19  Multiple question.
20      A.    Sorry.  I didn't understand.
21  BY MR. HAZOURI:
22      Q.    Okay.  Well, we'll go back through it.  That's
23  perfectly fine and thank you for telling me you didn't
24  understand.  99204 has medical decision-making of
25  moderate complexity, correct?
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                         171

```
 1      A.   Okay.

 2      Q.   Do you see that?

 3      A.   Yes, sir.

 4      Q.   99214, on the next page, also has medical

 5  decision-making of moderate complexity, right?

 6      A.   Yes, sir.

 7      Q.   So, they're the same for 04 and 14, right?

 8      A.   Yes, sir.

 9      Q.   Okay.  So, what I'm asking you then is to look

10  at medical decision-making of 99215 and that -- or, I'm

11  sorry, I'm asking you to look at 99215, and it says

12  medical decision-making of high complexity as opposed to

13  moderate complexity.  Do you see that?

14      A.   Yes, sir.

15      Q.   So, what I'm asking you is your best

16  understanding of the difference between medical

17  decision-making of high complexity as listed under 99215

18  and medical decision-making of moderate complexity as

19  listed under 99204 and 99214.

20          MR. PIVNIK:  Same objection.

21      A.   I'm not really sure if I understand your

22  question, but do you want me to tell you what's the

23  difference between those three code?

24  BY MR. HAZOURI:

25      Q.   Let me try it one more time.  Let's forget
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    172

1    about 99205, okay, and let's just look at -- let's look

2    at 99214.  Okay?  Medical decision-making of moderate

3    complexity, correct?

4         A.   Correct.

5         Q.   So, that's a phrase -- and you've told me what

6    you think that phrase means, right?

7         A.   Yes, sir.

8         Q.   Okay.  So, now I'm asking you to look at

9    medical decision-making of high complexity too.  Do you

10   see that?

11        A.   Yes, sir.

12        Q.   My simple question is, what is your

13   understanding of the difference between medical

14   decision-making of moderate complexity as listed under

15   99214 and medical decision-making of high complexity as

16   listed under 99215?

17        A.   It would be --

18             MR. PIVNIK:  Same objection.

19        A.    It would be the -- to determine the need and

20   the diagnosis and treatment on the patient.

21   BY MR. HAZOURI:

22        Q.   Okay.  Is that your best answer as to the

23   difference between those two phrases used in 99214 --

24        A.   Yeah.

25        Q.   -- I'm sorry, those two components of 99214



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    173

1   and 99215?

2       A.   Yes, sir.  One would be a moderated one and

3   another one would be more complex.

4       Q.   And that's your best answer of your

5   understanding?

6       A.   Yes, sir.

7       Q.   Okay.

8           MR. HAZOURI:  8, I believe.  Right?  Let's see

9   if that last one was 7.

10          THE COURT REPORTER:  Sure.

11  BY MR. HAZOURI:

12      Q.   Handing you Exhibit 8 to your deposition.

13          (Plaintiff's Exhibit 8 was marked for

14  identification.)

15  BY MR. HAZOURI:

16      Q.   Okay.  And this is a bill prepared for date of

17  service 2/20/17 -- February 20th, 2017 for patient H.P.,

18  correct?

19      A.   Correct.

20      Q.   And you prepared this bill?

21      A.   Yes, sir.

22      Q.   And here, this bill includes a charge for

23  99214, correct?

24      A.   Correct.

25      Q.   And once again, that's the second highest --



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    174

```
 1  well, strike that.

 2            What's your understanding of the 99214 code?

 3      A.    It's a follow-up office visit.

 4      Q.    So, it's not a new patient.  It's an existing

 5  patient who comes up -- comes back for another visit

 6  with the doctor?

 7      A.    Yes, sir.

 8      Q.    And this is a level 4 code, correct?

 9      A.    Correct.

10      Q.    And so, it's the second highest code that the

11  provider can bill for a follow-up visit?

12      A.    Yes, sir.

13      Q.    While we're here, I can see there's a -- the

14  charge for 99214 for patient H.P. was $275.  Is that

15  correct?

16      A.    Yes, sir.

17      Q.    Is that the standard -- the clinic's standard

18  charge for 99214?

19      A.    Yes, sir.

20      Q.    What does the clinic charge for 99215?

21      A.    I believe it's $400.

22      Q.    $400?

23      A.    Yeah.

24      Q.    Okay.  We're going to look at one, so if you

25  have to correct yourself, you can.  What about 99213?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                175

```
 1      A.   I think it's $200.

 2      Q.   $200?

 3      A.   Yes, sir.

 4      Q.   99212?

 5      A.   No, I'm sorry.  99213.

 6      Q.   Yeah.  I'm sorry.  That was another question.

 7  What is the clinic's charge for 99212?

 8      A.   I don't recall it.

 9      Q.   What is the clinic's charge for 99211?

10      A.   I'm not sure.

11      Q.   Is that because the clinic doesn't bill 99212

12  and 99211 very often?

13      A.   Well, we do bill it; Medicare patients,

14  private insurance, accident cases.  He take a lot of

15  time with the accident cases.

16      Q.   Okay.

17      A.   We do bill it.

18      Q.   You don't -- you just don't remember the

19  amounts, correct?

20      A.   I just don't remember the amount.

21      Q.   All right.  And the numbers that you've given

22  me, the amount of the charges, have those been the same

23  since 2001?

24      A.   Yes, sir.

25      Q.   Okay.  The second code listed is 95851.
```



 1   That's the range of motion testing we've talked -- we've

 2   already spoken about, correct?

 3        A.   Yes, sir.

 4        Q.   There's a third code listed, 76140.  Do you

 5   see that?

 6        A.   Yes.

 7        Q.   What medical service does this code describe?

 8        A.   It's an x-ray review.

 9        Q.   Okay.  So, could you explain to me in more

10   detail exactly what Dr. Feijoo does for which the clinic

11   has issued the 76140 charge?

12        A.   He review the x-rays, either CD films and

13   reports, done somewhere else.

14        Q.   Done somewhere -- okay.  So, let me help here.

15   So, a patient comes to see Dr. Feijoo.

16        A.   Yes, sir.

17        Q.   Correct?  And the x-rays that Dr. Feijoo would

18   review are of that patient.

19        A.   Correct.

20        Q.   Correct?  How do the x-rays get to the office

21   for Dr. Feijoo to review?

22        A.   We have different way to get it.  Sometimes

23   they either email it or fax it or patient bring the film

24   and the CD.

25        Q.   With them?



```
 1      A.   With them, yeah.

 2      Q.   Okay.

 3      A.   Oh, they'll also bring the result.

 4      Q.   The report?

 5      A.   The report.

 6      Q.   Right.  Okay.  But in all these cases, what's

 7  happening is however Dr. Feijoo gets the x-ray film or

 8  report, he is reviewing it, that x-ray, as part of his

 9  examination of the patient, correct?

10      A.   When he's examining the patient in the same

11  day as the consultation?

12      Q.   Yes.

13      A.   Yes, sir.

14      Q.   That's -- so, in other words, he's examining

15  the patient to try and figure out what their medical

16  condition is and what their treatment should be, right?

17      A.   Yes, sir.

18      Q.   And part of that examination is he's going to

19  look at the x-ray and see what the x-ray helps tell him

20  about what the patient's condition is and what the

21  treatment should be?

22      A.   What the results of the x-ray has been.

23      Q.   Right.  That helps his -- him to assess the

24  patient and make medical decisions?

25      A.   Yes.
```



```
 1           MR. PIVNIK:  Objection, form and foundation.

 2   BY MR. HAZOURI:

 3      Q.   And so, the purpose of him reviewing these x-

 4   rays is -- again, I'm repeating myself, but it's part of

 5   examining the patient?

 6           MR. PIVNIK:  Objection, form and foundation.

 7      A.   During the examination on the patient, but not

 8   all the patients get x-ray review.

 9   BY MR. HAZOURI:

10      Q.   Right.  Because if a patient doesn't bring in

11   x-rays or Dr. Feijoo doesn't get x-rays, then he doesn't

12   review them.

13      A.   Correct.

14      Q.   Right?  So, that's -- well, I'll tell you

15   what, I'm going to help you out here.  Does the clinic

16   bill 76140 if Dr. Feijoo only reviews a written x-ray

17   report as opposed to the x-ray films?

18      A.   For both.  He usually get them both.  Like he

19   do the film and the -- or CD and the report, but he will

20   bill for reviewing the x-ray.

21      Q.   Okay.  I get that sometimes he gets both, but

22   the situation I'm asking you about is the patient comes

23   in and there's only a written x-ray report, no x-ray

24   film, an x-ray report done by somebody else who

25   performed the x-ray.  Do you understand?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                179

```
 1      A.    Yes.

 2      Q.    Okay.  Dr. Feijoo has that.  He reviews it as

 3  part of his examination.  Not the x-ray itself, not the

 4  film.  Does the clinic bill 76140 for him reviewing just

 5  the x-ray report?

 6      A.    I believe so.

 7      Q.    And is it your understanding that's a proper

 8  billing of 76140 if Dr. Feijoo just reads an x-ray

 9  report as part of his exam of the patient?

10      A.    Well, he usually do both.  So, that's why we

11  bill x-ray review.

12      Q.    Well, I understand, but the clinic will also

13  bill if he only -- 76140 if only reviews the report.

14            MR. PIVNIK:  Objection, asked and answered.

15      A.    Yeah, and then occasionally -- I may say

16  maybe.

17  BY MR. HAZOURI:

18      Q.    Are you now saying maybe, you don't know?

19      A.    I say that I -- we have billed.  I'm not sure

20  if it would be for both or just the x-ray report.

21      Q.    Okay.  So, I'll ask you again.  If the patient

22  comes -- if the patient only -- if Dr. Feijoo only has

23  the patient's x-ray report, not the films, not the

24  actual x-rays, and he reviews that x-ray report, is the

25  clinic going to bill a 76140 for that service?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                 180

1            MR. PIVNIK:  You're talking about with the

2    patient actually being there or not being there?

3            MR. HAZOURI:  Well, as part of the

4    examination.  I mean --

5            MR. PIVNIK:  But you didn't say that because

6    it might be the case where someone just sends out a

7    report for review.  I don't want to do a speaking

8    objection.

9            MR. HAZOURI:  Well, that's fine.  I'll --

10           MR. PIVNIK:  I just want to just clarify your

11   question.

12           MR. HAZOURI:  Yeah.  I'll fix it.  Thank you.

13   BY MR. HAZOURI:

14       Q.    Dr. Feijoo is examining the patient.  Okay?

15   There's an office visit and it's what's called a follow-

16   up office visit like this one that we're looking at.

17   Okay?  As part of the office visit -- in conjunction

18   with the office visit, Dr. Feijoo has gotten an x-ray

19   report of the patient, okay, and the doctor -- in the

20   course of examining the patient and diagnosing the

21   patient and determining treatment options for the

22   patient, Dr. Feijoo reviews that x-ray report, not

23   films, not the actual x-rays.  Is the clinic going to

24   bill 76140 for that service?

25       A.    I'm not sure if we have billed in the past or

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
181

1  we're doing it, but he usually review both.

2      Q.   Okay.  You've been working here since 2001 and

3  you don't know if the office will bill just for an x-ray

4  report?

5      A.   I'm not saying we don't bill it.  I'm saying

6  I'm not sure if we billed it without being the two, just

7  the film or CD, because he don't write it down.  Like he

8  don't make notation if he did both or he only do the x-

9  ray report.

10     Q.   Okay.  Well, we might come back to that.  I'll

11  give you some records to hopefully help.

12          Okay.  So, I've handed you what we've marked

13  as Exhibit 9 to the -- to your deposition.

14          (Plaintiff's Exhibit 9 was marked for

15  identification.)

16  BY MR. HAZOURI:

17     Q.   It says at the top, off to the side here,

18  "Follow-up Orthopedic Evaluation".  Do you see that?

19     A.   Yes, sir.

20     Q.   And it's got a bates number down here in the

21  corner and you can see the H and the P.  So, I'll

22  represent to you that this was a -- you know, a document

23  that was in the medical chart for H.P. that was produced

24  to us in this case.  All right?

25     A.   Yes.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                              182

```
 1      Q.   So, does this appear to be the handwritten
 2  note that coincides with the bill that we marked as
 3  Exhibit 8?
 4      A.   Yes.
 5      Q.   Okay.  So, the first thing I want to ask you
 6  is -- so we see this bates number here, 11881.  Do you
 7  see that?
 8      A.   Yes, sir.
 9      Q.   Go to the next bates number and, as we would
10  expect, it's 11 --
11      A.   82.
12      Q.   -- 882, which means that it was copied in this
13  order out of the medical chart.  Do you see that?
14      A.   Yes, sir.
15      Q.   Okay.  My question is -- up at the top of the
16  second page, it says page 3.  And so, we've gone from a
17  -- the first page directly to page 3.  And so, my
18  question to you is, where's page 2 -- strike that.  What
19  is page 2?
20      A.   I'm not sure.
21      Q.   So, you don't have an explanation of why we go
22  from the first page to page 3?
23      A.   Maybe we're missing a page.
24      Q.   That's what I'm trying to find out.
25      A.   I would not be --
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

183

```
 1      Q.   I'm asking you.

 2      A.   I would not be able to know because we don't

 3  have the original file, but it could be we're missing a

 4  page if it's from page 1 and then page 3.

 5      Q.   Well, you've seen these reports before, right,

 6  lots of times?  Lots and lots of times, right?  So, is

 7  there usually three pages, and if so, what's the second

 8  page, in your experience?

 9      A.   The continuance on page 1.

10      Q.   So, more writing like there is on page 1?

11      A.   It could be.

12      Q.   Okay.  The handwriting on this follow-up

13  orthopedic evaluation is Dr. Feijoo's?

14      A.   Yes, sir.

15      Q.   Has this form, the typewritten form, been in

16  use since you've been at the clinic since 2001?

17      A.   Yes, sir.

18      Q.   I'm handing you Exhibit 10 to your deposition.

19           (Plaintiff's Exhibit 10 was marked for

20  identification.)

21  BY MR. HAZOURI:

22      Q.   Okay.  Is this the "range of motion report"

23  for the February 20th, 2017 office visit of H.P. with

24  Dr. Feijoo?

25      A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                          184

```
 1        Q.    And in this case, there's two circles around

 2   "Thoracolumbar".  Do you see that?

 3        A.    Yes.

 4        Q.    Do you remember the prior range of motion

 5   rerport had one circle?

 6        A.    Yes, sir.

 7        Q.    Do you know the significance or the difference

 8   between two circles or one circle here?

 9        A.    No, sir.

10        Q.    Okay.  And what does it say, the handwriting

11   next to the thoracolumbar spine entry?  Can you read

12   that?

13        A.    I was able to read only the percentage.

14        Q.    Right here, that number, can you read that?

15        A.    No, sir.

16        Q.    It looks to me like 30%.  You're not seeing

17   30%?

18             MR. PIVNIK:  I -- I'm going to object to the

19   form because --

20             MR. HAZOURI:  I'm just --

21             MR. PIVNIK:  -- that's your interpretation.

22             MR. HAZOURI:  Sure.  I'm asking her.

23   BY MR. HAZOURI:

24        Q.    Does -- you don't see 30%?

25        A.    No, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                 185

```
 1      Q.   Okay.

 2           MR. PIVNIK:  I thought it was 20.

 3  BY MR. HAZOURI:

 4      Q.   You just can't tell what it is?

 5      A.   Yeah.

 6      Q.   We'll have to ask Dr. Feijoo?

 7      A.   Correct.

 8      Q.   All right.  Okay.  And do you know if the --

 9  whatever it is, whatever percentage it is, do you know

10  if it applies to the thoracic spine or the lumbar spine

11  or both?

12      A.   I would have to read the transcribed report.

13      Q.   So, you would look to the transcribed report

14  to get that answer?

15      A.   Yeah.  I don't understand it.

16      Q.   Okay.  Well, let's help you out with that.

17  Handing you Exhibit 11 to your deposition.

18           (Plaintiff's Exhibit 11 was marked for

19  deposition.)

20           MR. PIVNIK:  Thank you.

21           MR. HAZOURI:  You're welcome.

22  BY MR. HAZOURI:

23      Q.   Okay.  Would you look at the thoracic spine

24  and the lumbosacral spine?

25      A.   Yes, sir.
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                186

```
 1      Q.    Okay.  And what do you see there?

 2      A.    That there is a 40%.

 3      Q.    For both the -- the 30 -- a 40% limited range

 4  of motion for both the thoracic and the lumbosacral

 5  spine?

 6      A.    Correct.

 7      Q.    And in fact, the entry is identical to the

 8  entries that -- the entries are identical to the entries

 9  in the first report, are they not --

10            MR. PIVNIK:  Objection.  Document speaks for

11  itself.

12  BY MR. HAZOURI:

13      Q.    -- in Exhibit 4?  Why don't you compare the

14  two and tell me if you can see any difference?

15            MR. PIVNIK:  Same objection, please.

16  BY MR. HAZOURI:

17      Q.    Do you see what I'm saying?  Oh, you got it.

18  Good.

19      A.    Yes, sir.

20      Q.    So, the entries for both the range of motion

21  findings in the typed report and the pain findings for

22  thoracic spine and lumbosacral spine are identical for

23  the January 26 report and the February 20th report,

24  correct?

25      A.    Yes.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                                    187

1      Q.   Because I recognize that you said you couldn't

2  read it, but does the handwritten notation on the range

3  of motion report that we've marked as Exhibit 10 look

4  like 40% to you?

5           MR. PIVNIK:  Objection.  She already said she

6  couldn't read it.

7  BY MR. HAZOURI:

8      Q.   Can you rule out 40%?

9      A.   Not really.

10     Q.   Okay.  Because the range of motion report we

11  marked as Exhibit 3 pretty clearly has 40%, right?

12          MR. PIVNIK:  Objection, asked and answered.

13     A.   Yes.

14  BY MR. HAZOURI:

15     Q.   And it looks different than the one that's on

16  Exhibit 10, right?

17     A.   He always write different.

18     Q.   Okay.

19     A.   He's a doctor.

20     Q.   Okay, sure.  I know about doctors'

21   writing.  My dad's a doctor.  But it looks different,

22  right?

23     A.   Yes, sir.

24     Q.   Okay.  And the same procedure would've been

25  followed to convert the written notes at Exhibit 9 into



```
 1    the typed-written report at Exhibit 10; that is, the

 2    transcriptionist would get the range of motion report,

 3    the handwritten notes and dictation from Dr. Feijoo?

 4         A.    Yes, sir.

 5              MR. PIVNIK:  I think you misspoke because

 6    Exhibit 10 was the range of motion.  Exhibit 11 is the

 7    typewritten report.  You said that to turn 9 into a 10.

 8              MR. HAZOURI:  Oh, okay.  Turn 9 into 11.

 9              MR. PIVNIK:  Got it.

10              MR. HAZOURI:  Yeah.

11   BY MR. HAZOURI:

12         Q.    You understood my question, right --

13         A.    Yes, sir.

14         Q.    -- even though I said the wrong exhibit?

15    Okay.

16              MR. PIVNIK:  I'm not trying to be a nitpicker.

17              MR. HAZOURI:  No, I appreciate it.  Thank you.

18   BY MR. HAZOURI:

19         Q.    Okay.  Now, in the handwritten report marked

20    as Exhibit 9, does it reference anything about x-ray

21    review that you can see?

22         A.    I believe maybe that's the page we're missing.

23         Q.    The x-ray review?

24         A.    The result of the x-ray.

25              MR. PIVNIK:  Yeah.  We'll go back and check
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                            189

```
 1   with our scanner, see if we're missing a page.

 2   BY MR. HAZOURI:

 3        Q.   Well, I'm going to help.  Let's just keep

 4   moving forward.  Okay.  So, just, first of all, to

 5   answer my question, in Exhibit 9, you don't see any

 6   reference to the x-rays --

 7        A.   Well, I don't understand his handwriting, but

 8   I really don't see it.

 9        Q.   Yeah, I get if you can't read his writing.

10   I'm just -- if there is some writing you can understand

11   that references the x-ray, I want you to tell me that.

12   That's all.

13        A.   Okay.  No, sir, I don't.

14        Q.   Okay.  So, you don't see any reference to x-

15   ray review in Exhibit 9?

16        A.   No, sir.

17        Q.   Correct?  Okay.  And, certainly, there's no

18   reference to x-ray review in Exhibit 10?  That's the

19   range of motion report.

20        A.   No.

21        Q.   All right.  If we go to Exhibit 11, down at

22   "Diagnoses", number 4, at the very bottom of the first

23   page -- you see that?

24        A.   Yes, sir.

25        Q.   It says, "As per x-rays review on the cervical
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                                      190

```
 1   spine, there is straightening of the normal lordotic

 2   curve related to sprain injury of muscle spasm.  On the

 3   lumbosacral spine there is straightening of the normal

 4   lordotic curvature."  Do you see that?

 5        A.   Yes, sir.

 6        Q.   Okay.  So, that does document -- it says an x-

 7   ray review?

 8        A.   Yes, sir.

 9        Q.   Correct?  Do you know whether Dr. Feijoo

10   reviewed x-ray films, the actual x-rays, an x-ray report

11   only or both an x-ray film and an x-ray report in making

12   these findings?

13        A.   Well, based on the records you provide me, I

14   don't.  This is a 2017 case.  I don't -- I don't

15   remember.

16        Q.   Okay.  Is -- the x-ray review documented in

17   bullet point 4 under "Diagnosis", is that the service

18   for which the clinic billed 6 -- 76140?

19        A.   If x-ray review has been performed, yes, sir.

20        Q.   Okay.  Well, you -- the clinic obviously

21   believed that x-ray review was performed because it

22   billed a 76140.

23        A.   Correct.

24        Q.   Right?  Just to -- it's on Exhibit 8, right

25   there, right?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    191

```
 1       A.   Yes, sir.

 2       Q.   Okay.  So, my question to you is, this 76140

 3   that was on the bill that we marked as Exhibit 8 -- do

 4   you see that?

 5       A.   Yes, sir.

 6       Q.   Okay.  The service that this 76140 represents

 7   is what is documented in paragraph 4 of Exhibit 11,

 8   where it says Dr. Feijoo reviewed the x-rays and these

 9   are his findings?

10       A.   Yes.

11       Q.   Handing you what we've marked as Exhibit 12 to

12   your deposition.  It's actually two documents.

13            (Plaintiff's Exhibit 12 was marked for

14   identification.)

15   BY MR. HAZOURI:

16       Q.   You can take a second and familiarize yourself

17   with them.  Let me know when you're ready.

18       A.   Yes, sir.  Ready.

19       Q.   Okay.  So, what do you -- and, again, these

20   are bates stamped and you can see the H.  I promise you

21   the second name started with a P, even though I blacked

22   it out.  So, I'll represent to you these are out of the

23   same chart that we've been working from.  What is your

24   understanding of what these documents are?

25       A.   The patient has done the x-ray.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

192

1    Q.   So, let me help -- try and clarify.  Do you

2  understand these to be reports of x-rays performed on

3  the patient H.P.?

4    A.   Correct.

5    Q.   And do you understand the first one to be a

6  cervical spine --

7    A.   Yes.

8    Q.   -- a report of a cervical spine x-ray and the

9  second one to be a report of a lumbosacral spine x-ray?

10   A.   Yes.

11   Q.   You see that?  Up at the top of both pages,

12  there's a fax line.  Do you see that?  Right at the top

13  there.

14   A.   Yes.

15   Q.   Okay.  It's dated February 20th, 2017,

16  correct?

17   A.   Yes.

18   Q.   And that's -- February 20th is the same date

19  that Dr. Feijoo had this follow-up visit with the

20  patient that we're talking about, correct?

21   A.   Yes.

22   Q.   And it says, "Silver Medical Center".  There's

23  a hole there, a hole punch.

24   A.   I understand.

25   Q.   But it's "Silver".  Do you agree?  Huh?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          193

```
 1       A.    Silver, you say?

 2       Q.    Silver, yes.  I'll show you a fax sheet that

 3   I'm going to --

 4       A.    Oh, okay.

 5       Q.    See Silver?

 6       A.    Okay.

 7       Q.    Do you know that clinic?

 8       A.    No.  We work with different clinics.

 9       Q.    It doesn't sound familiar to you?

10       A.    No.

11       Q.    Okay.  So -- and then this was page 6, do you

12   see, of the fax?

13       A.    Yes.

14       Q.    And this next page was page 7.

15       A.    Yes.

16       Q.    Do you see that?  So, it appears that Silver

17   Medical Center faxed these reports to Dr. Feijoo's

18   office on February 20th, 2017 at 4:07 p.m.  Do you agree

19   that's what it appears to be?

20       A.    Yes, sir.

21       Q.    All right.  So, why -- what would be your

22   understanding of why Silver Medical Center would be

23   sending x-ray reports that Dr. Feijoo himself ordered?

24       A.    Because he ordered the x-rays.

25       Q.    Well, let me try and help again.  The x-rays
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        194

```
 1   were done by DLP Radiology.

 2        A.   Correct.

 3        Q.   Correct?  So, do you have an understanding why

 4   DLP Radiology didn't send the x-rays and reports to Dr.

 5   Feijoo?  It came from Silver Medical instead, the

 6   reports.

 7        A.   It must be that we called the clinic to find

 8   out if the x-ray has been done.

 9        Q.   Okay.  And I -- you're guessing there, right?

10   I mean, in all fairness, it's --

11        A.   Well, I can guarantee you that that's the

12   case.

13        Q.   Okay.  So, what happened was the patient H.P.

14   is coming back for a February 20th visit, right?

15        A.   Yes.

16        Q.   And by the way, let me -- oh, we looked at it.

17   Remember the x-ray studies --

18        A.   Yes.

19        Q.   -- the four views?

20        A.   Yeah.

21        Q.   Dr. Feijoo's expecting there to be x-rays --

22        A.   Yes.

23        Q.   -- right, for his follow-up visit?  And we

24   don't know what the timing was, but at some point, these

25   reports get -- or at 4:07, these reports get sent over
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
195

 1    from Silver Medical.

 2        A.    Correct.

 3        Q.    And if the films had been sent either by

 4    Silver Medical or brought by the patient, would that be

 5    reflected in the chart anywhere?

 6        A.    It may be.  If not, he may dictate it, that he

 7    did it.  Like he will say, I reviewed x-ray report and

 8    x-ray films.

 9        Q.    Okay.  Other than it being dictated into his

10    report, was there -- is there somewhere else you would

11    look in the chart?

12        A.    He start -- lately, he start doing it and he

13    will put it in his handwriting note.

14        Q.    Okay.  So, we've been through that.  You

15    didn't see it in the handwritten note?

16        A.    No, sir.

17        Q.    So, other than the handwritten note and the

18    transcribed report, there's no other place you would

19    look to see the x-ray film -- if he looked at x-ray

20    films?

21        A.    Well, at the time that we're in consultation,

22    we would know if we put the CD, but not years after.

23        Q.    Yeah.  You don't remember now.

24        A.    No.

25        Q.    Correct?  Okay.  At any rate, so let's look at



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                196

 1   the cervical spine report, the first page here.  The

 2   findings are, "Straightening of the normal lordotic

 3   curve of cervical spine possibly related to sprain

 4   injury or muscle spasm."  Do you see that?

 5       A.   Yes, sir.

 6       Q.   Dr. Feijoo said, on the cervical spine, "There

 7   is straightening of the normal lordotic curve related to

 8   sprain injury" -- it says "of", but I think he --

 9   "sprain injury or muscle spasm".  Do you see that on his

10   report?

11       A.   Yes.

12       Q.   So, Dr. Feijoo did not use the word possibly

13   like the x-ray report, correct?

14       A.   Yes.

15            MR. PIVNIK:  Objection.  Document speaks for

16   itself.

17   BY MR. HAZOURI:

18       Q.   Other than that, his statement is the same as

19   what's in the x-ray report, correct?

20       A.   What is --

21            MR. PIVNIK:  Same objection.

22       A.   -- in the x-ray result?

23   BY MR. HAZOURI:

24       Q.   Yes.

25       A.   Yes.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                197

```
 1      Q.   Yes.  His statement and his transcribed report

 2  is a re-statement of what's in the x-ray report, almost

 3  the same, except the word possibly is not there,

 4  correct?

 5          MR. PIVNIK:  Same objection.

 6      A.   Yes.

 7  BY MR. HAZOURI:

 8      Q.   And then going to the second page of the

 9  report for -- on the lumbosacral spine, complete x-ray,

10  do you see that?

11      A.   Mm-hmm.

12      Q.   I'm sorry.  Is that a yes?

13      A.   Yes.

14      Q.   Okay.  I'm taking you right -- yes, right

15  there.  It says, "Complete examination shows

16  straightening of the normal lordotic curve of the lumbar

17  spine possibly related to sprain injury or muscle

18  spasm", correct?

19      A.   Yes.

20      Q.   And Dr. Feijoo said, on the lumbosacral spine,

21  "There is straightening of the normal lordotic

22  curvature", correct?

23      A.   Yes.

24      Q.   So, the same finding, but he left out possibly

25  -- he left out the "possibly related to sprain injury or
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                198

```
 1   muscle spasm", correct?

 2           MR. PIVNIK:  Same objection.

 3       A.   Yes.

 4   BY MR. HAZOURI:

 5       Q.   Okay.  Now, did Dr. Feijoo simply take these

 6   findings from the x-ray report and put them into his own

 7   orthopedic evaluation?

 8       A.   No.

 9       Q.   How do you know that?

10       A.   Because he sees the films or CDs and he get

11   his own opinion.

12       Q.   Okay.  But we have no documentation in here of

13   him looking at any films.

14       A.   And we don't have no documentation that he

15   didn't -- that he did look.

16       Q.   But we do have reports.

17       A.   Yes.

18       Q.   And the reports have the same -- essentially,

19   the same language that his findings have?

20       A.   Correct.

21           MR. PIVNIK:  Same objection.  Yeah.  Asked and

22   answered --

23           MR. HAZOURI:  Okay.

24           MR. PIVNIK:  -- twice now.

25           MR. HAZOURI:  That's fine.
```



```
 1   BY MR. HAZOURI:

 2       Q.   So, I'm not asking you to admit that what I'm

 3   going to say happened.  Okay?  Just -- I want to make

 4   that very clear you're not admitting that.  Okay?

 5       A.   Okay.

 6       Q.   But I'm asking you, if Dr. Feijoo had simply

 7   taken -- reviewed these reports, these two x-ray reports

 8   that we marked as Exhibit 12, okay, took the findings

 9   out of the x-ray reports and wrote them into his own

10   report that we marked as Exhibit 11, if that would have

11   occurred, would the clinic have billed 76140 for that

12   service?

13       A.   Without being -- without doing the film review

14   or CD?

15       Q.   Without seeing the films or CD.

16       A.   I'm not sure.

17       Q.   Are you aware of your clinic ever billing for

18   Dr. Feijoo just reviewing written x-ray reports, taking

19   the findings out of the x-ray reports and putting them

20   into his own report -- the clinic billing a 76140 for

21   that service?

22       A.   I think I answered that before that I was not

23   sure, that sometimes we may have done it.

24       Q.   Okay.  I just want to offer to you, just as a

25   matter of completeness, I do have the entire chart here,
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    200

```
 1   a copy of it.  You have told me as far as if you were

 2   going to look and see if he reviewed x-ray films, you

 3   would look at either the handwritten notes or the

 4   written report from the February 20th, 2017 office

 5   visit, and I've given you those.

 6        A.   Yeah.

 7        Q.   Right?  You've looked at them?

 8        A.   Or his dictations.

 9        Q.   If -- well, his dictations is -- does he have

10   tapes of his dictation?

11        A.   It get erased.

12        Q.   I'm sorry?

13        A.   He use it.  He reuse it.

14        Q.   Right.  So, it gets erased?

15        A.   Yes.

16        Q.   So, you can't go find the dictation --

17        A.   No.

18        Q.   -- from those?  But my question is -- I have

19   the chart.  If there's anywhere else you'd like to look

20   to see if x-rays are documented, I can give it to you,

21   but if you're comfortable that it would only be, you

22   know, the handwritten notes or the typewritten report,

23   then we can move on.

24        A.   Okay.

25             MR. PIVNIK:  I mean, do you have another copy
```



1  of Exhibit 2 that -- other than the one we produced to

2  you, the one that you have?  Did I say Exhibit 2?  I

3  mean 1, the three-page exhibit that we only have --

4          MR. HAZOURI:  No, no, I'm talking about the x-

5  ray review right now.

6  BY MR. HAZOURI:

7      Q.    Did you understand?  What I'm saying is I

8  don't want to waste our time, but I want to give you

9  every opportunity to look at what you feel like you need

10  to.  So, I have the chart here.  This is the complete

11  medical chart that was delivered to us.

12      A.    Yeah.

13      Q.    Okay.  What I'm trying to find out, if there's

14  anywhere documented that Dr. Feijoo actually reviewed x-

15  ray films.  You told me you would look in the

16  handwritten notes and in the written report -- the

17  typewritten report and you have that.  So, what I'm

18  saying is if you're comfortable with that, that's the

19  only place you would look, we're fine.  If you want to

20  look somewhere in the rest of the chart, I'll give it to

21  you and you can check.

22          MR. PIVNIK:  Is -- and what I'll ask, is this

23  the chart that we gave you or is this the one that you

24  have?

25          MR. HAZOURI:  It's the chart you gave us.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

1          MR. PIVNIK:  Oh, okay.  So, it's not going to

2   be -- Exhibit 11 is not going to be any different,

3   right, because it's still bates stamped --

4          MR. HAZOURI:  No.  It'll have copies -- I'm

5   saying look at other stuff in the chart.

6          MR. PIVNIK:  Okay.

7          MR. HAZOURI:  That's what I'm trying to get

8   to.

9          MR. PIVNIK:  Okay.

10  BY MR. HAZOURI:

11      Q.   Do you understand?

12      A.   Yes, sir.

13      Q.   Would you like to look at the chart or are you

14  comfortable that --

15      A.   I'm comfortable, but I just want to double

16  check -- or recall that there's from page 1 to page 3.

17      Q.   Yeah.  Would you like to look at the chart at

18  that?

19      A.   But I don't know if you have the extra page.

20  If you have it like this it's because you don't have it.

21      Q.   Well --

22      A.   I don't know if it was like that or what

23  happened.

24      Q.   Okay.  Well, I'll tell you -- what I can tell

25  you is -- see the chart has the bates numbers?



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
203

```
 1      A.    Mm-hmm.

 2      Q.    So, if I pull them out of here, it's going to

 3  be the same as what I've already given you because what

 4  I've given you I took out of this.  So, I know we don't

 5  have the original chart here.

 6      A.    Okay.

 7            MR. PIVNIK:  Yeah.  What I'm saying is that,

 8  you know, we don't know right now if the scanner just

 9  skipped over that and that you might have one in the one

10  that State Farm had.

11            MR. HAZOURI:  Can we go off the record real

12  quick?

13            THE VIDEOGRAPHER:  We are off the record.  The

14  time is --

15            THE COURT REPORTER:  1:40.

16            THE VIDEOGRAPHER:  -- 1:40 p.m.

17            (Discussion was held off the record.)

18            (Videotaped deposition resumed.)

19            THE VIDEOGRAPHER:  We are back on the record.

20  The time is 1:42 p.m.

21  BY MR. HAZOURI:

22      Q.    Okay.  So, we had a little discussion off the

23  record and, as I understand it, you do not believe that

24  anywhere else in the chart since -- and taking into

25  account the page 2 that we talked about that we --
```



**Orange Legal**
**800-275-7991**

```
 1              MR. PIVNIK:  11.

 2  BY MR. HAZOURI:

 3      Q.   -- on Exhibit 11 -- and that page is not in

 4  this chart because I copied the exhibit right out of the

 5  chart --

 6      A.   Okay.

 7      Q.   -- and the bates numbers are consecutive like

 8  I showed you.  So, setting that issue aside, you don't

 9  believe looking at the chart would help you determine

10  whether Dr. Feijoo looked at x-ray films over and above

11  what you've already looked at here?

12      A.   No, sir.

13      Q.   Okay.  All right.

14           (Brief interruption.)

15  BY MR. HAZOURI:

16      Q.   Okay.  So, let me mark --

17           (Brief interruption.)

18      Q.   I'm handing you what's been marked as Exhibit

19  13 to your deposition.

20           (Plaintiff's Exhibit 13 was marked for

21  identification.)

22  BY MR. HAZOURI:

23      Q.   I'll represent to you this is just a fax cover

24  sheet that we found in the chart.  Do you see that?

25      A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
205

```
 1      Q.   This is Dr. Feijoo's standard fax cover sheet?

 2      A.   Yes, sir.

 3      Q.   And it looks like it was sent -- a fax was

 4  sent to Silver Medical?

 5      A.   Yes.

 6      Q.   And it says, "Orthopedic Evaluation"?

 7      A.   Yes.

 8      Q.   And the fax was sent on February 23rd, 2017,

 9  correct?

10      A.   Correct.

11      Q.   So, would that be the office -- Dr. Feijoo's

12  office sending Exhibit 11, the follow-up orthopedic

13  examination, to Silver Medical?

14      A.   Yes, sir.

15      Q.   And why did Dr. Feijoo send the follow-up

16  orthopedic evaluation to Silver medical or why did the

17  office do that?

18      A.   It must be the referral provider.

19      Q.   So, it's -- based on that, it's your

20  understanding that the patient was referred to Dr.

21  Feijoo by Silver Medical?

22      A.   Yeah.  Well, I will have to confirm it when I

23  see the records.

24      Q.   That's your best understanding --

25      A.   Yes.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
206

1      Q.    -- right now?  Well, I'll tell you what, do

2  you want to -- is there somewhere you can look in the

3  chart real quick?

4      A.    Yes.

5      Q.    Okay.  I'm handing you the complete medical

6  chart that was produced to us.  Okay.  So, what is the

7  document you're looking at?

8      A.    Where the patient information is, he wrote

9  that he coming from Silver Medical.

10     Q.    This says, "Silver Clinic", right here?

11     A.    Mm-hmm.

12     Q.    So, that tells you that the patient was

13  referred by Silver Medical or the Silver Clinic?

14     A.    Yes.  And there's another document that we --

15  when we do the insurance verification.  It should be

16  there, but I don't see it.

17     Q.    Yeah, I've seen that document in there.  I'm -

18  - if you're comfortable, I'm comfortable.

19     A.    Yeah.

20     Q.    Okay.

21     A.    Okay.

22     Q.    So, Silver Medical referred this patient.  And

23  so, why is the orthopedic evaluation being sent to

24  Silver Medical based on it being the referring clinic?

25     A.    We send it back to the referring provider in



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        207

1    case they need it for their treatment plans or any other

2    additional information they may need.

3         Q.   Yeah.  Provide information regarding the

4    patient?

5         A.   Correct.

6         Q.   Okay.  Did the office fax the range of motion

7    report from the February 20th, 2017 office visit to

8    Silver Medical?

9         A.   No, sir.

10        Q.   Why not?

11        A.   We send the transcribed report and the

12   transcribed report, that's a description of the range of

13   motion.

14        Q.   Okay.  And this follow-up evaluation report,

15   the same typewritten one that was sent to Silver, is

16   what would be submitted along with the bill to State

17   Farm to document the services?

18        A.   Yes, sir.

19        Q.   And that's the only document submitted to

20   document --

21        A.   Yes, sir.

22        Q.   If you could, please go back to Exhibit 7.

23   Pull that out, if you would, please.  It's the CPT book

24   entries for E&M codes.  And if you could go to 99214,

25   third page, let me know when you're there.



1       A.    Correct.

2       Q.    You ready?  And I would encourage you to look

3   at the written notes, the transcribed report, the range

4   of motion report for the 2/20/17 -- February 20th, 2017

5   visit if you need them to assist you in answering this

6   question.  And so, my first question is -- well, strike

7   that.

8              Under 99214, you see it says, "Office or other

9   outpatient visit for the evaluation and management of an

10  established patient, which requires at least two of

11  these three key components: A detailed history, a

12  detailed examination and medical decision-making of

13  moderate complexity."  Did I read that correctly?

14      A.    Yes, sir.

15      Q.    And do you agree that these -- two of these

16  three components are required for Dr. Feijoo to -- Dr.

17  Feijoo's clinic to properly bill a 99214 for the

18  February 20th, 2017 office visit with patient H.P.?

19      A.    Yes, sir.

20      Q.    Okay.  So, in looking at the records you have

21  in front of you -- and, again, I have the chart if you'd

22  like to reference it.  Explain to me -- please explain

23  how Dr. Feijoo's February 20th, 2017 office visit with

24  H.P. included a detailed history, if it did.

25      A.    Ready?



1      Q.   Yes.

2      A.   I can talk?

3      Q.   Yes.  Oh, please.

4      A.   Oh, okay.

5      Q.   I've been waiting for you.

6      A.   Okay.  He did the history of the present

7  illness in the patient.  He did the examination.  He

8  reviewed the x-rays and explained the x-rays and the

9  treatments to the patient.

10     Q.   Okay.  Let's work through that.  You'd said he

11 did an examination.  Examination is not history.

12 Examination is something separate, right?  That's the

13 second bullet point, "A detailed examination".

14     A.   A detailed examination.

15     Q.   So, I'm only asking you about the first bullet

16 point, "A detailed history".  Do you see that?

17     A.   Yes.

18     Q.   Okay.  So, let me help here.  You said he did

19 -- he had the history of present illness.  And that is

20 listed on Exhibit 11, the transcribed report?

21     A.   Correct.

22     Q.   Right?  And what he wrote was, "The patient

23 has been receiving physiotherapy treatment and refers is

24 feeling better, but still complaining of pain on the

25 aforementioned areas."  Correct?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                             210

```
 1      A.    Correct.

 2      Q.    That's not a detailed history, is it?

 3            MR. PIVNIK:  Objection, form.  Argumentative.

 4      A.    That would be your opinion.

 5 BY MR. HAZOURI:

 6      Q.    Well, okay.  I'll rephrase the question.  Do

 7 you believe that's a detailed history?

 8      A.    Well, this is what is in the transcriber

 9 report.  I'm not sure what he will be dictating.

10      Q.    Okay.  Well, the transcribed report should

11 accurately document what he dictated, correct?

12      A.    It may be.  It could be that they short it

13 down for purpose of the transcriber report.

14      Q.    But you don't know if that occurred?

15      A.    No, sir.

16      Q.    Right?  And the point of Dr. Feijoo dictating

17 is to have his -- the typewritten report that comes out

18 reflect what he dictated into the Dictaphone, correct?

19      A.    That, and sometimes they would not understand

20 his handwriting note.

21      Q.    Okay.  But if he's dictating, they don't have

22 to understand his handwritten note, right?

23      A.    No, but they always review it.  It's always

24 good to review it.

25      Q.    Okay.  So, let's -- we'll move to that, but
```



1   let me just ask you.  The history of present illness,

2   just on Exhibit 11, is it your understanding that that's

3   a detailed history that allows for the appropriate

4   billing of 99214, just that entry alone?

5       A.   Yes.

6       Q.   Okay.  And then let's look at the handwritten

7   page.  Do you see any entries related to history in the

8   handwritten page?

9       A.   No, sir.

10      Q.   Okay.  And we don't have his dictation and we

11  can't ever have it, right, because it's been erased?

12      A.   Of course.

13      Q.   So, your entire understanding that there was a

14  detailed history taken by Dr. Feijoo in his February

15  20th, 2017 office visit with H.P. for the purposes of

16  billing a 99214 is this one sentence, "The patient has

17  been receiving physiotherapy and refers is feeling

18  better but still complaining of pain on the

19  aforementioned areas", correct?

20      A.   Well, that's what we have in the transcribed

21  note.  We're not able to confirm nothing else.

22      Q.   But you believe that's a detailed history,

23  that one sentence?

24      A.   It's part of the detailed history.  There is a

25  detailed history of the present illness.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
212

1    Q.   Right.  That sentence is the detailed history.

2    That's your understanding, correct?

3    A.   Yes, sir.

4    Q.   All right.  Now, the second component is a

5    detailed examination, correct?

6    A.   Correct.

7    Q.   That's the second component of a 99214, right?

8    A.   Yes, sir.

9    Q.   Okay.  Please explain how Dr. Feijoo's

10   February 20th, 2017 office visit with H.P. included a

11   detailed examination.

12   A.   There's an examination on the cervical,

13   thoracic, lumbar, upper extremity, lower extremity.

14   Q.   Okay.  Do you have any other explanation as to

15   how this constitutes a detailed examination for purposes

16   of 99214?

17   A.   Can you repeat your question?

18   Q.   Yes.  Do you have any other explanation of

19   your understanding of how Dr. Feijoo performed a

20   detailed examination for purposes of 99214 on the

21   patient on February 20th, 2017?

22   A.   Just that information that we have that the

23   patient was -- that Dr. Feijoo did the examination on

24   the patient in the different area of his body.

25   Q.   That's the full extent of your understanding?



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                              213

```
 1      A.   Yes, sir.

 2      Q.   All right.  And then the third component there

 3 is medical decision-making of moderate complexity,

 4 correct?

 5      A.   Correct.

 6      Q.   Please explain how Dr. Feijoo's February 20th,

 7 2017 office visit with H.P. included medical decision-

 8 making of moderate complexity.

 9      A.   There is an instruction on the limitation;

10 what he needs to do, what he needs to avoid.  Also, he

11 was fully explained about his x-rays.

12      Q.   Okay.  I'm sorry.  Are you done with your

13 answer?

14      A.   No.

15      Q.   Oh, continue, please.  That's why I asked.

16      A.   The patient needed to continue physical

17 therapy treatment and -- I couldn't understand the other

18 thing.

19      Q.   I'm sorry?

20      A.   I couldn't understand the other

21 recommendation.

22      Q.   Are you reading from the handwritten --

23      A.   Yes, sir.

24      Q.   -- report?  His recommendation's also in the

25 typewritten report?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          214

```
 1      A.   Yes.

 2      Q.   Is -- are they the same?  Would that help you?

 3      A.   It may be.  I don't understand his

 4  handwriting, but there is a recommendation in there.

 5      Q.   Okay.  Well, let's look from the -- let's work

 6  from the typewritten --

 7      A.   Okay.

 8      Q.   -- page because it's easier to read.  Right?

 9  There's a section on the last page called

10  "Recommendations", right?

11      A.   Yes, sir.

12      Q.   "Limit overall activities", number 1, right?

13      A.   Yes, sir.

14      Q.   Number two, "Use a low pillow."

15      A.   Correct.

16      Q.   Number three, "Avoid heavy lifting.  Bend the

17  knees, not the back, when picking up anything from the

18  floor", right?

19      A.   Correct.

20      Q.   "The patient was fully explained about the x-

21  ray results."  Right?  Correct?

22      A.   Correct.

23      Q.   "The patient was highly recommended to

24  continue with the physiotherapy treatment on the

25  affected areas."  Right?
```



```
 1      A.   That's correct.

 2      Q.   And the last entry has -- is, "Return to the

 3  office in one month for further evaluation and treatment

 4  if necessary."

 5      A.   Correct.

 6      Q.   Correct?  Is it your understanding that those

 7  recommendations constitute medical decision-making of

 8  moderate complexity that justifies the billing of a

 9  99214 for Dr. Feijoo's February 20th, 2017 office visit

10  with H.P.?

11      A.   Yes, sir.

12      Q.   Is there any other support for that billing or

13  is that the total of it?  That's the total of your

14  understanding?

15      A.   Yes, and the time that he take with the

16  patient.

17      Q.   Is the time documented anywhere --

18      A.   No.

19      Q.   -- that he spent?  Okay.  So, as you sit here

20  today, you don't know how much time he spent with her --

21      A.   Well, I'm there every day, so I do see that he

22  spend 30 minute, 35 minute, 29 minute.

23      Q.   Okay.  But you don't know how long he spent

24  with this patient on this day?

25      A.   Not at this time or the year.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        216

```
 1      Q.   I wouldn't expect you to, believe me, but you

 2  don't because it happened in 2017, right?

 3      A.   Correct.

 4      Q.   Okay.  All right.  Let's see here.

 5           MR. PIVNIK:  Good time for a break?

 6           MR. HAZOURI:  Do you want -- yeah.  Do you

 7  want to take a break and we stretch a little bit and you

 8  make your call?

 9           THE WITNESS:  Well, it's after 2:00.

10           MR. HAZOURI:  Do you want to go to 2:10?

11           THE WITNESS:  Yeah.

12           MR. HAZOURI:  Okay.  Let's go 10 more

13  minutes.

14  BY MR. HAZOURI:

15      Q.   All right.  I'm handing you what's been marked

16  as Exhibit 15 to your deposition.

17           MR. SCHURR:  15?

18           MR. PIVNIK:  Yeah, was the last one 15?

19           THE WITNESS:  14.

20           MR. HAZOURI:  14, 14, 14.  Sorry.  My bad.

21           MR. PIVNIK:  Okay.

22           MR. HAZOURI:  Counting is not my strong suit.

23           (Plaintiff's Exhibit 14 was marked for

24  identification.)

25  BY MR. HAZOURI:
```



```
 1       Q.   All right.  I represent to you -- see the

 2  bates stamps here, H.P. up here?  Is this a bill that

 3  you prepared for an office visit that H.P. had with Dr.

 4  Feijoo on March 20th, 2017?

 5       A.   Correct.

 6       Q.   And that's the date of service right over

 7  here?

 8       A.   Yes, sir.

 9       Q.   Okay.  And there's two codes billed here,

10  99215 and 95851, correct?

11       A.   Yes, sir.

12       Q.   All right.  So, that is an office visit, E&M,

13  99215, and a range of motion testing?

14       A.   Yes, sir.

15       Q.   All right.

16            MR. PIVNIK:  Oh, Ken, I guess I'll point out I

17  didn't look at the other HCFA, but this one also has the

18  --

19            MR. HAZOURI:  Yeah.

20            MR. PIVNIK:  -- patient's --

21            MR. HAZOURI:  Address and phone number?

22            MR. PIVNIK:  Yeah.

23            MR. HAZOURI:  Yeah.  I'm going to -- if you

24  can remind me, I'll redact those out before I leave just

25  so the exhibits, you know, to the depo will be clean.
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                218

```
 1   BY MR. HAZOURI:

 2        Q.   Okay.  I have handed you what we've now marked

 3   as Exhibit 15 to your deposition.

 4             (Plaintiff's Exhibit 15 was marked for

 5   identification.)

 6   BY MR. HAZOURI:

 7        Q.   First of all, going back to Exhibit 14, what

 8   does the 99215 code describe?

 9        A.   A follow-up office consultation.

10        Q.   Okay.  And what are the attributes or

11   components of a 99215 follow-up office visit?

12        A.   Like the description?

13        Q.   Yeah.  What's required to go in 99215?  Would

14   you just go look at the CPT code --

15        A.   Let me go.

16        Q.   -- book that I gave you?  You don't have to

17   go.  We'll go there.  So, if you're just going to go

18   look at that, we don't have to do that right now.  But

19   you do understand it's a level 5 code?

20        A.   Yes, sir.

21        Q.   You understand level 5 is the highest code

22   that can be billed for a follow-up visit?

23        A.   I understand.

24        Q.   Right?  So, why did the clinic choose the

25   highest level 5 code for a follow-up visit for this
```



 1  particular patient?

 2      A.  It must be a discharge patient, like the final

 3  patient -- it's like it's the final visit.  Yeah, it is

 4  the final visit.

 5      Q.  So, help me out with that.  You said it must

 6  be a final discharge visit.  Does that mean that the

 7  clinic, Feijoo, P.A., bills 99215 for all final

 8  discharge visits?

 9      A.  Not for all.  This -- it's never the same

10  code.  It's depending on what the doctors do on the

11  patient.

12      Q.  Okay.  So, then what was it about this

13  particular treatment?  I'll tell you what, we'll hold on

14  that and I'll let you have the records in front of you

15  so you can answer with the records in front of you.

16          Okay.  So, Exhibit 15, is that Dr. Feijoo's

17  handwritten note?

18      A.  Yes, sir.

19      Q.  From the March 20th, 2017 office visit with

20  H.P.?

21      A.  Yes, sir.

22      Q.  So, that's the notes that he fills out while

23  he's meeting with the patient, correct?

24      A.  Correct.

25      Q.  All right.  So, let's look at this one,



 1  Exhibit 15.  Do you have it in front of you?

 2      A.   Yes, sir.

 3      Q.   You see down here bates 11871?  You see that?

 4      A.   Yes.

 5      Q.   Next page is the range of motion report.  Do

 6  you see that?

 7      A.   Yes, sir.

 8      Q.   And the bates is 11872.  You see that?

 9      A.   Correct.

10      Q.   So, the very next page in the chart.  And the

11  third page, again, says page 3.  Do you see that?

12      A.   Yes, sir.

13      Q.   So, based on this, is it your understanding

14  that the range of motion report is actually supposed to

15  be page 2, the second page of the follow-up evaluation

16  and the final evaluation notes?

17      A.   No, sir.  The range of motion is a separate

18  document that is under the patient file.

19      Q.   Okay.  Then why is it in between pages 1 and 3

20  of the final orthopedic evaluation of this patient?

21      A.   It will be maybe that's the way that they file

22  it or maybe that's the way they scan it.  But, usually,

23  range of motion is the last page in the file.

24      Q.   So, we still don't know --

25      A.   What page --



1      Q.   So, let's take out the -- you're saying the

2    range of motion report shouldn't be between these two

3    pages?

4      A.   No, sir.

5      Q.   Correct?  So, then now we have two reports --

6    or two handwritten notes, I should say, in here where we

7    skip from the front page to a page that says page 3.

8      A.   Correct.

9      Q.   And we don't know why that is?

10     A.   No, sir.

11          MR. HAZOURI:  Why don't we -- we're five

12   minutes to your call --

13          THE WITNESS:  Okay.

14          MR. HAZOURI:  -- and why don't we just take a

15   little break, stretch our legs?

16          THE VIDEOGRAPHER:  We are going off the

17   record.  The time is --

18          MR. SCHURR:  2:05.

19          THE VIDEOGRAPHER:  -- 2:05 p.m.

20          (Brief recess was held.)

21          (Videotaped deposition resumed.)

22          THE VIDEOGRAPHER:  This is media four.  We are

23   on the record.  The time is 2:17 p.m.

24   BY MR. HAZOURI:

25     Q.   Okay.  I wanted to go back real quick to



1   Exhibits 9 and 10, which were the -- Exhibit 9 is Dr.

2   Feijoo's handwritten notes from the follow-up orthopedic

3   evaluation.  Exhibit 10 is the range of motion report.

4       A.   Yes, sir.

5       Q.   Do you see that?

6       A.   So, on the first page of Exhibit 9, once

7   again, like the prior handwritten notes we looked at,

8   there's all sorts of templated entries for the cervical

9   spine range of motion, the thoracic spine range of

10  motion and the lumbar spine range of motion.  You see it

11  has degrees, with or without pain, and it even has

12  normal ratings out to the right?  Do you see that?

13      A.   Yes, sir.

14      Q.   And it is for the cervical, thoracic and

15  Lumbar, right --

16      A.   Yes, sir.

17      Q.   -- range of motion?  So, given that these

18  entries are available for Dr. Feijoo to fill out when

19  he's doing the range of motion testing on the patient,

20  why does he write the range of motion findings into a

21  separate report, which is marked as Exhibit 10, instead

22  of just simply notating them in this handwritten note?

23           MR. PIVNIK:  Objection, asked and answered.

24           MR. HAZOURI:  It's a different report.

25           MR. PIVNIK:  Yeah, but it's --



Orange Legal
800-275-7991

 1          MR. HAZOURI:   If the answer's the same, the

 2   answer's the same.

 3      A.   Sorry.

 4   BY MR. HAZOURI:

 5      Q.   Okay.  My question is, when -- the follow-up

 6   orthopedic evaluation template that he writes on when

 7   he's doing the follow-up orthopedic has all these places

 8   to enter range of motion findings for the cervical,

 9   thoracic and lumbar spine, correct?

10      A.   Yes, sir.

11      Q.   So, my question is, why doesn't Dr. Feijoo

12   just notate his findings of range of motion right here

13   in these templated entries in the follow-up orthopedic

14   evaluation as opposed to writing them into a separate

15   range of motion report?

16      A.   I think I answered that before and I say that

17   he -- usually, when he do the range of motion, it's not

18   at the same time of the consultation -- when he's doing

19   the consultation with a patient.

20      Q.   Oh, I don't recall you saying that.

21      A.   Meaning it's not like a different day, like --

22   but he do the range of motion last.

23      Q.   He does it last, but in the same visit?

24      A.   Yes, sir.

25      Q.   When he does it last, he could just write it



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                224

 1  in, couldn't he, to the follow-up orthopedic evaluation?

 2      A.   It could be.  Yes, sir.

 3      Q.   So, why doesn't he just do that?

 4      A.   I'm not sure.

 5      Q.   And then going back to where we were, which

 6  was Exhibit 15, which had the range of motion report,

 7  you say it's not supposed to be page 2, but it's after

 8  the first page and in between the third page.

 9      A.   Yes, sir.

10      Q.   Right?  If I ask you the same questions about

11  why he doesn't make the range of motion findings on the

12  first page instead of the range of motion reports, would

13  your answers be the same?

14      A.   Yes, sir.

15      Q.   Okay.

16           (Brief interruption.)

17  BY MR. HAZOURI:

18      Q.   Handing you what we've marked as Exhibit 16 to

19  your deposition.

20           (Plaintiff's Exhibit 16 was marked for

21  identification.)

22           MR. PIVNIK:  Thank you.

23           MR. HAZOURI:  You're welcome.

24  BY MR. HAZOURI:

25      Q.   Okay.  You can see the bates stamps and the



 1  initials H.P. up at the top.

 2       A.   Yes, sir.

 3       Q.   I'll represent to you this is out of the same

 4  medical chart.   What is this document?

 5       A.   That's the final orthopedic evaluation.

 6       Q.   Of patient H.P. that was performed on March

 7  20th, 2017, correct?

 8       A.   Correct.

 9       Q.   So, what -- again, what happened here is Dr.

10  Feijoo saw the patient on March 28, 2017, filled out

11  Exhibit 15, filled out the range of motion report that

12  is part of Exhibit 15, did a dictation of his findings

13  and that's what -- how he came to the final orthopedic

14  evaluation?

15       A.   Correct.

16       Q.   All right.   And, again, when the bill that we

17  marked as Exhibit 14 was sent to State Farm, it would've

18  been the typewritten final orthopedic evaluation that

19  was sent along with the bill that we marked as Exhibit

20  16?

21       A.   Yes, sir.

22       Q.   So, let's look at the final orthopedic

23  evaluation report.   "Chief complaint, painless", right?

24       A.   Yes, sir.

25       Q.   The patient is no longer in pain, correct?



1   It's what that means?

2       A.   Yes, sir.

3       Q.   If you look at the range of motion findings,

4   the patient has a normal range of motion, right?

5       A.   Correct.

6       Q.   And the patient is discharged from Dr.

7   Feijoo's care.  That's the only recommendation in the

8   whole report, right?

9       A.   Correct.

10      Q.   Okay.  So, what happened here is that H.P. --

11  patient H.P. came to the doctor -- came to Dr. Feijoo,

12  had a visit with him on March 20th, 2017.  He found her

13  to be pain free.  By the way, right here, "History of

14  Present Illness", he says the patient is -- "Today, she

15  is asymptomatic."  Do you see that?

16          MR. PIVNIK:  Objection.  Document speaks for

17  itself.

18  BY MR. HAZOURI:

19      Q.   Right here, "asymptomatic", do you see that?

20      A.   Yes.

21      Q.   Okay.  So, what happened here was that the

22  patient comes in to see Dr. Feijoo on March 20th, 2017.

23  He examined her and evaluated her.  He found her to be

24  pain free and asymptomatic, to have no range of motion

25  restrictions, and he discharged her from his care,



**Orange Legal**
**800-275-7991**

 1  right?

 2     A.   Correct.

 3          MR. PIVNIK:   Objection, form.

 4  BY MR. HAZOURI:

 5     Q.   And yet, the clinic billed the highest level

 6  possible for a follow-up evaluation for that office

 7  visit, 99215, right?

 8          MR. PIVNIK:   Objection, asked and answered.

 9     A.   Yes, sir.

10  BY MR. HAZOURI:

11     Q.   Okay.   Now, let me ask you to pull out Exhibit

12  7 again, the CPT book, if you would, please.   Let me

13  know when you have it in front of you.

14     A.   Yes, sir.

15     Q.   Okay.   And the first -- there has to be two

16  out of three of the following components to bill a

17  99215; a comprehensive history, a comprehensive

18  examination and medical decision-making of high

19  complexity, correct?

20     A.   Correct.

21     Q.   And you agree those are the requirements for

22  billing a 99215 for this office visit, March 30th, 2017?

23  There has to be two out of three of those?

24     A.   Yes, sir.

25     Q.   All right.   Okay.   So, the first requirement



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        228

```
 1   is a comprehensive history.  I look at these records and

 2   I see, "History of Present Illness".  "The patient has

 3   been receiving physiotherapy and refers is feeling

 4   better and today she is asymptomatic", right?

 5       A.   Yes, sir.

 6            MR. PIVNIK:  Objection, asked and answered.

 7   Document speaks for itself.

 8   BY MR. HAZOURI:

 9       Q.   That's not a comprehensive history, is it?

10            MR. PIVNIK:  Objection, argumentative.

11       A.   Well, that's what is written in the

12   transcriber report.

13   BY MR. HAZOURI:

14       Q.   That statement is not a comprehensive history,

15   correct?

16            MR. PIVNIK:  Objection, asked and answered

17   Argumentative.

18       A.   You're saying -- or you asked -- you want me

19   to answer?

20   BY MR. HAZOURI:

21       Q.   I said, "Correct?"  I'm asking you.  This is a

22   question.  That is not a comprehensive history, correct?

23       A.   Based on the records, I don't know what he

24   also transcribed or dictated.

25       Q.   Okay.  I'm not asking you about what else he
```



 1   might've transcribed or what else he might've dictated.

 2   I'm first asking you about "History of Present Illness".

 3   "The patient has been receiving physiotherapy and refers

 4   is feeling better and today she is asymptomatic."  That

 5   statement standing alone is not a comprehensive history,

 6   correct?

 7          MR. PIVNIK:  Objection, asked and answered.

 8   The document speaks for itself.

 9      A.   I believe he did his work.

10   BY MR. HAZOURI:

11      Q.   That statement is not a comprehensive history,

12   is it?

13          MR. PIVNIK:  Objection, argumentative.  I'll

14   let -- go ahead and answer the question, but this is the

15   last time I'm going to let you ask it because it is the

16   fifth time, Ken.

17          MR. HAZOURI:  And I haven't gotten an answer

18   yet.

19   BY MR. HAZOURI:

20      Q.   So, please answer the question.

21      A.   But I don't understand the question, if you're

22   asking me or you want me to answer what you're asking

23   me.  I'm not -- I'm not understanding.

24      Q.   Okay.  Let me make it clear.

25      A.   You're saying it like it's something that I



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    230

```
 1  want -- you want me to repeat what you are saying.

 2      Q.   I want you to say yes or no.

 3          MR. PIVNIK:  That's exactly right.

 4  BY MR. HAZOURI:

 5      Q.   Okay.  We'll word it differently.

 6          MR. HAZOURI:  And let's hold down the --

 7          MR. PIVNIK:  I'm sorry.  I apologize for that.

 8  BY MR. HAZOURI:

 9      Q.   Okay.  I'm only asking you about this one

10  statement.  Okay?  So, when you answer my question,

11  please don't talk about what he might've dictated or

12  what might be somewhere else because I'm not asking

13  about that.

14      A.   Okay.

15      Q.   Okay?  I'll read the statement again.  It

16  says, "History of Present Illness.  The patient has been

17  receiving physiotherapy treatment and refers is feeling

18  better and today she is asymptomatic."  Did I read that

19  correctly?

20      A.   Yes, sir.

21      Q.   Now, yes or no, is that statement a

22  comprehensive history as set forth in the CPT book for

23  99215 or not?

24      A.   My opinion, yes.

25      Q.   And on what do you base that opinion?
```



1    A.    That he did -- he -- usually, when he do his

2  final, he goes over the initial, the follow-up and the

3  finals.

4    Q.    Okay.  Do you see anywhere else in the records

5  that other history is documented, you know, in Exhibit

6  15?

7    A.    No, sir.

8    Q.    Okay.  So, the records that we have for the

9  office visit, that is the only history, that one

10  statement, that you can find?

11    A.    Yes, sir.

12    Q.    All right.  A comprehensive examination is the

13  second element, correct?

14    A.    Yes, sir.

15    Q.    Okay.  Do you believe that these records of

16  the March 20th, 2017 office visit document a

17  comprehensive examination?

18    A.    There is a physical examination.

19    Q.    Okay.  I'm not asking if there's a physical

20  examination.  I'm asking you if it's your understanding

21  that there is a comprehensive examination sufficient to

22  properly bill 99215 for this office visit.

23    A.    Yes, sir.

24    Q.    Why do you believe that?

25    A.    Because he went over to examine the patient to



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    232

```
 1   make sure he was okay to be discharged.

 2        Q.   Okay.  Any other reason that you believe it's

 3   -- it is a comprehensive examination?

 4        A.   No, sir.

 5        Q.   All right.  And then the third component is

 6   medical decision-making of high complexity, correct?

 7        A.   Yes, sir.

 8        Q.   The decision that Dr. Feijoo -- the medical

 9   decision-making that Dr. Feijoo made with this patient

10   is, because she was painless and asymptomatic, he

11   discharged her, correct?

12        A.   Correct.

13        Q.   That is not medical decision-making of high

14   complexity, is it?

15        A.   No, sir.

16             MR. PIVNIK:  Objection, argumentative.

17   BY MR. HAZOURI:

18        Q.   It is not?

19        A.   Not that I'm aware.

20        Q.   Okay.  So, you agree that there's no medical

21   decision-making of high complexity for this office

22   visit?

23        A.   Other than the patient being discharged?

24        Q.   Yeah, but that's not a high -- highly complex

25   medical decision, right?
```



 1          MR. PIVNIK:  Objection, form and foundation.

 2     A.   No.

 3  BY MR. HAZOURI:

 4     Q.   Okay.  It was a bad question by me.  I said

 5  "right", so I wasn't clear.  I think you were clear.

 6  I'm beating the horse, but I just want to make sure I

 7  have your testimony clear.  Your testimony is that you

 8  do not believe that the March 20th -- you do not

 9  understand that the March 20th, 2017 office visit

10  involved medical decision-making of high complexity?

11     A.   For the diagnosis.

12     Q.   Well -- okay.  At all, does the visit involve

13  medical decision-making of high complexity?

14     A.   I believe so.

15     Q.   Oh, you believe it does?  Okay.  Why?

16     A.   Because he did the treatment that he was

17  supposed to do on the patient.

18     Q.   Okay.  Is there any other support you have for

19  your understanding that the March 20th, 2017 office

20  visit involved medical decision-making of high

21  complexity sufficient to bill a 99215?

22     A.   Besides the records that we already have?

23     Q.   No, your testimony.

24     A.   I'm basing my testimony on the record.

25     Q.   Right.  In your prior answer -- I don't



 1    remember exactly what it was -- you gave me the reason

 2    why you believed the office visit involved medical

 3    decision-making of high --

 4         A.   Yeah.

 5         Q.   -- high complexity.  I'm asking you, do you

 6    have any other reasons?

 7         A.   Oh, no.

 8         Q.   You're done?

 9         A.   Yes, sir.

10         Q.   Okay.  So, you -- as you sit here today and

11    you've reviewed these records and we've had these

12    questions, it's your belief and understanding that the

13    99215 that the Feijoo, P.A. clinic billed State Farm for

14    the March 20, 2017 is fully accurate and proper?

15         A.   To my understanding, yes.

16         Q.   Why -- do you have an understanding of why Dr.

17    Feijoo would perform a comprehensive examination, the

18    second element, of the patient when she reported being

19    pain free and asymptomatic?

20         A.   I'm not sure.

21              MR. PIVNIK:  Objection, foundation.

22              MR. HAZOURI:  Did you get her answer?

23              THE COURT REPORTER:  Yes.  Thank you.

24    BY MR. HAZOURI:

25         Q.   I'm handing you Exhibit 17 to your deposition.



**Orange Legal**
**800-275-7991**

```
 1              (Plaintiff's Exhibit 17 was marked for

 2   identification.)

 3   BY MR. HAZOURI:

 4       Q.    Is this a fax cover sheet under which the

 5   Feijoo P.A. clinic sent the March 20th, 2017 orthopedic

 6   evaluation to Silver Medical Center?

 7       A.    Yes, sir.

 8       Q.    And it was done -- it was sent for the same

 9   reason that you've already described, Silver is the

10   referring clinic and you're giving them information

11   regarding Dr. Feijoo's treatment and evaluation of the

12   patient?

13       A.    Correct.

14       Q.    All right.  And the 99215 -- I'm sorry, the --

15   strike that.

16              The 95851 charge that's on Exhibit 14 for the

17   range of motion testing, I'm referring you to it.  You

18   see that?

19       A.    Yes.

20       Q.    All right.  Actually, let's look at page 2 of

21   Exhibit 15, the range of motion report.  Are those --

22   what are those marks next to each one of these, the

23   handwritten mark?

24       A.    Negative.

25       Q.    Negative?  So, it's an "N", in other words?
```



1    Is that your understanding?

2         A.   Mm-hmm.

3         Q.   Okay.  That's why I was asking.

4         A.   Yes.

5         Q.   So, the service that was billed a 95851 was

6    Dr. Feijoo performing the range of motion on patient

7    H.P. and noting negative of all these areas?

8         A.   Correct.

9         Q.   Correct?  Part of the evaluation that he did

10   that day?

11        A.   Yes, sir.

12        Q.   I don't remember if I asked you that on the

13   follow-up visit, but let's just do it real quick.  On

14   the follow-up visit of February 20th, 2017, there was

15   also a 95851 --

16        A.   Yes, sir.

17        Q.   -- billed?  We looked at the range of motion

18   report and the findings and the typewritten report.  You

19   remember that, Exhibit 11?

20        A.   Yes.

21        Q.   Okay.  And the 95851 charge for February 20,

22   2017 is for that range of motion testing that he did as

23   part of his evaluation of the patient that day?

24        A.   Yes, during the patient consultation.

25        Q.   Okay.  All right.  So, in going through this



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                237

```
 1   patient's records, patient H.P., and looking at the

 2   bills, we've seen charges for 99204, 99214, 99215, 95851

 3   and 76140.  Do you remember looking at all of those?

 4        A.   Yes, sir.

 5        Q.   And do you recall earlier in your deposition

 6   you said the clinic only uses a few codes?

 7        A.   Correct.

 8        Q.   Is that -- are those a few -- some of the few

 9   standard codes that the clinic uses?

10        A.   Some of those.

11        Q.   Right.  So, there may be others, but these are

12   some of the standard ones?

13        A.   It just depend on what the patients get done

14   like to bill 99203, 99213 injection, which is the

15   Kenalog injection.  We bill the cast.  Don't have a lot

16   of code.

17        A.   Right.  And I understand there's other codes.

18   I'm not disputing that or trying to go there, but the

19   ones that we talked about today are part of the standard

20   codes that the clinic uses --

21        A.   Yes, sir.

22        Q.   -- for its services, right?  Okay.  And how

23   was the decision made to use those codes, 99204, 99214,

24   99215, 95851 and 76140, in the manner that we've seen

25   them billed with this particular patient?  Do you
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

238

```
 1   understand what I'm saying?

 2           MR. PIVNIK:  Objection.  That's what we --

 3   you've gone over this for the past --

 4           MR. HAZOURI:  No.

 5           MR. PIVNIK:  -- three hours.

 6           MR. HAZOURI:  We don't have to get like that.

 7   Okay?  Just hear me out.  I'm going to --

 8           MR. PIVNIK:  Okay.

 9           MR. HAZOURI:  -- answer the question.  Okay?

10   BY MR. HAZOURI:

11       Q.   I'm not asking about, with this particular

12   patient, what happened in this particular instance, what

13   does it show in the records.  We've done that and that's

14   what your attorney just referred to.  What I'm saying

15   is, was there a meeting between maybe you and Dr. Feijoo

16   at some point where you -- we sat down -- you and him

17   sat down and you said, okay, here's the types of

18   evaluations we're going to be doing here, you know, for

19   this type of evaluation, generally, we'll bill a 99204

20   and if we do a range of motion, we'll bill a 95851.  If

21   we do an x-ray review, it will be a -- do a 76140?  Was

22   there a discussion in general about billing those codes?

23           MR. PIVNIK:  Objection, form.

24   BY MR. HAZOURI:

25       Q.   Okay.  Go ahead.
```



```
 1              THE WITNESS:  I'm sorry.

 2              MR. PIVNIK:  You can go ahead and answer.

 3         A.   If -- we're talking about this patient

 4    specific?

 5    BY MR. HAZOURI:

 6         Q.   I'm not.  That's what I'm trying to

 7    distinguish.  We've talked about this patient

 8    specifically.  Okay.  These codes have been in place --

 9    the clinic's been using these codes for a long time?

10         A.   Of course.

11         Q.   Right?  Since you've been at the clinic?

12         A.   Yes, sir.

13         Q.   Okay.  So -- and I'll represent to you I've

14    seen lots of 99204s.

15         A.   I understand.

16         Q.   You know?  There's 525 claim files or medical

17    charts at issue in this case.  I think every one of them

18    has a 99204.  I'm just telling you that.

19         A.   Okay.

20         Q.   So, it's a code that you -- that the clinic

21    uses a lot for its initial evaluations.  And what I want

22    to know is who made the decision -- was there a decision

23    made generally to use that code for initial evaluations

24    and what the standards would be for using that code.

25         A.   Original, when we sit down -- we usually do it
```



1  like every week or every month, but when we -- when he

2  took a decision on the CPT code we were using, he -- we

3  sit down together and I explain him the -- each code and

4  when -- then he explain what he does in the office

5  visit.  That's why I was telling you that he do a

6  complete examination even if the patient only complain

7  for one thing.  And that's how we come out with the

8  codes.

9       Q.   And you have these -- so, you have meetings

10  with Dr. Feijoo?

11       A.   Yes, sir.

12       Q.   And how often do you have those?

13       A.   Well, usually, it's depending if I have any

14  changes in the insurance or any question.  We do it like

15  once a month for that and weekly for any question on the

16  patients.

17       Q.   Okay.  So, you have monthly meetings to just

18  review the general billing standards --

19       A.   Yeah, denials.

20       Q.   -- that the clinic uses?

21       A.   Exactly.  Yeah.

22       Q.   Okay.  And to consider making adjustments to

23  billing?

24       A.   Correct.

25       Q.   And who are in these meetings?



```
 1      A.   Just him and myself.

 2      Q.   So, Dr. Feijoo and you?

 3      A.   Correct.

 4      Q.   All right.  Okay.  And so, let's just talk

 5   about the 95851, to pick another code.  As I understand

 6   it -- and we've talked about this in the context of this

 7   particular patient -- it's billed when Dr. Feijoo does

 8   range of motion testing as part of his evaluation --

 9      A.   Yes, sir.

10      Q.   -- of the patient, right?  So, who made -- who

11   participated or who made the decision that 95851 would

12   be billed if the doctor does a range of motion testing

13   in one of his evaluations?

14      A.   We both did.

15      Q.   You both do?

16      A.   Yes.

17      Q.   Okay.  And same for 76140?  That was a

18   decision -- both of y'all participated in that --

19      A.   Correct.

20      Q.   -- decision?  Okay.  So, again, I understand -

21   - I'm not trying to get you to say that, you know,

22   there's an overriding decision that's made for all

23   patients.  I understand you're saying that, we look at

24   the patient and we bill it, but as far as these general

25   standards for billing that we've talked about, that's
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    242

```
 1   you and Dr. Feijoo who are making those decisions?

 2        A.   Yes, sir.

 3        Q.   Okay.  He's the owner of the clinic?

 4        A.   Yes, sir.

 5        Q.   So, he has the ultimate decision?

 6        A.   Correct.

 7        Q.   Right?  In other words, if he decides he wants

 8   to have a certain billing standard or do it a certain

 9   way, you can talk to him about it, you can give your

10   input, but he has -- is the ultimate decision maker on

11   that question?

12        A.   Of course.

13        Q.   Do you recall a specific discussion -- not

14   specific.  Do you recall a discussion with him about the

15   95851 code and how it will be used, a decision-making

16   meeting on that issue?

17        A.   When we talk about it like way back -- because

18   when I started doing their billing, they were already

19   doing those code.

20        Q.   Okay.

21        A.   I ask him what he was doing and he explain me

22   that he do a separate report for a range of motion, that

23   he don't do on all the patient.  Then I look at the CPT

24   code to see if he was doing it correctly and then we

25   continued to do it like that.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                             243

```
1       Q.    And that was a long time ago when you first

2   started?

3       A.    Yes, sir.

4       Q.    Right around 2001?

5       A.    Yes, sir.

6       Q.    And then would your answer be the same for the

7   76140 code?

8       A.    Yes, sir.

9       Q.    And also for the evaluation and management

10  codes?

11      A.    Yes.

12      Q.    That was -- you had those discussions early

13  when you first started --

14      A.    Correct?

15      Q.    -- at the clinic?  It was you and him?

16      A.    Yes, sir.

17      Q.    All right.  Handing you what's been marked as

18  Exhibit 18 to your deposition.

19            (Plaintiff's Exhibit 18 was marked for

20  identification.)

21  BY MR. HAZOURI:

22      Q.    You can see there's a bates stamp down in the

23  right-hand corner and I'll represent to you this is

24  another document from the H.P. patient chart that we've

25  been looking at.
```

ORANGELEGAL

**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                      244

```
 1      A.   Yes, sir.
 2      Q.   Okay.  Do you recognize this document?
 3      A.   Yes, sir.
 4      Q.   What is this?
 5      A.   The Assignment of Benefit.
 6      Q.   And what is an Assignment of Benefits?
 7      A.   I think if the patients give the doctor the
 8  right to bill his insurance.
 9      Q.   When the patient comes to see Dr. Feijoo, they
10  -- if they sign this form, they give Dr. Feijoo and his
11  clinic the right to bill the insurance company directly
12  for the PIP benefits?
13      A.   Correct.
14      Q.   And the form also gives the clinic the right
15  to sue the insurer, you know, for any benefits that are
16  unpaid that the clinic believes it's entitled to?
17      A.   Correct.
18      Q.   Right?  And for auto accident patients, this
19  is a standard form they sign at the clinic when they
20  come in?
21      A.   Yes, sir.
22      Q.   Right?  Who drafted this form?
23      A.   I'm not sure if it was one on the attorney
24  that we work with.
25      Q.   So, you don't know for sure who drafted it?
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
245

```
 1     A.   No, sir.

 2     Q.   How long has the clinic been using it?

 3     A.   I think we change it because we had a

 4  different one and we change it about four or five years

 5  ago.

 6     Q.   So, this particular form, your best testimony,

 7  has been in place for four or five years?

 8     A.   Yes, sir.

 9     Q.   Do you know if Mr. Schurr, who's sitting in

10  the office, participated in drafting this at all, this

11  form?

12     A.   Well, he's not the only attorney that we work

13  with, so I'm not sure if it was him or somebody else.

14     Q.   Okay.  I'm going to ask you about some of the

15  language here and what I'm going to do is I'm going to

16  try and point you to it to get us there.  Starting right

17  here, this word "Since", do you see that?

18     A.   Mm-hmm.

19     Q.   And I'll show your counsel.

20          MR. HAZOURI:  About two-thirds of the way

21  down, first Paragraph, "Since".

22          MR. PIVNIK:  Got it.

23  BY MR. HAZOURI:

24     Q.   Okay.  I'll read it for the record.  "Since I

25  have assigned my PIP benefits to the above-referenced
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                          246

```
 1   medical provider, any reservation of benefits" --

 2              MR. PIVNIK:  "Prior".

 3              MR. HAZOURI:  I'm sorry.

 4   BY MR. HAZOURI:

 5       Q.   -- "any prior reservation of benefits or

 6   demand for wage loss benefits is withdrawn.  I am

 7   instructing the PIP carrier not to reserve any benefits

 8   and to pay all bills in the order received."  Did I read

 9   that correctly with Mr. Pivnik's correction?

10       A.   Yes, sir.

11       Q.   Okay.  What is your understanding of that

12   provision?

13              MR. PIVNIK:  Objection, form.  Foundation.

14   Calls for legal conclusion.

15       A.   I'm not really sure.

16   BY MR. HAZOURI:

17       Q.   Okay.  Well, let's work through it.  "Since I

18   have assigned my PIP benefits" -- "I" is the patient,

19   right, the patient who's assigning the PIP benefits?

20   Right?

21              MR. PIVNIK:  Same objection.

22   BY MR. HAZOURI:

23       Q.   Do you understand that?

24       A.   Yes.

25       Q.   Okay.  So, "Since I", the patient, "have
```



 1   assigned my PIP benefits to the above-referenced medical

 2   provider" -- that's Dr. Feijoo and in his clinic, Manuel

 3   V. Feijoo, M.D., P.A., right?

 4       A.   Yes, sir.

 5       Q.   Okay.  So, the patient is acknowledging

 6   assigning his or her PIP benefits to the clinic and Dr.

 7   Feijoo, correct?

 8       A.   Yes, sir.

 9            MR. PIVNIK:  Same objection.  Continue --

10            MR. HAZOURI:  You can have a standing

11   objection.

12            MR. PIVNIK:  I'm just going to make a standing

13   --

14            MR. HAZOURI:  Standing objection.

15            MR. PIVNIK:  Okay.

16   BY MR. HAZOURI:

17       Q.   "Any prior reservation of benefits or demand

18   for wage loss benefits is withdrawn".  Do you understand

19   what a demand for wage loss benefits is?

20       A.   Like for salary wage for them --

21       Q.   Okay.

22       A.   -- for the patient?

23       Q.   I'm asking you.

24       A.   I don't know.

25       Q.   Okay.  Well, so, I'll represent to you that as



 1  part of the PIP coverage, the PIP benefits, an insurer -

 2  - an insured, the patient, can recover lost wages if

 3  they lost wages as a result of the accident.  Do you

 4  understand that the clinic is saying that the patient is

 5  having the patient withdraw that right to be paid loss

 6  wages with this form?

 7      A.   I was not aware.

 8      Q.   Okay.  And then it says, "I am instructing the

 9  PIP carrier not to reserve any benefits and to pay all

10  bills in the order received."  Do you see that?

11      A.   Yes.

12      Q.   Yes?  I'll represent to you that a person

13  who's injured in an automobile accident who has PIP

14  coverage can ask to reserve benefits for his or her lost

15  wages.  Okay?  Do you understand that the clinic is

16  having the patient sign something saying, I no longer

17  reserve --

18          MR. HAZOURI:  You have a standing objection.

19          MR. PIVNIK:  Continuing objection.

20          MR. HAZOURI:  Yeah.

21  BY MR. HAZOURI:

22      Q.   You know, you have the patient saying, don't

23  reserve -- insurance company, don't reserve any PIP

24  benefits for my lost wages.  Did you know that the form

25  was saying this?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    249

```
 1        A.   No, sir.
 2        Q.   All right.  Is it Feijoo, P.A.'s standard
 3   practice to explain this form to the patient before he
 4   or she signs it?
 5        A.   Yes, I do.  Yes, we do.
 6        Q.   Okay.  Now -- and I want to be clear.  Before,
 7   when we were talking about some of the forms, you said
 8   you give them the form and they fill it out and if they
 9   have a question about it, you know, what you're
10   responsible for -- remember that --
11        A.   Yes, sir.
12        Q.   -- that you'll answer the question.  Okay?  In
13   this case, is that how it works with this form, if they
14   have a question, you'll answer it, or is there an
15   explanation that is proactively provided to the patient?
16        A.   The Assignment of Benefits is something that
17   we explain to the patient.
18        Q.   Okay.  And who provides that explanation?
19        A.   The front desk.
20        Q.   Okay.  And are you -- have you heard that
21   explanation before?
22        A.   Yes, sir.
23        Q.   Okay.  Tell me what the explanation is.
24        A.   We instruct the patient that this is --
25        Q.   Please.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    250

```
 1      A.   Huh?

 2      Q.   Sorry.  I just wanted to say please.  Okay.

 3      A.   We instruct the patient this is an Assignment

 4  of Benefit like giving us the right to bill the

 5  insurance company and suing the insurance company if we

 6  don't get paid.

 7      Q.   So, that's what's explained to --

 8      A.   Yes, sir.

 9      Q.   Is anything else explained to the patient?

10      A.   No, sir.

11      Q.   Okay.  And at the very top -- not at the very

12  top, I'm sorry, but near the top, under the assignment

13  of insurance benefits language, it says, "Insurer,

14  please read the following in its entirety upon receipt",

15  correct?

16      A.   Yes, sir.

17      Q.   And so, what the form is saying is a PIP

18  insurer, who receives it, like State Farm, read this

19  form, could be aware, right?

20      A.   Yes, sir.

21      Q.   And so, this form may very well be given to

22  PIP insurers?  That happens?

23      A.   It happen.

24      Q.   Right.

25      A.   We have done it.
```



```
 1       Q.    Right.  One time you do it is if you send a

 2   demand for PIP benefits before you file a PIP lawsuit,

 3   you include the assignment in that --

 4       A.    Correct.

 5       Q.    Right?  Okay.  So, again, recognizing that the

 6   insurer may very well get this form and is supposed to

 7   read it, let me direct you to some other language here.

 8   It's in the third paragraph starting with "The", right

 9   there.

10           MR. HAZOURI:  It's right here, Jerry, third

11   paragraph, third Line.

12   BY MR. HAZOURI:

13       Q.    I'll read it for the record.  "The provider

14   hereby objects to any reductions or partial payments

15   made at the discretion of the insurer."  Did I read that

16   correctly?

17       A.    Yes.

18       Q.    So, what Feijoo, P.A. is telling me, the PIP

19   insurers, with this form is, if you make any reduction

20   or any partial payment of the charges that we submit to

21   you for treatment of this patient, we object to it,

22   right?

23       A.    Yes, sir.

24       Q.    And the reason Feijoo, P.A. includes this

25   statement in its assignment and objects to the charges
```



1    is because Feijoo, P.A. believes that all the charges it

2    issues to PIP -- PIP insurers, such as State Farm

3    Mutual, are correct, proper and payable in full, right?

4        A.   Yes, sir.

5        Q.   And Feijoo, P.A. expects to have his charges

6    paid in full at 80% for a PIP only policy and 100% for a

7    PIP plus medical payments coverage policy, correct?

8        A.   Yes, sir.

9        Q.   Feijoo, P.A. is not taking the position in

10   this lawsuit that the CPT codes it sent to State Farm

11   Mutual were so obviously incorrect and false that State

12   Farm Mutual should not have paid them?

13           MR. PIVNIK:  Objection to form.

14       A.   Can you repeat your --

15   BY MR. HAZOURI:

16       Q.   Yes.  In this lawsuit, is Feijoo, P.A. taking

17   the position that the CPT code charges that we've looked

18   at that are at issue in the case and that was sent to

19   State Farm are so obviously incorrect and so obviously

20   false that State Farm Mutual should not have paid them?

21   Is that the clinic's position in this lawsuit?

22           MR. PIVNIK:  Same objection.

23       A.   I don't understand your question.

24   BY MR. HAZOURI:

25       Q.   Okay.  Forget about this lawsuit.  Let me just



```
 1   ask you in general.  The -- well, let me ask this.  You

 2   understand that this lawsuit involves the bills that

 3   Feijoo, P.A. submitted to State Farm Mutual?

 4        A.   Yes.

 5        Q.   The lawsuit we're here on today --

 6        A.   Correct.

 7        Q.   -- that you're giving your deposition.  Right?

 8   And you understand those bills contain CPT code charges

 9   like the ones we looked at for patient H.P. today?

10        A.   Okay.

11        Q.   Right?

12        A.   Yes.

13        Q.   You following me?

14        A.   Mm-hmm.

15        Q.   Okay.  So, does the clinic believe that those

16   CPT code charges issued to State Farm Mutual -- the

17   clinic, Feijoo P.A., believe that those charges are

18   false and incorrect?

19        A.   No.

20        Q.   Not proper?

21        A.   No.

22        Q.   Okay.  Does the clinic -- does Feijoo, P.A.

23   believe that the CPT code charges that were in the bills

24   submitted to State Farm Mutual are so false and so

25   incorrect that State Farm would be unreasonable for
```



```
 1  paying them?

 2          MR. PIVNIK:  Same objection.

 3      A.   No.

 4  BY MR. HAZOURI:

 5      Q.   Does the clinic believe that the CPT code

 6  charges in the bills that Feijoo, P.A. submitted to

 7  State Farm Mutual are so obviously false, so obviously

 8  incorrect, so obviously misleading that State Farm

 9  mutual would be boneheaded for paying the bills?  Is

10  that the clinic's position?

11      A.   No.

12          MR. PIVNIK:  Same objection.

13  BY MR. HAZOURI:

14      Q.   The clinic's position is that its CPT code

15  charges in the bills were fully accurate, correct,

16  proper?

17      A.   Yes.

18      Q.   Right?  And pursuant to the language in the

19  Assignment of Benefits, because the clinic believes that

20  its CPT code charges were fully correct, accurate and

21  proper, the clinic objects to State Farm Mutual reducing

22  the charges or issuing a partial payment on them, right?

23      A.   Yes, sir.  Not only State Farm.

24      Q.   Not only State Farm?  Every -- all PIP

25  insurers?
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                           255

```
 1      A.    Correct.

 2      Q.    I referenced State Farm Mutual because --

 3      A.    Okay.

 4      Q.    -- that's my client, that's who we're here on.

 5  But it's all insurers?

 6      A.    Yes.

 7      Q.    Because this -- that language is in this

 8  Assignment of Benefits that goes to all PIP insurers?

 9      A.    Yes, sir.

10            MR. PIVNIK:  Can we take a short break?

11            MR. HAZOURI:  Sure.

12            THE VIDEOGRAPHER:  We are off the record.  The

13  time is 2:55 p.m.

14            (Brief recess was held.)

15            (Videotaped deposition resumed.)

16            THE VIDEOGRAPHER:  We are back on the record.

17  The time is 2:56 p.m.

18  BY MR. HAZOURI:

19      Q.    You good?

20      A.    Yes.

21      Q.    Okay.  All right.  We covered this somewhat,

22  but I just want to read the language from the Assignment

23  of Benefits just so it's clear for the record what we're

24  talking about.  I'm going to start at the very beginning

25  here.
```

```
 1      A.    Okay.

 2      Q.    Okay?  It says, "I, the undersigned

 3   patient/insured knowingly and voluntarily and

 4   intentionally assign the benefits of insurance and any

 5   overdue interest payments under the no-fault policy of

 6   automobile insurance, also known as personal injury

 7   protection (PIP), or medical payments policy of

 8   insurance from my automobile insurer or the responsible

 9   insurer to the above-described medical providers (Manuel

10   V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.) for

11   any and all services rendered to the undersigned

12   patient/insured, including the right to bring suit in a

13   court of law for any failure to pay PIP

14   benefits/insurance benefits."  Correct?

15      A.    Yes, sir.

16      Q.    Did I read that correctly?

17      A.    Yes, sir.

18      Q.    So, that -- it's really that first sentence

19   where the insured both assigns his or her PIP benefits

20   and assigns the right to bring a lawsuit against the PIP

21   insurer for any unpaid PIP or med-pay benefits --

22      A.    Correct.

23      Q.    -- as we just read?  Okay.  And if an insurer

24   such as State Farm does not pay either 80% -- or, I'm

25   sorry, strike that.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
257

```
 1            If an insurer such as -- if a PIP insurer such

 2   as State Farm does not pay the full amount of Feijoo,

 3   P.A.'s charges at 80% on a PIP only policy or 100% on a

 4   PIP and med-pay policy, Feijoo, P.A. will sue the PIP

 5   insurer for the balance of the charges?

 6            MR. PIVNIK:  Objection.  I think it

 7   mischaracterizes the law.

 8   BY MR. HAZOURI:

 9       Q.   You can answer.

10       A.   Yes, sir.

11       Q.   Yes, it will file suit against the PIP

12   insurer?

13       A.   Yes, sir.

14       Q.   And that's done pursuant to the Assignment of

15   Benefits -- the right is pursuant to the Assignment of

16   Benefits?

17       A.   Yeah.  First, we will send a demand letter

18   without --

19       Q.   Right.  That's part of the requirement.  The

20   statute says you have to send a demand letter to the PIP

21   insurer first, right?

22       A.   Yes, sir.

23       Q.   And it gives the PIP insurer the opportunity

24   to pay the unpaid benefits?

25       A.   Correct.
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                      258

1       Q.    Plus postage and penalty?

2       A.    Correct.

3       Q.    And then if the PIP insurer pays the unpaid

4  benefits, postage and penalty, Feijoo, P.A. and Dr.

5  Feijoo don't sue the PIP insurer?

6       A.    Correct.

7       Q.    If the PIP insurer does not pay, then Feijoo,

8  P.A. and Dr. Feijoo move forward and file a PIP suit

9  against the PIP insurer?

10      A.    That's correct.

11      Q.    All right.  And it's fair to say that Dr.

12  Feijoo and Feijoo, P.A. have not been shy about suing

13  State Farm Mutual for PIP benefits?

14            MR. PIVNIK:  Objection to form.

15  BY MR. HAZOURI:

16      Q.    Would you agree with that?

17      A.    When you're saying shy, what do you mean?

18      Q.    Not been shy.  They've sued the -- Dr. Feijoo

19  and Feijoo, P.A. have sued State Farm Mutual many times

20  to recover PIP benefits.  Wouldn't you agree?

21      A.    I'm not -- I don't have a calculation on how

22  much, but if the case get denial, yeah.

23      Q.    Okay.  Yeah.  If State Farm Mutual doesn't pay

24  the full amount of the charges at 80% for PIP only, 100%

25  for PIP and med-pay, doesn't pay pursuant to statutory



1  demand, the clinic, Feijoo, P.A., and Dr. Feijoo are

2  going to file a PIP suit against State Farm?

3       A.   Correct.

4       Q.   And that's because the -- your -- the clinic,

5  Feijoo, P.A., believes that his charges are, in all

6  respects, correct, accurate and fully payable?

7       A.   Yes.  We have sent records.  Like when they

8  ask for a request for a B(6), we send the records and

9  they still pay for it.

10      Q.   Okay.  Okay.  I'm marking or I have marked and

11 handed you what's been -- strike that.

12           I've handed you what's been marked as Exhibit

13 19 to your deposition.

14           (Plaintiff's Exhibit 19 was marked for

15 identification.)

16 BY MR. HAZOURI:

17      Q.   And have you seen this document before?

18      A.   No, sir.

19      Q.   Okay.  I will represent to you that this is a

20 list of PIP suits, lawsuits for PIP benefits that your

21 attorneys sent to State Farm in this case along with

22 some discovery requests.  So, it's Exhibit A to some

23 discovery requests.

24      A.   Okay.

25      Q.   Okay?  You don't think you've seen this list



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
260

```
 1  before today?

 2      A.   No, sir.

 3      Q.   All right.  I actually took the time -- you

 4  can see on my copy the numbering.

 5      A.   Oh, on yours.

 6      Q.   Yeah.

 7      A.   Okay.

 8      Q.   I only did it on mine because I didn't want to

 9  write on the exhibit, but I counted 137 PIP suits.

10      A.   For the whole year or --

11      Q.   Well, I'm going to help you -- I'm going to

12  help you with that.  But there's 137.  Can you trust me

13  on 137 without having to count them all up yourself?

14      A.   Yeah.

15      Q.   Okay.  If you look at the first case number --

16      A.   Okay

17      Q.   -- do you see it's 13-12572?

18      A.   Yes.

19      Q.   Right here.

20      A.   I see.

21      Q.   The 13 means that it was filed in the year

22  2013.  Okay?  You understand?

23      A.   Yes, sir.

24      Q.   And if you go to the last one, number 137 --

25  if you go to the last page, you can see that there's a
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          261

```
 1   lawsuit and it starts with 15, 15-4731, and there's a

 2   bunch of 15s above that.  Do you see that?

 3        A.   Yes, sir.

 4        Q.   So, I'll represent to you that, you know,

 5   based on the information contained in this exhibit, this

 6   compilation, that these are PIP suits filed from 2000 --

 7   sometime in 2013 to -- through 2015.  You understand?

 8        A.   Yes, sir.

 9        Q.   So, do you have any reason to doubt the fact

10   that Dr. Feijoo and Feijoo, P.A. have sued State Farm

11   for PIP benefits 137 times from 2013 to 2015?

12        A.   Yes, sir.  No -- sorry.

13        Q.   Yeah.

14        A.   It may be filed 2013, but I'm sure it's not

15   the service date or the year of the treatment, 2013.

16        Q.   I'm just -- yes.  The file date would be 2013,

17   okay, through '15.  So, that's the date the lawsuit was

18   filed.

19        A.   Exactly.

20        Q.   Okay.

21        A.   But --

22        Q.   So, I'm not asking about dates of service or

23   anything like that.  I'm just saying, in the years 2013

24   through 2015, do you have any reason to doubt that

25   during that time period, Dr. Feijoo and Feijoo, P.A.
```



 1  filed 137 lawsuits for PIP benefits against State Farm?

 2      A.   Okay.  No.  That's correct.

 3      Q.   Do you know how many lawsuits Dr. Feijoo and

 4  Feijoo, P.A. have filed against State Farm Mutual

 5  Automobile Insurance Company or State Farm Fire and

 6  Casualty Company since 2015?

 7      A.   Like from 2015 to forward?

 8      Q.   2016 -- January 1st, 2016 forward.  Do you

 9  know how many?

10      A.   No, sir.

11      Q.   Can you estimate?

12      A.   Well, the thing is that we give a chance to

13  pay on the demand.  So, I don't know if they pay on the

14  demand or they pay when they file a lawsuit.

15      Q.   Okay.  So, you just don't know how many --

16      A.   No, sir.

17      Q.   Okay.  So, let's go back to these 137 lawsuits

18  for PIP benefits filed from 2013 to 2015.  Why did Dr.

19  Feijoo and Feijoo, P.A. sue State Farm Mutual Automobile

20  Insurance Company and State Farm Fire and Casualty

21  Company 137 different times for PIP benefits during that

22  time period?

23      A.   We will have to verify each patient to see the

24  reason that State Farm decide not to pay.

25      Q.   Well -- okay.  So, the last part is State Farm



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

```
 1  decided not to pay the full amount.  Is that the reason?
 2       A.   Do you know that's the reason?  Because I
 3  don't know if it's the full amount, they just deny it
 4  for IME, deny it for EUO.  It could be any reason.  I
 5  don't know.
 6       Q.   Well, whatever the reason is, it's because
 7  some of the Feijoo P.A.'s charges have not been paid,
 8  right?  That's why you -- the clinic has filed suit?
 9       A.   But I'm not saying some.  I don't know if it's
10  partial payment or if it's the total amount.
11       Q.   At least some.  It could be all of the charges
12  are not paid.
13       A.   It could be deductible applied inappropriate.
14  I don't know.
15       Q.   Okay.  But the point is the suits have been
16  filed because Dr. Feijoo and Feijoo, P.A. believe that
17  they're entitled to more PIP benefits on each of these
18  claims?
19       A.   More PIP benefit, I'm not sure, but entitle of
20  the benefit for payment, yes.
21       Q.   Okay.  There's unpaid PIP benefits that are
22  due?
23       A.   Yes.
24       Q.   Right?  And the -- the way that the -- strike
25  that.
```



1          The bills for the unpaid PIP benefits that the

2   clinic is suing on look like the bills that we looked at

3   today.  They're on CMS 1500 Forms and they use CPT code

4   charges, right?

5          A.   Yes.

6          Q.   And, again, a lot of the codes are pretty

7   standard?  You only use a few of them, so it wouldn't

8   surprise you to see the same -- a lot of the same codes

9   in these cases, would it?

10         A.   That's correct.

11         Q.   Okay.  Are you familiar with the term down-

12  code or down-coding?

13         A.   Yes, sir.

14         Q.   What's your understanding of the word down-

15  code?

16         A.   We have that in the past with Progressive.

17  They would call and tell me that -- believe that the

18  medical records that we have provided are not pertaining

19  to the level of service that we billed.  So, they decide

20  to down-code it from 99204 to 9903.  They request

21  additional record or they -- we send the same records

22  and they determine if to pay under 04 or under 03.

23         Q.   Okay.  So, in that example, you've given the

24  initial charge that goes out the door from Feijoo, P.A.

25  is a 99204 for an initial office visit?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                265

```
 1       A.   Correct.

 2       Q.   Went to Progressive?

 3       A.   Correct.

 4       Q.   And then somebody at Progressive got the bill

 5  and, I assume, the typed report that went with the bill

 6  --

 7       A.   Correct.

 8       Q.   -- for the initial evaluation and they

 9  contacted your office, Feijoo, P.A.

10       A.   Yes, sir.

11       Q.   Was it you that the person spoke to?

12       A.   Yes, sir.

13       Q.   And the person at Progressive said, hey, we

14  think that this record reflects a 99203 not a 99204,

15  right?

16       A.   Correct.

17       Q.   And so, they -- the down-code is they changed

18  the code from 99204, which is a level 4, to a 99203,

19  which is a level 3.  So, it went from 4 to 3.  That's

20  the down-code, right?

21       A.   Yes, sir.

22       Q.   And so, you understand that's what a down-

23  coding is?  At least in the E&M code context, it's

24  somebody changing a higher code to a lower code?

25       A.   Correct.
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
266

1    Q.    All right.  Now, in this case with Progressive

2    that you talked about and I appreciate, did the clinic,

3    Feijoo, P.A., accept the down-code?

4    A.    I had never got any call or any request to

5    down-code it or that I'm doing something -- sending

6    records inappropriate for the code that I'm billing.

7    Q.    I'm -- I didn't understand your answer.  I'm

8    not sure you understood my question.  Let me go ahead

9    and try again.

10   A.    Okay.

11   Q.    You told me about the situation with

12   Progressive.  That's what I'm asking you about.

13   A.    Oh, okay.  So, I'm -- I was thinking you were

14   asking about State Farm --

15   Q.    That's what I thought you did.  I'm still on -

16   - I'm going to ask you about State Farm.

17   A.    Okay.

18   Q.    A little heads up.

19   A.    That's all right.

20   Q.    But for now, I'm asking you about the

21   Progressive situation.

22   A.    Okay.

23   Q.    Okay?  So, did the Progressive representative

24   actually down-code the charge from a 99204 to a 99203?

25   A.    Yes.



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    267

```
 1        Q.    That happened?

 2        A.    He has done it, yeah.

 3        Q.    And did Feijoo, P.A. accept the down-code or

 4   did Feijoo, P.A. challenge that down-code?

 5        A.    There have been occasion where I bring the

 6   file back to Dr. Feijoo and I ask -- and I told him,

 7   this is what's going on, they say that the documentation

 8   that we sent does not support the level of service.  He

 9   will review it and then he will say, just resend what we

10   have and if they determine that that is a 99203, then I

11   will accept it.

12        Q.    Okay.  So, in that case with Progressive, he

13   accepted it?

14        A.    There been a time where he agreed that he did

15   a 99203 and he accept it.

16        Q.    Okay.  You just don't -- do you remember what

17   happened?  I'm just asking about the Progressive

18   situation because you --

19        A.    No, we have sent records and they paid the

20   99204.

21        Q.    Oh, okay.  So, then you sent them more records

22   and then they did not down-code?

23        A.    No.

24        Q.    Yes, they did not down-code?

25        A.    They didn't down-code it.  They paid the
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                            268

 1  99204.

 2      Q.   Oh, okay.  So, there was not an actual down-

 3  code.  They had talked about the possibility of

 4  down=coding to 99203?

 5      A.   We have gotten paid as down-coding at 99203.

 6      Q.   You're confusing me.

 7           MR. PIVNIK:  I think I understood.  Sometimes

 8  they down-coded to 203 and requested information.  You

 9  sent the information and they sent you the reimbursement

10  for the difference to 204?

11           THE WITNESS:  Exactly.

12  BY MR. HAZOURI:

13      Q.   Is that what happened?

14      A.   Yes.

15      Q.   Okay.

16      A.   Then there's been time when they do send a

17  99203 and they send payment.  They say that they believe

18  that it's 99203.  Even we send the records, they still

19  say that it's 99203.

20      Q.   Okay.  In that situation, is -- when you say

21  "they", is that Progressive?

22      A.   Progressive.

23      Q.   Okay.  Have you challenged the 99203?

24      A.   There been two occasions where we just agreed

25  to the 99203.



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

1     Q.   Okay.  Have there been other occasions where
2  you didn't agree to it and you challenged it by sending
3  a notice to initiate litigation and filing a PIP suit?
4     A.   Not by sending to PIP suit.  Just by resending
5  notes or any additional documentation they require.
6     Q.   That's your interaction with Progressive?
7     A.   Yes.
8     Q.   Okay.  Do you recall having any discussions
9  with anybody at State Farm regarding a down-coding of a
10  99204 charge?
11     A.   No, sir.
12     Q.   All right.  And my question was, "Do you
13  recall".  That's how I worded the question.  Let me just
14  make sure I'm clear.  When I say, do you recall, are you
15  saying, I don't remember, it might've happened or are
16  you saying -- would your testimony be that did not
17  happen?
18     A.   With State Farm?
19     Q.   Yes.
20     A.   I've done so many deposition with them.  I
21  have provided medical records, 6(b), and at no point I
22  remember --
23     Q.   Okay.
24     A.   -- them down-coding.
25     Q.   You don't remember them --



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          270

```
 1       A.   No, sir.
 2       Q.   Okay.  So, you just don't remember is the best
 3   answer, a down-coding -- okay.
 4            (Brief interruption.)
 5            MR. HAZOURI:  Okay.  I just noticed that I did
 6   not redact these HCFA forms.  So, again, I'm going to
 7   redact at the end of the deposition, assuming they have
 8   a Sharpie I can use.  But I will just use patient
 9   initials for now.
10            MR. PIVNIK:  Is this still for H.P. or a new
11   patient?
12            MR. HAZOURI:  No, this is new patients.  And
13   since they're different HCFAs, it just didn't occur to
14   me to redact it and I just -- I did it at different
15   times.
16   BY MR. HAZOURI:
17       Q.   But let's go ahead and take a look at these.
18            MR. PIVNIK:  Are we on 20?
19            MR. HAZOURI:  Yeah.  Okay.  Ken?
20            MR. SCHURR:  I'm sorry.
21            MR. HAZOURI:  No, you're fine.  20 and 21,
22   right?
23            THE WITNESS:  Correct.
24            MR. PIVNIK:  20 is --
25            MR. HAZOURI:  Yeah.  Don't say the name.
```

```
 1                MR. PIVNIK:  -- S.B. or --

 2                MR. HAZOURI:  Yeah, yeah, S.B.

 3                MR. PIVNIK:  -- or B.S.

 4                MR. HAZOURI:  You just wanted to say that.

 5                (Plaintiff's Exhibits 20 and 21 were marked

 6      for identification.)

 7      BY MR. HAZOURI:

 8           Q.   All right.  So, I've handed you a HCFA or CMS

 9      1500 that we marked as Exhibit 20 for a patient S.B.,

10      date of service, July 2nd, 2015.  Do you see that?

11           A.   Yes, sir.

12           Q.   And it contains a charge for 99204 and a

13      charge for 95851, correct?

14           A.   Correct.

15           Q.   And I've also handed you a second CMS, a HCFA

16      form, for a patient J.B., also dated July 5th, 2015

17      (sic) with charges of 99204 and 95851, right?

18           A.   Correct.

19           Q.   If you look up at the box -- it's too small

20      for me.  I can't see, but the top right-hand corner, it

21      has the same claim number for both patients.  Do you see

22      that?

23           A.   Yes, sir.

24           Q.   So, these two patients were part of the same

25      claim.  Do you understand that?
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

```
 1      A.   Yes, sir.

 2      Q.   Does that make sense to you?  Okay.  And the

 3   clinic issued 99204 charges to State Farm, right --

 4      A.   Yes, sir.

 5      Q.   -- for the initial evaluation on July 2nd,

 6   2015?  Okay.  Does this ring any bells, these names?

 7   You remember having any discussion with State Farm about

 8   these folks and their claim and their treatment?

 9      A.   No, sir.

10      Q.   Okay.  I'm handing you what we've marked as

11   Exhibit 22 to your deposition.

12           (Plaintiff's Exhibit 22 was marked for

13   identification.)

14   BY MR. HAZOURI:

15      Q.   I'll represent to you these are adjuster's

16   notes.  We call them claim log notes.  They were

17   produced by State Farm in this case.  See this bates

18   number?  That's State Farm's bates number and it means

19   we produced them to your attorneys in this case.

20      A.   Okay.

21      Q.   Okay?  And right here on the first page, at

22   the bottom, there's an entry that says, "August 13,

23   2015".  Do you see that?

24      A.   Yes, sir.

25      Q.   All right.  So, we have to go to the next page
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

273

```
 1  to get to the rest of the entry.  And I'm just going to
 2  work through the language for you so you can see it.
 3  And, by the way, you see it has the same patient names,
 4  S.B. here and J.B. here, these patients we're talking
 5  about?  Wait.  No, I'm sorry, go to the second page.
 6  Patient S.B.  Patient J.B. is right --
 7           MR. PIVNIK:  J.B. is on this.
 8  BY MR. HAZOURI:
 9      Q.  -- right here.  You see?  Okay.  S.B., J.B.
10  You see?
11      A.  Yes.
12      Q.  So, we're talking about this CMS 1500 Form.
13  Okay.  And so, the first line says, "Received medical
14  bill and records for DOS" -- I'll represent to you
15  that's date of service -- "07/02/2015", July 2nd, 2015,
16  right?
17      A.  Yes.
18      Q.  And that matches the --
19      A.  The service.
20      Q.  -- the CMS 1500 Forms that we marked as
21  Exhibits 20 and 21, right?
22      A.  Correct.
23      Q.  Okay.  And then it says, "Received and/or
24  response indicating that the provider failed to meet the
25  documentation for both the comprehensive exam and the
```



 1    medical decision-making fo moderate complexity

 2    components listed for CPT 99204.  Instead, the

 3    provider's documentation supports a level 3 new patient

 4    code, 99203."  Did I read that correctly?

 5         A.   Yes.

 6         Q.   All right.  And then it says, "Called medical

 7    office of Dr. Manuel Feijoo at 305-265-7505."  Is that

 8    the office number?

 9         A.   Yes, sir.

10         Q.   "Spoke with Anie" -- that's you, right?

11         A.   Yes, sir.

12         Q.   "Spoke with Anie who stated that the provider"

13    -- and I don't think she meant you stated this.  She

14    wrote, "who stated".  I think she meant to say, I stated

15    to Anie, "that the provider failed to meet the

16    documentation for both the comprehensive exam and the

17    medical decision-making of moderate complexity

18    components listed for 99204; instead, the provider's

19    documentation supports a level 3 new patient code,

20    99203.  She" -- meaning you, Anie -- "stated that she

21    did not agree."  Do you recall -- after looking at this,

22    do you recall having a discussion with State Farm that's

23    documented in these adjuster's notes?

24         A.   No, sir.

25         Q.   Okay.  Do you dispute that this discussion



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                            275

 1  occurred or you just don't remember?

 2      A.  I don't remember.

 3      Q.  All right.  Then let me --

 4          (Brief interruption.)

 5          MR. HAZOURI:  I think, Ken, you and Jerry

 6  might -- did I give you -- I might need you guys to

 7  share that.  I don't know that I have four copies of

 8  these.

 9  BY MR. HAZOURI:

10      Q.  So, there's -- I'm going to hand you, ma'am,

11  23 and 24 to your deposition.  Okay?

12          (Plaintiff's Exhibits 23 and 24 were marked

13  for identification.)

14          MR. HAZOURI:  Jerry, I gave you 23.  This is

15  24.

16          MR. PIVNIK:  Oh, thank you.

17          MR. HAZOURI:  Maybe I do have enough.  Okay.

18  And here you are, Ken.  23 is on top, 24 is next.

19          MR. PIVNIK:  Thanks.

20  BY MR. HAZOURI:

21      Q.  Okay.  All right.  So, I've handed you what

22  we've marked as Exhibit 23 and 24.  Have you seen these

23  type of documents before?

24      A.  Yes, sir.

25      Q.  What are these?

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        276

1       A.    The Explanation of Benefit.

2       Q.    And what's your understanding of an

3    Explanation of Benefits?

4       A.    It's the detailed payment that was done for

5    the service that we billed.

6       Q.    So, what happens is Feijoo, P.A. submits its

7    bill to State Farm, right?  In this case, the July 2nd,

8    2015 bill, right?

9       A.    Yes, sir.

10       Q.    And State Farm issues payment and, along with

11    the payment, sends this document that's called an

12    Explanation of Review, sometimes called an Explanation

13    of Benefits, right?

14       A.    Correct.

15       Q.    And the Explanation of Review has information

16    explaining State Farm's payment to Feijoo, P.A., right?

17       A.    Yes, sir.

18       Q.    And these are -- you'll see that the

19    Explanation of Review marked as Exhibit 23 is for

20    patient S.B. and the one marked as Exhibit 24 is for

21    patient J.B.  You see that?

22       A.    Yes, sir.

23       Q.    And they both reference the July 2nd, 2015

24    service, correct?

25       A.    Correct.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
277

```
 1       Q.    And as you can see, State Farm issued payment

 2   for a 99203 to Feijoo, P.A., correct?

 3       A.    Yes, sir.

 4       Q.    So, State Farm down-coded the 99204 charges on

 5   July 2nd -- or for the date of service, July 20th, 2015

 6   for these two patients?

 7       A.    Yes.

 8       Q.    Right?  Makes sense?

 9       A.    Yes, sir.

10       Q.    And that's another example of down-coding when

11   I asked you what it was, right?

12       A.    Correct.

13       Q.    All right.  Now, did the clinic accept the

14   down -- did Feijoo, P.A. accept State Farm's down-

15   coding?

16       A.    I'm not sure.  I will have to look into the

17   files note.

18       Q.    Okay.

19       A.    But I don't recall that they have down-coded.

20       Q.    Let me hand you what's been marked as Exhibit

21   25 to your deposition.

22             (Plaintiff's Exhibit 25 was marked for

23   identification.)

24             MR. HAZOURI:  25.

25   BY MR. HAZOURI:
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                278

1      Q.   Let me hand you what's been marked as Exhibit

2   26 to your deposition.

3           (Plaintiff's Exhibit 26 was marked for

4   identification.)

5   BY MR. HAZOURI:

6      Q.   Okay.  Have you seen these types of documents

7   before?

8      A.   Yes, sir.

9      Q.   What are Exhibits 25 and Exhibit 26?

10     A.   A demand letter sent to the insurance company.

11     Q.   These are the type of demand letters that you

12  were previously describing in your deposition testimony

13  that are necessary for the clinic to send before it

14  files a lawsuit to recover PIP benefits against State

15  Farm Mutual, correct?

16     A.   Yes, sir.

17     Q.   And at the top, it says, "The Law Offices of

18  Kenneth B. Schurr, P.A."  That's Mr. Schurr, who's

19  sitting with us today, his office, correct?

20     A.   Correct.

21     Q.   And he files a lot of the personal injury

22  protection lawsuits on behalf of the clinic and Dr.

23  Feijoo.

24     A.   Not only him.  We have other attorneys.

25     Q.   Right.  But he does a good number of them.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    279

```
 1  He's one of the attorneys --

 2       A.   Yes, sir.

 3       Q.   Right?  And so, let's look at Exhibit 25.

 4  This is a demand for the insured, who's J.B., correct?

 5       A.   Yes, sir.

 6       Q.   Right here.  And the date of service is July

 7  2nd, 2015, correct?

 8       A.   Correct.

 9       Q.   And the amount of the bill was $575, correct?

10       A.   Correct.

11       Q.   And so, that matches -- all that matches

12  Exhibit 21, the July 2nd, 2015 bill that the clinic,

13  Feijoo, P.A., sent to State Farm for patient J.B.,

14  correct?

15       A.   Yes, sir.

16       Q.   And so, you understand that this is a demand

17  letter being sent to State Farm Mutual demanding the

18  payment of PIP benefits for that date of service,

19  correct?

20       A.   Yes, sir.

21       Q.   And, again, this is a step towards filing a

22  PIP lawsuit, as you previously testified to.  If State

23  Farm pays, then the clinic's happy and it's good, right?

24       A.   Yes.

25       Q.   If State Farm doesn't pay, then the clinic
```



```
 1  will move forward with filing a lawsuit, generally

 2  speaking?

 3       A.   We file the demand letter.

 4       Q.   After the demand letter.

 5       A.   Yes.

 6       Q.   If State Farm doesn't pay pursuant to the

 7  demand letter --

 8       A.   Yes, sir.

 9       Q.   -- right?  Okay.  And then the second one,

10  Exhibit 26, is, you know, the same type of letter.  I'm

11  sorry, patient 25 was exhibit S.B. (sic).  Patient 20 --

12  or Exhibit 26 was the -- is patient J.B., correct?

13       A.   Correct.

14       Q.   Same thing, July 2nd, 2015, right, date of

15  service?

16       A.   Yes, sir.

17       Q.   $575 bill matches Exhibit 21 --

18       A.   Correct.

19       Q.   -- right, the CMS?  Now, in fact, if we go

20  three pages in -- four pages in, the same -- another

21  copy of the bill is enclosed.  Do you see?

22       A.   Yes, sir.

23       Q.   And if we go one more page in, there's the

24  Assignment of Benefits form, the same form that we

25  marked as an exhibit, exhibit -- it was 18 to your
```



 1  deposition.  Let me check and see.

 2            MR. SCHURR:  18 is the AOB.

 3            MR. HAZOURI:  Yeah.  That's what I'm saying.

 4  BY MR. HAZOURI:

 5      Q.   Same type of -- it's the -- the standard

 6  Assignment of Benefits form is the last form in there.

 7      A.   Yes, sir.

 8      Q.   Right?

 9      A.   So, again, this is how the assignment of -- or

10  at least one way that it will get delivered to the

11  insurer is inside one of these types of demand letters?

12      A.   That, or a request for 6(b).

13      Q.   Right.  Okay.  So, what happened here was --

14  just to walk through what the documents show us, is the

15  clinic issued charges of 99204 for an initial office

16  visit with patient S.B. and patient J.B. on July 2nd,

17  2015, correct?

18      A.   Yes, sir.

19      Q.   The log notes that I showed you reflect that

20  State Farm looked at the -- that 99204 code and decided

21  to down-code it to 99203 and had a conversation with you

22  about it.  You don't remember that conversation?

23      A.   No, sir.

24      Q.   But the log notes reflect it.  You just don't

25  remember it, correct?



1          MR. PIVNIK:  Well, we can't speak to the log

2  notes.

3          MR. HAZOURI:  Fair enough.

4  BY MR. HAZOURI:

5      Q.    You don't remember the conversation.

6      A.    Correct.

7      Q.    Correct?  But the -- okay.  So, then the log

8  notes say what they say.  Then State Farm issued a

9  payment that was for a 99203 service as set forth in the

10  Explanation of Review for both patients.

11      A.    Yes, sir.

12      Q.    Right?  And then what happened was upon

13  receiving that payment, the clinic, Feijoo, P.A., didn't

14  accept the 99203 down-code.  It sent a demand for

15  additional PIP benefits to State Farm.

16      A.    Can I clear you something?

17      Q.    Well, can you answer me first?  And then yes.

18      A.    Well, it's related to what you're asking.

19      Q.    Okay, go ahead.

20      A.    Not necessarily it's that we did not accept

21  the 99203.  We usually do not accept the reduction that

22  they do.

23      Q.    Okay.  Well --

24      A.    Like if it's $575, they reduce it to $280.  It

25  don't have to be specific because of the code.



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                              283

1      Q.   Okay.

2      A.   The demand letter say that we're not asking

3   for the difference between 99203 and 99204.

4      Q.   Well -- all right.  But here's what you're

5   asking for, is the full amount of your charge at 80%.

6      A.   Correct.

7      Q.   Right?  And so, if State Farm down-codes from

8   99204 to 99203 and pays a lesser amount than your charge

9   because of that down-coding, Feijoo, P.A. is not going

10  to accept that, right?

11     A.   It's not going to accept it because they're

12  not paying -- even if it's down-coded to 99203, they're

13  not paying 80% of the amount allowed.

14     Q.   That's right.

15          MR. PIVNIK:  Even if they paid a 9204, they're

16  still not paying --

17          MR. HAZOURI:  Well, wait, wait, wait.

18          MR. PIVNIK:  Okay.

19  BY MR. HAZOURI:

20     Q.   Let me help.  Let me help.  Let's just --

21  let's use some hypotheticals.  Okay?

22     A.   Yeah.

23     Q.   Let me just -- let me try and do this.  So,

24  the charge for 99204 is $475?

25     A.   Yes.



1    Q.   Okay.  And the charge for 95851 -- and I'm

2  looking at Exhibit 20 and we're talking about patient

3  S.B., July 20th, 2015.  The charge for 95851 is $100,

4  right?

5    A.   Correct.

6    Q.   So, the total amount of the charges is $575.

7    A.   Yes.

8    Q.   Right?  So -- and let's just say this is a PIP

9  only policy because I think it is.  Okay?  So, the

10 clinic expects to be paid 80% of $575?

11    A.   Correct.

12    Q.   Right?  Let me pull out my handy-dandy

13 calculator.  $575 times 80% equals $460.

14    A.   Correct.

15    Q.   So, that is what the clinic expects to be

16 paid?

17    A.   Correct.

18    Q.   Right?  If State Farm down-codes 99204, okay -

19 -

20    A.   You need this?

21    Q.   That's what I'm looking for.  If the -- State

22 Farm down-codes to a 99203 and only pays $237.58 on

23 $475, the clinic's not going to accept that because it's

24 not 80% of the full charge, right?

25    A.   Even if they down-code the code, they still



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
285

```
 1   not paying 80% of 99203.
 2        Q.   Right.  Well -- right.  And the clinic's not
 3   going to accept that?
 4        A.   Yes.
 5        Q.   Yes, the clinic is not going to accept that?
 6        A.   They're not going to accept it.
 7        Q.   Right.  Well, and the whole point of an
 8   insurance company down-coding a code is to pay less on
 9   it, right?  I mean, that's why they do it.
10        A.   I understand, but I don't think you're
11   understanding my answer.  Let's agree that I will --
12   that we are going to accept 99203.  State Farm is still
13   paying under Medicare Fee, which we're not accepting.
14   We're expecting 80% of the price of 99203, if we would
15   accept the down-code.  This is something that it's not
16   like a routine for State Farm to do that.  This is the
17   first time I've seen something like this.  But what I'm
18   trying to tell you, even if they down-code it to 99203,
19   we're still expecting 80% of the amount for 99203.
20        Q.   Of 99203.  Okay.  But you can't tell whether
21   that's what you were expecting or not?
22        A.   Exactly.
23        Q.   Right?  Okay.  All right.  But at any rate, we
24   do know the demands were served?
25        A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

286

1     Q.     Following the down-coding by State Farm,

2   correct?

3     A.     Yes, sir.

4     Q.     Who makes the decision at Feijoo, P.A., you

5   know, whether to refer a case out to an attorney for

6   preparation of a demand letter like this and then the

7   potential filing of a PIP suit?

8     A.     I usually do it.  If I need to confirm with

9   him if it's like an amount that he will agree to waive

10  or accept, he will determine yes or no.

11    Q.     Okay.  So, it sounds like it's a decision made

12  between -- both you and Dr. Feijoo talk about it and

13  decision -- make the decision together?

14    A.     In some cases.

15    Q.     Okay.  Well, what's the standard practice?

16  Who makes the decision?

17    A.     I'm the one who review the Explanation of

18  Benefit.

19    Q.     Okay.

20    A.     If there's a zero payment, like there's no

21  payment at all, I don't ask for him to like -- do I send

22  it to PIP suit or not or do I send demand letter or not.

23  If it's a case that was paid partial payment on an

24  amount, I ask him if I file it or he want me to contact

25  the insurance or contact the patient or the patient



 1    attorney.

 2        Q.    Okay.  So, if it's a zero payment, you make

 3    the  command decision it's going out for collection?

 4        A.    Yeah, with his authorization.

 5        Q.    Right.  He's authorized you to do that for

 6    zero payments?

 7        A.    Yes, sir.

 8        Q.    If it's a partial payment, then you and him

 9    have a discussion about whether to send it out for

10    collection?

11        A.    Yes, sir.

12        Q.    Okay.  At the end of the day, he has the

13    ultimate decision?

14        A.    Yes, sir.

15        Q.    "He" being Dr. Feijoo?

16        A.    Dr. Feijoo.

17              MR. HAZOURI:  Last unredacted exhibit.

18              (Brief interruption.)

19    BY MR. HAZOURI:

20        Q.    All right.  Let's see here.  Let me just

21    follow up one more time on this.  You -- I just want to

22    make sure you're understanding.  You do understand that

23    if State Farm down-codes from a 99204 to a 99203, State

24    Farm is going to pay less than the full amount of the

25    99204 charge?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          288

```
 1      A.   I understand.
 2      Q.   Right?  And you told me before that the clinic
 3   expects to be paid the full amount of its charge?
 4      A.   Correct.
 5      Q.   Because it believes the charges are proper and
 6   accurate and correct, right?
 7      A.   Yes, sir.
 8      Q.   So, isn't it fair to say that if State Farm
 9   down-codes a 99204 to a 99203 and pays less than the
10   full amount of the charge, the clinic is not going to
11   accept that because it's not the full amount of the
12   charge?
13           MR. PIVNIK:  Objection.  You're talking about
14   every single circumstance.
15           MR. HAZOURI:  Yeah, as a matter of --
16           MR. PIVNIK:  Speculation.
17           MR. HAZOURI:  -- as a matter of practice.
18      A.   You got confused now.  It's not our standard
19   practice not to say we don't accept it.  We review our
20   records.  We provide records if they request it.  I
21   don't think it's the State Farm standard to request to
22   down-code it because it's not -- I don't see it.  I
23   don't see phone calls or it would be like other
24   insurance company does.
25   BY MR. HAZOURI:
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
289

```
 1      Q.   Okay.

 2      A.   So, if they down-code it or request to down-

 3 code it, we will either resubmit records or additional

 4 information.  Have they done it before?  Yes.  State

 5 Farm had requested additional documentation.  They paid

 6 for the records and they paid for the service.

 7      Q.   Well, I think you said Progressive did that.

 8 Do you recall --

 9      A.   State Farm too.

10      Q.   You recall State Farm doing this?

11      A.   Yes, sir.

12      Q.   Okay.  Okay.  You recall that, but you don't

13 recall this other discussion?

14      A.   They request record, like 6(b), additional

15 information.  They don't request for down-code.  They

16 just ask for record for -- to provide for the service

17 rendered.

18      Q.   I see what you're -- you weren't referencing a

19 down-coding conversation?

20      A.   No, sir.

21      Q.   You were referencing a 6(b) request for

22 records?

23      A.   Correct.

24      Q.   And then what you're saying is in the past,

25 State Farm has requested records through 6(b)?
```



```
 1      A.    And we have provided and then they decide pay.

 2      Q.    Okay.  Okay.  I got you.

 3            (Brief interruption.)

 4            MR. HAZOURI:  Okay.  We have to go off the

 5   record.  One second, please.

 6            THE VIDEOGRAPHER:  We are going off the

 7   record.  The time is 3:38 p.m.

 8            (Discussion was held off the record.)

 9            (Videotaped deposition resumed.)

10            THE VIDEOGRAPHER:  We are on the record.  This

11   is media four.  The time is 3:39 p.m.

12   BY MR. HAZOURI:

13      Q.    Okay.  I'm handing you Exhibit 27.  This is a

14   composite exhibit of multiple documents that were sent

15   in a single envelope, as I think we'll see.

16            (Plaintiff's Composite Exhibit 27 was marked

17   for identification.)

18   BY MR. HAZOURI:

19      Q.    Why don't you flip through the documents and

20   you'll see it ends with an envelope to State Farm.  Can

21   you see that?

22      A.    Yes, sir.

23      Q.    So, is this a -- do you have any reason to

24   dispute this was a medical bill and related

25   documentation submitted to State Farm to support the
```

```
 1  bill?

 2       A.   Yes, sir.

 3       Q.   Okay.  So, on -- and by the way, this is a

 4  date of service, March 7th, 2019, correct?

 5       A.   Correct.

 6       Q.   And there is a billing code for 99203.  Do you

 7  see that?

 8       A.   Yes, sir.

 9       Q.   And the charge is for $350.  You see that?

10       A.   Yes, sir.

11       Q.   Is that what you told me before was the 99203

12  -- the clinic's 99203 charge?

13       A.   I think I say $375.

14       Q.   I think you did too.  Does this help refresh

15  your recollection?  Do you believe it's $350?

16       A.   $350.

17       Q.   Okay.  So, the clinic charges -- the clinic

18  charges $475 for a 99204 and $350 for a 99203, correct?

19       A.   Yes, sir.

20       Q.   And those charges have remained the same since

21  2001?

22       A.   Yes, sir.

23       Q.   Simple math, the clinic's charge is $125 less

24  for 99203 than it is for 99204?

25       A.   Yes, sir.
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Castillo Anielka

292

1    Q.   Okay.  If you could turn to the sixth page of

2    this last exhibit, please.  The sixth page, the form.

3    What is this form?

4    A.   It's a superbill.

5    Q.   A superbill?

6    A.   Correct.

7    Q.   I thought I had asked you before if the clinic

8    used superbills and I thought you had said no.  Did I

9    misunderstand?

10   A.   No.  We didn't use it.  We were talking about

11   the service for the patient.

12   Q.   Okay.

13   A.   So, at that year, at that time, we didn't use

14   it.

15   Q.   So, this is a newer procedure or document?

16   A.   Correct.

17   Q.   When did the clinic start using the superbill?

18   A.   When we start getting complaint.

19   Q.   From whom?

20   A.   From you.

21   Q.   Oh, okay.

22   A.   No, sorry.

23   Q.   Well, no, if that's the truth, that's okay.

24   From -- when you say "you", do you mean State Farm

25   Mutual?



Orange Legal
800-275-7991

 1     A.   State Farm.

 **2     Q.   Okay.  So, State Farm -- was it the filing of**

 **3  this lawsuit that started this?**

 4     A.   Yes.  We decide -- Dr. Feijoo and I, we sit

 5  together and we -- because of the situation that we

 6  were, we wanted to make sure that we're doing correctly

 7  how State Farm wanted for us to do it and make sure that

 8  if they need a superbill or they need him to mark the

 9  code for him to do it.

**10     Q.   Okay.  And so, this -- again, this sixth**

**11  document, the one right before the envelope, you're**

**12  calling a superbill.**

13     A.   Correct.

**14     Q.   When was this created, the superbill, the**

**15  form?**

16     A.   I think we started on December or November of

17  2018.

**18     Q.   All right.  And did --**

19          MR. PIVNIK:  Let me just -- a standing

20  objection for possible subsequent remedial measures.

21          MR. HAZOURI:  It's preserved.

22          MR. PIVNIK:  Yeah.  Okay.

23          MR. HAZOURI:  You raised that at trial and

24  it's preserved.  I stipulated to preservation of it.  I

25  don't stipulate to its accuracy; to its preservation --



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

294

```
 1  to its merit.  I don't stipulate to its merit.  I

 2  stipulate to its preservation.

 3  BY MR. HAZOURI:

 4       Q.   So, on the superbill, it says level 3, 15

 5  minutes, 99203.

 6       A.   It's the wrong discription.

 7       Q.   That's wrong?

 8       A.   Yes, sir.

 9       Q.   Okay.  I was going to ask you.  Who -- is this

10  a form that the clinic got somewhere?

11       A.   Exactly.  I'm sorry.

12       Q.   Where'd you get the form from?

13       A.   I think it was provided by another physician

14  and that's why it's not correctly.  We -- I believe we

15  fix it already.

16       Q.   Okay.  So, the -- where it says level 3, 15

17  minutes, 99203, you're saying the 15 is incorrect?

18       A.   It's incorrect.

19       Q.   What should it say?

20       A.   Twenty-five to 30 minute, it could be.

21       Q.   Okay.  And then level 4, 25 minutes for 99204,

22  you're saying that's incorrect?

23       A.   Yes, sir.

24       Q.   What should that be?

25       A.   Forty to 45 minute.
```



1      Q.    Level 5, 40 minutes, is that incorrect also?

2      A.    Forty to 60 minute.

3      Q.    Okay.  And the same would be the same for the

4  level 3, 4 and 5 --

5      A.    Of follow-up.

6      Q.    -- on the follow-up visits?

7      A.    Correct.

8      Q.    The 9921 codes?

9      A.    Correct.

10      Q.    Okay.  And I have to ask you this question.  I

11  apologize.  Have you ever been convicted of a crime?

12      A.    No, sir.

13            MR. HAZOURI:  I don't have anything further at

14  this time.

15            MR. PIVNIK:  Okay.  Let me just have five

16  minutes and then --

17            MR. HAZOURI:  Sure.

18            MR. PIVNIK:  I do have just a -- I think just

19  a handful of questions.

20            MR. HAZOURI:  Okay.

21            THE VIDEOGRAPHER:  We're going off the record.

22  The time is 3:45 p.m.

23            (Brief recess was held.)

24            (End of Volume II.)

25



```
 1                     CERTIFICATE OF OATH

 2
      STATE OF FLORIDA
 3    COUNTY OF MIAMI-DADE

 4

 5        I, Martha Rodriguez, FPR, Notary Public, State of
      Florida, certify that Anielka Castillo personally
 6    appeared before me and was duly sworn/affirmed.

 7        WITNESS my hand and official seal this 29th day
      of May, 2019.
 8

 9

10

11

12

13

14

15                           Martha Rodriguez
                             _____
                             Martha Rodriguez, FPR
16                           Notary Public
                             State of Florida
17                           My Commission: GG097851
                             Expires: 05/20/2021
18

19

20

21

22

23

24

25
```



```
 1                    CERTIFICATE OF REPORTER

 2
     STATE OF FLORIDA
 3   COUNTY OF MIAMI-DADE

 4

 5        I, Martha Rodriguez, FPR, Court Reporter, do
     hereby certify that I was authorized to and did report
 6   the videotaped deposition of Anielka Castillo; that a
     review of the transcript was requested; that the
 7   foregoing transcript, pages 155 through 295, is a true
     and accurate record of the above-mentioned
 8   proceedings; and that said record has been transcribed
     by me or under my direction.
 9
          I further certify that I am not a relative,
10   employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
11   attorney or counsel connected with the action, nor am
     I financially interested in the action.
12
          DATED this 24th day of June, 2019.
13

14

15

16

17

18

19
                              Martha Rodriguez
20                            _____
                              Martha Rodriguez, FPR
21                            Court Reporter

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1                ERRATA SHEET (VOLUME II)

 2   DO NOT WRITE ON THIS TRANSCRIPT - ENTER CHANGES HERE

 3   IN RE:      STATE FARM MUTUAL AUTOMOBILE INSURANCE
                 COMPANY V. MANUEL V. FEIJOO and MANUEL V.
 4               FIEJOO, M.D., P.A.
     CASE NO.:  1:18-cv-23329
 5   DATE:      MAY 29, 2019
     DEPONENT:  ANIELKA CASTILLO
 6

 7   PAGE   LINE       CORRECTION & REASON

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22
     Under penalties of perjury, I declare that I have read
23   the foregoing document and that the facts stated are
     true.
24   _____

25   DATE                        DEPONENT NAME
```



```
 1                                                     JUNE 24, 2019
      ANIELKA CASTILLO
 2    c/o Jerome A. Pivnik, Esquire
      The Pivnik Law Firm
 3    7700 North Kendall Drive
      Suite 703
 4    Miami, Florida 33156
      pivniklaw@aol.com
 5
      In Re:   May 29, 2019 Videotaped Deposition of
 6              Anielka Castillo
                State Farm Mutual Automobile Insurance
 7              Company v. Manuel V. Feijoo and Manuel V.
                Fiejoo, M.D., P.A.
 8
      Dear Madam:
 9
             This letter is to advise that the transcript of
10    the above-referenced deposition has been completed and
      is available for review. Please contact our office at
11    (800) 275-7991 to make arrangements to read and sign
      or sign below to waive the review of this transcript.
12
             It is suggested that the review of this
13    transcript be completed within 30 days of your receipt
      of this letter, as considered reasonable under Federal
14    Rules*; however, there is not Florida Statute to this
      regard.
15
             The original of this transcript has been
16    forwarded to the ordering party, and your errata, once
      received, will be forwarded to all ordering parties.
17
                                      Sincerely,
18
                                      Martha Rodriguez, FPR
19                                    Orange Legal, Inc.

20    cc:   Kenneth P. Hazouri, Esquire

21
      WAIVER:
22    I, _____, hereby waive the reading
      and signing of my deposition transcript.
23
      _____        _____
24    Deponent Signature                     Date
      *Federal Civil Procedure Rule 30(e)/Florida Civil
25    Procedure Rule 1.310(e)
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                                    Index: $100..9

**$**

**$100** 284:3

**$125** 291:23

**$200** 175:1,2

**$237.58** 284:22

**$275** 174:14

**$280** 282:24

**$350** 291:9,15,16,18

**$375** 291:13

**$400** 174:21,22

**$460** 284:13

**$475** 283:24 284:23
291:18

**$575** 279:9 280:17
282:24 284:6,10,13

**0**

**03** 264:22

**04** 156:8 171:7
264:22

**05** 156:8

**07/02/2015** 273:15

**1**

**1** 156:5 183:4,9,10
201:3 202:16 214:12
220:19

**10** 162:3,6 183:18,19
187:3,16 188:1,6,7
189:18 216:12
222:1,3,21

**100%** 252:6 257:3
258:24

**11** 182:10 185:17,18
188:6,8 189:21
191:7 199:10 202:2
204:1,3 205:12
209:20 211:2 236:19

**11871** 220:3

**11872** 220:8

**11881** 182:6

**12** 191:11,13 199:8

**12:45** 155:3

**12:46** 155:5

**13** 204:19,20 260:21
272:22

**13-12572** 260:17

**137** 260:9,12,13,24
261:11 262:1,17,21

**14** 171:7 216:19,20,
23 218:7 225:17
235:16

**15** 216:16,17,18
218:3,4 219:16
220:1 224:6 225:11,
12 231:6 235:21
261:1,17 294:4,16,
17

**15-4731** 261:1

**1500** 264:3 271:9
273:12,20

**15s** 261:2

**16** 224:18,20 225:20

**17** 234:25 235:1

**18** 243:18,19 280:25
281:2

**19** 259:13,14

**1:40** 203:15,16

**1:42** 203:20

**1st** 262:8

**2**

**2** 156:5 182:18,19
201:1,2 203:25
220:15 224:7 235:20

**2/20/17** 173:17
208:4

**20** 185:2 234:14
236:21 270:18,21,24
271:5,9 273:21
280:11 284:2

**2000** 261:6

**2001** 175:23 181:2
183:16 243:4 291:21

**2013** 260:22 261:7,
11,14,15,16,23
262:18

**2015** 261:7,11,24
262:6,7,18 271:10,
16 272:6,23 273:15
276:8,23 277:5
279:7,12 280:14
281:17 284:3

**2016** 262:8

**2017** 155:15,19
173:17 183:23
190:14 192:15
193:18 200:4 205:8
207:7 208:4,18,23
211:15 212:10,21
213:7 215:9 216:2
217:4 219:19 225:7,
10 226:12,22 227:22
231:16 233:9,19
234:14 235:5
236:14,22

**2018** 293:17

**2019** 291:4

**203** 268:8

**204** 268:10

**20th** 173:17 183:23
186:23 192:15,18
193:18 194:14 200:4
207:7 208:4,18,23
211:15 212:10,21
213:6 215:9 217:4
219:19 225:7
226:12,22 231:16
233:8,9,19 235:5
236:14 277:5 284:3

**21** 270:21 271:5
273:21 279:12
280:17

**22** 272:11,12

**23** 275:11,12,14,18,
22 276:19

**23rd** 205:8

**24** 275:11,12,15,18,
22 276:20

**25** 277:21,22,24

278:9 279:3 280:11
294:21

**26** 186:23 278:2,3,9
280:10,12

**27** 290:13,16

**28** 225:10

**29** 215:22

**2:00** 216:9

**2:05** 221:18,19

**2:10** 216:10

**2:17** 221:23

**2:55** 255:13

**2:56** 255:17

**2nd** 271:10 272:5
273:15 276:7,23
277:5 279:7,12
280:14 281:16

**3**

**3** 156:5 182:16,17,22
183:4 187:11 202:16
220:11,19 221:7
265:19 274:3,19
294:4,16 295:4

**30** 186:3 215:22
294:20

**30%** 184:16,17,24

**305-265-7505** 274:7

**30th** 227:22

**35** 215:22

**3:38** 290:7

**3:39** 290:11

**3:45** 295:22

**4**

**4** 156:5 174:8 186:13
189:22 190:17 191:7
265:18,19 294:21
295:4

**40** 295:1

**40%** 186:2,3 187:4,
8,11

**45** 294:25

**4:07** 193:18 194:25

**5**

**5** 156:5 218:19,21,25
295:1,4

**525** 239:16

**5th** 271:16

**6**

**6** 190:18 193:11

**6(b)** 269:21 281:12
289:14,21,25

**60** 295:2

**7**

**7** 155:10,11 173:9
193:14 207:22
227:12

**76140** 176:4,11
178:16 179:4,8,13,
25 180:24 190:18,22
191:2,6 199:11,20
237:3,24 238:21
241:17 243:7

**7th** 291:4

**8**

**8** 173:8,12,13 182:3
190:24 191:3

**80%** 252:6 256:24
257:3 258:24 283:5,
13 284:10,13,24
285:1,14,19

**82** 182:11

**882** 182:12

**9**

**9** 181:13,14 187:25
188:7,8,20 189:5,15
222:1,6



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                                                    Index: 9204..benefits

**9204** 283:15

**95851** 175:25 217:10
235:16 236:5,15,21
237:2,24 238:20
241:5,11 242:15
271:13,17 284:1,3

**9903** 264:20

**992** 155:23

**9920** 156:7 160:21

**99201** 156:2,14
161:16 163:1 166:6,
12,19

**99202** 156:8 157:4
164:3,13,23 167:11

**99203** 156:7,8 158:4
159:5 160:20 161:14
164:15,17 165:2,10,
21 167:12,14,19
168:9 237:14
265:14,18 266:24
267:10,15 268:4,5,
17,18,19,23,25
274:4,20 277:2
281:21 282:9,14,21
283:3,8,12 284:22
285:1,12,14,18,19,20
287:23 288:9 291:6,
11,12,18,24 294:5,17

**99204** 158:15 159:4,
16 160:21 161:6,14
163:25 165:4,9,12,
16,20 168:1,8
170:15,24 171:19
237:2,23 238:19
239:18 264:20,25
265:14,18 266:24
267:20 268:1 269:10
271:12,17 272:3
274:2,18 277:4
281:15,20 283:3,8,
24 284:18 287:23,25
288:9 291:18,24
294:21

**99204s** 239:14

**99205** 169:11 172:1

**9921** 295:8

**99211** 175:9,12

**99212** 175:4,7,11

**99213** 174:25 175:5
237:14

**99214** 170:16 171:4,
19 172:2,15,23,25
173:23 174:2,14,18
207:24 208:8,17
211:4,16 212:7,16,
20 215:9 237:2,23

**99215** 169:16,23
170:17 171:10,11,17
172:16 173:1 174:20
217:10,13 218:8,11,
13 219:7 227:7,17,
22 230:23 231:22
233:21 234:13
235:14 237:2,24

**99291** 156:15

---

**A**

**above-described**
256:9

**above-referenced**
245:25 247:1

**accept** 266:3 267:3,
11,15 277:13,14
282:14,20,21
283:10,11 284:23
285:3,5,6,12,15
286:10 288:11,19

**accepted** 267:13

**accepting** 285:13

**accident** 162:4
175:14,15 244:18
248:3,13

**accidents** 160:13

**account** 203:25

**accuracy** 293:25

**accurate** 234:14
254:15,20 259:6
288:6

**accurately** 210:11

**acknowledging**
247:5

**activities** 214:12

**actual** 160:19,22
179:24 180:23

190:10 268:2

**additional** 207:2
264:21 269:5 282:15
289:3,5,14

**Address** 217:21

**adjuster's** 272:15
274:23

**adjustments** 240:22

**admit** 199:2

**admitting** 199:4

**affected** 214:25

**aforementioned**
209:25 211:19

**agree** 156:11 192:25
193:18 208:15
227:21 232:20
258:16,20 269:2
274:21 285:11 286:9

**agreed** 267:14
268:24

**ahead** 229:14 238:25
239:2 266:8 270:17
282:19

**allowed** 283:13

**amount** 160:5
175:20,22 257:2
258:24 263:1,3,10
279:9 283:5,8,13
284:6 285:19 286:9,
24 287:24 288:3,10,
11

**amounts** 175:19

**and/or** 273:23

**Anie** 274:10,12,15,
20

**answer's** 223:1,2

**answering** 208:5

**answers** 224:13

**AOB** 281:2

**apologize** 230:7
295:11

**appears** 193:16,19

**applied** 263:13

**applies** 185:10

**area** 212:24

**areas** 209:25 211:19
214:25 236:7

**argumentative**
210:3 228:10,17
229:13 232:16

**articulate** 159:12

**assess** 177:23

**assign** 256:4

**assigned** 245:25
246:18 247:1

**assigning** 246:19
247:6

**assignment** 244:5,6
249:16 250:3,12
251:3,25 254:19
255:8,22 257:14,15
280:24 281:6,9

**assigns** 256:19,20

**assist** 208:5

**assume** 265:5

**assuming** 270:7

**asymptomatic**
226:15,19,24 228:4
229:4 230:18 232:10
234:19

**attorney** 238:14
244:23 245:12 286:5
287:1

**attorneys** 259:21
272:19 278:24 279:1

**attributes** 218:10

**August** 272:22

**authorization**
287:4

**authorized** 287:5

**auto** 157:1 244:18

**automobile** 248:13
256:6,8 262:5,19

**avoid** 213:10 214:16

**aware** 199:17
232:19 248:7 250:19

---

**B**

---

**B(6)** 259:8

**B.S.** 271:3

**back** 157:1 160:16
161:16 162:5 163:12
166:5 170:22 174:5
181:10 188:25
194:14 203:19
206:25 207:22
214:17 218:7 221:25
224:5 242:17 255:16
262:17 267:6

**bad** 216:20 233:4

**balance** 257:5

**base** 230:25

**based** 162:17 190:13
205:19 206:24
220:13 228:23 261:5

**basing** 233:24

**bates** 181:20 182:6,9
191:20 202:3,25
204:7 217:2 220:3,8
224:25 243:22
272:17,18

**beating** 233:6

**beginning** 255:24

**behalf** 278:22

**belief** 234:12

**believed** 190:21
234:2

**believes** 244:16
252:1 254:19 259:5
288:5

**bells** 272:6

**Bend** 214:16

**benefit** 244:5 250:4
263:19,20 276:1
286:18

**benefits** 244:6,12,15
245:25 246:1,5,6,7,
18,19 247:1,6,17,18,
19 248:1,9,14,24
249:16 250:13 251:2
254:19 255:8,23



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                    Index: benefits/insurance..complexity

256:4,14,19,21
257:15,16,24 258:4,
13,20 259:20 261:11
262:1,18,21 263:17,
21 264:1 276:3,13
278:14 279:18
280:24 281:6 282:15

**benefits/insurance**
256:14

**bill** 173:16,20,22
174:11 175:11,13,17
178:16,20 179:4,11,
13,25 180:24 181:3,
5 182:2 191:3
207:16 208:17 217:2
225:16,19 227:16
231:22 233:21
237:14,15 238:19,20
241:24 244:8,11
250:4 265:4,5
273:14 276:7,8
279:9,12 280:17,21
290:24 291:1

**billed** 158:18
165:12,17 179:19
180:25 181:6
190:18,22 199:11
217:9 218:22 227:5
234:13 236:5,17
237:25 241:7,12
264:19 276:5

**billing** 179:8 199:17,
20 211:4,16 215:8,
12 227:22 238:22
240:18,23 241:25
242:8,18 266:6
291:6

**bills** 219:7 237:2
246:8 248:10 253:2,
8,23 254:6,9,15
264:1,2

**bit** 157:17,20,24
216:7

**blacked** 191:21

**body** 212:24

**boneheaded** 254:9

**book** 155:19 158:10
207:23 218:16
227:12 230:22

**bottom** 169:17

189:22 272:22

**bound** 155:18

**box** 271:19

**break** 155:8 216:5,7
221:15 255:10

**bring** 176:23 177:3
178:10 256:12,20
267:5

**broader** 157:24

**brought** 195:4

**bullet** 190:17
209:13,15

**bullet-point** 166:6

**bunch** 261:2

---

## C

**calculation** 258:21

**calculator** 284:13

**call** 216:8 221:12
264:17 266:4 272:16

**called** 180:15 194:7
214:9 274:6 276:11,
12

**calling** 293:12

**calls** 246:14 288:23

**capable** 159:23
160:24 169:8

**care** 226:7,25

**carrier** 246:7 248:9

**carries** 158:5 167:13

**case** 162:4 165:12
170:8 180:6 181:24
184:1 190:14 194:12
207:1 239:17 249:13
252:18 258:22
259:21 260:15 266:1
267:12 272:17,19
276:7 286:5,23

**cases** 175:14,15
177:6 264:9 286:14

**cast** 237:15

**Casualty** 262:6,20

**CD** 176:12,24 178:19
181:7 195:22
199:14,15

**CDS** 198:10

**Center** 192:22
193:17,22 235:6

**cervical** 189:25
192:6,8 196:1,3,6
212:12 222:8,14
223:8

**challenge** 267:4

**challenged** 268:23
269:2

**chance** 262:12

**change** 245:3,4

**changed** 265:17

**changing** 265:24

**charge** 173:22
174:14,18,20 175:7,
9 176:11 235:16
236:21 264:24
266:24 269:10
271:12,13 283:5,8,
24 284:1,3,24
287:25 288:3,10,12
291:9,12,23

**charges** 175:22
237:2 251:20,25
252:1,5,17 253:8,16,
17,23 254:6,15,20,22
257:3,5 258:24
259:5 263:7,11
264:4 271:17 272:3
277:4 281:15 284:6
288:5 291:17,18,20

**chart** 181:23 182:13
191:23 195:5,11
199:25 200:19
201:10,11,20,23,25
202:5,13,17,25
203:5,24 204:4,5,9,
24 206:3,6 208:21
220:10 225:4 243:24

**charts** 239:17

**check** 188:25 201:21
202:16 281:1

**Chief** 225:23

**choose** 218:24

**circle** 184:5,8

**circles** 184:1,8

**circumstance**
288:14

**claim** 239:16 271:21,
25 272:8,16

**claims** 263:18

**clarify** 180:10 192:1

**clean** 217:25

**clear** 199:4 229:24
233:5,7 249:6
255:23 269:14
282:16

**client** 255:4

**clinic** 158:18 165:17
174:20 175:11
176:10 178:15
179:4,12,25 180:23
183:16 190:18,20
193:7 194:7 199:11,
17,20 206:10,13,24
208:17 218:24 219:7
227:5 234:13 235:5,
10 237:6,9,20
239:11,20 240:20
242:3 243:15
244:11,14,16,19
245:2 247:2,6 248:4,
15 253:15,17,22
254:5,19,21 259:1,4
263:8 264:2 266:2
272:3 277:13
278:13,22 279:12,25
281:15 282:13
284:10,15 285:5
288:2,10 291:17
292:7,17 294:10

**clinic's** 174:17
175:7,9 239:9
252:21 254:10,14
279:23 284:23 285:2
291:12,23

**clinics** 193:8

**CMS** 264:3 271:8,15
273:12,20 280:19

**code** 171:23 174:2,8,
10 175:25 176:4,7
218:8,14,19,21,25

219:10 237:16
239:20,23,24 240:2,
3 241:5 242:15,19,
24 243:7 252:17
253:8,16,23 254:5,
14,20 264:3,12,15
265:18,23,24 266:6
268:3 274:4,19
281:20 282:25
284:25 285:8 289:3
291:6 293:9

**codes** 155:22,23
156:1,12 207:24
217:9 237:6,9,17,20,
23 238:22 239:8,9
240:8 243:10 252:10
264:6,8 295:8

**coding** 265:23
277:15

**coincides** 182:2

**collection** 287:3,10

**comfortable** 200:21
201:18 202:14,15
206:18

**command** 287:3

**company** 244:11
248:23 250:5 262:5,
6,20,21 278:10
285:8 288:24

**compare** 186:13

**compared** 160:21

**compilation** 261:6

**complain** 240:6

**complaining** 209:24
211:18

**complaint** 225:23
292:18

**complaints** 157:1
159:10

**complete** 197:9,15
201:10 206:5 240:6

**completeness**
199:25

**complex** 173:3
232:24

**complexity** 167:14,
18 168:3,7,8,20,21,



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    Index: complicated..detailed

23 169:7,8,13,18,23
170:6,11,15,16,25
171:5,12,13,17,18
172:3,9,14,15
208:13 213:3,8
215:8 227:19 232:6,
14,21 233:10,13,21
234:5 274:1,17

**complicated** 167:22

**component** 160:10
166:6 167:13 212:4,
7 213:2 232:5

**components** 156:15
162:20 172:25
208:11,16 218:11
227:16 274:2,18

**composite** 290:14,
16

**comprehensive**
158:3,21,25 159:3,9,
16 160:1,7,12,17,21
161:7,10,13 162:1,2
163:16 165:5,8,19,
25 227:17 228:1,9,
14,22 229:5,11
230:22 231:12,17,21
232:3 234:17 273:25
274:16

**conclusion** 246:14

**condition** 157:18,21
166:25 167:6
177:16,20

**confirm** 205:22
211:21 286:8

**confused** 163:8
288:18

**confusing** 268:6

**conjunction** 180:17

**consecutive** 204:7

**considered** 160:19

**constitute** 215:7

**constitutes** 212:15

**consultation** 157:3
158:11 161:22 163:9
164:8 177:11 195:21
218:9 223:18,19
236:24

**contact** 286:24,25

**contacted** 265:9

**contained** 261:5

**context** 241:6
265:23

**continuance** 183:9

**continue** 155:9
213:15,16 214:24
247:9

**continued** 155:6
242:25

**Continuing** 248:19

**conversation**
281:21,22 282:5
289:19

**convert** 187:25

**convicted** 295:11

**copied** 182:12 204:4

**copies** 155:18 202:4
275:7

**copy** 200:1,25 260:4
280:21

**corner** 155:14
169:17 181:21
243:23 271:20

**correct** 156:2,3,13,
14 158:19 159:1,2,
19 162:8 163:25
165:5,6 169:2,19
170:4,25 172:3,4
173:18,19,23,24
174:8,9,15,25
175:19 176:2,17,19,
20 177:9 178:13
185:7 186:6,24
189:17 190:9,23
192:4,16,20 194:2,3
195:2,25 196:13,19
197:4,18,22 198:1,
20 205:9,10 207:5
208:1 209:21,25
210:1,11,18 211:19
212:2,5,6 213:4,5
214:15,19,21,22
215:1,5,6 216:3
217:5,10 219:23,24
220:9 221:5,8 223:9
225:7,8,15,25 226:5,

9 227:2,19,20
228:15,21,22 229:6
231:13 232:6,11,12
235:13 236:8,9
237:7 240:24 241:3,
19 242:6 243:14
244:13,17 247:7
250:15 251:4 252:3,
7 253:6 254:15,20
255:1 256:14,22
257:25 258:2,6,10
259:3,6 262:2
264:10 265:1,3,7,16,
25 270:23 271:13,
14,18 273:22
276:14,24,25 277:2,
12 278:15,19,20
279:4,7,8,9,10,14,19
280:12,13,18
281:17,25 282:6,7
283:6 284:5,11,14,
17 286:2 288:4,6
289:23 291:4,5,18
292:6,16 293:13
295:7,9

**correction** 246:9

**correctly** 208:13
230:19 242:24 246:9
251:16 256:16 274:4
293:6 294:14

**couldn't** 224:1

**counsel** 245:19

**count** 260:13

**counted** 260:9

**Counting** 216:22

**court** 173:10 203:15
234:23 256:13

**cover** 204:23 205:1
235:4

**coverage** 248:1,14
252:7

**covered** 255:21

**CPT** 155:15,19
158:10 207:23
218:14 227:12
230:22 240:2 242:23
252:10,17 253:8,16,
23 254:5,14,20
264:3 274:2

**created** 293:14

**crime** 295:11

**curvature** 190:4
197:22

**curve** 190:2 196:3,7
197:16

---

## D

**dad's** 187:21

**date** 173:16 192:18
217:6 261:15,16,17
271:10 273:15 277:5
279:6,18 280:14
291:4

**dated** 192:15 271:16

**dates** 261:22

**day** 177:11 215:21,
24 223:21 236:10,23
287:12

**December** 293:16

**decide** 262:24
264:19 290:1 293:4

**decided** 263:1
281:20

**decides** 242:7

**decision** 165:14
166:21,24 167:5
168:14 169:24
170:1,15 232:8,25
237:23 239:22 240:2
241:11,18,20,22
242:5,10 286:4,11,
13,16 287:3,13

**decision-** 169:7
213:7

**decision-making**
166:7,12,19 167:7,
14,18 168:2,7,8,19,
20 169:6,12,18,22
170:10,14,16,24
171:5,10,12,17,18
172:2,9,14,15
208:12 213:3 215:7
227:18 232:6,9,13,
21 233:10,13,20
234:3 242:15 274:1,
17

**decisions** 170:2
177:24 242:1

**deductible** 263:13

**degrees** 222:11

**delivered** 201:11
281:10

**demand** 246:6
247:17,19 251:2
257:17,20 259:1
262:13,14 278:10,11
279:4,16 280:3,4,7
281:11 282:14 283:2
286:6,22

**demanding** 279:17

**demands** 285:24

**denial** 258:22

**denials** 240:19

**deny** 263:3,4

**depend** 237:13

**depending** 219:10
240:13

**depo** 217:25

**deposition** 155:3,9,
10 173:12 181:13
183:18 185:17,19
191:12 203:18
204:19 216:16 218:3
221:21 224:19
234:25 237:5 243:18
253:7 255:15 259:13
269:20 270:7 272:11
275:11 277:21
278:2,12 281:1
290:9

**describe** 176:7
218:8

**describing** 278:12

**description** 166:20
207:12 218:12

**desk** 249:19

**detail** 158:8,12
176:10

**detailed** 158:6,9
159:4 160:1,6,18,20
161:8,14 164:15,17
165:1,9,20 208:11,



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

12,24 209:13,14,16 210:2,7 211:3,14,22, 24,25 212:1,5,11,15, 20 276:4

**detailing** 164:19,20

**details** 159:8,15

**determination** 166:21 168:12,17

**determinative** 162:12

**determine** 163:10 172:19 204:9 264:22 267:10 286:10

**determining** 180:21

**Diagnoses** 189:22

**diagnosing** 180:20

**diagnosis** 161:23 163:17,21 167:21 168:13 172:20 190:17 233:11

**diagnostic** 165:14

**Dictaphone** 210:18

**dictate** 195:6

**dictated** 195:9 210:11,18 228:24 229:1 230:11

**dictating** 210:9,16, 21

**dictation** 188:3 200:10,16 211:10 225:12

**dictations** 200:8,9

**didn't** 217:17

**difference** 159:3,25 160:11 161:13 165:8,19,22 168:6, 18,19,21 170:14 171:16,23 172:13,23 184:7 186:14 268:10 283:3

**differences** 160:25 161:3 169:9

**differently** 230:5

**direct** 155:6 251:7

**directly** 182:17 244:11

**discharge** 219:2,6,8

**discharged** 226:6, 25 232:1,11,23

**discovery** 259:22,23

**discretion** 251:15

**discription** 294:6

**discussed** 159:24 160:19,23

**discussion** 203:17, 22 238:22 242:13,14 272:7 274:22,25 287:9 289:13 290:8

**discussions** 243:12 269:8

**dispute** 274:25 290:24

**disputing** 237:18

**distinguish** 239:7

**distinguishing** 162:16

**DLP** 194:1,4

**doctor** 159:17 160:23 163:19,22 167:1,4,5 174:6 180:19 187:19,21 226:11 241:12 244:7

**doctors** 159:8 170:2 219:10

**doctors'** 187:20

**document** 181:22 186:10 190:6 196:15 206:7,14,17 207:17, 19,20 210:11 220:18 225:4 226:16 228:7 229:8 231:16 243:24 244:2 259:17 276:11 292:15 293:11

**documentation** 198:12,14 267:7 269:5 273:25 274:3, 16,19 289:5 290:25

**documented** 190:16 191:7 200:20 201:14 215:17 231:5 274:23

**documents** 191:12, 24 275:23 278:6 281:14 290:14,19

**don't** 180:7 206:16 221:14 236:12 247:24 252:23 267:16 270:25 275:7 290:19 293:25 294:1

**door** 264:24

**DOS** 273:14

**double** 202:15

**doubt** 261:9,24

**down-** 264:11,14 265:22 268:2 277:14 289:2

**down-code** 264:20 265:17,20 266:3,5, 24 267:3,4,22,24,25 281:21 282:14 284:25 285:15,18 288:22 289:2,15

**down-coded** 268:8 277:4,19 283:12

**down-codes** 283:7 284:18,22 287:23 288:9

**down-coding** 264:12 268:5 269:9, 24 270:3 277:10 283:9 285:8 286:1 289:19

**down=coding** 268:4

**drafted** 244:22,25

**drafting** 245:10

**due** 263:22

---

**E**

**E&m** 156:12 207:24 217:12 265:23

**earlier** 237:5

**early** 243:12

**easier** 214:8

**element** 161:17 231:13 234:18

**email** 176:23

**enclosed** 280:21

**encourage** 208:2

**end** 270:7 287:12 295:24

**ends** 290:20

**enter** 223:8

**entire** 199:25 211:13

**entirety** 250:14

**entitle** 263:19

**entitled** 244:16 263:17

**entries** 186:8,20 207:24 211:7 222:8, 18 223:13

**entry** 184:11 186:7 211:4 215:2 272:22 273:1

**envelope** 290:15,20 293:11

**equals** 284:13

**erased** 200:11,14 211:11

**essentially** 160:7 198:18

**established** 208:10

**estimate** 262:11

**EUO** 263:4

**evaluated** 226:23

**evaluation** 155:22 181:18 183:13 198:7 205:6,16 206:23 207:14 208:9 215:3 220:15,16,20 222:3 223:6,14 224:1 225:5,14,18,23 227:6 235:6,11 236:9,23 238:19 241:8 243:9 265:8 272:5

**evaluations** 238:18 239:21,23 241:13

**exam** 179:9 273:25 274:16

**examination** 155:6 158:12 160:12 161:18,21 162:24 163:15,23,25 164:4, 13,16,17,19,20,23 165:1,5,8,9,13,19,20 177:9,18 178:7 179:3 180:4 197:15 205:13 208:12 209:7,11,12,13,14 212:5,11,12,15,20,23 227:18 231:12,17, 18,20,21 232:3 234:17 240:6

**examinations** 165:23

**examine** 159:9 161:23 163:11 231:25

**examined** 226:23

**examining** 157:1 177:10,14 178:5 180:14,20

**exhibit** 155:10,11 173:12,13 181:13,14 182:3 183:18,19 185:17,18 186:13 187:3,11,16,25 188:1,6,14,20 189:5, 15,18,21 190:24 191:3,7,11,13 199:8, 10 201:1,2,3 202:2 204:3,4,18,20 205:12 207:22 209:20 211:2 216:16,23 218:3,4,7 219:16 220:1 222:1, 3,6,21 224:6,18,20 225:11,12,17,19 227:11 231:5 234:25 235:1,16,21 236:19 243:18,19 259:12, 14,22 260:9 261:5 271:9 272:11,12 275:22 276:19,20 277:20,22 278:1,3,9 279:3,12 280:10,11, 12,17,25 284:2 287:17 290:13,14,16 292:2

**exhibits** 217:25 222:1 271:5 273:21 275:12 278:9



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    Index: existing..gave

**existing** 174:4

**expand** 157:20,22, 23

**expanded** 157:7,10, 15 163:10 164:4,12, 22 168:24

**expanding** 163:15

**expect** 182:10 216:1

**expecting** 194:21 285:14,19,21

**expects** 252:5 284:10,15 288:3

**experience** 183:8

**explain** 159:2 165:11 166:10 168:5 169:21 176:9 208:22 212:9 213:6 240:3,4 242:21 249:3,17

**explained** 209:8 213:11 214:20 250:7,9

**explaining** 169:8 276:16

**explanation** 161:9 182:21 212:14,18 249:15,18,21,23 276:1,3,12,15,19 282:10 286:17

**extent** 212:25

**extra** 202:19

**extremity** 212:13

---

**F**

**face** 159:7,18,21 162:7 163:9,10

**fact** 186:7 261:9 280:19

**factor** 162:12

**factors** 162:20

**failed** 273:24 274:15

**failure** 256:13

**fair** 258:11 282:3 288:8

**fairness** 194:10

**false** 252:11,20 253:18,24 254:7

**familiar** 193:9 264:11

**familiarize** 191:16

**Farm** 203:10 207:17 225:17 234:13 250:18 252:2,10,12, 19,20 253:3,16,24,25 254:7,8,21,23,24 255:2 256:24 257:2 258:13,19,23 259:2, 21 261:10 262:1,4,5, 19,20,24,25 266:14, 16 269:9,18 272:3,7, 17 274:22 276:7,10 277:1,4 278:15 279:13,17,23,25 280:6 281:20 282:8, 15 283:7 284:18,22 285:12,16 286:1 287:23,24 288:8,21 289:5,9,10,25 290:20,25 292:24 293:1,2,7

**Farm's** 272:18 276:16 277:14

**fax** 176:23 192:12 193:2,12 204:23 205:1,3,8 207:6 235:4

**faxed** 193:17

**February** 173:17 183:23 186:23 192:15,18 193:18 194:14 200:4 205:8 207:7 208:4,18,23 211:14 212:10,21 213:6 215:9 236:14, 21

**Fee** 285:13

**feel** 201:9

**feeling** 209:24 211:17 228:3 229:4 230:17

**Feijoo** 156:25 158:1 161:25 165:12,15 176:10,15,17,21 177:7 178:11,16

179:2,8,22 180:14, 18,22 183:24 185:6 188:3 190:9 191:8 192:19 193:23 194:5 196:6,12 197:20 198:5 199:6,18 201:14 204:10 205:15,21 208:16 210:16 211:14 212:19,23 217:4 219:7 222:18 223:11 225:10 226:11,22 232:8,9 234:13,17 235:5 236:6 238:15 240:10 241:2,7 242:1 244:9,10 247:2,3,7 249:2 251:18,24 252:1,5,9, 16 253:3,17,22 254:6 256:10 257:2, 4 258:4,5,7,8,12,18, 19 259:1,5 261:10, 25 262:3,4,19 263:7, 16 264:24 265:9 266:3 267:3,4,6 274:7 276:6,16 277:2,14 278:23 279:13 282:13 283:9 286:4,12 287:15,16 293:4

**Feijoo's** 183:13 193:17 194:21 205:1,11 208:17,23 212:9 213:6 215:9 219:16 222:2 226:7 235:11

**figure** 163:20 177:15

**file** 183:3 220:18,21, 23 251:2 257:11 258:8 259:2 261:16 262:14 267:6 280:3 286:24

**filed** 260:21 261:6, 14,18 262:1,4,18 263:8,16

**files** 239:16 277:17 278:14,21

**filing** 269:3 279:21 280:1 286:7 293:2

**fill** 222:18 249:8

**filled** 225:10,11

**fills** 219:22

**film** 176:23 177:7 178:19,24 179:4 181:7 190:11 195:19 199:13

**films** 176:12 178:17 179:23 180:23 190:10 195:3,8,20 198:10,13 199:15 200:2 201:15 204:10

**final** 219:2,3,4,6,7 220:16,20 225:5,13, 18,22 231:2

**finally** 166:5

**finals** 231:3

**find** 160:12 163:16 182:24 194:7 200:16 201:13 231:10

**finding** 197:24

**findings** 160:13 186:21 190:12 191:9 196:2 198:6,19 199:8,19 222:20 223:8,12 224:11 225:12 226:3 236:18

**fine** 162:16 170:23 180:9 198:25 201:19 270:21

**finish** 164:11

**Fire** 262:5,20

**fix** 180:12 294:15

**flip** 290:19

**floor** 214:18

**fo** 274:1

**focus** 156:21 157:17

**focused** 164:23

**focusing** 156:25

**folks** 272:8

**follow** 287:21

**follow-** 180:15

**follow-up** 174:3,11 181:18 183:12 192:19 194:23 205:12,15 207:14

218:9,11,22,25 220:15 222:2 223:5, 7,13 224:1 227:6 231:2 236:13,14 295:5,6

**forget** 171:25 252:25

**form** 156:20 157:12 159:6 160:9 161:1 163:2 164:18 166:13 167:8,20 168:10,22 170:18 178:1,6 183:15 184:19 210:3 227:3 233:1 238:23 244:10,14,19,22 245:6,11 246:13 248:6,24 249:3,8,13 250:17,19,21 251:6, 19 252:13 258:14 271:16 273:12 280:24 281:6 292:2, 3 293:15 294:10,12

**forms** 249:7 264:3 270:6 273:20

**Forty** 294:25 295:2

**forward** 189:4 258:8 262:7,8 280:1

**found** 204:24 226:12,23

**foundation** 156:20 157:12 159:6 161:1 163:2 164:18 166:14 167:8,20 168:11,22 170:18 178:1,6 233:1 234:21 246:13

**free** 162:18 226:13, 24 234:19

**front** 208:21 219:14, 15 220:1 221:7 227:13 249:19

**full** 212:25 252:3,6 257:2 258:24 263:1, 3 283:5 284:24 287:24 288:3,10,11

**fully** 213:11 214:20 234:14 254:15,20 259:6

---

**G**

**gave** 201:23,25



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    Index: general..involve

218:16 234:1 275:14

**general** 238:22
240:18 241:24 253:1

**generally** 238:19
239:23 280:1

**give** 181:11 200:20
201:8,20 242:9
244:7,10 249:8
262:12 275:6

**giving** 235:10 250:4
253:7

**good** 186:18 210:24
216:5 255:19 278:25
279:23

**guarantee** 194:11

**guess** 156:21 217:16

**guessing** 194:9

**guys** 275:6

---

**H**

**H.P.** 158:2,19 165:16
173:17 174:14
181:23 183:23 192:3
194:13 208:18,24
211:15 212:10 213:7
215:10 217:2,3
219:20 225:1,6
226:10,11 236:7
237:1 243:24 253:9
270:10

**hand** 275:10 277:20
278:1

**handed** 181:12
218:2 259:11,12
271:8,15 275:21

**handful** 295:19

**handing** 155:9
173:12 183:18
185:17 191:11
204:18 206:5 216:15
224:18 234:25
243:17 272:10
290:13

**handwriting** 183:12
184:10 189:7 195:13
210:20 214:4

**handwritten** 182:1
187:2 188:3,19
195:15,17 200:3,22
201:16 210:22
211:6,8 213:22
219:17 221:6 222:2,
7,22 235:23

**handy-dandy**
284:12

**happen** 250:23
269:17

**happened** 194:13
199:3 202:23 216:2
225:9 226:10,21
238:12 267:1,17
268:13 269:15
281:13 282:12

**happening** 177:7

**happy** 279:23

**HAZOURI** 155:7,
13 156:22 157:13
159:11 160:15
161:2,11 163:6
164:21 166:2,16
167:10,23 168:15,25
170:21 171:24
172:21 173:8,11,15
178:2,9 179:17
180:3,9,12,13
181:16 183:21
184:20,22,23 185:3,
21,22 186:12,16
187:7,14 188:8,10,
11,17,18 189:2
191:15 196:17,23
197:7 198:4,23,25
199:1 201:4,6,25
202:4,7,10 203:11,
21 204:2,15,22
210:5 216:6,10,12,
14,20,22,25 217:19,
21,23 218:1,6
221:11,14,24 222:24
223:1,4 224:17,23,
24 226:18 227:4,10
228:8,13,20 229:10,
17,19 230:4,6,8
232:17 233:3
234:22,24 235:3
238:4,6,9,10,24
239:5 243:21
245:20,23 246:3,4,
16,22 247:10,14,16

248:18,20,21
251:10,12 252:15,24
254:4,13 255:11,18
257:8 258:15 259:16
268:12 270:5,12,16,
19,21,25 271:2,4,7
272:14 273:8 275:5,
9,14,17,20 277:24,25
278:5 281:3,4 282:3,
4 283:17,19 287:17,
19 288:15,17,25
290:4,12,18 293:21,
23 294:3 295:13,17,
20

**HCFA** 217:17 270:6
271:8,15

**HCFAS** 270:13

**heads** 266:18

**hear** 168:16 238:7

**heard** 249:20

**heavy** 214:16

**held** 203:17 221:20
255:14 290:8 295:23

**helps** 177:19,23

**hey** 265:13

**high** 169:13,18,23
170:6,10,16 171:12,
17 172:9,15 227:18
232:6,13,21,24
233:10,13,20 234:3,
5

**higher** 157:4 169:1,7
265:24

**highest** 173:25
174:10 218:21,25
227:5

**highly** 214:23
232:24

**history** 156:16,19
157:2,8,11,16,18,21
158:6,9,12,21,25
159:4,9,10,16,25
160:1,7,8,12,17,18,
20,22 161:9,13,14,24
163:4 164:20 165:13
208:11,24 209:6,11,
16,19 210:2,7 211:1,
3,7,14,22,24,25
212:1 226:13 227:17

228:1,2,9,14,22
229:2,5,11 230:16,
22 231:5,9

**hold** 219:13 230:6

**hole** 192:23

**horse** 233:6

**hours** 238:5

**hypotheticals**
283:21

---

**I**

**identical** 186:7,8,22

**identification**
155:12 173:14
181:15 183:20
191:14 204:21
216:24 218:5 224:21
235:2 243:20 259:15
271:6 272:13 275:13
277:23 278:4 290:17

**II** 155:2 295:24

**illness** 156:21
160:13 161:8 209:7,
19 211:1,25 226:14
228:2 229:2 230:16

**IME** 263:4

**inappropriate**
263:13 266:6

**include** 251:3

**included** 208:24
212:10 213:7

**includes** 173:22
251:24

**including** 256:12

**incorrect** 252:11,19
253:18,25 254:8
294:17,18,22 295:1

**increased** 156:11

**increasing** 156:12

**indicating** 273:24

**information** 206:8
207:2,3 212:22
235:10 261:5 268:8,
9 276:15 289:4,15

228:1,2,9,14,22
229:2,5,11 230:16,
22 231:5,9

**initial** 231:2 239:21,
23 264:24,25 265:8
272:5 281:15

**initials** 225:1 270:9

**initiate** 269:3

**injection** 237:14,15

**injured** 248:13

**injury** 157:1 190:2
196:4,8,9 197:17,25
256:6 278:21

**input** 242:10

**inside** 281:11

**instance** 238:12

**instruct** 249:24
250:3

**instructing** 246:7
248:8

**instruction** 213:9

**insurance** 175:14
206:15 240:14
244:8,11 248:23
250:5,13 256:4,6,8
262:5,20 278:10
285:8 286:25 288:24

**insured** 248:2
256:19 279:4

**insurer** 244:15
248:1 250:13,18
251:6,15 256:8,9,21,
23 257:1,5,12,21,23
258:3,5,7,9 281:11

**insurers** 250:22
251:19 252:2 254:25
255:5,8

**intentionally** 256:4

**interaction** 269:6

**interest** 256:5

**interpretation**
184:21

**interruption**
204:14,17 224:16
270:4 275:4 287:18
290:3

**involve** 233:12



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                 Index: involved..mischaracterizes

**involved** 233:10,20 234:2

**involves** 253:2

**issue** 204:8 239:17 242:16 252:18

**issued** 176:11 253:16 272:3 277:1 281:15 282:8

**issues** 252:2 276:10

**issuing** 254:22

**It's** 165:25

---

**J**

**J.B.** 271:16 273:4,6, 7,9 276:21 279:4,13 280:12 281:16

**January** 186:23 262:8

**Jerry** 251:10 275:5, 14

**July** 271:10,16 272:5 273:15 276:7,23 277:5 279:6,12 280:14 281:16 284:3

**justifies** 215:8

---

**K**

**Ken** 217:16 229:16 270:19 275:5,18

**Kenalog** 237:15

**Kenneth** 278:18

**key** 208:11

**kind** 162:19

**knees** 214:17

**knowingly** 256:3

---

**L**

**language** 198:19 245:15 250:13 251:7 254:18 255:7,22 273:2

**law** 256:13 257:7 278:17

**lawsuit** 251:2 252:10,16,21,25 253:2,5 256:20 261:1,17 262:14 278:14 279:22 280:1 293:3

**lawsuits** 259:20 262:1,3,17 278:22

**learn** 159:10

**leave** 217:24

**left** 197:24,25

**left-hand** 155:14 169:12,17

**legal** 246:14

**legs** 221:15

**lesser** 283:8

**letter** 257:17,20 278:10 279:17 280:3,4,7,10 283:2 286:6,22

**letters** 278:11 281:11

**letting** 162:21

**level** 157:5 169:1,7 174:8 218:19,21,25 227:5 264:19 265:18,19 267:8 274:3,19 294:4,16, 21 295:1,4

**levels** 156:4,5,12 162:17

**lifting** 214:16

**Limit** 214:12

**limitation** 213:9

**limited** 186:3

**list** 259:20,25

**listed** 156:1 159:4,5 164:13,23 165:8,9, 19,20 166:12,19 167:19 168:7,9 170:15,17 171:17,19 172:14,16 175:25 176:4 209:20 274:2, 18

**litigation** 269:3

**log** 272:16 281:19,24 282:1,7

**long** 215:23 239:9 243:1 245:2

**longer** 225:25 248:16

**looked** 168:1 194:16 195:19 200:7 204:10,11 222:7 236:17 252:17 253:9 264:2 281:20

**lordotic** 190:1,4 196:2,7 197:16,21

**loss** 246:6 247:18,19 248:5

**lost** 248:2,3,14,24

**lot** 175:14 237:15 239:21 264:6,8 278:21

**lots** 183:6 239:14

**low** 167:14,18 168:8, 20 169:8 214:14

**lower** 212:13 265:24

**lumbar** 185:10 197:16 212:13 222:10,15 223:9

**lumbosacral** 185:24 186:4,22 190:3 192:9 197:9,20

**lunch** 155:8

---

**M**

**M.D.** 247:3 256:10

**made** 232:9 237:23 239:22,23 241:10, 11,22 251:15 286:11

**make** 166:24 170:2 177:24 181:8 199:3 216:8 224:11 229:24 232:1 233:6 247:12 251:19 269:14 272:2 286:13 287:2,22 293:6,7

**maker** 242:10

**makes** 167:5 277:8 286:4,16

**making** 169:8 190:11 213:8 240:22 242:1

**management** 155:22 208:9 243:9

**manner** 237:24

**manuel** 247:2 256:9, 10 274:7

**March** 217:4 219:19 225:6,10 226:12,22 227:22 231:16 233:8,9,19 234:14 235:5 291:4

**mark** 204:16 235:23 293:8

**marked** 155:10,11 173:13 181:12,14 182:2 183:19 185:18 187:3,11 188:19 191:3,11,13 199:8, 10 204:18,20 216:15,23 218:2,4 222:21 224:18,20 225:17,19 235:1 243:17,19 259:10, 12,14 271:5,9 272:10,12 273:20 275:12,22 276:19,20 277:20,22 278:1,3 280:25 290:16

**marking** 259:10

**marks** 235:22

**matches** 273:18 279:11 280:17

**math** 291:23

**matter** 199:25 288:15,17

**matters** 159:24 160:19,22

**meaning** 166:11,18 223:21 274:20

**means** 172:6 182:12 226:1 260:21 272:18

**meant** 274:13,14

**measures** 293:20

**med-pay** 256:21 257:4 258:25

**media** 155:4 221:22 290:11

**medical** 157:21 164:19 166:7,11,18, 21 167:6,14,18 168:2,6,8,19,20,23 169:6,7,12,18,22 170:10,14,15,16,24 171:4,10,12,16,18 172:2,9,13,15 176:7 177:15,24 181:23 182:13 192:22 193:17,22 194:5 195:1,4 201:11 205:4,13,16,21 206:5,9,13,22,24 207:8 208:12 213:3, 7 215:7 225:4 227:18 232:6,8,13, 20,25 233:10,13,20 234:2 235:6 239:16 246:1 247:1 252:7 256:7,9 264:18 269:21 273:13 274:1,6,17 290:24

**Medicare** 175:13 285:13

**meet** 273:24 274:15

**meeting** 219:23 238:15 242:16

**meetings** 240:9,17, 25

**meets** 163:19

**merit** 294:1

**might've** 229:1 230:11 269:15

**mind** 159:14

**mine** 260:8

**minute** 162:3 215:22 294:20,25 295:2

**minutes** 162:6 216:13 221:12 294:5,17,21 295:1, 16

**mischaracterizes** 257:7



misleading 254:8

missing 182:23
183:3 188:22 189:1

misspoke 188:5

misunderstand
292:9

Mm-hmm 197:11
203:1 206:11 236:2
245:18 253:14

moderate 168:2,7,
20,23 169:6 170:5,
14,25 171:5,13,18
172:2,14 208:13
213:3,8 215:8 274:1,
17

moderated 173:2

month 215:3 240:1,
15

monthly 240:17

motion 176:1 183:22
184:4 186:4,20
187:3,10 188:2,6
189:19 207:6,13
208:4 217:13 220:5,
14,17,23 221:2
222:3,9,10,17,19,20
223:8,12,15,17,22
224:6,11,12 225:11
226:3,4,24 235:17,
21 236:6,17,22
238:20 241:8,12
242:22

move 164:2,15
200:23 210:25 258:8
280:1

moving 157:4 189:4

multiple 170:19
290:14

muscle 190:2 196:4,
9 197:17 198:1

mutual 252:3,11,12,
20 253:3,16,24
254:7,9,21 255:2
258:13,19,23 262:4,
19 278:15 279:17
292:25

**N**

names 272:6 273:3

necessarily 282:20

neck 157:1

needed 213:16

negative 235:24,25
236:7

newer 292:15

nitpicker 188:16

no-fault 256:5

normal 190:1,3
196:2,7 197:16,21
222:12 226:4

notate 223:12

notating 222:22

notation 181:8
187:2

note 182:2 195:13,
15,17 210:20,22
211:21 219:17
222:22 277:17

notes 187:25 188:3
200:3,22 201:16
208:3 219:22 220:16
221:6 222:2,7 269:5
272:16 274:23
281:19,24 282:2,8

notice 162:5 269:3

noticed 270:5

noting 236:7

November 293:16

number 181:20
182:6,9 184:14
189:22 214:12,14,16
217:21 260:15,24
271:21 272:18 274:8
278:25

numbering 260:4

numbers 175:21
202:25 204:7

**O**

object 184:18
251:21

objection 156:20
157:12 159:6 160:9
161:1,5 163:2
164:18 165:24
166:13 167:8,20
168:10,22 170:18
171:20 172:18
178:1,6 179:14
180:8 186:10,15
187:5,12 196:15,21
197:5 198:2,21
210:3 222:23 226:16
227:3,8 228:6,10,16
229:7,13 232:16
233:1 234:21 238:2,
23 246:13,21 247:9,
11,14 248:18,19
252:13,22 254:2,12
257:6 258:14 288:13
293:20

objects 251:14,25
254:21

occasion 267:5

occasionally 179:15

occasions 268:24
269:1

occur 270:13

occurred 199:11
210:14 275:1

offer 199:24

office 174:3 176:20
180:15,16,17,18
181:3 183:23 193:18
200:4 205:11,12,17
207:6,7 208:8,18,23
211:15 212:10 213:7
215:3,9 217:3,12
218:9,11 219:19
227:6,22 231:9,16,
22 232:21 233:9,19
234:2 240:4 245:10
264:25 265:9 274:7,
8 278:19 281:15

Offices 278:17

opinion 198:11

210:4 230:24,25

opportunity 201:9
257:23

opposed 160:20
171:12 178:17
223:14

options 180:21

order 182:13 246:8
248:10

ordered 193:23,24

original 183:3 203:5
239:25

orthopedic 181:18
183:13 198:7 205:6,
12,16 206:23 220:20
222:2 223:6,7,13
224:1 225:5,13,18,
22 235:5

outpatient 208:9

overdue 256:5

overriding 241:22

owner 242:3

**P**

P.A. 219:7 234:13
235:5 247:3 251:18,
24 252:1,5,9,16
253:3,17,22 254:6
256:10 257:4 258:4,
8,12,19 259:1,5
261:10,25 262:4,19
263:16 264:24 265:9
266:3 267:3,4 276:6,
16 277:2,14 278:18
279:13 282:13 283:9
286:4

P.a.'s 249:2 257:3
263:7

p.m. 155:3,5 193:18
203:16,20 221:19,23
255:13,17 290:7,11
295:22

pages 183:7 192:11
220:19 221:3 280:20

paid 248:5 250:6
252:6,12,20 263:7,

12 267:19,25 268:5
283:15 284:10,16
286:23 288:3 289:5,
6

pain 157:2 186:21
209:24 211:18
222:11 225:25
226:13,24 234:19

painless 225:23
232:10

paragraph 191:7
245:21 251:8,11

part 157:3 158:11
162:13,14 163:22
164:8 177:8,18
178:4 179:3,9 180:3,
17 211:24 225:12
236:9,23 237:19
241:8 248:1 257:19
262:25 271:24

partial 251:14,20
254:22 263:10
286:23 287:8

participated
241:11,18 245:10

past 157:23 180:25
238:3 264:16 289:24

patient 156:1,21
157:17 158:2,19
159:8,10,17 160:6,
14,24 161:8,23
162:7 163:5,9,11,18,
20,21 165:16 166:24
167:22 168:13
169:25 170:2 172:20
173:17 174:4,5,14
176:15,18,23 177:9,
10,15,24 178:5,7,10,
22 179:9,21,22
180:2,14,19,20,21,22
191:25 192:3,20
194:13 195:4 205:20
206:8,12,22 207:4
208:10,18 209:7,9,
22 211:16 212:21,
23,24 213:16
214:20,23 215:16,24
219:1,2,3,11,23
220:18,20 222:19
223:19 225:6,10,25
226:4,6,11,14,22
228:2 229:3 230:16



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        Index: patient's..question

231:25 232:9,23
233:17 234:18
235:12 236:6,23,24
237:1,25 238:12
239:3,7 240:6 241:7,
10,24 242:23 243:24
244:9 246:18,19,25
247:5,22 248:2,4,5,
16,22 249:3,15,17,24
250:3,9 251:21
253:9 262:23 270:8,
11 271:9,16 273:3,6
274:3,19 276:20,21
279:13 280:11,12
281:16 284:2 286:25
292:11

**patient's** 167:6
177:20 179:23
217:20 237:1

**patient/insured**
256:3,12

**patients** 170:3
175:13 178:8 237:13
240:16 241:23
244:7,18 270:12
271:21,24 273:4
277:6 282:10

**pay** 246:8 248:9
256:13,24 257:2,24
258:7,23,25 259:9
262:13,14,24 263:1
264:22 279:25 280:6
285:8 287:24 290:1

**payable** 252:3 259:6

**paying** 254:1,9
283:12,13,16 285:1,
13

**payment** 251:20
254:22 263:10,20
268:17 276:4,10,11,
16 277:1 279:18
282:9,13 286:20,21,
23 287:2,8

**payments** 251:14
252:7 256:5,7 287:6

**pays** 258:3 279:23
283:8 284:22 288:9

**penalty** 258:1,4

**percentage** 184:13
185:9

**perfectly** 170:23

**perform** 234:17

**performed** 168:14,
17 169:25 178:25
190:19,21 192:2
212:19 225:6

**performing** 236:6

**period** 261:25
262:22

**person** 248:12
265:11,13

**personal** 256:6
278:21

**pertaining** 264:18

**phone** 217:21
288:23

**phrase** 169:22
172:5,6

**phrases** 172:23

**physical** 213:16
231:18,19

**physician** 160:20
294:13

**physiotherapy**
209:23 211:17
214:24 228:3 229:3
230:17

**pick** 241:5

**picking** 214:17

**pillow** 214:14

**PIP** 244:12 245:25
246:7,18,19 247:1,6
248:1,9,13,23
250:17,22 251:2,18
252:2,6,7 254:24
255:8 256:7,13,19,
20,21 257:1,3,4,11,
20,23 258:3,5,7,8,9,
13,20,24,25 259:2,20
260:9 261:6,11
262:1,18,21 263:17,
19,21 264:1 269:3,4
278:14 279:18,22
282:15 284:8 286:7,
22

**PIVNIK** 156:20
157:12 159:6 160:9

161:1,5 163:2
164:18 165:24
166:13 167:8,20
168:10,22 170:18
171:20 172:18
178:1,6 179:14
180:1,5,10 184:18,
21 185:2,20 186:10,
15 187:5,12 188:5,9,
16,25 196:15,21
197:5 198:2,21,24
200:25 201:22
202:1,6,9 203:7
204:1 210:3 216:5,
18,21 217:16,20,22
222:23,25 224:22
226:16 227:3,8
228:6,10,16 229:7,
13 230:3,7 232:16
233:1 234:21 238:2,
5,8,23 239:2 245:22
246:2,13,21 247:9,
12,15 248:19
252:13,22 254:2,12
255:10 257:6 258:14
268:7 270:10,18,24
271:1,3 273:7
275:16,19 282:1
283:15,18 288:13,16
293:19,22 295:15,18

**Pivnik's** 246:9

**place** 195:18 201:19
239:8 245:7

**places** 223:7

**plaintiff's** 155:11
173:13 181:14
183:19 185:18
191:13 204:20
216:23 218:4 224:20
235:1 243:19 259:14
271:5 272:12 275:12
277:22 278:3 290:16

**plans** 207:1

**point** 190:17 194:24
209:13,16 210:16
217:16 238:16
245:16 263:15
269:21 285:7

**policy** 252:6,7 256:5,
7 257:3,4 284:9

**position** 252:9,17,21
254:10,14

**possibility** 268:3

**possibly** 196:3,12
197:3,17,24,25

**postage** 258:1,4

**potential** 286:7

**practice** 249:3
286:15 288:17,19

**preparation** 286:6

**prepared** 173:16,20
217:3

**present** 209:6,19
211:1,25 226:14
228:2 229:2 230:16

**preservation**
293:24,25 294:2

**preserved** 293:21,
24

**pretty** 187:11 264:6

**previously** 165:18
278:12 279:22

**price** 285:14

**prior** 184:4 222:7
233:25 246:2,5
247:17

**private** 175:14

**proactively** 249:15

**problem** 157:24
161:23 163:5,10,14

**problem-** 164:22

**problem-focused**
156:16,18 157:2,7,
10,16,23 161:18,21
162:24 164:4,13

**procedure** 187:24
292:15

**produced** 181:23
201:1 206:6 272:17,
19

**Progressive** 264:16
265:2,4,13 266:1,12,
21,23 267:12,17
268:21,22 269:6
289:7

**promise** 191:20

**proper** 179:7 234:14
252:3 253:20
254:16,21 288:5

**properly** 208:17
231:22

**protection** 256:7
278:22

**provide** 190:13
207:3 288:20 289:16

**provided** 249:15
264:18 269:21 290:1
294:13

**provider** 174:11
205:18 206:25 246:1
247:2 251:13 273:24
274:12,15

**provider's** 274:3,18

**providers** 256:9

**provision** 246:12

**pull** 203:2 207:23
227:11 284:12

**punch** 192:23

**purpose** 178:3
210:13

**purposes** 211:15
212:15,20

**pursuant** 254:18
257:14,15 258:25
280:6

**put** 162:15,18
195:13,22 198:6

**putting** 199:19

___

**Q**

**question** 162:22
166:15,17 170:19
171:22 172:12 175:6
180:11 182:15,18
188:12 189:5 191:2
200:18 208:6 210:6
212:17 223:5,11
228:22 229:14,20,21
230:10 233:4 238:9
240:14,15 242:11
249:9,12,14 252:23
266:8 269:12,13



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

295:10

**questions** 224:10 234:12 295:19

**quick** 203:12 206:3 221:25 236:13

---

**R**

**Radiology** 194:1,4

**raised** 293:23

**range** 176:1 183:22 184:4 186:3,20 187:2,10 188:2,6 189:19 207:6,12 208:3 217:13 220:5, 14,17,23 221:2 222:3,9,10,17,19,20 223:8,12,15,17,22 224:6,11,12 225:11 226:3,4,24 235:17, 21 236:6,17,22 238:20 241:8,12 242:22

**rate** 195:25 285:23

**ratings** 222:12

**ray** 181:9 189:15 190:7 201:5,15 214:21

**rays** 178:4

**re-statement** 197:2

**read** 184:11,13,14 185:12 187:2,6 189:9 208:13 214:8 230:15,18 245:24 246:8 250:14,18 251:7,13,15 255:22 256:16,23 274:4

**reading** 213:22

**reads** 179:8

**ready** 191:17,18 208:2,25

**real** 203:11 206:3 221:25 236:13

**reason** 232:2 234:1 235:9 251:24 261:9, 24 262:24 263:1,2,4, 6 290:23

**reasons** 234:6

**recall** 175:8 202:16 223:20 237:5 242:13,14 269:8,13, 14 274:21,22 277:19 289:8,10,12,13

**receipt** 250:14

**received** 246:8 248:10 273:13,23

**receives** 250:18

**receiving** 209:23 211:17 228:3 229:3 230:17 282:13

**recess** 221:20 255:14 295:23

**recognize** 187:1 244:2

**recognizing** 251:5

**recollection** 291:15

**recommendation** 213:21 214:4 226:7

**recommendation's** 213:24

**recommendations** 214:10 215:7

**recommended** 214:23

**record** 155:5 203:11,13,17,19,23 221:17,23 233:24 245:24 251:13 255:12,16,23 264:21 265:14 289:14,16 290:5,7,8,10 295:21

**records** 181:11 190:13 205:23 208:20 219:14,15 228:1,23 231:4,8,15 233:22 234:11 237:1 238:13 259:7,8 264:18,21 266:6 267:19,21 268:18 269:21 273:14 288:20 289:3,6,22, 25

**recover** 248:2 258:20 278:14

**redact** 217:24 270:6, 7,14

**reduce** 282:24

**reducing** 254:21

**reduction** 251:19 282:21

**reductions** 251:14

**refer** 286:5

**reference** 188:20 189:6,14,18 208:22 276:23

**referenced** 255:2

**references** 189:11

**referencing** 162:9 289:18,21

**referral** 205:18

**referred** 205:20 206:13,22 238:14

**referring** 167:3 206:24,25 235:10,17

**refers** 209:23 211:17 228:3 229:3 230:17

**reflect** 210:18 281:19,24

**reflected** 195:5

**reflects** 265:14

**refresh** 291:14

**reimbursement** 268:9

**related** 190:2 196:3, 7 197:17,25 211:7 282:18 290:24

**remained** 291:20

**remedial** 293:20

**remember** 156:4 175:18,20 184:4 190:15 194:17 195:23 234:1 236:12,19 237:3 249:10 267:16 269:15,22,25 270:2 272:7 275:1,2 281:22,25 282:5

**redact** (continued)
**remind** 217:24

**rendered** 256:11 289:17

**repeat** 212:17 230:1 252:14

**repeating** 178:4

**rephrase** 210:6

**report** 177:4,5,8 178:17,19,23,24 179:5,9,13,20,23,24 180:7,19,22 181:4,9 183:22 185:12,13 186:9,21,23 187:3, 10 188:1,2,7,19 189:19 190:10,11 192:8,9 195:7,10,18 196:1,10,13,19 197:1,2,9 198:6 199:10,20 200:4,22 201:16,17 207:7,11, 12,14 208:3,4 209:20 210:9,10,13, 17 213:24,25 220:5, 14 221:2 222:3,21, 24 223:15 224:6 225:11,23 226:8 228:12 235:21 236:18 242:22 265:5

**reported** 234:18

**REPORTER** 173:10 203:15 234:23

**reports** 176:13 183:5 192:2 193:17, 23 194:4,6,25 198:16,18 199:7,9, 18,19 221:5 224:12

**represent** 155:17 181:22 191:22 204:23 217:1 225:3 239:13 243:23 247:25 248:12 259:19 261:4 272:15 273:14

**representative** 266:23

**represents** 191:6

**request** 259:8 264:20 266:4 281:12 288:20,21 289:2,14,

15,21

**requested** 268:8 289:5,25

**requests** 259:22,23

**require** 160:10 269:5

**required** 208:16 218:13

**requirement** 227:25 257:19

**requirements** 227:21

**requires** 208:10

**rerport** 184:5

**resend** 267:9

**resending** 269:4

**reservation** 246:1,5 247:17

**reserve** 246:7 248:9, 14,17,23

**resolving** 163:5

**respects** 259:6

**response** 273:24

**responsible** 249:10 256:8

**rest** 201:20 273:1

**restrictions** 226:25

**resubmit** 289:3

**result** 177:3 188:24 196:22 248:3

**results** 177:22 214:21

**resumed** 155:3 203:18 221:21 255:15 290:9

**Return** 215:2

**reuse** 200:13

**review** 176:8,12,18, 21 178:8,12 179:11 180:7 181:1 188:21, 23 189:15,18,25 190:7,16,19,21 199:13 201:5



210:23,24 238:21
240:18 267:9
276:12,15,19 282:10
286:17 288:19

**reviewed** 190:10
191:8 195:7 199:7
200:2 201:14 209:8
234:11

**reviewing** 177:8
178:3,20 179:4
199:18

**reviews** 178:16
179:2,13,24 180:22

**right-hand** 243:23
271:20

**ring** 272:6

**routine** 285:16

**rule** 187:8

---

### S

**S.B.** 271:1,2,9 273:4,
6,9 276:20 280:11
281:16 284:3

**salary** 247:20

**sat** 238:16,17

**scan** 220:22

**scanner** 189:1 203:8

**Schurr** 216:17
221:18 245:9 270:20
278:18 281:2

**section** 214:9

**sees** 198:10

**send** 194:4 205:15
206:25 207:11 251:1
257:17,20 259:8
264:21 268:16,17,18
278:13 286:21,22
287:9

**sending** 193:23
205:12 266:5 269:2,
4

**sends** 180:6 276:11

**sense** 272:2 277:8

**sentence** 211:16,23

212:1 256:18

**separate** 209:12
220:17 222:21
223:14 242:22

**served** 285:24

**service** 173:17 176:7
179:25 180:24
190:17 191:6
199:12,21 217:6
236:5 261:15,22
264:19 267:8 271:10
273:15,19 276:5,24
277:5 279:6,18
280:15 282:9 289:6,
16 291:4 292:11

**services** 207:17
237:22 256:11

**set** 230:22 282:9

**setting** 156:15 204:8

**share** 275:7

**Sharpie** 270:8

**sheet** 193:2 204:24
205:1 235:4

**short** 210:12 255:10

**show** 193:2 238:13
245:19 281:14

**showed** 204:8
281:19

**shows** 197:15

**shy** 258:12,17,18

**sic** 271:17 280:11

**side** 169:12 181:17

**sign** 244:10,19
248:16

**significance** 184:7

**signs** 249:4

**Silver** 192:22,25
193:1,2,5,16,22
194:5 195:1,4 205:4,
13,16,21 206:9,10,
13,22,24 207:8,15
235:6,9

**simple** 172:12
291:23

**simply** 198:5 199:6
222:22

**single** 288:14 290:15

**sir** 155:16,24 156:6,
10,17 157:25 158:7,
14,17,20,23 159:20
160:4 161:15,19
162:10 164:10,14
165:3 166:4,9
167:16 168:4 169:4,
10,14,20 170:12
171:3,6,8,14 172:7,
11 173:2,6,21 174:7,
12,16,19 175:3,24
176:3,16 177:13,17
181:19 182:8,14
183:14,17,25 184:6,
9,15,25 185:25
186:19 187:23
188:4,13 189:13,16,
24 190:5,8,19 191:1,
5,18 193:20 195:16
196:5 202:12
204:12,25 205:2,14
207:9,18,21 208:14,
19 210:15 211:9
212:3,8 213:1,23
214:11,13 215:11
217:8,11,14 218:20
219:18,21 220:2,7,
12,17 221:4,10
222:4,13,16 223:10,
24 224:2,9,14 225:2,
21,24 226:2 227:9,
14,24 228:5 230:20
231:7,11,14,23
232:4,7,15 234:9
235:7 236:11,16
237:4,21 239:12
240:11 241:9 242:2,
4 243:3,5,8,16
244:1,3,21 245:1,8
246:10 247:4,8
249:1,11,22 250:8,
10,16,20 251:23
252:4,8 254:23
255:9 256:15,17
257:10,13,22 259:18
260:2,23 261:3,8,12
262:10,16 264:13
265:10,12,21 269:11
270:1 271:11,23
272:1,4,9,24 274:9,
11,24 275:24 276:9,
17,22 277:3,9 278:8,

16 279:2,5,15,20
280:8,16,22 281:7,
18,23 282:11 285:25
286:3 287:7,11,14
288:7 289:11,20
290:22 291:2,8,10,
19,22,25 294:8,23
295:12

**sit** 215:19 234:10
239:25 240:3 293:4

**sitting** 245:9 278:19

**situation** 178:22
266:11,21 267:18
268:20 293:5

**sixth** 292:1,2 293:10

**skip** 221:7

**skipped** 203:9

**small** 271:19

**sorts** 222:8

**sound** 193:9

**sounds** 286:11

**spasm** 190:2 196:4,9
197:18 198:1

**speak** 282:1

**speaking** 180:7
280:2

**speaks** 186:10
196:15 226:16 228:7
229:8

**specific** 157:23
159:23 239:4
242:13,14 282:25

**specifically** 239:8

**Speculation** 288:16

**spend** 160:11 215:22

**spends** 159:17

**spent** 160:5 162:7
215:19,20,23

**spine** 184:11 185:10,
23,24 186:5,22
190:1,3 192:6,8,9
196:1,3,6 197:9,17,
20 222:9,10 223:9

**spiral** 155:18

**spoke** 265:11
274:10,12

**spoken** 176:2

**sprain** 190:2 196:3,
8,9 197:17,25

**stamp** 243:22

**stamped** 191:20
202:3

**stamps** 217:2 224:25

**standard** 174:17
205:1 237:9,12,19
242:8 244:19 249:2
264:7 281:5 286:15
288:18,21

**standards** 239:24
240:18 241:25

**standing** 229:5
247:10,12,14 248:18
293:19

**start** 155:21,25
195:12 255:24
292:17,18

**started** 191:21
242:18 243:2,13
293:3,16

**starting** 245:16
251:8

**starts** 261:1

**State** 203:10 207:16
225:17 234:13
250:18 252:2,10,11,
19,20 253:3,16,24,25
254:7,8,21,23,24
255:2 256:24 257:2
258:13,19,23 259:2,
21 261:10 262:1,4,5,
19,20,24,25 266:14,
16 269:9,18 272:3,7,
17,18 274:22 276:7,
10,16 277:1,4,14
278:14 279:13,17,
22,25 280:6 281:20
282:8,15 283:7
284:18,21 285:12,16
286:1 287:23 288:8,
21 289:4,9,10,25
290:20,25 292:24
293:1,2,7



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    Index: stated..unredacted

**stated** 274:12,13,14, 20

**statement** 196:18 197:1 228:14 229:5, 11 230:10,15,21 231:10 251:25

**statute** 257:20

**statutory** 258:25

**step** 279:21

**stipulate** 293:25 294:1,2

**stipulated** 293:24

**straightening** 190:1,3 196:2,7 197:16,21

**straightforward** 166:7,11,18 167:6

**stretch** 216:7 221:15

**strike** 157:14 174:1 182:18 208:6 235:15 256:25 259:11 263:24

**strong** 216:22

**studies** 194:17

**stuff** 202:5

**submit** 251:20

**submits** 276:6

**submitted** 207:16, 19 253:3,24 254:6 290:25

**subsequent** 293:20

**sue** 244:15 257:4 258:5 262:19

**sued** 258:18,19 261:10

**sufficient** 231:21 233:21

**suing** 250:5 258:12 264:2

**suit** 216:22 256:12 257:11 258:8 259:2 263:8 269:3,4 286:7, 22

**suits** 259:20 260:9 261:6 263:15

**superbill** 292:4,5,17 293:8,12,14 294:4

**superbills** 292:8

**support** 215:12 233:18 267:8 290:25

**supports** 274:3,19

**supposed** 220:14 224:7 233:17 251:6

**surprise** 264:8

---

**T**

---

**takes** 160:17

**taking** 166:20 197:14 199:18 203:24 252:9,16

**talk** 165:15 209:2 230:11 241:4 242:9, 17 286:12

**talked** 156:4 158:21 165:4 176:1 203:25 237:19 239:7 241:6, 25 266:2 268:3

**talking** 155:23 158:16 180:1 192:20 201:4 239:3 249:7 255:24 273:4,12 284:2 288:13 292:10

**tapes** 200:10

**telling** 160:24 170:23 239:18 240:5 251:18

**tells** 206:12

**template** 223:6

**templated** 222:8 223:13

**term** 167:18 264:11

**testified** 279:22

**testimony** 233:7,23, 24 245:6 269:16 278:12

**testing** 176:1 217:13 222:19 235:17

236:22 241:8,12

**that's** 162:7 180:9 230:3 236:3 238:2

**therapy** 213:17

**thing** 164:5 182:5 213:18 240:7 262:12 280:14

**thinking** 266:13

**thoracic** 185:10,23 186:4,22 212:13 222:9,14 223:9

**thoracolumbar** 184:2,11

**thought** 185:2 266:15 292:7,8

**three-page** 201:3

**time** 155:5 159:7,9, 17,21,22 160:5,11, 16,18 161:7,9 162:5, 11,14,17 163:11,12, 13,16 165:13 166:1 171:25 175:15 195:21 201:8 203:14,20 215:15, 17,20,25 216:5 221:17,23 223:18 229:15,16 239:9 243:1 251:1 255:13, 17 260:3 261:25 262:22 267:14 268:16 285:17 287:21 290:7,11 292:13 295:14,22

**times** 183:6 258:19 261:11 262:21 270:15 284:13

**timing** 194:24

**today** 215:20 226:14 228:4 229:4 230:18 234:10 237:19 253:5,9 260:1 264:3 278:19

**told** 158:24 164:25 165:18 172:5 200:1 201:15 266:11 267:6 288:2 291:11

**top** 155:14 156:1 181:17 182:15 192:11,12 225:1

250:11,12 271:20 275:18 278:17

**total** 215:13 263:10 284:6

**transcribed** 185:12, 13 195:18 197:1 207:11,12 208:3 209:20 210:10 211:20 228:24 229:1

**transcriber** 210:8, 13 228:12

**transcriptionist** 188:2

**treatment** 161:8 163:17,21 165:14 167:22 168:13,14, 17,24 169:24 170:2, 3 172:20 177:16,21 180:21 207:1 209:23 213:17 214:24 215:3 219:13 230:17 233:16 235:11 251:21 261:15 272:8

**treatments** 209:9

**trial** 293:23

**trust** 260:12

**truth** 292:23

**turn** 188:7,8 292:1

**Twenty-five** 294:20

**two-thirds** 245:20

**type** 238:19 275:23 278:11 280:10 281:5

**typed** 186:21 265:5

**typed-written** 188:1

**types** 165:22 238:17 278:6 281:11

**typewritten** 183:15 188:7 200:22 201:17 207:15 210:17 213:25 214:6 225:18 236:18

**typically** 162:6

---

**U**

---

**ultimate** 242:5,10 287:13

**undersigned** 256:2, 11

**understand** 155:20, 22 156:18 159:21 160:16 161:3,7 162:17,19,21 166:15,22 170:20,24 171:21 178:25 179:12 185:15 189:7,10 192:2,5,24 201:7 202:11 203:23 210:19,22 213:17,20 214:3 218:19,21,23 229:21 233:9 237:17 238:1 239:15 241:5, 20,23 246:23 247:18 248:4,15 252:23 253:2,8 260:22 261:7 265:22 266:7 271:25 279:16 285:10 287:22 288:1

**understanding** 157:15 158:9,13,25 159:3,13 160:6 161:20 162:11,25 164:3,17 165:1,7,18, 22 166:11,18 167:7, 17,24 168:6,21 169:22 170:13 171:16 172:13 173:5 174:2 179:7 191:24 193:22 194:3 205:20,24 211:2,13 212:2,19,25 215:6, 14 220:13 229:23 231:20 233:19 234:12,15,16 236:1 246:11 264:14 276:2 285:11 287:22

**understood** 188:12 266:8 268:7

**unpaid** 244:16 256:21 257:24 258:3 263:21 264:1

**unreasonable** 253:25

**unredacted** 287:17



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

**upper** 212:13

**V**

**verification** 206:15

**verify** 262:23

**views** 194:19

**visit** 158:3 174:3,5, 11 180:15,16,17,18 183:23 192:19 194:14,23 200:5 207:7 208:5,9,18,23 211:15 212:10 213:7 215:9 217:3,12 218:11,22,25 219:3, 4,6,19 223:23 226:12 227:7,22 231:9,16,22 232:22 233:9,12,20 234:2 236:13,14 240:5 264:25 281:16

**visits** 219:8 295:6

**volume** 155:2 295:24

**voluntarily** 256:3

**W**

**wage** 246:6 247:18, 19,20

**wages** 248:2,3,6,15, 24

**wait** 273:5 283:17

**waiting** 209:5

**waive** 286:9

**walk** 281:14

**wanted** 221:25 250:2 271:4 293:6,7

**waste** 201:8

**week** 240:1

**weekly** 240:15

**Where'd** 294:12

**withdraw** 248:5

**withdrawn** 246:6 247:18

**word** 196:12 197:3 230:5 245:17 264:14

**worded** 269:13

**words** 177:14 235:25 242:7

**work** 193:8 209:10 214:5 229:9 244:24 245:12 246:17 273:2

**working** 181:2 191:23

**works** 249:13

**would've** 187:24 225:17

**write** 163:14 181:7 187:17 222:20 223:25 260:9

**writes** 223:6

**writing** 183:10 187:21 189:9,10 223:14

**written** 178:16,23 187:25 199:18 200:4 201:16 208:3 228:11

**wrong** 188:14 294:6, 7

**wrote** 159:15 199:9 206:8 209:22 274:14

**X**

**x-** 178:3 181:8 189:14 190:6 201:4, 14 214:20

**x-ray** 176:8 177:7,8, 19,22 178:8,16,17, 20,23,24,25 179:3,5, 8,11,20,23,24 180:18,22 181:3 188:20,23,24 189:11,18 190:10, 11,16,19,21 191:25 192:8,9 193:23 194:8,17 195:7,8,19 196:13,19,22 197:2, 9 198:6 199:7,9,18, 19 200:2 204:10 238:21

**x-rays** 176:12,17,20 178:11 179:24 180:23 189:6,25 190:10 191:8 192:2 193:24,25 194:4,21 200:20 209:8 213:11

**Y**

**y'all** 241:18

**year** 215:25 260:10, 21 261:15 292:13

**years** 195:22 245:4,7 261:23

**You're** 288:13



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION

 3              CASE NO.: 1:18-cv-23329

 4

 5
      STATE FARM MUTUAL AUTOMOBILE
 6    INSURANCE COMPANY

 7       Plaintiff,

 8    v.

 9    MANUEL V. FEIJOO; and MANUEL V.
      FEIJOO, M.D., P.A., a Florida
10    professional association,

11       Defendants.
      _____/
12

13   VIDEO DEPOSITION OF:  Anielka Castillo

14   DATE TAKEN:           May 29, 2019

15   TIME:                 9:17 A.M. to 4:39 P.M.

16   TAKEN BY:             Kenneth P. Hazouri, Esquire
                           Counsel for the Plaintiff
17
     PLACE:                Orange Legal
18                         6303 Blue Lagoon Drive
                           Suite 380
19                         Miami, Florida 33126

20   REPORTED BY:          Martha Rodriguez, FPR
                           Court Reporter and Notary Public
21                         State of Florida at Large

22

23

24

25
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    301

```
 1              A P P E A R A N C E S:

 2   KENNETH P. HAZOURI, ESQUIRE
     OF:  DSK Law
 3        332 North Magnolia Avenue
          Orlando, Florida 32801
 4        khazouri@dsklawgroup.com

 5        Counsel for the Plaintiff

 6

 7

 8   JEROME A. PIVNIK, ESQUIRE
     OF:  The Pivnik Law Firm
 9        7700 North Kendall Drive
          Suite 703
10        Miami, Florida 33156
          pivniklaw@aol.com
11
     KENNETH B. SCHURR, ESQUIRE
12   OF:  Law Offices of Kenneth B. Schurr, P.A.
          2030 South Douglas Road
13        Suite 105
          Coral Gables, Florida 33134
14        counselken@schurrlaw.com

15        Counsel for the Defendants

16

17

18    ALSO PRESENT:

19        GEORGE RODRIGUEZ, Videographer

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                      302

```
 1                   I N D E X (VOLUME III)

 2   TESTIMONY OF ANIELKA CASTILLO

 3   Cross Examination by Mr. Pivnik. . . . . . . . . .303

 4   Redirect Examination by Mr. Hazouri. . . . . . . .319

 5   CERTIFICATE OF OATH. . . . . . . . . . . . . . . .339

 6   CERTIFICATE OF REPORTER. . . . . . . . . . . . . .340

 7   ERRATA SHEET (VOLUME III). . . . . . . . . . . . .341

 8   NOTIFICATION LETTER. . . . . . . . . . . . . . . .342

 9

10

11                    E X H I B I T S

12                      (None Marked.)

13

14

15                 S T I P U L A T I O N S

16       It is hereby stipulated and agreed by and between

17   counsel present for the respective parties, and the

18   deponent, that the reading and signing of the deposition

19   are hereby reserved.

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1                 P R O C E E D I N G S

 2                      (VOLUME III)

 3            (Videotaped deposition resumed.)

 4            THE VIDEOGRAPHER:  Afternoon.  This is media

 5   three.  This is media three -- media four.  The time is

 6   3:59 p.m.

 7                   CROSS EXAMINATION

 8   BY MR. PIVNIK:

 9      Q.    Okay.  Good afternoon, Ms. Castillo.  Just a

10   few questions about some of the questions that Mr.

11   Hazouri asked you earlier in the deposition.  One thing

12   that he mentioned was that there were about 500 patient

13   files in this case.  You recall that -- him pointing

14   that out?

15      A.    Yes, sir.

16      Q.    Okay.  And he noted that all or nearly all of

17   them have 99204, the level 4 initial visit, correct?

18   You remember him asking you about that?

19      A.    Some -- some will have that CPT code.

20      Q.    And I think he pointed out that most of the --

21   most of the -- if not all of the ones in this case, this

22   lawsuit -- 500 patient files between 2014 and 2018 all

23   involve 99204s.  You remember him asking you that?

24      A.    Yes.

25            THE COURT REPORTER:  Counsel, one second.
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

304

1           (Discussion was held off the record.)

2           (Deposition resumed.)

3   BY MR. PIVNIK:

4       Q.   All right.  So, while you're fixing that, let

5   me ask you the question.  So, are there other files that

6   aren't billed to State Farm or that aren't involved in

7   this lawsuit that don't involve 99204s or a lower code?

8       A.   There's a lot of other cases that are not a

9   part of the lawsuit.

10       Q.   Are there thousands of other files or other

11   patient bills to State Farm that are not before the

12   Court where you billed a lower code than 99204?

13       A.   Yes, sir.

14       Q.   Let's talk a little about the patient H.P.

15   And if I recall, that was a -- started with Exhibit 1

16   and I'll show you Exhibit 2, which was the initial

17   orthopedic evaluation.  And patient H.P. was a 10 year

18   old female?

19       A.   Yes, sir.

20       Q.   And that means that when Dr. Feijoo met with

21   her, he probably met with a parent or a guardian at the

22   same time?

23       A.   Yes.

24       Q.   All right.  And State Farm -- and it was an

25   automobile accident case, correct?



Orange Legal
800-275-7991

1      A.    Yes, sir.

2      Q.    In fact, all the cases in this suit involve

3    automobile accidents, correct?

4      A.    That's correct.

5      Q.    And is it fair to say that automobile accident

6    cases have a higher level of complexity than maybe

7    certain other types of patients that Dr. Feijoo might

8    see?

9      A.    Yes, sir.

10      Q.    All right.  When he sees a patient that's not

11    automobile accident, such as a Medicare patient who's

12    just coming in because they have pain in a finger or

13    something, does that always require a 99204 or can that

14    sometimes be a 99203?

15      A.    It could be 99203, 99202.  Not only Medicare,

16    but private insurance too.

17      Q.    Because they don't have as big a history or as

18    complex a problem to someone who might be involved in an

19    automobile accident.  Is that fair to say?

20      A.    Yes, sir.

21      Q.    All right.  So, going back to patient H.P.,

22    she gave a history of the present illness and that -- in

23    your experience being with Dr. Feijoo since 2001, does

24    Dr. Feijoo take the history from both a 10-year-old

25    female as well as her parent or guardian?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

306

```
 1      A.   Yes.

 2      Q.   And in your experience, does that take a

 3  little more time than a -- when you're dealing with a

 4  child and a parent?

 5      A.   Correct.

 6      Q.   And let me turn -- let me direct your

 7  attention to Exhibit Number 11, which I believe was the

 8  follow-up orthopedic exam, and I'll just show you my

 9  copy.  Mr. Hazouri asked you about the fact that the

10  history of present illness was brief.  It only had about

11  two -- one sentence or two lines.  You see that, Ms.

12  Castillo?

13      A.   Yes, sir.

14      Q.   You don't know how long Dr. Feijoo actually

15  spoke to the 10-year-old girl and her parent, do you, or

16  guardian?

17      A.   Well, specific for this patient?  No.  Based

18  on the consultation, it was about 35 minute or less.

19      Q.   And he could've -- I mean, the mother could've

20  gone on and on about her daughter's history.  Is that

21  possible?

22           MR. HAZOURI:  Objection, calls for

23  speculation.

24      A.   It is.  Usually, they are -- the parents are

25  the one who describe.
```



 1   BY MR. PIVNIK:

 2       Q.   And would Dr. Feijoo normally just summarize

 3   what the patient or the patient's parent or guardian had

 4   said or noted something that was abnormal?

 5       A.   Not always.

 6       Q.   And then on the final evaluation -- and, by

 7   the way, are -- final evaluations, do they take more

 8   time than the regular follow-up evaluations?

 9       A.   Sometimes.

10       Q.   Okay.  And does -- Dr. Feijoo, to do a final

11   evaluation, does he normally review the initial

12   evaluation and all the follow-up evaluations?

13       A.   The complete file.

14       Q.   And that takes more time, does it?

15       A.   Yes, sir.

16       Q.   And I believe with patient H.P., on the final

17   evaluation, the final orthopedic report, Exhibit 16, he

18   found that the patient was asymptomatic.  Is that

19   correct?

20       A.   Yes, sir.

21       Q.   And that was at the last and final evaluation

22   as a result of the exam, correct?

23       A.   Yes, sir.

24       Q.   The fact that she may have been pain free or

25   asymptomatic doesn't mean that the exam that he did to



 1    find that result was any less comprehensive, does it?

 2         A.   No.

 3              MR. HAZOURI:  Objection, leading.  But go

 4    ahead.

 5         A.   No.   That's what I was trying to explain.

 6    BY MR. PIVNIK:

 7         Q.   Can you explain that?

 8         A.   The -- Dr. Feijoo -- just because -- if the

 9    report don't show -- it shows that they -- it was

10    painless, that doesn't mean that he don't take the time

11    to do the medical examination and review the history of

12    the patient or the treatment that it was performed to

13    the patient.

14         Q.   He still has to confirm that the patient is

15    better, correct?

16         A.   Yes, sir.

17              MR. HAZOURI:  Objection, leading.

18    BY MR. PIVNIK:

19         Q.   And does the comprehensive history involve the

20    doctor speaking with the patient or the patient's family

21    member?

22         A.   Yes, sir.

23         Q.   And that's true in the initial, the follow-up

24    and the final orthopedic evaluation?

25         A.   Yes, sir.



1      Q.    And the doctor has to absorb that information,

2  correct?

3            MR. HAZOURI:  Objection, leading.

4  BY MR. PIVNIK:

5      Q.    Or does the -- let me rephrase it.  Does the

6  doctor have to absorb that information?

7      A.    When you say absorb -- I'm sorry.

8      Q.    You know, understand, decide what's important

9  and what's not important --

10     A.    Yes, sir.

11     Q.    -- about the patient's history and her -- and

12  the examination.

13     A.    That's correct.

14     Q.    And I imagine sometimes the parents or

15  guardians of smaller children sometimes say things that

16  aren't all that important or -- and some things that

17  are.  I mean, is that fair to say?

18     A.    It's fair to say.

19     Q.    And then he -- the doctor dictates what's

20  noteworthy in his notes or would that normally be the

21  case?

22     A.    Correct.

23     Q.    He's not going to always note something that

24  he didn't consider noteworthy such as the fact that

25  maybe she wasn't sleeping well or missed soccer practice



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                310

```
 1  or something like that?

 2          MR. HAZOURI:  Objection, leading.  Calls for

 3  speculation.

 4      A.   No, sir.

 5  BY MR. PIVNIK:

 6      Q.   The doctor has to listen to the patient,

 7  correct?

 8          MR. HAZOURI:  Objection, leading.

 9      A.   Yes, sir.

10  BY MR. PIVNIK:

11      Q.   Would it be unusual for Dr. Feijoo not to

12  include stuff that was irrelevant to his examination?

13  In other words, he doesn't -- does Dr. Feijoo generally

14  include in his notes -- his dictated notes matters that

15  are irrelevant to his diagnosis or treatment of the

16  patient?

17      A.   No.

18      Q.   All right.  Let's talk a little bit about

19  Exhibit 19, and I'll show you my copy.  Mr. Hazouri

20  asked you about the list of 137 cases that we asked or

21  submitted to State Farm to provide certain documents

22  about.  Is it fair to say that you have hundreds of

23  State Farm PIP claims that were not paid and that you

24  did not file suit?

25      A.   That's correct.
```



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    311

1      Q.   So, from 2013 to 2015, there were 137 times

2   that State Farm did not pay you that you did file suit.

3   Do you know how many -- how many cases there were where

4   State Farm did not pay you but you did not file suit?

5      A.   We have a lot.

6      Q.   More than 137?

7      A.   More than 200.

8      Q.   And that was even when you believed your bills

9   were correct or -- let me rephrase that.  Was that even

10  when your -- you believe that your bills were correct

11  that you decided not to sue State Farm?

12     A.   Yes, sir.

13     A.   And of those 137 cases that were filed suit --

14  those were filed suit, by the way, in Small Claims Court

15  or County Court?

16          MR. HAZOURI:  Objection, leading.

17     A.   I believe, yes.

18  BY MR. PIVNIK:

19     Q.   And did you ever lose a single case or you

20  receive an adverse verdict of any of those 137 cases?

21     A.   No, sir.

22     Q.   And in all those cases then, did State Farm

23  either settle or pay you or did you decide to dismiss

24  the case?

25     A.   It could be both.



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                312

1      Q.    Okay.  But in no case did you ever lose or

2  receive an adverse verdict?

3      A.    No, sir.

4            MR. HAZOURI:  Object to the last question as

5  leading.

6  BY MR. PIVNIK:

7      Q.    Let's talk about more recently.  Is State Farm

8  currently paying you for the code procedures 99204,

9  95851, which I believe was the --

10     A.    The range of motion.

11     Q.    -- range of motion, and the 76140, the x-rays

12 -- where x-ray reports were taken at a different

13 location?  Are they still paying for that even during --

14 or have they paid you any of those even during the

15 pendency of this lawsuit?

16     A.    Some.

17     Q.    Okay.  And about Exhibits 23 and 24, which

18 were the Explanation of Review or Explanation of

19 Benefits for those two patients that -- I think it was

20 S.B. and J.B. --

21           MR. HAZOURI:  That's correct.

22 BY MR. PIVNIK:

23     Q.    -- is it your policy that State Farm -- the

24 State Farm policy has a Medicare fee schedule allowing

25 State Farm to reduce its bills -- all bills to --



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    313

```
 1              MR. SCHURR:  Medicare.

 2   BY MR. PIVNIK:

 3        Q.    -- Medicare Part B?

 4        A.    Can you repeat the question, sir?

 5        Q.    Yeah.  I think you -- let me rephrase the

 6   question because I don't think I really worded that very

 7   well.  Mr. Hazouri asked you that even -- you know, even

 8   if they reduced it to a 99 -- the 99204 to a 99203, a

 9   lesser initial office visit, you didn't state -- Dr.

10   Feijoo's policy was not to accept it, but not because of

11   just that, but because of an issue with the Medicare fee

12   schedule.  Can you explain that?

13        A.    That was what I was trying to explain him.

14        Q.    Okay.  Can you explain that?

15        A.    That even if the CPT code is not -- like we

16   usually -- if they call us for a CPT code down-coded, we

17   try to work it out, but in this case, even if the CPT

18   code was accepted as 99203, they're still paying under

19   the Medicare fee and we wouldn't be able to try to get

20   different, even if it's -- the code is 99203.

21        Q.    And is that because there's an issue pending

22   whether State Farm's policy has incorporated the

23   Medicare schedule or not?

24        A.    That's correct.

25        Q.    That's your understanding?
```



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                            314

```
 1      A.   Yes, sir.
 2      Q.   And is it your understanding that case is
 3  still up to the Florida Supreme Court?
 4      A.   Yes, sir.
 5      Q.   Okay.  And Mr. Hazouri asked you -- you know,
 6  pointed out to one of the exhibits where State Farm's
 7  record show that someone from State Farm called you and
 8  spoke to you about possibly down-coding a 99204 to a
 9  99203 and you didn't recall that specific conversation,
10  I think you said, right?
11      A.   No, sir.
12      Q.   But if State Farm calls and asks you to down-
13  code and if they are correct, do you accept that
14  sometimes?
15      A.   Correct.  We have done it in the past for
16  different insurance.
17           MR. HAZOURI:  Objection, calls for speculation
18  for different insurance.  Progressive.  I'm sorry.  I'm
19  --
20           THE WITNESS:  No, not only progressive.
21           MR. HAZOURI:  Okay.
22           THE WITNESS:  Whoever request it and if
23  they're right.  If not, we submit additional record.
24           MR. HAZOURI:  Okay.  Sorry.  I shouldn't have
25  jumped in.
```



 1  BY MR. PIVNIK:

 2      Q.   And State Farm certainly could ask you and has

 3  asked you in the past for additional -- the B(6)

 4  requests for additional information, correct?

 5      A.   Yes, sir.

 6      Q.   And for over 10 years or, I guess, since 2001,

 7  when that has happened, have they generally paid the 2 -

 8  - the 99204 rate?

 9      A.   After submitting the medical records, yes,

10  sir.

11      Q.   And if you agree that the records didn't match

12  the code bill, would you accept a down-coding?

13      A.   If they would call me and talk about it, yeah.

14  I will have Dr. Feijoo review it.

15      Q.   Right.  And we're almost wrapping up.  The

16  super bill that you instituted, I think you said -- that

17  was exhibit -- oh, yeah, page 6 of Number 25.  Here we

18  go.  I'll show you my copy.  Now, I think you indicated

19  that that was instituted just recently or at least in

20  2019.

21      A.   Yes, sir.

22      Q.   And I think you mentioned that was -- you said

23  that you were trying in good faith to do something.  Can

24  you explain that?

25      A.   Well, we usually -- when we have any issues --



 1  and that's my job.  When we get Explanation of Benefit

 2  with a continued denial or requesting information, I

 3  talk to the doctor to resolve that matter.  In the case,

 4  for example, Windhaven, they were requesting proof of

 5  filing all the time.  So, we adjusted ourselves to

 6  submit that proof to avoid any issue with the insurance

 7  company.  In the case right now, State Farm is filing a

 8  lawsuit because they believe Dr. Feijoo should mark the

 9  CPT code or the performing code that has been done.  So,

10  we try to do it in a good faith to make sure that

11  they're aware that everything has been done by him.

12       **Q.   Okay.  It doesn't mean that you believe that**

13  **anything you did up till then is improper, correct?**

14       A.   No, sir, at all.

15       **Q.   Right.  In fact, I think Mr. Hazouri asked you**

16  **-- and I'll just paraphrase it -- that you guys are so**

17  **crooked and cheated them so much --**

18            MR. HAZOURI:  Come on.

19  BY MR. PIVNIK:

20       **Q.   Let me rephrase it.**

21            MR. HAZOURI:  Those words didn't come out of

22  my mouth.  Why would you say something like that?

23            MR. PIVNIK:  That they were -- I think you

24  said that they were so fraudulent, were so improper --

25            MR. HAZOURI:  No.  I said, it is not your



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO

Castillo Anielka                                                                317

 1  position, you are not taking the position that the bills

 2  are so -- so improper and incorrect.  I did not call the

 3  clinic crooked.  I said, you are not saying that your

 4  bills are incorrect.

 5  BY MR. PIVNIK:

 6      **Q.    There are a lot of double negatives in that.**

 7  **So, I try to make it -- but I'll try and say it the way**

 8  **that I think Mr. Hazouri asked it, that it's not your**

 9  **position that your bills were so improper and so**

10  **fraudulent that State Farm --**

11            MR. PIVNIK:  I think you said.

12  BY MR. PIVNIK:

13      **Q.    -- would be boneheaded --**

14            MR. HAZOURI:  Right.

15  BY MR. PIVNIK:

16      **Q.    -- to pay them?**

17      A.   No, sir.  We've been working for a lot of

18  years in the same practice and Dr. Feijoo is a very

19  honest doctor and we believe that he does -- everything

20  that he does is correctly and we provide records to

21  prove what he's doing.  We have never deny any records

22  or deny any information.  Our files always been there.

23  BY MR. PIVNIK:

24      **Q.    And in some of those cases, the 137, or even**

25  **other cases that you had to file suit against State Farm**



**Orange Legal**
**800-275-7991**

1   to get them to pay, you gave a deposition or say State

2   Farm required you to give a deposition, correct?

3       A.   That's correct.

4       Q.   And did you explain to their attorneys at

5   those depositions state -- the billing practice of Dr.

6   Feijoo?

7       A.   Yes, sir.  I explained the procedure and how

8   we do it.  I showed them the records.

9       Q.   And did that include the fact that when Dr.

10  Feijoo did a range of motion in addition to his initial

11  evaluation that those two items were billed separately?

12      A.   Yes, sir.

13      Q.   And that -- and have you also explained to

14  State Farm that if Dr. Feijoo reviewed a report without

15  an x-ray film, that that'd still get billed under the

16  code for that procedure?

17      A.   If in that case, the case that we were talking

18  about, he happened to have x-ray review only, not films,

19  no CD, yes.

20      Q.   You haven't hid anything from State Farm in

21  any of those depositions or any -- in any of your

22  conversations with State Farm personnel?

23      A.   Can you -- I'm sorry.

24      Q.   Yeah.  You haven't hidden any of your billing

25  practices when you discussed it in your prior



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                            319

```
 1   depositions?

 2        A.   No, sir.

 3        Q.   You haven't hidden anything in any

 4   communications with State Farm personnel?

 5        A.   No, sir.

 6        Q.   State Farm has known of the billing practice

 7   for over 10 years now?

 8             MR. HAZOURI:  Objection.

 9        A.   Yes, sir.

10             MR. HAZOURI:  Leading and calls for

11   speculation.

12   BY MR. PIVNIK:

13        Q.   Has State Farm known of your billing practice

14   since you communicated that in depositions over the past

15   10 years?

16             MR. HAZOURI:  Objection, calls for

17   speculation.

18        A.   That's correct.

19             MR. PIVNIK:  Nothing else.

20                  REDIRECT EXAMINATION

21   BY MR. HAZOURI:

22        Q.   Okay.  Are you familiar with the name Andrew

23   Barrata?

24        A.   Andrew Barrata?  That's an attorney?

25        Q.   Yes.  Do you understand that he's one of the
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                        320

```
 1   attorneys representing Dr. Feijoo and Feijoo, P.A. in

 2   this lawsuit?

 3           MR. PIVNIK:  Andy.  Yeah.

 4       A.   Yeah, Andy.

 5  BY MR. HAZOURI:

 6       Q.   Andy Barrata.

 7       A.   Yeah.  Okay.

 8       Q.   Yeah.  So, you know who I'm talking about now?

 9       A.   Yes, sir.

10       Q.   Are you aware that Andy Barrata asked a State

11  Farm representative at her deposition who made the

12  boneheaded decision to pay these charges when talking

13  about your clinic's charges?

14           MR. PIVNIK:  Ken, I appreciate your --

15  BY MR. HAZOURI:

16       Q.   Are you aware?

17           MR. HAZOURI:  Please.

18           MR. PIVNIK:  Let me finish.

19  BY MR. HAZOURI:

20       Q.   Are you aware?

21           MR. SCHURR:  You made quite a long speaking

22  objection.

23  BY MR. HAZOURI:

24       Q.   Are you aware of that?

25           MR. PIVNIK:  Before she answers, the only way
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                                321

```
 1  she could be aware of that is if she heard it from one

 2  of the attorneys here.

 3          MR. HAZOURI:  No.  She could've read a

 4  transcript.

 5  BY MR. HAZOURI:

 6      Q.  Are you aware of it?

 7      A.  No, sir.

 8      Q.  Okay.  So, you're not aware of that.  Okay.

 9  Do you have any feelings about your own attorney saying

10  to a State Farm representative that it was a boneheaded

11  decision to pay your clinic's charges?

12          MR. PIVNIK:  That I'm going to have to

13  instruct her not to answer.

14          MR. HAZOURI:  There is no basis for

15  instructing, no.  I asked her feelings about him saying

16  that in a deposition.  There's nothing privileged about

17  that.

18  BY MR. HAZOURI:

19      Q.  What are your -- how do you feel about your

20  attorney, Mr. Barrata, saying to a State Farm

21  representative -- asking her, "Who made the boneheaded

22  decision to pay these charges of your clinic?"  How do

23  you feel about that?

24          MR. PIVNIK:  I'm going to just object on form

25  and foundation.
```



**Orange Legal**
**800-275-7991**

1   BY MR. HAZOURI:

2        Q.   **You can answer.**

3        A.   I would not understand why -- that question,

4   but if State Farm, after four years of -- after years of

5   paying this bill, they wait four years to send a

6   lawsuit.  They could've done it at anytime.  They

7   could've asked us at any time.  So, maybe that's what he

8   was trying to say, why wait so long to do this?

9        Q.   Okay.

10       A.   Why not 2010, '11, '12?

11       Q.   **If State Farm files a lawsuit in 2010, how is**

12  **that any different?**

13       A.   Well, maybe we would be able to fix it back

14  then if they think there's -- we were doing something

15  wrong.  We don't think we're doing it, but if they

16  would've done it before or they advised us any way at

17  any point, we may be able to fix it.

18       Q.   **Okay.  And Exhibit 22 reflects that somebody**

19  **from State Farm advised you, Anie, that the 99204 was**

20  **incorrect and it reflects that you disagree.**

21       A.   You have one patient out of hundreds and

22  hundreds of patient.  You have one patient that the

23  adjuster stated they got in contact with me.

24       Q.   Okay.

25       A.   I don't -- do you have any other type of proof



1  that they did get in contact with me?

2      Q.   Here's the good news.  I'm not answering

3  questions here, you are.  You saw this record.

4      A.   That's a document provided by State Farm.

5      Q.   Right.  You're not disputing that this

6  conversation occurred?

7      A.   I don't -- I don't have no recollection of

8  that call.

9      Q.   Okay.  Now, in questioning from Mr. Pivnik --

10  correct me if I'm wrong, but you just testified that

11  there are thousands -- that was the number you used --

12  thousands of other PIP claims that you have submitted to

13  State Farm that include E&M codes lower than 99204; I

14  guess a 99203.  Do you recall giving that testimony?

15      A.   9920 -- I didn't specify code.  He asked me

16  files that they have not been included in the lawsuit,

17  that I have not filed a PIP case like out of the 137.

18      Q.   That was one question.  There was a different

19  question.  The question that Mr. Pivnik asked you was,

20  are there thousands of other PIP claims that you have

21  submitted to State Farm that are not a part of this

22  lawsuit that had an E&M code of lower than 99204?

23      A.   He didn't specify State Farm.  He asked

24  generally.

25      Q.   No.  I understood him to say State Farm.



Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    324

```
 1              MR. PIVNIK:  No.  I corrected or whatever.

 2  BY MR. HAZOURI:

 3       Q.   Okay.

 4       A.   My understanding on the question was that he

 5  was asking generally.

 6       Q.   Generally, your entire patient population?

 7       A.   Exactly.

 8       Q.   There have been thousands of --

 9       A.   Different code.

10       Q.   -- different codes lower than 99204?

11       A.   Yes, sir.

12       Q.   Medicare patients?

13       A.   Yes, sir.

14       Q.   Health -- private healthcare patients?

15       A.   Yes, sir.

16       Q.   Self-pay patients?

17       A.   Yes, sir.

18       Q.   Right?  So, you --

19       A.   PIP patient.

20       Q.   PIP patients -- well, okay.  Now, let's -- let

21  me just ask you then.  Are you aware of ever submitting

22  a 99203 code to State Farm Mutual on a PIP claim?

23       A.   I would not be able to confirm unless I see

24  it.

25       Q.   So, you don't know --
```

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                      325

```
 1      A.   No, sir.

 2      Q.   -- as you sit here?

 3           Okay.  Mr. Pivnik asked you if auto accident

 4  patients generally have a higher level of complexity in

 5  their examinations.  Do you recall that?

 6      A.   Yes, sir.

 7      Q.   And you said yes.

 8      A.   Yes, sir.

 9      Q.   Okay.  So, what -- when you're looking at the

10  complexity of an auto accident patient and you're saying

11  it's generally higher, what other patient are you

12  comparing it to?

13      A.   To patient for private insurance, patient from

14  Medicare, patients that they're follow-up visit that

15  they're just coming from -- or initial visit, they just

16  come for a routine visit.

17      Q.   Okay.  So, how can you make that analysis?

18  I'll give you an example.  If a 65 year old Medicare

19  patient falls down their stairs and breaks a couple

20  bones --

21      A.   I don't think he would go to Dr. Feijoo.

22      Q.   Dr. Feijoo can't fix a broken bone?

23      A.   I don't think.  He will send it to the

24  hospital.

25      Q.   Okay.  Well, the -- okay.  So, the patient
```



 1    falls down the stairs and comes -- and goes to the

 2    emergency room.  He gets x-rays and then comes to see

 3    Dr. Feijoo and he sees that the patient has broken

 4    bones.  Okay?

 5         A.    Correct.

 6         Q.    All right.  You -- that's more complex than an

 7    auto accident sprain/strain of the neck and back, is it

 8    not?

 9         A.    It is.

10         Q.    Right.  So, it's impossible, really, to sit

11    here and say that auto accidents are more complex than

12    other types of patients because you'd have to look at

13    the injuries that those particular patients suffered to

14    know the complexity, right?

15         A.    That's right, but that was not what he asked.

16         Q.    Okay.  What did you understand him to ask?

17         A.    That he asked of -- the majority of the PIP

18    patients are more complex than the other, because our

19    office do Medicare, but Medicare patients that they're

20    continuous.  Like they're not -- they're coming for an

21    initial visit for a pain and an injection.  Like we

22    don't have like extreme patients that they --

23         Q.    You don't have what?

24         A.    Like with a lot of -- like what you were

25    describing, like broken bones or --



**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka
327

1      Q.    Okay.  So, what your testimony was -- is a

2  patient who comes in with an auto accident injury, that

3  might be more complex than a routine patient that comes

4  in routinely --

5      A.    With a back pain.

6      Q.    -- with a back pain that you treat all the

7  time?

8      A.    Of course.

9      Q.    Is that what you meant?

10     A.    Yes, sir.

11     Q.    In questioning from Mr. Pivnik about -- I

12  believe it was the initial visit with patient H.P. that

13  we looked at.

14     A.    No, it was not.

15          MR. PIVNIK:  Well, it was the follow-up.

16  BY MR. HAZOURI:

17     Q.    The follow-up visit?

18     A.    Yes.

19     Q.    The one where you said it was about 35

20  minutes?

21     A.    Yes, sir.

22     Q.    Do you recall that testimony?

23     A.    Yeah.

24     Q.    How do you know how much time Dr. Feijoo spent

25  with patient H.P. at that follow-up visit?



```
 1      A.    I've been there like for many times and I know

 2  how much he like to spend with the patient.

 3      Q.    Okay.  So, you don't really know how much time

 4  he spent.  You're basing it on your standard experience

 5  of what you've observed?

 6      A.    Yes, sir.

 7      Q.    Okay.  Mr. Pivnik also asked you about State

 8  Farm claims -- I'm sorry, claims that Feijoo, P.A. has

 9  submitted to State Farm and that State Farm has not paid

10  and on which the clinic has not filed lawsuits.  Do you

11  recall that testimony?

12      A.    Yes, sir.

13      Q.    And I believe, correct me if I'm wrong, you

14  said there -- Mr. Pivnik asked you are there a hundred

15  State Farm PIP claims that were not paid and that the

16  clinic has not sued on, or about a hundred.  Do you

17  recall that?

18      A.    Yes.

19      Q.    And you answered yes.

20      A.    Yes.

21      Q.    Okay.  So, my first question is, that -- is

22  that right?  Is that about the number?  There's a

23  hundred claims --

24            MR. PIVNIK:  I thought I said hundreds, but --

25            MR. HAZOURI:  Did you say hundreds?
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                        329

```
 1   BY MR. HAZOURI:

 2        Q.   How many are there?  Tell us.

 3        A.   Okay.  I just want to make sure that we

 4   understand, that question that he asked me, how do I --

 5   how do I answer.

 6        Q.   Okay.

 7        A.   He asked -- he say there's about -- a lot of

 8   cases that they didn't pay or paid less.

 9        Q.   That's what I was going to ask you --

10        A.   Yes.

11        Q.   -- because what Mr. Pivnik said was State Farm

12   had not paid.

13        A.   Yes.

14        Q.   He did not say paid less.

15        A.   Okay.

16        Q.   Okay.  So, I wanted to clarify that.

17        A.   Yes.

18        Q.   Okay.  So, your testimony related to claims

19   that State Farm has not paid at all, has paid zero on or

20   has paid less than the full amount of the charges?

21        A.   Both.

22        Q.   Both?  Okay.  And there was a number, an

23   estimate of the number of those types of claims the

24   clinic has not filed a lawsuit over.

25        A.   Correct?
```



1       Q.    Right?  Of both zero paid claims and reduced

2   paid claims.

3       A.    Correct.

4       Q.    Right?  Okay.  What's that estimate?

5       A.    About 200.

6       Q.    About 200?  And how many of those has there

7   just been a final decision made that there's -- that the

8   clinic's not going to file suit or how many of those

9   might the clinic file suit on in the future?

10      A.    I don't have no recollection.  I have to --

11           MR. PIVNIK:  Yeah.  Objection to -- I didn't

12  understand that question.

13           MR. HAZOURI:  I think she understood.

14           MR. PIVNIK:  Okay.

15  BY MR. HAZOURI:

16      Q.    Do you understand?

17      A.    Yes, sir.

18      Q.    Okay.  So, what was your answer?

19      A.    I don't know.  Like I don't know what will be

20  -- in the future, if we bill it or not, but at this

21  point, they're a closed file.

22      Q.    That's right.  But those 200 or so files where

23  the claims have been either zero paid or reduced paid,

24  your clinic may still decide to file suit on them at

25  some point?



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                      331

```
 1       A.   I don't think so.

 2            MR. PIVNIK:  Let me -- that I'll only object

 3  to because that's attorney-client privilege.

 4            MR. HAZOURI:  No.

 5  BY MR. HAZOURI:

 6       Q.   I'm asking the clinic's decision without any

 7  input from your counsel.

 8       A.   I don't think so because maybe it would be

 9  already late to file it.  There are cases for 2014.

10       Q.   If the statute of limitations is expired, you

11  wouldn't do it?

12       A.   No.

13       Q.   Okay.  Well, setting those aside -- you don't

14  want to file cases that are expired under statute of

15  limitations.  You don't know how many of those there

16  are, right?

17       A.   No, sir.

18       Q.   The clinic could decide to file suit on those

19  in the future, other than statute of limitations --

20       A.   We have a way of working, the way that I do

21  it.  If at this time I haven't done it, like 2015 or

22  2016, it may not be.

23       Q.   You write it off as a bad --

24       A.   Exactly.  Yes, sir.

25       Q.   Okay.  Mr. Pivnik asked you if there -- if
```

Orange Legal
800-275-7991

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka

332

 1    State Farm has been paying bills during the -- since

 2    they filed this lawsuit.

 3         A.    Yes, sir.

 4         Q.    And you said sometimes.

 5         A.    Some.

 6         Q.    Some bills?

 7         A.    Yes.

 8         Q.    Tell me about that.  What bills have been

 9    paid?

10         A.    A couple ones.  They also -- I get phone call

11    from adjuster that they're trying to pay me, but their

12    tax ID is like kind of blocked --

13         Q.    Blocked, yeah.

14         A.    -- and they think it's something wrong with my

15    tax ID and they want me to send proof from Sunbiz that I

16    still have an active tax ID.  So, I have been submitting

17    the tax ID, but then at one time I explained them I

18    don't think there is a problem with my tax ID.  I think

19    they block us.

20         Q.    Okay.  So, I understand what you're saying

21    about those conversations that -- where the adjuster's

22    calling you and saying we're trying to send you payment.

23         A.    Yeah.

24         Q.    But they're not -- those aren't actual

25    payments.  So, let's set those aside.  Have there been



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    333

```
 1  actual payments made on your bills since this lawsuit --

 2      A.  Yes, sir.

 3      Q.  -- has been filed?  How many bills have been

 4  paid?

 5      A.  Bills or patients?

 6      Q.  We could do patients.

 7      A.  Okay.  About six more, maybe.

 8      Q.  Six?

 9      A.  Yes.

10      Q.  And so, how many bills out of those six

11  patients?

12      A.  I guess each patient have one or two bills.

13      Q.  All right.  So, 12 or so, somewhere there?

14      A.  Less.

15      Q.  And I know we're estimating.  Less?  Less than

16  12 bills?

17      A.  Yes.

18      Q.  Okay.  And do those bills contain -- what

19  charges do they contain?  Do you remember?

20      A.  The same thing, 99204.

21      Q.  Okay.  Okay.  And Mr. Pivnik asked you about

22  this -- I'm going to call it a dispute and the issue of

23  State Farm paying pursuant to the -- paying the Feijoo,

24  P.A. clinic's charges at the Medicare fee schedule rate.

25      A.  Yes, sir.
```



1      Q.    And you understand it to be 200% of Medicare,

2  twice --

3      A.    Twice what Medicare pay --

4      Q.    Right.  Why is that not sufficient for the

5  clinic?  Why does the clinic feel like that's

6  insufficient payment?

7      A.    Well, I don't -- I don't think it's the

8  clinic.  It's just we expected to get paid 80% of our

9  bill.  If State Farm policy does not indicate that we're

10  supposed to accept 200% of Medicare, we expected to get

11  the whole thing.

12      Q.    Okay.  So -- but my point is -- you said you

13  expect to get the whole thing --

14      A.    Yes, sir.

15      Q.    -- the clinic expects to get the whole thing.

16  So, the clinic's position is that 200% of the Medicare

17  rate, two -- you know, two times the amount Medicare

18  would pay, is not a fair payment for the clinic's

19  services?

20      A.    I don't -- I don't -- I wouldn't call it like

21  that, that it's not fair.  It's just that until this

22  point, we have billed State Farm and expected 80% of the

23  bill.

24      Q.    That's what I'm trying to get at.  Why?  Why

25  isn't 200% of Medicare, twice the amount of Medicare,



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                    335

 1  enough for the clinic?

 2      A.   This is like just like -- we have -- we're not

 3  contracted with State Farm.  It's not like Medicare.  We

 4  are supposed to accept what Medicare paid.  In this

 5  case, if the policy is not clearly updated, we're

 6  expected to get paid 80%.

 7      **Q.   Okay.  So, the point is you understand the**

 8  **clinic could accept 200% of Medicare and just accept the**

 9  **payment, right?**

10      A.   Yes.

11      **Q.   The clinic has made a conscious decision not**

12  **to do that and to instead look to send a demand --**

13  **statutory demand and to file suit?**

14      A.   Not in all the cases because we have a lot of

15  cases that we haven't even done that.

16      **Q.   Okay.  So -- but in a good number of the**

17  **claims?**

18      A.   Yes.

19      **Q.   Right?  And is it the clinic's position then**

20  **the 200% of Medicare in those claims is not a reasonable**

21  **payment?**

22      A.   At this time, yes, until we have a notice that

23  the policy is correctly.

24      **Q.   Okay.  If the policy is correct, then you have**

25  **to accept --**



**Orange Legal**
**800-275-7991**

```
 1      A.    Exactly.

 2      Q.    Right?  But -- so, you're not going to accept

 3 the 200% of Medicare, the clinic's not going to accept

 4 200% of Medicare unless you have to.  Fair?

 5      A.    Yeah.

 6            THE WITNESS:  You need this back?

 7            MR. HAZOURI:  Oh, yeah.  Thank you.  Can you

 8 pause it real quick?

 9            THE VIDEOGRAPHER:  We're going off the record.

10 The time is --

11            THE COURT REPORTER:  4:32.

12            THE VIDEOGRAPHER:  -- 4:32 p.m.

13            (Discussion was held off the record.)

14            (Videotaped deposition resumed.)

15            THE VIDEOGRAPHER:  This is media five.  We're

16 on the record.  The time is 4:34 p.m.

17 BY MR. HAZOURI:

18      Q.    Okay.  Just a few more questions, I promise,

19 about Mr. Pivnik's questions to you.

20            He was asking you about what Dr. Feijoo

21 documents in his exams, what he writes down and what

22 goes into his written notes and then becomes a

23 transcribed report.  Do you remember those questions?

24      A.    Yes, sir.

25      Q.    One of the questions he asked you was, does
```



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                337

1   Dr. Feijoo write down irrelevant information.  Do you

2   remember that question?

3        A.   Yes, sir.

4        Q.   All right.  So, the overriding point is Dr.

5   Feijoo -- you would expect that Dr. Feijoo's notes and

6   the transcribed report that come out of it accurately

7   reflect the examination that he performed on the patient

8   that day, correct?

9        A.   Can you repeat it?

10        Q.   You expect and the clinic, Feijoo, P.A.,

11   expects that Dr. Feijoo's handwritten notes and then the

12   transcribed report that come from the hand-written notes

13   and his dictation accurately reflect the medical

14   examinations and evaluations he provided to the patient

15   on that particular date, correct?

16        A.   Yes.

17             MR. HAZOURI:  Okay.  I don't have anything

18   further.  Are you done?

19             MR. PIVNIK:  We're done.

20             MR. HAZOURI:  Okay.

21             MR. PIVNIK:  We'll read.

22             MR. HAZOURI:  You're going to read?

23             MR. PIVNIK:  Yeah.

24             MR. HAZOURI:  All right.  Thank you.

25             THE VIDEOGRAPHER:  We are off the record.  The

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                          338

1   time is 4:35 p.m. and this concludes media five.

2            (Brief interruption.)

3            THE COURT REPORTER:  Are you ordering the

4   transcript at this time?

5            MR. HAZOURI:  I'm going to order everything.

6            THE COURT REPORTER:  Okay.

7            MR. HAZOURI:  Just regular delivery.

8            (The videotaped deposition concluded at 4:39

9   p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                            339

```
 1                    CERTIFICATE OF OATH

 2
      STATE OF FLORIDA
 3    COUNTY OF MIAMI-DADE

 4

 5        I, Martha Rodriguez, FPR, Notary Public, State of
      Florida, certify that Anielka Castillo personally
 6    appeared before me and was duly sworn/affirmed.

 7        WITNESS my hand and official seal this 29th day
      of May, 2019.
 8

 9

10

11

12

13

14
                                   Martha Rodriguez
15                                 _____
                                   Martha Rodriguez, FPR
16                                 Notary Public
                                   State of Florida
17                                 My Commission: GG097851
                                   Expires: 05/20/2021
18

19

20

21

22

23

24

25
```

ORANGELEGAL

**Orange Legal**
**800-275-7991**

STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                        340

```
 1                    CERTIFICATE OF REPORTER

 2
      STATE OF FLORIDA
 3    COUNTY OF MIAMI-DADE

 4

 5         I, Martha Rodriguez, FPR, Court Reporter, do
      hereby certify that I was authorized to and did report
 6    the videotaped deposition of Anielka Castillo; that a
      review of the transcript was requested; that the
 7    foregoing transcript, pages 303 through 338, is a true
      and accurate record of the above-mentioned
 8    proceedings; and that said record has been transcribed
      by me or under my direction.
 9
           I further certify that I am not a relative,
10    employee, attorney, or counsel of any of the parties,
      nor am I a relative or employee of any of the parties'
11    attorney or counsel connected with the action, nor am
      I financially interested in the action.
12
           DATED this 24th day of June, 2019.
13

14

15

16

17

18

19
                                _Martha Rodriguez_____
20                              Martha Rodriguez, FPR
21                              Court Reporter

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1                    ERRATA SHEET (VOLUME III)

 2      DO NOT WRITE ON THIS TRANSCRIPT - ENTER CHANGES HERE

 3      IN RE:      STATE FARM MUTUAL AUTOMOBILE INSURANCE
                    COMPANY V. MANUEL V. FEIJOO and MANUEL V.
 4                  FIEJOO, M.D., P.A.
        CASE NO.:  1:18-cv-23329
 5      DATE:      MAY 29, 2019
        DEPONENT:  ANIELKA CASTILLO
 6

 7      PAGE    LINE        CORRECTION & REASON

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22
        Under penalties of perjury, I declare that I have read
23      the foregoing document and that the facts stated are
        true.
24
        _____
25      DATE                         DEPONENT NAME
```



**Orange Legal**
**800-275-7991**

```
 1                                          JUNE 24, 2019
     ANIELKA CASTILLO
 2   c/o Jerome A. Pivnik, Esquire
     The Pivnik Law Firm
 3   7700 North Kendall Drive
     Suite 703
 4   Miami, Florida 33156
     pivniklaw@aol.com
 5
     In Re:   May 29, 2019 Videotaped Deposition of
 6             Anielka Castillo
              State Farm Mutual Automobile Insurance
 7             Company v. Manuel V. Feijoo and Manuel V.
              Fiejoo, M.D., P.A.
 8
     Dear Madam:
 9
          This letter is to advise that the transcript of
10   the above-referenced deposition has been completed and
     is available for review. Please contact our office at
11   (800) 275-7991 to make arrangements to read and sign
     or sign below to waive the review of this transcript.
12
          It is suggested that the review of this
13   transcript be completed within 30 days of your receipt
     of this letter, as considered reasonable under Federal
14   Rules*; however, there is not Florida Statute to this
     regard.
15
          The original of this transcript has been
16   forwarded to the ordering party, and your errata, once
     received, will be forwarded to all ordering parties.
17
                                    Sincerely,
18
                                    Martha Rodriguez, FPR
19                                  Orange Legal, Inc.

20   cc:   Kenneth P. Hazouri, Esquire

21
     WAIVER:
22   I, _____, hereby waive the reading
     and signing of my deposition transcript.
23
     _____    _____
24   Deponent Signature                       Date
     *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)
```



**Orange Legal**
**800-275-7991**

**1**

**1** 304:15

**10** 304:17 315:6 319:7,15

**10-year-old** 305:24 306:15

**11** 306:7 322:10

**12** 322:10 333:13,16

**137** 310:20 311:1,6, 13,20 317:24 323:17

**16** 307:17

**19** 310:19

**2**

**2** 304:16 315:7

**200** 311:7 330:5,6,22

**200%** 334:1,10,16, 25 335:8,20 336:3,4

**2001** 305:23 315:6

**2010** 322:10,11

**2013** 311:1

**2014** 303:22 331:9

**2015** 311:1 331:21

**2016** 331:22

**2018** 303:22

**2019** 315:20

**22** 322:18

**23** 312:17

**24** 312:17

**25** 315:17

**3**

**35** 306:18 327:19

**3:59** 303:6

**4**

**4** 303:17

**4:32** 336:11,12

**4:34** 336:16

**4:35** 338:1

**4:39** 338:8

**5**

**500** 303:12,22

**6**

**6** 315:17

**65** 325:18

**7**

**76140** 312:11

**8**

**80%** 334:8,22 335:6

**9**

**95851** 312:9

**99** 313:8

**9920** 323:15

**99202** 305:15

**99203** 305:14,15 313:8,18,20 314:9 323:14 324:22

**99204** 303:17 304:12 305:13 312:8 313:8 314:8 315:8 322:19 323:13,22 324:10 333:20

**99204s** 303:23 304:7

**A**

**abnormal** 307:4

**absorb** 309:1,6,7

**accept** 313:10 314:13 315:12 334:10 335:4,8,25

336:2,3

**accepted** 313:18

**accident** 304:25 305:5,11,19 325:3, 10 326:7 327:2

**accidents** 305:3 326:11

**accurately** 337:6,13

**active** 332:16

**actual** 332:24 333:1

**addition** 318:10

**additional** 314:23 315:3,4

**adjusted** 316:5

**adjuster** 322:23 332:11

**adjuster's** 332:21

**adverse** 311:20 312:2

**advised** 322:16,19

**afternoon** 303:4,9

**agree** 315:11

**ahead** 308:4

**allowing** 312:24

**amount** 329:20 334:17,25

**analysis** 325:17

**Andrew** 319:22,24

**Andy** 320:3,4,6,10

**Anie** 322:19

**answering** 323:2

**answers** 320:25

**anytime** 322:6

**aren't** 304:6

**asks** 314:12

**asymptomatic** 307:18,25

**attention** 306:7

**attorney** 319:24 321:9,20

**attorney-client** 331:3

**attorneys** 318:4 320:1 321:2

**auto** 325:3,10 326:7, 11 327:2

**automobile** 304:25 305:3,5,11,19

**avoid** 316:6

**aware** 316:11 320:10,16,20,24 321:1,6,8 324:21

**B**

**B(6)** 315:3

**back** 305:21 322:13 326:7 327:5,6 336:6

**bad** 331:23

**Barrata** 319:23,24 320:6,10 321:20

**Based** 306:17

**basing** 328:4

**basis** 321:14

**believed** 311:8

**Benefit** 316:1

**Benefits** 312:19

**big** 305:17

**bill** 315:12,16 322:5 330:20 334:9,23

**billed** 304:6,12 318:11,15 334:22

**billing** 318:5,24 319:6,13

**bills** 304:11 311:8,10 312:25 317:1,4,9 332:1,6,8 333:1,3,5, 10,12,16,18

**bit** 310:18

**block** 332:19

**blocked** 332:12,13

**bone** 325:22

**attorney-client** 331:3

**boneheaded** 317:13 320:12 321:10,21

**bones** 325:20 326:4, 25

**breaks** 325:19

**broken** 325:22 326:3,25

**C**

**call** 313:16 315:13 317:2 323:8 332:10 333:22 334:20

**called** 314:7

**calling** 332:22

**calls** 306:22 310:2 314:12,17 319:10,16

**case** 303:13,21 304:25 309:21 311:19,24 312:1 313:17 314:2 316:3, 7 318:17 323:17 335:5

**cases** 304:8 305:2,6 310:20 311:3,13,20, 22 317:24,25 329:8 331:9,14 335:14,15

**Castillo** 303:9 306:12

**CD** 318:19

**charges** 320:12,13 321:11,22 329:20 333:19,24

**cheated** 316:17

**child** 306:4

**children** 309:15

**claim** 324:22

**claims** 310:23 311:14 323:12,20 328:8,15,23 329:18, 23 330:1,2,23 335:17,20

**clarify** 329:16

**clinic** 317:3 321:22 328:10,16 329:24 330:9,24 331:18



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                                    Index: clinic's..file

334:5,8,15 335:1,8,
11 337:10

**clinic's**  320:13
321:11 330:8 331:6
333:24 334:16,18
335:19 336:3

**closed**  330:21

**code**  303:19 304:7,
12 312:8 313:15,16,
18,20 314:13 315:12
316:9 318:16
323:15,22 324:9,22

**codes**  323:13 324:10

**communicated**
319:14

**communications**
319:4

**company**  316:7

**comparing**  325:12

**complete**  307:13

**complex**  305:18
326:6,11,18 327:3

**complexity**  305:6
325:4,10 326:14

**comprehensive**
308:1,19

**concluded**  338:8

**concludes**  338:1

**confirm**  308:14
324:23

**conscious**  335:11

**consultation**  306:18

**contact**  322:23
323:1

**continued**  316:2

**continuous**  326:20

**contracted**  335:3

**conversation**  314:9
323:6

**conversations**
318:22 332:21

**copy**  306:9 310:19
315:18

**correct**  303:17
304:25 305:3,4
306:5 307:19,22
308:15 309:2,13,22
310:7,25 311:9,10
312:21 313:24
314:13,15 315:4
316:13 318:2,3
319:18 323:10 326:5
328:13 329:25 330:3
335:24 337:8,15

**corrected**  324:1

**correctly**  317:20
335:23

**could've**  306:19
322:7

**could've**  306:19
321:3 322:6

**counsel**  303:25
331:7

**County**  311:15

**couple**  325:19
332:10

**Court**  303:25 304:12
311:14,15 314:3
336:11 338:3,6

**CPT**  303:19 313:15,
16,17 316:9

**crooked**  316:17
317:3

**CROSS**  303:7

———————

**D**

**date**  337:15

**daughter's**  306:20

**day**  337:8

**dealing**  306:3

**decide**  309:8 311:23
330:24 331:18

**decided**  311:11

**decision**  320:12
321:11,22 330:7
331:6 335:11

**delivery**  338:7

**demand**  335:12,13

**denial**  316:2

**deny**  317:21,22

**deposition**  303:3,11
304:2 318:1,2
320:11 321:16
336:14 338:8

**depositions**  318:5,
21 319:1,14

**describe**  306:25

**describing**  326:25

**diagnosis**  310:15

**dictated**  310:14

**dictates**  309:19

**dictation**  337:13

**didn't**  323:15

**direct**  306:6

**disagree**  322:20

**discussed**  318:25

**discussion**  304:1
336:13

**dismiss**  311:23

**dispute**  333:22

**disputing**  323:5

**doctor**  308:20 309:1,
6,19 310:6 316:3
317:19

**document**  323:4

**documents**  310:21
336:21

**don't**  308:9 313:6
325:23 330:10

**double**  317:6

**down-**  314:12

**down-coded**  313:16

**down-coding**  314:8
315:12

———————

**E**

**E&m**  323:13,22

**earlier**  303:11

**emergency**  326:2

**entire**  324:6

**estimate**  329:23
330:4

**estimating**  333:15

**evaluation**  304:17
307:6,11,12,17,21
308:24 318:11

**evaluations**  307:7,8,
12 337:14

**exam**  306:8 307:22,
25

**examination**  303:7
308:11 309:12
310:12 319:20 337:7

**examinations**  325:5
337:14

**exams**  336:21

**exhibit**  304:15,16
306:7 307:17 310:19
315:17 322:18

**exhibits**  312:17
314:6

**expect**  334:13 337:5,
10

**expected**  334:8,10,
22 335:6

**expects**  334:15
337:11

**experience**  305:23
306:2 328:4

**expired**  331:10,14

**explain**  308:5,7
313:12,13,14 315:24
318:4

**explained**  318:7,13
332:17

**Explanation**  312:18
316:1

**extreme**  326:22

———————

**F**

**fact**  305:2 306:9
307:24 309:24
316:15 318:9

**fair**  305:5,19 309:17,
18 310:22 334:18,21
336:4

**faith**  315:23 316:10

**falls**  325:19 326:1

**familiar**  319:22

**family**  308:20

**Farm**  304:6,11,24
310:21,23 311:2,4,
11,22 312:7,23,24,25
314:7,12 315:2
316:7 317:10,25
318:2,14,20,22
319:4,6,13 320:11
321:10,20 322:4,11,
19 323:4,13,21,23,25
324:22 328:8,9,15
329:11,19 332:1
333:23 334:9,22
335:3

**Farm's**  313:22
314:6

**fee**  312:24 313:11,19
333:24

**feel**  321:19,23 334:5

**feelings**  321:9,15

**Feijoo**  304:20 305:7,
23,24 306:14 307:2,
10 308:8 310:11,13
315:14 316:8 317:18
318:6,10,14 320:1
325:21,22 326:3
327:24 328:8 333:23
336:20 337:1,5,10

**Feijoo's**  313:10
337:5,11

**female**  304:18
305:25

**file**  307:13 310:24
311:2,4 317:25
330:8,9,21,24 331:9,
14,18 335:13



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                              Index: filed..motion

**filed** 311:13,14
323:17 328:10
329:24 332:2 333:3

**files** 303:13,22
304:5,10 317:22
322:11 323:16
330:22

**filing** 316:5,7

**film** 318:15

**films** 318:18

**final** 307:6,7,10,16,
17,21 308:24 330:7

**find** 308:1

**finger** 305:12

**finish** 320:18

**fix** 322:13,17 325:22

**fixing** 304:4

**Florida** 314:3

**follow-up** 306:8
307:8,12 308:23
325:14 327:15,17,25

**form** 321:24

**found** 307:18

**foundation** 321:25

**fraudulent** 316:24
317:10

**free** 307:24

**full** 329:20

**future** 330:9,20
331:19

### G

**gave** 305:22 318:1

**generally** 310:13
315:7 323:24 324:5,
6 325:4,11

**girl** 306:15

**give** 318:2 325:18

**giving** 323:14

**good** 303:9 315:23
316:10 323:2 335:16

**guardian** 304:21
305:25 306:16 307:3

**guardians** 309:15

**guess** 315:6 323:14
333:12

**guys** 316:16

### H

**H.P.** 304:14,17
305:21 307:16
327:12,25

**hand-written**
337:12

**handwritten** 337:11

**happened** 315:7
318:18

**Hazouri** 303:11
306:9,22 308:3,17
309:3 310:2,8,19
311:16 312:4,21
313:7 314:5,17,21,
24 316:15,18,21,25
317:8,14 319:8,10,
16,21 320:5,15,17,
19,23 321:3,5,14,18
322:1 324:2 327:16
328:25 329:1
330:13,15 331:4,5
336:7,17 337:17,20,
22,24 338:5,7

**Health** 324:14

**healthcare** 324:14

**heard** 321:1

**held** 304:1 336:13

**hid** 318:20

**hidden** 318:24 319:3

**higher** 305:6 325:4,
11

**history** 305:17,22,24
306:10,20 308:11,19
309:11

**honest** 317:19

**hospital** 325:24

**hundred** 328:14,16,
23

**hundreds** 310:22
322:21,22 328:24,25

### I

**ID** 332:12,15,16,17,
18

**III** 303:2

**illness** 305:22
306:10

**imagine** 309:14

**important** 309:8,9,
16

**impossible** 326:10

**improper** 316:13,24
317:2,9

**include** 310:12,14
318:9 323:13

**included** 323:16

**incorporated**
313:22

**incorrect** 317:2,4
322:20

**information** 309:1,
6 315:4 316:2
317:22 337:1

**initial** 303:17 304:16
307:11 308:23 313:9
318:10 325:15
326:21 327:12

**injection** 326:21

**injuries** 326:13

**injury** 327:2

**input** 331:7

**instituted** 315:16,19

**instruct** 321:13

**instructing** 321:15

**insufficient** 334:6

**insurance** 305:16
314:16,18 316:6
325:13

**interruption** 338:2

**involve** 303:23

304:7 305:2 308:19

**involved** 304:6
305:18

**irrelevant** 310:12,
15 337:1

**issue** 313:11,21
316:6 333:22

**issues** 315:25

**items** 318:11

### J

**J.B.** 312:20

**job** 316:1

**jumped** 314:25

### K

**Ken** 320:14

**kind** 332:12

### L

**late** 331:9

**lawsuit** 303:22
304:7,9 312:15
316:8 320:2 322:6,
11 323:16,22 329:24
332:2 333:1

**lawsuits** 328:10

**leading** 308:3,17
309:3 310:2,8
311:16 312:5 319:10

**lesser** 313:9

**level** 303:17 305:6
325:4

**limitations** 331:10,
15,19

**lines** 306:11

**list** 310:20

**listen** 310:6

**location** 312:13

**long** 306:14 320:21
322:8

**looked** 327:13

**lose** 311:19 312:1

**lot** 304:8 311:5
317:6,17 326:24
329:7 335:14

**lower** 304:7,12
323:13,22 324:10

### M

**made** 320:11,21
321:21 330:7 333:1
335:11

**majority** 326:17

**make** 316:10 317:7
325:17 329:3

**mark** 316:8

**match** 315:11

**matter** 316:3

**matters** 310:14

**means** 304:20

**meant** 327:9

**media** 303:4,5
336:15 338:1

**medical** 308:11
315:9 337:13

**Medicare** 305:11,15
312:24 313:1,3,11,
19,23 324:12
325:14,18 326:19
333:24 334:1,3,10,
16,17,25 335:3,4,8,
20 336:3,4

**member** 308:21

**mentioned** 303:12
315:22

**met** 304:20,21

**minute** 306:18

**minutes** 327:20

**missed** 309:25

**mother** 306:19

**motion** 312:10,11
318:10



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                      Index: mouth..required

**mouth** 316:22

**Mutual** 324:22

---

**N**

**neck** 326:7

**negatives** 317:6

**news** 323:2

**note** 309:23

**noted** 303:16 307:4

**notes** 309:20 310:14
336:22 337:5,11,12

**noteworthy** 309:20,
24

**notice** 335:22

**number** 306:7
315:17 323:11
328:22 329:22,23
335:16

---

**O**

**object** 312:4 321:24
331:2

**objection** 306:22
308:3,17 309:3
310:2,8 311:16
314:17 319:8,16
320:22 330:11

**observed** 328:5

**occurred** 323:6

**office** 313:9 326:19

**order** 338:5

**ordering** 338:3

**orthopedic** 304:17
306:8 307:17 308:24

**overriding** 337:4

---

**P**

**P.A.** 320:1 328:8
333:24 337:10

**p.m.** 303:6 336:12,16
338:1,9

**paid** 310:23 312:14
315:7 328:9,15
329:8,12,14,19,20
330:1,2,23 332:9
333:4 334:8 335:4,6

**pain** 305:12 307:24
326:21 327:5,6

**painless** 308:10

**paraphrase** 316:16

**parent** 304:21
305:25 306:4,15
307:3

**parents** 306:24
309:14

**part** 304:9 313:3
323:21

**past** 314:15 315:3
319:14

**patient** 303:12,22
304:11,14,17
305:10,11,21 306:17
307:3,16,18 308:12,
13,14,20 310:6,16
322:21,22 324:6,19
325:10,11,13,19,25
326:3 327:2,3,12,25
328:2 333:12 337:7,
14

**patient's** 307:3
308:20 309:11

**patients** 305:7
312:19 324:12,14,
16,20 325:4,14
326:12,13,18,19,22
333:5,6,11

**pause** 336:8

**pay** 311:2,4,23
317:16 318:1 320:12
321:11,22 329:8
332:11 334:3,18

**paying** 312:8,13
313:18 322:5 332:1
333:23

**payment** 332:22
334:6,18 335:9,21

**payments** 332:25
333:1

**pendency** 312:15

**pending** 313:21

**performed** 308:12
337:7

**performing** 316:9

**personnel** 318:22
319:4

**phone** 332:10

**PIP** 310:23 323:12,
17,20 324:19,20,22
326:17 328:15

**Pivnik** 303:8 304:3
307:1 308:6,18
309:4 310:5,10
311:18 312:6,22
313:2 315:1 316:19,
23 317:5,11,12,15,23
319:12,19 320:3,14,
18,25 321:12,24
323:9,19 324:1
325:3 327:11,15
328:7,14,24 329:11
330:11,14 331:2,25
333:21 337:19,21,23

**Pivnik's** 336:19

**point** 322:17 330:21,
25 334:12,22 335:7
337:4

**pointed** 303:20
314:6

**pointing** 303:13

**policy** 312:23,24
313:10,22 334:9
335:5,23,24

**population** 324:6

**position** 317:1,9
334:16 335:19

**possibly** 314:8

**practice** 309:25
317:18 318:5 319:6,
13

**practices** 318:25

**present** 305:22
306:10

**prior** 318:25

**private** 305:16
324:14 325:13

**privilege** 331:3

**privileged** 321:16

**problem** 305:18
332:18

**procedure** 318:7,16

**procedures** 312:8

**progressive** 314:18,
20

**promise** 336:18

**proof** 316:4,6 322:25
332:15

**prove** 317:21

**provide** 310:21
317:20

**provided** 323:4
337:14

**pursuant** 333:23

---

**Q**

**question** 304:5
312:4 313:4,6 322:3
323:18,19 324:4
328:21 329:4 330:12
337:2

**questioning** 323:9
327:11

**questions** 303:10
323:3 336:18,19,23,
25

**quick** 336:8

---

**R**

**range** 312:10,11
318:10

**rate** 315:8 333:24
334:17

**read** 321:3 337:21,
22

**real** 336:8

**reasonable** 335:20

**recall** 303:13 304:15
314:9 323:14 325:5
327:22 328:11,17

**receive** 311:20 312:2

**recently** 312:7
315:19

**recollection** 323:7
330:10

**record** 304:1 314:7,
23 323:3 336:9,13,
16 337:25

**records** 315:9,11
317:20,21 318:8

**REDIRECT** 319:20

**reduce** 312:25

**reduced** 313:8
330:1,23

**reflect** 337:7,13

**reflects** 322:18,20

**regular** 307:8 338:7

**related** 329:18

**remember** 303:18,
23 333:19 336:23
337:2

**repeat** 313:4 337:9

**rephrase** 309:5
311:9 313:5 316:20

**report** 307:17 308:9
318:14 336:23
337:6,12

**REPORTER**
303:25 336:11
338:3,6

**reports** 312:12

**representative**
320:11 321:10,21

**representing** 320:1

**request** 314:22

**requesting** 316:2,4

**requests** 315:4

**require** 305:13

**required** 318:2



STATE FARM MUTUAL AUTOMOBILE INSURANCE vs MANUEL V. FEIJOO
Castillo Anielka                                                      Index: resolve..years

**resolve** 316:3

**result** 307:22 308:1

**resumed** 303:3 304:2 336:14

**review** 307:11 308:11 312:18 315:14 318:18

**reviewed** 318:14

**room** 326:2

**routine** 325:16 327:3

**routinely** 327:4

---

**S**

**S.B.** 312:20

**schedule** 312:24 313:12,23 333:24

**SCHURR** 313:1 320:21

**sees** 305:10 326:3

**Self-pay** 324:16

**send** 322:5 325:23 332:15,22 335:12

**sentence** 306:11

**separately** 318:11

**services** 334:19

**set** 332:25

**setting** 331:13

**settle** 311:23

**show** 304:16 306:8 308:9 310:19 314:7 315:18

**showed** 318:8

**shows** 308:9

**single** 311:19

**sir** 303:15 304:13,19 305:1,9,20 306:13 307:15,20,23 308:16,22,25 309:10 310:4,9 311:12,21 312:3 313:4 314:1,4, 11 315:5,10,21

316:14 317:17 318:7,12 319:2,5,9 320:9 321:7 324:11, 13,15,17 325:1,6,8 327:10,21 328:6,12 330:17 331:17,24 332:3 333:2,25 334:14 336:24 337:3

**sit** 325:2 326:10

**sleeping** 309:25

**Small** 311:14

**smaller** 309:15

**soccer** 309:25

**speaking** 308:20 320:21

**specific** 306:17 314:9

**speculation** 306:23 310:3 314:17 319:11,17

**spend** 328:2

**spent** 327:24 328:4

**spoke** 306:15 314:8

**sprain/strain** 326:7

**stairs** 325:19 326:1

**standard** 328:4

**started** 304:15

**state** 304:6,11,24 310:21,23 311:2,4, 11,22 312:7,23,24,25 313:9,22 314:6,7,12 315:2 316:7 317:10, 25 318:1,5,14,20,22 319:4,6,13 320:10 321:10,20 322:4,11, 19 323:4,13,21,23,25 324:22 328:7,9,15 329:11,19 332:1 333:23 334:9,22 335:3

**stated** 322:23

**statute** 331:10,14,19

**statutory** 335:13

**stuff** 310:12

**submit** 314:23 316:6

**submitted** 310:21 323:12,21 328:9

**submitting** 315:9 324:21 332:16

**sue** 311:11

**sued** 328:16

**suffered** 326:13

**sufficient** 334:4

**suit** 305:2 310:24 311:2,4,13,14 317:25 330:8,9,24 331:18 335:13

**summarize** 307:2

**Sunbiz** 332:15

**super** 315:16

**supposed** 334:10 335:4

**Supreme** 314:3

---

**T**

**takes** 307:14

**taking** 317:1

**talk** 304:14 310:18 312:7 315:13 316:3

**talking** 318:17 320:8,12

**tax** 332:12,15,16,17, 18

**testified** 323:10

**testimony** 323:14 327:1,22 328:11 329:18

**that'd** 318:15

**That's** 308:5

**thing** 303:11 333:20 334:11,13,15

**things** 309:15,16

**thought** 328:24

**thousands** 304:10 323:11,12,20 324:8

**till** 316:13

**time** 303:5 304:22 306:3 307:8,14 308:10 316:5 322:7 327:7,24 328:3 331:21 332:17 335:22 336:10,16 338:1,4

**times** 311:1 328:1 334:17

**transcribed** 336:23 337:6,12

**transcript** 321:4 338:4

**treat** 327:6

**treatment** 308:12 310:15

**true** 308:23

**turn** 306:6

**type** 322:25

**types** 305:7 326:12 329:23

---

**U**

**understand** 309:8 319:25 322:3 326:16 329:4 330:12,16 332:20 334:1 335:7

**understanding** 313:25 314:2 324:4

**understood** 323:25 330:13

**unusual** 310:11

**updated** 335:5

---

**V**

**verdict** 311:20 312:2

**visit** 303:17 313:9 325:14,15,16 326:21 327:12,17,25

**VOLUME** 303:2

---

**W**

**wait** 322:5,8

**wanted** 329:16

**Windhaven** 316:4

**worded** 313:6

**words** 310:13 316:21

**work** 313:17

**working** 317:17 331:20

**would've** 322:16

**wouldn't** 331:11

**wrapping** 315:15

**write** 331:23 337:1

**writes** 336:21

**written** 336:22

**wrong** 322:15 323:10 328:13 332:14

---

**X**

**x-ray** 312:12 318:15, 18

**x-rays** 312:11 326:2

---

**Y**

**year** 304:17 325:18

**years** 315:6 317:18 319:7,15 322:4,5



# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O BOX 106134

ATLANTA   GA 30348

CARRIER

PICA                                                                                                              PICA

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|

1a. INSURED'S I.D. NUMBER: 5907187P4

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
P■■ H■■

3. PATIENT'S BIRTH DATE
MM | DD | YY
■ | ■ | 2006   SEX   M   F [X]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
P■■ H■■

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self [X]   Spouse   Child   Other

7. INSURED'S ADDRESS (No., Street)

CITY: NORTH MIAMI   STATE: FL

8. RESERVED FOR NUCC USE   X

CITY: NORTH MIAMI   STATE: FL

ZIP CODE: 33162   TELEPHONE (Include Area Code) ( )

ZIP CODE: 33162   TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
9146903E1859G4

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
YES   [X] NO

a. INSURED'S DATE OF BIRTH
MM | DD | YY   SEX   M   F

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?
[X] YES   NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?
YES   [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES   NO   If yes, complete items 9, 9a, and 9d

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE   I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE   DATE   03 07 17

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE   I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)
MM DD YY   01 24 17   QUAL

15. OTHER DATE   QUAL   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
MM DD YY   FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
MM DD YY   FROM   TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   YES   NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY   Relate A-L to service line below (24E)   ICD Ind.
A. M48.34   B.   C. S134XXA   D.
E.   F.   G.   H.
I. S199XXA   J.   K. S335XXA   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 26 17 | | 11 | 1 | 99204 | | M48.34 | 475 00 | 1 | | NPI | |
| 2 | 01 26 17 | | 11 | 1 | 95851 | | M48.34 | 100 00 | 1 | | NPI | |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

EXHIBIT

25. FEDERAL TAX I.D. NUMBER   SSN EIN
650409050   [X]

26. PATIENT'S ACCOUNT NO.
P01685 1

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
[X] YES   NO

28. TOTAL CHARGE
$ 575 00

29. AMOUNT PAID
$ 0 00

30. Rsvd for NUCC Use
575 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
FEIJOO   MANUEL V MD
SIGNED 63009   DATE 03 07 17

32. SERVICE FACILITY LOCATION INFORMATION
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI   FL 33144
a. 1811923105   b.

33. BILLING PROVIDER INFO & PH #
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI   FL 33144
a. 1811923105

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02-12)

011844

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**REFERS TO GOVERNMENT PROGRAMS ONLY**

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11

**BLACK LUNG AND FECA CLAIMS**

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)**

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

**NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)**

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; F.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990 or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records." Federal Register Vol. 55 No. 40. Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S). To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S). Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions, to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary, however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988" permits the government to verify information by way of computer matches

**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

011845

*Manuel V. Feijoo M.D. P.A.*

ORTHOPEDIC

REPLY TO MIAMI OFFICE

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

8421 South Orange
Blossom Trail
Suite 104.
Orlando, FL 32809
Tel: (407) 857-5686
Fax: (407) 857-5687

## Initial Orthopedic Evaluation

Today's Date _____ 1/26/17

Name: _____ H███████ P███████    Age: _10_ Sex: _F_ Status _____

Weight _70_ Height _4 6_ B/P _____ Pulse _____ Temp: _____

Date of Accident: _____ 1/24/17

Actual Complaints: _____ (P c apio, L. Q. gue

_____ NAI: A.M, dnega, Fig, Al
_____ Cn, (al (an L. Aull . 18.14/
_____ Can. V BG N/4. 07 2,

Past Medical History

Previous Accidents: _____ Ø

Surgeries: _____ N/A

Allergies: _____ N/A

Habits: _N/A_ Alcohol: _____ Smoking: _____ Drugs: _____ Coffee: _____

Is the patient taking any medications currently? _____ Dt Offer

Diseases: _____ Hypertension: _____ Diabetes: _____ Heart Disease _____

Other: _____ N/A

If applicable, Date of patient's last menstruation: _____

To the patient's knowledge, is she pregnant at this time: Yes _____ No _____

Patient's Signature _____                    Witness _____



EXHIBIT
2
5/29/19  AG

011892

Date of examination: _____  Pulse: _____
Date of Accident: _____  Resp: _____

## PHYSICAL EXAMINATION:

**Headache:**   occipital / frontal / temporal  (R)  (L)
severe / significant / considerable / moderate / mild / some
Onset:   immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few days
Dizziness:   frequent / occasional

**Cervical Pain:**   sharp / dull / persistent / excessive / extreme / severe
significant considerable / moderate / mild / some
Onset:   immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few days
R.O.M.   extension / flexion / right / left / both lateral flexion or rotation limited to 20 30 40 50 60 70 80% of normal with / without pain

**Thoracic Pain:**   sharp / dull / persistent / excessive / extreme / severe
significant considerable / moderate / mild / some
Onset:   immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few days
R.O.M.   extension / flexion / right / left / both lateral flexion or rotation limited to 20 30 40 50 60 70 80% of normal with / without pain

**Lumbar Pain:**   sharp / dull / persistent / excessive / extreme / severe
significant considerable / moderate / mild / some
Onset:   immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few days
R.O.M.   extension / flexion / right / left / both lateral flexion or rotation limited to 20 30 40 50 60 70 80% of normal with / without pain

**Extremities:**   (R) (L) shoulder / (R) (L) elbow / (R) (L) wrist / (R) (L) hand /
(R) (L) hip / (R) (L) knee / (R) (L) thigh / (R) (L) ankle / (R) (L) foot
sharp / dull / persistent / excessive / extreme / severe
significant considerable / moderate / mild / some
Onset:   immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few days
R.O.M.   extension / flexion / right / left / both lateral flexion or rotation limited to 20 30 40 50 60 70 80% of normal with / without pain

Knee:         Drawer (   )   Apply compression (   ) Apply Distraction (   )

General Limitations:

(   ) Sedentary work        Lifting 10lbs. maximum
(   ) Moderate work         Lifting 20lbs. maximum
(   ) No lifting

Other limitations if indicated:
Patient can stand / walk in an 8 hr. day      (   ) none (   ) 1-4 hrs.  (   ) 4-8 hrs.
In an 8 hr. day, patient can sit              (   ) none (   ) 1-4 hrs.  (   ) 4-8 hrs.
In an 8 hr. day, patient can drive            (   ) none (   ) 1-4 hrs.  (   ) 4-8 hrs.

| Patient is able to: | frequently | intermediately | occasionally | not at all |
|---|---|---|---|---|
| Bend | (   ) | (   ) | (   ) | (   ) |
| Squat | (   ) | (   ) | (   ) | (   ) |
| Climb | (   ) | (   ) | (   ) | (   ) |
| Perform overhead work | (   ) | (   ) | (   ) | (   ) |

Impression: _____

_____

_____

_____

R/O _____

Clinical course and treatment:

X-ray examination of the injured areas: _____

_____

Recommended diagnosis procedures: _____

Orthopedic supports for injured regions: _____
Limit overall activities: _____
Therapeutic modalities: _____
Other recommendations: _____

Follow-up: _____

Doctor's Signature: _____

MEDICAL OFFICE
8326 S.W. 8th St.
MIAMI, FL 33144

*Manuel V. Feijoo M.D. P.A.*
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

**RANGE OF MOTION REPORT**

PATIENT'S NAME �ना▬▬▬▬▬  D/A: 1/24/17

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| **CERVICAL SPINE:** | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | |
| Lateral Flexion | 0—45 | |
| Rotation | 0—80 | |
| **THORACOLUMBAR SPINE:** | | |
| Forward Flexion | 0—90 | 40% |
| Extension | 0—30 | |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| **SHOULDER:** | | |
| Forward Elevation | 0—150 | |
| Backward Elevation | 0—40 | |
| Abduction | 0—150 | |
| Adduction | 0—30 | |
| External Rotation | 0—80 | |
| Internal Rotation | 0—40 | |
| **ELBOW:** | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| **WRIST:** | | |
| Dorsiflexion | 0—60 | |
| Palmar Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| **HAND:** | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| **HIP:** | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| **KNEE:** | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| **ANKLE:** | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking
If an assitive device is used for ambulation , comment on its medical necessity and the patient's ability to walk without it.)

PHYSICIAN'S SIGNATURE

1.26.17
DATE

**EXHIBIT**
3
5/29/19

011895

*Manuel V. Feijoo M.D. P.A.*

**MEDICAL OFFICE**
8370 S.W. 8th St.
MIAMI, FL 33144

**ORTHOPEDIC**

Tel: (305) 265-7505
Fax: (305) 265-7535

**PATIENT NAME:** P██████H████
**DATE OF INJURY:** 01/24/17
**EXAMINATION DATE:** 01/26/17

## INITIAL ORTHOPEDIC EVALUATION

**CHIEF COMPLAINT:**
Pain on the cervical region, the lower region.

**HISTORY OF PRESENT ILLNESS:**
This is a 10-year-old female who was involved in an automobile accident on January 24th, 2017 she was front seat passenger, wearing the seatbelt, when another car hit the left front side of the vehicle she was in, suffering multiples traumas, but did not go to any hospital.

**PAST MEDICAL HISTORY:**
No previous accident.

**SURGERIES:**
None.

**ILLNESSES:**
None.

**ALLERGIES:**
None.

**SOCIAL HABITS:**
The patient does not have any social habit.

**MEDICATIONS:**
Diclofenac for pain, I advised the patient to take it with meals.

**OCCUPATION:** Student 4th grade.

**PHYSICAL EXAMINATION:**
The patient is well-nourished, well-developed, oriented and alert, cooperative, head; eyes, ears, nose, mouth and throat are within normal limits.

**Weight:** 70 lbs.          **Height:** 4'06"



EXHIBIT
4
5/29/19   RC

011885

**PATIENT NAME:** P████ H████
**DATE OF INJURY:** 01/24/17
**PAGE:** 2

**CERVICAL SPINE:** There is pain on the posterior cervical region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation on the paracervical muscles with slight limited range of motion of the normal range.

**THORACIC SPINE:** There is limited range of motion to the last 40 percent of the normal range, but not painful.

**LUMBOSACRAL SPINE:** There is pain on the lumbosacral region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paralumbar muscles with limited range of motion to 40 percent of the normal range.

**UPPER EXTREMITIES:** Abduction/adduction, internal and external rotations are normal in both shoulders and arms.

**LOWER EXTREMITIES:** Flexion/extension, both hips and knees are normal with Lasegue's sign being positive bilaterally to 45 degrees.

DIAGNOSIS:
1. Cervical spine post-traumatic painful syndrome.
2. Lumbosacral spine post-traumatic painful syndrome.
3. Lumbosacral spine radiculitis.

RECOMMENDATION'S:
1. Limit overall activities.
2. Use a low pillow.
3. Avoid heavy weight lifting; bend the knees not the back when picking up anything from the floor.
4. I ordered x-rays of the cervical spine and lumbosacral spine.
5. I Manuel V. Feijoo, MD, have examined the patient H██ P████ for an accident that occurred on 01/24/17 and I have concluded that this patient has an emergency medical condition, which is defined as a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain such that the absence of immediate medical attention would reasonably be expected to result in any of the following a) serious jeopardy to the patient's health; b) serious impairment of body

011886

**PATIENT NAME:** P████ H██
**DATE OF INJURY:** 01/24/17
**PAGE:** 3

## RECOMMENDATION'S:

function; c) serious dysfunction of any bodily organs or parts. The patient should start medical treatment and care as soon as possible, as an emergency.

6. Return to the office in one month for further evaluation and treatment if necessary.

_____, M.D.
Physician's Signature Required

MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                          02/23/17

011887

*Manuel V. Feijoo M.D. P.A.*

**MEDICAL OFFICE**
8370 S.W. 8th St.
MIAMI, FL. 33144

**ORTHOPEDIC**

Tel: (305)265-7905
Fax: (305)265-7535

## STUDIES REQUEST

PATIENTS NAME _____ D.O.B _____ SEX: ☐ M

DATE: | / 22 / 7      CHART: _____  AGE: __/0___      ☑ F

REFERRING PHYSICIAN: _____

CLINICAL PHYSICIAN: _____

**X-RAY STUDIES:**

**HEAD:**
( ) SKULL
( ) FACIAL, BONES
( ) NASAL, BONES
( ) MASTOIDS
( ) PARANASAL, SINUSES
( ) MANDIBLE
( ) ORBITS
( ) T.M.J.S.

**CHEST:**
( ) CHEST AP & LATERAL
( ) CHEST AP
( ) STERNUM
( ) RIGHT RIB CAGE
( ) LEFT RIB CAGE

**SPINE:**
( ) CERVICAL 4V + Oflexext
( ) THORACIC
( ) LUMBAR 4V
( ) SACRUM COCCYX
( ) PELVIS

**EXTREMITIES:**      LT:      RT:
( ) BONE AGE      ( )      ( )
( ) FOOT          ( )      ( )
( ) ANKLE         ( )      ( )
( ) KNEE          ( )      ( )
( ) LEG           ( )      ( )
( ) FEMUR         ( )      ( )
( ) HIP           ( )      ( )
( ) HAND          ( )      ( )
( ) FINGER        ( )      ( )
( ) WRIST         ( )      ( )
( ) FOREARM       ( )      ( )
( ) ELBOW         ( )      ( )
( ) HUMERUS       ( )      ( )
( ) SHOULDER      ( )      ( )
( ) CLAVICLE      ( )      ( )

**GRASTROINTESTINAL:**
( ) ABDOMEN FLAT
( ) ORAL CHOLECYSTOGRAM
( ) ESOPHAGYS
( ) U G I SERIES
( ) SMALL BOWEL
( ) BARIUM ENEMA

**UROLOGICAL:**
( ) INTRAVENOUS PYELOGRAM
( ) CYSTOGRAM

**SONOGRAPHY:**
( ) LIVER
( ) GALLBLADDER
( ) KIDNEY
( ) PANCREAS
( ) SPLEEN
( ) ABDOMINCAL AORTA
( ) RETROPERITONEAL
( ) PROSTATE
( ) URINARY BLADDER
( ) PELVIC

( ) OB FOR FETAL AGE
( ) TESTICLE
( ) BREAST      ( ) LT( ) RT
( ) THYROID

**CARDIAC:**
( ) ECHOCARDIOGRAM
( ) E K G
( ) TRANSTELEPHONIC MONITOR
( ) HOLTER MONITOR

**VASCULAR STUDIES:**
( ) PERIORBITAL DOPPLER
( ) CAROTID DOPPLER      ( ) W/IMAGING
( ) DOPPLER STUDY ARTERIES ( ) U ( ) L
             VEINS ( ) ( )
( ) QUANTITATIVE NEVOUS FLOW
( ) PERIPHERAL IMAGING DUPLEX DOPPLER
( ) PENILE FLOW

**NEUROLOGICAL:**
( ) E E G
( ) NERVE CONDUCTION
      ( ) UPPER ( ) LT      ( ) RT
      ( ) LOWER ( )      ( )
( ) EVOKED POTENTIAL:
      ( ) VEP   (visual)
      ( ) BAEP  (auditory)
      ( ) SEP   (somatosensory)

**LABORATORY:**
( ) URINALYSIS
( ) GLUCOMETER
( ) HEMOGROBINOMETER
( ) PREGNANCY TEST
( ) RESPIRATORY TESTS

**OTHERS:**
_____

**EXHIBIT**
5
5/29/19  RC

Physician's Signature _____

011889

Evaluation/Management

- A detailed history;
- A detailed examination;
- Medical decision making of low complexity.

Counseling and/or coordination of care with other physicians, other health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate severity. Typically, 30 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, Oct 04:10, Feb 05:9, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jun 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➔ *Clinical Examples in Radiology* Winter 12:9

★ **99204**   Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision making of moderate complexity.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 45 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, May 02:1, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➔ *Clinical Examples in Radiology* Winter 12:9

★ **99205**   Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components:

- A comprehensive history;
- A comprehensive examination;
- Medical decision making of high complexity.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 60 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:2, May 02:1, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jul 10:4, Jan 11:3, Jan 12:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➔ *Clinical Examples in Radiology* Winter 12:9

## Established Patient

**99211**   Office or other outpatient visit for the evaluation and management of an established patient, that may not require the presence of a physician or other qualified health care professional. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

➔ *CPT Changes: An Insider's View* 2013

➔ *CPT Assistant* Winter 91:11, Spring 92:14, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Oct 96:10, Feb 97:9, May 97:4, Jul 98:9, Sep 98:5, Oct 99:9, Feb 00:11, Aug 01:2, Jan 02:2, Oct 04:10, Feb 05:15, Mar 05:11, Apr 05:1, 3, May 05:1, Jun 05:11, Nov 05:1, Dec 05:10, Feb 06:14, May 06:1, Jun 06:1, Jul 06:19, Oct 06:15, Nov 06:21, Apr 07:11, Jul 07:1, Sep 07:1, Dec 07:9, Mar 08:3, Aug 08:13, Mar 09:3, Aug 09:5, Apr 10:10, Jun 11:3, Jan 12:3, Mar 12:4, 8, Apr 12:10, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Nov 13:3, Mar 14:14, Jan 15:12, Mar 16:11

★ **99212**   Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- A problem focused history;
- A problem focused examination;
- Straightforward medical decision making.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are self limited or minor. Typically, 10 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Jun 00:11, Aug 01:2, Jan 02:2, May 02:3, Apr 04:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Jun 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Feb 10:13, Jul 10:4, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Apr 12:17, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Feb 14:11, Jan 15:12, Mar 16:11

★ **99213**   Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- An expanded problem focused history;
- An expanded problem focused examination;
- Medical decision making of low complexity.

EXHIBIT
6
5/29/19   AC

# Evaluation and Management

## Office or Other Outpatient Services

The following codes are used to report evaluation and management services provided in the office or in an outpatient or other ambulatory facility. A patient is considered an outpatient until inpatient admission to a health care facility occurs.

To report services provided to a patient who is admitted to a hospital or nursing facility in the course of an encounter in the office or other ambulatory facility, see the notes for initial hospital inpatient care (page 15) or initial nursing facility care (page 25).

For services provided in the emergency department, see 99281-99285.

For observation care, see 99217-99226.

For observation or inpatient care services (including admission and discharge services), see 99234-99236.

--- *Coding Tip* ---

**Determination of Patient Status as New or Established Patient**

Solely for the purposes of distinguishing between new and established patients, **professional services** are those face-to-face services rendered by physicians and other qualified health care professionals who may report evaluation and management services reported by a specific CPT code(s). A new patient is one who has not received any professional services from the physician/qualified health care professional or another physician/qualified health care professional of the **exact** same specialty and subspecialty who belongs to the same group practice, within the past three years.

An established patient is one who has received professional services from the physician/qualified health care professional or another physician/qualified health care professional of the exact same specialty and subspecialty who belongs to the same group practice, within the past three years.

In the instance where a physician/qualified health care professional is on call for or covering for another physician/qualified health care professional, the patient's encounter will be classified as it would have been by the physician/qualified health care professional who is not available. When advanced practice nurses and physician assistants are working with physicians they are considered as working in the **exact** same specialty and exact same **subspecialties** as the physician.

*CPT Coding Guidelines, Evaluation and Management, Definitions of Commonly Used Terms, New and Established Patient*

## New Patient

★ **99201**   **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **A problem focused history;**
- **A problem focused examination;**
- **Straightforward medical decision making.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are self limited or minor. Typically, 10 minutes are spent face-to-face with the patient and/or family.

➡ *CPT Changes: An Insider's View* 2011, 2013, 2017

➡ *CPT Assistant* Winter 91:11, Spring 92:13, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Jun 99:8, Feb 00:3, 9, 11, Aug 01:2, Oct 04:11, Mar 05:11, Apr 05:1, May 05:1, Jun 05:11, Dec 05:10, Feb 06:14, May 06:1, Jun 06:1, Aug 06:12, Oct 06:15, Apr 07:11, Sep 07:1, Nov 08:10, Mar 09:3, Aug 09:5, Dec 09:9, Jul 10:10, Jan 11:3, Jan 12:5, Mar 12:4, 8, Apr 12:10, Jan 13:9, Jun 13:3, Aug 13:13, 14, Aug 14:3, Oct 14:3, Nov 14:14, Jan 15:12, Mar 16:11

➡ *Clinical Examples in Radiology* Winter 12:9

★ **99202**   **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **An expanded problem focused history;**
- **An expanded problem focused examination;**
- **Straightforward medical decision making.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of low to moderate severity. Typically, 20 minutes are spent face-to-face with the patient and/or family.

➡ *CPT Changes: An Insider's View* 2013, 2017

➡ *CPT Assistant* Winter 91:11, Spring 92:13, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➡ *Clinical Examples in Radiology* Winter 12:9

★ **99203**   **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

**EXHIBIT**

7

5/29/19  AC

**Evaluation/Management**

- A detailed history;

- A detailed examination;

- Medical decision making of low complexity.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate severity. Typically, 30 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, Oct 04:10, Feb 05:9, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➔ *Clinical Examples in Radiology* Winter 12:9

★ **99204** **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- A comprehensive history;

- A comprehensive examination;

- Medical decision making of moderate complexity.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 45 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, May 02:1, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➔ *Clinical Examples in Radiology* Winter 12:9

★ **99205** **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- A comprehensive history;

- A comprehensive examination;

- Medical decision making of high complexity.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 60 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Jun 01:2, Apr 02:2, May 02:1, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jul 10:4, Jan 11:3, Jan 12:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

➔ *Clinical Examples in Radiology* Winter 12:9

## Established Patient

**99211** **Office or other outpatient visit** for the evaluation and management of an established patient, that may not require the presence of a physician or other qualified health care professional. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

➔ *CPT Changes: An Insider's View* 2013

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Oct 96:10, Feb 97:9, May 97:4, Jul 98:9, Sep 98:5, Oct 99:9, Feb 00:11, Aug 01:2, Jan 02:2, Oct 04:10, Feb 05:15, Mar 05:11, Apr 05:1, 3, May 05:1, Jun 05:11, Nov 05:1, Dec 05:10, Feb 06:14, May 06:1, Jun 06:1, Jul 06:19, Oct 06:15, Nov 06:21, Apr 07:11, Jul 07:1, Sep 07:1, Dec 07:9, Mar 08:3, Aug 08:13, Mar 09:3, Aug 09:5, Apr 10:10, Jan 11:3, Jan 12:3, Mar 12:4, 8, Apr 12:10, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Nov 13:3, Mar 14:14, Jan 15:12, Mar 16:11

★ **99212** **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- A problem focused history;

- A problem focused examination;

- Straightforward medical decision making.

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are self limited or minor. Typically, 10 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Jun 00:11, Aug 01:2, Jan 02:2, May 02:3, Apr 04:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Feb 10:13, Jul 10:4, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Apr 12:17, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Feb 14:11, Jan 15:12, Mar 16:11

★ **99213** **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- An expanded problem focused history;

- An expanded problem focused examination;

- Medical decision making of low complexity.

Evaluation/Management

Counseling and coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of low to moderate severity. Typically, 15 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jan 97:10, Jul 98:9, Sep 98:5, Aug 01:2, May 02:3, Oct 03:5, Apr 04:14, Oct 04:10, Mar 05:11, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Jan 15:12, Mar 16:11

★ **99214**  **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- **A detailed history;**

- **A detailed examination;**

- **Medical decision making of moderate complexity.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:15, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, May 97:4, Jul 98:9, Sep 98:5, Aug 01:2, Jan 02:2, May 02:1-2, Oct 03:5, Apr 04:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Jan 15:12, Oct 15:3, Mar 16:11

★ **99215**  **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- **A comprehensive history;**

- **A comprehensive examination;**

- **Medical decision making of high complexity.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 40 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013, 2017

➔ *CPT Assistant* Winter 91:11, Spring 92:15, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jan 97:10, Jul 98:9, Sep 98:5, Aug 01:2, Jan 02:2, May 02:1, 3, Apr 04:14, Oct 04:10, Mar 05:11, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Nov 13:3, Aug 14:3, Oct 14:3, Nov 14:14, Jan 15:12, Mar 16:11

# Hospital Observation Services

The following codes are used to report evaluation and management services provided to patients designated/admitted as "observation status" in a hospital. It is not necessary that the patient be located in an observation area designated by the hospital.

If such an area does exist in a hospital (as a separate unit in the hospital, in the emergency department, etc.) these codes are to be utilized if the patient is placed in such an area.

For definitions of key components and commonly used terms, please see **Evaluation and Management Services Guidelines.**

— *Coding Tip* —

**The Significance of Time as a Factor in Selection of an Evaluation and Management Code**

The inclusion of time as an explicit factor beginning in CPT 1992 is done to assist in selecting the most appropriate level of E/M services. It should be recognized that the specific times expressed in the visit code descriptors are averages and, therefore, represent a range of times that may be higher or lower depending on actual clinical circumstances.

Intraservice times are defined as **face-to-face** time for office and other outpatient visits and as **unit/floor** time for hospital and other inpatient visits. This distinction is necessary because most of the work of typical office visits takes place during the face-to-face time with the patient, while most of the work of typical hospital visits takes place during the time spent on the patient's floor or unit.

**Unit/floor time (hospital observation services, inpatient hospital care, initial inpatient hospital consultations, nursing facility):**

For reporting purposes, intraservice time for these services is defined as unit/floor time, which includes the time present on the patient's hospital unit and at the bedside rendering services for that patient. This includes the time to establish and/or review the patient's chart, examine the patient, write notes, and communicate with other professionals and the patient's family.

In the hospital, pre- and post-time includes time spent off the patient's floor performing such tasks as reviewing pathology and radiology findings in another part of the hospital.

STATE FARM INS
P O BOX 106134

ATLANTA   GA 30348

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| PICA | | | | | | PICA |
|---|---|---|---|---|---|---|

| 1. MEDICARE      MEDICAID       TRICARE        CHAMPVA        GROUP HEALTH PLAN   FECA BLK LUNG   OTHER | 1a. INSURED'S I.D. NUMBER                    (For Program in Item 1) |
|---|---|
| (Medicare#)   (Medicaid#)   (ID#/DoD#)   (Member ID#)   (ID#)   (ID#)   ☑(ID#) | 5907187P4 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3 PATIENT'S BIRTH DATE / SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|
| P█████  H███ | MM  DD  YY  2006  M  F ☑ | P█████  H███ |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self ☑  Spouse  Child  Other | |

| CITY                          STATE | 8. RESERVED FOR NUCC USE | CITY                          STATE |
|---|---|---|
| NORTH MIAMI          FL | X | NORTH MIAMI          FL |

| ZIP CODE    TELEPHONE (Include Area Code) | | ZIP CODE    TELEPHONE (Include Area Code) |
|---|---|---|
| 33162   (████) | | 33162   (████) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| | | 9146903E1859G4 |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) | a. INSURED'S DATE OF BIRTH     SEX |
|---|---|---|
| | YES ☑NO | MM  DD  YY   M   F |

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?    PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|
| | ☑YES  NO | |

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|
| | YES  NO | |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| | | YES  NO   If yes, complete items 9, 9a, and 9d. |

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE. I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE         DATE   03-07-17

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) | 15. OTHER DATE | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION |
|---|---|---|
| MM DD YY  01 24 17   QUAL. | QUAL.   MM DD YY | FROM  MM DD YY   TO  MM DD YY |

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|
| | 17b. NPI | FROM  MM DD YY   TO  MM DD YY |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?    $ CHARGES |
|---|---|
| | YES  NO |

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind | 22. RESUBMISSION CODE    ORIGINAL REF. NO. |
|---|---|
| A L S134XX D   B L _____   C L S233XX D   D L | |
| E L _____   F L _____   G L _____   H L | 23. PRIOR AUTHORIZATION NUMBER |
| I L S335XX D   J L _____   K L _____   L L | |

| 24. A. DATE(S) OF SERVICE | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | To MM DD YY | | | | | | | | | |
| 02 20 17 | | 11 | 1 | 99214 | S134XX D | 275 00 | 1 | | NPI | |
| 02 20 17 | | 11 | 1 | 95851 | S134XX D | 100 00 | 1 | | NPI | |
| 02 20 17 | | 11 | 1 | 76140 | S134XX D | 100 00 | 1 | | NPI | |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER   SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| 650409050   ☑ | P01685_1 | ☑YES  NO | $ 475 00 | $ 0 00 | 475 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH # ( ) |
|---|---|---|
| FEIJOO   MANUEL V MD | MANUEL V FEIJOO MD PA | MANUEL V FEIJOO MD PA |
| SIGNED█263009   DATE 03 07 17 | 8370 SW 8TH STREET   MIAMI   FL 33144 | 8370 SW 8 TH STREET   MIAMI   FL 331 |
| | a. 1811923105   b. | a. 1811923105   b. |

**EXHIBIT**
8

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS. A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has another group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black Lung claims I further certify that the services performed were for a Black Lung related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101:41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501 titled, 'Carrier Medicare Claims Record.' published in the Federal Register. Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990. See ESA-5. ESA-6, ESA-12, ESA-13. ESA-30. or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S). Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the 'Computer Matching and Privacy Protection Act of 1988', permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

*Manuel V. Feijoo M.D. P.A.*

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

ORTHOPEDIC

REPLY TO MIAMI OFFICE

8421 South Orange
Blossom Trail
Suite 104
Orlando, FL 32809
Tel: (407) 857-5686
Fax: (407) 857-5687

**FOLLOW-UP ORTHOPEDIC EVALUATION**

TODAY'S DATE: 2 - 200 - 17

NAME: ▮▮▮▮▮▮

DATE OF LOSS: _____

RESIDUAL COMPLAINTS: _____

PHYSICAL EXAMINATION:
VITAL SIGNS: TEMP:_____ BP:___/___ PULSE:_____ /min. RESP:_____ /min.
HEADACHES: YES___ NO___ DIZZINESS: YES___ NO___ SWELLING: YES___ NO___

SKULL & FACE: _____
H.E.E.N.T: _____
THYROID/NECK GLANDS: _____
CHEST: _____
HEART: _____
LUNGS: _____
RIB CAGE: _____
ABDOMEN: _____
MUSCULOSKETAL EXAMINATION:
UPPER
EXTREMITIES: _____

LOWER
EXTREMITIES: _____

SPINE:     CURVATURE:     NORMAL_____     ABNORMAL_____

CERVICAL SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUS PROCESSES:_____

| | | MUSCLES_____ |
| | | NORMAL |
| FLEXION | ____ DEGREES WITH / WITHOUT PAIN | 50 DEGREES |
| EXTENSION | ____ DEGREES WITH / WITHOUT PAIN | 60 DEGREES |
| LT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 80 DEGREES |
| RT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 80 DEGREES |
| LT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 45 DEGREES |
| RT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 45 DEGREES |

THORACIC SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUSPROCESSES:_____

| | | MUSCLES_____ |
| FLEXION | ____ DEGREES WITH / WITHOUT PAIN | 50 DEGREES |
| EXTENSION | ____ DEGREES WITH / WITHOUT PAIN | 40 DEGREES |
| LT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 30 DEGREES |
| RT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 30 DEGREES |

LUMBAR SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUS PROCESSES_____

| | | MUSCLES_____ |
| EXTENSION | ____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| LT. LAT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| RT. LAT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| | ____ DEGREES WITH / WITHOUT PAIN | 60 DEGREES |

EXHIBIT

tabbies

9

01188▮

*Manuel V. Feijoo M.D. P.A.*

ORTHOPEDIC

**REPLY TO MIAMI OFFICE**

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

8421 South Orange
Blossom Trail
Suite 104
Orlando, FL 32809
Tel: (407) 857-5686
Fax: (407) 857-5687
**PAGE 3**

**FOLLOW-UP ORTHOPEDIC EVALUATION**

DIAGNOSIS:

1.
2.
3.
4.
5.
6.
7.
8.

COMMENTS / RECOMMENDATIONS:

PHYSICIAN'S SIGNATURE

PATIENT'S SIGNATURE

011882

MEDICAL OFFICE
8326 S.W. 8th St.
MIAMI, FL 33144

*Manuel V. Feijoo M.D. P.A.*
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

## RANGE OF MOTION REPORT

PATIENT'S NAME _____   D/A: _____

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| **CERVICAL SPINE:** | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | |
| Lateral Flexion | 0—45 | |
| Rotation | 0—60 | |
| **THORACOLUMBAR SPINE:** | | |
| Forward Flexion | 0—90 | |
| Extension | 0—30 | |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| **SHOULDER:** | | |
| Forward Elevation | 0—150 | |
| Backward Elevation | 0—45 | |
| Abduction | 0—150 | |
| Adduction | 0—30 | |
| External Rotation | 0—90 | |
| Internal Rotation | 0—45 | |
| **ELBOW:** | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| **WRIST:** | | |
| Dorsiflexion | 0—60 | |
| Palma Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| **HAND:** | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| **HIP:** | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| **KNEE:** | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| **ANKLE:** | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking.
If an assitive device is used for ambulation , comment on its medical necessity and the patient's ability to walk without it.)

_____

PHYSICIAN'S SIGNATURE

**EXHIBIT**
tabbies
10
5/24/19   AC

2-20-17
DATE

011883

*Manuel V. Feijoo M.D. P.A.*

MEDICAL OFFICE                                    **ORTHOPEDIC**                          Tel: (305) 265-7505
8370 S.W. 8th St.                                                                          Fax: (305) 265-7535
MIAMI, FL 33144

**PATIENT NAME:**              P████ H████
**DATE OF INJURY:**            01/24/17
**EXAMINATION DATE:**          02/20/17

## FOLLOW-UP ORTHOPEDIC EVALUATION

**CHIEF COMPLAINT:**
Pain on the cervical region, the lower region.

**HISTORY OF PRESENT ILLNESS:**
The patient has been receiving physiotherapy treatment and refers is feeling better,
but still complaining of pain on the aforementioned areas.

**PHYSICAL EXAMINATION:**

**CERVICAL SPINE:**  There is pain on the posterior cervical region at
flexion/extension, lateral flexion and rotation to the right and left with tenderness
at palpation on the paracervical muscles with slight limited range of motion of the
normal range.

**THORACIC SPINE:**  There is limited range of motion to the last 40 percent of the
normal range, but not painful.

**LUMBOSACRAL SPINE:**  There is pain on the lumbosacral region at
flexion/extension, lateral flexion and rotation to the right and left with tenderness
at palpation of the paralumbar muscles with limited range of motion to 40 percent
of the normal range.

**UPPER EXTREMITIES:**  Abduction/adduction, internal and external rotations are
normal in both shoulders and arms.

**LOWER EXTREMITIES:**  Flexion/extension, both hips and knees are normal with
Lasegue's sign being positive bilaterally to 45 degrees.

**DIAGNOSIS:**
1. Cervical spine sprain.
2. Lumbosacral spine sprain.
3. Lumbosacral spine radiculitis.
4. As per X-rays review; on the cervical spine there is straightening of the
   normal lordotic curve related to sprain injury of muscle spasm. On the
   lumbosacral spine there is straightening of the normal lordotic curvature.


EXHIBIT
11
5/26/19  AC

011875

**PATIENT NAME:** P█████ H████
**DATE OF INJURY:** 01/24/17
**PAGE:** 2

## RECOMMENDATION'S:

1. Limit overall activities.
2. Use a low pillow.
3. Avoid heavy weight lifting; bend the knees not the back when picking up anything from the floor.
4. The patient was fully explained about the X-rays results.
5. The patient was highly recommended to continue with the physiotherapy treatment on the affected areas.
6. Return to the office in one month for further evaluation and treatment if necessary.

_____, M.D.
Physician's Signature Required
MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                         02/23/17



Manuel V. Feljoo, M.D., P.A.
8370 Sw 8 Street
Miami, FL 33144

RE:   H███████
DOB:  ██████
ID:   40253
DOS:  02/02/2017

Cervical spine complete x-ray:

Straightening of the normal lordotic curve of cervical spine possibly related to sprain injury or muscle spasm. The remainder the examination including vertebral bodies, intervertebral spaces and intervertebral foramina are normal.

IMPRESSION:

See the above comments.

Transcribed on 02/02/17

Thank you for the courtesy of this referral.

Osvaldo DE LA Pedraja, MD
ODL/dlp

cc: Armando, Zabala, M.D.
Electronically Signed - OSVALDO DE LA PEDRAJA,M.D  02/02/17 18:27

DE LA PEDRAJA RADIOLOGY ASSOCIATES Inc.
4776-4790 SW 8 STREET, CORAL GABLES, FL 33134. Phone: 305-447-1415, Fax: 305-446-2435
DIGITAL RADIOGRAPHY DIGITAL MAMMOGRAPHY  ULTRASOUND  CT SCAN BONE DENSITY(DEXA)  OPEN MRI

AMERICAN CANCER SOCIETY GUIDELINES FOR SCREENING MAMMOGRAPHY
BASELINE MAMMOGRAM BY AGE 35-40 .MAMMOGRAPHY EVERY 1-2 YEARS FROM AGE 40-49 .MAMMOGRAM YEARLY AFTER AGE 50

EXHIBIT
12
5/29/19

Feb. 20. 2017  4:08PM   SILVA MEDICAL CENTER                    No. 1722   P. 7

Manuel V. Feijoo, M.D., P.A.
8370 Sw 8 Street
Miami, FL 33144

RE:     H██████ █████
DOB:    ██████
ID:     40253
DOS:    02/02/2017

**Lumbar-sacral spine complete x-ray:**

Complete examination shows straightening of the normal lordotic curve of the lumbar spine possibly related to sprain injury or muscle spasm.  Bilateral sacralization of L5. The remainder the examination including the sacroiliac joints are normal.

IMPRESSION:

See the the above comments.

Transcribed on 02/02/17

Thank you for the courtesy of this referral.

Osvaldo DE LA Pedraja, MD
ODL/dlp

cc: Armando, Zabala, M.D.
Electronically Signed - OSVALDO DE LA PEDRAJA,M.D  02/02/17 18:28

DE LA PEDRAJA RADIOLOGY ASSOCIATES Inc.
4776-4790 SW 8 STREET, CORAL GABLES, FL 33134. Phone: 305-447-1415. Fax: 305-446-2435
DIGITAL RADIOGRAPHY  DIGITAL MAMMOGRAPHY  ULTRASOUND  CT SCAN  BONE DENSITY(DEXA)  OPEN MRI

AMERICAN CANCER SOCIETY GUIDELINES FOR SCREENING MAMMOGRAPHY
BASELINE MAMMOGRAM BY AGE 35-40 , MAMMOGRAPHY EVERY 1-2 YEARS FROM AGE 41-49 , MAMMOGRAM YEARLY AFTER AGE 50

011880

# *FAX TRANSMITTAL*



| TO: | SILVER MEDICAL CTR | FROM: | DR. MANUEL V. FEIJOO'S OFFICE |
|---|---|---|---|
| ATTENTION | SAME AS ABOVE | PAGES: | INCLUDING COVER SHEET |
| FAX: | (305) | DATE: | 02/23/17 |
| PHONE: | (305) 262-1732 | CC: | |
| RE: | P███  H████ | | |

_____ URGENT    _____ FOR REVIEW    _____ PLEASE REPLY    _____ PLEASE COMMENT

ORTHOPEDIC EVALUATION

THIS FAX IS INTENDED ONLY FOR THE USE OF THE PERSON OR OFFICE TO WHOM IT IS ADDRESSED, AND CONTAINS PRIVILEGED OR CONFIDENTIAL INFORMATION PROTECTED BY THE LAW. ALL RECIPIENTS ARE HEREBY NOTIFIED THAT UNAUTHORIZED RECEIPT DOES NOT WAIVE SUCH PRIVILEGE. AND THAT UNAUTHORIZED DISSEMINATION, DISTRIBUTION. OR COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX AS AN ERROR, PLEASE DESTROY THE ATTACHED DOCUMENT (S) AND NOTIFY THE SENDER OF THE ERROR IMMEDIATELY BY CALLING (305) 265-7505.

THANK YOU. ☺



EXHIBIT
13
5/29/19   AC

011874



STATE FARM INS
P O BOX 106134

ATLANTA GA 30348

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

☐ PICA

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) 5907187P4 |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
P█████ H█

3. PATIENT'S BIRTH DATE 2006  SEX  F ☒

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
P█████ H█

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self ☒ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY NORTH MIAMI   STATE FL

8. RESERVED FOR NUCC USE  X

CITY NORTH MIAMI   STATE FL

ZIP CODE 33162   TELEPHONE (Include Area Code)

ZIP CODE 33162   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
9146903E1859G4

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous) ☐ YES ☒ NO

a. INSURED'S DATE OF BIRTH  SEX  M ☐ F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT? ☒ YES ☐ NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT? ☐ YES ☐ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☐ YES ☐ NO   If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE   DATE 04-13-17

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) 01 24 17  QUAL.

15. OTHER DATE  QUAL.  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE   17a.   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM   TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB? ☐ YES ☐ NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind. |

A. V892XXD   B.   C.   D.

E.   F.   G.   H.

I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From / To | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS / MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 03 20 17 | 11 | 1 | 99215 | V892XXD | 425 00 | 1 | | NPI | |
| 2 | 03 20 17 | 11 | 1 | 95851 | V892XXD | 100 00 | 1 | | NPI | |
| 3 | | | | | | | | | NPI | |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER 650409050  ☒ SSN EIN

26. PATIENT'S ACCOUNT NO. P01685 1

27. ACCEPT ASSIGNMENT? (For govt. claims, see back) ☒ YES ☐ NO

28. TOTAL CHARGE $ 525 00

29. AMOUNT PAID $ 0 00

30. Rsvd for NUCC Use 525 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
FEIJOO MANUEL V MD
SIGNED ME63009   DATE 04 13 17

32. SERVICE FACILITY LOCATION INFORMATION
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI FL 33144
a. 1811923105 b.

33. BILLING PROVIDER INFO & PH #
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI FL 33144
a. 1811923105

EXHIBIT 14

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02-12)

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

011842

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "insured", i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds I certify that, 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE. 6) for each service rendered incident to my professional service, the identity (legal name and NPI license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills

For TRICARE claims, I further certify that I (or any employee who rendered services are not on active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32)

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101(4) CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq, 38 USC 613. E.O. 9397

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled "Carrier Medicare Claims Record," published in the Federal Register Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990. See ESA-5 ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S), Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

011843

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

St.
3144
5-7505
)265-7535

## FINAL ORTHOPEDIC EVALUATION

NAME: _____   DISCHARGE DATE: 3- 20 - 17
RESIDUAL COMPLAINTS:   DATE OF LOSS:

_____ W, 4o full litt _____

PHYSICAL EXAMINATION:
VITAL SIGNS: TEMP:_____  BP:___/____ PULSE: _____/min. RESP: _____/min.
HEADACHES: YES___ NO___ DIZZINESS: YES___ NO___ SWELLING: YES___ NO___

SKULL & FACE:_____
H.E.E.N.T:_____
THYROID/NECK GLANDS:_____
CHEST:_____
HEART:_____
LUNGS:_____
RIB CAGE:_____
ABDOMEN:_____
MUSCULOSKETAL EXAMINATION:
UPPER
EXTREMITIES:_____

LOWER
EXTREMITIES:_____

SPINE:   CURVATURE:   NORMAL_____   ABNORMAL_____

CERVICAL SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUS PROCESSES:_____   MUSCLES_____
                                                  NORMAL
FLEXION _____ DEGREES WITH / WITHOUT PAIN   50 DEGREES
EXTENSION _____ DEGREES WITH / WITHOUT PAIN   60 DEGREES
LT. ROTATION _____ DEGREES WITH / WITHOUT PAIN   80 DEGREES
RT. ROTATION _____ DEGREES WITH / WITHOUT PAIN   80 DEGREES
LT. BENDING _____ DEGREES WITH / WITHOUT PAIN   45 DEGREES
RT. BENDING _____ DEGREES WITH / WITHOUT PAIN   45 DEGREES

THORACIC SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUSPROCESSES:_____   MUSCLES_____
FLEXION _____ DEGREES WITH / WITHOUT PAIN   50 DEGREES
EXTENSION _____ DEGREES WITH / WITHOUT PAIN   40 DEGREES
LT. ROTATION _____ DEGREES WITH / WITHOUT PAIN   30 DEGREES
RT. ROTATION _____ DEGREES WITH / WITHOUT PAIN   30 DEGREES

LUMBAR SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUS PROCESSES_____   MUSCLES_____
EXTENSION _____ DEGREES WITH / WITHOUT PAIN   25 DEGREES
LT. LAT. BENDING _____ DEGREES WITH / WITHOUT PAIN   25 DEGREES
RT. LAT. BENDING _____ DEGREES WITH / WITHOUT PAIN   25 DEGREES
_____ DEGREES WITH / WITHOUT PAIN   60 DEGREES



EXHIBIT
/5
5/29/19 AC

011871

MEDICAL OFFICE
8326 S.W 8th St.
MIAMI, FL 33144

*Manuel V. Feijoo M.D. P.A.*
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

## RANGE OF MOTION REPORT

PATIENT'S NAME _____   D/A _____

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| **CERVICAL SPINE:** | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | |
| Lateral Flexion | 0—45 | |
| Rotation | 0—80 | |
| **THORACOLUMBAR SPINE:** | | |
| Forward Flexion | 0—50 | |
| Extension | 0—30 | |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| **SHOULDER:** | | |
| Forward Elevation | 0—150 | |
| Backward Elevation | 0—40 | |
| Abduction | 0—155 | |
| Adduction | 0—30 | |
| External Rotation | 0—90 | |
| Internal Rotation | 0—40 | |
| **ELBOW:** | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| **WRIST:** | | |
| Dorsiflexion | 0—60 | |
| Palmar Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| **HAND:** | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| **HIP:** | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| **KNEE:** | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| **ANKLE:** | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking.
If an assitive device is used for ambulation , comment on its medical necessity and the patient's ability to walk without it ) :

_____
_____
_____
_____
_____
_____

PHYSICIAN'S SIGNATURE

3-20-17
DATE

011872

**FINAL ORTHOPEDIC EVALUATION**                    **PAGE 3**

FINAL DIAGNOSIS:

1.
2.
3.
4.
5.
6.

PARTIAL PERMANENT IMPAIRMENT RATING: _____%

COMMENTS / FUTURE RESTRICTIONS:

_____    _____
PHYSICIAN'S SIGNATURE                       PATIENT'S SIGNATURE

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

**MEDICAL OFFICE**
**8370 S.W. 8th St.**
**MIAMI, FL, 33144**

Tel: (305)265-7505
Fax: (305)265-7535

**PATIENT NAME:** P██████ H█████
**DATE OF INJURY:** 01/24/17
**EXAMINATION DATE:** 03/20/17

## FINAL ORTHOPEDIC EVALUATION

**CHIEF COMPLAINT:**
Pain less.

**HISTORY OF PRESENT ILLNESS:**
The patient has been receiving physiotherapy treatment and refers is feeling better, and today she is asymptomatic.

**PHYSICAL EXAMINATION:**

**CERVICAL SPINE:** Flexion/extension, lateral flexion and rotation to the right and left all these movements are normal with normal range of motion and normal muscle tone.

**THORACIC SPINE:** Flexion/extension, lateral flexion and rotation to the right and left all these movements are normal with normal range of motion and normal muscle tone.

**LUMBOSACRAL SPINE:** Flexion/extension, lateral flexion and rotation to the right and left all these movements are normal with normal range of motion and normal muscle tone.

**UPPER EXTREMITIES:** Abduction/adduction, internal and external rotations are normal in both shoulders and arms.

**LOWER EXTREMITIES:** Flexion/extension, both hips and knees are normal with Lasegue and Patrick signs bilaterally being negative.

**DIAGNOSIS:**
1. Status post auto accident.
2. As per X-rays reviewed previously; on the cervical spine there is straightening of the normal lordotic curve related to sprain injury of muscle spasm. On the lumbosacral spine there is straightening of the normal lordotic curvature.



EXHIBIT
16
8/29/19 AC

011868

PATIENT NAME:    P█████, H████
DATE OF INJURY:   01/24/17
PAGE:             2


## RECOMMENDATION'S:

1. Discharged.

_____, M.D.
Physician's Signature Required
MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                    03/28/17

# *FAX TRANSMITTAL*



| TO: | SILVER MEDICAL CTR | FROM: | DR. MANUEL V. FEIJOO'S OFFICE |
|---|---|---|---|
| ATTENTION | SAME AS ABOVE | PAGES: | INCLUDING COVER SHEET |
| FAX: | (305) | DATE: | 03/28/17 |
| PHONE: | (305) 262-1732 | CC: | |
| RE: | ▉▉▉▉▉▉▉ | | |

_____ URGENT        _____ FOR REVIEW        _____ PLEASE REPLY        _____ PLEASE COMMENT

ORTHOPEDIC EVALUATION

THIS FAX IS INTENDED ONLY FOR THE USE OF THE PERSON OR OFFICE TO WHOM IT IS ADDRESSED, AND CONTAINS PRIVILEGED OR CONFIDENTIAL INFORMATION PROTECTED BY THE LAW. ALL RECIPIENTS ARE HEREBY NOTIFIED THAT UNAUTHORIZED RECEIPT DOES NOT WAIVE SUCH PRIVILEGE, AND THAT UNAUTHORIZED DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX AS AN ERROR, PLEASE DESTROY THE ATTACHED DOCUMENT (S) AND NOTIFY THE SENDER OF THE ERROR IMMEDIATELY BY CALLING (305) 265-7505.

THANK YOU. ☺



EXHIBIT
17
5/24/19 AC

011867

# Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.
8370 SW 8 Street - Miami, Florida 33144

### ASSIGNMENT OF INSURANCE BENEFITS, POWER OF ATTORNEY & RELEASE OF INFORMATION
Insurer Please Read the Following, in its Entirety, upon Receipt:

I, the undersigned patient/insured knowingly, voluntarily and intentionally assign the benefits of insurance and any overdue interest payments under the No-Fault Policy of Automobile Insurance, also known as Personal Injury Protection (P.I.P.), or Medical Payments policy of insurance from my automobile insurer or the responsible insurer to the above described medical providers (Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.) for any and all services rendered to the undersigned patient/insured, including the right to bring suit in a court of law for any failure to pay PIP benefits / insurance benefits. The patient understands it is the express intention of the provider to accept this assignment of benefits in lieu of demanding full payment at the time services are rendered. The undersigned assigns any and all claims for statutory bad faith to the above medical providers. If the insurer disputes the validity of this assignment of benefits then the insurer is instructed to notify the provider in writing within five (5) days of receipt of this document. I understand this assignment will remain in full force and effect and will NOT be revoked unless the revocation is agreed to by both the medical providers and the undersigned patient or the patient's attorney. Since I have assigned my PIP benefits to the above-referenced medical provider, any prior reservation of benefits or demand for wage loss benefits is withdrawn. I am instructing the PIP carrier not to reserve any benefits and to pay all bills in the order received. This assignment applies to both past and future medical expenses and is valid even if undated. A photocopy of this assignment is to be considered as valid as the original. The undersigned patient/insured directs the insurer to pay the medical provider directly without including the patient's name on the check.

The insurer is directed by the provider and the patient/insured to not issue any checks or drafts in partial settlement of a claim that contain or are accompanied by language releasing the insurer or its insured/patient from liability unless there has been a prior written settlement agreed to by the medical provider and the insurer as to the amount payable under the insurance policy or contact. The provider hereby objects to any reductions or partial payments made at the discretion of the insurer. Any partial or reduced payment, regardless of the accompanying language, issued by the insurer and deposited by the provider shall be done so under protest, at the risk of the insurer, and the deposit shall not be deemed a waiver, accord, satisfaction, discharge, or settlement agreement by the provider to accept a reduced amount as payment in full. The insurer is hereby placed on notice that this provider reserves the right to seek the full amount of the bills submitted. Please acknowledge your acceptance of the foregoing terms by issuing a check for the services rendered by these medical providers payable to one or more of the medical provider(s) named herein, and not to the patient / claimant / insured.

In the event the subject medical benefits are disputed by the insurer for any reason, including but not limited to, medical reasonableness and/or necessity, the undersigned patient/insured hereby instructs the insurer to set aside any amount disputed (i.e. to escrow the money) and not pay the disputed amount to anyone, including myself, or any entity until the dispute is resolved. The insurer is instructed to immediately explain in writing to the above provider of any dispute. If the insurer schedules an IME or EUO the insurer is hereby requested and authorized to send a copy of said notification to this provider. The provider is not the agent of the insurer or the patient for any purpose. The undersigned patient/insured agrees to pay any applicable deductible and co-payments for services rendered.

#### Release of Information:

I hereby authorize the above named medical providers to: furnish my insurance company or companies and the patient's attorney with any and all information that may be contained in my medical records; to obtain coverage information telephonically from my insurer; to request a written non-redacted PIP payout sheet from the insurer; and to obtain copies of my medical records, including but not limited to, documents, reports, scans, notes, opinions, X-rays, and MRIs, from any other medical provider or any insurance company. The insurer is directed to keep the patient's medical records private and confidential. The insurer is NOT authorized to provide these medical records to anyone, including but not limited to, third party vendors without the patient's and the provider's prior express written permission.

I certify that I have not been solicited or promised anything in exchange for receiving medical care or that I have received any promises or guarantees from anyone as to the results that may be obtained by any medical treatment.
Caution! Please read before signing. If you do not completely understand this document please ask us to explain it to you. If you sign below we will assume that you understand and agree to the terms.

Patient Signature X _____          Date: _____

Patient Name (please print) _____

**EXHIBIT**
18
5/29/19 A?

011858

## EXHIBIT "A"
## FEIJOO PIP SUITS V. STATE FARM

| | | |
|---|---|---|
| Dr. Feijoo (Ventura Acosta) v State Farm Mutual | 13-12572 SP 25 | 59A521868 |
| Dr. Feijoo (Edelberto Acuna) v State Farm Mutual | 13-12448 SP 25 | 59A620506 |
| Dr. Feijoo (Bryan Adrianzola) v State Farm Mutual | 13-12458 SP 25 | 59A501460 |
| Dr. Feijoo (Jorge Aguero) v State Farm Mutual | 13-12536 SP 25 | 59A575858 |
| Dr. Feijoo (Caridad Aguilar) v State Farm Mutual | 13-12537 SP 25 | 59A706144 |
| Dr. Feijoo (Olga Aguirre) v State Farm Mutual | 13-12529 SP 25 | 59A402427 |
| Dr. Feijoo (Juan Aleman) v State Farm Mutual | 13-12418 SP 25 | 59A632433 |
| Dr. Feijoo (Jose I. Alvarez) v State Farm Mutual | 13-12576 SP 25 | 59A707470 |
| Dr. Feijoo (Martha Betancourt) v State FarmMutual | 13-12532 SP 25 | 59A526813 |
| Dr. Feijoo (Jose Blanco) v State Farm Mutual | 13-11123 SP 25 | 59A502695 |
| Dr. Feijoo (Oliva Cabrera) v State Farm Fire | 15-4772 SP 25 | 59A723365 |
| Dr. Feijoo (Felix Callico) v State Farm Mutual Auto | 14-9404 SP 25 | 59A739298 |
| Dr. Feijoo (Nerly Campos) v State Farm Mutual | 13-12579 SP25 | 59A660873 |
| Dr. Feijoo (Billy Cardenas) v State Farm Mutual | 13-12057 SP 25 | 59A591231 |
| Dr. Feijoo (Lourdes Cardoneda) v State Farm Mutual | 13-12056 SP 25 | 59A526813 |
| Dr. Feijoo (Keidy Carrasco) v State Farm Mutual | 15-4708 SP 25 | 59A843516 |
| Dr. Feijoo (Osvaldo Carrasco-Guzman) v State Farm | 15-4717 SP 25 | 59A843516 |
| Dr. Feijoo (Yasleni Carrazana) v State Farm Mutual Auto | 14-9403 SP 25 | 590G97495 |
| Dr. Feijoo (Enrique Carretero) v State Farm | 14-9218 SP 25 | 590B22923 |
| Dr. Feijoo (Avilio Castillo) v State Farm Mutual | 1312528 SP 25 | 59A454082 |
| Dr. Feijoo (Jorge Chiriboga) v State Farm Mutual | 15-4698 SP 25 | 59A732366 |
| Dr. Feijoo (Diane Clay) v State Farm Mutual | 13-12571 SP 25 | 59A520212 |
| Dr. Feijoo (Carmen Collado) v State Farm Mutual | 15-4750 SP 25 | 59A745349 |
| Dr. Feijoo (Yunio Companioni) v State Farm Mutual | 15-4753 SP 25 | 590G56072 |
| Dr. Feijoo (Yosvany Contreras) v State Farm Mutual | 15-4751 SP 25 | 59A845776 |
| Dr. Feijoo (Geidy Crego) v State Farm Mutual Auto | 14-9400 SP 25 | 59A745134 |
| Dr. Feijoo (Benjamin Cubas) v State Farm Mutual | 13-12538 SP 25 | 59A596765 |
| Dr. Feijoo (Ivonne Cuesta) v State Farm Mutual | 15-4755 SP 25 | 59A702841 |
| Dr. Feijoo (Roberto Cuesta) v State Farm Mutual | 13-12424 SP 25 | 59A648502 |
| Dr. Feijoo (Leonardo Dalerta) v State Farm Mutual | 13-12417 SP 25 | 59A505791 |
| Dr. Feijoo (Nely Damian) v State Farm Mutual | 13-12530 SP 25 | 59A418443 |
| Dr. Feijoo (Maria Elena De Castro) v State Farm Mutual | 15-4724 SP 25 | 59A798504 |
| Dr. Feijoo (Augusto De La Torre) v State Farm Mutual Auto | 14-9401 SP 25 | 59A690163 |
| Dr. Feijoo (Francisco De La Torre) v State Farm Mutual | 13-12535 SP 25 | 59A603301 |
| Dr. Feijoo (Janet De La Torre) v State Farm Mutual Auto | 14-9402 SP 25 | 59A690163 |
| Dr. Feijoo (Judith De La Torre) v State Farm Fire | 13-12527 SP 25 | 59A515556 |
| Dr. Feijoo (Ana De Nobrega) v State Farm Mutual | 13-12423 SP 25 | 59A462009 |



EXHIBIT
19
5/20/19 AD

# EXHIBIT "A"
## FEIJOO PIP SUITS V. STATE FARM

| | | |
|---|---|---|
| Dr. Feijoo (Tiffany Del Pozo) v State Farm Mutual | 15-4754 SP 25 | 590H33318 |
| Dr. Feijoo (Candice Delgado) v State Farm Mutual | 13-12531 SP 25 | 59A470272 |
| Dr. Feijoo (Sonia Delgado) v State Farm Mutual | 13-12060 SP 25 | 59A227706 |
| Dr. Feijoo (Adonis Diaz) v State Farm Mutual | 13-12422 SP 25 | 59A589801 |
| Dr. Feijoo (Harold Diaz) v State Farm Mutual | 13-12915 SP 25 | 59A439163 |
| Dr. Feijoo (Jaimmie Diaz) v State Farm Mutual | 13-12534 SP 25 | 59A589801 |
| Dr, Feijoo (Luis A. Diaz) v State Farm Mutual | 13-12449 SP 25 | 59A641655 |
| Dr. Feijoo (Odalys Diaz) v State Farm Mutual | 15-5031 SP 25 | 59A669788 |
| Dr. Feijoo (Marcos Domenech) v State Farm Fire | 15-4768 SP 25 | 59A621791 |
| Dr. Feijoo (Alejandro Duarte) v State Farm Mutual | 15-4726 SP 25 | 59A796087 |
| Dr. Feijoo (Yessica Echeverri) v State Farm Mutual | 13-12574 SP 25 | 59A512503 |
| Dr. Feijoo (Alex Edwards) v State Farm Mutual | 13-12457 SP 25 | 59A489592 |
| Dr. Feijoo (Jorge Espinosa) v State Farm Mutual | 15-5034 SP 25 | 59A841871 |
| Dr. Feijoo (Isael Esquivel Llanes) v State Farm | 15-4714 SP 25 | 59A644324 |
| Dr. Feijoo (Nancy Estevez) v State Farm Mutual | 15-4738 SP 25 | 59A757208 |
| Dr. Feijoo (Raiko Exposito Martinez) v State Farm Mutual Auto | 14-9405 SP 25 | 59A753591 |
| Dr. Feijoo (Randy Falcon) v State Farm Fire | 13-12573 SP 25 | 59A515556 |
| Dr. Feijoo (Daniel Fajardo) v State Farm Mutual | 13-11122 SP 25 | 59A486271 |
| Dr. Feijoo (Gwendolyn Fajo) v State Farm Mutual | 15-4703 SP 25 | 590C00360 |
| Dr. Feijoo (Carlos Farray) v State Farm Mutual | 15-4721 SP 25 | 59A708652 |
| Dr. Feijoo (Eloidio Ferras) v. State Farm Mutual | 13-12332 SP 25 | 59A531237 |
| Dr. Feijoo (Carlos A. Fernandez) v State Farm Mutual | 15-4735 SP 25 | 59A763392 |
| Dr. Feijoo (Dianet Fernandez) v State Farm 3/3/12 | 15-5680 SP 25 | 59A702134 |
| Dr. Feijoo (Fernando Fernandez) v State Farm Mutual | 15-4767 SP 25 | 59A801007 |
| Dr. Feijoo (Francisco Fernandez) v State Farm Mutual | 15-4757 SP 25 | 59A836972 |
| Dr. Feijoo (Heliet Fernandez) v State Farm Mutual | 15-4739 SP 25 | 590D44903 |
| Dr. Feijoo (Mario Fernandez) v State Farm Mutual | 13-12419 SP 25 | 59A567156 |
| Dr. Feijoo (Arturo Figueroa) v State Farm Mutual | 13-12533 SP 25 | 59A466231 |
| Dr. Feijoo (Pedro Fornaris) v State Farm Fire | 13-12580 SP 25 | 59A360106 |
| Dr. Feijoo (Isaul Frontela) v State Farm Mutual | 13-12058 SP 25 | 59A488319 |
| Dr. Feijoo (Ivan Fumero) v State Farm Mutual | 13-12578 SP 25 | 59A548731 |
| Dr. Feijoo (Leisha Galarza) v State Farm Fire | 15-4761 SP 25 | 59A363558 |
| Dr. Feijoo (Araisy Garcia Martinez) v State Farm Mutual | 15-5032 SP 25 | 59A485001 |
| Dr. Feijoo (Monique Gomez) v State Farm | 14-12001 SP 25 | 59A710077 |
| Dr. Feijoo (Victor Gomez) v State Farm Mutual | 15-4706 SP 25 | 59A641671 |
| Dr. Feijoo (Andres Gonzalez) v State Farm - DOL 8/11/11 | 15-4747 SP 25 | 590F79970 |

## EXHIBIT "A"
# FEIJOO PIP SUITS V. STATE FARM

| | | |
|---|---|---|
| Dr. Feijoo (Andres Gonzalez) v State Farm - DOL 8/25/11 | 15-4736 SP 25 | 59A844531 |
| Dr. Feijoo (Kirenia Gonzalez) v State Farm Mutual | 15-4701 SP 25 | 59A784269 |
| Dr. Feijoo (Donald Granado) v State Farm Mutual | 15-4762 SP 25 | 59A684357 |
| Dr. Feijoo (Michelle Gutierrez) v State Farm Mutual | 15-4749 SP 25 | 59A744039 |
| Dr. Feijoo (Manuel Hartman) v State Farm Fire | 15-4765 SP 25 | 59A698616 |
| Dr. Feijoo (Raymundo Hernandez) v State Farm Mutual | 15-4770 SP 25 | 590B60037 |
| Dr. Feijoo (Arturo Herrera) v State Farm Mutual | 15-4699 SP 25 | 59A729095 |
| Dr. Feijoo (Arturo Herrera Rosell) v State Farm | 15-4734 SP 25 | 59A729095 |
| Dr. Feijoo (Raciel Herrera) v State Farm Mutual | 15-4740 SP 25 | 59A729095 |
| Dr. Feijoo (Vivian Herrera) v State Farm | 14-12000 SP 25 | 59A622413 |
| Dr. Feijoo (Alberto Izquierdo) v State Farm Mutual | 15-4773 SP 25 | 59A716335 |
| Dr. Feijoo (Freddy Jimenez) v State Farm Mutual | 15-4766 SP 25 | 590D48733 |
| Dr. Feijoo (Amelbys Jose) v State Farm Mutual | 15-4737 SP 25 | 59A757208 |
| Dr. Feijoo (Frank Luaces) v State Farm Mutual | 15-4692 SP 25 | 59A740812 |
| Dr. Feijoo (Marilde Lopez) v State Farm Mutual | 15-5029 SP 25 | 59A843516 |
| Dr. Feijoo (Onilver Lopez-Garrido) v State Farm Mutual | 15-4764 SP 25 | 59A691827 |
| Dr. Feijoo (Brandon Lujan) v State Farm Mutual | 15-5030 SP 25 | 590C45848 |
| Dr. Feijoo (Maylen Madueno) v State Farm Mutual | 15-4694 SP 25 | 59A719474 |
| Dr. Feijoo (Margarita Mena) v State Farm Mutual | 15-4696 SP 25 | 59A649148 |
| Dr. Feijoo (Daisuky Mendez) v State Farm Mutual | 15-4693 SP 25 | 590H56887 |
| Dr. Feijoo (Maikel Oliveros Mendez) v State Farm Mutual | 15-4711 SP 25 | 59A819040 |
| Dr. Feijoo (Erik Olivo) v State Farm Mutual | 15-4719 SP 25 | 590J94526 |
| Dr. Feijoo (Luis M. Orta-Torres) v State Farm Mutal | 15-4742 SP 25 | 59A754910 |
| Dr. Feijoo (Roger Osorio) v State Farm Mutual | 15-4707 SP 25 | 59A595608 |
| Dr. Feijoo (Ofelia Padilla) v State Farm Mutual Auto | 15-00193 SP 25 | 59A715941 |
| Dr. Feijoo (Mirta Padron) v State Farm Mutual | 15-4758 SP 25 | 59A736686 |
| Dr. Feijoo (Hugo Pedreros) v State Farm Mutual Auto | 15-2824 SP 25 | 59A815103 |
| Dr. Feijoo (Francisco Perez) v State Farm Mutual | 15-4722 SP 25 | 59A723028 |
| Dr. Feijoo (Norris Perez) v State Farm Mutual | 15-4728 SP 25 | 59A635225 |
| Dr. Feijoo (Oscar Perez) v State Farm Mutual Auto | 15-00371 SP 25 | 59A554575 |
| Dr. Feijoo (Rita Perez) v State Farm | 15-2816 SP 25 | 59A701973 |
| Dr. Feijoo (Ramon Piedra) v State Farm Mutual | 13-12761 SP 25 | 59A050092 |
| Dr. Feijoo (Leticia Pizzaro-Mascort) v State Farm Mutual | 15-4697 SP 25 | 59A801007 |
| Dr. Feijoo (Carlos Plua) v State Farm Fire | 15-4723 SP 25 | 59A363558 |
| Dr. Feijoo (Ana Quintana) v State Farm Mutual Auto | 15-00368 SP 25 | 59A720563 |
| Dr. Feijoo (Luis Quintana) v State Farm Mutual Auto | 15-00373 SP 25 | 59A720563 |



**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O BOX 106134

ATLANTA GA 30348

PICA

| PICA | | | | | | | | PICA |

1. MEDICARE   MEDICAID   TRICARE   CHAMPVA   GROUP HEALTH PLAN   FECA BLK LUNG   OTHER   **1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

596S04934

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
B      S

3. PATIENT'S BIRTH DATE   MM DD YY   1984   SEX   M   F [X]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
B      S

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self [ ] Spouse [X] Child [ ] Other [ ]

7. INSURED'S ADDRESS (No., Street)

CITY MIAMI   STATE FL

8. RESERVED FOR NUCC USE   X

CITY MIAMI   STATE FL

ZIP CODE 33125   TELEPHONE (Include Area Code)

ZIP CODE 33125   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   [ ] YES [X] NO

a. INSURED'S DATE OF BIRTH   MM DD YY   SEX   M [ ] F [ ]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   [X] YES [ ] NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   [ ] YES [ ] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   [ ] YES [ ] NO   If yes, complete items 9, 9a and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED ___SIGNATURE ON FILE___   DATE___07-24-15___

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED ___SIGNATURE ON FILE___

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)   MM DD YY   06 23 15   QUAL.

15. OTHER DATE   QUAL.   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   FROM   MM DD YY   TO   MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
RFG MEDICAL CLINIC

17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   FROM   MM DD YY   TO   MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   [ ] YES [ ] NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. Relate A-L to service line below (24E)   ICD Ind.

A. 723 1   B.   C. 724 1   D.
E.   F.   G.   H.
I. 724 2   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From | | | To | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Fam Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
| MM | DD | YY | MM | DD | YY | | | | | | | | | | | |
| 07 | 02 | 15 | | | | 11 | 1 | 99204 | | 723 1 | 475 | 00 | 1 | | NPI | |
| 07 | 02 | 15 | | | | 11 | 1 | 95851 | | 723 1 | 100 | 00 | 1 | | NPI | |
| | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER   650409050   SSN [ ] EIN [X]

26. PATIENT'S ACCOUNT NO.   B00924 1

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)   [X] YES [ ] NO

28. TOTAL CHARGE   $ 575 00

29. AMOUNT PAID   $ 0 00

30. Rsvd for NUCC use   575 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
FEIJOO MANUEL V MD

SIGNED ME63009   DATE 07/24 15

32. SERVICE FACILITY LOCATION INFORMATION
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI FL 33144
b. 1811923105

33. BILLING PROVIDER INFO & PH. #
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI FL 33144
a. 1811923105   08032015

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02-12)

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAY...

**EXHIBIT**
20
5/29/19 4C

CONFIDENTIAL       SFMA v. Manuel V. Feijoo et a...       SFPROD000309516

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If Item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services [...............................]

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424 32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411 24(a) and 424 5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086, 5 USC 8101 et seq, and 30 USC 901 et seq, 38 USC 613  E O 9397

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No  09-70-0501, titled  'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No  177, page 37549, Wed. Sept. 12. 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974  "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb  28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept  of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197  The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

# EXHIBIT "A"
# FEIJOO PIP SUITS V. STATE FARM

| | | |
|---|---|---|
| Dr. Feijoo (Chandarth Ramgoolam) v State Farm Mutual | 15-4695 SP 25 | 59A753535 |
| Dr. Feijoo (Alejandro Redondo) v State Farm Mutual Auto | 15-2827 SP 25 | 59A705125 |
| Dr. Feijoo (Armando Redondo) v State Farm Mutual | 15-4725 SP 25 | 59A791124 |
| Dr. Feijoo (Alfredo Reguero) v State Farm Fire | 15-4760 SP 25 | 59A817007 |
| Dr. Feijoo (Jorge Ribet) v State Farm Mutual Auto | 15-00369 SP 25 | 59A620506 |
| Dr. Feijoo (Manuel Riera) v State Farm Mutual Auto | 15-00370 SP 25 | 59A731624 |
| Dr. Feijoo (Leydis Rodriguez) v State Farm Mutual | 15-4744 SP 25 | 59A843461 |
| Dr. Feijoo (Marvi Rodriguez) v State Farm Mutual | 15-4691 SP 25 | 59A676562 |
| Dr. Feijoo (Karina Romiro) v State Farm Fire | 15-4771 SP 25 | 59A722119 |
| Dr. Feijoo (Leticia Romero) v State Farm Mutual | 15-4704 SP 25 | 59A666092 |
| Dr. Feijoo (Sonia Romero) v State Farm Mutual | 15-4710 SP 25 | 59A732366 |
| Dr. Feijoo (Paul Sanchez) v State Farm Mutual | 15-4746 SP 25 | 59A709747 |
| Dr. Feijoo (Pedro Sanchez) v State Farm Mutual Auto | 15-2819 SP 25 | 59A677251 |
| Dr. Feijoo (Carlos Sandoval) v State Farm Mutual | 15-4763 SP 25 | 59A673682 |
| Dr. Feijoo (Fatima Selva) v State Farm Mutual | 15-4748 SP 25 | 59A765685 |
| Dr. Feijoo (Mayelin Sierra) v State Farm Mutual | 15-4759 SP 25 | 59A847783 |
| Dr. Feijoo (Oscar Sigas-Martinez) v State Farm Mutual | 15-4733 SP 25 | 59A782428 |
| Dr. Feijoo (Bayolet Socorro) v State Farm Mutual Auto | 15-2817 SP 25 | 59A705125 |
| Dr. Feijoo (Alan Strazzeri) v State Farm Mutual | 15-4702 SP 25 | 590C71674 |
| Dr. Feijoo (Fernando Suarez) v State Farm Mutual | 15-4727 SP 25 | 590G14909 |
| Dr. Feijoo (Jorge Suarez Valdes) v State Farm Mutual | 15-4709 SP 25 | 59A801007 |
| Dr. Feijoo (Dunia Tabares) v State Farm  Mutual | 15-4730 SP 25 | 59A787080 |
| Dr. Feijoo (Eduardo Tapanes) v State Farm Mutual | 15-4769 SP 25 | 590J45959 |
| Dr. Feijoo (Maria Tooley) v State Farm Mutual | 15-4732 SP 25 | 59051P188 |
| Dr. Feijoo (Frank Torres) v State Farm | 15-4756 SP 25 | 59A701973 |
| Dr. Feijoo (Leonardo Torres) v State Farm Mutual | 15-4712 SP 25 | 590C69663 |
| Dr. Feijoo (Maria Tovio) v State Farm Mutual | 15-4705 SP 25 | 59A794968 |
| Dr. Feijoo (Lucia Trujillo) v State Farm Mutual | 15-4731 SP 25 | 590H92395 |

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O BOX 106134
ATLANTA GA 30348

PICA

| | | | | | |
|---|---|---|---|---|---|
| 1. MEDICARE (Medicare #) | MEDICAID (Medicaid #) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) / FECA BLK LUNG (ID#) / OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) 596S04934 |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial) — B▇ J▇

3. PATIENT'S BIRTH DATE: 1967 — SEX X M F

4. INSURED'S NAME (Last Name, First Name, Middle Initial) — B▇ J▇

5. PATIENT'S ADDRESS (No., Street) ▇

6. PATIENT RELATIONSHIP TO INSURED: Self X Spouse Child Other

7. INSURED'S ADDRESS (No., Street) ▇

CITY MIAMI BEACH STATE FL
8. RESERVED FOR NUCC USE X
CITY MIAMI BEACH STATE FL

ZIP CODE 33139 TELEPHONE (Include Area Code) ▇1
ZIP CODE 33139 TELEPHONE (Include Area Code) ▇

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous) YES X NO

a. INSURED'S DATE OF BIRTH MM DD YY — SEX M F

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT? X YES NO PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT? YES X NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES X NO If yes, complete items 9, 9a and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE   DATE 07 24 15

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) 06 23 15 QUAL.

15. OTHER DATE QUAL. MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM MM DD YY TO MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE RFG MEDICAL CLINIC
17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM MM DD YY TO MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB? YES NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. Relate A-L to service line below (24E)   ICD Ind

A. 723 1   B.   C. 724 4   D.
E. 716 11   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 07 02 15 | 11 | 1 | 99204 | | 723 1 | 475 00 | 1 | | NPI | |
| 2 | 07 02 15 | 11 | 1 | 95851 | | 723 1 | 100 00 | 1 | | NPI | |
| 3 | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER 650409050 SSN EIN X

26. PATIENT'S ACCOUNT NO. B00923 1

27. ACCEPT ASSIGNMENT? X YES NO

28. TOTAL CHARGE $ 575 00

29. AMOUNT PAID $ 0 00

30. Rsvd for NUCC use 575 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
FEIJOO MANUEL V MD
SIG# ME63009 07 24 15

32. SERVICE FACILITY LOCATION INFORMATION
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI FL 33144
a. 1811923105

33. BILLING PROVIDER INFO & PH #
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI FL 33144
a. 1811923105   b. 08032015

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB 0938-1197 FORM 1500 (02-12)

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAY▇

EXHIBIT 21 5/29/19 AC

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS  A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If Item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS
The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE. For each service rendered incident to my professional service, the identity (legal name and NPI, license # or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral  although incidental part of a covered physician service  3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government  either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32)

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare  TRICARE, FECA, and Black Lung programs  Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411 24(a) and 424 5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq  and 30 USC 901 et seq, 38 USC 613, E O  9397

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No  09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol  55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol  55 No  40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30  or as updated and republished

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S)  To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept  of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains  Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement  claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**AUTO**    Claim Number: 59-6S04-934    **RBZ000HK**

-Reviewed bill DOS 07/17-08/11/2015 (050) $1905.46
**Redacted** auth on file, AP off pending review of bills/reports
-Review medical reports
-Reviewed file notes
-Processing bill accordingly

Refer to CS to address treatment date range.

08-18-2015 - 2:30 PM EDT          **Performer:** Gonzalez, Vicky                    **Office:**PIPA1T3W
    **File Note:** PIP-AP Failure
    **Participant:** R. F.G. MEDICAL CLINIC,INC, J█████    **COL(Participant):** 050(J███ B████████)
    **Category:** Medical Bill, PIP/AB/MPC          **Sub Category:**
-Reviewed bill DOS 07/17-08/11/2015 (050) $1836.32
**Redacted** auth on file, AP off pending review of bills/reports
-Review medical reports
-Reviewed file notes
 -Processing bill accordingly

08-18-2015 - 10:39 AM EDT          **Performer:** Norton, Lana                    **Office:**PIPA1T3W
    **File Note:** PIP/MPC Pending
    **Participant:** I█████████, J█   **COL(Participant):** 050(S██████ B███████████),
    B█████████                          050(J███ B████████)
    **Category:** Pending          **Sub Category:**
**050 / J Baptista**
CA
- Label medical records
- Process bills FIFO
CS
- Review TX plan and medical records
- Handle accordingly
**050 / S.B**█████████
CA
- Label medical records
- Process bills FIFO
CS
- Review TX plan and medical records
- Handle accordingly

08-18-2015 - 10:38 AM EDT          **Performer:** Norton, Lana                    **Office:**PIPA1T3W
    **File Note:** Medical Bill - Contact
    **Participant:** R. F.G. MEDICAL CLINIC,INC, J█████    **COL(Participant):** 050(J███ B████████)
    **Category:** Contact, PIP/AB/MPC, Medical Bill          **Sub Category:**

Rev'd medical bills and records on file.  Medical diagnosis codes on bill do not coincide with the medical record and TX.  97110 Therapeutic procedure documents are not providing exercise and goal

Called RFG Medical @ 305-476-3173 and was advised she would be in the office in 20 minutes.  Advised I would call back.

Called RFG Medical back and spoke w/Yesenia and had an extensive conversation.  I explained to her that diagnosis coding on bills must coincide with the TX being given.  She stated that her medisoft system is old and they are in the process of upgrading.  She stated that it only allows her 4 diagnosis codes per bill.  She did confirm TX and diag for bills on file.  We also discussed the 97110 Therapeutic procedure code and I explained that documentation needs to be clarified on each visit indicating what type of exercise was performed and what was the goal.  She stated the therapist did not have room in the block, I explained it can be noted in the Progress notes or at the bottom of the page but it needed to be documented.  I also explained the document she sent over showing what CPT code 97110 and 97112 consisted of was a universal document and we need for TX with actual exercises performed and goals on each office visit.  She understood.

08-13-2015 - 4:43 PM EDT          **Performer:** Norton, Lana                    **Office:**PIPA1T3W
    **File Note:** Medical Bill - AP Failure



Date: 11-15-2018

STATE FARM CONFIDENTIAL INFORMATION
Distribution on a Business Need to Know Basis Only

Page 20

CONFIDENTIAL          SFMA v. Manuel V. Feijoo et al.          SFPROD000088167

AUTO                                        Claim Number: 59-6S04-934                                        RBZ000HK

**Participant:** MANUEL V FEIJOO, S▓▓▓▓▓▓▓         **COL(Participant):** 050(S▓▓▓▓▓ A B▓▓▓▓▓▓)
B▓▓▓▓▓▓▓▓
**Category:** Medical Bill                          **Sub Category:**

Rev'd medical bill and medical records for DOS 07/02/2015
Rev'd NR response indicating that the provider failed to meet the documentation for both the comprehensive exam and the the medical
decision making of moderate complexity components listed for CPT 99204.  Instead, the provider's documentation supports a level 3 new
patient code (99203)
Called Medical Office of Dr Manuel Feijoo @ 305-265-7505 spoke w/ Annie who stated that the provider failed to meet the documentation for
both the comprehensive exam and the the medical decision making of moderate complexity components listed for CPT 99204.  Instead, the
provider's documentation supports a level 3 new patient code (99203)  She stated that she did not agree
 Downcoding and processing bill with CPT 99203

08-13-2015 - 4:40 PM EDT              **Performer:** Norton, Lana                  **Office:**PIPA1T3W
**File Note:** Medical Bill - AP Failure
**Participant:** MANUEL V FEIJOO, J▓▓▓▓▓▓           **COL(Participant):** 050(▓▓▓ B▓▓▓▓▓)
**Category:** Medical Bill                          **Sub Category:**

Rev'd medical bill and medical records for DOS 07/02/2015
Rev'd NR response indicating that the provider failed to meet the documentation for both the comprehensive exam and the the medical
decision making of moderate complexity components listed for CPT 99204.  Instead, the provider's documentation supports a level 3 new
patient code (99203)
Called Medical Office of Dr Manuel Feijoo @ 305-265-7505 spoke w/ Annie who stated that the provider failed to meet the documentation for
both the comprehensive exam and the the medical decision making of moderate complexity components listed for CPT 99204.  Instead, the
provider's documentation supports a level 3 new patient code (99203)  She stated that she did not agree.
 Downcoding and processing bill with CPT 99203

08-13-2015 - 4:01 PM EDT              **Performer:** Harrison, Jody                **Office:**PIPMPCFL
**File Note:** RE:PIP/MPC NR
**Participant:** MANUEL V FEIJOO, S▓▓▓▓▓▓▓         **COL(Participant):** 050(S▓▓▓▓ BB▓▓▓▓▓▓▓)
B▓▓▓▓▓▓▓
**Category:** Medical Bill                          **Sub Category:**

NR review-
After reviewing the provider's documentation for DOS 7-2-2015, I have determined that the provider is upcoding  The documentation does
not meet the criteria for CPT 99204  When billing office or other outpatient services for new patients, all 3 key components must be fully
documented in order to bill (comprehensive history, comprehensive examination & medical decision making that are of moderate complexity)
as defined in the current CPT book.  The provider failed to meet the documentation for both the comprehensive exam and the the medical
decision making of moderate complexity components listed for CPT 99204.  Instead, the provider's documentation supports a level 3 new
 patient code (99203).

08-13-2015 - 3:57 PM EDT              **Performer:** Harrison, Jody                **Office:**PIPMPCFL
**File Note:** RE:PIP/MPC NR
**Participant:** MANUEL V FEIJOO, J▓▓▓ B▓▓▓▓         **COL(Participant):** 050(JOAO B▓▓▓▓▓▓)
**Category:** Medical Bill                          **Sub Category:**

NR review-
After reviewing the provider's documentation for DOS 7-2-2015, I have determined that the provider is upcoding  The documentation does
not meet the criteria for CPT 99204  When billing office or other outpatient services for new patients, all 3 key components must be fully
documented in order to bill (comprehensive history, comprehensive examination & medical decision making that are of moderate complexity)
as defined in the current CPT book.  The provider failed to meet the documentation for both the comprehensive exam and the the medical
decision making of moderate complexity components listed for CPT 99204.  Instead, the provider's documentation supports a level 3 new
 patient code (99203).

08-13-2015 - 2:55 PM EDT              **Performer:** Norton, Lana                  **Office:**PIPA1T3W
**File Note:** PIP/MPC NR
**Participant:** MANUEL V FEIJOO, S▓▓▓▓▓▓         **COL(Participant):** 050(S▓▓▓▓▓▓ B▓▓▓▓▓▓▓)
B▓▓▓▓▓▓▓
**Category:** Medical Bill                          **Sub Category:**

NR - Please review Medical Record and Bill for DOS 07/02/2015 for Manuel V Feijoo and advise if medical record office visit supports CPT
 code 99204

08-13-2015 - 2:54 PM EDT              **Performer:** Norton, Lana                  **Office:**PIPA1T3W

Date: 11-15-2018                                                                                            Page 21

STATE FARM CONFIDENTIAL INFORMATION
Distribution on a Business Need to Know Basis Only

**StateFarm**

## EXPLANATION OF REVIEW
*This is not a bill*

| | | |
|---|---|---|
| **Claim Number:** 59-6S04-934 | **Date of Loss:** 06-23-2015 | **Office Name:** State Farm Mutual Automobile Insurance Company PIPMPC T3 Office - WIN |

**Patient:** SV██████ B████████████
MIAMI BEACH, FL 33139-1632

**Provider:** Manuel V. Feijoo
8370 SW 8TH ST
MIAMI, FL 33144-4180

**Claim Handler:** Lana Norton
**Address:** P. O. Box 106134
Atlanta, GA 30348-6134
**Phone:** (844) 292-8615   **Ext:** 8633182913

**Named Insured:** B██████ J██████
& LU███████ ██████
**Policy Number:** 6943-841-59A

**Date Received:** 08-03-2015
**Jurisdiction:** Florida
**Bill Reference Number:** B009241

**TIN:** ████████
**Payment Number:** 119628399J
**Zip of Service:** 33144

**Diagnosis Codes:** 723.1 - Cervicalgia
724.1 - Pain in thoracic spine
724.2 - Lumbago

| Ln | Date of Service | POS | CPT/ HCPCS | MOD/TS | Units | Submitted Amount | Approved Amount | Reason Codes |
|---|---|---|---|---|---|---|---|---|
| 1 | 07-02-2015 - 07-02-2015 | 11 | 99203 | | 1.00 | $475.00 | $237.58 | 305,7 |
| 2 | 07-02-2015 - 07-02-2015 | 11 | 95851 | | 1.00 | $100.00 | $42.94 | 681,7 |

| | |
|---|---|
| **Total Submitted Charges:** | $575.00 |
| **Total Approved Amount:** | $280.52 |
| **Amount Not Payable:** | $56.10 |
| **Deductible:** | $0.00 |
| **CoPay:** | $0.00 |
| **Apportionment / Pro Rata:** | $0.00 |
| **Offset:** | $0.00 |
| **Paid Amount:** | $224.42 |



EXHIBIT
23
5/29/15 AC

**DATE:** 08-14-2015

**59-6S04-934**

Professional

**Explanations**

7 - The diagnosis reported by the provider may represent a condition occurring as a result of the motor vehicle accident or an unrelated condition. The insurer may request additional documentation from the provider if the relatedness is not clear.

305 - Our payment for this service is based upon a reasonable amount pursuant to both the terms and conditions of the policy of insurance under which the subject claim is being made as well as the Florida No-Fault Statute, which permits, when determining a reasonable charge for a service, an insurer to consider usual and customary charges and payments accepted by the provider, reimbursement levels in the community and various federal and state fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service. The payment for this service is based upon 200% of the Participating Level of Medicare Part B fee schedule for the locale in which the services were rendered.

681 - Our payment for this service is based upon a reasonable amount pursuant to both the terms and conditions of the policy of insurance under which the subject claim is being made as well as the Florida No-Fault Statute, which permits, when determining a reasonable charge for a service, an insurer to consider usual and customary charges and payments accepted by the provider, reimbursement levels in the community and various federal and state fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service. The payment for this service is based upon 200% of the 2007 Limiting Charge of Medicare physician fee schedule for the locale in which the services were rendered.

**Procedure Guide**

95851 - Range of motion measurements and report (separate procedure); each extremity (excluding hand) or each trunk section (spine)

99203 - Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A detailed history; A detailed examination; Medical decision making of low complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate severity. Typically, 30 minutes are spent face-to-face with the patient and/or family.

Pursuant to Florida Statute, should you have any information to substantiate payment of an additional amount for the services rendered, please forward for our consideration within 15 days.

Any person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim containing false, incomplete, or misleading information is guilty of a felony of the third degree. F.S. 817.234(1)(b).

Information on administering benefits under the 9810A policy form: Due to ongoing litigation in Myers v. McCarty, (Case No. 2013-CA-0073) (Fla. 2d Jud'l Cir.), the Emergency Medical Condition provisions of the No-Fault statute are not being applied.  Please contact us if you have any questions.

**DATE:** 08-14-2015                   **59-6S04-934**                   Professional

CONFIDENTIAL          SFMA v. Manuel V. Feijoo et al.          SFPROD000309551

**State Farm**

## EXPLANATION OF REVIEW
*This is not a bill*

| | | |
|---|---|---|
| **Claim Number:** 59-6S04-934 | **Date of Loss:** 06-23-2015 | **Office Name:** State Farm Mutual Automobile Insurance Company<br>PIPMPC T3 Office - WIN |

| | | |
|---|---|---|
| **Patient:** Jo███ a████<br>2301 COLLINS AVE APT 723<br>MIAMI BEACH, FL 33139-1632 | | **Provider:** Manuel V. Feijoo<br>8370 SW 8TH ST<br>MIAMI, FL 33144-4180 |

| | |
|---|---|
| **Claim Handler:** Lana Norton | **Named Insured:** B██████, J█████<br>& LU█████ I████ |
| **Address:** P. O. Box 106134<br>Atlanta, GA 30348-6134 | **Policy Number:** 6943-841-59A |
| **Phone:** (844) 292-8615    Ext: 8633182913 | |
| **Date Received:** 08-03-2015 | **TIN:** ██████████ |
| **Jurisdiction:** Florida | **Payment Number:** 119628399J |
| **Bill Reference Number:** B009231 | **Zip of Service:** 33144 |

**Diagnosis Codes:** 716.11 - Traumatic arthropathy, shoulder region
723.1 - Cervicalgia
724.4 - Thoracic or lumbosacral neuritis or radiculitis, unspecified

| Ln | Date of Service | POS | CPT/<br>HCPCS | MOD/TS | Units | Submitted<br>Amount | Approved<br>Amount | Reason Codes |
|---|---|---|---|---|---|---|---|---|
| 1 | 07-02-2015 - 07-02-2015 | 11 | 99203 | | 1.00 | $475.00 | $237.58 | 305,7 |
| 2 | 07-02-2015 - 07-02-2015 | 11 | 95851 | | 1.00 | $100.00 | $42.94 | 681,7 |

| | |
|---|---|
| **Total Submitted Charges:** | $575.00 |
| **Total Approved Amount:** | $280.52 |
| **Amount Not Payable:** | $56.10 |
| **Deductible:** | $0.00 |
| **CoPay:** | $0.00 |
| **Apportionment / Pro Rata:** | $0.00 |
| **Offset:** | $0.00 |
| **Paid Amount:** | $224.42 |

EXHIBIT
24
3/29/19 AC

**DATE:** 08-14-2015          **59-6S04-934**          Professional

CONFIDENTIAL          SFMA v. Manuel V. Feijoo et al.          SFPROD000309548

**Explanations**

7 - The diagnosis reported by the provider may represent a condition occurring as a result of the motor vehicle accident or an unrelated condition. The insurer may request additional documentation from the provider if the relatedness is not clear.

305 - Our payment for this service is based upon a reasonable amount pursuant to both the terms and conditions of the policy of insurance under which the subject claim is being made as well as the Florida No-Fault Statute, which permits, when determining a reasonable charge for a service, an insurer to consider usual and customary charges and payments accepted by the provider, reimbursement levels in the community and various federal and state fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service. The payment for this service is based upon 200% of the Participating Level of Medicare Part B fee schedule for the locale in which the services were rendered.

681 - Our payment for this service is based upon a reasonable amount pursuant to both the terms and conditions of the policy of insurance under which the subject claim is being made as well as the Florida No-Fault Statute, which permits, when determining a reasonable charge for a service, an insurer to consider usual and customary charges and payments accepted by the provider, reimbursement levels in the community and various federal and state fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service. The payment for this service is based upon 200% of the 2007 Limiting Charge of Medicare physician fee schedule for the locale in which the services were rendered.

**Procedure Guide**

95851 - Range of motion measurements and report (separate procedure); each extremity (excluding hand) or each trunk section (spine)

99203 - Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A detailed history; A detailed examination; Medical decision making of low complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate severity. Typically, 30 minutes are spent face-to-face with the patient and/or family.

Pursuant to Florida Statute, should you have any information to substantiate payment of an additional amount for the services rendered, please forward for our consideration within 15 days.

Any person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim containing false, incomplete, or misleading information is guilty of a felony of the third degree. F.S. 817.234(1)(b).

Information on administering benefits under the 9810A policy form: Due to ongoing litigation in Myers v. McCarty, (Case No. 2013-CA-0073) (Fla. 2d Jud'l Cir.), the Emergency Medical Condition provisions of the No-Fault statute are not being applied.  Please contact us if you have any questions.

**DATE:** 08-14-2015                    59-6S04-934                    Professional

The Law Offices of
# KENNETH B. SCHURR, P.A.
Attorney At Law
2030 S. Douglas Road, Suite 105
Coral Gables, Florida 33134

Telephone (305) 441-9031
Telecopier (786) 221-2720

August 23, 2017

**Via certified mail, return receipt requested**
**7017 1070 0000 9439 0181**

State Farm Insurance Co.
Attn: Paul Robichaux
P.O. Box 106140
Atlanta, GA 30348

<u>**DEMAND LETTER UNDER FL STATUTE 627.736 (10)**</u>

|     |                |                |
| --- | -------------- | -------------- |
| RE: | **Claimant:**  | S█████ B██████ |
|     | **Insured:**   | J███ B███      |
|     | **Claim Number:** | **596S04934** |
|     | **Policy Number:** | **UNKNOWN** |
|     | **Date of Loss:** | **June 23, 2015** |

Dear: Mr. Robichaux:

  Please be advised that demand is hereby made for the payment of medical services provided to the above-named patient.  Payment for these services is overdue as of this letter.
**PROVIDER:**  MANUEL V. FEIJOO, M.D. AND MANUEL V. FEIJOO, M.D. P.A.
**DATE OF SERVICE:** JULY 2ND 2015.
**CPT CODES:**  see copy of bills attached

| **BILL** | **DEDUCTIBLE** | **CO-PAYMENT** | **PIP PAID** | **DUE** |
| -------- | -------------- | -------------- | ------------ | ------- |
| $575.00  | UNKNOWN        | UNKNOWN        | UNKNOWN      | $460.00 |

  Enclosed please find the requisite itemized statement or copies of same in the form of *Health Care Finance Administration 1500 form or UB 92 forms previously submitted and specifying each exact amount, the date of treatment, service, or accommodation, and the type of benefit claimed to be due. To the extent that this demand involves an insurer's withdrawal of payment for future treatment not yet rendered, attached please find a copy of your notice withdrawing such payment and an itemized statement of the type, frequency, and duration of future treatment claimed to be reasonable and medically necessary.* Also, enclosed please find a copy of the assignment of benefits executed by the patient. Pursuant to Florida Statute, demand is also hereby made for reimbursement of the postage costs totaling $    .  Make checks payable as follows: Medical Benefits to the provider: **Manuel V. Feijoo, M.D., and Manuel V. Feijoo, M.D., P.A.**; and interest, postage and penalty to the **Law Offices of Kenneth B. Schurr, P.A.**

  If there is additional coverage then we demand 100% of the difference between the billed



EXHIBIT

25

SFPROD000089531

amount and the amount paid. If there is a deductible or if the bills are paid at 100% please let us know.   If the insurance company is entitled to limit reimbursement based on 200% of Medicare or 80 percent of the maximum reimbursable allowance under workers' compensation, please produce a copy of the policy of insurance along with the payment.  We do not accept limitations unless your policy specifically provides for this limitation. It is our contention the charges are reasonable based on what other doctors charge and what other PIP insurers have allowed for these services.  If you have any questions about the bills at issue please compare the attached ledger to your explanation of benefits and please note we dispute each and every reduction and nonpayment.

Section 627.736(10) of the Florida Statutes requires that if payment of the overdue amount is made within thirty (30) business days of receipt of this letter, said payment must include the applicable interest and a ten (10%) percent penalty of the overdue amount paid, subject to maximum penalty of Two Hundred Fifty dollars (250). Failure to pay within the allowed period will result in the immediate institution of a civil suit for the damages, attorney's fees, and costs.

In addition, please provide the undersigned with the following:

1.    An up-to-date PIP payout log for this claim. Said payout log should not be redacted so that my client is able to accurately determine what is in fact due and owing.

2.    A copy of any all independent medical examination reports conducted by a physician after physical examination of the patient, a copy.

3.    A copy of any and all medical examination reports created by a physician without physical examination of the patient.

4.    A copy of any and all peer review medical reports created by a physician and/or billing service or by anyone else without physical examination of the patient.

5.    A copy of any and all reports created by a medical bill review service who has reviewed the billing by my client for this patient/insured.

6.    A copy of any document showing the scheduling and if applicable, missing of an independent medical examination by patient.

7.    A copy of any document showing the scheduling and, if applicable, missing of an examination under oath.

8.    Any document or correspondence detailing why there is no coverage for the patient on the date of loss.

In addition pursuant to Florida law, Florida Statutes 627.736 and 627.736(6)(d). A copy of all the Explanation of Benefits (EOBs) applicable to the above captioned medical provider's claim for the above captioned patient.

Failure to comply with these requests will force my client to file a breach of contract lawsuit and/or a declaratory lawsuit to determine what rights and benefits are in effect for my client under the applicable insurance policy.

I look forward to your prompt response.

Sincerely,

Kenneth B. Schurr, Esq.
KBS/sf

09052017

The Law Offices of

# KENNETH B. SCHURR, P.A.

Attorney At Law
2030 S. Douglas Road, Suite 105
Coral Gables, Florida 33134

Telephone (305) 441-9031
Telecopier (786) 221-2720

August 23, 2017

**Via certified mail, return receipt requested
7017 1070 0000 9439 0181**

State Farm Insurance Co.
Attn: Paul Robichaux
P.O. Box 106140
Atlanta, GA 30348

<u>DEMAND LETTER UNDER FL STATUTE 627.736 (10)</u>

| RE: | **Claimant:** | J██ B████ |
| | **Insured:** | J██ B████ |
| | **Claim Number:** | **596S04934** |
| | **Policy Number:** | **UNKNOWN** |
| | **Date of Loss:** | **June 23, 2015** |

Dear: Mr. Robichaux:

Please be advised that demand is hereby made for the payment of medical services provided to the above-named patient. Payment for these services is overdue as of this letter. PROVIDER: MANUEL V. FEIJOO, M.D. AND MANUEL V. FEIJOO, M.D. P.A. DATE OF SERVICE: JULY 2ND 2015.
CPT CODES: see copy of bills attached

| BILL | DEDUCTIBLE | CO-PAYMENT | PIP PAID | DUE |
|------|-----------|------------|----------|-----|
| $575.00 | UNKNOWN | UNKNOWN | UNKNOWN | $460.00 |

Enclosed please find the requisite itemized statement or copies of same in the form of *Health Care Finance Administration 1500 form or UB 92 forms* previously submitted and specifying each exact amount, the date of treatment, service, or accommodation, and the type of benefit claimed to be due. To the extent that this demand involves an insurer's withdrawal of payment for future treatment not yet rendered, attached please find a copy of your notice withdrawing such payment and an itemized statement of the type, frequency, and duration of future treatment claimed to be reasonable and medically necessary. Also, enclosed please find a copy of the assignment of benefits executed by the patient. Pursuant to Florida Statute, demand is also hereby made for reimbursement of the postage costs totaling $    . Make checks payable as follows: Medical Benefits to the provider: **Manuel V. Feijoo, M.D., and Manuel V. Feijoo, M.D., P.A.;** and interest, postage and penalty to the **Law Offices of Kenneth B. Schurr, P.A.**

If there is additional coverage then we demand 100% of the difference between the billed



EXHIBIT
26
5/29/19 AC

amount and the amount paid. If there is a deductible or if the bills are paid at 100% please let us know.   If the insurance company is entitled to limit reimbursement based on 200% of Medicare or 80 percent of the maximum reimbursable allowance under workers' compensation, please produce a copy of the policy of insurance along with the payment.  We do not accept limitations unless your policy specifically provides for this limitation. It is our contention the charges are reasonable based on what other doctors charge and what other PIP insurers have allowed for these services.  If you have any questions about the bills at issue please compare the attached ledger to your explanation of benefits and please note we dispute each and every reduction and nonpayment.

Section 627.736(10) of the Florida Statutes requires that if payment of the overdue amount is made within thirty (30) business days of receipt of this letter, said payment must include the applicable interest and a ten (10%) percent penalty of the overdue amount paid, subject to maximum penalty of Two Hundred Fifty dollars (250). Failure to pay within the allowed period will result in the immediate institution of a civil suit for the damages, attorney's fees, and costs.

In addition, please provide the undersigned with the following:

1. An up-to-date PIP payout log for this claim. Said payout log should not be redacted so that my client is able to accurately determine what is in fact due and owing.

2. A copy of any all independent medical examination reports conducted by a physician after physical examination of the patient, a copy.

3. A copy of any and all medical examination reports created by a physician without physical examination of the patient.

4. A copy of any and all peer review medical reports created by a physician and/or billing service or by anyone else without physical examination of the patient.

5. A copy of any and all reports created by a medical bill review service who has reviewed the billing by my client for this patient/insured.

6. A copy of any document showing the scheduling and if applicable, missing of an independent medical examination by patient.

7. A copy of any document showing the scheduling and, if applicable, missing of an examination under oath.

8. Any document or correspondence detailing why there is no coverage for the patient on the date of loss.

In addition pursuant to Florida law, Florida Statutes 627.736 and 627.736(6)(d). A copy of all the Explanation of Benefits (EOBs) applicable to the above captioned medical provider's claim for the above captioned patient.

Failure to comply with these requests will force my client to file a breach of contract lawsuit and/or a declaratory lawsuit to determine what rights and benefits are in effect for my client under the applicable insurance policy.

I look forward to your prompt response.

Sincerely,

Kenneth B. Schurr, Esq.
KBS/sr



## HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O BOX 106134

ATLANTA GA 30348

| PICA | | | | | | | | PICA |

1. MEDICARE ☐ (Medicare#)  MEDICAID ☐ (Medicaid#)  TRICARE ☐ (ID#/DoD#)  CHAMPVA ☐ (Member ID#)  GROUP HEALTH PLAN ☐ (ID#)  FECA BLK LUNG ☐ (ID#)  OTHER ☐ (ID#)

1a. INSURED'S I.D. NUMBER (For Program in Item 1)
596047M23

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
O███████ N███████

3. PATIENT'S BIRTH DATE MM | DD | YY  1979  SEX M ☐ F ☐ X

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
O███████ N███████

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self ☒  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY DAVIE  STATE FL

8. RESERVED FOR NUCC USE  X

CITY DAVIE  STATE FL

ZIP CODE 33331  TELEPHONE (Include Area Code)

ZIP CODE 33331  TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
D843180E2459C4

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
YES ☐  NO ☒

a. INSURED'S DATE OF BIRTH MM | DD | YY  SEX M ☐ F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?
YES ☒  NO ☐  PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?
YES ☐  NO ☐

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES ☐  NO ☐  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE  DATE 04 09 19

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM 10 DD 04 YY 18  QUAL.

15. OTHER DATE MM | DD | YY  QUAL.

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM MM DD YY  TO MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
PINE ISLAND MEDICAL

17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM MM DD YY  TO MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  YES ☐  NO ☐  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind.
A. S134XX A  B.  C. S233XX A  D.
E. S335XX A  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | | |
| 03 | 07 | 19 | | | | 11 | 1 | 99203 | | S134XX A | 350 00 | 1 | | NPI | |
| 03 | 07 | 19 | | | | 11 | 1 | 95851 | | S134XX A | 100 00 | 1 | | NPI | |
| 03 | 07 | 19 | | | | 11 | 1 | 76140 | | S134XX A | 100 00 | 1 | | NPI | |
| | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN ☐  EIN ☒
650409050

26. PATIENT'S ACCOUNT NO.
000595 1

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
YES ☒  NO ☐

28. TOTAL CHARGE
$ 550 00

29. AMOUNT PAID
$ 0 00

30. Rsvd for NUCC Use
550 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
FEIJOO MANUEL V MD
SIGNED ME53009  DATE 04 09 19

32. SERVICE FACILITY LOCATION INFORMATION
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI FL 33144
a. 1811923105

33. BILLING PROVIDER INFO & PH #
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI FL 33144
a. 1811923105

NUCC Instruction Manual available at: www.nucc.org  **PLEASE PRINT OR TYPE**  APPROVED OMB-0938-1197 FORM 1500 (02-12)

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

EXHIBIT 27 5/30/18

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

**MEDICAL OFFICE**
**8370 S.W. 8th St.**
**MIAMI, FL 33144**

Tel: (305) 265-7505
Fax: (305) 265-7535

04/29/2019

| | |
|---|---|
| **PATIENT NAME:** | O█████N█████ |
| **DATE OF INJURY:** | 10/04/18 |
| **EXAMINATION DATE:** | 03/07/19 |

## INITIAL/FINAL ORTHOPEDIC EVALUATION

**CHIEF COMPLAINT:**
Pain on the cervical region, the upper/lower back.

**HISTORY OF PRESENT ILLNESS:**
This is a 43-year-old male who was involved in an automobile accident on October 4th, 2018 he was driving, wearing the seatbelt another car making a u turn cut him off and his car hit that other vehicle, suffering multiples traumas, but did not go to any hospital. The car a Toyota Camry '2018 could be fixed.
The patient has been receiving physiotherapy treatment and refers is feeling better, but still complaining of pain on the aforementioned areas.

**PAST MEDICAL HISTORY:**
No previous accident.

**SURGERIES:**
None.

**ILLNESSES:**
High blood pressure.

**ALLERGIES:**
None.

**SOCIAL HABITS:**
The patient drinks coffee, does not smoke, drink alcohol, or take drugs.

**MEDICATIONS:**
None for pain.

**OCCUPATION:** Office job.

**PHYSICAL EXAMINATION:**
The patient is well-nourished, well-developed, oriented and alert, cooperative, head; eyes, ears, nose, mouth and throat are within normal limits.
**Weight:** 194 lbs.          **Height:** 6'00"

04/29/2019

**PATIENT NAME:**       ███████ ███

**DATE OF INJURY:**      10/04/18

**PAGE:**               2

**CERVICAL SPINE:**  There is pain on the posterior cervical region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation and muscle spasm on the paracervical muscles with slight limited range of motion of the normal range.

**THORACIC SPINE:**  There is pain on the mid-thoracic spine at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paravertebral muscles with limited range of motion to 60 percent of the normal range.

**LUMBOSACRAL SPINE:**  There is pain on the lumbosacral region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paralumbar muscles with limited range of motion to 60 percent of the normal range.

**UPPER EXTREMITIES:**  Abduction/adduction, internal and external rotations are normal in both shoulders and arms.

**LOWER EXTREMITIES:**  Flexion/extension, both hips and knees are normal with Lasegue's sign being positive bilaterally to 45 degrees.

**DIAGNOSIS:**
1. Cervical spine sprain.
2. Thoracic spine sprain.
3. Lumbosacral spine sprain.
4. Lumbosacral radiculitis.
5. As per MRI of lumbar spine shows disc herniation at L3-L4 and L4-L5.
6. MRI of cervical spine revealed disc herniation at C4-C5. There is bulging disc at C6-C7.

**RECOMMENDATION'S:**
1. Limit overall activities.
2. Use a low pillow.
3. Avoid heavy weight lifting; bend the knees not the back when picking up anything from the floor.
4. The patient was fully explained about the MRIs results and advised that he might need surgical evaluation and treatment in the future to remove the disc herniations. The update cost of the surgery (after review of prices with different sources) including anesthesia and rehabilitation could be between $70,000.00 and $100,000.00.

**PATIENT NAME:** ███████, ██████
**DATE OF INJURY:** 10/04/18
**PAGE:** 3

## RECOMMENDATION'S:

5. Ibuprofen 800 mg # 60 tabs PO BID with food and Flexeril 10 mg # 30 tabs PO 1 at H.S.

## FINAL EVALUATION:

This patient was advised on this final evaluation that he has been left with a partial impairment of 12% of the body as a whole.

_____, M.D.
Physician's Signature Required
MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                    03/24/19

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144

Tel: (305) 265-7505
Fax: (305) 265-7535

**NOTICE OF INITIATION OF MEDICAL TREATMENT PURSUANT
TO FL. STATUE 627.736**

**CERTIFIED MAIL:  7017 2620 0001 0254 0962**

March 14, 2019

STATE FARM INS
PO BOX 106134
ATLANTA, GA 30348

Patient Name: N███ O███
Insured:       **SELF**
Policy#:       D843180-E24-59C4
Claim#:        59-6047-M23
Date of loss:  10/24/18

Dear Sir/Madam:

Please be advised that the above-named patient/s began treatment on March 7TH, 2019
Notice is hereby given pursuant to Fla. Stat. 627.736 of the initiation of medical treatment within 21
days of the first examination or treatment of the patient/s.
Pursuant to Florida Statute, the time frames for submission of this medical provider's charges for
treatment of this patient /s are now from 35 days to 75 days from the date of service.

If you have any questions, please do not hesitate to contact the office at your convenience.

Very truly yours,

*nathalie*

Nathalie Inirio
Office Representative

04/29/2019

04/29/2019

**MANUEL V. FEIJOO, MD**
**Orthopedic**
8370 SW 8th ST Miami, FL 33144
Ph: (305) 265-7505 Fax: (305) 265-7535

Patient Name:                     Date: 3/7/19

PROCEDURES:

| PROCEDURES: | CPT CODE | |
|---|---|---|
| INIT VISIT W/O REF | | |
| LEVEL 1 | 99201 | |
| LEVEL 2 10 MIN | 99202 | |
| LEVEL 3 15 MIN | 99203 | ✓ |
| LEVEL 4 25 MIN | 99204 | |
| LEVEL 5 40 MIN | 99205 | |
| KENALLOG INJECTION | J3301 | |
| CAST PLASTER | 27520 | |
| OTHER PROCEDURES: | 95851 | ✓ |
| | 76140 | ✓ |

| PROCEDURES: | CPT CODE | |
|---|---|---|
| ESTABLISHED PATIENT | | |
| LEVEL 1 | 99211 | |
| LEVEL 2 10 MIN | 99212 | |
| LEVEL 3 15 MIN | 99213 | |
| LEVEL 4 25 MIN | 99214 | |
| LEVEL 5 40 MIN | 99215 | |
| ARTHROCENTESIS | | |
| SMALL JOINT | 20600 | |
| INTERMEDIATE JOINT | 20605 | |
| MAJOR JOINT | 20610 | |

DIAGNOSIS:

__ G 44.319 Acute post traumatic headaches
__ Shoulders bursitis M06.219 Unspecified
__ Shoulders bursitis M06.212 L 211 RT/ M06.211 LT
__ Shoulders Synovitis M67.311 RT/ M67.312 LT
__ Pain in shoulder M25.511 RT/ M25.512 LT.
__ Pain on Elbow.  M25.52 RT/M25.522 LT
__ Pain on Arms unspecified M79.603
__ Pain on forearm M79.631 RT/M79.632 LT
__ Synovitis Wrists M67.331 RT/ M67.332 LT
__ Synovitis Hands M67.341 RT/ M67.342 LT
__ Pain in hip unspecified  M25.559
__ Pain in lower leg  M79.661 RT/ M79.662 LT.
__ Pain in ankle and foot M25.571 RT/M25.272 LT.
__ Cervicalgia/pain in neck M54.2.
__ Cervicobrachial syndrome (diffuse) M53.1.
__ Cervical Spine Radiculopathy M54.12.
__ Pain in the thoracic spine M54.6.
__ Lumbago/low back pain M54.5.
__ Lumbago with Sciatia M54.41 RT/M54.42 LT
__ Radiculopathy thoracolumbar M54.15
__ Backache, unspecified M54.9
__ Post Traumatic pain/myositis __ M60.9
✓ Cervical spine sprain S13.4XX
__ Cervical spine strain S16.1XX
✓ Thoracic spine sprain S23.3XX
__ Others Diagnosis:

✓ Lumbo sacral spine sprain S33.5XX
__ Shoulder/Upper arm sprain RT S43.401__/LTS43.402__.
__ Shoulder strain (ROT CUFF) RT S46.011__LT S46.012
__ Elbow/Forearm sprain RT S53.491__/LT S53.492__
__ Elbow forearm strain RT S46.111__/LT S46.112__
__ Wrist/Hand Sprain RT S63.91X__/LT S63.92 X__
__ Wrist/Hand Strain RT S66.811__/LT S66.812__
__ Synovitis knees RT M67.361__/M67-362__
__ Hip/Thigh sprain RT S73.111__    __/LT S73 112__
__ Hip/Thigh strain RT S76.011__/LT S76.012
__ Knee/Lower leg sprain RT S83.91X__/LT S83.92X__
__ Knee/Lower leg strain RT S86.911__/LT S86.912__
__ Ankle/Foot sprain RT S93.491__/LT S86.912__
__ Ankle/Foot Strain RT S96.911__LT S96.912
__ Sacroiliac joint sprain S33.6XX__.
__ 847.3 Sacrum sprain.
__ Chest/Rib Contusion S20.219__.
__ 923.21 Wrist Contusion.
__ Hip Contusion RT S70.01X__.
__ O/A Hands RT M19.241__/LT M19.242__
__ O/A Elbows Unspecified RT M19.221__/LT M19.22__
__ O/A Hips Unspecified M16.9
__ O/A Shoulders RT M19.211__/LT M19.212__
__ O/A Wrists RT M19.231__/ LT M19.232__
__ O/A Knees (Bilateral) M17.0__ (Unilateral) M17.10__
__ O/A Ankles/Foot RT M19.271__ / LT M19.272__

CERTIFIED MAIL

7018 1130 0002 1668 8318

U.S. POSTAGE PAID
DOMG SENV
MIAMI FL
MAR 8 '19
AMOUNT
$7.75
R2305M146480-06
30348
1020

STATE FARM INS
P.O. BOX 106134
ATLANTA, GA 30348

Manuel O. Tejeo, M.D. & P.A.
MEDICAL OFFICE
8370 S.W. 8th St. • Miami FL 33144



STATE FARM INS
P O BOX 106134

ATLANTA   GA 30348

09052017

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

☐ PICA                                                                                                    PICA ☐

| 1. MEDICARE ☐ (Medicare#)  MEDICAID ☐ (Medicaid#)  TRICARE ☐ (ID#/DoD#)  CHAMPVA ☐ (Member ID#)  GROUP HEALTH PLAN ☐ (ID#)  FECA BLK LUNG ☐ (ID#)  OTHER ☐ (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) 596S04934 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) B___ J___ | 3. PATIENT'S BIRTH DATE  1967 X  SEX M ☐ F ☐ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) B___ J___ |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED Self ☐ Spouse X Child ☐ Other ☐ | 7. INSURED'S ADDRESS (No., Street) |

| CITY MIAMI BEACH    STATE FL | 8. RESERVED FOR NUCC USE  X | CITY MIAMI BEACH    STATE FL |

| ZIP CODE 33139    TELEPHONE (Include Area Code) | | ZIP CODE 33139    TELEPHONE (Include Area Code) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) YES ☐  NO X | a. INSURED'S DATE OF BIRTH  MM DD YY    SEX M ☐ F ☐ |

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? YES X  NO ☐  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? YES ☐  NO ☐ | c. INSURANCE PLAN NAME OR PROGRAM NAME |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES ☐  NO ☐  If yes, complete items 9, 9a, and 9d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE   DATE   07 24 15

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   SIGNATURE ON FILE

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) 06 23 15   QUAL. | 15. OTHER DATE  MM DD YY   QUAL. | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM     TO |

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE RFG MEDICAL CLINIC | 17a.   17b. NPI | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM     TO |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | | 20. OUTSIDE LAB?  YES ☐  NO ☐   $ CHARGES |

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind.  A. 723 1   B.   C. 724 4   D.  E.   F.   G.   H.  I. 716 11 | 22. RESUBMISSION CODE   ORIGINAL REF. NO.  23. PRIOR AUTHORIZATION NUMBER |

| 24. A. DATE(S) OF SERVICE From / To  MM DD YY  MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS   MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 07 02 15 | 11 | 1 | 99204 | 723 1 | 475 00 | 1 | | NPI | |
| 2 | 07 02 15 | 11 | 1 | 95851 | 723 1 | 100 00 | 1 | | NPI | |
| 3 | | | | | | | | | NPI | |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  650409050   SSN ☐ EIN X | 26. PATIENT'S ACCOUNT NO. B00923 1 | 27. ACCEPT ASSIGNMENT? YES X  NO ☐ | 28. TOTAL CHARGE  $ 575 00 | 29. AMOUNT PAID  $ 0 00 | 30. Rsvd for NUCC Use  575 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  FEIJOO   MANUEL V MD   SIGNED   07 24 15 | 32. SERVICE FACILITY LOCATION INFORMATION MANUEL V FEIJOO MD PA  8370 SW 8TH STREET  MIAMI FL 33144  a. 1811923105 | 33. BILLING PROVIDER INFO & PH # ( )  MANUEL V FEIJOO MD PA  8370 SW 8 TH STREET  MIAMI FL 33144  a. 1811923105 |

NUCC Instruction Manual available at: www.nucc.org    PLEASE PRINT OR TYPE    CR0081653    APPROVED OMB-0938-1197 FORM 1500 (02-12)

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

09052017

# Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.
8370 SW 8 Street - Miami, Florida 33144

### ASSIGNMENT OF INSURANCE BENEFITS, POWER OF ATTORNEY & RELEASE OF INFORMATION
Insurer Please Read the Following, in its Entirety, upon Receipt:

I, the undersigned patient/insured knowingly, voluntarily and intentionally assign the benefits of insurance and any overdue interest payments under the No-Fault Policy of Automobile Insurance, also known as Personal Injury Protection (P.I.P.), or Medical Payments policy of insurance from my automobile insurer or the responsible insurer to the above described medical providers (Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.) for any and all services rendered to the undersigned patient/insured, including the right to bring suit in a court of law for any failure to pay PIP benefits / insurance benefits. The patient understands it is the express intention of the provider to accept this assignment of benefits in lieu of demanding full payment at the time services are rendered. The undersigned assigns any and all claims for statutory bad faith to the above medical providers. If the insurer disputes the validity of this assignment of benefits then the insurer is instructed to notify the provider in writing within five (5) days of receipt of this document. I understand this assignment will remain in full force and effect and will NOT be revoked unless the revocation is agreed to by both the medical providers and the undersigned patient or the patient's attorney. Since I have assigned my PIP benefits to the above-referenced medical provider, any prior reservation of benefits or demand for wage loss benefits is withdrawn. I am instructing the PIP carrier not to reserve any benefits and to pay all bills in the order received. This assignment applies to both past and future medical expenses and is valid even if undated. A photocopy of this assignment is to be considered as valid as the original. The undersigned patient/insured directs the insurer to pay the medical provider directly without including the patient's name on the check.

The insurer is directed by the provider and the patient/insured to not issue any checks or drafts in partial settlement of a claim that contain or are accompanied by language releasing the insurer or its insured/patient from liability unless there has been prior written settlement agreed to by the medical provider and the insurer as to the amount payable under the insurance policy or contract. The provider hereby objects to any reductions or partial payments made at the discretion of the insurer. Any partial or reduced payment, regardless of the accompanying language, issued by the insurer and deposited by the provider shall be done so under protest, at the risk of the insurer, and the deposit shall not be deemed a waiver, accord, satisfaction, discharge, or settlement agreement by the provider to accept a reduced amount as payment in full. The insurer is hereby placed on notice that this provider reserves the right to seek the full amount of the bills submitted. Please acknowledge your acceptance of the foregoing terms by issuing a check for the services rendered by these medical providers payable to one or more of the medical provider(s) named herein, and not to the patient / claimant / insured.

In the event the subject medical benefits are disputed by the insurer for any reason, including but not limited to, medical reasonableness and/or necessity, the undersigned patient/insured hereby instructs the insurer to set aside any amount disputed (i.e. to escrow the money) and not pay the disputed amount to anyone, including myself, or any entity until the dispute is resolved. The insurer is instructed to immediately explain in writing to the above provider of any dispute. If the insurer schedules an IME or EUO the insurer is hereby requested and authorized to send a copy of said notification to this provider. The provider is not the agent of the insurer or the patient for any purpose. The undersigned patient/insured agrees to pay any applicable deductible and co-payments for services rendered.

### Release of Information:

I hereby authorize the above named medical providers to: furnish my insurance company or companies and the patient's attorney with any and all information that may be contained in my medical records; to obtain coverage information telephonically from my insurer; to request a written non-redacted PIP payout sheet from the insurer; and to obtain copies of my medical records, including but not limited to, documents, reports, scans, notes, opinions, X-rays, and MRIs, from any other medical provider or any insurance company. The insurer is directed to keep the patient's medical records private and confidential. The insurer is NOT authorized to provide these medical records to anyone, including but not limited to, third party vendors without the patient's and the provider's prior express written permission.

I certify that I have not been solicited or promised anything in exchange for receiving medical care or that I have received any promises or guarantees from anyone as to the results that may be obtained by any medical treatment.
Caution! Please read before signing. If you do not completely understand this document please ask us to explain it to you. If you sign below we will assume you understand and agree to the terms.

Patient Signature X _____          Date: _____

Patient Name (please print) _____

STFPBO0000000853



09052017

**HEALTH INSURANCE CLAIM FORM**
APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O  BOX 106134

ATLANTA  GA 30348

| | | | | | |
|---|---|---|---|---|---|
| MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER  (For Program in Item 1) |

596S04934

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE: 1984  SEX: M X

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED: Self  Spouse X  Child  Other

7. INSURED'S ADDRESS (No., Street)

CITY: MIAMI   STATE: FL

8. RESERVED FOR NUCC USE   X

CITY: MIAMI   STATE: FL

ZIP CODE: 33125   TELEPHONE (Include Area Code)

ZIP CODE: 33125   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  YES  X NO

a. INSURED'S DATE OF BIRTH  SEX M  F

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  X YES  NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  YES  NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES  NO  If yes, complete items 9, 9a, and 9d

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE   I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  SIGNATURE ON FILE   DATE  07 24 15

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE   I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP): 06 23 15  QUAL.

15. OTHER DATE   MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   FROM  TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE: RFG MEDICAL CLINIC   17a.   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   FROM  TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  YES  NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind.

A. 723 1   B.   C. 724 1   D.

E.   F.   G.   H.

I. 724 2   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 07 02 15 | | 11 | 1 | 99204 | | 723 1 | 475 00 | 1 | | NPI | |
| 2 | 07 02 15 | | 11 | 1 | 95851 | | 723 1 | 100 00 | 1 | | NPI | |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER: 650409050   SSN  EIN X

26. PATIENT'S ACCOUNT NO.: B00924 1

27. ACCEPT ASSIGNMENT?  X YES  NO

28. TOTAL CHARGE  $ 575 00

29. AMOUNT PAID  $ 0 00

30. Rsvd for NUCC Use  575 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

FEIJOO  MANUEL V MD
ME63009   07 24 15   1811923105

32. SERVICE FACILITY LOCATION INFORMATION

MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI FL 33144
1811923105

33. BILLING PROVIDER INFO & PH #

MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI FL 33144
1811923105

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   CR061653  APPROVED OMB-0938-1197 FORM 1500 (02-12)

**PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT**

09052017

CARRIER

PATIENT AND INSURED INFORMATION

PHYSICIAN OR SUPPLIER INFORMATION

## Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.
8370 SW 8 Street - Miami, Florida 33144

ASSIGNMENT OF INSURANCE BENEFITS, POWER OF ATTORNEY &
RELEASE OF INFORMATION
Insurer Please Read the Following, in its Entirety, upon Receipt:

I, the undersigned patient/insured knowingly, voluntarily and intentionally assign the benefits of insurance and any overdue interest payments under the No-Fault Policy of Automobile Insurance, also known as Personal Injury Protection (P.I.P.), or Medical Payments policy of insurance from my automobile insurer or the responsible insurer to the above described medical providers (Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.) for any and all services rendered to the undersigned patient/insured, including the right to bring suit in a court of law for any failure to pay PIP benefits / insurance benefits. The patient understands it is the express intention of the provider to accept this assignment of benefits in lieu of demanding full payment at the time services are rendered. The undersigned assigns any and all claims for statutory bad faith to the above medical providers. If the insurer disputes the validity of this assignment of benefits then the insurer is instructed to notify the provider in writing within five (5) days of receipt of this document. I understand this assignment will remain in full force and effect and will NOT be revoked unless the revocation is agreed to by both the medical providers and the undersigned patient or the patient's attorney. Since I have assigned my PIP benefits to the above-referenced medical provider, any prior reservation of benefits or demand for wage loss benefits is withdrawn. I am instructing the PIP carrier not to reserve any benefits and to pay all bills in the order received. This assignment applies to both past and future medical expenses and is valid even if undated. A photocopy of this assignment is to be considered as valid as the original. The undersigned patient/insured directs the insurer to pay the medical provider directly without including the patient's name on the check.

The insurer is directed by the provider and the patient/insured to not issue any checks or drafts in partial settlement of a claim that contain or are accompanied by language releasing the insurer or its insured/patient from liability unless there has been a prior written settlement agreed to by the medical provider and the insurer as to the amount payable under the insurance policy or contact. The provider hereby objects to any reductions or partial payments made at the discretion of the insurer. Any partial or reduced payment, regardless of the accompanying language, issued by the insurer and deposited by the provider shall be done so under protest, at the risk of the insurer, and the deposit shall not be deemed a waiver, accord, satisfaction, discharge, or settlement agreement by the provider to accept a reduced amount as payment in full. The insurer is hereby placed on notice that this provider reserves the right to seek the full amount of the bills submitted. Please acknowledge your acceptance of the foregoing terms by issuing a check for the services rendered by these medical providers payable to one or more of the medical provider(s) named herein, and not to the patient / claimant / insured.

In the event the subject medical benefits are disputed by the insurer for any reason, including but not limited to, medical reasonableness and/or necessity, the undersigned patient/insured hereby instructs the insurer to set aside any amount disputed (i.e. to escrow the money) and not pay the disputed amount to anyone, including myself, or any entity until the dispute is resolved. The insurer is instructed to immediately explain in writing to the above provider of any dispute. If the insurer schedules an IME or EUO the insurer is hereby requested and authorized to send a copy of said notification to this provider. The provider is not the agent of the insurer or the patient for any purpose. The undersigned patient/insured agrees to pay any applicable deductible and co-payments for services rendered.

### Release of Information:

I hereby authorize the above named medical providers to: furnish my insurance company or companies and the patient's attorney with any and all information that may be contained in my medical records; to obtain coverage information telephonically from my insurer; to request a written non-redacted PIP payout sheet from the insurer; and to obtain copies of my medical records, including but not limited to, documents, reports, scans, notes, opinions, X-rays, and MRIs, from any other medical provider or any insurance company. The insurer is directed to keep the patient's medical records private and confidential. The insurer is NOT authorized to provide these medical records to anyone, including but not limited to, third party vendors without the patient's and the provider's prior express written permission.

I certify that I have not been solicited or promised anything in exchange for receiving medical care or that I have received any promises or guarantees from anyone as to the results that may be obtained by any medical treatment.
Caution! Please read before signing. If you do not completely understand this document please ask us to explain it to you. If you sign below we will assume you understand and agree to the terms.

Patient Signature X _____     Date: _____

Patient Name (please print) _____



09052017