# EXHIBIT "B"

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                      MIAMI DIVISION

 3               CASE NO.: 1:18-cv-23329

 4  STATE FARM MUTUAL AUTOMOBILE
    INSURANCE COMPANY,
 5
         Plaintiff,
 6
    v.
 7
    MANUEL V. FEIJOO; and
 8  MANUEL V. FEIJOO, M.D., P.A.,
    A Florida professional association,
 9
         Defendants.
10
    _____/
11  VIDEOTAPED
    DEPOSITION OF:  MANUEL V. FEIJOO
12
    DATE:           Friday, June 7, 2019
13
    TIME:           9:02 AM
14
    TAKEN BY:       Plaintiff
15
    PLACE:
                    Orange Legal - Miami
16                  6303 Blue Lagoon Drive
                    Suite 380
17                  Miami, Florida  33126

18  REPORTED BY:    JORDANN A. WILLIAMS,
                    COURT REPORTER AND NOTARY PUBLIC,
19                  STATE OF FLORIDA AT LARGE

20  TRANSCRIBED BY: NICHOLE RYAN, NOTARY PUBLIC,
                    STATE OF FLORIDA AT LARGE
21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1                    A P E A R A N C E S:

 2   KENNETH P. HAZOURI, ESQUIRE
     OF:  DSK Law
 3        332 North Magnolia Avenue
          Orlando, Florida  32801
 4        khazouri@dsklawgroup.com

 5        Counsel for the Plaintiff

 6

 7   JEROME PIVNIK, ESQUIRE
     OF:  The Pivnik Law Firm
 8        7700 North Kendall Drive, Suite 703
          Miami, Florida  33156
 9        pivniklaw@aol.com

10

11   KENNETH SCHURR, ESQUIRE

12   OF:  Law Offices of Kenneth B. Schurr, P.A.
          2030 South Douglas Road, Suite 105
13        Coral Gables, Florida 33134
          counselken@schurrlaw.com
14
          Counsel for the Defendant
15

16
     ALSO PRESENT:
17   Raul Torres, Videographer

18

19

20

21

22

23

24

25
```



```
 1                        I N D E X

 2    TESTIMONY OF MANUEL V. FEIJOO, M.D., P.A.
            Direct Examination by Mr. Hazouri . . . . . .5
 3          Cross Examination by Mr. Pivnik . . . . . .296
            Redirect Examination by Mr. Hazouri . . . .305
 4
      CERTIFICATE OF OATH . . . . . . . . . . . . . .38
 5    CERTIFICATE OF REPORTER . . . . . . . . . . . .39
      ERRATA SHEET . . . . . . . . . . . . . . . . . 40
 6    NOTIFICATION LETTER . . . . . . . . . . . . . .41

 7                     E X H I B I T S

 8    PLAINTIFF'S EXHIBIT NO. 28 . . . . . . . . . . 14
            (Department of Health CV)
 9
      PLAINTIFF'S EXHIBIT NO. 29 . . . . . . . . . . 33
10          (Application for Certification of Exemption)

11    PLAINTIFF'S EXHIBIT NO. 30 . . . . . . . . . . 33
            (Certificate of Exemption)
12
      PLAINTIFF'S EXHIBIT NO. 31 . . . . . . . . . . 45
13          (Medical Bill Issued by Feijoo, P.A.)

14    PLAINTIFF'S EXHIBIT NO. 32 . . . . . . . . . . 61
            (Handwritten Initial Orthopedic Evaluation)
15
      PLAINTIFF'S EXHIBIT NO. 37 . . . . . . . . . . 90
16          (Range of Motion Report - 5/19/16 for E.G.A.)

17    PLAINTIFF'S EXHIBIT NO. 33 . . . . . . . . . . 98
            (Typewritten Report of Initial Exam of E.G.A.)
18
      PLAINTIFF'S EXHIBIT NO. 34 . . . . . . . . . . 126
19          (Studies Request Form)

20    PLAINTIFF'S EXHIBIT NO. 35 . . . . . . . . . . 129
            (Pages Taken Out of CPT 2016 Book)
21
      PLAINTIFF'S EXHIBIT NO. 36. . . . . . . . . . .146
22          (Health Insurance Claim Form)

23    PLAINTIFF'S EXHIBIT NO. 38 . . . . . . . . . . 147
            (Handwritten Notes from Follow-Up With E.G.A.)
24
      PLAINTIFF'S EXHIBIT NO. 39 . . . . . . . . . . 148
25          (Range of Motion Report - E.G.A.)
```



**Orange Legal**
**800-275-7991**

```
  1                      I N D E X (Continued)

  2      PLAINTIFF'S EXHIBIT NO. 40 . . . . . . . . . . .158
             (Typewritten Follow Up for Orthopedic Evaluation)
  3
         PLAINTIFF'S EXHIBIT NO. 41 . . . . . . . . . . .172
  4          (Prescription for Cervical and Lumbar Spine MRI)

  5      PLAINTIFF'S EXHIBIT NO. 42 . . . . . . . . . . .192
             (Referral for Therapy)
  6
         PLAINTIFF'S EXHIBIT NO. 43 . . . . . . . . . . .199
  7          (Bill Dated 12/5/16)

  8      PLAINTIFF'S EXHIBIT NO. 44 . . . . . . . . . . .206
             (Handwritten Notes)
  9
         PLAINTIFF'S EXHIBIT NO. 45 . . . . . . . . . . .206
 10          (Range of Motion Report)

 11      PLAINTIFF'S EXHIBIT NO. 46 . . . . . . . . . . .214
             (Typewritten Final Orthopedic Evaluation for Exam)
 12
         PLAINTIFF'S EXHIBIT NO. 47 . . . . . . . . . . .222
 13          (X-Ray Report for E.A.G.)

 14      PLAINTIFF'S EXHIBIT NO. 48 . . . . . . . . . . .246
             (Patient Log)
 15
         PLAINTIFF'S EXHIBIT NO. 49 . . . . . . . . . . .250
 16          (Initial/Final Orthopedic Evaluation Patient J.A.)

 17      PLAINTIFF'S EXHIBIT NO. 50 . . . . . . . . . . .257
             (MRI Report - Patient J.A.)
 18
         PLAINTIFF'S EXHIBIT NO. 51 . . . . . . . . . . .259
 19          (Written Evaluation of Patient J.A. Dated 12/17/15)

 20      PLAINTIFF'S EXHIBIT NO. 52 . . . . . . . . . . .259
             (Range of Motion Report of Patient J.A., 12/17/15)
 21
         PLAINTIFF'S EXHIBIT NO. 53 . . . . . . . . . . .260
 22          (Fax Transmittal Sheet to Valles and Associates)

 23      PLAINTIFF'S EXHIBIT NO. 54 . . . . . . . . . . .260
             (Phone Correspondence Sheet)
 24
         PLAINTIFF'S EXHIBIT NO. 55 . . . . . . . . . . .260
 25          (Patient Log)
```



1                    I N D E X (Continued)

2    PLAINTIFF'S EXHIBIT NO. 56 . . . . . . . . . . . .261
         (Bill for Date of Service)
3
     PLAINTIFF'S EXHIBIT NO. 57 . . . . . . . . . . . .261
4        (Remainder of Medical Chart for Patient J.A.)

5    PLAINTIFF'S EXHIBIT NO. 58 . . . . . . . . . . . .269
         (Assignment of Benefits From E.A.G. Chart)
6
     PLAINTIFF'S EXHIBIT NO. 59 . . . . . . . . . . . .280
7        (Chart Control Form)

8

9

10

11

12

13

14

15

16                    S T I P U L A T I O N S

17        It is hereby stipulated and agreed by and between

18   counsel present for the respective parties, and the

19   deponent, that the reading and signing of the

20   deposition are hereby reserved.

21

22

23

24

25



```
 1              P R O C E E D I N G S

 2                  - - - - - -

 3         THE VIDEOGRAPHER:  Good morning.  Here

 4    begins the deposition of Manuel Feijoo, M.D.,

 5    taken in the matter of case 1:18-cv-23329, State

 6    Farm vs. Manuel Feijoo, M.D., to be heard in the

 7    United District Court Southern District of

 8    Florida, Miami Division.

 9         The deposition is being held at Miami Orange

10    Legal, 6303 Blue Lagoon Drive, Suite 308 -- 388,

11    sorry, Miami, Florida.  Today is June 7th, 2019.

12    The time is 9:02.

13         Would all counsel please state their

14    appearance for the record?

15         MR. HAZOURI:  Ken Hazouri, counsel for the

16    Plaintiff, State Farm Mutual Automobile Insurance

17    Company.

18         MR. PIVNIK:  And Jerry Pivnik, for the

19    Defendants, Dr. Feijoo and Dr. Feijoo, M.D., P.A.

20         MR. SCHURR:  Ken Schurr, for Defendants.

21         THE COURT REPORTER:  Please raise your right

22    hand.  Do you swear or affirm the testimony

23    you're going to give today will be the truth, the

24    whole truth and nothing but the truth?

25         THE WITNESS:  I do.
```



```
 1                     MANUEL V. FEIJOO, M.D.,

 2          after having been first duly sworn, was examined

 3          and testified under oath as follows:

 4                        DIRECT EXAMINATION

 5   BY MR. HAZOURI:

 6          Q.    Good morning, sir, how are you?

 7          A.    Good.

 8          Q.    Good.  Could you please state your name?

 9          A.    Manuel V. Lourdes Feijoo, F-e-i-j-o-o.

10          Q.    Okay.  And have you given your deposition

11   before?

12          A.    I don't remember.

13                THE COURT REPORTER:  Was that I don't

14          remember?

15                THE WITNESS:  I don't remember.

16   BY MR. HAZOURI:

17          Q.    Yeah, you have kind of a soft voice.  I'm

18   going to ask that you speak up.

19          A.    I don't remember.

20          Q.    Okay.  Thank you.  So you don't know if

21   you've been deposed before?  You don't remember?

22          A.    Not here.  No here, no.  I've been deposed

23   before, yes, but no here.

24          Q.    Yeah, in the past at any time.

25          A.    Yes, yes, I have been deposed before.
```



1        Q.   Okay.  Let me go ahead and jump right to

2   ground rules because there's one we need to go over

3   right now.  If we were sitting here having a

4   conversation over -- or we were sitting at lunch having

5   a conversation and we were asking each other questions,

6   a lot of times we can anticipate what the question is

7   going to be and start answering it before the question

8   is done.  Here, because we're taking a transcript of

9   everything that everybody says on the record, like we

10  are now, I need you to please make a concerted effort to

11  let me finish my question before you start answering.

12  Okay?  And I will make a concerted effort to let you

13  finish your answer before I ask the next question.  That

14  way we get a nice question, answer, question, answer on

15  the transcript.  Make sense?

16       A.   Yes.

17       Q.   If you start talking over me a little bit or

18  even if I talk over you, I'll try and remind us to --

19  because sometimes it just happens, so I'll try and

20  remind us to let the question finish.  Okay?

21       A.   All right.

22       Q.   Also, I'm going to be asking you question

23  about the case that we're here on today, and if you

24  don't understand my question for any reason or it

25  confuses you for any reason, please tell me and I will



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    9

```
 1   try and rephrase it in a way that you can understand it.

 2   Okay?

 3        A.   All right.

 4        Q.   If you do not tell me that you're confused

 5   or you don't understand the question, I'm going to

 6   assume that you do.  So please tell me if you're

 7   confused.

 8        A.   Okay.

 9        Q.   Okay?  And then finally, you're doing a good

10   job of it now.  Again, if we were just sitting around

11   talking informally, nodding our head or shaking or head

12   or saying uh-huh or huh-uh is a fine way to communicate.

13   Here in a deposition, I'd ask that you please give very

14   clear answers, yes, no and any explanation you want to

15   provide so again, the transcript is clear as to how

16   you're answering the questions.  Okay?

17        A.   Got it.

18        Q.   And if you say uh-huh or huh-uh, nod your

19   head, I might gently remind you that I need a yes or a

20   no.  Okay?

21        A.   Yes.

22        Q.   All right.  Now, getting back to the

23   depositions that you've given before, can you tell me

24   how many depositions you've given in the past?

25        A.   Probably about 20, more or less.  I don't
```



**Orange Legal**
**800-275-7991**

 1  know.  I don't remember exactly.

 2         Q.   When was the last time you gave a

 3  deposition?

 4         A.   Last time.  I don't exactly know.

 5         Q.   Was it within the last year?

 6         A.   Maybe.

 7         Q.   You might have given a deposition within the

 8  last year?

 9         A.   Might be.  I don't remember.

10         Q.   Okay.  What types of cases have you given a

11  deposition in?

12         A.   Well, cases of accidents.

13         Q.   Auto accident cases?

14         A.   Yes.

15         Q.   Okay.  And you're familiar with Florida's

16  PIP system, PIP insurance?

17         A.   I have an idea.

18         Q.   Yeah.  So -- and you're familiar with PIP

19  suits?  In fact, your clinic has filed a lot of PIP

20  suits, correct?

21         A.   Right.

22         Q.   Okay.  Have you given depositions in those

23  PIP cases?

24         A.   Yes.

25         Q.   When was the last time you gave a deposition



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    11

```
 1  in a PIP case filed by your clinic?

 2       A.   I don't remember.

 3       Q.   Could it have been in the last year?

 4       A.   Maybe.

 5       Q.   So you've given me your best recollection on

 6  that?

 7       A.   Yes.

 8       Q.   Did you meet with anybody to prepare for

 9  your deposition today?

10       A.   Yes.

11       Q.   Who did you meet with?

12       A.   Just my lawyers.

13       Q.   The lawyers who are sitting here, Mr. Pivnik

14  and Mr. Schurr?

15       A.   Yes, sir.

16       Q.   Was there anybody else present in the

17  meetings?

18       A.   My secretary, Anielka Castillo, Jisela

19  Medrano, Anielka Castillo, Jisela Medrano.

20            THE COURT REPORTER:  Can you spell that?

21            THE WITNESS:  Excuse me?

22            THE COURT REPORTER:  Can you spell that?

23            THE WITNESS:  Which one?  Both?

24            THE COURT REPORTER:  Both.

25            THE WITNESS:  Anielka, A-n-i-e-l-k-a,
```



1          Castillo, C-a-s-t-i-l-l-o.  Jisela is

2          J-i-s-e-l-a, Medrano, M-e-d-r-a-n-o.

3     BY MR. HAZOURI:

4          Q.   Okay.  Who is Jisela Medrano?

5          A.   She works with me on my office and she's the

6     one who does the transcribing from my recording of the

7     different cases I dictate.

8          Q.   Your office is Manuel V. Feijoo, M.D., P.A.?

9          A.   Right.

10         Q.   If I, in this deposition I'm going to

11    shorten that and make it easier for us to talk and call

12    it Feijoo, P.A., will you understand --

13         A.   Yeah.

14         Q.   -- that that's the -- let me finish the

15    question.

16         A.   Oh.

17         Q.   Will you understand that's the clinic I'm

18    talking about?

19         A.   Yes.

20         Q.   Okay.  And so Jisela Medrano is an employee

21    of Feijoo, P.A.?

22         A.   Yes.

23         Q.   Okay.  And when did you meet with your

24    attorneys, Ms. Castillo, Ms. Medrano, to prepare for

25    this deposition?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                      13

```
 1       A.    Yesterday.

 2       Q.    And how long did you meet with them?

 3       A.    Maybe an hour, more or less.

 4       Q.    Did you review any documents in preparation

 5  for your deposition?

 6       A.    Yes.

 7       Q.    What did you review?

 8             MR. PIVNIK:  Objection.  Instruct the

 9       witness not to answer.  Work-product privilege.

10             MR. HAZOURI:  Okay.  I don't think that's

11       work-product, but we will make the same objection

12       and instruct our witness not to answer at Mr.

13       Banhan's (phonetic) deposition and we expect that

14       won't be challenged.  So we'll move forward based

15       on your objection.

16  BY MR. HAZOURI:

17       Q.    Did you discuss your deposition with Ms.

18  Castillo, outside the presence of your attorneys?

19       A.    Not that I remember, no.

20       Q.    Did you discuss Ms. Castillo's deposition

21  with her, outside the presence of your attorneys?

22       A.    Oh, next day when she came, she told me

23  about.

24       Q.    And what did she tell you about it?

25       A.    More or less what she answer on the
```



 1  questions, what were related to.

 2        Q.    Anything else that you can recall?

 3        A.    No.

 4        Q.    Was there anything in particular she was

 5  concerned about in the deposition, in her deposition?

 6        A.    The long time it took.  She was really

 7  tired.  That's what she tell me.

 8        Q.    It's a tiring process.  I will concede that.

 9        A.    Yeah, she told me so, yes.

10        Q.    Again, that wasn't really a question but

11  let's try not to talk over each other.

12        A.    Yes.

13        Q.    It's certainly tiring and it's tiring for

14  all of us, but it's one of those things we just have to

15  do.

16        A.    I know.  It's all right.  You have to do

17  that.

18        Q.    I know you know.  Thank you.  All right.

19  What I'm going to do now is I'm going to ask you some

20  questions about your educational history and training,

21  and I'm going to give you a document that I think will

22  help us do that that I've downloaded from the Florida

23  Department of Health.  You understand?

24        A.    Yes.

25              (Plaintiff's Exhibit No. 28 marked for



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    15

```
 1          identification.)

 2   BY MR. HAZOURI:

 3          Q.   Okay.  Okay, sir.  I've handed you what I

 4   would describe as your practitioner profile from the

 5   Florida Department of Health.  And I would ask you to

 6   turn to -- well, we could start on the first page.  And

 7   do you see down near the bottom there's a line item that

 8   says education and training?

 9          A.   Yes, sir.

10          Q.   Okay.  So it says you went to the University

11   of Havana, that's in Cuba, School of Medicine from

12   around January 1st, 1962 to January 1st, 1967; is that

13   correct?

14          A.   Well, no, it's not January.  I graduated in

15   December 1967.  It's not January.

16          Q.   Okay.

17          A.   My graduate date was in December 1967.

18          Q.   Okay.  And when did you start?

19          A.   In January 1962.

20          Q.   Okay.  So it's right except it's December

21   1967 --

22          A.   Right.

23          Q.   -- you graduated.  And what was your degree?

24          A.   Medical doctor.

25          Q.   Okay.  And then there is a -- did you also
```

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                16

 1    get another degree later, from the University of Havana?

 2         A.    Yes, sir.

 3         Q.    And what was that degree?

 4         A.    Orthopedic, board certified, first degree

 5    orthopedic surgeon.  In Cuba, when we go to school, we

 6    have to (inaudible) to an internship after we finish the

 7    medical courses, which were six years.  Internship was

 8    one year, and then the residency program to become board

 9    certified, like here, three years.

10         Q.    Okay.  So let me go back and cover some of

11    that.  Did you get your degree in the specialty of

12    orthopedic surgery that allowed you to become board

13    certified, from the University of Havana from 1970 to

14    1973?  Is that when you got that degree?

15         A.    Yes, I got a degree in 1973 as an orthopedic

16    surgeon, a board-certified degree, rating of one degree.

17         Q.    And so you became a board-certified

18    orthopedic surgeon in Cuba?

19         A.    Yes, sir.

20         Q.    Okay.  And what was the board that certified

21    you as an orthopedic surgeon?

22         A.    The Board of Orthopedic Surgeons.

23         Q.    I imagine that's a government organization

24    in Cuba, I would think?

25         A.    It's different -- the main orthopedic



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    17

```
 1   doctors, the main -- the principle orthopedic doctors of

 2   the island, the medical school.  For example, one of the

 3   best one was Dr. Martinez Paez, the director of

 4   orthopedic hospital (inaudible) and also the director of

 5   (inaudible) orthopedic doctor in (inaudible).

 6        THE COURT REPORTER:  Can you --

 7        MR. HAZOURI:  Okay, can we stop you?  First

 8        of all, you're talking very fast and very soft.

 9        It's going to be hard for the court reporter.

10        And secondly, you've gone way past my question so

11        let me just stop you.  I just asked if it was a

12        government board.  That's all I asked.  Okay?  So

13        just listen to my question and let's move on.

14        And I do need you to speak up and speak louder

15        because the court reporter needs to accurately

16        take down what you're saying, so please try and

17        do that.

18        THE WITNESS:  Just let me know when you need

19        me to rephrase something.

20        MR. HAZOURI:  You talk a little soft and a

21        little fast, so --

22        THE WITNESS:  Yeah.

23        MR. HAZOURI:  -- a little slower and a

24        little louder would be good.

25        THE COURT REPORTER:  Would we be able to go
```



 1        off the record for a moment?

 2               MR. HAZOURI:  Yes.

 3               THE COURT REPORTER:  Thank you.

 4               THE VIDEOGRAPHER:  Off record 9:14.

 5               (A recess was taken.)

 6               THE VIDEOGRAPHER:  On record 9:16.

 7   BY MR. HAZOURI:

 8        Q.   Okay.  Did you receive any other education

 9   in Cuba for your medical training?

10        A.   No.

11        Q.   And did you go to work as a physician in

12   Cuba?

13        A.   Yes, sir.

14        Q.   For what years did you work as a physician

15   in Cuba?

16        A.   Well, since I graduate in 1967 until I left

17   Cuba in 1983, 1983, yes, 1983.

18        Q.   So you were working as a physician in Cuba

19   until you left in 1983?

20        A.   Yes.

21        Q.   And after you got your board certification

22   in orthopedic surgery, were you working as an orthopedic

23   surgeon?

24        A.   Right.

25        Q.   And were you performing surgeries?;



```
 1        A.   Yes, I performed surgeries on children's

 2   hospital and adult hospitals.  It's not like here.  When

 3   we go to training, we train in children and adults and

 4   we treat every (inaudible).  Here you specialize in

 5   hand, shoulder, in spine, hips.  I did everything there.

 6        Q.   Okay.  And then you came to the United

 7   States in 1983?

 8        A.   '83.

 9        Q.   And did your medical license that you had in

10   Cuba authorize you to practice medicine in the United

11   States?

12        A.   No, sir.

13        Q.   Did you come to Miami?

14        A.   Yes, sir.

15        Q.   And have you been in Miami ever since --

16        A.   Yes.

17        Q.   -- you got here?  So I take it you decided

18   you wanted to practice medicine in the United States?

19        A.   Of course.

20        Q.   As you've been trained to do.

21        A.   Right.

22        Q.   Right?  So did you undertake training in the

23   United States to become licensed to practice medicine

24   here in Miami, Florida?

25        A.   Yes, sir.
```



1        Q.    Could you describe for me your educational

2    training that you took when you got to the United

3    States?

4        A.    Okay.  I went to Kaplan's office for

5    training for different specialties.  I took the course

6    for medical doctors.  I also took a course taken --

7    given by the University of Miami School of Medicine.

8              THE COURT REPORTER:  School of?

9              THE WITNESS:  University of Miami School of

10        Medicine.

11       A.    Here at Jackson Memorial.  Different courses

12   I took, yes.

13   BY MR. HAZOURI:

14       Q.    Okay.  Did you say Kaplan?

15       A.    Kaplan.

16       Q.    And so that's a training course where they

17   give you manuals?

18       A.    Right.  You go there and you listen to tapes

19   and they teach you how to take the test, because they

20   are very complicated.  When I took the test, it was

21   three years long -- I mean three -- three days long.

22   Three days taking the test, every day.

23       Q.    Okay.  So you took a course at Kaplan.

24       A.    Right.

25       Q.    And you did some training at the University



 1  of Miami?

 2        A.    School of Medicine.

 3        **Q.    School of Medicine, right.  And what years**

 4  **was that when you were doing that training you just**

 5  **described?**

 6        A.    I believe it was in 1983 or -- 1983, no.

 7  maybe three or four years, so 1987 to 1989, probably.  I

 8  do not remember.

 9        **Q.    Somewhere in the 80s?**

10        A.    Yes, yes.

11        **Q.    Okay.**

12        A.    Because I came 1983.  Three or four years

13  later I start taking those courses.  All the time I was

14  doing at home, of course.

15        **Q.    You were getting situated, getting a house?**

16        A.    Yes, and getting to start it, because I was

17  working at Hollywood Memorial Hospital as a surgical

18  assistant, helping the orthopedic surgeons to perform

19  surgery.

20        **Q.    Thank you.  I understand.  So the tests, so**

21  **you did this training and then you took a test that took**

22  **three days, was that the test to get your medical**

23  **license in the state of Florida?**

24        A.    Yes, sir.

25        **Q.    And did you pass the test the first try?**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                      22

```
 1        A.   Yes.

 2        Q.   Okay.  And so then you, at that point

 3   sometime in the 80s after you took the three-day test,

 4   you were a licensed medical doctor in Florida?

 5        A.   Yes.  I received my license in 1992.

 6        Q.   All right.  And that was just a general --

 7        A.   Medical --

 8        Q.   -- medical license?

 9        A.   Yes.

10        Q.   Since that time, have any disciplinary

11   proceedings been taken against your license in Florida?

12        A.   No.

13        Q.   Now, after you became licensed in Florida to

14   practice medicine in 1992, did you undertake any other

15   medical training?

16        A.   Oh, I took a training for disability

17   analyst.

18             THE COURT REPORTER:  Disability analyst?

19             THE WITNESS:  Disability analyst.

20   BY MR. HAZOURI:

21        Q.   Could you tell me about that training,

22   please?

23        A.   It's a training where they send you

24   different courses to read and take test.  When you're

25   familiar with -- to become familiar with how do you give
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                23

```
 1  some disability to different patient, require those

 2  evaluations and forms.

 3       Q.   Let me see if I understood you.  It was a

 4  class, seminar-type class to get some sort of

 5  certification or --

 6       A.   Right.

 7       Q.   -- document that certifies that you have

 8  training in assigning disability and impairment ratings

 9  to patients?

10       A.   Right.

11       Q.   I understand that.  Other than that, have

12  you received any medical training in the United States

13  after you -- or at all, really, after you got your

14  license, your general practitioner's license in 1992?

15       A.   I believe, yeah, I -- I went to Red Cross

16  and -- for medical training resuscitation --

17       Q.   I'm sorry, I --

18            THE COURT REPORTER:  I didn't get that.

19       A.   Resuscitation.  Medical training for

20  resuscitation.  (Inaudible) how to intubate a patient,

21  how to do mouth to mouth resuscitation.  How to use the

22  fibrillator (sic).  You know, the -- in those cases.  I

23  took that course.  That was written by Red Cross, I

24  believe.

25  BY MR. HAZOURI:
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              24

```
 1        Q.   Okay, thank you.  Any other training, you

 2   know, since you got your license in 1992?  Any other

 3   medical training courses?

 4        A.   Not that I remember.

 5        Q.   So you are not board certified in orthopedic

 6   surgery in the United States?

 7        A.   No, sir.

 8        Q.   You're not board eligible to be board

 9   certified in the United States?

10        A.   I believe I am.

11        Q.   You believe you are?  Why do you believe

12   that?

13        A.   Because of my experience, of the years I've

14   been working.

15        Q.   Okay.  Any other reasons you believe you're

16   eligible to be board certified in orthopedic surgery?

17        A.   No.

18        Q.   Okay.  And you have not taken a residency in

19   orthopedics in the United States?

20        A.   No, sir.

21        Q.   You have not taken a fellowship in

22   orthopedic surgery in the United States?

23        A.   No, sir.

24        Q.   Do you hold yourself out as being a

25   specialist in orthopedic surgery in your practice?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                        25

1      A.   Yes, sir, but I do -- I do not do orthopedic

2  surgery here.

3      Q.   Do you hold yourself out as a specialist in

4  orthopedics?

5      A.   Yes, sir.

6      Q.   And on what grounds do you hold yourself out

7  as a specialist in orthopedics?

8      A.   On the years of experience I have.  On the

9  years of experience I have.

10     Q.   The years of experience that you have?

11     A.   Yes.

12     Q.   Work experience?

13     A.   Yes.

14     Q.   Okay.  Any other grounds on which you hold

15  yourself out as a specialist in orthopedics?

16     A.   Well, when I became a orthopedic -- grade 1

17  specialist in Cuba, board certified in Cuba.

18          THE COURT REPORTER:  Orthopedic?

19          THE WITNESS:  Board certified specialist in

20     Cuba.

21          THE COURT REPORTER:  I heard red 1.

22          THE WITNESS:  Board certified, grade 1,

23     grade 1.

24          MR. HAZOURI:  Reg, r-e-g?

25          THE WITNESS:  Grade.



```
 1                MR. HAZOURI:  Grade, grade.

 2                THE WITNESS:  Grade 1, grade 1.

 3                MR. HAZOURI:  Okay.  Did you get all that?

 4                THE COURT REPORTER:  Yes.

 5                THE WITNESS:  I'm sorry.

 6   BY MR. HAZOURI:

 7        Q.   I want to make sure I got your full answer.

 8   It's okay.  We're working through it.

 9             Are there any other grounds that support

10   your holding yourself out as a specialist in orthopedics

11   from what you've told me already?

12        A.   Yes, and then what I told you.

13        Q.   Nothing else?

14        A.   No.

15        Q.   Okay.  Do you have privileges at any

16   hospital?

17        A.   No.

18        Q.   I think you told me, but just to be clear,

19   you don't perform surgeries?

20        A.   Right.

21        Q.   You've never performed surgeries in the

22   United States?

23        A.   No.

24        Q.   As a surgeon.

25        A.   No.
```



```
 1        Q.   I asked it a bad way.  I am correct, you

 2   have never performed surgeries in the United States,

 3   right?

 4        A.   I have helped in surgery but not doing the

 5   surgery myself.

 6        Q.   Right.

 7        A.   I've been first assistant in many surgeries

 8   at Hollywood Memorial Hospital.

 9             THE COURT REPORTER:  May I stop you?  I have

10        held in many surgeries but have not --

11             THE WITNESS:  As a surgical assistant.

12             MR. HAZOURI:  Helped.

13        A.   But I have not been the surgeon.  First

14   assistant in different specialties, surgical treatments

15   at Hollywood Memorial Hospital here in Broward County,

16   Hollywood.

17   BY MR. HAZOURI:

18        Q.   Right.  You have not performed surgeries as

19   a surgeon in the United States?

20        A.   No, sir.

21        Q.   Are you faculty at any school?  Are you a

22   teacher?

23        A.   No.

24        Q.   Have you ever been in the United States?

25        A.   No.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                28

```
 1        Q.    Have you authored, written, any publications

 2  relating to medicine?

 3        A.    Yes.

 4        Q.    Could you describe those for me, please?

 5        A.    Well, I have so many.  I have a written

 6  report on fractures of the hip, urgent care from

 7  (inaudible) there was a hip fracture.  It took a long

 8  time, about one week at least, for the patient to have

 9  the surgery.  And usually the fracture of the hips are

10  seen on all elderly patients.  When you wait one week,

11  many times --

12        Q.    Can I stop you?

13        A.    Yes.

14        Q.    I just need to know the publications.

15        A.    Oh, okay.

16        Q.    I don't need you to describe them for me.

17        A.    Okay.  Fracture of the hip, Perthes --

18        Q.    I'm sorry?

19              THE COURT REPORTER:  I didn't get that.

20        A.    Perthes, P-e-r-t-h-e-s, Perthes Disease.

21  Bicycle lesions in the ankle of children.

22              THE COURT REPORTER:  I didn't get that.

23              THE WITNESS:  Bicycle --

24              THE COURT REPORTER:  Bicycle lesions?

25              THE WITNESS:  -- lesions of the ankle in
```



```
 1        children.

 2        A.    In Cuba, many people -- a lot of people use

 3   bicycles.  They take the children to school, and the

 4   children many times put their ankle between the -- who

 5   do you call it?

 6   BY MR. HAZOURI:

 7        Q.    Chain and sprocket.

 8        A.    The chain and --

 9        Q.    And sprocket.

10        A.    The spokes.

11        Q.    Oh, the spokes.

12        A.    The spokes, and the spokes sometimes

13   (inaudible).  So I did a report on that.  I authored

14   also tumors in the children -- in children.  Bone tumors

15   in the children.  Reactions to the vaccines in children.

16   I don't remember.  I did many reports.

17        Q.    I'm just asking for your best memory.

18        A.    Yes.

19        Q.    All those reports that you have described to

20   me, did you write those while you were in Cuba?

21        A.    In Cuba.

22        Q.    Have you written any reports since you've

23   been a physician in the United States?

24        A.    No, sir.

25        Q.    I said reports.  Publications, anything like
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                30

 1  that, not in the United States?

 2       A.   No, sir.

 3       Q.   So then the last report that you wrote, the

 4  last publication, medical report, treatise, scholarly

 5  article, whatever you want to call it, would have been

 6  done before 1983, because that's when you came to the

 7  United States?

 8       A.   Right.

 9       Q.   Is Feijoo, P.A. in the Medicare network?

10       A.   Medicare, yes.

11       Q.   Has Feijoo P.A.'s right to participate in

12  the Medicare network ever been suspended?

13       A.   No.

14       Q.   Has the right of any clinic that you have

15  ever owned or been affiliated with to participate in the

16  Medicare network ever been suspended?

17       A.   No.

18       Q.   Has the Center for Medicare Services or any

19  other government agency instituted disciplinary

20  proceedings against either you or a clinic that you

21  owned or were affiliated with?

22       A.   No.

23       Q.   Let's talk about Manuel V. Feijoo, M.D.,

24  P.A., which again, I'm going to call Feijoo, P.A.; do

25  you understand?



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                          31

```
 1      A.   Yes.

 2      Q.   All right.  Who are the current owners of

 3  Feijoo, P.A.?

 4      A.   Myself.

 5      Q.   You are the single, 100 percent owner of

 6  Feijoo, P.A., correct?

 7      A.   Yes.

 8      Q.   And has that always been the case, from the

 9  time of Feijoo, P.A.'s formation until present?

10      A.   Well, I don't remember when we formed the

11  P.A.  I believe my wife was also on it, so I don't

12  remember.  Maybe my wife is, too.  I believe so.

13      Q.   So at some -- let me see if I understand.

14  At some point you believe your wife may have been a co-

15  owner of Feijoo, P.A. with you?

16      A.   I believe when I made the P.A., the -- the

17  corporation, she was --

18      Q.   One of the owners?

19      A.   My wife.

20      Q.   Yes.  And since that time, sometime after

21  that, there was an amendment to the P.A., a change,

22  where you became the 100 percent owner?

23      A.   No, I believe with an amendment.  So I

24  believe she's still a --

25      Q.   Okay.  So now, if I understand, you're
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                32

```
 1   modifying your answer and both you and your wife are

 2   owners of Feijoo, P.A.?

 3        A.   I believe so, because I remember when I told

 4   you so, what when we created the corporation she was

 5   with me.

 6        Q.   Okay.  And you don't recall any change to

 7   that?

 8        A.   I -- I don't.

 9        Q.   All right.  And so do you know what

10   percentage ownership interest you and your wife have in

11   Feijoo, P.A.?

12        A.   100 percent.

13        Q.   Okay, but I meant respective.  Like, is it

14   50 percent/50 percent?

15        A.   I don't know.

16        Q.   You don't know?

17        A.   Probably, but I don't remember.

18        Q.   You just don't know?

19        A.   No.

20        Q.   Okay.  So whatever that percentage ownership

21   is between you and your wife, you believe now, your best

22   answer is it's been that way from the beginning until

23   the present continuously, you two being the owners?

24        A.   Yes.

25        Q.   Does Anielka Castillo --
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    33

```
 1        A.    Yes.

 2        Q.    Does she have an ownership interest in

 3   Feijoo, P.A.?

 4        A.    No.

 5        Q.    Has she ever had an ownership interest in

 6   Feijoo, P.A.?

 7        A.    No.

 8        Q.    Okay.  So since you and your wife are the

 9   sole owners of Feijoo, P.A., 100 percent of the profits

10   generated by the clinic are paid to you and your wife,

11   correct?

12        A.    Yes.

13        Q.    And that has been the case continuously,

14   from Feijoo, P.A.'s formation until now?

15        A.    Yes.

16        Q.    I'm going to hand you a couple more exhibits

17   to your deposition.

18              MR. HAZOURI:  This is 29.

19              (Plaintiff's Exhibit No. 29 marked for

20        identification.)

21              (Plaintiff's Exhibit No. 30 marked for

22        identification.)

23   BY MR. HAZOURI:

24        Q.    Okay, sir, I've handed you Exhibits 29 and

25   30 to your deposition.  I see you reviewing Exhibit 29.
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                          34

```
 1   Take a look at them and let me know when you're ready to

 2   discuss it.  And just so you know, I'm going to direct

 3   you to the areas that I want to as you about, so I don't

 4   think you have to read the whole document but if you

 5   need to read more you just tell me and that's fine.

 6        A.   Okay.

 7        Q.   Okay, so you ready?

 8        A.   Yes.

 9        Q.   Let's talk about, please, Exhibit 29.  First

10   I'm going to ask you a question.

11             Is Feijoo, P.A. a licensed medical clinic

12   with the Florida Agency of Healthcare Administration?

13        A.   I think so.

14        Q.   Well, let me try and help you here.  Look at

15   the top of Exhibit 29, if you would please, right here.

16        A.   Yes.

17        Q.   You can see this says application for

18   certificate of exemption from licensure as a healthcare

19   clinic.  Do you see that?

20        A.   Yes.

21        Q.   So I understand this to be an application to

22   exempt the clinic from having to be licensed with the

23   Florida Healthcare Administration.

24        A.   Guess that means to accept or not be

25   accepted.
```



1        Q.   To be accepted, correct.  So now that I've

2   shown you this, does this help refresh your recollection

3   on whether the clinic is actually licensed or not?

4        A.   We're exempt.

5        Q.   Okay.  So would you agree with me that the

6   clinic is not licensed with the Florida Agency of

7   Healthcare Administration?

8        A.   I think it's licensed.

9        Q.   I'm sorry?

10       A.   It's licensed.

11            MR. PIVNIK:  Could you read the question

12       back?

13            THE COURT REPORTER:  Sure.  One moment.

14            (The court reporter plays back the

15       question.)

16            MR. SCHURR:  Objection to form.

17       Mischaracterizes document.  It says as a

18       healthcare clinic.

19            MR. HAZOURI:  Okay.  I'll clarify.  That's

20       fine.  Did you get his objection?

21            THE COURT REPORTER:  What was your

22       objection?

23            MR. SCHURR:  It's a term of art.

24   BY MR. HAZOURI:

25       Q.   Let's work back through this, okay?  And



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                36

```
 1   maybe there's some confusion on my question about what

 2   licensure I'm talking about.  Okay?  Feijoo, P.A. is a

 3   healthcare clinic, correct?

 4        A.   Yes.

 5        Q.   All right.  And so are you familiar with the

 6   Florida Agency of Healthcare Administration, sometimes

 7   called AHCA, like it says up here?  You know that

 8   organization?

 9        A.   Yes.

10        Q.   Okay.  And do you understand that AHCA is in

11   charge of licensing healthcare clinics in the state of

12   Florida?

13        A.   Right.

14        Q.   Right, you agree?

15        A.   Yes.

16        Q.   Okay.  And do you understand that certain

17   clinics, if they meet certain requirements, can be

18   exempt or in your words, accepted from being licensed as

19   a healthcare clinic in the state of Florida?

20        A.   Exactly.

21        Q.   You understand that?

22        A.   Yes, yes.

23        Q.   Okay.  What I'm asking you is, is Feijoo,

24   P.A. one of those clinics that is accepted from the

25   requirement to be a licensed healthcare clinic with
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    37

```
 1   AHCA?

 2        A.   I believe so.  This is a certificate.

 3        Q.   Well, this is a certificate of exemption.

 4   That's why I showed it to you.

 5        A.   Yes.

 6        Q.   Okay.  So I think we can all agree that if

 7   Feijoo, P.A. is accepted from having a healthcare clinic

 8   license with AHCA, then it doesn't have the license.

 9   That's the whole reason of getting the exemption.  Do

10   you agree with that?

11        A.   I --

12             MR. PIVNIK:  Objection to form.

13   BY MR. HAZOURI:

14        Q.   What was that?

15        A.   Means I have the license to have the clinic.

16        Q.   Well, we're getting confused on the word

17   license.  My question is not intended to get you to

18   admit that you're operating incorrectly.  You either

19   have a license or you're accepted from having a license.

20   And if you're properly accepted from having a license

21   then you're operating lawfully.  It's not an issue.

22        A.   Yes.

23        Q.   So let me word it this way.  Is it your

24   understanding that Feijoo, P.A. is properly accepted or

25   exempted from having a healthcare license with AHCA?
```



1      A.   Yes.

2      Q.   Okay.  And so because Feijoo, P.A. is

3  properly accepted or exempted from having to obtain a

4  healthcare clinic license from AHCA, Feijoo, P.A. has

5  not obtained that license because it's exempted, it's

6  accepted from that requirement?  That's your

7  understanding?

8      A.   It's accepted, okay.

9      Q.   You understand?

10     A.   Yes.

11     Q.   Do you agree with my statement?

12     A.   Yes.

13     Q.   Okay.  Now, this document 29, again, reading

14  you the title, is the application for certificate of

15  exemption for licensure.  Do you see that?

16     A.   Yes.

17     Q.   As a healthcare clinic.

18     A.   Yes.

19     Q.   You see that?  Okay.  Does this form look

20  familiar to you?

21     A.   Well, I don't remember but my writing is

22  here.

23     Q.   You don't remember it?

24     A.   No.

25     Q.   The writing on the first page there up at



 1  the top, is that your writing?

 2       A.   Yes.

 3       Q.   Okay.  So you do believe you filled out this

 4  form?

 5       A.   Of course.

 6       Q.   Okay.  And the signature on the second page,

 7  Exhibit 29, that is your signature?

 8       A.   Yes.

 9            MR. PIVNIK:  Can we take a short break?

10            MR. HAZOURI:  Okay.

11            THE VIDEOGRAPHER:  Off record at 9:39.

12            (A recess was taken.)

13            THE VIDEOGRAPHER:  On record, 9:43.

14  BY MR. HAZOURI:

15       Q.   Okay, Doctor, so before we took a brief

16  break there we were looking at the Exhibit 29 to your

17  deposition, which is an application for exemption from

18  licensure as a healthcare clinic.  It's an AHCA form.

19            Do you see that?

20       A.   Yes.

21       Q.   Okay.  And I think you confirmed for me

22  right before the break that you filled out this form and

23  your signature is at the bottom of it, correct?

24       A.   Yes.

25       Q.   Okay.  I'd like you to take a look at the



 1   second page.  And by the way, do you see the checkmark

 2   right here at the top?

 3        A.   Yes.

 4        Q.   Okay.  So do you understand you were

 5   checking off this paragraph, you know, as -- I'll just

 6   represent to you, you're checking off this paragraph as

 7   the basis for Feijoo, P.A.'s exemption from having to

 8   get an AHCA license.

 9        A.   Yes.

10        Q.   You understand that?  Okay.  So if we look

11   at -- you can read it, but I'll summarize it for you.

12   This is an exemption that allows an exemption from

13   licensure for medical clinics that are owned 100 percent

14   by medical practitioners such as yourself and/or their

15   spouse.

16        A.   Yes.

17        Q.   Right?

18             MR. PIVNIK:  Objection to form and

19        mischaracterizes that.

20             MR. HAZOURI:  Okay.

21   BY MR. HAZOURI:

22        Q.   And by the way, you listed your spouse,

23   Lourdes Feijoo, as a person, a related person to this

24   claim; do you see that?

25        A.   Yes.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                41

 1        Q.   Okay.  So I want to direct you to the

 2   language in here that starts right -- the language, "So

 3   long as."

 4        A.   Yes.

 5        Q.   Do you see that?  So there's a whole lot of

 6   writing over there, and I'm just, again, summarizing.

 7   It says the clinic is wholly owned by a healthcare

 8   practitioner and his or her spouse.  And then it says,

 9   "So long as one of the owners who is a licensed

10   healthcare practitioner is supervising the services

11   performed therein and is legally responsible for the

12   entity's compliance with all federal and state law."

13             Do you see that?

14        A.   Yes.

15        Q.   All federal and state laws.  Did I read that

16   correctly?

17        A.   Yes.

18        Q.   Okay.  You are the person who's responsible

19   for Feijoo, P.A.'s compliance with all federal and state

20   laws, correct?

21        A.   Right.

22        Q.   And you were certifying that when you signed

23   off on this form?

24        A.   Yes.

25        Q.   And I'll represent to you that, again, this



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    42

```
 1   is just a certificate of exemption for Manuel V. Feijoo,

 2   M.D., P.A. that we obtained from AHCA.  Do you have any

 3   reason to doubt the accuracy of this certificate?

 4        A.   No.

 5        Q.   That we've marked as Exhibit 30 to your

 6   depo?

 7        A.   No.

 8        Q.   Okay.  And so do you understand that, you

 9   know, based on the certification, that you are the

10   person legally responsible for the entity's compliance

11   with all federal and state laws that was part of the

12   reason that AHCA issued this certificate of exemption?

13        A.   Yes.

14        Q.   Ms. Castillo, I'll represent to you,

15   testified in her deposition that she does the billing

16   for Feijoo, P.A.  Do you agree with that?

17        A.   Yes.

18        Q.   And I think I asked you this before but just

19   to ask you again, you've heard of personal injury

20   protection or PIP coverage?

21        A.   Yes.

22        Q.   Could you describe for me your understanding

23   of what PIP coverage is?

24        A.   It's a medical insurance that you pay when

25   you have a car.  And in case that you have an accident,
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    43

 1   they cover for the expenses that you receive for the

 2   medical treatment for the issue that you might suffer

 3   during the accident.

 4        Q.   Okay.  And does your clinic, Feijoo, P.A.,

 5   often bill PIP insurers for the services that you

 6   provide to patients?

 7        A.   Yes.

 8        Q.   Has your clinic been billing PIP insurance

 9   since it was first formed?

10        A.   Yes.

11        Q.   I don't know that I asked you that.  When

12   was Feijoo, P.A. formed or created?

13        A.   Probably in 1994 or '95.  I don't remember

14   exactly.

15        Q.   Mid-90s would be your best estimate?

16        A.   Yeah, mid-90s.

17        Q.   Okay.  And you've operated it as its owner,

18   your and your wife, continuously since then?

19        A.   Yes.

20        Q.   During -- let's just say -- I don't want to

21   do the entire period, but let's just say in the last

22   five years, have you been affiliated with any other

23   medical clinics other than Feijoo, P.A.?

24        A.   No, sir.

25        Q.   Have you performed services out of any other



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                44

```
 1   clinics other than Feijoo, P.A.?

 2        A.   No.  Well, I go to other clinics to see

 3   other patients, yes.

 4        Q.   So you go mobile to other clinics?

 5        A.   Right.

 6        Q.   Okay.  And you'll see patients of theirs?

 7        A.   Right.

 8        Q.   And the services that you provide at the

 9   other clinics when you go mobile there, are they similar

10   to the services that you provide in your own clinic that

11   we see in your reports?

12        A.   Yes.

13        Q.   Okay.  And what are the other clinics that

14   you go mobile to and provide orthopedic services?

15        A.   I go to Coastal Medical Center in Hialeah

16   and Miami Medical Services here in -- in Flagler Street,

17   number 40 -- 45, I believe.  I go to Miami Physical

18   Therapy Services.  This is in -- near Homestead,

19   Naranja.

20        Q.   Naranja is a clinic or a --

21        A.   It's a clinic.

22        Q.   A clinic.  Okay.  And so those clinics that

23   you named for me, you go mobile to them currently?

24        A.   Yes.

25        Q.   And is that all that you can remember right
```



 1  now?

 2      A.   Right.

 3      Q.   Okay.  I'm going to switch gears a little

 4  bit and I'm going to ask you some questions about some

 5  treatment that Feijoo, P.A. has provided to a particular

 6  insured whose claim is at issue in our case and the

 7  billing for that treatment.

 8           Do you understand?

 9      A.   Yes.

10      Q.   Okay.

11           (Plaintiff's Exhibit No. 31 marked for

12           identification.)

13  BY MR. HAZOURI:

14      Q.   I'm handing you what's been marked as

15  Exhibit 31 to your deposition, if you could take a look

16  at that for me, please.  I've blacked out the -- we've

17  redacted the patient name, address --

18      A.   Yes.

19      Q.   -- and telephone number for the patient's

20  privacy.  Do you recognize this as a medical bill issued

21  by Feijoo, P.A.?

22      A.   Right.

23      Q.   Okay.  I'm going to show you something that

24  may come up in the deposition, too, just to give you

25  full disclosure.  Not every document, but at least in



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                             46

1   this medical chart that we're going to look at, it'll

2   have a number down here.

3        A.   Yes.

4        Q.   That was added in this lawsuit.  Okay?  That

5   wasn't on your original form.  And what that means is

6   it's a document that was given by your attorneys to us

7   in the lawsuit.  Okay?  So what I'm showing you has been

8   given to us as part of your clinic's medical charts in

9   the lawsuit, in a process called discovery.

10            Do you understand?

11       A.   Yes.

12       Q.   So when I point to that Bates stamp, that

13  means the document came from your attorneys and I may

14  use it to direct you, to say go to Bates number so-and-

15  so and that's where you would look.

16            Do you understand?

17       A.   Yes.

18       Q.   Okay.  And do you understand this form to be

19  a form that's commonly called a HCFA or a CMS 1500 form?

20       A.   All right, yes.

21       Q.   And Feijoo, P.A. uses this form as its

22  standard billing form when it bills PIP insurers such as

23  State Farm Mutual?

24       A.   Yes.

25       Q.   Do you see box 31 right here, there's a



Orange Legal
800-275-7991

 1  little 31 there --

 2       A.   Yeah.

 3       Q.   -- do you see that?

 4       A.   Yes.

 5       Q.   And it says signature of physician or

 6  supplier, and it has your name typed out but it doesn't

 7  have a signature there.  Do you see that?

 8       A.   Yes.

 9       Q.   Why did you not sign off on this bill?

10            MR. PIVNIK:  Objection to form.

11       A.   I don't remember.

12  BY MR. HAZOURI:

13       Q.   Is it your practice in Feijoo, P.A. for you,

14  when your name is listed in box 31 here, to sign these

15  bills?

16       A.   I usually don't sign.

17       Q.   You usually do not sign them?

18       A.   No.

19       Q.   And is there any reason why you chose not to

20  sign the bills?

21       A.   Because --

22            MR. PIVNIK:  Objection.

23       A.   -- I'm always very busy with my patients

24  (inaudible).

25  BY MR. HAZOURI:



1        Q.   Any other reasons?

2        A.   No.

3        Q.   Okay.  And then over here, you see a date.

4    There's two dates, same date in a row, lines 1 or 2.

5    It's May 19, 2016.  Do you see that?

6        A.   Yes.

7        Q.   And that is what we call the date of

8    service, right?

9        A.   Yes.

10        Q.   And that's the date that you actually saw

11    this patient?

12        A.   Right.

13        Q.   And the numbers next to those dates of

14    service are 99204 and 95851, correct?

15        A.   Yes.

16        Q.   And do you understand that those are called

17    CPT codes?

18        A.   Yes.

19        Q.   And please explain to me your understanding

20    of what CPT codes are.

21        A.   These are the codes that I'm providing in

22    order to bill for the treatment and render to the

23    patients.

24             THE COURT REPORTER:  Treatment and?

25             THE WITNESS:  Render to the patient or given



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                  49

```
 1        to the patients.
 2   BY MR. HAZOURI:
 3        Q.   I want you to be comfortable, but when you
 4   put your mouth behind your hands like that it makes it
 5   hard for her to hear.  Maybe if you hold your hands a
 6   little lower just so she can hear you.  Thank you.
 7             So these are the codes -- let me try and
 8   help here.  These are numeric codes that describe the
 9   treatment that you provided to the patient on the
10   particular date, correct?
11        A.   Yes.
12        Q.   And you understand that the purpose of the
13   codes is to give information to the insurance company,
14   such as State Farm Mutual, regarding the services that
15   you and your clinic provided to the patient when they're
16   deciding to issue payment for those services, correct?
17        A.   Right.
18        Q.   And you would agree that the CPT codes that
19   are listed in Feijoo, P.A.'s bills to State Farm Mutual
20   and all the other insurers that the clinic bills, it's
21   important that they accurately describe the medical
22   services performed by you on your patients?
23        A.   Yes.
24        Q.   And you agree that's a mandatory
25   requirement, right?
```



```
 1        A.    Yes.
 2        Q.    I will tell you that -- just to help here,
 3   that Ms. Castillo testified that she has the CPT book --
 4   well, first of all, are you familiar with the CPT book?
 5        A.    Yeah, I see it but I don't look at it.
 6        Q.    Okay.  You kind of answered my question.  So
 7   you know what the CPT book is.
 8        A.    Yes.
 9        Q.    It's a book and it lists the CPT codes and
10   it provides descriptions for them, right?
11        A.    Yes.
12        Q.    As to what service each CPT code describes?
13        A.    Yes.
14        Q.    Okay.  You're familiar with it but you don't
15   generally look at it?
16        A.    Right.
17        Q.    Can you tell me the last time you looked at
18   the CPT book?
19        A.    I don't know.
20        Q.    Okay.  Are you familiar with a publication
21   called the CPT Assistant?
22        A.    No.
23        Q.    So it's fair to say you don't recall ever
24   looking at the CPT assistant or any articles published
25   in the CPT Assistant, correct?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    51

```
 1      A.   No.

 2      Q.   Do you take steps to ensure that the CPT

 3 codes listed in Feijoo, P.A.'s bills accurately reflect

 4 the medical services performed by you on the patients?

 5      A.   Well, when I see a patient I tell her

 6 exactly what I did and she prints the report.  She knows

 7 by experience, what CPT code is best in each case.

 8      Q.   Other than what you just described to me, is

 9 there anything else that you do to ensure that the CPT

10 codes listed in Feijoo, P.A.'s bills accurately reflect

11 the medical services performed by you on the patients?

12      A.   Yes, review the -- the cart and the report.

13 The complexity of the examination by -- by me.

14      Q.   Okay.  I want to follow up on that answer.

15 You said you review the chart and the report and the

16 complexity of the examination performed by you.

17      A.   Yeah, it's given to a billing person, in

18 this case Anielka Castillo.

19      Q.   Okay.  So let me see if I understand.  We're

20 going to look at some of these documents that I think

21 you're referencing, so I'll tell you that ahead of time,

22 but I just want to try and understand your answer.

23           As I understand it and I think I'm going to

24 show you one document that you prepare when you examine

25 a patient is a handwritten evaluation of a patient that
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    52

 1   you take while you're talking to the patient.

 2        A.   Right.

 3        Q.   Right?  And the I think there's also a

 4   document called a range of motion report that you also

 5   put handwriting on?

 6        A.   That's right.

 7        Q.   Right?  And then as I understand it, you use

 8   those two documents to dictate a written report of your

 9   examination of the patient?

10        A.   Right.

11        Q.   Is that right?  And then Jisela Medrano, who

12   you referenced earlier in your deposition, listens to

13   your dictation and transcribes what becomes a written

14   report?

15        A.   That's right.

16        Q.   Is that right?

17        A.   Yes.

18        Q.   Okay.  And are those the documents that

19   mainly comprise your findings and the description of

20   your examination of the patient?

21        A.   Yes.

22        Q.   So then going back to my question, which was

23   how do you ensure that the CPT codes that are listed on

24   Feijoo, P.A.'s bills accurately reflect the services

25   that you provide to the patients, you said you look at



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    53

 1  those documents and you look at the complexity of your

 2  exam as documented by those documents, right?

 3      A.   Yes.

 4      Q.   Okay.  So I understand that you're doing

 5  that review in your own mind, but how does that

 6  translate to making sure that the CPT codes that get put

 7  in the bills accurately reflect the services that are

 8  set forth in those documents?

 9      A.   Well, Anielka who is the billing person, is

10  close by my office, one door away, so every time a

11  patient leaves I usually talk to her or -- or later if

12  there is no time to do it at the same time.  So she's

13  informed of what's the complexity and the amount of time

14  that I spent with a patient.

15      Q.   Okay.  So if I understand you correctly, let

16  me try and go through it.  One thing you do is you have

17  the written documents that document your examination,

18  and those, I assume, are available to Ms. Castillo when

19  she's preparing the bills?

20      A.   Right.

21      Q.   So she can look at those to try and make

22  sure the CPT codes are accurate, right?

23      A.   And beside, yeah, I tell her (inaudible).

24      Q.   And then you have oral conversations with

25  her?



**Orange Legal**
**800-275-7991**

 1        A.    Right.

 2        Q.    Now, are you telling me that -- I understand

 3   I'm not asking 100 percent all the time, but your

 4   procedure is to talk to her after each patient and have

 5   a discussion with her or about each patient?

 6        A.    Not after each patient.  If there is time to

 7   do it after each patient, sometimes we do.  Not

 8   necessarily every patient.

 9        Q.    Okay.  And I wasn't trying to pin you down

10   to 100 percent.

11        A.    No.

12        Q.    Sometimes that conversation occurs right

13   when the patient leaves.  Sometimes it may occur later

14   in the day?

15        A.    Right.

16        Q.    Okay.  Now, as a practice and procedure,

17   what would you tell Ms. Castillo in those conversations

18   about the treatment of the patient that's not documented

19   in the records that we've discussed documenting the

20   examination?

21        A.    I tell her if it was something -- a visual

22   evaluation, I tell her this is a visual evaluation.

23   More or less the time I spent with the patient so she

24   can have an idea what is the proper number to bill.

25        Q.    Anything else you tell her -- as a general



 1   practice and procedure, anything else you tell her in

 2   those conversations that's not documented in the

 3   records?

 4       A.   No.  We talk about the patient; that's it.

 5       Q.   Okay.  So I understand that and I understand

 6   that you have the records documenting your exam and you

 7   have your conversations with Ms. Castillo as a general

 8   practice that you described for us now.  Okay?

 9            Going back to my question of what steps do

10   you take to ensure that Feijoo, P.A.'s bills

11   accurately -- the CPT codes used in Feijoo, P.A.'s bills

12   accurately reflect the services that you provide, is

13   there anything else that you do other than what you've

14   already told me?

15       A.   No.

16       Q.   And have you now fully described for me the

17   process by which you ensure that the CPT codes that are

18   reported on the bill accurately describe the medical

19   services that you provide to the patient?

20       A.   Yes.

21       Q.   Let's, if we could please, go back to

22   Exhibit 31 which you still have in front of you there,

23   and I want to ask you about 99204.

24            What does that code describe?

25       A.   It's a complex initial medical evaluation.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                              56

1         Q.    And do you understand that there are

2    certain -- if you need a break please tell me.

3         A.    No, no, it's okay.

4         Q.    You okay?  Okay.  Do you understand that

5    there are certain components or requirements that must

6    exist in order for a clinic such as Feijoo, P.A. to

7    properly bill a 99204?

8         A.    Yes.

9         Q.    What are those requirements?

10        A.    It's a complex medical initial evaluation

11   that require a complex history taking, complex

12   examination of the patient and a medical evaluation and

13   treatment.  Also that require the patient (inaudible)

14   complex medical evaluation.  Anything that the patient

15   is given by the doctor.

16        Q.    Okay.  Any other requirements or

17   descriptions?

18        A.    Yeah, length of time also.

19        Q.    I'm sorry?

20        A.    Length of time.

21        Q.    Do you understand that to be a requirement,

22   the length of time?

23        A.    I believe so.

24        Q.    Do you understand that there are five levels

25   of -- well, strike that.



```
 1              These 99204, you understand there's 99205,

 2   99203, et cetera?

 3       A.   Yes.

 4       Q.   Down to 99201, right?

 5       A.   Yes.

 6       Q.   And do you understand that to be sometimes

 7   called E&M codes?

 8       A.   E&M?

 9       Q.   E&M.  Evaluation and management.

10       A.   Yes.

11       Q.   All right.  So you do understand that

12   there's different levels of E&M codes?

13       A.   Yes.

14       Q.   And you understand that 99204 is the second-

15   highest level that a clinic can select?

16       A.   Yes.

17       Q.   And so in billing this patient whose

18   initials are G.A., the clinic has made a conscious

19   decision to bill the second-highest code that it can

20   possibly choose for this initial evaluation, right?

21       A.   Yes.

22       Q.   And generally speaking, the higher the code,

23   the higher level the code, the higher the charge?

24       A.   Yes.

25       Q.   What does the clinic charge for a 99205?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    58

```
 1        A.    $475.

 2        Q.    That was --

 3        A.    No.

 4        Q.    -- 04.  05?

 5        A.    No, I don't know.

 6        Q.    What does the clinic charge for 99203?

 7        A.    I don't know.

 8        Q.    What does the clinic charge for 99202?

 9        A.    I don't know.

10        Q.    What does the clinic charge for 99201?

11        A.    I don't know.

12        Q.    Let me ask you a question.  You told me

13  before that you don't remember the last time you looked

14  at the CPT book.

15        A.    Right.

16        Q.    Right?  So how is it you were able to tell

17  me what the requirements were for 99204 if you haven't

18  looked at the CPT book since you can remember?

19        A.    Well, because I talked with Anielka.  She

20  was taking some of her courses and she --

21              THE COURT REPORTER:  Um --

22        A.    I talked to Anielka, which is the billing

23  person, Castillo, and she's familiar because she does

24  the billing, with the different CPT codes.  What they

25  require.  And based on that, I always know exactly what
```



**Orange Legal**
**800-275-7991**

 1  I tell her.

 2  BY MR. HAZOURI:

 3      **Q.   So your understanding that you've testified**

 4  **to in this deposition about the requirements to properly**

 5  **bill a 99204 comes from Ms. Castillo?**

 6      A.   Well, because I talk to her and she knows

 7  exactly what's the requirement for the code to be -- to

 8  be billed.  So I -- when I finish, I tell her this is

 9  the patient, this is the amount of time I spent seeing,

10  the complexity of the examination, of the clinic

11  finding, of the history, everything.  Based on that and

12  the amount of time, she -- she makes the billing.

13      **Q.   So the answer to my question is yes, your**

14  **understanding of the requirements to properly bill a**

15  **99204 comes from Ms. Castillo?**

16      A.   (Inaudible) because I also -- I'm also --

17  through me.  I have an understanding of what the amount

18  of time and the services I provide, which I tell her and

19  she bills the -- she writes down the billing code, the

20  numbers.

21      **Q.   Okay.  We're getting a little confused here.**

22  **You said you have an understanding of the services that**

23  **you provided and -- and the amount of time, right?**

24  **That's what you said.**

25      A.   Yes.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    60

```
 1        Q.   And I understand that.  Okay?  I'm not
 2   asking about the services that you provide.  I'm asking
 3   about the requirements, the objective requirements to
 4   bill a 99204.  And before when I asked you, you said you
 5   hadn't looked at the CPT book since you can remember,
 6   and I asked you how do you know the requirements of
 7   99204 if you haven't looked at the CPT book, and you
 8   said you talked to Ms. Castillo about it and then you
 9   continued with your answer.
10            So I understand from your testimony that you
11   talked to Ms. Castillo and that's how you understand the
12   requirements for 99204.  That is correct, right?
13            MR. PIVNIK:  Objection to form.  Compound
14       question.
15            MR. HAZOURI:  Okay, I'll ask it again.
16   BY MR. HAZOURI:
17        Q.   It is correct that your knowledge about the
18   99204, the requirements to properly bill a 99204 code
19   come from Ms. Castillo, correct?
20            MR. PIVNIK:  Objection to form.
21       Mischaracterizes testimony.
22        A.   Well, I always talk to her and we have a
23   conversation about this, the different codes.  So based
24   on what I do, that's what she gets to write the numbers.
25   BY MR. HAZOURI:
```



```
 1        Q.    Let me ask you this.  Does your

 2  understanding of the requirements to properly bill a

 3  99204 or any other CPT code come from anywhere else but

 4  Ms. Castillo?

 5        A.    I -- I haven't read the book for a long

 6  time.

 7        Q.    So --

 8        A.    I don't remember.

 9        Q.    So can you cite me to any other source of

10  information that is a basis for your understanding of

11  the requirements to bill 99204 or any other CPT code

12  other than Ms. Castillo?

13        A.    Right.

14        Q.    You can't cite me to anything else?

15        A.    No.

16        Q.    I asked you if you looked at the CPT book --

17  well, strike that.

18              (Plaintiff's Exhibit No. 32 marked for

19              identification.)

20  BY MR. HAZOURI:

21        Q.    I'm handing you what's been marked as

22  Exhibit 32 to your deposition.

23              Could you describe for me, please, what this

24  document is?

25        A.    It's initial orthopedic evaluation.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    62

1       Q.   So this is a handwritten initial orthopedic

2    evaluation, correct?

3       A.   Yes.

4       Q.   And I'll represent to you it's the same

5    patient with the initials E.G.A., if you look up at the

6    top there.  Do you see that?

7       A.   Yes.

8       Q.   Same -- I'll represent to you it's the same

9    patient that I showed you the bill that we marked as

10   Exhibit 31, and all the records we're going to look at

11   are the same patient until I tell you otherwise.  We're

12   going to go through some records for this patient.

13            So is all the handwriting on this form

14   yours?

15      A.   Yes.

16      Q.   Is that your signature on page 3 of the

17   form?

18      A.   Yes.

19      Q.   So this is a form that you fill out while

20   you're meeting with the patient, to document the

21   subjective complaints and your objective findings and

22   your treatment plan?

23      A.   Right.

24      Q.   Where did the template for the form, the

25   typewritten information that's in the form come from?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              63

```
 1        A.   We have this form and then we copy it and

 2   then we use it (inaudible).

 3        Q.   It's a form that you copy from somewhere?

 4        A.   Yes.

 5        Q.   Do you know where you copy it --

 6        A.   I don't remember.

 7        Q.   Let me finish my question.

 8        A.   Okay.

 9        Q.   It's easy to do.  You don't remember where

10   you got the form from?

11        A.   Right.

12        Q.   How long has Feijoo, P.A. been using this

13   form for initial orthopedic evaluations?

14        A.   I can't tell you.  I don't remember.

15        Q.   Long time?

16        A.   I don't remember.

17        Q.   More than 10 years?

18        A.   Probably.

19        Q.   Okay.  So let's just take a step back and

20   confirm.  You performed an examination and evaluation of

21   this patient on May 19th, 2016, correct?

22        A.   Right.

23        Q.   Okay.  Do you generally perform these types

24   of evaluations in your personal office within the office

25   building?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                   64

```
 1        A.    Yes.
 2        Q.    And I understand from Ms. Castillo's
 3   deposition that you have a desk in there?
 4        A.    Right.
 5        Q.    And you have your chair behind the desk?
 6        A.    Right.
 7        Q.    And there's a couple chairs on the other
 8   side of the desk?
 9        A.    Three chairs on the other side.
10        Q.    Three chairs?  And do you normally perform
11   these examinations while sitting at your desk, with the
12   patient on the other side?
13        A.    Right.
14        Q.    And if you could, please, just for an
15   initial evaluation like this one, walk me through what
16   you do.  What you would have done with this patient,
17   please.
18        A.    Okay.  When the patient comes, I have the
19   chart.  I have a referral with some information that the
20   patient fills out.  So I greet the patient.  I ask how
21   you doing, how are you feeling, shake hands.  Sit down,
22   please.  Then I ask her age, her weight.  I ask what the
23   actual complaints, what the symptoms are, where do you
24   feel pain.  She tells me.  I write down the areas of the
25   pain.  I ask how did the accident happen.  If it was an
```



 1  automobile accident, slip-and-fall, history of present

 2  illness.  Then she --

 3        THE COURT REPORTER:  I'm sorry, if it was an

 4  automobile accident --

 5        A.   If an automobile accident or slip-and-fall

 6  accident, that's the history of present illness.  I ask

 7  the patient how did the accident happen.  In the case of

 8  an automobile accident, she tell me, well, it was an

 9  automobile accident.  I ask the patient were you driving

10  or were you a passenger.  Were you wearing the seatbelt?

11  How did the accident happen?  Then the patient tells me

12  and I write down how did the accident happen.

13         After the accident, were you taken to any --

14  did you go to any hospital?  The paramedics came?  The

15  car you were driving, can't be repaired or could be

16  repaired?  The car you were driving, can't be repaired

17  or could be repaired.  The paramedics came, I said

18  before.  Were you take to a hospital, I said before.

19  What type of car were you driving?  What year?

20         Then I go to past medical history.  I ask

21  the patient have you ever had an accident before.  If

22  she tells me yes, I ask when and what type of accident

23  was it.  I ask her if she received treatment, what the

24  type of treatment.  If after that treatment she was

25  feeling well or she have any symptoms related to that



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                      66

 1  previous accident or no.  Then I ask her if she has any

 2  surgical treatment before.  If she has any allergies to

 3  medication known to her.  In this case (inaudible).  And

 4  if she drinks, smokes, drugs, coffee.  If she's taking

 5  any medication actually.  If she suffer any illness.

 6  That's basically what I do the first page of my

 7  examination.  And then I sign and the patient signs.

 8  BY MR. HAZOURI:

 9       Q.   Okay.  And so I noticed when you were

10  answering that question you were just kind of walking

11  through the first page of the initial orthopedic

12  evaluation that we marked as Exhibit 32, correct?

13       A.   Right.

14       Q.   So that's what you refer to when you're

15  trying to determine what you did with this patient?

16       A.   Yes.

17       Q.   And this and maybe the written report and

18  the related documents are the best information available

19  about how you examined this patient?

20       A.   Well, that's -- it's written because

21  initially I talk to the patient, they give me a lot of

22  information.  For example, when the accident happened,

23  many patients (inaudible).  For example, how did the

24  accident -- well, you know, I was going to the store to

25  buy some food for my family and I got into the car, I



1  went to the corner of so-and-so, the -- the red light

2  was on, I stopped.  Then the green light came.  When I

3  moved, then another car ran the red light, hit me on the

4  side.  I felt confused.  The car spin around.  And you

5  know, what happened, I was afraid because there was

6  smoke.  I got out of the car.  I couldn't get it easily.

7  The paramedics came.  You know?

8      Q.   Can I stop you?

9      A.   Yes.

10      Q.   Because I know you want to finish this

11  today, so --

12      A.   Yeah.

13      Q.   I get that people tell long stories about

14  their auto accidents.  Right?

15      A.   Yeah, long stories so I have to cut the off.

16  I don't write that in the record.

17      Q.   I understand.

18      A.   Because there are many things that are --

19  when we are talking are not written because they make no

20  sense.  It would be a long story.

21      Q.   Right.  You write what's important --

22      A.   Yeah.

23      Q.   -- into the records.

24      A.   That's what I do.

25      Q.   Right.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                68

```
 1        A.    What's most important finding.

 2        Q.    Right.  What's important for your findings

 3   and for your treatment plan --

 4        A.    Right.

 5        Q.    -- and for the examination.

 6        A.    Exactly.

 7        Q.    Right?  Okay.  So again, I ask just to

 8   confirm this, the written orthopedic evaluation, the

 9   range of motion report that we're going to look at and

10   the typewritten report that comes out of it, that is the

11   best information available about your examination?

12        A.    Yes.

13        Q.    Right?  And that's what you rely upon --

14        A.    Yes.

15        Q.    -- to remember what you did to the patient?

16        A.    Right.

17        Q.    Okay.  Why do you ask the patient all the

18   questions about how the accident happened and what kind

19   of car they were driving and whether they were the

20   passenger or the driver?

21        A.    It's very important to know because the

22   accident gives you an idea of what type of lesions can

23   the patient suffer and the -- if she was the driver --

24   if the patient was driving or a passenger is also

25   important to know, because when you are driving you're
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                          69

```
 1   more aware of the situations.  You might be noticing

 2   that another car is coming to hit you or you're going to

 3   hit another car and you might be more easily aware of

 4   the situation and take proper steps to avoid different

 5   traumas in the collision.  The passenger, many times, is

 6   not able to identify when the accident is happening

 7   because it's so fast and sometimes you don't have the

 8   time to know exactly.

 9        Q.   Okay.

10        A.   So it's very important to know if she's a

11   passenger or a driver.

12             THE COURT REPORTER:  I got everything except

13        for did I hear it gives you an idea what type of

14        lesions the patient suffered?

15             THE WITNESS:  Right.

16             THE COURT REPORTER:  Okay, lesions.

17        A.   Because when you are driving, you have the

18   hands on the steering wheel.  The patient usually don't

19   have -- is not holding nothing.  Only the seatbelt.

20   It's important to know if they have the seatbelt.  Most

21   of the patients have the seatbelt.  You be surprised,

22   I've had many patients driving and I ask and they don't

23   use the seatbelt.

24   BY MR. HAZOURI:

25        Q.   It's surprising in this day and age.
```



**Orange Legal**
**800-275-7991**

1    A.   Yeah, it's surprising.

2    **Q.   But one thing you ask about is the cost of**

3    **repair to the vehicle, right?**

4    A.   No.  No, because I ask them your car can be

5    repaired, yes or no.  Sometimes they tell me it can be

6    repaired; it cost so much money.

7    **Q.   Let me show you -- we're going to mark your**

8    **handwritten one in a moment, but it says, "She doesn't**

9    **know how much it could be, the cost to fix it."**

10   A.   Oh, yeah, because I -- I ask her in this

11   case, can your car be repaired?  She doesn't know.  I

12   don't know if it can be repaired or not.  If it can be

13   repaired, you know any idea of the cost?  Most of the

14   time they don't know.

15   **Q.   Right, but you ask that question --**

16   A.   Yes.

17   **Q.   -- because you're trying -- let me finish**

18   **the question.  You ask that question because you're**

19   **trying to determine the severity of the accident --**

20   A.   Right.

21   **Q.   -- how -- right?  And the reason you want to**

22   **know the severity of the accident is the more severe the**

23   **accident, the more property damage there is, generally**

24   **speaking, that could lead to more significant injuries**

25   **than a lesser accident?**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                71

```
 1      A.   That's right.

 2      Q.   All right.

 3      A.   And the type of car it was is important

 4  because, for example, this patient was driving a small

 5  car.  If she were driving a big car you're supposed to

 6  have less lesion because a big car can protect you more

 7  than a small car.

 8      Q.   Okay.

 9      A.   It's not like driving, for example, a car

10  like a VW.

11      Q.   Got you.

12           MR. PIVNIK:  And Doctor, you're saying

13      lesions, right?

14           THE WITNESS:  Lesions.

15           MR. PIVNIK:  Lesions.

16           MR. SCHURR:  Spanish for injury.

17           MR. PIVNIK:  Injury, yeah, I --

18           THE WITNESS:  Injuries, yeah.

19  BY MR. HAZOURI:

20      Q.   You're using lesions as injuries?

21      A.   Yes.

22      Q.   Okay.

23           MR. PIVNIK:  We were thinking it was a spot.

24           THE WITNESS:  Well, English you say lesions,

25      too.
```



1          MR. HAZOURI:  Well, lesions has a different

2      medical meaning in English.  It's more of a spot

3      or a skin problem.

4          THE WITNESS:  If you suffer a trauma, for

5      example, of the spine it's not a lesion?

6          MR. HAZOURI:  We generally call it injuries.

7          THE WITNESS:  Oh, injuries.

8          MR. HAZOURI:  Try and use the term injuries

9      if that's what you're referring to.

10          THE WITNESS:  Okay, injuries, okay.

11          MR. HAZOURI:  Thank you, gentlemen, for

12      clarifying.

13          THE WITNESS:  Yeah, thank you.

14          MR. HAZOURI:  Okay, so let's get back.

15   BY MR. HAZOURI:

16      **Q.   So I'm still on Exhibit 32 here, and let me**

17   **point you to these sections right here.  BP is blood**

18   **pressure.**

19      A.   Right.

20      **Q.   Pulse, a person's pulse.**

21      A.   Yes.

22      **Q.   And temperature is their body temperature,**

23   **right?  And these are blank.**

24      A.   Yes.

25      **Q.   So you didn't take the patient's blood**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                73

 1  pressure, pulse or temperature?

 2       A.   No.

 3       Q.   Why not?

 4       A.   Usually I don't do it.  If I ask the patient

 5  they suffer -- for example, this patient, high blood

 6  pressure, yes, she says high blood pressure.  Usually I

 7  ask are you taking medication.  Yes.  It's under

 8  control.  It's under control.  Most of the time that's

 9  what I do.  If it's under control I don't lose time

10  checking the blood pressure or the pulse.

11       Q.   Okay, because the blood pressure, pulse and

12  temperature are not relevant to the orthopedic injuries

13  that you're looking at?

14       A.   Right.  Sometimes when the patient tells me

15  that she's having severe headaches or dizziness,

16  sometimes I do it because maybe (inaudible).  Sometimes

17  just the dizziness caused by the sudden moving of the

18  neck, the sudden change to position.  When you're

19  sitting down after an accident, you step up suddenly or

20  you are in bed and you step up suddenly when you try to

21  wake up or stand up, you might feel dizzy if you don't

22  do it slowly.  So like, every time I advise my patients

23  don't do sudden motions of your head.  Don't do sudden

24  motions of your body.

25       Q.   Okay.  I appreciate that.  So just getting



 1  back to my question here, for this patient she was

 2  complaining of orthopedic injuries, correct?

 3       A.   Yes.

 4       Q.   If I understand it, to her neck, back,

 5  shoulder and knee, right?

 6       A.   Neck -- well, medium back, lower back, left

 7  knee, left shoulder and the left elbow, too.

 8       Q.   Right, okay.  Left elbow, too?  So those are

 9  orthopedic injuries, right?

10       A.   Yes.

11       Q.   And those are the injuries you were focused

12  on in this examination?

13       A.   Right.

14       Q.   And that's why you didn't take the blood

15  pressure, pulse or temperature of this patient?

16       A.   Yes.

17       Q.   And even the patient, as you noted, reported

18  to you as having high blood pressure, hypertension?

19       A.   Yes.  But --

20       Q.   Right.  Just --

21       A.   -- usually when --

22       Q.   Listen.  We don't need to -- so the patient

23  reported having hypertension, but because you were

24  focused on the orthopedic injuries and you didn't feel

25  like -- she said it was under control and the blood



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                75

 1   pressure wouldn't affect those orthopedic injuries, you

 2   did not check the blood pressure?

 3        A.   Right.

 4        Q.   Same with pulse and same with temperature?

 5        A.   Yes.

 6        Q.   Okay.  So let's go to -- well, before we go

 7   to your examination which is documented on the second

 8   page, right?  Yes?

 9        A.   Yes.

10        Q.   Okay.  Let me ask you this.  What medical

11   records or tests did you review as part of your taking a

12   history of the patient?

13        A.   Usually when the patient comes to my office

14   they fill out (inaudible), asking the same question,

15   (inaudible) the pain, were you taken to a hospital, all

16   those questions.

17        Q.   Let me help you.  Your clinic has a

18   questionnaire --

19        A.   Questionnaire.

20        Q.   -- that you give the patient to fill out?

21        A.   Yeah, it's a form that they fill out.

22        Q.   And that's in the medical charts?

23        A.   Yeah, and they also have a place where they

24   put the degree of pain from zero to ten.

25        Q.   Okay.  So I get that those are your internal



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                          76

```
 1  forms that the patient fills out and you look at those.

 2       A.   Right.

 3       Q.   I'm talking about for the -- and you did

 4  that for this patient?

 5       A.   Every patient does that.

 6       Q.   Right.

 7       A.   They fill out the form themselves.

 8       Q.   Right.

 9       A.   When they are waiting.

10       Q.   Right.  So I get that for this patient, that

11  you --

12       A.   Yes.

13       Q.   -- look at that.  What other medical records

14  or medical tests did you look at to do this initial

15  evaluation on this patient on May 19th, 2016?

16       A.   Sometimes the -- the patient send me a

17  report, a written report of what they did.  If they

18  have -- if they go into a hospital, sometimes they give

19  the medical reports of the hospital.  If there are x-

20  rays, then I receive the x-ray report and whatever.

21       Q.   Okay.  So if that happens you'll document

22  that in your initial orthopedic evaluation, correct?

23       A.   Yes.

24       Q.   All right.  So I'm asking you about this

25  patient.  Okay?  I want you to look at your record here,
```



```
 1  your initial orthopedic examination.  Is there any

 2  reference to any records coming from any other clinic

 3  that you would have reviewed?

 4           MR. SCHURR:  Just this without the whole

 5       file?

 6       A.   Well, in these pages I don't see anything.

 7  BY MR. HAZOURI:

 8       Q.   Okay.  So --

 9       A.   But usually when they (inaudible) any

10  documents, the documents are in the chart.

11       Q.   All right.  So if we were to look in this

12  patient's chart, which I have and we can do at some

13  point, if you reviewed medical records that you received

14  from another provider or x-ray tests, what have you,

15  they would be in the chart?

16       A.   They would be in the chart.

17       Q.   Right?  So if you were to look at your

18  initial evaluation handwritten and look at your typed

19  report --

20       A.   Report.

21       Q.   -- right, and look in the chart and see no

22  medical records delivered to you prior to this

23  evaluation, you would reach the conclusion that you

24  didn't review any other clinics' medical evaluation,

25  right?
```



```
 1       A.   Yes.

 2       Q.   Okay.  Now, and again, you don't see any

 3  reference to any other clinic's records in this initial

 4  report, this handwritten report that we're looking at as

 5  Exhibit 32, right?

 6       A.   No.  I ask her if she went to hospital and

 7  she told me she didn't go to the hospital.  So there

 8  cannot be any medical records from the hospital because

 9  she told me that she didn't go to any hospital.

10       Q.   Okay.  Now, let's talk about the second page

11  which sets forth your physical examination of this

12  patient, right?

13       A.   Yeah.

14       Q.   Are you there?

15       A.   Yeah.

16       Q.   You ready?  Okay.  You look ready.  Let's

17  talk about -- first of all, I'm just going to ask you to

18  kind of interpret your writing under headache.  What

19  does that say, please?

20       A.   Pain in flexion/extension --

21            THE COURT REPORTER:  I'm sorry --

22            MR. HAZOURI:  You've got to go way slower.

23            THE COURT REPORTER:  Pain affliction --

24            THE WITNESS:  Pain in flexion/extension.

25            MR. HAZOURI:  Pain in flexion and extension.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                 79

```
 1        A.    Lateral flexion.   Rotation right and left.

 2   Tenderness on palpation.   This is the cervical spine.

 3   (Inaudible) limited range of motion to 70 percent of the

 4   normal range.

 5   BY MR. HAZOURI:

 6        Q.    Okay.  So what you just read was related not

 7   to the headache category above but the cervical pain,

 8   the second category?

 9        A.    The cervical spine.

10        Q.    Cervical spine.  And under the cervical

11   spine, there's three letters, initials ROM, right?

12        A.    Range of motion.

13        Q.    That means range of motion?

14        A.    Right.

15        Q.    And what you just described for us in your

16   answer a couple answers ago, were the findings that you

17   made on range of motion testing with this patient at the

18   initial evaluation?

19        A.    Right.

20        Q.    And what you found was you described it, the

21   pain in flexion and extension, and you also found there

22   was a 30 percent limitation in range of motion, which is

23   why you circled 30?

24        A.    That's right.

25        Q.    Right?  Okay.  What does this say here?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                              80

```
 1      A.    Limited range of motion cervical spine.

 2      Q.    Okay.  Same finding?

 3      A.    LROM.

 4      Q.    Okay, got you.

 5      A.    Limited range of motion, LROM.

 6      Q.    Okay.  So what happened was -- well, let's

 7   work through the thoracic and the lumbar.

 8      A.    Okay.

 9      Q.    And then I'll ask you a general question and

10   we'll knock all three of them out.

11            The next line item is thoracic pain,

12   correct?

13      A.    Right.

14      Q.    And there's handwriting next to that one,

15   too?

16      A.    Yes.

17      Q.    Can you translate that for us, please?

18      A.    Okay.  Pain in flexion/extension, lateral

19   flexion (inaudible) to the right and left.  Tender on

20   palpation.  Limited range of motion to 70 percent.  When

21   I say --

22            THE COURT REPORTER:  I'm sorry, tendon upper

23        patient?

24            THE WITNESS:  Tender on palpation.

25      A.    When I say tender on palpation, I usually
```



 1  take --

 2          MR. HAZOURI:  Wait one second.  Tender upon

 3      palpation.

 4          THE COURT REPORTER:  Thank you.

 5      A.   When I write down, I usually dictate

 6  tenderness on palpation on the muscles of the area I'm

 7  examining.  In this case, the paravertebral muscles of

 8  the thoracic spine.  In the case of the cervical spine,

 9  paracervical muscles, tender on palpation.

10  BY MR. HAZOURI:

11      **Q.   Okay, got it.  Did you finish interpreting**

12  **the thoracic spine finding?  I'm not sure if you did.**

13  **She stopped you.**

14      A.   Yeah, I -- I did range of motion which was

15  limited to 70 percent of the normal range.

16      **Q.   Okay.  So this was range of motion testing**

17  **of the thoracic spine that you did on the patient at**

18  **your initial --**

19      A.   Of the spine, right.

20      **Q.   Okay.  The lumbar, the next line is lumbar**

21  **pain, and again it has the range of motion initials,**

22  **right?**

23      A.   Right.

24      **Q.   Right?  Could you interpret for us your**

25  **handwritten findings for the lumbar section?**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    82

```
 1       A.    There is pain on flexion/extension, lateral

 2  flexion and rotation to the right and left.  The range

 3  of motion is limited to 70 percent of normal range -- of

 4  normal with pain.

 5       Q.    Okay.  And so this documents range of motion

 6  testing that you performed on the lumbar region of the

 7  patient's spine at your initial evaluation on May 19th,

 8  2016?

 9       A.    Yes.

10       Q.    And then there's a section called

11  extremities.

12       A.    Right.

13       Q.    Okay?  And so extremities are, generally

14  speaking, the arms and the legs, right?

15       A.    Right.

16       Q.    And you've got some findings there.  Could

17  you interpret those for us?

18       A.    Okay.  The left shoulder, there is pain on

19  the left shoulder at abduction and external rotation.

20  Also pain at adduction and internal rotation with a

21  slight limited range of motion.  On the left elbow, it's

22  painful flexion/extension.  The left knee is painful

23  flexion/extension.  McMurray Sign --

24            THE COURT REPORTER:  I'm sorry.

25       A.    M-c, like McDonalds, then Murray,
```



**Orange Legal**
**800-275-7991**

 1   M-u-r-r-a-y --

 2              MR. HAZOURI:  McMurray.

 3        A.    McMurray Sign is positive on the left knee.

 4   Lasegue Sign, L-a-s-s-u-e-g-e (sic), Lasegue Sign

 5   bilateral positive 45 degrees.

 6   BY MR. HAZOURI:

 7        Q.    Okay.  So what you did here -- part of what

 8   you did here was range of motion testing on the shoulder

 9   and the elbow and the knee, in your initial examination

10   of this patient?

11        A.    And the Lasegue Signs.

12        Q.    Right.  But the range of motion testing is

13   documented, your findings are documented in this initial

14   evaluation?

15        A.    Yes.

16        Q.    And you did that in your office, your own

17   personal office, inside the office building with the

18   patient?

19        A.    Correct.

20        Q.    At the initial evaluation?

21        A.    Yes.

22        Q.    Okay.  And so we've confirmed from this

23   record that at this initial examination on May 19, 2016,

24   you performed range of motion testing on the patient's

25   cervical spine, thoracic spine, lumbar spine, shoulder,



 1  elbow and knee?

 2        A.    Right.

 3        Q.    Right?  Describe for us, if you would,

 4  please, how you performed that range of motion testing

 5  on those areas.

 6        A.    Okay.

 7        Q.    And let me be -- I don't need you to tell me

 8  exactly which way you moved.  I just want a general

 9  description of how you do it.

10        A.    Yeah.

11        Q.    Okay.

12        A.    Yeah, describing -- on the cervical spine, I

13  tell the patient, I said, here, flex the head forward

14  until you feel pain.  Do it slowly, as I said before,

15  because if you do it fast you might feel more pain and

16  you might feel dizzy.  So I tell the patient that.  So

17  they move forward the head to flexion until they feel

18  pain.  When they feel pain, they tell me there.

19             Then I go and palpate.  Many times I find

20  muscle spasm.  If the muscle is spasming it's visible

21  sometimes.  You can see the muscle contract.  It's like

22  swelling.  And they can barely move the neck.  I refrain

23  from touching because I know I'm going to give the

24  patient a lot of pain.  But you can see even with your

25  eyes the muscle spasm.  So there is limit in this case



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                  85

1   to 70 percent.

2              Then I do the (inaudible) for extension.  I

3   tell the patient to extend their head up to the ceiling.

4        **Q.   Extend their head up?**

5        A.   Extend their head up until she feels pain.

6   I always say do it slowly.  And I refrain -- again,

7   because you might feel dizzy or you might have more

8   pain.  So they do it until they feel the pain and they

9   stop there.  I proceed to tell the patient to rotate the

10  head to the right and to the left.  And usually to tilt

11  the head right and left also.  So I see what range of

12  motion she has, and on palpation find out if there is

13  muscle spasm.  If there is tender on palpation

14  (inaudible).

15       **Q.   So you described the cervical range of**

16  **motion.**

17       A.   Right.

18       **Q.   That's what you just described for us,**

19  **right?**

20       A.   Yes.

21       **Q.   Now, everything that you described that you**

22  **do, which I thank you for describing, are you sitting at**

23  **your desk observing the patient across from your desk**

24  **when they're doing the flexion/extension left/right**

25  **range of motion movements?**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              86

```
 1        A.   I do sitting down but when they do it and
 2   they feel too much pain I go there and I see.  If I can
 3   palpate I do it.  If not, I don't do it.
 4        Q.   Okay.  So when you start the range of motion
 5   testing, you're still sitting at your desk and the
 6   patient's still sitting across from you?
 7        A.   Yes.
 8        Q.   Right?  And then if you feel the need to go
 9   palpate the patient, or the ability, you'll stand up,
10   walk around your desk and go place your hands on the
11   patient?
12        A.   Right.
13        Q.   Right?  You may or may not palpate the
14   patient, depending on the situation?
15        A.   Right.
16        Q.   But the range of motion testing is done, as
17   you described in the cervical area, with just the
18   patient moving his or her head through those range of
19   motion, sitting across the desk from you?
20        A.   The patient does actively.
21        Q.   Actively, yes.
22        A.   Himself.
23        Q.   Active means the patient is doing it himself
24   or herself; you're not pushing.
25        A.   I'm not pushing because I -- I shouldn't do
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    87

```
 1  that.

 2       Q.   Sure.  So the patient actively moves his or

 3  her head through those cervical range of motions,

 4  generally, while sitting across the desk from you?

 5       A.   Right.

 6       Q.   For the thoracic and lumbar testing, would

 7  that generally be how the patient does it?  They're

 8  sitting across the desk from you or -- they probably

 9  stand up to do some of those, but they're across the

10  desk from you and they actively go through the range of

11  motion?

12       A.   No, for the thoracic and lumbar spine I step

13  up like this, they are standing up.  I tell the patient

14  to stand up and do the same motions I'm going to do.  I

15  teach them what to do.

16       Q.   Okay.

17       A.   I tell them do it slowly.  Forward flexion

18  of the back.  And if you feel pain in the upper or lower

19  back you told me.  I do this slowly.  If they feel pain

20  here, then I go and palpate.  If I don't palpate that

21  area where he feels the pain.  Then he does forward

22  flexion.  I say go to extension like me.  I do it myself

23  and they do it until they feel the pain.  And then I go

24  do lateral tilting right and left, and they do it

25  slowly, as I tell them.  And then I do rotation to one
```



 1  side and the other like this, which they do it slowly

 2  also.  I go and palpate and refer to muscle spasms, the

 3  tender on palpation the different areas of the spine,

 4  paravertebral thoracic or paravertebral lumbosacral.

 5            THE COURT REPORTER:  I didn't get that.

 6            THE WITNESS:  Paravertebral.  Around the

 7       vertebral.  Paravertebral thoracic or

 8       paravertebral lumbosacral spine.

 9            MR. HAZOURI:  Yeah, paravertebral around the

10       thoracic, paravertebral around --

11            THE WITNESS:  The lumbosacral --

12            MR. HAZOURI:  Lumbosacral.

13            THE WITNESS:  Lumbosacral spine, yes.

14  BY MR. HAZOURI:

15       Q.   Okay.  So what you just described for me,

16  was that the case for the thoracic and the lumbar?

17       A.   And the lumbar spine.

18       Q.   Range of motion test?

19       A.   Right.

20       Q.   Okay.  So the difference between the

21  cervical and the thoracic/lumbar is you actually stand

22  up and demonstrate for the patient what you want them to

23  do?

24       A.   Yes, because sitting down I can't do it

25  myself.  I have to stand up to the flexion and

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                     89

 1    extension.

 2         Q.   Sure.  But the patient still does it

 3    actively, without you touching the patient?

 4         A.   Yeah, I don't like to do it actively because

 5    when they have a lot of pain and my -- I might increase

 6    those injuries.

 7         Q.   Sure.  And so the percentage range of motion

 8    findings, the limitations.  For example, this patient

 9    had a 30 percent limitation in her cervical range of

10    motion, and on flexion, I think you said, and extension?

11         A.   Flexion/extension.

12         Q.   Right.  So that 30 percent measurement, you

13    come up with that by just visually seeing the patient?

14         A.   Visually seeing, yes.

15         Q.   Right.  You don't use any measuring tool?

16    And that's the truth across your practice; that's how

17    you do it?

18         A.   Yes.

19         Q.   And that's the same for all the range of

20    motion percentages?

21         A.   Yes.

22         Q.   Let me just ask a better question.  That's

23    the same for all the percentage limitations that you

24    document in your range of motion testing?  That's how

25    you --



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                               90

```
 1      A.   Yes.

 2      Q.   -- identify those?  Okay.

 3           THE COURT REPORTER:  Can we go off?

 4           MR. HAZOURI:  Yeah.

 5           THE COURT REPORTER:  Thank you.

 6           (A recess was taken.)

 7           THE VIDEOGRAPHER:  On record 10:51.

 8           (Plaintiff's Exhibit No. 37 Marked for

 9      Identification.)

10 BY MR. HAZOURI:

11      Q.   Okay, sir, we're back on the record after a

12 quick break.  I'm handing you what we've marked as

13 Exhibit 37 to your deposition.

14           Do you recognize this as a range of motion

15 report for your May 19, 2016 office visit with the

16 patient whose initials are E.G.A.?

17      A.   Yes.

18           MR. PIVNIK:  I think we're on 32.

19           THE COURT REPORTER:  We're on 33,

20      technically.

21           MR. HAZOURI:  What'd I say?

22           MR. PIVNIK:  You said 37.

23           MR. HAZOURI:  Oh, I put the wrong stamp on.

24      Can we just keep that 37 and then I'll go back?

25           MR. PIVNIK:  Yeah, sure.
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    91

```
 1              MR. HAZOURI:  And then we'll skip it.  Let's

 2        just do that.  I'm missing the 33 page.  That's

 3        why I did it.  That's why I did it right there.

 4        All right.  First time I messed up.  Okay.

 5  BY MR. HAZOURI:

 6        Q.   So you answered this is the range of motion

 7  report from that date of service?

 8        A.   Right.

 9        Q.   And so at the cervical spine section of the

10  range of motion report, it says 30 percent, right?

11        A.   Yes.

12        Q.   And so that's documenting the same 30

13  percent limitation on range of motion that you

14  documented in the handwritten initial evaluation, right?

15        A.   Yes.

16        Q.   And the next section is called thoracolumbar

17  spine?

18        A.   Thoracolumbar spine.

19        Q.   And that's combining the thoracic and lumbar

20  spine into one word?

21        A.   Right.

22        Q.   Right?  And I see there's two circles here.

23  One around the thoraco part and one around the lumbar

24  part.  Does that indicate that the 70 percent next to it

25  applies to both of those sections?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    92

```
 1      A.   Right, yes.

 2      Q.   If you were only going to apply a percentage

 3 finding to one of them, either thoraco or lumbar, you

 4 would only circle one of them?

 5      A.   Right.

 6      Q.   Okay.  And so what is documented here is a

 7 70 percent limitation on the range of motion in both the

 8 thoracic spine and the lumbar spine?

 9      A.   Yes.

10      Q.   All right.  And going down, the next section

11 is shoulder.  Right?  Could you interpret for us what is

12 written out in the shoulder section?

13      A.   Okay.  It says left shoulder 90 degrees of

14 abduction, which is (inaudible) of the arm, abduction.

15 90 percent of adduction.  It's when you put your

16 shoulder down backwards.  Adduction, internal rotation.

17      Q.   Okay.  So -- oh, and were you saying

18 external rotation or internal rotation?

19      A.   Adduction, internal rotation; abduction,

20 external rotation.

21      Q.   So what does -- again summarize for us the

22 finding here.

23      A.   90 percent of the left shoulder for

24 abduction and external rotation.  90 percent for

25 adduction, internal rotation.
```



 1        Q.   Okay.   These are the same findings that are

 2   set forth -- same range of motion findings on the

 3   shoulder that are set forth in the handwritten report

 4   that we've marked as Exhibit 32?

 5        A.   Yes.

 6        Q.   And the range of motion findings in the

 7   range of motion report that you've just described for us

 8   and we've talked about that we marked as Exhibit 37, you

 9   arrived at those percentages by doing the same

10   testing --

11        A.   Yes.

12        Q.   -- that you already described for us that

13   was the basis for the notes you made in Exhibit 32, the

14   handwritten initial orthopedic evaluation?

15        A.   Right.

16        Q.   Right?   I do note that the elbow on Exhibit

17   37 has no range of motion findings.

18        A.   Because it was normal one.   You have a

19   normal range of motion, I don't write a limited range of

20   motion.

21        Q.   Oh, okay, so the left elbow, if we look at

22   Exhibit 32, you circled the left elbow, there was normal

23   range of motion?

24        A.   Yes, normal range of motion.   When you flex

25   both, it's not pain -- it's not limited.



1       Q.    Okay.

2       A.    When there is limited, I write down limited

3    range of motion.

4       Q.    So let me make sure I understand that.  You

5    did, on this patient, E.G.A, on May 19, 2016, you did

6    perform range of motion testing on the left elbow?

7       A.    The left elbow.

8       Q.    All right.

9       A.    It says right here, see?

10      Q.    Okay, yeah.  You're pointing to the bottom,

11   your handwritten notes on the bottom of Exhibit 32 at

12   Bates stamp 21827, right?

13      A.    Yes.

14            THE COURT REPORTER:  And that's E.G.E?

15            MR. HAZOURI:  E.G.A.

16            THE COURT REPORTER:  Thank you.

17   BY MR. HAZOURI:

18      Q.    Okay.  So you did perform range of motion on

19   the left elbow of patient E.G.A., range of motion

20   testing on the left elbow of patient A.G.A. (sic) on May

21   19th, 2016, and what that testing showed was some pain

22   on range of motion but no limitation on range of motion?

23      A.    Right.  It's not limited.  Just painful on

24   flexion/extension.

25      Q.    Okay, got it.  So because there was no



**Orange Legal**
**800-275-7991**

 1   limitation on the range of motion on the -- there was no

 2   limitation in the range, you did not document that in

 3   the range of motion report?

 4        A.   Because it's normal, yes.

 5        Q.   Because it was normal?

 6        A.   Right.

 7        Q.   The range of motion.

 8        A.   Yes.

 9        Q.   But you did, in your initial evaluation,

10   document the pain that the patient experienced when

11   going through the normal range of motion with the left

12   elbow?

13        A.   Yes, because the patient have pain on

14   flexion/extension.  The first pain was --

15        Q.   Okay.

16        A.   That's why I did the exam.

17        Q.   And then the knee, you also have findings

18   regarding the knee in the written initial evaluation

19   report, which is Exhibit 32.  Was that pain on range of

20   motion in the left knee, too?

21        A.   Yeah, pain on the left knee and

22   flexion/extension, which is normal because if -- if we

23   have any limitation I would have written a limitation in

24   degrees.  And the McMurray Sign, which is the other exam

25   for the knee, was also positive.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                             96

 1      Q.   Okay.  So the knee -- like the elbow, the
 2  knee, there was normal range of motion on the left knee
 3  but there was pain when the patient went through the
 4  range of motion, right?
 5      A.   That's right.  They both were painful for
 6  the range of motion of the knee, and the elbow were
 7  normal.
 8      Q.   That's right.
 9      A.   And so that's why I didn't write anything
10  because it's normal.
11      Q.   Okay.
12           THE COURT REPORTER:  Give it to me again,
13      Mc?
14           MR. PIVNIK:  McMrurray.
15           THE COURT REPORTER:  McMurray, thank you.
16           THE WITNESS:  Like McDonald, M-c, and
17      Murray.
18           THE COURT REPORTER:  I got it.
19           THE WITNESS:  M-u-r-r-a-y, McMurray.
20           THE COURT REPORTER:  Thank you.
21      A.   McMurray was positive on the left knee.
22  BY MR. HAZOURI:
23      Q.   Okay.  So the sole purpose, as I understand
24  it, for the range of motion report that we've marked as
25  Exhibit 37 for this patient, is to document percentage



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                            97

```
 1   limitations on range of motion that you identify.

 2        A.   Right.

 3        Q.   Right?  And those same -- for this patient,

 4   those same percentage limitations were documented also

 5   in your initial written evaluation?

 6        A.   Yes.

 7        Q.   All right.  Okay, so if you document -- for

 8   this patient you actually did document the same

 9   percentage limitations in the thoracic, cervical, lumbar

10   regions of the spine and the shoulder.  If you had

11   already documented them in your handwritten initial

12   evaluation report that we've marked as Exhibit 32,

13   what's the point of having the range of motion, the

14   separate range of motion report with the repetitive

15   information regarding those limitations?

16        A.   Sometimes when I advise the patient to go to

17   physical therapy, the clinic who's referring the patient

18   to me, I send that so the physical therapist doesn't

19   have to go through all my exam and (inaudible)

20   information about what I found.  It's better for me

21   because it's all -- he's going to do anyway the physical

22   examination of a patient, but (inaudible).  So he

23   doesn't have to go through the whole thing.

24        Q.   Okay.  So if I understand you correctly, you

25   say you -- let me just walk through this.  You do the
```



```
 1   range of motion testing to see the percentage

 2   limitations and you write the down in your handwritten

 3   report, right?

 4        A.   Right.

 5        Q.   Then you also write down those same -- any

 6   limitations that you find, the same percentage degree

 7   limitation in the separate range of motion report.

 8        A.   Right.

 9        Q.   Right?  And you have told me that one reason

10   you write it on a separate piece of paper is that you

11   may send just the range of motion report to a therapist;

12   is that right?  Right?  That's one reason?

13        A.   Yes, yes.

14        Q.   Are there any other reasons that you rewrite

15   the range of motion percentage limitations into this

16   separate document that we marked as Exhibit 37?

17        A.   No, just to have it available.

18        Q.   Okay.  So no other reason that you can think

19   of right now?

20        A.   No.

21        Q.   Okay.  Now, let me jump ahead here.

22             (Plaintiff's Exhibit No. 33 marked for

23             identification.)

24   BY MR. HAZOURI:

25        Q.   And hand you Exhibit 33 to your deposition.
```



 1   Is this the typewritten report of your initial

 2   examination of the patient E.G.A. that you performed on

 3   May 19th, 2016?

 4        A.   Right, yes.

 5        Q.   Okay.  Now, if you go to the second page,

 6   the top of that page is entitled -- not the very top,

 7   but the -- where the text starts it's entitled physical

 8   examination, right?

 9        A.   Yes.

10        Q.   So this sets forth your physical examination

11   findings?

12        A.   Yes.

13        Q.   Right?  And then it says cervical spine,

14   thoracic spine, lumbosacral spine and upper extremities

15   and lower extremities, right?

16        A.   Right.

17        Q.   And under cervical spine, thoracic spine and

18   lumbosacral spine, you have the same percentage of

19   limitation range of motion findings that you wrote into

20   the range of motion report that we marked as Exhibit 37

21   and the initial orthopedic evaluation that we marked as

22   Exhibit 32?

23        A.   Yes.

24        Q.   Right?  Okay.  Now, wouldn't this be the

25   report that you'd want to send to any person performing



 1  therapy so they could see the limited range of motion

 2  typed out in an easily readable fashion and also have

 3  knowledge of any pain that the patient's experiencing,

 4  their range of motion and palpation?

 5       A.   Yes.

 6            MR. PIVNIK:  Objection to form.

 7       A.   Well, as I said before, this is a rapid form

 8  for the therapist so he doesn't have to go through --

 9  looking through all what I wrote.

10  BY MR. HAZOURI:

11       Q.   That's the reason you do this separate form.

12  But wouldn't it be easier for the therapist to read your

13  typewritten note and see that?

14       A.   Well, I do that because it's another paper

15  that is less extensive with the corresponding findings

16  that he needs.

17       Q.   Okay.

18       A.   Anyway, he's going to do the physical

19  examination of the patient before having the therapy.

20       Q.   Okay.

21       A.   So he just look at that and see if the range

22  of motion found is the same as his finding now, because

23  you won't (inaudible).  Sometimes a patient comes to me

24  with symptoms with limited range of motion certain area

25  of the -- for example, in the cervical spine.  Two or



**Orange Legal**
**800-275-7991**

1  three days later, it changes completely.

**2**          Q.    Okay.

3          A.    Increases or decreases or the symptoms are

4  worse or better.  Many times when the patient has the

5  accident, the same time, the paramedic come and they

6  ask, do you want to go to hospital?  No, I okay, I don't

7  have any pain.  Usually that's they answer.

**8**          Q.    Okay.

9          A.    The pain usually comes one day later, and

10  the range of motion increases or decreases.

**11**          Q.    Okay.

12          A.    As time goes on.

**13**          Q.    All right.  So let me ask you to pull out

**14**  Exhibit 31.  I'll get it for you here just to help.  Do

**15**  you have it there in front of you?  Do you see?

16          A.    Yes.

**17**          Q.    Okay.  And then the second CPT code after

**18**  99204 is 95851, correct?

19          A.    Yes.

**20**          Q.    And the range of motion testing that we've

**21**  talked about that's documented in your handwritten

**22**  evaluation that we marked as Exhibit 32, the range of

**23**  motion report that we marked as Exhibit 37 and the

**24**  initial orthopedic evaluation that we marked as Exhibit

**25**  33 that you performed on this patient on May 19th, 2016,



**Orange Legal**
**800-275-7991**

 1   that's what the 95851 charge is for?

 2        A.   Yes.

 3        Q.   Right?  Okay.  Now, if you sent this range

 4   of motion report to another therapist, that would be

 5   documented in your file with a fax cover sheet or

 6   something like that, correct?

 7        A.   I don't know.

 8        Q.   You don't know?

 9        A.   No.

10        Q.   Okay.

11        A.   Usually they send everything.

12        Q.   Usually you send everything?

13        A.   Everything.

14        Q.   Okay.  You send everything to whom?

15        A.   To the clinic.  The medical report.

16        Q.   Okay.  So you also send to the clinic your

17   typewritten report?

18        A.   Right.

19        Q.   Right?  Okay.  So what you're -- if a clinic

20   refers a patient to you and you perform an initial

21   evaluation like this, you're going to send the

22   handwritten report that we've marked as Exhibit 33 back

23   to the clinic -- or to the clinic.

24        A.   Typewritten.

25        Q.   Typewritten.  I'm sorry, was I saying



 1  handwritten?

 2      A.   Yeah.

 3      Q.   **Typewritten, right?  And then are you also**

 4  **going to send the range of motion report?**

 5      A.   Yes.

 6      Q.   **And are you going to also send your**

 7  **handwritten notes?**

 8      A.   Usually handwritten, no, I don't send them.

 9      Q.   **So it's just --**

10      A.   Because they won't understand.

11           THE COURT REPORTER:  I'm sorry, I didn't get

12      that.

13           THE WITNESS:  Because they won't understand

14      my handwritten report.

15  BY MR. HAZOURI:

16      Q.   **Right.  So what you send out to the clinic**

17  **would be, again, the handwritten note and the range of**

18  **motion report?**

19      A.   The typewritten.

20      Q.   **Did I say handwritten?  Gosh darn it.**

21      A.   That's okay.

22      Q.   **The typewritten report that we've marked as**

23  **Exhibit 33 and the range of motion report --**

24      A.   Yes.

25      Q.   **-- we marked as --**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    104

```
 1      A.   Yes.

 2      Q.   -- Exhibit 37?  Okay.  And you're not here

 3  saying that that happens in every chart, every file, or

 4  are you, that it gets sent to a referring physician?

 5      A.   I usually do the -- yeah.

 6      Q.   Okay.  What if there is no referring

 7  physician?

 8      A.   No.  Well, the patient has to go to a

 9  clinic.  I send it to the clinic where he's going to

10  have the therapy.  Sometimes it's an initial final

11  evaluation.  The patient has received all the treatment,

12  so in that case obviously I won't send to the clinic

13  that because they don't need it.  It's a final

14  evaluation.

15      Q.   Okay.  We'll get there.  Okay.  And the

16  range of motion testing that you've described for us,

17  how you performed it and it's documented in these three

18  records we've been looking at, that is a standard part

19  of your evaluation of an auto accident patient

20  complaining of muscle pain?

21      A.   Right.

22      Q.   And we'll look at some records from the

23  follow-up visit and the final visit with this patient.

24  You're familiar with that, follow-up visits and final

25  visit?
```



1      A.   Yes.

2      Q.   And you do range of motion testing in those

3  examinations also?

4      A.   Every time.

5      Q.   Right.  And that's part of your standard

6  initial evaluation of an auto accident patient in the

7  follow up and the final --

8      A.   Yes.

9      Q.   -- examinations who are complaining of

10  orthopedic-type injuries?

11      A.   That's right, yes.

12      Q.   And you never use an inclinometer or other

13  measurement tools?

14      A.   I have the inclinometer, but I barely use

15  them because it takes too long.

16          THE COURT REPORTER:  And that's internometer

17      (sic)?

18          THE WITNESS:  Inclinometer.

19          THE COURT REPORTER:  Inclinometer.

20      A.   There are different instruments that I have.

21  I rather don't use it because it takes a lot of time to

22  do them.

23  BY MR. HAZOURI:

24      Q.   So you just don't --

25      A.   I need to do it three times.  I have to use



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              106

 1  two measures -- it's (inaudible).

 2       Q.    Okay.  So you have those instruments but you

 3  don't use them?

 4       A.    Usually I don't use them.

 5       Q.    They're too time consuming and to do the

 6  measurements using them you have to do --

 7       A.    Right.

 8       Q.    Let me finish.  You have to do the

 9  measurements three times and it's just you don't go

10  through all that?

11       A.    Yes, it's very complicated and the patient

12  gets bored, you know?

13       Q.    Okay.  How long does it take to do a

14  measurement with an inclinometer?

15       A.    More than a half an hour.

16       Q.    Okay.  How about a goniometer?

17       A.    Almost the same, I guess.  It'd be a very

18  extensive consultation.

19       Q.    Does your clinic, Feijoo, P.A., prepare this

20  separate form, this range of motion report form that

21  we've marked as Exhibit 37 in an attempt to justify its

22  charge for 95851 to insurance companies?

23            MR. PIVNIK:  Objection to form.

24       A.    Well, it might be included but it's not

25  exactly the reason.



 1  BY MR. HAZOURI:

 2       Q.   **When you say it might be included but it's**

 3  **not exactly the reason --**

 4       A.   It might be included in our code.

 5       Q.   **Okay.  The reason you prepare the form is to**

 6  **support the code, right?**

 7       A.   Yeah.

 8            MR. PIVNIK:  Objection to form.

 9       Mischaracterizes prior testimony.

10  BY MR. HAZOURI:

11       Q.   **Now, going back to the form real quick,**

12  **these straight lines on Exhibit 37, what do those mean?**

13       A.   They're normal.

14       Q.   **The straight line means you tested, you**

15  **actually tested these areas but they were normal?**

16       A.   They're normal.

17       Q.   **Okay.  So did you test this patient's hand**

18  **range of motion?**

19       A.   Well, usually if there is a finding of the

20  hand, when I check hands, when I see a patient and

21  observe the patient, it's everything with movements.

22  Their hands, their legs, everything.  If there is

23  something, for example two days ago a patient came --

24       Q.   **That's --**

25       A.   It's to refer to things that you're asking



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              108

 1  me.

 2        Q.   Okay, go ahead.

 3        A.   Two days ago a patient came with symptoms of

 4  the back (inaudible), and he has this finger like this.

 5  He was not complaining of the finger.  I said, what's

 6  wrong with your finger?  Oh, I don't know, it's been

 7  like this for two years.  So I write it down.

 8        Q.   Okay.

 9        A.   I found out.  It's not included (inaudible)

10  I refer this is a lesion that he has to -- two years

11  before.  It's not related to the accident, but I see it.

12  I have to document it.

13        Q.   Right.  So in that case you saw an injury or

14  a --

15        A.   Right, of the finger.

16        Q.   You have to let me finish the question.

17        A.   Oh, I'm sorry.

18        Q.   You saw an injury, a condition with the

19  finger, so you treated it.  You examined it, right?

20        A.   Right.  I didn't treat it.  I examined it.

21        Q.   You examined it.  Good point.

22        A.   I write it down.  This is a previous injury,

23  not related to the accident.

24        Q.   Got you.  But here, this patient wasn't

25  complaining of any injury to the hand and there's



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    109

```
 1   nothing you documenting any abnormality, right?

 2        A.   That's why I put the line.  There's nothing

 3   for -- it's normal.

 4        Q.   Okay.  Well, what I'm wondering is we're

 5   talking about the hand here.

 6        A.   Yeah.

 7        Q.   Does the line mean -- it could mean one of

 8   two things.  You tell me which.  Does the line mean you

 9   actually tested the range of motion of the hand and it

10   came out normal, or does the line mean you did not test

11   the range of motion of the hand because that test wasn't

12   indicated by the patient's condition?

13        A.   I didn't find any symptoms so I didn't test

14   it.

15        Q.   Okay.  So the lines, at least as far as the

16   hand and the hip and the ankle go, the lines mean you

17   didn't test them because there were no symptoms?

18        A.   Right.

19        Q.   Right?  You also put a line next to elbow

20   and knee, but you did test those but those came out

21   negative?

22        A.   Right.

23        Q.   Right?  So it's a little -- you could use a

24   line for different reasons --

25        A.   Right.
```



```
 1        Q.   -- I suppose?  Okay.  But you wouldn't test

 2   the hand if there was no indication to test the hand?

 3        A.   No.

 4        Q.   You wouldn't test this patient's ankle if

 5   there was no indication, right?

 6        A.   No.

 7        Q.   Same reason you didn't test the blood

 8   pressure.  It wasn't relevant to the conditions that you

 9   were examining?

10        A.   You're right.

11        Q.   Right?  Okay.  The range of motion report

12   that we marked as Exhibit 37, the typewritten part of

13   it, the template, where did that come from?

14        A.   I don't remember.

15        Q.   How long has the clinic been using it?

16        A.   I don't remember.

17        Q.   More than 10 years?

18        A.   Probably.

19        Q.   Is that your best estimate, probably --

20        A.   I don't remember.

21        Q.   I get it.  So it's not a memory quiz.

22        A.   No, no, I know.

23        Q.   This is a good thing.  We're moving along.

24             MR. PIVNIK:  I'll feel better when you flip

25        pages.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                        111

```
 1              MR. HAZOURI:  Well, I got to check off this
 2      list.  This is the precursor to flipping.
 3              THE WITNESS:  Okay.
 4  BY MR. HAZOURI:
 5      Q.   I want to ask you a couple more questions
 6  about the written report, which I'm looking for.
 7      A.   32.
 8      Q.   33.  I said written -- the typewritten, the
 9  typewritten.  The typed report.  It's written out but it
10  was typed.  Okay, you with me?  Page 2, please.  We're
11  going to talk about a couple tests that you've already
12  referenced in your deposition.
13      A.   Okay.
14      Q.   Down under lower extremities, it says
15  Lasegue Sign being positive bilaterally to 45 degrees,
16  right?
17      A.   Right.
18      Q.   Could you describe for us -- well, first of
19  all, Lasegue Sign is a test?
20      A.   Yes.
21      Q.   Could you describe for us what that test is
22  and what it -- well, first of all, what is that test?
23  Describe it for us.
24      A.   Okay.  The test, initially you place the
25  patient in the prone position on the examine table, and
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                 112

1  then you tell him to relax over.  And you grab a leg and

2  you stand the leg up.  If he feels pain in the low back,

3  that's a possible sign.  Usually when you reach 45

4  degrees it's positive.  It means cervical or lumbosacral

5  root compression.  Lumbosacral root compression.

6           THE COURT REPORTER:  Lumbosacral foot

7      compression?

8           MR. HAZOURI:  Root.

9           THE WITNESS:  Root.

10          THE COURT REPORTER:  Thank you.

11     A.   Lumbosacral root compression, usually caused

12 by trauma to the lower back, bulging disc, disc

13 herniation, different causes, spondylolisthesis,

14 s-p-o-n-d-y-l-o-l-i-s-t-h-e-s-i-s, spondylolisthesis.

15 That's displacement of a vertebral body over another.

16 It happens very frequently in an accident in the lower

17 back.  Logically, it compresses the nerve root sac and

18 give you a Lasegue Sign positive.

**19     Q.   Okay.**

20          THE COURT REPORTER:  Logically it compresses

21      the --

22     A.   Compresses the nerve roots in the

23 lumbosacral spine and of course it will give you a

24 positive Lasegue Sign when you lift the leg to 45

25 degrees.



**Orange Legal**
**800-275-7991**

 1  BY MR. HAZOURI:

 2        Q.   Okay.  So let me follow up on some of that.

 3  You talked about nerve root compression.

 4        A.   Nerve root compression.

 5        Q.   Right.  Let me just -- okay?  That's

 6  radiculitis, right?

 7        A.   Radiculitis, right.

 8        Q.   Right?  And you've got that documented as

 9  one of the diagnosis here, lumbosacral spine

10  radiculitis, right?

11        A.   That's because of the positive Lasegue Sign.

12        Q.   That's where I'm going.

13        A.   Yeah, yeah.

14        Q.   Okay, so when you said the patient goes up

15  to 45 degrees and there's a positive sign for

16  radiculitis, that's a particular type of pain; isn't it?

17  It's a nerve pain, right?

18        A.   Yeah.  It's a pinching nerve.  They

19  frequently say a pinching nerve right here, and the pain

20  many times go down the leg.

21        Q.   Goes down.

22        A.   What -- what we call the sciatica pain,

23  s-c-i -- you know, sciatica?

24        Q.   Right.

25        A.   Sciatica pain.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                      114

1      Q.    Because the nerve is being compressed, so it

2  causes nerve pain down the leg a lot of times?

3      A.    Yeah, because of the lower back, you have

4  the nerves that cause the -- form the sciatic nerve.

5      Q.    Okay.

6      A.    And those different nerves forming the

7  sciatic nerve, when they are compressed, they have

8  different levels of symptoms.  Sometimes the pain goes

9  to the whole leg.  Sometimes you feel weakness of the

10  leg.  Sometimes you feel numbness that goes from the

11  upper leg to the toes.  Sometime you have difficulty

12  moving.

13      Q.    But for you to find a positive finding of

14  radiculitis, it would have to be some form of that type

15  of nerve pain, either a numbness or a referral of the

16  electrical-type nerve pain to another part of the body,

17  right?

18      A.    Yes.

19      Q.    Okay.  And you mentioned various --

20      A.    Causes.

21      Q.    Well, indications.  That could be an

22  indication of a herniated disc, is one thing.

23      A.    Right.

24      Q.    Right?  Okay.  And when you -- on this

25  particular patient, when you diagnosed lumbosacral



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                          115

```
 1   radiculitis, did you form an opinion as to what you

 2   thought might be causing the radiculitis?

 3        A.   Just the things I told you before.  Could be

 4   (inaudible) bulging disc, spondylolisthesis, even a

 5   fracture.

 6        Q.   Okay.  So you didn't know what caused it;

 7   you just found it?

 8        A.   Right.

 9        Q.   Right?  Okay.  Now, in the recommendations

10   section, did you make any recommendations designed to

11   diagnose the cause of the radiculitis, the lumbar

12   radiculitis?

13        A.   Just only the x-rays.

14        Q.   Okay.  So --

15        A.   Because you have the symptoms, you finally

16   start the therapy, sometimes with the therapy the

17   symptoms get better and the (inaudible) can be a

18   compression of the nerves because of the swelling of

19   tissues.

20        Q.   Slow down for her.

21             MR. HAZOURI:  Did you get all that?

22             THE COURT REPORTER:  Yes.

23             MR. HAZOURI:  Okay.

24        A.   Because it can be a swelling of the soft

25   tissues, causing compression of the nerves.  So with the
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    116

```
 1  therapy, the patient might feel better if -- when he

 2  comes back for the follow-up evaluation, if the patient

 3  feels better I don't do -- this patient, orders, because

 4  if the pain still there and the symptoms are the same I

 5  usually do order an MRI to rule out disc herniation,

 6  swollen disc, bulging disc, spondylolisthesis, et

 7  cetera.

 8           THE COURT REPORTER:  Rule out -- I didn't

 9      get the first one.

10           THE WITNESS:  To rule out disc herniation,

11      bulging disc --

12           THE COURT REPORTER:  Disc herniation.

13           THE WITNESS:  Bulging disc,

14      spondylolisthesis, et cetera.

15  BY MR. HAZOURI:

16      Q.   Okay, I think I understand your answer.  Let

17  me summarize it.  First of all, you did not order an MRI

18  or any other test at this visit --

19      A.   Only the x-rays.

20      Q.   Well, let me finish my questions.  The x-

21  rays aren't designed to diagnose the cause of the

22  radiculitis, right?

23      A.   No.

24      Q.   They are not, right?

25      A.   Well, the x-ray, you can see
```



Orange Legal
800-275-7991

 1  spondylolisthesis.

 2      Q.   Okay, a spur, a bone spur?

 3      A.   A bone spur and a spondylolisthesis, too.

 4      Q.   Okay, what --

 5      A.   Spondylolisthesis, what I told her,

 6  displacement of the vertebral body over other one.

 7      Q.   Okay, okay.  So the x-ray could --

 8      A.   Could diagnosis spondylolisthesis, and I see

 9  spondylolisthesis many times on the x-ray report.

10      Q.   Okay.  But if you really wanted to get to

11  the cause of the radiculitis, the main test you would go

12  to is an MRI?

13      A.   Absolutely.

14      Q.   Fair, right?

15      A.   Exactly.

16      Q.   And as I understood your testimony, you

17  didn't do that.  You didn't order an MRI for this

18  patient on May 19, 2016, because you wanted to wait?

19  You wanted to see how the patient responded to therapy

20  and the radiculitis might improve with conservative

21  therapy?

22      A.   You are right, perfect.

23      Q.   Okay.  So I understand that.  Let me ask you

24  just about your other recommendations here.  Limit

25  overall activities is --



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                118

 1      A.   Yes.

 2      Q.   -- the first recommendation.  My

 3  interpretation, that's a little general.  What

 4  activities do you have the patient limited to?

 5      A.   Yes.  When you have an accident, you

 6  shouldn't be doing heavy lifting, heavy effort.  As I

 7  told you before, I recommend the patient to avoid

 8  certain motions of your head, of -- because can be more

 9  pain and can make you dizzy.  Avoid sudden change of

10  positions when you're sitting down and you're going to

11  stand up.  Do it slowly.  When you are in bed and you're

12  going to stand up, do it slowly.  Because if you do it

13  fast, you might feel dizzy and you might suffer another

14  lesion falling down to the floor.

15      Q.   Another injury?

16      A.   Yes.

17      Q.   Right?  Okay.  So those are the overall

18  activities that you described to the patient?

19      A.   Right, right.

20      Q.   Okay.  And you mentioned heavy lifting,

21  avoid heavy lifting, bend the knees not the back when

22  picking up anything from the floor.

23      A.   That's right.

24      Q.   Bend the knees not the back when picking up

25  anything from the floor is good advice for all of us,



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    119

```
 1  right?

 2       A.   Oh, everyone, yeah, should do it.  You know?

 3  The people who do the most weightlifting, the heavy --

 4  pumping iron, when they are going to take the barrels --

 5       Q.   Bend the knees.

 6       A.   -- they do it with their knees.

 7       Q.   Right.

 8       A.   They bend their knees, not their back.

 9       Q.   So that's good advice for everybody, not

10  just --

11       A.   Yeah, for everyone, yes, that's right.

12       Q.   Not just an injured person, right?

13       A.   No, no.

14       Q.   Okay.  And then avoid heavy lifting.  What

15  was the weight restriction you placed on this -- the

16  weightlifting restriction?

17       A.   No, I usually -- I usually tell them don't

18  lift more than 20 pounds.

19       Q.   Okay.  But 20 pounds?

20       A.   More or less, yes.

21       Q.   For a patient like this?

22       A.   Yes.

23       Q.   All right.  And then it says that you

24  ordered the x-rays of the cervical spine, thoracic

25  spine, lumbosacral spine, left shoulder, left knee,
```



1  right?

2       A.   Right.

3       Q.   **Why did you order x-rays?**

4       A.   Because when you have an accident, you have

5  to know if there is any lesion that is being -- is being

6  seen on the x-ray reports or in x-ray films.  I prefer

7  to see the films and the CDs than the report, but

8  anyway, I would like to have the radiologist report in

9  my chart because not only what I see but what he says

10 because he's a board-certified radiologist.

11      Q.   **Okay, but -- I appreciate that.  Let me ask**

12 **you this.  The outcome of the x-rays could affect the**

13 **patient's treatment plan, right?**

14      A.   Of course.

15      Q.   **And you did not have x-rays at this initial**

16 **evaluation.  That's why you ordered them, right?**

17      A.   That's why I ordered them, yes.

18      Q.   **Right.  And so you would want to see the x-**

19 **rays the next time the patient came, in order to**

20 **consider making adjustments to the treatment plan,**

21 **right?  And that's why you ordered them?**

22      A.   Yes.

23      Q.   **Additional piece of diagnosis information**

24 **for your consideration when making recommendations for**

25 **this patient?**



 1        A.    Of course.

 2        Q.    **Could result in a modification of the**

 3  **treatment plan for this patient?**

 4        A.    Possibly.

 5        Q.    **All right.**

 6        A.    I also in the second -- number two --

 7        Q.    **Yes.**

 8        A.    -- recommend when you have cervical pain, I

 9  always tell the patient to use a very small pillow,

10  because when you use a very small pillow you feel

11  better.  The symptoms decrease.  The symptomatology gets

12  better.

13        Q.    **I meant to ask you about the second one.**

14        A.    Yeah.

15        Q.    **I skipped it.**

16        A.    That's what I tell them.

17        Q.    **Thank you.  Let me go back to it, okay?  So**

18  **the second one is use a low pillow?**

19        A.    Right.

20        Q.    **Right?  And that's for patients who have a**

21  **cervical injury?**

22        A.    Right.

23        Q.    **And you --**

24              THE COURT REPORTER:  You said use of low

25        pillow?  I didn't get that.



```
 1              THE WITNESS:  Small pillow or low pillow.

 2              THE COURT REPORTER:  I thought you said

 3       small.

 4              MR. HAZOURI:  Use a low pillow.

 5              THE COURT REPORTER:  Thank you.

 6       A.   A very small pillow, low pillow.  I always

 7  tell them use a small pillow (inaudible) low pillow.

 8  BY MR. HAZOURI:

 9       Q.   For people with neck injuries?

10       A.   Right.

11       Q.   Because you don't want their head craned

12  forward?

13       A.   That's right.

14       Q.   Right?  Okay.

15       A.   You know, many people, they watch TV in bed.

16  They put two pillows like this and when they spend two

17  hours they have a lot of pain there.  If you have an

18  accident, you do that, you can make things worse.

19       Q.   Okay.

20       A.   So I tell them do not watch TV in bed.  I

21  always tell them.  I don't write it here, but I always

22  tell them.

23       Q.   Okay, I got you.  And then number five is

24  emergency medical evaluation.  We're going to talk about

25  that later, so I'm just going to skip that for now.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                           123

 1   Okay?  I'll come back to that one.

 2        A.   Yeah.

 3        Q.   Let's not go there now.

 4        A.   Yeah.

 5        Q.   Number six, return to the office in one

 6   month for further evaluation/treatment, if necessary,

 7   correct?

 8        A.   Yeah.

 9        Q.   So if the patient felt it was necessary or

10   the person treating the patient, the clinic providing

11   the primary treatment thought it was necessary, you'd

12   want to see this patient back in a month, fair?

13        A.   I usually tell them if you feel that you

14   need to see me before, you are welcome anytime you need

15   me.

16        Q.   Sure.  But short of that, come back in a

17   month?

18        A.   Right.

19        Q.   It says if necessary.  With this patient,

20   did you expect to see her in a month?  I mean, was that

21   your expectation?

22        A.   Yes.

23        Q.   Okay.  And that would be because you wanted

24   to reassess the patient?

25        A.   Right.



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                      124

```
 1        Q.    You want to see how the condition is
 2   improving or not improving?
 3        A.    Exactly.
 4        Q.    You want to consider modifications to the
 5   treatment plan?
 6        A.    Yes.
 7        Q.    You want to consider potentially
 8   modifications to the treatment plan depending on what
 9   the x-rays that you ordered show?
10        A.    Yes.
11        Q.    Right?  All of these are the reasons for
12   asking the patient to come back in a month?
13        A.    Yes, and possibly ordering an MRI, as I told
14   you before.
15        Q.    Depending on the outcome of the radiculitis?
16        A.    Right.
17        Q.    Right?  Okay.
18        A.    And the other symptoms.
19        Q.    And the other symptoms?
20        A.    Yes.
21        Q.    Okay.  Yes, could be --
22        A.    The neck, the back, the shoulder.
23        Q.    Right.  Okay.  By the way, I think you
24   answered but I'm just curious.  How low of a pillow do
25   you want?
```



```
 1        A.   I always tell the patient use a small

 2   pillow, no pillow at all.  The lower your head the

 3   better, I always tell them, so.  The lower your head the

 4   better.

 5        Q.   What if the patient just has an injury to

 6   their lumbar spine and not their neck?  Do you recommend

 7   a low pillow?

 8        A.   Always a low pillow is better for your neck.

 9   When you have a lesion of the lower -- pain in the

10   lumbosacral region, I usually tell the patient to sleep

11   in fetal position, flexed like this with -- on the side,

12   with a pillow between the legs.

13        Q.   And you said lesion which meant injury,

14   right?

15        A.   Injury.  I always say lesion.

16        Q.   So let me -- I keep saying handwritten and

17   that's your original language, so I understand.

18             But let me get back to the patient with just

19   a lumbar injury, no cervical injury.  No injury reported

20   to the neck, no objective findings, no injuries to the

21   neck.

22        A.   Yes.

23        Q.   You don't recommend a low pillow for that

24   patient, based on any injuries that patient has?

25        A.   No.
```



1        Q.   Right?  A low pillow will not -- or a high

2   pillow -- no pillow is going to affect just a lumbar

3   injury, right?

4        A.   No.

5        Q.   A lumbar is lower back.

6        A.   Yes.

7        Q.   So the pillow doesn't affect back pain?

8        A.   Right.

9             MR. PIVNIK:  Marking that as Exhibit 34?

10            MR. HAZOURI:  Yes, sir.

11            (Plaintiff's Exhibit No. 34 marked for

12        identification.)

13  BY MR. HAZOURI:

14        Q.   I've handed you what I've marked as Exhibit

15   34.  This is a form called a studies request, right?

16        A.   Yes.

17        Q.   The purpose of this form is to ask for some

18   diagnostic testing on a patient?

19        A.   That's right.

20        Q.   Right?

21        A.   Yes.

22        Q.   And what this form documents is the x-rays

23   that you prescribe for this patient, as also documented

24   in your typewritten initial report that we just looked

25   at, right?



**Orange Legal**
**800-275-7991**

```
 1       A.   That's right, yes.

 2       Q.   And so you wanted, it looks like, four views

 3   of the cervical spine?

 4       A.   Right.

 5       Q.   Two views of the thoracic?

 6       A.   In the cervical spine I put four views plus

 7   open mouth.

 8       Q.   Open mouth.

 9       A.   Yeah.

10       Q.   I'll tell you, why don't you just interpret

11   for us your handwriting and go right through it.

12       A.   Okay.  The cervical spine, I ordered four

13   views of the cervical spine and open mouth.  Thoracic

14   spine two views.

15       Q.   Slower, slower.

16       A.   Thoracic spine, two views.  Lumbosacral

17   spine, four views.  The left knee, two views.  The left

18   elbow, two views.  The left shoulder, AP, AP.

19       Q.   What does that mean?

20       A.   Anterior/posterior.

21       Q.   Front/back?

22       A.   Anterior posterior.

23       Q.   Is that --

24       A.   (Inaudible) lateral and the upper

25   (inaudible).
```



 1      Q.   So anterior is just one view?

 2      A.   One view because usually with one view you

 3  are able to see there is a fracture or not.

 4      Q.   Okay.  Could you add up the number of views,

 5  then, that you're requesting?

 6      A.   What?

 7      Q.   The number of views, the total number, how

 8  many, please.

 9      A.   Okay.  I recommended for the cervical spine,

10  five views.  For the thoracic spine, two views.  For the

11  lumbar spine, four views.  For the left knee, two views.

12  For the left elbow, two views.  For the shoulder, one

13  view.  That's a total of --

14      Q.   16?

15      A.   6, 12, 14, 17.

16      Q.   17.  So that would be 17 different films,

17  views --

18      A.   Right.

19      Q.   -- of the patient?

20      A.   Yes.

21      Q.   Which you found were medically necessary for

22  your determination on how to treat this patient?

23      A.   Right.

24      Q.   Based on your initial evaluation of the

25  patient?



1       A.   Yes.

2       Q.   And examination?

3       A.   Yes.

4       Q.   And I understand your clinic, Feijoo, P.A.,

5   does not have an x-ray machine?

6       A.   No, we don't.

7       Q.   And so when you do a studies request like

8   this, it's to have the x-ray performed somewhere else?

9       A.   Yeah.  I usually send them to the clinic who

10  sent me the patient.  Many of the clinic have x-ray

11  machine (inaudible) send it to the place (inaudible).

12      Q.   Okay.  And your clinic also does not have an

13  MRI --

14      A.   No.

15      Q.   -- machine, right?  And you wanted to have

16  these x-rays back for your follow-up visit with the

17  patient?

18      A.   Of course.

19      Q.   Do you need a break?  Are you okay?

20      A.   Yeah.

21           (Plaintiff's Exhibit No. 35 marked for

22           identification.)

23  BY MR. HAZOURI:

24      Q.   So I've handed you what's been marked as

25  Exhibit 35 here to your deposition.  Yes?  I'll



 1   represent to you that these are pages that I've taken

 2   out of the CPT 2016 book.  You see up here?

 3        A.   Yes.

 4        Q.   Right here it says CPT?

 5        A.   Yeah.

 6        Q.   Have you seen these pages before?

 7        A.   I don't remember.  Probably.  I don't know.

 8        Q.   You don't have any recollection of seeing

 9   them before?  Okay.

10             THE COURT REPORTER:  Was that a no?

11        A.   No.

12   BY MR. HAZOURI:

13        Q.   Let's go to the second page, if you would,

14   please.  On the left-hand side, about a quarter of the

15   way down, you see 99204?

16        A.   Yes.

17        Q.   Okay.  And I'm just going to read them for

18   the record.  And you understand this is describing the

19   99204 CPT code?

20        A.   Right.

21        Q.   Okay.  "Office or other outpatient visit for

22   the evaluation and management of a new patient, which

23   requires these three key components.  A comprehensive

24   history, a comprehensive examination and medical

25   decision making of moderate complexity."



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                          131

 1              Did I read that correctly?

 2       A.   Yes.

 3       Q.   And you agree that your initial evaluation

 4  of the patient, G.A.E., on --

 5       A.   May 19, 2016.

 6       Q.   -- May 19, 2016, had to comply with these

 7  three requirements in order to properly bill a 99204?

 8       A.   Yes.

 9       Q.   All right.  Could you explain for me,

10  please, how -- use your records, documenting initial

11  examination, how this examination involved a

12  comprehensive history sufficient to bill a 99204?

13       A.   Well, as I said before, when the patient

14  comes, I ask the patient first the symptoms, the

15  complaints.  Second, how did the accident happen.  If

16  she was driving or not, wear the seatbelt, what happened

17  when the accident happened.  Was taken to a hospital?

18  The car she was driving.  If she was seen by paramedics

19  at the site of the accident.  If the car she was driving

20  can be repaired.  How many -- that's probably the most

21  important things I talk to the patient.  Always we talk

22  more because the patient always explain many things

23  about the accident, but that's the most important.

24       Q.   Okay.  Do you have any other explanation of

25  why you believe you took a comprehensive history of this



**Orange Legal**
**800-275-7991**

 1  patient, sufficient to bill a 99204, or is that it?  I

 2  just want to make sure I've got all your reasons.

 3       A.   A comprehensive history also includes past

 4  medical history.  If the patient was involved in

 5  previous accidents, slip-and-falls.  If the patient

 6  underwent any surgical treatments for any reason.  If

 7  the patient has any allergies, toxic habits.  If the

 8  patient has been taking any medication.  If the patient

 9  suffers of any illness.  What type of work does the

10  patient does?  That's basically the history.

11       Q.   Okay.  And so you've now given me a further

12  description of why you believe this was -- the history

13  you took from the patient on May --

14       A.   May 19 --

15       Q.   -- May 19, 2016, was comprehensive.  Any

16  other explanation to add to that?

17       A.   I believe that's the most important.

18       Q.   Okay.  Then next is a comprehensive

19  examination, correct?

20       A.   Yes.

21       Q.   Describe for me, please, all the facts or

22  reasons you believe that you took a comprehensive -- or

23  you performed a comprehensive examination on this

24  patient on May 19, 2016, sufficient for your clinic to

25  bill 99204.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    133

```
 1        A.    Okay.   When I do the examination for the

 2  patient, I do the -- first, like if you were patient and

 3  I see and evaluate his condition.   The patient is well-

 4  knowledged, well-developed, oriented, alert

 5  cooperative --

 6        THE COURT REPORTER:   I'm not getting that.

 7        A.    The patient is well-knowledged, well-

 8  developed, oriented, alert, cooperative.   On the head,

 9  the eyes, ears, nose, mouth and throat.   If they have

10  any visible injuries, the weight, the height.   And then

11  I go to the specific areas of the body where the patient

12  is complaining, beginning from the cervical spine,

13  thoracic spine, lumbosacral spine, upper and lower

14  extremities.   That's the main -- the clinical

15  examination, physical examination, I do.   (Inaudible)

16  examine the tenderness and the range of motion and

17  everything that I describe before.

18        THE COURT REPORTER:   I examine the tender

19        and range of motion?

20        A.    The range of motion.   The --

21  BY MR. HAZOURI:

22        Q.    Tenderness?

23        A.    -- tender symptoms, tenderness of patient,

24  exactly what I said before.   I'm just repeating what I

25  said before.
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              134

 1  BY MR. HAZOURI:

 2       Q.   Okay.  And anything else, any other facts

 3  you want to provide me to support your belief,

 4  understanding, that you performed a comprehensive

 5  examination sufficient to support the billing of a 99204

 6  code?

 7       A.   Well, everything I described before with the

 8  physical findings, the palpation, the physical findings

 9  in accordance to the patient complaints and then

10  objective and subjective findings, diagnostics,

11  diagnostics of the symptoms, the recommendations I give

12  the patient, what we -- before you said small pillow

13  (inaudible) or heavy lifting.  X-rays were done.  The

14  physical therapy recommendation for the patient and I

15  asked the patient to return again.

16            THE COURT REPORTER:  You asked the patient

17       to?

18            MR. HAZOURI:  Return.

19       A.   Return again in one month or before, if

20  needed.

21  BY MR. HAZOURI:

22       Q.   So any other facts you want to give me to

23  support your understanding that on May 19, 2016, you

24  performed a comprehensive examination of this patient,

25  sufficient to properly bill a 99204?



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                      135

1         A.    Everything in my exam, history and

2    recommendations, I believe, is related to that.

3         Q.    Okay.  So yeah, so let me help with that.

4    When I asked you about a comprehensive history and a

5    comprehensive examination, you took your typewritten

6    report and you basically, you know, told us what the

7    typewritten report shows.

8         A.    Yeah.

9         Q.    Documents, right?

10        A.    Right, to remind me what I did for whole

11   exam.

12        Q.    Exactly.  I wouldn't expect you to remember

13   what you did with this patient back in May of 2016.

14        A.    No, of course.

15        Q.    Right?

16        A.    I don't even remember the patient.

17        Q.    So then my question is this.  You would

18   agree that in determining whether there was a

19   comprehensive history that you took and a comprehensive

20   examination that you performed on any patient that's at

21   issue in this case, the best way to determine that is to

22   look at your typewritten report, right?

23        A.    Yes, because what I write there is the basic

24   findings, the primary findings.  That's why I told you

25   before there are many things that are not written



 1   because they -- I don't believe that they need to be

 2   written.

 3          **Q.   So we need to look to your typewritten**

 4   **report to determine whether the requirements of 99204 or**

 5   **99214 or 99215 are met?**

 6          A.   Yes.

 7          **Q.   And then the last component, required**

 8   **component of 99204 is medical decision making of**

 9   **moderate complexity.  Do you see that?**

10          A.   Yes.

11          **Q.   Do you believe -- is it your understanding**

12   **that the decision making that you had to make with this**

13   **patient based on your May 19, 2016**

14   **examination/evaluation was of moderate complexity,**

15   **sufficient to support the proper billing of a 99204?**

16          A.   Yes, because it says here counseling or

17   coordination of care with other physicians, other

18   qualified healthcare professionals or agencies provided

19   they're consistent with the nature of the problem or

20   problems the patient or family needs.  Usually they

21   present the (inaudible) typically 45 minutes and explain

22   face-to-face with a patient and/or family.

23              When I ordered the therapy, when I ordered

24   the x-rays, when I tell the patient everything I told

25   them, I believe that is what it says here.



```
 1          Q.   You believe that's medical decision making
 2   of moderate complexity?
 3          A.   That's right.
 4          Q.   Do you believe that the problems that the
 5   patient presented with on May 19, 2016, were of moderate
 6   to high severity?
 7          A.   I believe so.
 8          Q.   Okay.  And have you now told me all the
 9   reasons you believe that there was -- that you engaged
10   in medical decision making of moderate complexity at
11   this May 19, 2016 office visit sufficient to support
12   Feijoo, P.A.'s billing of 99204?
13          A.   Yes.
14          Q.   Could you turn back for me, please, to the
15   prior page?  And I want to reference you to 99203.  Do
16   you see that?
17          A.   Yes.
18          Q.   And I think your clinic sometimes bills a
19   99203, correct?
20          A.   Sometimes.
21          Q.   All right.  And there, it says -- let me
22   just read it for the record.  "Office or other
23   outpatient visit for the evaluation and management of a
24   new patient which requires these three key components."
25               Do you see that?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                138

```
 1        A.    Yes.

 2        Q.    So it requires all three, right?  Do you see

 3   that?

 4        A.    Yes.

 5        Q.    And it says a detailed history, a detailed

 6   examination and medical decision making of low

 7   complexity.  Right?

 8        A.    Yes.

 9        Q.    Okay.  Could you explain for me your

10   understanding of the difference between a detailed

11   history as described under 99203, and a comprehensive

12   history as described under 99204?

13        A.    Well I believe the first one is very complex

14   because it involves different areas of the body and it's

15   more complex, and the time you spend with the patient

16   and the recommendations you made with the patient.

17              THE COURT REPORTER:  Under?

18        A.    The time you spent with the patient and the

19   recommendations you order in the patient, you advise the

20   patient to do the therapy treatment, the x-rays to be

21   taken, the proper care of --

22   BY MR. HAZOURI:

23        Q.    Well, can I stop you?

24        A.    Yeah.

25        Q.    First of all, you said the first one when
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                               139

```
 1   you answered that.  Are you referring to 99204?

 2        A.   Yes, right.

 3        Q.   As compared to 99203?

 4        A.   Right.

 5        Q.   Okay.  Now, you talked about the

 6   examination, ordering x-rays.  That wasn't my question.

 7   I'm only asking you about the history part.  So let me

 8   just make that very clear, okay?

 9        A.   Yes.

10        Q.   So let me ask you again.  Can you explain to

11   me your understanding, if you have one, of the

12   difference between a detailed history as listed under

13   99203, and a comprehensive history as listed under

14   99204?  What's the difference between those two, only

15   talking about history?

16        A.   Well, the detailed history, I believe,

17   should be more time consuming than this one and more --

18   I usually try to ask the patient, examine the history,

19   make the medical history.  That is more available to us

20   for the patient.

21        Q.   Okay.  Do you have any further explanation

22   of your understanding of the difference between a

23   detailed history as listed under 99203 and a

24   comprehensive history as listed under 99204?

25        A.   I believe the detailed history is less data
```



**Orange Legal**
**800-275-7991**

 1   that you need.

 **2**       Q.   **Data?**

 3        A.   Yes.

 **4**       Q.   **Such as other medical records, x-ray?**

 5        A.   Yeah, simpler than the other one.

 **6**       Q.   **Okay.  So what data did you look at for this**

 **7**  **initial orthopedic evaluation of this patient?**

 8        A.   Well, that's when I asked the patient if --

 9             MR. PIVNIK:  Before you answer that, let me

10        just object.  It's been asked and answered and

11        we've kind of gone over this in great detail over

12        each of these reports.

13             MR. HAZOURI:  You can answer.

14             MR. PIVNIK:  You can go ahead and answer.

15        A.   Okay.  As I told you before, when the

16   patient comes here I ask about past medical history,

17   previous accidents, surgeries, allergies, toxic habits,

18   medical issues, illnesses, allergies.

19   BY MR. HAZOURI:

**20**       Q.   **Let me stop you.  That's the data you were**

**21**  **talking about?  I didn't know if you were talking about**

**22**  **written data, like records or what have you.  You're**

**23**  **talking about either written data, medical records, or**

**24**  **an oral report from the patient, right?**

25        A.   Yes.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                      141

```
 1        Q.   And as I understand your testimony, correct
 2   me if I'm wrong, a detailed history is less data and
 3   information than a comprehensive history?
 4        A.   I believe so.
 5        Q.   Okay.  Can you quantify that, how much less,
 6   what's the difference, are there any specifics there?
 7        A.   I don't -- I don't know exactly how to --
 8   how to explain that.  It's just not as complex as the
 9   other one.
10        Q.   Okay.  Explain for me, please, your best
11   understanding of the difference between a detailed
12   examination, only talking about examinations, a detailed
13   examination as listed under 99203, and a comprehensive
14   examination as listed under 99204.
15        A.   I believe the detailed examination is not as
16   extensive as the one -- the 99204, comprehensive,
17   because it takes more time.  You try to include
18   everything as possible in the physical examination of
19   the patient, even if the symptoms are not presently in
20   that area, as I told you before.
21        Q.   Yeah, well, you don't do everything that's
22   possible.
23        A.   No.
24        Q.   Because you didn't take this patient's blood
25   pressure, right?
```



1      A.   That's right.

2      Q.   Or temperature or pulse.

3      A.   Yeah.

4      Q.   And you didn't test the patient's hand or

5  ankle, right?

6      A.   Yeah.

7      Q.   You may have answered the question.  Do you

8  have any other facts that you want to tell me to support

9  your understanding of the difference between a detailed

10  examination as listed under 99203 and comprehensive

11  examination as listed under 99204?

12      A.   (Inaudible) this evaluation management

13  guides, the detailed examination is a simpler

14  examination.  It takes, typically, 30 minutes.  And the

15  comprehensive examination takes -- it's more extensive

16  and time consuming, typically 45 minutes.

17      Q.   Anything else you want to tell me about the

18  difference?

19      A.   No.

20           THE COURT REPORTER:  One moment.

21           (A brief recess was taken.)

22           THE VIDEOGRAPHER:  Back on the record 11:49.

23  BY MR. HAZOURI:

24      Q.   Okay, sir, and then still working under

25  99203, one of the required components of 99203 is



1  medical decision making of low complexity.  Under 99204,

2  the requirement is medical decision making of moderate

3  complexity.

4          Could you tell me your best understanding of

5  the difference between medical decision making of low

6  complexity as stated under 99203 and medical decision

7  making of moderate complexity as stated in 99204?

8      A.   Might be, for example, if the physical

9  examination requires less maneuvers.  For example, the

10 patient is complaining of pain on the cervical spine,

11 you spend less time examining the lower and upper --

12          THE COURT REPORTER:  I'm sorry.

13     A.   If the patient is complaining of pain the

14 cervical spine, for example, you don't have to spend so

15 much time examining the mid-back, the thoracic spine or

16 the lumbosacral spine or the extremities if their

17 symptoms only refer, for example, to the cervical spine.

18 You examine the other areas but you don't have to spend

19 so much time examining the other areas as you do when

20 the patient, for example in this case, has different

21 symptoms of different areas, cervical spine, thoracic

22 spine, lumbosacral spine, left knee, left shoulder, left

23 elbow.  If you have to examine all the areas where the

24 patient is complaining of symptoms, you have to spend

25 more time, more acute examination, more detailed



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                144

1  examination.  If he only feels pain on the leg, I will

2  examine the whole body with less dedication and less

3  time consuming.

4       Q.

5  BY MR. HAZOURI:

6       Q.   Okay.  Are there any other facts that you

7  want to provide or that you can and want to provide to

8  me regarding your understanding of the difference

9  between medical decision making of low complexity as

10 listed under 99203 and medical decision making of

11 moderate complexity as listed under 99204?

12      A.   I believe that what I said is mostly what I

13 believe is require the different changes in numbers from

14 99203 to 99204.

15      Q.   Anything you want to add?  Anything else?

16      A.   No, I believe that's it.

17      Q.   Okay.  What about if you look at 99202?  It

18 says there, it says, "Office or outpatient visit for the

19 evaluation and management of a new patient which

20 requires these three key components."  And it says, "An

21 expanded problem-focused history and expanded problem-

22 focused examination and straightforward medical decision

23 making."  Correct?

24      A.   Yes.

25      Q.   Do you have an understanding of the



```
 1   difference between an expanded problem-focused history

 2   as stated under 99202 as compared to a detailed history

 3   under 99203 or a comprehensive history as listed in

 4   99204?

 5        A.   I believe on this one, the 33 -- 99202, you

 6   don't have to spend so much time either in the physical

 7   examination of the patient based on what the patient

 8   will tell you.  I believe it's a low level examination.

 9   It's not as complex.  It's a little bit more easily to

10   perform, I believe.

11        Q.   And if I went through the other two, an

12   expanded problem-focused examination and straight

13   forward medical decision making, your answer would be

14   the same?

15        A.   Right.

16        Q.   Less complex, less time?

17        A.   That's right.

18        Q.   Is that what it comes down --

19        A.   Yes.

20        Q.   -- to in your mind?  Okay.

21             MR. HAZOURI:  Let's go off the record,

22        please.

23             THE VIDEOGRAPHER:  Off record 11:53.

24             (A luncheon recess was taken.)

25             THE VIDEOGRAPHER:  On record 12:59.
```



1  BY MR. HAZOURI:

2      Q.   Okay, Doctor, good afternoon.  We've had a

3  lunch break and we're back for an afternoon session.

4  Welcome back.

5          MR. HAZOURI:  Let me mark another exhibit to

6      your deposition.

7          (Plaintiff's Exhibit No. 36 marked for

8      identification.)

9  BY MR. HAZOURI:

10     Q.   So sir, I've handed you what we marked as

11  Exhibit 36 to your deposition.

12     A.   Yes.

13     Q.   Represent to you it's the same patient we've

14  been talking about.  The initial are E.A.G.  Do you see

15  that at the top?

16     A.   Yes.

17     Q.   Okay.  And do you recognize this as a bill

18  that your clinic submitted to State Farm Mutual for a

19  date of service July 5th, 2016?

20     A.   Right.

21     Q.   For this patient, correct?

22     A.   Yes.

23     Q.   And this was a follow-up visit with the

24  patient, right?  And that's what the 99214 charge is

25  for, is the follow-up office visit?  Need you to answer



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                147

```
 1  out loud, like we talked about.  I need you to answer

 2  out loud with a yes or no.

 3        A.    Yes, yes.

 4        Q.    Okay.  Thank you.  Yeah, all the ground

 5  rules are still in place.

 6        A.    Yes.

 7        Q.    Speak loudly, slowly and yes or no's,

 8  please.

 9        A.    Okay.

10        Q.    And so it also has the range of motion

11  testing code on here, 95851, correct?

12        A.    Right.

13        Q.    Okay.

14              (Plaintiff's Exhibit No. 38 marked for

15              identification.)

16  BY MR. HAZOURI:

17        Q.    The next exhibit to your deposition I'm

18  handing you is Exhibit 38.

19        A.    37, no?

20        Q.    Remember I marked 37 incorrectly before?

21        A.    Oh.

22        Q.    So we already have a 37, so we'll be back on

23  track after this one.

24        A.    Okay, okay.

25        Q.    So I've handed you 38, and do you recognize
```



 1   this as your handwritten notes from the initial -- or

 2   I'm sorry, the follow-up evaluation of this same patient

 3   that happened on July 5th, 2016?

 4        A.   That's right.

 5        Q.   Could you turn and -- by the way, if you

 6   look at the Bates numbers down here at the bottom that I

 7   told you about, you can see this one ends in 815, right?

 8   And you turn to the next page and it ends in 816, so

 9   they're consecutive.  You see that?

10        A.   Yes.

11        Q.   Now, up at the top of the second page -- go

12   to second page for me.  It says page 3.  So it skips

13   from the first page to page 3.  Do you know what page 2

14   is supposed to do?

15        A.   Probably what I have to order for the x-

16   rays.

17        Q.   Would it be the range of motion report?

18        A.   Maybe.  Could be.

19             (Plaintiff's Exhibit No. 39 marked for

20             identification.)

21   BY MR. HAZOURI:

22        Q.   Handing you what we've marked as Exhibit 39

23   to your deposition.  Is this the range of motion report

24   that you prepared for the -- oh, here it is.

25             MR. HAZOURI:  What's the date on the one I



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    149

```
 1        handed you guys?

 2             THE WITNESS:  The date on this one, 5/25.

 3             THE COURT REPORTER:  5/12?

 4             THE WITNESS:  Date of the accident.  That's

 5        date of the accident.

 6             MR. HAZOURI:  Okay.

 7   BY MR. HAZOURI:

 8        Q.   Okay, I'm sorry.  The one that I handed you

 9   just now that we marked as 39 is not dated.  Do you see

10   that?

11        A.   Yes.

12        Q.   Okay.  But I think we'll see that this is

13   the range of motion report from the follow-up

14   examination.  We can confirm that in questioning.

15        A.   Should be, yes.

16        Q.   Okay.  So as I asked you, this might be page

17   2, the missing page 2 of your handwritten notes?

18        A.   Should be, it should be.

19        Q.   Okay.  Looking at Exhibit 38, your

20   handwritten notes, let's work through it.  It says

21   follow-up orthopedic examination at the top, right?

22        A.   Right.

23        Q.   And then there's a section that says

24   residual complaints, right?

25        A.   That's right.
```



**Orange Legal**
**800-275-7991**

 1        Q.    This is the section where you document the

 2    patient's subjective complaints that the patient

 3    describes to you, right?

 4        A.    Yes.

 5        Q.    And just while we're here, can you interpret

 6    your writing there?

 7        A.    Cervical spine, thoracic spine, lumbosacral

 8    spine, those are residual complaints, cervical,

 9    thoracic, lumbosacral spine.  And I wrote down there

10    with the therapy feels better.

11        Q.    Right here, with the therapy feels better?

12        A.    Yeah.

13        Q.    So the therapy is making the patient feel

14    better?

15        A.    Right.

16        Q.    Still having residual issues in the

17    cervical, thoracic and lumbar spine?

18        A.    That's right.

19        Q.    All right.  Now, the next section says

20    physical examination, and the first section of the

21    physical examination section is blank.

22        A.    Yes.

23        Q.    Right?

24        A.    Yes.

25        Q.    So you did not perform these elements of a



```
 1   physical examination on this patient during this visit?

 2        A.   On the follow up, no.

 3        Q.   Why not?

 4        A.   Because already using the primary evaluation

 5   the first visit, the initial report.

 6        Q.   Yeah, so let me see if I understand you.

 7   You performed a more extensive physical examination of

 8   these items in the initial office visit with this

 9   patient, and that's included in the initial report?

10        A.   You are right.

11        Q.   Right?  And so because this section, which

12   for example it has the vital signs, it has skull and

13   face, chest, heart and all these, your examination of

14   those items was documented in your typewritten report

15   from the initial evaluation, right?

16        A.   You are right.

17        Q.   So you did not perform this examination of

18   these areas on the patient at this visit?

19        A.   That's right.

20        Q.   Okay.  And then the next section that we get

21   to is a place to put range of motion findings and other

22   information regarding the cervical, thoracic and lumbar

23   spine, correct?

24        A.   Right.

25        Q.   That's the typewritten part?
```



```
 1        A.    Yes.

 2        Q.    Okay.  And then you do have some handwriting

 3   in that typewritten section, correct?

 4        A.    Yes, sir.

 5        Q.    Okay.  Could you -- let's start with the

 6   cervical section.  Could you interpret your handwriting

 7   for us?

 8        A.    On the cervical spine, the physical exam

 9   shows pain on flexion/extension, lateral flexion and

10   rotation to the right and the left.  The range of motion

11   is limited to 30 percent of the normal range, and there

12   is tenderness on palpation (inaudible).

13        Q.    Okay.  So you did range of motion testing on

14   the patient's cervical spine, right, at this visit,

15   correct?

16        A.    Yes.

17        Q.    And let me just ask a broader question to

18   try and knock it all out.  You did range of motion

19   testing on the cervical, thoracic and lumbar spine with

20   this patient at this visit?

21        A.    Yes, sir.

22        Q.    This follow-up visit, right?

23        A.    Yes.

24        Q.    And the way that you performed that range of

25   motion testing on the patient, would it have been the
```



 1    same as the manner in which you performed it in your

 2    initial evaluation which you've already described for

 3    us?

 4         A.    It's similar evaluation, yes, sir.

 5         Q.    Okay.  You said similar.  Are there any

 6    differences?

 7         A.    Well, no, it really is the same.

 8         Q.    Okay.  So what you described earlier in your

 9    deposition about how you do it in your office, that's

10    how you did it at this visit?

11         A.    Right.

12         Q.    Okay.  And as you said, you documented a 30

13    percent restriction in the range of motion of this

14    patient's cervical spine?

15         A.    Cervical spine, right.

16         Q.    And as we said, you look at Exhibit 39, you

17    also had 30 percent restriction on the range of motion

18    in the cervical spine?

19         A.    Right.

20         Q.    So you've written the 30 percent result of

21    the range of motion testing that you observed in both

22    your written follow-up orthopedic evaluation and the

23    separation range of motion report?

24         A.    Right.

25         Q.    Right?  Separate piece of paper here.  And



Orange Legal
800-275-7991

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                           154

1   then could you interpret for us the thoracic findings?

2        A.   Okay.  On the thoracic spine, there is pain

3   on flexion/extension (inaudible) rotation to the right

4   and left.  The limit of range of motion is 50 percent,

5   and there is tenderness on palpation also on the spinal

6   muscles.

7        Q.   So there was a limitation of 50 percent on

8   range of motion --

9        A.   Yes, sir.

10       Q.   Let me finish.  On the thoracic spine?

11       A.   Right.

12       Q.   Go ahead and while we're here, just to keep

13  moving, go ahead if you would, please, and interpret

14  your findings under the lumbar spine section.

15       A.   Okay.  On the lumbar spine, there is pain on

16  flexion/extension (inaudible) --

17            THE COURT REPORTER:  I'm sorry.

18            MR. HAZOURI:  You really got to slow down.

19       She's doing a good job but you're going to kill

20       her.

21            THE WITNESS:  I'm sorry.  Just remind me,

22       please.

23            MR. HAZOURI:  Slow and loud.

24       A.   The lumbosacral spine, there is pain on

25  flexion/extension, lateral flexion and rotation to the



1  right and left.  Tenderness on palpation of the

2  paraspinal muscles and the range of motion is limited to

3  50 percent of the normal range.

4  BY MR. HAZOURI:

5       Q.   Okay.  So at both the thoracic and lumbar

6  spines, you observed a 50 percent limitation on range of

7  motion at this office visit on July 5th, 2016, right?

8       A.   July 5th, 2016.

9       Q.   And those same range of motion findings from

10  your testing that you've just interpreted in your

11  follow-up orthopedic evaluation report are documented in

12  the range of motion report, right?

13       A.   Right.  That's right.

14       Q.   Because it says 50 percent, right?

15       A.   Right.

16       Q.   In the lumbosacral region, or in the section

17  for the lumbosacral region, and then you circled both

18  thoracic and lumbar?

19       A.   Thoracolumbar spine, yeah.

20       Q.   And you circled both sides?

21       A.   That's right.

22       Q.   Right?  So that documents the same finding

23  as the range of motion test?

24       A.   Right.

25       Q.   Right?



 1      A.   Yes.

 2      Q.   Okay.  And then at this point, the patient

 3  is -- well, strike that.

 4           On the next page, could you tell us --

 5  interpret your note there under diagnosis?

 6      A.   Diagnosis, cervical spine, post-traumatic

 7  sprain -- I put cervical spine but I know it's post-

 8  trauma sprain.  Thoracic --

 9           THE COURT REPORTER:  What was that?  What

10      kind of sprain?

11      A.   Cervical spine post-traumatic sprain.

12  Thoracic spine post-traumatic sprain.  Lumbosacral spine

13  post-traumatic sprain.

14  BY MR. HAZOURI:

15      Q.   Okay.  Did you document the improvement in

16  the patient's shoulder, elbow and knee in this report?

17      A.   No, it's negative.  When I don't write

18  anything it's normal.

19      Q.   Okay.

20      A.   If I find something I write it down.

21      Q.   So I want to make sure I understand.  Since

22  you didn't write any problems for the patient in their

23  knee or elbow or shoulder, you interpret that to mean

24  that the patient -- those problems had healed and gotten

25  better?



 1       A.   Disappeared.

 2       **Q.   Disappeared.**

 3       A.   There were not present anymore so the range

 4  of motion normal, everything is normal.

 5       **Q.   Okay.  And so going back to your range of**

 6  **motion report --**

 7       A.   Yes.

 8       **Q.   -- with the straight lines.**

 9       A.   Yes.

10       **Q.   Does that mean you did not test those areas**

11  **because there was no indication?**

12       A.   They were normal, yes.

13       **Q.   Okay.  Well, you said they were normal.  So**

14  **again, this goes back to my question.  Did you test them**

15  **and find that they were normal or did you just not test**

16  **them because there was no indicated need to test them?**

17       A.   Most of the time I test them, I do the range

18  of motion evaluation and if everything is normal, it's

19  negative, I don't write anything.  Most of the time

20  that's what I do.

21       **Q.   Well --**

22       A.   It was negative.  That's why I don't write

23  anything.

24       **Q.   So did you test this patient's ankle?**

25       A.   Well, the ankle I don't know, but the areas



 1   where he have pain before I -- I'm sure I tested them.

 2        Q.   Okay, so let me help you here.  What I think

 3   what you're saying is you probably would have tested the

 4   shoulder, the elbow and the knee based on the prior

 5   complaints?

 6        A.   That's right.

 7        Q.   Okay.  And so the lines there would mean

 8   that it was negative?

 9        A.   Negative.

10        Q.   You don't think you tested the patient's

11   ankle or hand or hip because there was no indication?

12        A.   Right.

13        Q.   No reason to do those tests?

14        A.   No.

15        Q.   Okay.

16             (Plaintiff's Exhibit No. 40 marked for

17             identification.)

18   BY MR. HAZOURI:

19        Q.   I'm handing you what's been marked as

20   Exhibit 40 to your deposition.

21             Do you recognize this as the typewritten

22   follow-up orthopedic evaluation for your follow-up

23   office visit with this patient on July 5th, 2016?

24        A.   Yes, sir.

25        Q.   Okay.  And under the physical examination



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                     159

```
 1   section, cervical spine, it shows limited range of

 2   motion of 30 percent of the normal range, correct?

 3        A.   Correct.

 4        Q.   Thoracic spine, it shows limited range of

 5   motion to 50 percent of the normal range?

 6        A.   Yes.

 7        Q.   And lumbosacral spine shows limited range of

 8   motion to 50 percent of the normal range, correct?

 9        A.   That's right.

10        Q.   So those are the same range of motion

11   findings resulting from the same range of motion testing

12   that are in both the handwritten report of this office

13   visit and range of motion report?

14        A.   That's right.

15        Q.   Performed on the patient at the -- those

16   range of motion testings were performed on the patient

17   at the office visit on July 5th, 2016?

18        A.   Right.

19        Q.   In the manner that you previously described?

20        A.   Yes.

21        Q.   And then if we go to upper extremities, as

22   you previously testified to, it says abduction/adduction

23   internal and external rotations are normal in both

24   shoulders and arms, correct?

25        A.   Yes.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                 160

```
 1        Q.   So that had gotten better, as you stated?

 2        A.   Correct.

 3        Q.   Right?  And then lower extremities,

 4   flexion/extension both hips -- so it appears you test

 5   the hips -- and knees are normal.  Let's stop there.  So

 6   the knees had gotten better, too?

 7        A.   Yes.

 8        Q.   Right?  As you previously testified?

 9        A.   Yes.

10        Q.   Right?  And then you say with Lasegue and

11   Patrick Signs bilaterally being negative.

12        A.   That's right.

13        Q.   Right?  Now, feel free to reference your

14   report if you need to from the initial.  When we talked

15   about it before our lunch break, the Lasegue's Sign was

16   positive for radiculitis in the first visit?

17        A.   Yes.

18        Q.   Right?  And you'll remember I asked you,

19   okay, you had a positive Lasegue Sign and you diagnosed

20   radiculitis but you didn't order an MRI; you remember I

21   asked you about that?

22        A.   Yes, that's right.

23        Q.   And your answer was yes, because the

24   patient's radiculitis might get better with treatment

25   and so I wanted to wait and see if it got better before
```



 1  I ordered the MRI.  Right?

 2       A.   Yes.

 3       Q.   With conservative physical therapy.

 4       A.   That's right.

 5       Q.   Right?  And that is what happened, right?

 6       A.   Yes.

 7       Q.   If we could go to the second page with your

 8  recommendations, on page 40.  Oh wait, I'm sorry, before

 9  you do that.  So the Lasegue Sign and -- what's the

10  Patrick test, real quick?

11       A.   Patrick is also called FABER Patrick.  It's

12  a test to test if there is pain on the hips.  Because

13  many times when you have lumbosacral pain, the pain goes

14  down to the hips and when you have a lesion of the hip,

15  that FABER Patrick Sign is positive.

16       Q.   Okay.  But it was negative in this case?

17       A.   Was negative.

18       Q.   And so then we go to your diagnosis and

19  you've got cervical spine sprain, which you've

20  documented, correct?

21       A.   Yes.

22       Q.   You've got thoracic spine sprain, correct?

23       A.   Yes.

24       Q.   And you've got lumbosacral spine sprain,

25  correct?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    162

```
 1       A.    Yes.

 2       Q.    The finding of radiculitis is gone?

 3       A.    Yes.

 4       Q.    Right?  Based on the negative Lasegue's and

 5   Patrick's test?

 6       A.    Right.

 7       Q.    Right?  Okay.  And if we go to the next

 8   page, bullet item 5 said, I ordered open MRI.  I don't

 9   know if you mean an MRI.  But it says you ordered an MRI

10   of the cervical and lumbosacral spines to rule out disc

11   herniation.  Do you see that?

12       A.    Yes.

13       Q.    Okay.  Can you point me to, in any of the

14   records for this visit that we've looked at, the

15   findings that indicated the need to -- let's start with

16   the lumbosacral spine -- the findings that indicated the

17   need for an MRI to rule out disc herniation in the

18   lumbosacral spine?

19       A.    Well, the patient after almost -- let me

20   see -- two months of therapy, still complained of pain

21   on the cervical spine, the lumbosacral spine.  And with

22   the previous finding of lumbosacral radiculitis, I

23   wanted to be sure that there was no disc herniation in

24   these areas.

25       Q.    Okay.  But let's walk through that.  Let's
```



 1    just stick with the lumbosacral spine.  You diagnosed

 2    radiculitis in this patient at the initial office visit,

 3    based on the Lasegue's positive test, right?

 4         A.    Right.

 5         Q.    And then you told me, well, you didn't order

 6    an MRI at that time because you wanted to see if the

 7    condition with the lumbar spine would heal with

 8    treatment.

 9         A.    Right.

10         Q.    Right?  Because it could be inflamed tissue,

11    not a herniation that was causing the positive Lasegue

12    Sign and the radiculitis, right?

13         A.    Right.

14         Q.    And the indication from your records of the

15    follow-up visit, May 12, 2016, is that is exactly what

16    happened, that the patient healed in the lumbosacral

17    spine because they had no more signs of radiculitis,

18    right?

19              MR. PIVNIK:  Objection, form,

20         mischaracterizes testimony

21    BY MR. HAZOURI:

22         Q.    Am I right?

23         A.    Yes.  Both --

24         Q.    Okay, but one second.

25              MR. PIVNIK:  Let him answer the question.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                           164

 1  BY MR. HAZOURI:

 2      Q.   Go ahead.

 3      A.   Well, the patient, as I told you before, was

 4  still complaining after two months of therapy, of pain

 5  in the cervical region and the lumbosacral region.

 6      Q.   Okay.

 7      A.   Many cases, you might have the bulging disc

 8  or the disc herniation, there is (inaudible) compression

 9  because of the symptoms before have improved with the

10  therapy, but that might be a still possibility.  So

11  being two months with the treatment and having that

12  previous thought in my mind, I thought it was advised to

13  be sure to order the MRI.

14      Q.   Okay.  So then are you now telling me that

15  anytime a patient complains of cervical or lumbar pain

16  for a period of two months, you're going to prescribe an

17  MRI?

18          MR. PIVNIK:  Objection, argumentative.

19      A.   Depend on the situation of the patient.

20  BY MR. HAZOURI:

21      Q.   Okay.

22      A.   Not everything is the same.

23      Q.   Okay.  Well, then point to me please what

24  was this patient's condition who, that after two months

25  they were still having cervical or lumbar pain that



 1  caused you to order the MRI for that reason?

 2      A.   Okay.  The lumbosacral radiculitis

 3  disappeared, the Lasegue Sign was negative, the Patrick

 4  Sign was negative, but she still have pain on the

 5  cervical spine.  Mostly it was the same limited range of

 6  motion.  The lumbosacral spine also was having pain and

 7  all the different range of motion than before.  The

 8  range of motion improved 20 percent, but still was

 9  limited to 50 percent.  So that's why I thought it was

10  advisable before I discharge this patient, to get an

11  MRI, too.

12      **Q.   Okay.  And so if a patient -- if you're**

13  **treating a patient and they come back to you a month**

14  **after the initial visit and they've complained of**

15  **cervical or neck pain and lower back pain and limited**

16  **range of motion like this patient had after, you know,**

17  **two months, you're going to order an MRI for that**

18  **patient?**

19          MR. PIVNIK:  Objection, argumentative.

20      A.   Possibly, possibly.

21  BY MR. HAZOURI:

22      **Q.   Well --**

23      A.   Possibly.  Not every patient, not every

24  situation is the same.

25          THE COURT REPORTER:  Repeat that.  I'm



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                166

```
 1        sorry.

 2        A.   Not every situation, not every patient has

 3   the same characteristics.  It depends on what I find and

 4   what I can do.

 5             MR. PIVNIK:  Dr. Feijoo, let me just say.

 6        If I start to object, let me finish.  It'll make

 7        it easier for her.

 8             THE WITNESS:  Okay.

 9             MR. HAZOURI:  If he starts talking, you stop

10        for a second.  Okay?

11   BY MR. HAZOURI:

12        Q.   Okay.  So let's go back over this then.  You

13   did diagnose the patient with a cervical spine sprain

14   and a lumbar spine sprain, correct?

15        A.   Right.

16        Q.   MRIs are not used to diagnose sprains,

17   right?

18        A.   No.

19        Q.   Okay.  Symptoms of cervical spine sprain are

20   pain in the cervical spine, the neck and limited range

21   of motion, correct?

22        A.   Right.

23        Q.   So the conditions that you saw in this

24   patient two months later were entirely consistent with a

25   cervical sprain, correct?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                167

1      A.    Yes.

2      Q.    And then the lumbosacral spine sprain, the

3  symptoms of that are pain in the lower back and limited

4  range of motion in the lower back, correct?

5      A.    Right.

6      Q.    And the symptoms you saw in this patient on

7  this May -- I'm sorry, July 5th, 2016, office visit were

8  those exact two things, pain in the lower back and

9  limited range of motion in the lower back which is

10 entirely consistent with a lumbar spine sprain, right?

11     A.    Right.

12     Q.    So everything you're observing with this

13 patient upon testing the patient and examining the

14 patient and talking to the patient, is consistent with a

15 cervical spine sprain and lumbar spine sprain, correct?

16     A.    Right.

17     Q.    Okay.  So given that everything that you've

18 heard from the patient subjectively and observed with

19 the patient objectively in your testing, showed that

20 this patient had a cervical spine sprain and a

21 lumbosacral spine sprain that was causing the symptoms

22 as of July 5th, 2016, given that that was all consistent

23 with a sprain, what was it that indicated the need to

24 get an MRI, which isn't used to diagnose the sprain?

25          MR. PIVNIK:  Objection, form.



Orange Legal
800-275-7991

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

168

```
 1        A.   No, I didn't order the MRI to diagnose a
 2   sprain.  As I told you before, I have in my mind a
 3   suspicion that it might be a bulging disc or a disc
 4   herniation that was causing after two months of therapy,
 5   still having limited range of motion to the same amount
 6   as the initial visit for the cervical spine and for the
 7   lumbosacral spine.  To reduce only 20 percent, was
 8   having still 50 percent of normal range, still painful.
 9   Many times when you have a bulging disc or a disc
10   herniation, with the treatment you feel better.
11   Sometimes the Lasegue Sign disappear, the radiculitis
12   disappear.  There are many patients with disc herniation
13   but they don't have any symptoms at all.  But I was
14   treating this patient.  I wanted to be sure that she
15   didn't have a disc herniation.  So the best way to prove
16   it, the only way I can prove it is to do an MRI.
17        Q.   But it's fair to say there's not a single
18   finding in this report that indicates a disc herniation?
19        A.   The -- no, but it's suspicious, as I told
20   you before, the suspicion might be, might be.
21        Q.   Okay.
22        A.   There's a possibility.
23        Q.   It was --
24        A.   After two months of therapy, still having
25   limitation of range of motion for two months, of the
```



 1  cervical spine of the same amount it was in the first

 2  visit.  And the lumbosacral spine just reducing 20

 3  percent to 50 percent.  So a sprain usually goes faster,

 4  relief of the symptoms, so that's why I thought there

 5  might be the bulging disc or disc herniation.  Not only

 6  a disc herniation.  Bulging disc can cause you severe

 7  symptoms also.

 8          THE COURT REPORTER:  Wait.  Not only does

 9      herniation, but?

10      A.   Bulging disc can cause also these severe

11  symptoms of pain and limited range of motion.

12  BY MR. HAZOURI:

13      **Q.   Okay.  And so you thought this patient's**

14  **sprain, you would have expected if it was just a sprain,**

15  **to heal much quicker than it was healing?**

16      A.   Usually --

17      **Q.   After a month?**

18      A.   Usually a sprain heals quickly.  Sometimes

19  not.  Depends, because some sprains have lesions on the

20  muscle and the fascia.  There is many lesions of the --

21      **Q.   Injury.**

22          THE COURT REPORTER:  Of the fascia?

23      A.   Some sprains, you have lesions or -- how do

24  you say?

25  BY MR. HAZOURI:



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    170

1       Q.    Injuries, injuries.

2       A.    Injuries of the muscle and the fascia,

3   fascia.  And they last longer.  The symptoms do get

4   relief with the treatment.  So there are sprains that

5   are (inaudible) sprains that the range of motion is very

6   limited, too.  Even if they don't have a disc herniation

7   or bulging disc.  It depends, as I told you --

8       Q.    Right.

9       A.    -- not every patient is the same.

10      Q.    And so that could have been this patient.

11  She could have had a sprain that was causing --

12      A.    For that -- for that -- the only way to be

13  sure is to get the MRI.

14      Q.    Well, then isn't it fair to -- if that's the

15  case, then if a patient is coming to you after a month

16  and still -- you've diagnosed him with a cervical and

17  lumbar sprain/strain and they come back in a month and

18  they still had pain and they still had limited range of

19  motion, you're going to order an MRI for all the reasons

20  you just described?

21           MR. PIVNIK:  Objection, asked and answered.

22       Asked and answered four times now and

23       mischaracterizes testimony.  Two months.

24  BY MR. HAZOURI:

25      Q.    Go ahead.



**Orange Legal**
**800-275-7991**

1       A.    Sometimes I order it.  Sometimes --

2       Q.    Okay.

3       A.    Because listen, every patient is different.

4       Q.    Sure.

5       A.    Medicine is not mathematics.  A patient

6   reacts different to a same injury to another patient.

7   For example, you have a child with, let's say measles.

8   He's playing outside, there's nothing happening.

9   Another child who's the same age, dies.  There's a

10  difference in the same condition.

11      Q.    I understand.  Okay, so if this patient had

12  come back with everything the same but reporting 20

13  percent limited range of motion in the cervical spine

14  and --

15      A.    30 percent.

16      Q.    Well, I'm saying if.  If the patient --

17      A.    Oh.

18      Q.    -- had come back and told you -- and you

19  tested him and they had 20 percent limitation in the

20  cervical spine and 30 percent limitation in the

21  lumbosacral spine, would you have ordered an MRI?

22      A.    Probably.

23            MR. PIVNIK:  Objection to form.

24            THE COURT REPORTER:  Hold on.  What was your

25      response?



**Orange Legal**
**800-275-7991**

1          MR. HAZOURI:  Probably.

2          THE COURT REPORTER:  Probably, thanks.

3     Continue.

4  BY MR. HAZOURI:

5     Q.    Okay.  What about 10 percent of the normal

6  range in the cervical spine and 20 percent in the

7  lumbar?  Do you order an MRI for this patient?

8     A.    Maybe not.  I have many patient who comes to

9  the visits and I don't order an MRI because they have

10  improved substantially.  So there is different ways to

11  assess ordering of the MRI.

12          (Plaintiff's Exhibit No. 41 marked for

13          identification.)

14  BY MR. HAZOURI:

15     Q.    And then going to 41.  Is this your

16  prescription for the MRI of the cervical spine and the

17  lumbar spine of the patient?

18     A.    Yes.

19     Q.    Okay.  And then if we go -- well, let's

20  stick with the diagnosis.  I don't see any reference to

21  the x-rays that you reviewed, either in the diagnosis

22  section or anywhere in this report, do you?

23     A.    No.

24     Q.    Okay.  Do you need to look at your

25  handwritten report, too?  I want you to see if anywhere



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                        173

```
 1   in this follow-up visit you documented reviewing the x-

 2   rays that you prescribed.

 3        A.   No.

 4        Q.   No?  Okay, so let's go back to your

 5   testimony on that.  You ordered 17 views of x-rays

 6   because you thought it was necessary to decide -- to

 7   make medical and treatment decisions for this patient at

 8   the initial evaluation, right?

 9        A.   Yes.

10        Q.   That was your decision making at that time.

11        A.   That's correct.

12        Q.   And you expected to have the x-rays at this

13   follow-up evaluation that happened on July 5th, 2016,

14   when you ordered them?

15        A.   Yes.

16        Q.   All right.  And you testified that you

17   needed the x-rays to evaluate the patient and determine

18   the treatment plan?

19        A.   Right.

20        Q.   Okay.  But you didn't have the x-rays on

21   July 5th, 2016?

22        A.   Right.

23        Q.   Is that of concern to you?

24        A.   Yes.

25        Q.   Do your records document that you asked the
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                           174

 1  patient about it or documented your concern?

 2       A.   When I see the patient, I usually ask if the

 3  x-rays were done.  If they were done, if he was informed

 4  about the reports.  I don't write that -- or usually I

 5  do that with the patient.  So if they have not told me

 6  anything about the report, I ask for the report to be

 7  sent to my office.  Many times I have to ask them and

 8  they fax it.

 9       Q.   You wouldn't rely on the patient's

10  explanation?

11       A.   No, no.  Many times they told me you have

12  (inaudible).  Sometimes they tell me.

13       Q.   Okay.  But my point is, I asked you if you

14  would have had conversations with the patient about the

15  missing x-rays.  You said sometimes I do, and they'll

16  say, yes, I've got an x-ray and it said this, this or

17  that.  My point is, you wouldn't rely on the patient's

18  description --

19       A.   No.

20       Q.   You wouldn't rely on the patient's

21  description of the x-ray results to make medical

22  decisions?

23       A.   Right.  No, I wouldn't.

24       Q.   Going to recommendations.  You said the

25  patient was highly recommended to continue with the



**Orange Legal**
**800-275-7991**

 1  physiotherapy treatment on the affected areas, correct?

 2  Number 4.

 3        A.   Yes.

 4        Q.   So you recommended that this patient

 5  continue with the current treatment plan, even though

 6  you didn't have the x-rays?

 7        A.   Right.

 8        Q.   And even though you hadn't gotten the x-rays

 9  that you felt were necessary for your continuing

10  evaluation of this patient, you went ahead and ordered

11  an MRI, another test, right?  Correct?

12        A.   Right.  Ordered the MRI, yes.

13        Q.   And then you said return to the office in

14  one month for further evaluation and treatment, if

15  necessary, correct?

16        A.   Right.

17        Q.   Did you expect to see the patient in a

18  month?

19        A.   Yes.

20        Q.   It's fair to say as far as the missing x-

21  rays go, you don't recall what discussions you had with

22  this patient?

23        A.   No, but I base that on my experience.  Every

24  time I don't see x-rays I ask the patient if he or she

25  was informed about the reports, and then I ask the -- my



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              176

1   secretary to call the office or the x-ray department to

2   send me the reports and the CD, if possible.

3        **Q.   Right, so your testimony is based on your**

4   **standard practice --**

5        A.   Right.

6        **Q.   -- not your recollection of this visit?**

7        A.   You're right.

8        **Q.   You know, we've used the term and we all use**

9   **it a lot and know it.  Maybe not everybody does, so I'm**

10  **just going to ask you to describe it.  You use the term**

11  **herniation.**

12       A.   Yes.

13       **Q.   Can you describe for us what a herniation**

14  **is?**

15       A.   Okay.  Well, you know, the vertebral bodies

16  are separated one another by intervertebral disc.

17           THE COURT REPORTER:  The radical bodies?

18       A.   The vertebral bodies of the spine, cervical,

19  thoracic, lumbosacral spine.  Each vertebral body

20  separate by a disc.  The (inaudible) cartilage

21  (inaudible) in the center is what we call the nucleus

22  pulposus.  It's like a gel.

23           THE COURT REPORTER:  Nucleus proposal?

24       A.   Nucleus, n-u-c-l-e-u-s, nucleus, that's

25  Latin.  Pulposus, p-u-l-p-o-s-u-s, that's Latin.  It has



1  the ability to avoid the friction with one bone with the

2  other.  If there was no disc layering, this, when you

3  move, you (inaudible) one side -- any movement would be

4  bone to bone.  The bone would be destroyed very soon

5  (inaudible).  Besides the nucleus pulposus, which is

6  like a gel in the center of a disc (inaudible) when you

7  jog or run, that the vertebral bodies hit another.  It's

8  like a caution to prevent the destruction of the bone.

9          So when you have a disc herniation, the

10  sudden motion of you head or your spine forward like

11  this, the disc that is in between the two vertebral bone

12  gets compressed with such force, and many times the

13  periphery breaks and then the nucleus pulposus that is

14  like a jelly, goes out.  When it goes out, that's a

15  hernia.  The hernia then --

16          THE COURT REPORTER:  Did you say the

17      periphery breaks?

18          MR. HAZOURI:  Yeah, periphery.

19          THE COURT REPORTER:  Okay, continue.

20      A.   The periphery, meaning the annulus fibrosus,

21  called annulus fibrosus, breaks, the nucleus pulposus

22  goes out.  Because it's like a gel; it's compression.

23  It's like when you take the cap from a toothbrush cream

24  and you push it.  It goes out.  It's the same.  It goes

25  out and then compresses, many times the nerve roots in



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO
                                                                    178

 1  that area.  In the lumbosacral spine, you have

 2  compression of the nerve roots in the lumbosacral

 3  region.  Those are the nerves that comprise most of the

 4  sciatic nerve.  The pain can go down to the lower back,

 5  to the front, to the one leg or the other, to both legs.

 6  That's why the Lasegue Sign is positive in these cases.

 7  When you're having the cervical spine, pain in the neck

 8  radiated to the upper back, the thoracic spine,

 9  sometimes to the shoulders, to the arms.  You might find

10  also --

11       Q.   You know, Doctor --

12            MR. PIVNIK:  I think you answered his

13       question.

14            MR. HAZOURI:  Yeah.  I don't mind you --

15       yeah, let's stop.

16            MR. PIVNIK:  It is interesting because I

17       haven't heard that --

18            MR. HAZOURI:  Yeah, thank you for the

19       explanation.

20            THE WITNESS:  Okay.

21  BY MR. HAZOURI:

22       Q.   Let me help summarize.

23       A.   Yes, yes.

24       Q.   A herniation is when a disc, which separates

25  the bony vertebrae, ruptures and the gel that's inside



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    179

 1  of it, as you described, comes outside but then presses

 2  on a nerve?

 3        A.    Yes.

 4        Q.    Right?

 5        A.    Yes.

 6        Q.    And you would agree with me, sir, would you

 7  not, that there are no symptoms of this patient having a

 8  herniation in either her neck or her lower back on July

 9  5th, 2016?

10        A.    Typical findings or symptoms of a

11  herniation, she doesn't have.

12        Q.    She does not have?

13        A.    Typical.

14        Q.    Right.

15        A.    But many times, I have seen a patient with

16  disc herniations, practical with no symptoms.  And when

17  you have an MRI, there is a disc herniation.

18        Q.    Sure, but she has no symptoms?

19        A.    No symptoms.

20        Q.    All right.

21        A.    That's what I told you before.  That with

22  the range of motion, the pain on the neck and the

23  lumbosacral spine.

24        Q.    Right, right.  But that's not -- pain in the

25  neck and the --



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    180

```
 1      A.   It's --
 2      Q.   Pain in the neck and the lower back,
 3 standing alone, muscle pain is not a classic symptoms of
 4 a herniation?
 5      A.   It's not what we call pathognomonic.
 6 Pathognomonic in medicine means when you have plus sign
 7 it's typically because you have that lesion there.  For
 8 example, the Patrick Sign, as I told you before, is
 9 pathognomonic of lesion on the hip.  When you have the
10 sign positive, you have lesion of the hip.
11      Q.   Injury.
12      A.   Pathognomonic.
13      Q.   You mean injury?
14      A.   Injury of the hip, yes.
15      Q.   Right.
16      A.   It's not typically lesion of a disc
17 herniation but might be a disc herniation.  Atypical
18 symptoms.
19      Q.   All right.  So --
20      A.   As I told you before, medicine always has
21 not the same findings on a patient, different patients.
22 Depending on the condition, the physical condition, the
23 weight, the activities.  If you are active and do -- and
24 you are maintaining your proper weight, you will heal
25 better than someone  who is obese and never walks.  You
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                181

 1  know?

 2       Q.    Sure.

 3       A.    It's quite a difference.

 4       Q.    Okay.  So could you please pull out Exhibit

 5  35, which was the pages of the CPT book that I gave you?

 6       A.    35, yes.

 7       Q.    And turn to the second page -- or actually

 8  the third page of the exhibit, please.

 9       A.    Third page.

10       Q.    99214, am I right?

11       A.    Yes.

12       Q.    Okay.  Is that right?

13       A.    Yes, that's it, that's it, 99214.

14       Q.    Okay, good.  All right.  So let's look at

15  your follow-up orthopedic evaluation, typewritten, and

16  you can look at the handwritten too, if you'd like, if

17  it helps you.  But as I see it, the patient reports pain

18  in the cervical region, upper and lower back, and the

19  history that you take is the patient has been receiving

20  physiotherapy and refers is feeling better but still

21  complaining of pain on the aforementioned areas.  Right?

22       A.    Yes.

23       Q.    Is there any other history that you took in

24  this follow-up evaluation on July 5th, 2016?  Just

25  history, not exam, nothing else.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    182

```
 1        A.   No, I believe that is it, what is written

 2   there.

 3        Q.   That's the entirety of the history?

 4        A.   Yes.

 5        Q.   Okay.  Under 99214, there needs to be two of

 6   the three items listed there, right?

 7        A.   Yeah.

 8        Q.   The first one is a detailed history, right?

 9        A.   Yes.

10        Q.   You would agree with me that the history

11   reflected in your records from July 5th, 2016, with the

12   patient is not a detailed history?

13        A.   Well, it depends because I detailed whatever

14   the patient told me that he has.  Those are the symptoms

15   he had before.

16        Q.   But this is just simply not a detailed

17   history.  It's two sentences.  Wouldn't you agree?

18        A.   Well, this is the history the patient gave.

19        Q.   Well, I understand, Doctor.

20        A.   Yes.

21        Q.   I'm just trying to get to the -- I'm not

22   saying you did anything wrong by taking the history.

23   I'm just talking about 99214, which is what your clinic

24   billed for this service.  This is not a detailed

25   history; you would agree, right?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    183

 1                 MR. PIVNIK:  Objection, argumentative.

 2   BY MR. HAZOURI:

 3        Q.   Do you agree or not agree?

 4        A.   I do not know about that because I don't

 5   understand the code.

 6        Q.   Okay.  So if I understand your answer, and

 7   correct me if you're wrong, you don't know whether your

 8   records from July 5th, 2016, reflect a detailed history?

 9   Is that your answer?

10        A.   Yes.

11        Q.   Okay.  And then a detailed examination.

12   Okay?  As I can tell from your records, you examined

13   four areas of the patient: Cervical spine, the thoracic

14   spine, the lumbosacral spine and then the upper

15   extremities which included the shoulders and arms, and

16   the lower extremities which included the hips and the

17   knees, correct?

18        A.   Right.

19        Q.   Do you believe that is a detailed

20   examination, as listed under 99214?

21        A.   I believe so.

22        Q.   Okay.  Why do you believe that?

23        A.   Because I had to examine the areas of the

24   patient who was complaining of the pain before, to make

25   sure that the areas that were cited on this visit by the



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                184

 1  patient were still -- there's no pain.  So I have to do

 2  the exam, cervical, thoracic, lumbosacral, upper and

 3  lower extremities.

 4      Q.  Okay.  So could you turn to -- back one page

 5  to the 99213?  Down at the bottom right-hand corner; do

 6  you see that, sir?

 7      A.  Yes.

 8      Q.  For a 99213, you have to have two of the

 9  three components, and one of them is an expanded

10  problem-focused examination.  Do you see that?

11      A.  Yes.

12      Q.  Okay.  How do you know that the examination

13  that you performed on this patient on July 5th, 2016, as

14  documented by your records is not an expanded problem-

15  focused examination?

16      A.  Probably because of the examination

17  performed on the patient and the complexity of the exam

18  and the amount of time I spent with the patient.

19      Q.  Okay.  So what is the level of complexity

20  for an expanded problem-focused examination for 99213?

21  You said the one that you did was more complex.

22      A.  Yes.

23      Q.  That's why it's not an expanded problem-

24  focused examination.  So based on that answer, I'm

25  wondering what your understanding of what's the level of



Orange Legal
800-275-7991

 1  complexity for an expanded problem-focused examination?

 2      A.   Well, it's not complex when you don't have

 3  to perform so many tests and so many examination on

 4  range of motion.

 5           THE COURT REPORTER:  What was that?

 6      A.   When you don't have to do so many tests or

 7  range of motion examination, it's not as complex as the

 8  other one.  And of course, you spend less time doing

 9  this than the other one.

10  BY MR. HAZOURI:

11      Q.   Anything else you want to add to that?

12      A.   No.

13      Q.   Is that your complete answer?

14      A.   I believe that is.

15      Q.   Okay.  If this patient had just come in and

16  you had just tested his or her cervical, thoracic and

17  lumbosacral spine at this visit July 5th, 2016, so you

18  didn't test the upper or lower extremities, would that

19  take it down to an expanded problem-focused examination?

20      A.   Probably.

21      Q.   Okay.  And then going back to 99214, medical

22  decision making.  It requires medical decision making of

23  moderate complexity.  Do you believe that your follow-up

24  exam -- well, strike that.

25           So medical decision making of moderate



```
 1   complexity.  Your decision making is reflected in your

 2   recommendations, right?

 3        A.   Right.

 4        Q.   And you have the first three recommendations

 5   are the ones you've given them before: Limit overall

 6   activities, use low pillow, avoid heavy weightlifting.

 7   Right?

 8        A.   Right.

 9        Q.   The next recommendation is that you highly

10   recommended the patient to continue with physiotherapy.

11        A.   Right.

12        Q.   Right?  That's not moderate complexity, is

13   it?  Just telling the patient to continue the treatment?

14             MR. PIVNIK:  Objection to form.

15        A.   Well, everything together I believe it is

16   moderate complexity.

17   BY MR. HAZOURI:

18        Q.   Okay.  Fair, and I'm not trying to limit

19   you, but standing alone, simply saying the patient was

20   recommended to continue with the physiotherapy is not --

21        A.   Only that line, no.

22        Q.   It's not moderate --

23             THE COURT REPORTER:  What was it?

24             MR. HAZOURI:  He said only that line, no.

25        Right?
```



```
 1              THE WITNESS:  Yes.

 2  BY MR. HAZOURI:

 3       Q.   Item 4 is not medical decision making of

 4  moderate complexity?

 5              MR. PIVNIK:  Objection, form.

 6  BY MR. HAZOURI:

 7       Q.   Standing alone.

 8              (Cellphone Vibrating.)

 9              THE COURT REPORTER:  Can you -- I'm sorry, I

10      can't.

11      A.   Altogether --

12      MR. HAZOURI:  Do you need to take a call?

13      THE WITNESS:  No, no, just to -- so it doesn't

14   make a noise.

15  BY MR. HAZOURI:

16       Q.   I promise I'm not trying to limit you.  I

17  just want --

18      A.   No, no, it's okay.

19       Q.   4, standing alone, is not moderate

20  complexity of decision making, standing alone by itself?

21      A.   Just that line, no.

22       Q.   And are any of these standing alone moderate

23  complexity?

24      A.   Only one item, no, but altogether

25  encompasses the decision making I made for the follow-up
```



 1  evaluation (inaudible) in this case the MRI.

 2      Q.   Okay.  And so all six of the items together

 3  reflects your medical decision making and you believe

 4  that that's medical decision making of moderate

 5  complexity, sufficient to properly bill 99214?

 6      A.   I believe so.

 7      Q.   All right.  Could you go back to 99213, if

 8  you would, please?  Medical decision making of low

 9  complexity is one of the items there.  Do you know the

10  difference between medical decision making of low

11  complexity and medical decision making of moderate

12  complexity?

13      A.   Well, low complexity, as the phrase states,

14  is when you have so much items to review or to examine

15  the patient based on the symptoms and clinical findings

16  of the patient.  It's a less extensive examination.

17  Requires less focusing on the problems of the patient,

18  and obviously it requires less time to do that than the

19  other one.

20      Q.   And under 99212, right above that, one of

21  the components of that is straightforward medical

22  decision making.  Do you see that?

23      A.   Yes.

24      Q.   Do you have an understanding what straight

25  forward medical decision making is?



```
 1        A.   I believe it's when you decide to do

 2   something with a patient in short term.  For example, do

 3   the therapy or do not do any heavy lifting, things like

 4   that.

 5        Q.   What was the first one you said?

 6        A.   Do the therapy.

 7        Q.   Do the therapy, okay.  So those items

 8   standing alone would be straight forward?

 9        A.   I don't know about the codes for that.  I

10   believe this is less complex than this one, of course.

11             THE COURT REPORTER:  I don't know about the?

12             THE WITNESS:  The codes.

13             THE COURT REPORTER:  Okay, and I got the

14        rest.

15   BY MR. HAZOURI:

16        Q.   And so I just want to make sure I get your

17   full explanation of your understanding of the difference

18   between straightforward medical decision making and

19   medical decision making of low complexity.

20             Have you given me your best understanding?

21        A.   Yes.

22        Q.   And the MRI that you ordered for the

23   patient, you did that because you thought it was

24   important for the patient's care?

25        A.   I thought it was important.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                190

1        Q.    I don't think I asked you this.  I should

2   have upfront.  You do agree that the 99214 that Feijoo,

3   P.A. billed for this July 5th, 2016, office visit with

4   the patient is required to meet two of these three

5   listed components I've stated in this exhibit, right?

6        A.    99204?

7        Q.    No, 99214.

8        A.    Oh, this one?

9        Q.    No, no, back to 99214, where we were.

10       A.    Oh.

11       Q.    Because let me show you, just to orient you,

12  your clinic billed a 99214 for the office visit on July

13  5th, 2016.

14            MR. PIVNIK:  And we're looking at Exhibit

15       36.

16  BY MR. HAZOURI:

17       Q.    Per Exhibit 36, right?

18       A.    That's the initial visit, no?

19       Q.    No, this is the follow up.

20       A.    Oh, the follow up.

21       Q.    July 5th, 2016, right?

22       A.    Right.

23       Q.    99214, right?  So my question to you is, you

24  do agree that based on this language in the CPT book, to

25  properly bill this 99214 as you did in Exhibit 36, your



```
 1   examination needs to have two of these three listed

 2   components?

 3       A.   Right.

 4       Q.   Okay.  By the way, while we're here, you had

 5   mentioned when I was talking to you about your

 6   qualifications -- or your training qualifications.

 7       A.   Yes.

 8       Q.   You had told me about being a member of the

 9   American Board of Disability and Analysts?

10       A.   Yes.

11       Q.   Is this it listed under your signature here?

12       A.   That's right.

13       Q.   Okay.  Are you still a member of that --

14   board certified by that organization?

15       A.   Yes.

16       Q.   Is that how you say it?

17       A.   Yes.

18       Q.   Where is this organization located?

19       A.   I don't know.

20       Q.   Do you have to do continuing education to

21   keep this certification?

22       A.   Yes.

23       Q.   Have you --

24       A.   And for the medical license the same.

25       Q.   Oh, so when you do training for your medical
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                  192

```
 1   license it can also support this certification?

 2        A.   No, as I do the training for the medical

 3   license every two years, I have to -- they require about

 4   40 hours, I believe, of continuing medical education,

 5   which I do on the internet.

 6        Q.   Okay.  And that also helps you meet this

 7   requirement here for this board certification?

 8        A.   No.

 9        Q.   Okay.

10        A.   Well, it mainly is like the American Medical

11   Association continuing medical education program.

12        Q.   Okay.  As far as the MRIs that you

13   prescribed, it was to the cervical spine, the neck and

14   the lumbar spine, the lower back?

15        A.   Right.

16        Q.   So it was two separate MRIs?

17        A.   Yes, sir.

18             MR. HAZOURI:  42.

19             (Plaintiff's Exhibit No. 42 marked for

20             identification.)

21   BY MR. HAZOURI:

22        Q.   Okay.  I've handed you what's been marked as

23   Exhibit 42 to your deposition.  It's a document entitled

24   referral for therapy treatment, correct?

25        A.   Yes.
```



1        Q.    Is this a form that you use in your office?

2        A.    Yes.

3        Q.    Is that your signature down at the bottom?

4        A.    Yes.

5        Q.    And you dated it July 5th, 2016?

6        A.    Right.

7        Q.    So you filled out this form in conjunction

8    with your July 5th, 2016, of the patient that we've been

9    talking about?

10       A.    Yes.

11       Q.    Right?  Okay.  And at the top there's two

12   boxes with therapies listed, right?

13       A.    Yes.

14       Q.    For example, just to read a few of them,

15   you've got on the left side, hot/cold packs, electrical

16   stim, ultrasound, manual massage, right?

17       A.    Yes.

18       Q.    So I've counted in the 2 boxes, there's 14

19   possible therapies or treatments there, correct?

20       A.    Right.

21       Q.    And you prescribed out of those 14 possible

22   therapies, you prescribed 13 of them for this patient?

23       A.    Yes.

24       Q.    The only one you didn't prescribe was

25   paraffin bath, right?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                194

```
 1      A.    Right.

 2      Q.    Why didn't you prescribe the paraffin bath?

 3      A.    Paraffin baths, we usually order when there

 4  is tenosynovitis or the sprains of the hands, the

 5  fingers, the toes, the foot.  Tenosynovitis of the

 6  hands, the feet and the fingers, the toes, because the

 7  paraffin baths is helpful for those conditions.  This

 8  patient didn't have any of these conditions.

 9      Q.    Okay.  What's the, on the right-hand side,

10  neuromuscular re-education, 97112?  Do you see that?

11      A.    Yes.

12      Q.    In prescribing that therapy for this

13  patient, explain -- well, just explain to me why you

14  prescribed that therapy for this patient.

15      A.    When you have a patient with symptoms

16  related to the spine, the cervical, thoracic,

17  lumbosacral, usually you have to prescribe strengthening

18  exercises of the muscle of the neck, the back.  It can

19  help you to re-education of this.  Because when you have

20  these symptoms, many times the pain increases when you

21  move the -- the neck, the back, which I tell the patient

22  to avoid sudden motions because I've already told you

23  before can lead to more pain.  So you have to re-educate

24  after the patient is feeling better, how to strengthen

25  these muscle.  Re-education is strengthening of the
```



**Orange Legal**
**800-275-7991**

 1  muscle, the neck and the back, helps you to improve

 2  recovery --

 **3**      Q.   Okay.  Sorry.

 4      A.   -- of the patient.

 **5**      Q.   Okay, thank you.  I'm sorry --

 6      A.   Yes.

 **7**      Q.   -- to interrupt you.  So you understand

 **8**  **neuromuscular re-education to be strengthening**

 **9**  **exercises?**

10      A.   That's part of it.  You can also use, for

11  example, I believe it's here, no?  Let me see if it's

12  here.  Electrical stimulation also helps.

**13**      Q.   Well, I --

14      A.   The second one, 97014.

**15**      Q.   Sure.  I'm only asking about neuromuscular

**16**  **re-education, though.  I'm just trying to get what that**

**17**  **is.  Your understanding is neuromuscular re-education is**

**18**  **a strengthening exercise?**

19      A.   And electrical stimulation also.

**20**      Q.   Electrical stimulation is a strengthening

**21**  **exercise?**

22      A.   It helps because it stimulates the muscle

23  and nerve endings of the muscle.

**24**      Q.   Okay.

25      A.   And the massage (inaudible).  Everything



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                          196

```
 1   is -- the goal of everything is to help the patient to

 2   recover as soon as possible from the symptoms.

 3        Q.   Okay.  So --

 4        A.   That's what the therapy does.

 5        Q.   Right.  So you prescribed these 13 therapies

 6   for this patient for a period of 4 weeks, at a frequency

 7   of 3 to 4 times a week.

 8        A.   Right.

 9        Q.   Right?  So I just did some math on my

10   calculator because I can't do it in my head.  You

11   prescribed 13 therapies.  If the patient was to have

12   those therapies 3 times a week --

13        A.   Yes.

14        Q.   -- in the 3 to 4, that would be 39 therapies

15   a week.  And if they were to have it 4 times, 4 times

16   13, that would be 52 therapies a week.  So you

17   prescribed for this patient, 39 to 52 therapies a week

18   for 4 weeks?

19        A.   Right.

20        Q.   You agree?

21        A.   Yes.

22        Q.   Okay.  And you made this prescription even

23   though you did not have the x-rays that you wanted to

24   see in order to help determine what the treatment plan

25   should be for the patient?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                197

```
 1      A.   Right.

 2      Q.   And you -- first of all, are any of these

 3   therapies designed to treat a disc herniation?

 4      A.   I believe when you have a disc herniation,

 5   the strengthening exercises of the back, which are

 6   called the William Exercises, help to recover the

 7   patient mostly sooner, if the hernia is not (inaudible)

 8   too much.  Then there's also the massage which can help

 9   a lot.  But as I order all these, remember that there is

10   a physical therapist who's trying to do these.  This is

11   why I suggest a physical therapist.  He does the

12   physical examination.  He does what he thinks from this

13   evaluation and treatment options can do the best for the

14   patient.

15      Q.   Okay.

16      A.   I mean, probably they won't do everything

17   together.  One day they will do something.  And based on

18   his experience, what the physical symptoms he finds.

19           THE COURT REPORTER:  Wait.

20      A.   That's why I ordered the physical therapies,

21   those therapy.

22   BY MR. HAZOURI:

23      Q.   All right.  You didn't order any of these to

24   treat a disc herniation?  I mean, because you --

25      A.   No.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                        198

```
 1        Q.    -- hadn't diagnosed one, right?

 2        A.    Just for the whole back pain, yes.

 3        Q.    For the sprains?

 4        A.    For the sprains.

 5        Q.    Right?  And so if this patient had a disc

 6   herniation, for example, you would agree that electrical

 7   stim isn't going to help a disc herniation, right?

 8        A.    It can help at times.

 9        Q.    You wouldn't --

10        A.    When you have a disc herniation, you might

11   have muscle spasm, and the electrical stimulation as

12   well as the cold/hot baths and muscle stimulation,

13   ultrasound, all those help to diminish the muscle spasm.

14        Q.    Okay.  You do understand that PIP coverage

15   has a limit of $10,000, right?

16        A.    Yes.

17        Q.    And so sometimes that's all patients have,

18   is the PIP coverage to pay for the medical treatment,

19   right?  So isn't there a goal to be at least somewhat

20   judicious on how many treatments you want to prescribe

21   or at least make sure the treatments that you're

22   prescribing match up to the conditions that you're

23   seeing?

24        A.    Yes, I ordered that in order to alleviate

25   the symptoms of the patient.  The faster the better.
```



**Orange Legal**
**800-275-7991**

 1  But as I told you before, the physical therapist has the

 2  authority to do what he believes is right at the moment

 3  and he can provide -- not everything can be done.

 4        Q.   And by the way, the diagnosis that you

 5  checked off were cervical spine sprain, thoracic spine

 6  sprain and lumbar spine sprain, right?

 7        A.   That's right.

 8        Q.   So you were prescribing these therapies to

 9  treat those conditions?

10        A.   Right.

11        Q.   And on the left side of the page there's

12  radiculopathy cervical is typewritten, and radiculopathy

13  lumbar, you didn't check those off?

14        A.   No.

15        Q.   And radiculopathy is what you'd expect in

16  the case of a herniation?

17        A.   Right.

18        Q.   So you didn't diagnose a herniation at this

19  point, as we've discussed?

20        A.   Right.

21             THE VIDEOGRAPHER:  Off the record 1:59.

22             (A recess was taken.)

23             THE VIDEOGRAPHER:  On record 2:06.

24             (Plaintiff's Exhibit No. 43 marked for

25        identification.)



 1  BY MR. HAZOURI:

 2       Q.   Okay.  I've handed you, sir, what we've

 3  marked as Exhibit 43 to your deposition.

 4       A.   Yes.

 5       Q.   Do you recognize this as a bill that your

 6  clinic issued for this same patient, the initials E.A.J.

 7  that we've been talking about, for a date of service

 8  December 15th, 2016?

 9       A.   Right.

10       Q.   The 99215 that's listed on there, what

11  medical service does that code describe?

12       A.   Yes.

13       Q.   Okay, no, I was asking you just -- I saw you

14  referencing the CPT book, but your clinic billed a

15  99215?

16       A.   Yes, that's right.

17       Q.   Okay.  What does that describe?

18       A.   It's comprehensive history (inaudible)

19  medical decision making (inaudible) complexity.

20       Q.   Okay.  So what you're doing is you're

21  looking at the CPT code book.

22       A.   Yes.

23       Q.   But I guess my question was simpler.  That's

24  an office visit?

25       A.   Oh, yes, an office visit, true.



1       Q.    Okay.  And you were looking at the CPT code

2   book --

3       A.    To be sure.

4       Q.    -- and reviewing the three requirements?

5       A.    Right.

6       Q.    I think it has to be two out of the three

7   with the three that were listed there.

8       A.    That's right.

9       Q.    Right?  Okay.  And then the 95851 is the

10  range of motion testing, right?

11      A.    Yes.

12      Q.    And we'll talk about 76140 here in a second.

13  So you understand that your clinic billed the highest

14  level of an E&M code for this follow-up examination as

15  possible?

16      A.    Um-hum, yes.

17      Q.    Right?  Why did your clinic choose to bill

18  the highest level E&M code for this visit?

19      A.    I believe it was based on the complexity of

20  physical exam, complex history and medical decision

21  making being of high complexity.

22      Q.    Okay.  So you looked at the CPT book and you

23  believe the exam meets --

24      A.    Because I don't remember exactly.

25      Q.    Fair.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                              202

 1              MR. PIVNIK:  I'm going to object without

 2        giving him, I guess, the records, which I know

 3        you're going to give him --

 4              MR. HAZOURI:  I am.

 5              MR. PIVNIK:  -- and you might as well give

 6        them now.

 7              MR. HAZOURI:  Fine.

 8   BY MR. HAZOURI:

 9        Q.   I guess I asked the question in a more

10   general sense.  This is an auto accident patient.  Not

11   to diminish her injuries, but she's got a cervical,

12   thoracic and lumbar spine sprain.

13        A.   Right.

14        Q.   At this point, right?  And you've diagnosed

15   how many of those in your career?  Thousands?

16        A.   Many.

17        Q.   Thousands, right?  Okay.  So you know, I

18   would compare, just pulling something out of air, let's

19   compare this patient to a patient who was in a car

20   accident and has become a quadriplegic as a result of

21   that.  Okay?  And that patient is coming for a follow-up

22   visit.  Okay?  Hypothetic.

23              Wouldn't you expect the level of history and

24   of decision making and of examination to be higher and

25   more complex for a patient who's a quadriplegic than for



 1    this patient that has cervical, thoracic and lumbar

 2    sprains?

 3              MR. PIVNIK:  Objection to form, speculation.

 4        A.   When you have a quadriplegic patient you

 5    require more than one specialty.  The neurologist, the

 6    neurosurgeon --

 7        THE COURT REPORTER:  I'm sorry.  Neurologist?

 8        A.   And neurosurgeon should be taking care of

 9    this patient, so you will have a neurologist and

10    neurosurgeon.

11    BY MR. HAZOURI:

12        Q.   Okay.

13        A.   It's very complex.

14        Q.   It's very complex, right?

15        A.   Yes.

16        Q.   And so if you were to be one of the

17    consulting physicians on that, your decision making

18    would be far more complex than it is for a patient that

19    just has a -- not to diminish the injuries, but has a

20    sprain of the lumbar, cervical and thoracic spine,

21    right?

22              MR. PIVNIK:  Same objection.

23        A.   Well, to a certain level you can say that.

24    BY MR. HAZOURI:

25        Q.   Yeah.  So I mean again, I'm not trying to



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                204

```
 1  make it complicated, but do you have any concerns that

 2  you chose the highest level possible in the whole CPT

 3  book for a follow-up examination for this patient, when

 4  on the face of it sprain injuries would not seem to

 5  justify the highest level of the code?

 6          MR. PIVNIK:  I'm still objecting because you

 7      haven't given him the records for that

 8      examination.

 9          MR. HAZOURI:  I'm talking in generalities.

10          MR. PIVNIK:  On generalities, we object.

11          MR. HAZOURI:  Okay.

12      A.   Well, I believe when we did that we were

13  doing it because we thought it was the code that should

14  be billed.

15  BY MR. HAZOURI:

16      Q.   You did it because you believed it was the

17  code that should be billed?

18      A.   Yes.

19      Q.   Does my asking you these questions to

20  compare it to a patient who's a quadriplegic or compare

21  it to a patient that has a broken vertebrae, that's more

22  severe than a sprain/strain; is it not?

23      A.   Right.

24      Q.   That requires a higher level of examination

25  and decision making, right?
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    205

1        A.    Yes.

2        Q.    So you have this patient, you know, for a

3  patient with a broken vertebra that you might see in a

4  follow-up visit, you can't put that patient at a higher

5  level of a follow-up visit.  You see what I'm saying?

6        A.    Yes.

7              MR. PIVNIK:  Objection, form.

8  BY MR. HAZOURI:

9        Q.    So again, does this give you -- do you see

10  my concern, the basis of my question and why I'm asking

11  for your concern or questioning about using the highest

12  code possible for this exam?  Do you understand?

13        A.    Yes.

14        Q.    And your response would be?

15        A.    At the time, we thought it was the proper

16  code to bill.

17        Q.    Are you questioning that now that I'm giving

18  you --

19        A.    Well, at the time I thought we were -- we

20  thought it was the proper code to bill.

21        Q.    Okay.  Now that I've given you these

22  examples and explained my -- this is me talking, my

23  concern, maybe State Farm Mutual's concern, are you

24  questioning now whether 99215 is the correct code?

25        A.    Well --



1          MR. PIVNIK:  Continuing objection

2     regarding -- let me finish my objection --

3     speculation, form, compound question and

4     ambiguous as to whether we're referring now to

5     the single patient or in general again.

6  BY MR. HAZOURI:

7     **Q.   You can answer.**

8     A.   I have to review every patient based on the

9  symptoms, findings, clinical finding, subjective and

10 objective findings, and based on that I made a decision

11 based on the -- everything, Anielka who's the billing

12 person (inaudible) so we proceed to bill that.

13          (Plaintiff's Exhibit No. 44 marked for

14     identification.)

15          (Plaintiff's Exhibit No. 45 marked for

16     identification.)

17 BY MR. HAZOURI:

18     **Q.   Handing you Exhibit 44 to your deposition.**

19 **Okay, so I've handed you Exhibits 44 and Exhibits 45 to**

20 **your deposition.  Take a look at them.**

21          **And my question is, is this a handwritten**

22 **final orthopedic evaluation report for your December 15,**

23 **2016 visit with this patient that we've marked as**

24 **Exhibit 44 and a range of motion report for your office**

25 **visit with the patient, same date, December 15, 2016,**



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    207

```
 1   that we've marked as Exhibit 45?  Is that what these

 2   are?

 3        A.   Yes.

 4        Q.   Okay.  Again, the second page skips to page

 5   3 of the initial report.  Do you see that?

 6        A.   Yes.

 7        Q.   Do you think the range of motion report that

 8   we've marked as Exhibit 45 is supposed to be page 2?

 9        A.   Should be.

10        Q.   And then this office visit happened five

11   months after you last saw the patient on July 5th, 2016.

12        A.   Right.

13        Q.   Right?  Do you remember your recommendation

14   you wanted to see the patient back in a month?

15        A.   Right.

16        Q.   So it's four months past when you wanted to

17   see the patient, right?

18        A.   Right.

19        Q.   Does that give rise to any concerns in your

20   head or, the lag?

21        A.   Well, I asked her what happened with her but

22   I don't remember everything.  I wrote she was feeling

23   better.

24        Q.   What was the purpose of this December 15,

25   2016 office visit?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              208

```
 1        A.   For evaluation of the patient, to see how

 2   she was doing.

 3        Q.   Okay.  Was the purpose also to give a

 4   disability rating to the patient?

 5        A.   Well, when they come for a final evaluation

 6   of the -- their accident, we usually do a disability

 7   accident.

 8        Q.   Okay.  And if you look at -- we're going to

 9   talk about it, but if you go to the second page of your

10   report you gave this patient a partial permanent

11   impairment rating of five percent.

12        A.   Five percent.

13        Q.   Right?  So that was at least one purpose of

14   this examination, was to determine if the person had a

15   permanent injury and to rate the person?

16        A.   No, the purpose -- the purpose was mostly to

17   fill the -- how the patient was feeling, to find out

18   what was the physical signs and symptoms that she was

19   complaining of after this treatment, to find out if she

20   needed anything else and if she needed a standing order

21   medication or anything else.

22        Q.   Okay.  So what's the purpose of giving this

23   patient a partial permanent impairment rating, or any

24   patient?  Why do you do that?

25        A.   If the patient, for example, needs to go to
```



 1  work to someplace, she can ask to, as I advise her, to

 2  work for --

 3            THE COURT REPORTER:  She can, I'm sorry?

 4       A.   If the patient needs to work, I looking for

 5  a job position, it's advisable for her to have a rating

 6  by a doctor of how much weight, how much effort she can

 7  do.  So the physical evaluation impairment rating helps

 8  the patient for this purpose mostly.

 9  BY MR. HAZOURI:

10       Q.   Okay.  Well, and you also understand that

11  attorneys who are representing people who have been

12  injured in auto accidents use the permanent impairment

13  rating in the lawsuit?

14       A.   Right.

15       Q.   That's another reason that you do this,

16  right?

17       A.   Yes.

18       Q.   Okay.  So in looking at just the

19  handwritten, I'm going to give you the written report,

20  but I just want to know in these handwritten reports,

21  probably in your initial, not in the range of motion but

22  in the final orthopedic evaluation, does it document

23  what medical records or tests you reviewed at this final

24  evaluation of the patient?

25       A.   No, it doesn't say.



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

1      Q.    Not in handwriting?

2      A.    No.

3      Q.    Okay.  Looking at the final orthopedic

4  evaluation handwritten that we marked as Exhibit 44,

5  again, the top part with the various areas of body to be

6  examined is blanked, which means you didn't examine

7  those areas, right?

8      A.    Right.

9      Q.    They weren't relevant for you to diagnose

10  the patient's condition or assign an impairment rating?

11      A.    Yes.

12      Q.    Then we go down to cervical, thoracic lumbar

13  regions, right?

14      A.    Right.

15      Q.    And you do have handwriting there?

16      A.    Yes.

17      Q.    Why don't you go ahead and let's just do

18  cervical first.  Interpret that for us, please.

19      A.    Okay.  Cervical spine, there is pain on

20  flexion/extension, lateral flexion and rotation to the

21  right and the left, with a slight limited range of

22  motion.  Thoracic spine, pain on flexion/extension,

23  lateral flexion and rotation to the right and left,

24  tender palpation paravertebral muscles, limited range of

25  motion 40 percent of the normal range.  On the



 1  lumbosacral spine, there is pain on flexion/extension,

 2  lateral flexion and rotation to the right and left,

 3  limited range of motion to 40 percent of the normal

 4  range.

 5       Q.   Okay.  So cervical spine with slight

 6  limitation, lumbar and thoracic spine were 40 percent

 7  limitation?

 8       A.   Yes.

 9       Q.   On range of motion testing, correct?

10       A.   Right.

11       Q.   And the range of motion testing that you

12  performed on this patient at this office visit, December

13  15, 2016, you did it the same way that you've already

14  described for us in the prior two visits?

15       A.   Right.

16       Q.   All right.  And if we look at Exhibit 45,

17  the range of motion report.

18       A.   Yes.

19       Q.   Under cervical, is that an S and an L,

20  meaning slight?

21       A.   Slight.

22       Q.   So that matches up with what you wrote in

23  the initial --

24       A.   Yes.

25       Q.   -- report?  And then under thoracic and



 1   lumbar, you have circled thoraco and you circled lumbar

 2   and you wrote 40 percent, which means 40 percent

 3   limitation in range of motion to both the thoracic spine

 4   and the lumbar spine?

 5        A.   Exactly.

 6        Q.   Which is entirely consistent with what you

 7   wrote in --

 8        A.   Yes.

 9        Q.   -- your initial evaluation?  All of these on

10   both pieces of paper, these range of motion findings

11   were done with the same range of motion test?

12        A.   Yes.

13        Q.   Now, you can look back, if you want, at the

14   other range of motion reports.  Remember how they had

15   kind of straight lines?

16        A.   Yes.

17        Q.   These look more like Ns to me.  Is there a

18   difference?

19        A.   No.

20        Q.   Okay.

21        A.   It's the way we mark them.

22        Q.   So there's no difference between these lines

23   and the other lines?

24        A.   No.

25        Q.   Okay.  So then if we look at -- and



 1   remember, and please feel free to look at your

 2   handwritten records, the patient started out with

 3   shoulder, elbow and knee also, and those got better by

 4   the second visit, right?

 5        A.   Right.

 6        Q.   Okay.  So for the rest of -- after we get

 7   past thoraco lumbar and we get to the other areas where

 8   you wrote either, you know, the line out at this point

 9   for, say, shoulder, elbow, wrist, hip, knee and ankle,

10   does this mean you did not test those areas because

11   there were no complaints?

12        A.   Probably no.  I don't know.  I don't know.

13        Q.   Or does it mean you tested the areas and

14   they were normal?

15        A.   Maybe.

16        Q.   Okay.  You can't say --

17        A.   Could be either one.

18        Q.   You can't tell?

19        A.   No.

20        Q.   And I should ask a better question.  You

21   can't tell from looking at Exhibit 45?

22        A.   Yes.

23        Q.   And you can't tell from looking at Exhibit

24   44 in your handwriting?

25        A.   Yes.



1        Q.   Right?  Okay.  Once again, remember, this

2   patient was hypertensive but you didn't check her blood

3   pressure?

4        A.   No.

5        Q.   Because her blood pressure wasn't relevant

6   to the orthopedic exam that you were focused on, right?

7        A.   No, when I ask her the first time she told

8   me that she was under control.  When they're under

9   control I don't check it.

10       Q.   Right.  So she has high blood pressure, she

11  told you it was under control and it wasn't relevant to

12  the orthopedic complaints you were looking at, right?

13       A.   Yes.

14       Q.   That's why you didn't check her blood

15  pressure.

16       A.   Right.

17            MR. HAZOURI:  Doing okay?

18            THE WITNESS:  Yeah.

19            MR. HAZOURI:  Need a break or anything?

20       Okay.  I know we just took one, but let me know

21       if you do.  Okay?

22            THE WITNESS:  Yes.

23            MR. HAZOURI:  Trying to move through this.

24            (Plaintiff's Exhibit No. 46 marked for

25       identification.)



```
 1   BY MR. HAZOURI:

 2        Q.   Exhibit 46.  Okay, do you recognize this as

 3   the typewritten -- I got it right that time -- final

 4   orthopedic evaluation for the exam that you performed on

 5   this same patient we've been discussing, on December 15,

 6   2016?

 7        A.   Yes.

 8        Q.   And the range of motion testing documented

 9   in the cervical area is -- actually, here you said

10   normal range of motion for the cervical spine, right?

11        A.   Yes, it's limited, almost normal, yes.

12        Q.   So it's a little different.  You said

13   slightly limited in your handwritten notes but you say

14   normal here?

15        A.   Yeah.

16        Q.   So a little bit of a discrepancy but you

17   wouldn't view that as a major thing?

18        A.   Yeah.

19        Q.   Is that fair?  Okay.  Thoracic spine

20   documents the 40 percent.

21        A.   Right.

22        Q.   And the lumbosacral spine documents the 40

23   percent limitation also?

24        A.   Same.

25        Q.   Same range of motion test?
```



1      A.   Right.

2           Q.   And just to be clear, the cervical spine,

3    you don't think that was a different test; you just

4    think it was a slightly different interpretation?

5           A.   Right.

6           Q.   Of the same test?

7           A.   Yes.

8           Q.   All right.  Okay.  Now, again, if we look at

9    the second page you can see you assigned a five percent

10   permanent impairment under the final evaluation, right?

11          A.   Yes.

12          Q.   And by the way, this is -- when you're a

13   member of the American Board of Disability and Analysts,

14   that's what that is -- you're certified to do, is

15   provide disability ratings, right?

16          A.   Yes.

17          Q.   Okay.  So to provide a permanent disability

18   rating like the one that you gave to this patient, is it

19   correct to say that they have to be at maximum medical

20   improvement?

21          A.   Yes.

22          Q.   And that's sometimes called MMI?

23          A.   Yes.

24          Q.   All right.  And I'm just going to tell you

25   my understanding and you tell me if you agree.  Maximum



 1  medical improvement means that the patient has reached a

 2  level of improvement that's essentially the best that

 3  they're going to as a result of the injury.  It's the

 4  maximum improvement they're going to see, correct?

 5       A.   For the time being with the treatment and

 6  all, everything the patient received, we believe that

 7  she reached that level.

 8       Q.   That's right.  And the level is, it's the

 9  best she's going to get?

10       A.   That's what we believe.

11       Q.   Right.  And she may not be back to as good

12  as she was before the accident but she's back as high as

13  she's going to get, in your opinion --

14       A.   Yes.

15       Q.   -- at this point?  And so a patient, again

16  to repeat myself, sorry, has to be at MMI because you

17  have to know that they're at that maximum level of

18  improvement before you can say they're permanently

19  injured?

20       A.   Yes.

21       Q.   Right?  And you rely on your history of

22  seeing the patient to --

23       A.   Yes.

24       Q.   -- determine that they've gotten to MMI,

25  right?



1      A.   Yes.

2      Q.   Because when you first see the patient, they

3    come in and they're at a certain level of condition,

4    they get treatment and then they come back and see you

5    for a follow-up visit and you reassess their condition,

6    right?

7      A.   Right.

8      Q.   And then they come back later for a final

9    evaluation and you use your history, your knowledge of

10   the patient from the prior two visits, to determine that

11   they're at maximum medical improvement; is that fair?

12   Correct?

13     A.   Yes.

14     Q.   Okay.  So let's look at under diagnosis.

15   You diagnose -- the first three are what we've seen

16   before, the cervical, thoracic and lumbosacral sprain,

17   correct?

18     A.   Yes.

19     Q.   All right.  And then 4, we see a new entry.

20     A.   Yes.

21     Q.   And it says, as per x-rays review on the

22   cervical spine, there is mild lower cervical

23   osteoarthritis.  On the thoracic spine there is mild

24   lower thoracic osteoarthritic -- I think maybe you meant

25   arthritis.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                 219

```
 1        A.    Arthritis, yes.

 2        Q.    Yes.  And then on the lumbar spine there's

 3   mild lower osteoarthritis.  Left elbow is normal, left

 4   knee is normal, left shoulder is normal, right?

 5        A.    Yes.

 6        Q.    So now on this December 15th, 2016 visit,

 7   you now have the x-rays.

 8        A.    Right.

 9        Q.    And I'm going to --

10        A.    What's --

11        Q.    I'm going to show you the report.

12        A.    I was able to review the films or the CD.

13        Q.    Okay, but --

14              THE COURT REPORTER:  I'm sorry, I didn't get

15        that.

16        A.    I was able to review the films or the CD.

17   Many times they send also the CD with the x-rays.  So I

18   don't remember if it was films or CD.

19   BY MR. HAZOURI:

20        Q.    Okay.

21        A.    Most of the time now they send the CD.

22        Q.    All right.  But before when you -- you

23   prescribed the x-ray at the initial visit, remember?

24        A.    Correct.

25        Q.    And you told me you did that because you
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

220

 1   thought the x-rays were necessary for assessing the

 2   patient's condition and the treatment plan, right?

 3        A.   Yes.

 4        Q.   But now you're referencing the x-rays at the

 5   end -- or at the end of the care because the patient's

 6   at MMI, right?

 7        A.   Right.

 8        Q.   So is that a concern to you that you didn't

 9   get the x-rays until your last visit with the patient?

10        A.   Yeah, probably when the patient came for the

11   follow up, I always tell my secretary to call the office

12   to send me the x-rays, the CD or the film or the report.

13   As I didn't see the patient anymore, so I didn't write

14   it down.

15        Q.   Okay.  But I guess my concern is -- or not

16   my concern, my question is as you sit here today and you

17   look at the history of this patient, does it give you

18   any concern that you didn't get the x-rays that you

19   thought were necessary to diagnose the patient and

20   develop a treatment plan until the end of the treatment

21   as opposed to earlier in the treatment?

22        A.   Well, I rely on the radiologist.  If they

23   found something that would require -- for example, a

24   fracture, they will call me immediately to let me know.

25             THE COURT REPORTER:  They?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                221

```
 1        A.   They would call me immediately if they found
 2   a fracture.  The radiologist.  And I would have probably
 3   called the patient to inform them.  So as they didn't
 4   call me, I believed there was nothing -- and besides,
 5   probably the x-ray and everything was there before this
 6   visit, the last visit.
 7   BY MR. HAZOURI:
 8        Q.   Okay.  You mean there in your office?
 9        A.   Probably, because when I call they send it
10   to me.  So I (inaudible).
11        Q.   And these findings that are -- you mentioned
12   this, but I want to follow up on your answer.  These
13   findings on the x-ray review in bullet point 4 here,
14   under the diagnosis.
15        A.   Yes.
16        Q.   Did you review the actual x-ray films,
17   either on film or on a CD, or did you just review a
18   written x-ray report issued by another doctor?
19        A.   I don't remember if it was a CD or a film.
20        Q.   Okay.  So are you telling me it was either a
21   CD --
22        A.   Yes.
23        Q.   -- or a film and not just a written report?
24        A.   Yes, because I don't see a written report
25   here so probably they didn't send me the written report.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                          222

1        Q.    Okay.

2        A.    Just the CD or the --

3        Q.    Well, let me help you.  I'm not trying to --

4        A.    Oh, you have --

5        Q.    I wanted to know just from looking at the

6    record, but if you want to look at the report and

7    that'll help you, let's do that.

8        A.    So I don't remember if it was a CD or a

9    film.  I always like to have the written report because

10   it's not only what I see, but what the radiologist who

11   is a board-certified doctor in radiology, with x-rays or

12   CDs, say about their findings.

13             (Plaintiff's Exhibit No. 47 marked for

14             identification.)

15   BY MR. HAZOURI:

16       Q.    Okay, so I've handed you a report.  You can

17   see the Bates stamps numbers down there.  I'll represent

18   to you this is out of the medical chart that your

19   attorneys gave to us for the same patient.  I've left

20   the first initials of the name, E.A.G.

21             So do you see this is the report?

22       A.    Yes.

23       Q.    Okay.  Now, under the cervical spine

24   observation in the x-ray report, do you see that?

25       A.    Yes.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                223

```
 1        Q.    It says mid/lower cervical osteoarthritis.
 2   Do you see that?
 3        A.    Yes.
 4        Q.    You wrote mild in your report, your
 5   typewritten report that we marked as Exhibit 46.  You
 6   wrote mild lower cervical osteoarthritis.  Did you mean
 7   to write mid?
 8        A.    Yeah, mid.  Yes, I made a mistake.
 9        Q.    Okay, so that's a typo, the mild?
10        A.    A typo.
11        Q.    Okay.  And then where it says mid -- look at
12   the report, down at thoracic area.
13        A.    Yeah, mid.
14        Q.    Mid/lower thoracic osteoarthritis.  You
15   wrote in your report, mild lower thoracic osteo --
16   again, arthritic, you probably meant arthritis.
17        A.    Yeah.
18        Q.    You meant to say mid there?
19        A.    Right.
20        Q.    And let me also say, we're saying it's a
21   typo.  You might have said it wrong dictating or she
22   might have transcribed it wrong, right?
23        A.    I -- I don't know.
24        Q.    Either way.
25        A.    Either way.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                        224

```
 1         Q.   But it was supposed to be mid?

 2         A.   Yeah.  It's an error.

 3         Q.   Right.

 4         A.   Missing L, missing L.

 5         Q.   Well, you guys added an L --

 6         A.   Yeah.

 7         Q.   -- to mid, right?

 8         A.   Yes.

 9         Q.   And then the third one is mid/lower lumbar

10    osteoarthritis, and again you said in your report, mild

11    lower osteoarthritis.  You meant to say mid?

12         A.   Yes.

13         Q.   Right?  And then it goes to the -- on the

14    report, Exhibit 47, left elbow, no evidence of fracture

15    or joint location.

16         A.   Dislocation.

17         Q.   Dislocation, right.  That's a normal

18    finding?

19         A.   Right.

20         Q.   And what you wrote is left elbow is normal?

21         A.   Right.

22         Q.   Right?  And left knee is no fracture or

23    displacement noted.  That's another normal finding?

24         A.   Yes.

25         Q.   You wrote in your report, left knee is
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                      225

 1  normal?

 2       A.   Yes.

 3       Q.   Right?  And then no fracture on the left

 4  shoulder, no fracture or dislocation is noted.  That's

 5  in the report in Exhibit 47.  That's a normal finding,

 6  correct?

 7       A.   Yes.

 8       Q.   And you wrote in your report, left shoulder

 9  is normal?

10       A.   Right.

11       Q.   Okay.  So does this refresh your

12  recollection as to whether the findings that you made in

13  Exhibit 4 are based on this report?  I'm sorry, the

14  findings that you made in paragraph 4 under diagnosis in

15  Exhibit 46, are from the report that we've marked as

16  Exhibit 47?

17       A.   I usually see the CDs and the films, but I

18  don't -- I don't keep them in my office.

19       Q.   As you sit --

20       A.   Just the report.

21       Q.   As you sit here today, you can't say whether

22  you looked at the CD or film?

23       A.   Or film, I don't know.

24       Q.   You don't know.  Right.  Now, if you look at

25  a CD or a film, you don't document that in your chart



1    somewhere?

2         A.   Usually I do.

3         Q.   Okay.  So is it possible that you documented

4    in your chart?

5         A.   Yeah, but I don't see it.

6         Q.   Okay.  Where would you do it?  Put it that

7    way.  Where would you document that you reviewed the

8    actual film or the CD?

9         A.   I put that in front of the x-rays.

10        Q.   Okay.  So it would be in your typewritten

11   report?

12        A.   In both, yes.

13        Q.   Okay.  And you're not seeing that here?

14        A.   No, I don't see it.

15        Q.   Okay.  Now, if you get a CD -- well, strike

16   that.

17             You said you have two ways of looking at x-

18   rays.  One is to get the films, and I think Ms. Castillo

19   said you have a lightbox in your office.

20        A.   Yes.

21        Q.   Is that right?  So that's one way you can

22   look at them, is get a film and stick it on the

23   lightbox?

24        A.   As I told you before, most of the time now

25   they do the CDs, the digital x-rays that don't require



 1  the film.

 2        Q.   Yeah, everything is digital these days.

 3        A.   I prefer the films because the digital CDs,

 4  sometime when you put the CD on the computer you aren't

 5  able to see them.

 6        Q.   Is that right?  Okay.

 7        A.   And there are different programs, you know,

 8  it takes a lot of times.  The film, I put it there

 9  (inaudible) and that's it.  Like this.

10        Q.   You're old school like me.

11        A.   Yeah.

12        Q.   I don't like all that digital stuff.

13        A.   Really.  Many of my patients, I tell them,

14  when you have the x-rays take a picture with the phone

15  and show me the picture because (inaudible).

16        Q.   Okay.  So if you get the CD and it comes in

17  electronic format, couldn't you save a copy of it on

18  your computer as part of your medical chart?

19        A.   I believe I could but we never do that

20  because I write it.

21        Q.   Okay.  Because you would write it, saying

22  you reviewed --

23        A.   Yeah.

24        Q.   -- the CD.

25        A.   Yes.



1        Q.   So you do expect your -- if you review

2   either a film or a CD, you expect your chart to reflect

3   that somehow?

4        A.   Yeah, I -- I write it down like here.

5        Q.   Right.  That's why you keep copies?

6        A.   Yes.

7        Q.   Or that's why you don't keep copies.

8        A.   No, yes.

9        Q.   But here, there's no such documentation?

10       A.   No, I don't see it.

11       Q.   Okay.  Now --

12       A.   I don't know if I saw a film or a CD.

13       Q.   Right.  Or whether you just relied on this

14   report, right?

15       A.   No.

16       Q.   You don't know.  Now, going back to 76140,

17   the code that your clinic billed State Farm $100 for

18   this visit on December 15, 2016.

19       A.   Yes.

20       Q.   Is your x-ray review, using your words here,

21   in paragraph 4 it says, as per x-ray review, and I won't

22   read it again, but the bullet point in 4 discussing your

23   review of the x-rays, we don't know exactly what you

24   reviewed, but what's documented in that paragraph 4,

25   that service, is that what the 76140 is for?



1        A.    I believe so.

2        Q.    We talked about how you review x-rays.  I

3   just want to ask you the same questions about reviewing

4   MRIs.

5             Do you review the actual films of MRIs or do

6   you leave that to other people?

7        A.    Usually they send me a CD of the MRIs, but

8   as I told you, it's very difficult sometimes.  It's very

9   difficult sometimes to view the CD on the computer, so I

10  prefer the radiology report because they have a special

11  machine that can see much better.

12       Q.    Okay.

13       A.    So the MRIs, I prefer the radiologist

14  report.  They're more complex.  There are so many

15  pictures that sometimes you are not able to see what --

16  x-rays are different.

17       Q.    MRIs are different.  It's more complex.

18       A.    Yes.

19       Q.    It's harder to see in digital format?

20       A.    I prefer the radiology report.

21       Q.    So you rely on the radiology report?

22       A.    Right.

23       Q.    Okay.  The written report?

24       A.    Sometimes they send me (inaudible) MRI, I

25  put it but (inaudible).



1        Q.   It doesn't compute for you?

2        A.   No, it's too little in the computer.

3        Q.   It got you, I got you.

4        A.   It's very difficult to rely on.  I believe

5   there is a hernia there, but I rely on what the -- the

6   others see it in this big screen.  They have a bigger

7   screen to see that.

8        Q.   It's a size issue.

9        A.   Yes.

10       Q.   Because they have the right machine.

11       A.   Have you seen that, no?

12       Q.   Probably somewhere.

13       A.   Yeah, it's a bigger screen, real one, and

14  they (inaudible) computer here.

15       Q.   They have better equipment for viewing.

16       A.   Of course.

17       Q.   Yeah.

18       A.   They do that every day.  That's what they

19  do.

20       Q.   Right.  And that's why you rely on them.

21       A.   Yeah.

22       Q.   And their interpretation.

23       A.   Right.

24       Q.   Do patients these days still ever bring in

25  the films that --



1      A.    Many, yes, many.  Not as many as before.

2      Q.    Let me finish the question.

3      A.    Yes.

4      Q.    Let me ask again.  Just let me finish it.

5            Do patients sometimes still bring in actual

6   films that you can put on the lightbox?

7      A.    Many times.

8      Q.    Okay.  And do they ever tell you that these

9   are copies that you can keep of the x-rays?

10     A.    No.

11     Q.    They always take them back with them?

12     A.    I always give them back.

13     Q.    Why do you always give them back?

14     A.    Because I write the report, what I find.

15   It's better for them to have it because in the future if

16   they need to see another doctor in relation to these

17   injuries, he could probably -- the film, the actual film

18   and the report and the other doctor can see the film as

19   I saw it.  So I always tell them to keep it for the

20   future if they need it.  Many times when there is a disc

21   herniation report, I tell the patients keep the CD

22   because if you need surgery in the future, then the

23   surgeon who's going to do the surgery would like to see

24   the CD.

25     Q.    When you do an x-ray review in conjunction



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                232

 1   with an examination either initial follow up or final --

 2   and when I say x-ray review -- well, again, we might not

 3   know whether you look at a film, a CD or a report or all

 4   three or just one of those, right?

 5        A.   Of course.

 6        Q.   But when you do the service that's

 7   documented on bullet point 4 of Exhibit 46, is it the

 8   clinic's practice to bill 76140, $100 charge?

 9        A.   I believe that's the one, yes.

10        Q.   Okay.  Now, feel free, please, to reference

11   either the typewritten report, the handwritten report or

12   the range of motion report even though I don't think it

13   would be germane to this question, but do you see any

14   reference to the patient having received the MRIs of the

15   cervical and lumbar spine that you prescribed for the

16   patient at the follow-up visit?

17        A.   No.

18        Q.   Is there any documentation in any of your

19   records for the December 15, 2016 visit of any

20   discussion with the patient about the MRI that either

21   did or did not happen?

22        A.   No, probably she didn't receive it because

23   when I see them I ask many times the patient -- first,

24   the patient is afraid.  Many patients don't want to go

25   to the MRI.  And sometimes for different reasons they



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    233

1  didn't do it.  So if I didn't write it, the study was

2  not done.

3       Q.    That's your understanding --

4       A.    Yes.

5       Q.    -- is since there's no discussion of it in

6  the final evaluation, your understanding is this patient

7  did not get the cervical and lumbar MRIs that you

8  prescribed for her?

9       A.    Probably she told me but I didn't write

10 that.

11      Q.    Okay.  Is that of concern to you?

12      A.    Yes.

13      Q.    And why is it of concern to you?

14      A.    Because I told you if you have a disc

15 herniation, this is the only way we can know about it.

16 But many people are afraid of MRI and they try not to

17 do.  They have claustrophobia.  Even there are open MRIs

18 now, right?  Always order the open MRIs because I know

19 they are claustrophobia.

20      Q.    Okay.  And then --

21            MR. PIVNIK:  I love them.  I wish I could

22       spend the whole day in one.

23            MR. HAZOURI:  In an MRI?

24            MR. PIVNIK:  People aren't bothering you.

25            THE WITNESS:  It's about 45 minutes



**Orange Legal**
**800-275-7991**

 1          (inaudible).  The open ones are much better.

 2               MR. PIVNIK:  Best 20 minutes I can spend.

 3               MR. HAZOURI:  I've had about 50 of them.

 4    BY MR. HAZOURI:

 5          Q.   Okay, well anyways, going back to the final

 6    orthopedic evaluation.  You finally diagnosed this

 7    patient with a cervical, thoracic and lumbosacral

 8    sprain, all three of those areas?

 9          A.   Right.

10          Q.   And that was kind of your working diagnosis

11    the whole time, other than the elbow, shoulder, knee,

12    which were also there at the initial office visit?

13          A.   Right.

14          Q.   Okay.  So again, it's a term we use all the

15    time but just to make sure we're clear as to what we're

16    talking about, what's a sprain?

17          A.   A sprain is a distention of ligaments and

18    muscles of certain joints.  The most common one that we

19    see is the ankle sprain.

20          Q.   Ankle?

21          A.   Ankle sprain is the most common.  But it can

22    happen in any of the joints.

23          Q.   I think you said stretching, right?

24          A.   Stretching, distention of ligaments or

25    muscles.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                 235

```
 1        Q.    So muscles and ligaments get stretched --

 2        A.    Yes.

 3        Q.    -- in some sort of traumatic event.

 4        A.    Yes.

 5        Q.    Twisting your ankle, falling down.

 6        A.    Yeah.

 7        Q.    Being in an auto accident.

 8        A.    Right.

 9        Q.    Right?  And the stretching causes, generally

10   when you have a sprain, inflammation and pain symptoms?

11        A.    Swelling, inflammation, tenderness.

12   Sometimes there is a small microfiber ruptures

13   sometimes, and that's the acute sprain when you have a

14   lot of swelling and a lot of limited range of motion.

15        Q.    I was going to say that, too.

16        A.    It can happen in the neck, in the ankle.

17   Sometimes when you see so much swelling and the x-ray is

18   negative, you put a cast because they should be

19   immobilized for at least three weeks for at least in the

20   ankle.  In the -- in the neck, we use the cervical

21   collar for immobilization of the neck because if you

22   move it you feel more pain.  So those patients we always

23   use the cervical collar.

24        Q.    Well, that's for a serious sprain.

25        A.    Yes, yes, that's what I'm telling you.
```



1        Q.    Okay.  And have you heard of these types of

2   sprains that this patient had, cervical, thoracic,

3   lumbar, being called soft tissue injuries?

4        A.    Soft tissue injury, yes.

5        Q.    And is that because the muscles and

6   ligaments are soft tissues and they're the ones that are

7   injured?

8        A.    Right.

9        Q.    As opposed to a bone, which is hard

10  material.

11       A.    Yes.

12       Q.    Right?

13       A.    Of course.

14       Q.    So this patient, her final diagnosis was

15  soft tissue injuries of cervical, thoracic and lumbar

16  sprains?

17       A.    That's right.  And the osteoarthritis

18  revealed by the x-rays, but it doesn't have to do --

19            THE COURT REPORTER:  What's revealed by the

20       x-rays?

21       A.    And the osteoarthritis revealed by the x-

22  rays, but the osteoarthritis is not related to the

23  accident.  That's something that she had before.  I

24  always explain to a patient when they have

25  osteoarthritis --



Orange Legal
800-275-7991

1            THE COURT REPORTER:  I always?

2            MR. HAZOURI:  You got to slow down.  You

3      have to slow down.

4      A.   I always tell the patient when they have

5 osteoarthritis, they ask me, you say arthritis,

6 surprise.  Yeah, you have osteoarthritis.  Then I

7 explain to them this is not related to the accident.

8 This is the loss of the cartilage of the bones on the

9 joints.  That is related to age, to use, but not related

10 to the accident.  When you have the accident, you have

11 the osteoarthritis already.  So I always clarify that

12 because many times they are afraid.  Osteoarthritis,

13 what is that?

14 BY MR. HAZOURI:

15      **Q.   In the final diagnosis, the final**

16 **evaluation, there's no reference to a herniation, right?**

17      A.   No.

18      **Q.   No.  There is no reference, correct?**

19      A.   No, no.

20      **Q.   Okay.  And so how were you able to rule out**

21 **a herniation?**

22      A.   Well, the symptoms are much better now.

23 They decrease the pain.  The range of motion improve.  I

24 would like to have the MRI done, but she didn't have the

25 MRI.



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              238

```
 1              THE COURT REPORTER:  I didn't get that.  I'd
 2       like to?
 3       A.   To see the MRI, but she didn't have the MRI
 4  done.
 5              MR. HAZOURI:  Let's take a quick break.
 6              THE VIDEOGRAPHER:  Off record 2:45.
 7              (A recess was taken.)
 8              THE VIDEOGRAPHER:  On record 2:57.
 9  BY MR. HAZOURI:
10       Q.   Okay, sir, so I was asking you how you were
11  able to rule out a herniation for this patient when you
12  didn't have the MRI at the final evaluation.  Do you
13  recall that?
14       A.   Yes.  No, I couldn't completely rule it out,
15  not without a doubt.  I told the patient probably -- I
16  don't know why she didn't do the MRI.  I don't remember.
17       Q.   So you couldn't rule out a herniation?
18       A.   No, no.
19       Q.   All right.  And then we discussed the five
20  percent impairment rating.
21       A.   Right.
22       Q.   Right?  And you understand that the five
23  percent impairment rating is used by the patient to file
24  personal injury lawsuits arising out of auto accidents?
25       A.   Yes.
```



**Orange Legal**
**800-275-7991**

```
 1        Q.   Right?  Can you explain for us how you

 2   arrived at the five percent impairment that you assigned

 3   this patient at the December 15, 2016 evaluation?

 4        A.   Based on the clinical finding, the symptoms,

 5   the evaluation of the patient, everything.  I reached

 6   the conclusion based on the AMA guides for evaluation of

 7   final impairment rates that it was five percent.

 8        Q.   You said AMA.  I think you meant the AMA?

 9        A.   The American Medical Association, AMA.

10        Q.   The AMA, which is the American Medical

11   Association guide to permanent impairment?

12        A.   Right.

13        Q.   Doesn't that guide provide like a

14   calculation for arriving at an impairment?

15        A.   Yes, that's where I did that because I've

16   done it -- I've done it so many times.  I usually have a

17   -- like with the range of motion, I have in my memory

18   what's the -- the rate.

19        Q.   Okay.

20        A.   So I don't have to look at the book every

21   time.

22        Q.   The calculation is not reflected in your

23   records, right?

24        A.   No.

25        Q.   Okay.  But you did it and you --
```



```
 1      A.   Based on experience.
 2      Q.   Okay.  You said you did it based on your
 3 experience.  Is it fair to say you've given thousands of
 4 impairment ratings over your career?
 5      A.   Right.
 6      Q.   Okay.  Take a look, please, if you would,
 7 sir, at the CPT code book here.
 8           MR. PIVNIK:  35, was it?
 9           MR. HAZOURI:  Exhibit -- I didn't write a
10      number on it.  What number do you have?  He's got
11      it.
12           THE WITNESS:  It's 35.
13           MR. HAZOURI:  35?  Actually I do have it
14      written.  Exhibit 35, page 3.
15           MR. PIVNIK:  Number 35 is making a comeback.
16           THE WITNESS:  Page 13?
17           MR. HAZOURI:  Yeah, page 13, exactly, sir.
18 BY MR. HAZOURI:
19      Q.   You agree that the 99215 that your clinic
20 billed State Farm for this office visit has to have two
21 of the three components listed there, correct?
22      A.   Yeah --
23           MR. PIVNIK:  Objection, asked and answered.
24      A.   -- that's what it says here.
25 BY MR. HAZOURI:
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                        241

 1         Q.    And it says what it says and you agree with

 2    that?

 3         A.    Yes.

 4         Q.    And looking at the history, as documented in

 5    your final orthopedic evaluation, the only history is a

 6    complaint of pain of the cervical region, upper and

 7    lumbosacral region, and then history of present illness.

 8    The patient has been receiving physiotherapy and refers

 9    is feeling better but still complaining of pain in the

10    aforementioned areas.  That's the entirety of the

11    history, right?

12         A.    Yes.

13         Q.    That is not a comprehensive history, is it?

14               MR. PIVNIK:  Objection, argumentative.

15    BY MR. HAZOURI:

16         Q.    Go ahead.  Do you think it's a comprehensive

17    history?

18         A.    When we evaluate the patient, we do the exam

19    and the history and everything.  That's what we do.

20         Q.    Okay.  My question is, is this a

21    comprehensive history for purposes of 99215?

22         A.    I believe so.

23         Q.    Why do you believe so?

24         A.    Based on the exam on the patient and

25    everything that we did.



1       Q.    Well, the exam is different from the

2    history.  I'm only asking you about the history.  The

3    history is as documented in the report here.  Explain to

4    me, please, how that's a comprehensive history.

5       A.    Well, that's what we assume as the findings

6    we have.

7       Q.    Okay.  The next one is a comprehensive

8    examination.  Is it your belief that the examination

9    that you performed on this patient on December 15, 2016,

10   is a comprehensive examination?

11      A.    Yes.

12      Q.    And why is it a comprehensive examination?

13      A.    Because of the symptoms the patient had on

14   the physical examination performed, the different areas

15   of the body where she was complaining of symptoms.  The

16   range of motion, the palpation, everything.

17      Q.    Any other reasons that you want to tell me?

18      A.    The amount of time that was spent with the

19   patient.

20      Q.    Any other reasons?

21      A.    No.

22      Q.    Okay.  Why wouldn't the examination that you

23   performed on this day be more in the nature of a

24   detailed examination, as listed under 99214, instead of

25   a comprehensive examination?



1            MR. PIVNIK:  Objection, asked and answered,

2      argumentative.

3      A.   Detailed examination takes a shorter period

4  of time to examine the patient.

5            THE COURT REPORTER:  Shows a period of?

6      A.   Shorter period of time to examine the

7  patient.

8  BY MR. HAZOURI:

9      **Q.   Any other reasons?**

10     A.   The scope of the physical exam and the

11  history usually is briefer, more brief than this one.

12     **Q.   Okay.  Any other reasons?**

13     A.   No.

14     **Q.   And then you've got medical decision making**

15  **of high complexity.  Do you see that?  99215.**

16     A.   Yes.

17     **Q.   All right.  In this particular case, your**

18  **medical decision making was this patient has reached**

19  **maximum medical improvement and she has a sprain of the**

20  **cervical, thoracic and lumbar spine and osteoarthritis**

21  **and a five percent impairment?**

22     A.   Right.

23     **Q.   Well, actually that was more of a diagnosis,**

24  **right?**

25     A.   Yes.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                           244

```
 1        Q.   Your medical decision making for this

 2   patient was you're at maximum medical improvement; you

 3   don't need any further treatment to get better because

 4   you can't, right?

 5        A.   Yeah, I also advised to use a low pillow,

 6   avoid sudden motion of the head, heavy lifting, flex the

 7   knees not the back when --

 8             THE COURT REPORTER:  I'm sorry.  Speak up.

 9        A.   Use a small pillow, a low pillow; avoid

10   sudden motions of the head; avoid heavy lifting; flex

11   knees, not the back, when picking up something from the

12   floor.

13             THE COURT REPORTER:  After heavy lifting,

14        flex knees?

15        A.   Flex the knees, not the back, when picking

16   up anything from the floor.

17   BY MR. HAZOURI:

18        Q.   So you're reading your recommendations?

19        A.   Right.

20        Q.   Okay.  Is your testimony here today that

21   what you've described and what's documented in this

22   final orthopedic evaluation is medical decision making

23   of high complexity?

24        A.   That's what I believe.

25        Q.   And again, we talked about it.  99215 is the
```



 1   highest level code you can bill for a follow-up visit,

 2   correct?

 3        A.   Yes.

 4        Q.   And so is it your testimony here today that

 5   the decision making that you made with this patient at

 6   this December 15, 2016 evaluation is the highest level a

 7   physician can be called upon to make?  Because that's

 8   what it was billed as.  Is that your testimony?

 9        A.   Yes.

10             MR. HAZOURI:  Looking for the bill.  This is

11        it.  I just want to see the number -- oh, that's

12        the wrong one.  What number do you guys have for

13        the bill in December, please?

14             THE COURT REPORTER:  It's number 43.

15             MR. HAZOURI:  Nobody can seem to find it.

16        Exhibit 43; is that what we all got?  We're good.

17             MR. PIVNIK:  Are we finally done for this

18        one patient?

19             MR. HAZOURI:  Pretty much.  We're close.

20             MR. SCHURR:  Six hours on one patient.

21             MR. HAZOURI:  Hasn't been six hours.

22             MR. SCHURR:  9:00 to 3:00.

23             MR. HAZOURI:  Yeah, an hour break and how

24        many other breaks?

25             MR. SCHURR:  About five hours.



1          MR. HAZOURI:  I've only got 424 more

2     patients to go, Ken.  I'm happy about that.

3          MR. SCHURR:  Let's go.

4          (Plaintiff's Exhibit No. 48 marked for

5     identification.)

6  BY MR. HAZOURI:

7     Q.   Handing you what we've marked as Exhibit 48

8  to your deposition.

9          Do you recognize this as a form that your

10  office uses?

11    A.   Yes.

12    Q.   And what is this form?

13    A.   It's called a patient log.

14    Q.   And why does the office use this form?

15    A.   The patient is signing that she was treated

16  by us.

17    Q.   Okay.  It says down at the first paragraph

18  down at the bottom, "My signature on this document

19  attests to the fact that the services set forth herein

20  were actually rendered" correct?

21    A.   Yeah, that she was seen by me.

22    Q.   And what's checked off is an office visit,

23  right?

24    A.   Right.

25    Q.   There's no reference to range of motion



 1  testing, right?

 2      A.   No.

 3      Q.   There's no reference to the range of motion

 4  testing that was billed as 95851 at all three visits,

 5  right?

 6      A.   No.

 7      Q.   And there's no reference to the x-ray review

 8  that you billed as 76140 at the last office visit in

 9  December 2016, correct?

10      A.   Right.

11      Q.   And that's because those services are

12  included within the office visit?

13      A.   Yes.

14      Q.   All right.  Okay, so we've looked at -- over

15  the course of looking at the records relating to these

16  three dates of service with this patient and the bills

17  associated with them, we've seen the codes 99204, 99214,

18  99215, 95851 and 76140; you agree, right?

19      A.   Yeah.

20           MR. PIVNIK:  Assuming you got those right.

21           MR. HAZOURI:  I read them right.  Do you

22      think I didn't?  Okay.  I want to keep meaning.

23           MR. PIVNIK:  I'm sorry.  I don't mean to

24      interrupt.

25           MR. HAZOURI:  That's fine.



 1  BY MR. HAZOURI:

 2       Q.   And those are codes you use, generally, in

 3  your practice?

 4       A.   Yes.

 5       Q.   Right?  Explain to me how -- well, first of

 6  all, who participated in the decision to use these CPT

 7  codes generally in your practice, with your clinic

 8  Feijoo, P.A.?

 9       A.   Well, I rely on my billing person, Anielka.

10  Depends on the data I give her.

11       Q.   Okay.  Was there -- and I'm not talking

12  about on a day-to-day or patient-to-patient basis how

13  CPT codes get used.  That's not what I'm asking you.

14  I'm asking more in a general sense, was there a meeting

15  with you and Ms. Castillo at some point in your practice

16  where you all discussed what codes would generally be

17  used for your services?

18       A.   Yeah, in the beginning we talked about this

19  and she explained to me what she knew about CPT codes.

20  So we were calling different doctors and clinics to see

21  what codes they were using and how much they were

22  charging, and based on all this information, the books

23  on the CPT code and the courses that she took, that's

24  why she relies on those data to provide the billing for

25  the patients.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    249

1        Q.    Okay.  And she discussed this all with you

2   in one or more meetings with you?

3        A.    Yeah.

4        Q.    And you two made a decision that these will

5   be the codes that you would use for your services,

6   generally?

7        A.    Yes.  Depending on the patient, the type of

8   exam, the amount of time.  Depending on these issues.

9        Q.    Do you recall any specific discussions

10  regarding the 95851 code, like where you got the idea to

11  use that from?

12       A.    No.

13       Q.    How about the 76140 code?  Same question.

14       A.    I don't remember exactly every code, no.

15       Q.    And do you recall when you had these meeting

16  or meetings with Ms. Castillo, in the general sense that

17  I'm talking about?

18       A.    When she began billing for me.

19       Q.    When was that?

20       A.    It was about probably 2001, 2002.  I don't

21  remember.

22       Q.    Right around that time period?

23       A.    Yeah.

24       Q.    And was it just you and her in these

25  meetings to discuss the codes or did anybody else



```
 1  participate?
 2       A.   I don't remember if there was another lady
 3  who used to be doing the billing for me before.
 4  Probably she was too.
 5       Q.   But you don't remember?
 6       A.   No, I don't remember.
 7       Q.   All right.  And you would agree that as the
 8  owner, co-owner with your wife, but as the owner and
 9  practicing physician at the clinic, you have the
10  ultimate authority to decide what codes --
11       A.   Right.
12       Q.   -- the clinic will bill?
13       A.   Yes.
14       Q.   Okay, I'm going to ask you some questions
15  about a different patient here.
16            MR. HAZOURI:  I'm going to need more
17       stickers.  Can you write them up for me?
18            THE COURT REPORTER:  Yeah.
19            MR. HAZOURI:  Maybe 10 of them.  I don't
20       know if I'll need that many.  But what are we on?
21            THE COURT REPORTER:  We are on 49.
22            MR. HAZOURI:  49?  Yeah.
23            (Plaintiff's Exhibit No. 49 marked for
24       identification.)
25  BY MR. HAZOURI:
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    251

```
 1        Q.   Okay, so yes, I've handed you what's been

 2   marked as Exhibit 49 to your deposition.

 3             And this is a document -- it's a different

 4   patient.  The initials are J.A.  You see it at the top?

 5   I think it's last name first.  Do you see that?

 6        A.   Yes.

 7        Q.   And this is entitled initial/final

 8   orthopedic evaluation.

 9        A.   Right.

10        Q.   And I think you referenced this earlier in

11   your testimony.

12        A.   Right.

13        Q.   Okay.  So what's happening here is this is

14   the first time you've seen this patient?

15        A.   Yes.

16        Q.   And it's also the last time you're going to

17   see the patient?

18        A.   Yes.

19        Q.   And on page 2, you provided a disability

20   rating of 11 percent for this patient under the final

21   evaluation, correct?

22        A.   Yes.

23        Q.   So the purpose of this exam was to provide

24   that disability rating, correct?

25             MR. PIVNIK:  Objection, argumentative.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    252

```
 1  BY MR. HAZOURI:

 2       Q.   Is that right?

 3       A.   Yes.

 4       Q.   Now, remember when I asked you before --

 5  first of all, about the patient needing to be at MMI?

 6       A.   Yes.

 7       Q.   To give a disability rating?

 8       A.   Right.

 9       Q.   And you said they do, and you described what

10  MMI was, right?

11       A.   Yes.

12       Q.   And remember I asked you in determining

13  whether the patient was at MMI, you use your prior

14  visits with the patient and the observations you made on

15  how the patient was improving or not improving on those

16  prior visits, in order to determine if the patient was

17  at MMI, right?

18       A.   Right.

19       Q.   You can't do that with this patient because

20  you've never seen the patient before, right?

21            MR. PIVNIK:  Objection, form.

22       A.   Well, when I have initial/final --

23            THE COURT REPORTER:  I'm sorry.

24            MR. HAZOURI:  You have to speak --

25       A.   When I have initial/final evaluation with a
```



 1  patient like this one, I rely on the history, the

 2  treatment that was provided to the patient, the

 3  symptoms, the physical examination and the reports of

 4  the different studies that were provided to the patient,

 5  like the MRI in this case.

 6          THE COURT REPORTER:  Different stories

 7      provided?

 8      A.  Different tests that were provided to the

 9  patient, like the MRI in this patient.

10  BY MR. HAZOURI:

11      Q.  Okay.  But how do you know that this patient

12  is at MMI if you've never seen this patient before and

13  you have no baseline for assessing his condition?

14      A.  Well, I don't know if the symptoms

15  decreased, but based on the physical exam and the

16  findings of the MRI where he has the disc herniation, I

17  believe this is the range of disability that she --

18          THE COURT REPORTER:  I'm sorry.  I believe

19      this is?

20      A.  That this is the range of disability, the

21  partial impairment rate of disability that she has,

22  which was 11 percent.

23  BY MR. HAZOURI:

24      Q.  Is that the best answer you can give me as

25  to how you assessed or determined that this patient was



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO
254

1  at MMI when you hadn't seen them before, previously seen

2  him and therefore had no baseline for assessing his

3  condition?  That's the best answer?

4          MR. PIVNIK:  I'm going to object, without

5       providing the entire file for this patient.

6       A.   I don't remember if I asked her if she was

7  feeling better with the symptoms.  Probably she was

8  feeling better with the therapy.  Usually when they have

9  the therapy they feel better.  She was still having pain

10 on the area of the lumbosacral spine, and the patient

11 motion was limited to 40 percent.  And the findings of

12 the disc herniation MRI.  That's why I gave her the

13 final evaluation rate of 11 percent as a whole.

14         MR. PIVNIK:  You said her, Doctor.  Is that

15      female or male?

16         THE WITNESS:  Huh?

17         MR. PIVNIK:  You said her.

18         MR. HAZOURI:  Yeah, I think it's a male.

19         THE WITNESS:  Oh, it's a male?

20         MR. HAZOURI:  That's okay.

21      A.   For him, 11 percent as a whole.  And I

22 advised the patient to avoid heavy lifting because she

23 might -- well, he might need in the future surgery to

24 remove the herniation.  When I have MRI with the disc

25 herniation, I explain to the patients what it means so



1   they can be very careful not to impair that condition

2   any more.  To avoid having the disc herniation getting

3   better, because that will cause severe pain that will be

4   only resolved through surgical treatment.

5   BY MR. HAZOURI:

6       Q.   Okay.  Your counsel objected to my prior

7   question about how you could assess the patient at MMI

8   when you hadn't previously seen the patient and didn't

9   have a baseline, on the grounds that you didn't have the

10  compete medical chart in front of you.  So I want to

11  give you the complete medical chart because I have it

12  right here, a copy of it that your attorneys produced to

13  us.

14          And I'd like you to tell me if there are any

15  documents or records in here that would help you

16  determine that the patient is at MMI, by establishing a

17  baseline, you know, for his prior condition to compare

18  against what you observed in the final evaluation of the

19  patient, initial/final evaluation of the patient on

20  December 17, 2015.  So I'm handing you a copy of the

21  chart.

22          MR. PIVNIK:  I just want to for purposes of

23      identification, just note the Bates numbers.

24          MR. HAZOURI:  That's a good idea.

25          MR. PIVNIK:  If that's okay.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                256

```
 1        MR. HAZOURI:  That's a good idea.

 2        MR. PIVNIK:  So we're giving the witness

 3   what you represented to be the chart.

 4        MR. HAZOURI:  Yes.

 5        MR. PIVNIK:  Which is Bates number 0002 --

 6   and I'm going to assume that they're in order,

 7   continuous until the end, 00043.

 8        MR. HAZOURI:  Correct.  I don't want to mark

 9   it as an exhibit because the names are on the

10   back.  But you'll have for the record what I've

11   given him because of the Bates.

12        MR. PIVNIK:  No, if you just give one

13   second.

14        MR. HAZOURI:  Take your time.

15        MR. PIVNIK:  Yeah, the one that we did mark

16   as an exhibit was Bates number 070 -- or 040.

17        MR. HAZOURI:  Yeah, 40 to 42.  It may be the

18   chart minus the initial --

19        MR. PIVNIK:  Yeah, so it looks like what

20   you're going to show Dr. Feijoo is missing 39 as

21   well as 40 and 41.

22        MR. SCHURR:  Exhibit 49 is Bates number 40

23   to 42.

24        MR. PIVNIK:  Oh, okay, 40 to 42?

25        MR. SCHURR:  Right.
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                257

```
 1                    MR. HAZOURI:  And --

 2                    MR. PIVNIK:  I don't see 39.

 3                    MR. HAZOURI:  Well, here's -- by the way,

 4          let me mark another one here.

 5                    MR. PIVNIK:  Oh, okay.

 6                    MR. HAZOURI:  Yeah, I don't -- we want you

 7          to have everything.

 8                    MR. PIVNIK:  Appreciate it.

 9                    MR. HAZOURI:  Yeah.

10                    (Plaintiff's Exhibit No. 50 marked for

11          identification.)

12   BY MR. HAZOURI:

13          Q.   Here's Exhibit 50.  I'll represent to you

14   that's an MRI report that came out of the chart.  Okay?

15                    MR. PIVNIK:  Okay.  And that's Bates number

16          44.

17                    MR. HAZOURI:  I think that should be the

18          complete chart.

19                    MR. PIVNIK:  We're still missing, I think,

20          from what the doctor's reviewing, Bates number

21          39.

22                    MR. SCHURR:  Does the chart end on 44, on

23          Bates 44?

24                    MR. HAZOURI:  I don't have it in front of

25          me.
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    258

```
 1       MR. PIVNIK:  Well, the doctor's reviewing
 2   Exhibit 43.
 3       MR. HAZOURI:  So it would.  Here, while he's
 4   looking, why don't you look at these and I'll
 5   mark them, just so you can see what I have here.
 6       MR. PIVNIK:  Okay.  Were you going to mark
 7   this one?
 8       MR. HAZOURI:  I already did, Exhibit 50.
 9       MR. PIVNIK:  Okay.  Okay, so we have more
10   documents from this patient's chart then?
11       MR. HAZOURI:  I didn't have this clipped.
12   In other words, Jerry, while he's looking at
13   that, those are all from the visit we're talking
14   about.  I'll go ahead and mark them but they
15   wouldn't be past records.  And then that's the
16   bill.  And I will give them all and let him see
17   them all before he has to answer.
18       MR. PIVNIK:  Okay, thank you.
19       MR. HAZOURI:  I think that will cover them
20   all.
21       MR. SCHURR:  Would it just be simpler now
22   just to mark the chart and redact the name?
23       MR. PIVNIK:  Well, we'd have to redact it
24   from 30 or so pages.
25       MR. HAZOURI:  Yeah, I just prefer not since
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    259

```
 1    I haven't done the redaction, but you've got the

 2    base.

 3         MR. PIVNIK:  Yeah.

 4         MR. HAZOURI:  I mean, if you want, let's

 5    mark it so there's no question, if you want to.

 6    I don't want there to be any question that he

 7    didn't get to see the entire chart.

 8         MR. PIVNIK:  Yeah, we can mark it for

 9    identification.  You don't have to file it if you

10    decide to file it.

11         MR. HAZOURI:  That's fine.

12         THE COURT REPORTER:  You're on 51.

13         MR. HAZOURI:  Do you want me to tell you

14    what they are?

15         THE COURT REPORTER:  Yeah, if you don't

16    mind.

17         MR. HAZOURI:  Exhibit 51 is the written

18    evaluation of this patient, December 17, 2015.

19         (Plaintiff's Exhibit No. 51 marked for

20    identification.)

21         MR. HAZOURI:  Exhibit 52 is the range of

22    motion report of the patient, same day.

23         (Plaintiff's Exhibit No. 52 marked for

24    identification.)

25         MR. HAZOURI:  Here's 52, Jerry.
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                  260

```
 1        MR. PIVNIK:  Okay, thanks.

 2        MR. HAZOURI:  Exhibit 53 is a fax

 3   transmittal sheet to Valles and Associates.

 4        (Plaintiff's Exhibit No. 53 marked for

 5   identification.)

 6        MR. PIVNIK:  Just so we stay on track, I

 7   think you're reviewing this to answer Mr.

 8   Hazouri's question --

 9        MR. HAZOURI:  I'll re-ask it when we get

10   there.

11        MR. PIVNIK:  Okay.

12        MR. HAZOURI:  There's more out of the chart

13   that I thought, actually.

14        MR. PIVNIK:  Should just mark the whole

15   chart.

16        MR. HAZOURI:  Well, I separated some out,

17   so.

18        MR. PIVNIK:  Yeah.

19        MR. HAZOURI:  So Exhibit 54 is a phone

20   correspondence sheet.

21        (Plaintiff's Exhibit No. 54 marked for

22   identification.)

23        MR. HAZOURI:  Exhibit 55 is another patient

24   log.

25        (Plaintiff's Exhibit No. 55 marked for
```



 1      identification.)

 2           MR. HAZOURI:  There's 55.

 3           MR. PIVNIK:  Thank you.

 4           MR. HAZOURI:  56 is a bill for the date of

 5      service.

 6           (Plaintiff's Exhibit No. 56 marked for

 7      identification.)

 8           MR. HAZOURI:  Okay, why don't we go off the

 9      record?  We probably should have done that

10      before.

11           THE VIDEOGRAPHER:  Off record 3:27.

12           (A recess was taken.)

13           (Plaintiff's Exhibit No. 57 marked for

14      identification.)

15           THE VIDEOGRAPHER:  3:33.

16  BY MR. HAZOURI:

17      Q.   Okay, Doctor, so we took a break and before

18  the break and while we were on the break you looked at

19  and finished reviewing what we've now marked as Exhibit

20  57, which I've represented is the remainder of the chart

21  for patient J.A., who you saw on December 17, 2015.

22  When I say remainder, that means I've pulled some

23  documents out of the chart that we've also marked as

24  exhibits, so I'm going to go through those with you.

25      A.   Yes.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                              262

```
 1        Q.   Okay?  Just so you can see everything.  But
 2   you've looked at Exhibit 57 now, correct?
 3        A.   Yes.
 4        Q.   And you recognize that as your chart
 5   material?
 6        A.   Yes.
 7        Q.   Right?  Okay.  So then let's work through
 8   these in order.  We've got Exhibit 49 here.  That's your
 9   typewritten report for the initial/final evaluation of
10   the patient, correct?
11        A.   Yes.
12        Q.   Okay.  I've attached as Exhibit 50, an MRI
13   report.  You can see for patient J.A.  Do you understand
14   that to be an MRI report that you reviewed in
15   conjunction with the initial/final evaluation of this
16   patient?
17        A.   Yes.
18        Q.   And you told me before in questions that you
19   don't review the actual MRI films; you rely on these
20   types of reports and the findings in them?
21        A.   Yes.
22        Q.   Right?  And I've marked as Exhibit 51, a
23   handwritten form that we've seen with the other patient,
24   called initial orthopedic evaluation.  Do you see that?
25        A.   Yes.
```



1        Q.   And this is the handwritten notes you would

2   have made while performing your initial/final evaluation

3   of this patient on December 17, 2015?

4        A.   Right.

5        Q.   Right?  Next document is a range of motion

6   report that we've seen before for this patient.

7        A.   Yes, right.

8        Q.   Same date, December 17, 2015, right?

9        A.   Yes.

10        Q.   Now, the next one is -- that we've marked as

11   Exhibit 53, this is a fax cover page, correct?

12        A.   Yes.

13        Q.   Fax transmittal sheet.

14        A.   Yes.

15        Q.   And it says orthopedic evaluation, right?

16        A.   Right.

17        Q.   And Valles and Associates is a law firm,

18   right?

19        A.   Right.

20        Q.   So you faxed your handwritten initial/final

21   report for this patient --

22        A.   Typewritten.

23        Q.   Typewritten.  Did I say handwritten again?

24   Shoot myself.  You faxed the typewritten report to the

25   law firm, right?



Orange Legal
800-275-7991

```
 1       A.    Yes.

 2       Q.    The report that we marked as Exhibit 49.

 3       A.    Right.

 4       Q.    And you understood that was the law firm

 5   that was representing patient J.A. in an auto negligence

 6   personal injury case?

 7       A.    Right.

 8       Q.    And so the reason you faxed them your

 9   initial/final orthopedic evaluation is so that they

10   could have your report, including the disability rating

11   of 11 percent and the estimated cost of surgery for this

12   patient for the lawsuit?

13       A.    Right.

14       Q.    Right?  Now, so that's Exhibit 53.  Exhibit

15   54 is called a phone correspondence sheet.  Do you see

16   that?

17       A.    Oh yes.

18       Q.    And you recognize that from your medical

19   chart, right?

20       A.    Right.

21       Q.    It tends to be the first page in your

22   medical chart, from what I've seen.  Does that sound

23   right to you?

24       A.    Yes.

25       Q.    And it says 2/2/16, February 2nd, 2016,
```



**Orange Legal**
**800-275-7991**

1  initial/final sent to attorney.  So your fax cover sheet

2  says it was sent on December 30th, 2015.  This reflects

3  that the initial/final was sent to the attorney on

4  February 2nd, 2016.

5       A.   Yes.

6       Q.   Perhaps it was sent a second time?

7       A.   Yes.

8       Q.   But it would be to the patient's attorney --

9       A.   Yes.

10      Q.   -- for use in the manner that we previously

11  discussed?

12      A.   Right.

13      Q.   And then Exhibit 55 is the same type of

14  patient log that we discussed with the other patient,

15  correct?

16      A.   Right.

17      Q.   Exhibit 56 is the bill that your firm issued

18  to -- or I'm sorry, your clinic, your practice, issued

19  to State Farm for this patient, correct?

20      A.   Right.

21      Q.   So I believe now, with the exhibits that

22  we've marked and including Exhibit 57 which has the

23  leftover chart materials, that you have now seen the

24  entire chart that was produced for this patient.

25      A.   Yes.



1      Q.   Okay.  So now having reviewed the entire

2  chart materials issued for this patient, my question to

3  you is how could you establish that this patient was at

4  maximum medical improvement, as necessary to assign the

5  patient a permanent impairment rating of 11 percent,

6  when you hadn't previously seen the patient and didn't

7  therefore have a baseline for his medical condition?

8      A.   Well, based on the history, the symptoms,

9  the findings on the MRI, the MRI report.

10     Q.   Okay.  So your testimony is you could look

11  at the symptoms, the MRI report, the subjective

12  complaints at this one moment in time, December 17,

13  2015, and determine that this patient was at MMI?

14     A.   And the objective findings of the physical

15  exam.

16     Q.   Okay, so I --

17          THE COURT REPORTER:  Of the what?

18     A.   Objective findings of the physical exam.

19  BY MR. HAZOURI:

20     Q.   So you could look at those items that you've

21  described at this point in time, on December 17, 2015,

22  and reach a viable, correct decision that this patient

23  was at maximum medical improvement?

24     A.   Yes.

25     Q.   How do these findings, the items you just



 1  described in your testimony, tell you that this patient

 2  is not capable of having any further improvement in his

 3  condition?

 4       A.   Well, he might have some improvement but

 5  with three disc herniation, it's very difficult to

 6  improve so much because he has three disc herniation the

 7  lower back, and the physical exam corroborates that he's

 8  having pain in the lower back.  So that's why I said he

 9  might need in the future surgical treatment if the

10  symptoms don't get better.

11            THE COURT REPORTER:  He might need it in the

12        future --

13       A.   The future, surgical treatment if the

14  symptoms do not get better.  Many times when you have

15  disc herniation, as I said before, the symptoms improve,

16  the patient feels better.  If he's careful with no heavy

17  lifting, with flexing the knees not back, as I always

18  tell them, there is less (inaudible) disc herniation.

19  But sometimes it doesn't improve.  Many patient have to

20  go to surgery.

21  BY MR. HAZOURI:

22       Q.   And once again, Exhibit 49 -- strike that.

23  I'm sorry.

24            Okay.  Looking at Exhibit 49, page 2, you

25  diagnose the patient of having -- based on the MRI of



1   the lumbar spine, shows disc herniations at L5/S1, L4/L5

2   and L3/L4.  Those are different levels of the spine,

3   right?

4        A.   Right.

5        Q.   And your diagnosis of the disc herniations

6   at those regions comes directly out of the MRI report

7   that we marked as Exhibit 50?

8        A.   Right.

9        Q.   Because you said you rely on the report?

10       A.   Yes.

11       Q.   Right?  And then if you look at the bill

12   that your clinic issued to State Farm Mutual for

13   12/17/2015, it has a 76140 charge for $100, correct?

14       A.   Yes.

15       Q.   So what happened here was you looked at the

16   Optimum Imaging MRI report that's marked as Exhibit 50,

17   right?

18       A.   Yes.

19       Q.   You took the impressions, the section of the

20   impression that found disc -- they used the word disc

21   protrusion; that's another word for herniation?

22       A.   Herniation, yes.

23       Q.   So you took the finding of the disc

24   protrusion at L4 -- I'm sorry, L5/S1, L4 and 5, and L3

25   and 4, you took it out of the Optimum Imaging report and



1   you put it into your own report.

2        A.   Right.

3        Q.   Right?  And for that service, for taking the

4   language from the Optimum Imaging MRI report and writing

5   it into your own report, you charged State Farm $100 for

6   a 76140?

7             MR. PIVNIK:  Objection, form, argumentative.

8        A.   Yeah.

9             MR. HAZOURI:  Can we go off the record for a

10       second?

11            THE VIDEOGRAPHER:  Off record 3:43.

12            (A brief recess was taken.)

13            THE VIDEOGRAPHER:  On record 3:44.

14            MR. HAZOURI:  58.

15            (Plaintiff's Exhibit No. 58 marked for

16       identification.)

17   BY MR. HAZOURI:

18       Q.   Okay, I've handed you what's been marked as

19   Exhibit 58 and I'll represent to you this came out of

20   the chart of the first patient that we were talking

21   about, this form, E.A.G.  Have you seen this document

22   before?

23       A.   Yes.

24       Q.   Do you understand it to be an assignment of

25   benefits?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO
                                                                    270

```
 1        A.    Yeah.

 2        Q.    And what this form does -- I'm just going to

 3   try and walk us through it --

 4        A.    Please.

 5        Q.    -- so we keep moving, is when the patient --

 6   well, first of all, when the patient comes to see you

 7   for an office visit they sign this form?

 8        A.    Right.

 9        Q.    And what this form does, one thing it does

10   is the patient is entitled to be paid PIP benefits as a

11   result of the accident, for medical expenses, and the

12   patient is taking that right to get paid PIP benefits

13   and giving it to you and your clinic?

14        A.    Right.

15        Q.    Right?  And the -- it also includes the

16   right to bring a suit in a court of law is also being

17   assigned over the PIP benefits; do you understand that?

18        A.    Yes.

19        Q.    You understand that?

20        A.    Yes.

21        Q.    Okay.  And you agree?

22        A.    Yes.

23        Q.    Okay.  And -- did you say yes?

24        A.    Yes.

25        Q.    That was a quiet one.
```



Orange Legal
800-275-7991

```
 1              THE COURT REPORTER:  Thank you.

 2   BY MR. HAZOURI:

 3        Q.   And who drafted this document for the

 4   clinic?

 5        A.   I don't know.

 6        Q.   Did you participate in its drafting?

 7        A.   I don't remember.

 8        Q.   How long has your clinic used it?

 9        A.   Well, five years, since I began.

10        Q.   Okay.  I want to direct you to this language

11   right here, starting with "since".

12        A.   Yes.

13        Q.   Do you see it there?

14        A.   Yes.

15        Q.   I'm going to read it for the record.

16        A.   Yes.

17        Q.   "Since I have assigned my PIP benefits to

18   the above-referenced medical provider, any prior

19   reservation of benefits or demand for wage-loss benefits

20   is withdrawn.  I am instructing the PIP carrier not to

21   reserve any benefits and to pay all bills in the order

22   received."

23              Did I read that correctly?

24        A.   Yes.

25        Q.   Okay, now, you understand that PIP benefits
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                 272

```
 1   are also available to pay an insured's lost wages; you

 2   know that?

 3        A.   Yes.

 4        Q.   And what this form is saying is -- and do

 5   you understand that the patient can reserve his or her

 6   PIP benefits, a portion of them to pay their lost wages?

 7        A.   Right.

 8        Q.   So that they don't get spent on medical

 9   expenses because the patient, for example, might have

10   health insurance to pay for their medical expenses, so

11   the patient can say keep my PIP benefits, please, to pay

12   my lost wages and use my health insurance?

13        A.   Right.

14        Q.   Right?  You understand that?

15        A.   Yes.

16        Q.   And what this form says is the patient is

17   withdrawing any reservation of benefits for his or her

18   lost wages, right?

19        A.   Yes.

20        Q.   Okay, good.  Do you -- does anybody in your

21   office explain that to the patient, that they're giving

22   up that right by signing this form?

23        A.   I believe they -- they explain -- the

24   patient read and they ask.

25        Q.   If the patient doesn't ask it doesn't get
```



 1  explained to them?

 2      A.   I believe they are explained.

 3      Q.   Would you defer to Ms. Castillo on what

 4  happens?

 5      A.   Yes.

 6      Q.   Okay.  On this question?  Because this is

 7  more her area.

 8      A.   Yes.

 9      Q.   All right.  Now, at the top it says insurer,

10  please read the following in its entirety upon receipt,

11  correct?

12      A.   Right.

13      Q.   And so you understand that this form may

14  very well be given to a PIP insurer like State Farm

15  Mutual?

16      A.   Yes.

17      Q.   If I can direct you -- I don't have it

18  highlighted -- it's the language starting with "the"

19  right there; do you see that?

20      A.   Yeah.

21      Q.   If you could, I'll read it for the record,

22  just read along with me.

23      A.   Yes.

24      Q.   "The provider hereby objects to any

25  reductions or partial payments made at the discretion of



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                         274

1   the insurer.  Any partial or reduced payment, regardless

2   of the accompanying language issued by the insurer and

3   deposited by the provider, shall be done so under

4   protest at the risk of the insurer and deposit shall not

5   be deemed a waiver or satisfaction discharge or

6   settlement agreement by the provider to accept the

7   reduced amount as payment in full."

8         Did I read that correctly?

9    A.   Yes.

10   Q.   Okay, going back to the first sentence.  Any

11  partial -- I'm sorry.  The provider hereby objects to

12  any reductions or partial payments made at the

13  discretion of the insurer.

14        What you are telling the insurer, such as

15  State Farm, with this form is, if you reduced my bill at

16  all, we object, right?

17        MR. PIVNIK:  Objection, form, legal

18     conclusion.

19  BY MR. HAZOURI:

20   Q.   That's what you're meaning to convey to the

21  insurer with this form?

22   A.   Right.

23   Q.   Right?  So before you even hear the

24  insurer's explanation or the reason why the insurer

25  reduced a charge, you're objecting to it?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                          275

```
 1              MR. PIVNIK:  Objection, form.

 2  BY MR. HAZOURI:

 3       Q.   Right?

 4       A.   Right.

 5              MR. PIVNIK:  And foundation.

 6  BY MR. HAZOURI:

 7       Q.   And that's because you believe that all

 8  charges that your clinic issues to insurers like State

 9  Farm are proper and correct?

10       A.   Yes.

11       Q.   When your clinic, Feijoo, P.A., submits a

12  bill for PIP benefits to an insurer such as State Farm

13  Mutual, Feijoo, P.A. expects that State Farm Mutual will

14  pay the full amount of the charges at 80 percent if it's

15  a PIP only policy?

16       A.   Right.

17       Q.   Because PIP pays 80 percent, right?

18       A.   Right.

19       A.   And if there -- you've heard of the coverage

20  MPC or medical payments coverage?  Have you heard of

21  that?  Picks up the other 20 percent?

22       A.   Yes.

23       Q.   You're familiar with that?

24       A.   Um-hum.

25       Q.   And so if there's a policy that has both PIP
```



Orange Legal
800-275-7991

1    and MPC coverage, Feijoo, P.A. expects an insurer such

2    as State Farm Mutual to pay the full amount of the

3    charges at 100 percent, right?

4         A.    Right.

5         Q.    And that's because you and your clinic

6    believe that your charges are correct --

7         A.    Right.

8         Q.    -- and proper?

9         A.    Right.

10        Q.    And accurate?

11        A.    Right.

12        Q.    Your charges -- you believe your charges

13   accurately provide -- or describe the services that you

14   provided to the patients?

15        A.    Yes.

16        Q.    Okay.  So is Feijoo, P.A. taking the

17   position in this lawsuit that the CPT code charges that

18   it sent to State Farm were so obviously incorrect and

19   false that State Farm should have realized that and not

20   paid them?

21             MR. PIVNIK:  Objection, form.

22   BY MR. HAZOURI:

23        Q.    Did you say no?

24        A.    Can you read it again?

25        Q.    Yes.  I'm asking you about if you're taking



1    the position in this lawsuit -- that's what the question

2    relates to.  And so my -- you and your clinic, Feijoo,

3    P.A.  My question is, are Feijoo, P.A. and you taking

4    the position in this lawsuit that the CPT code charges

5    it sent to State Farm Mutual that are at issue in this

6    case, were so obviously incorrect and false that State

7    Farm Mutual should not have paid them?

8            MR. PIVNIK:  Form and foundation.

9        A.   No.

10   BY MR. HAZOURI:

11       Q.   And as we discussed, the assignment of

12   benefits gives your clinic and you the right to file a

13   lawsuit against an insurer such as State Farm Mutual to

14   recover PIP benefits that you believe are owed for a

15   service?

16       A.   Right.

17       Q.   And is it fair to say that you filed a lot

18   of PIP suits against State Farm Mutual in the past?

19       A.   Yeah.

20           MR. PIVNIK:  Objection to form.

21   BY MR. HAZOURI:

22       Q.   You said yes?

23       A.   Yes.

24       Q.   So why have you filed a lot of PIP suits

25   against State Farm in the past and present?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                278

```
 1        A.    To get the payments that weren't being

 2   received.

 3        Q.    Payments for the full amount of the charges,

 4   either at 80 percent or 100 percent?

 5        A.    Yes.

 6        Q.    I'm going to hand you what we marked as an

 7   Exhibit to Ms. Castillo's deposition, so it already has

 8   a stamp on it, Exhibit 19, and I'll ask you to take a

 9   look at that.  You're familiar with it, I'm sure.

10             This is a -- I'll represent to you this is a

11   list of, we call them PIP suits, lawsuits for PIP

12   benefits that your clinic has filed against State Farm,

13   and I'm not saying it's a complete list.  I'm just

14   saying it's a list that your attorneys have sent over to

15   us.  I count in this list -- I've counted them up -- I

16   won't ask you to do it -- 137 PIP suits.  And so can you

17   accept that from me?

18        A.    Yes.

19        Q.    Without having to count anything?

20        A.    Yes.

21        Q.    And then I'll represent to you, you see the

22   case numbers here?  The ones that start with 13, meaning

23   they were filed in 2013, and it goes forward and we end

24   with some that are filed in '15; do you see that?

25        A.    Yes.
```



```
 1        Q.   So what we can gather from this list is that
 2   in the years 2013 to 2015 you have filed at least 137
 3   PIP suits against State Farm Mutual?
 4        A.   Right.
 5        Q.   You don't have any reason to dispute that?
 6        A.   No.
 7        Q.   And again, in all 137 of these PIP suits,
 8   you filed them against State Farm because State Farm
 9   didn't pay the full amount of your clinic's charges at
10   80 percent for a PIP only policy or 100 percent at PIP
11   and med-pay?
12        A.   Yes.
13             MR. PIVNIK:  Objection, overbroad.
14   BY MR. HAZOURI:
15        Q.   And that's because --
16             THE COURT REPORTER:  I'm sorry, what was
17        your objection?
18             MR. PIVNIK:  Objection, overbroad.
19   BY MR. HAZOURI:
20        Q.   And --
21             MR. PIVNIK:  He's asking him to discuss 137
22        different lawsuits and the reasons for it.
23             MR. HAZOURI:  Okay, got your objection.
24   BY MR. HAZOURI:
25        Q.   And in all 100 -- well, strike that.
```

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    280

```
 1              MR. SCHURR:  Can I see that list you showed

 2       him?

 3              MR. HAZOURI:  I'm sorry?

 4              MR. SCHURR:  The list you just -- you showed

 5       the witness?

 6              MR. HAZOURI:  Oh, yeah, here.  Jerry has it

 7       for you.

 8              MR. SCHURR:  Okay.

 9              MR. HAZOURI:  What was that one we just

10       marked; what number?

11              MR. PIVNIK:  50 -- are we on 59?

12              MR. HAZOURI:  Doctor, could you tell us the

13       number?

14              THE WITNESS:  59.

15              (Plaintiff's Exhibit No. 59 marked for

16       identification.)

17   BY MR. HAZOURI:

18       Q.   59, and it's a chart control form.  So as I

19   just said, I've handed you a document that we marked as

20   Exhibit 59 that's described as a chart control form.

21              Is this a form that you use in your office?

22       A.   Yes.

23       Q.   And I'll represent to you it's the patient

24   that we first talked about, the E.A.G.  You can see the

25   E.A.G. up there, right?
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                          281

```
 1        A.    Yeah.
 2        Q.    What's the purpose of this form?  Why do you
 3   use it?
 4        A.    I believe to have all the known -- any
 5   information from the patient; health insurance, other
 6   insurance, Social Security card, driver's license, all
 7   this data that are written there.
 8        Q.    Do you know who created this form?
 9        A.    No.
10        Q.    Do you know how long your clinic has used
11   it?
12        A.    I don't remember.
13        Q.    Now, down at the bottom it says payment
14   received, right?
15        A.    Right.
16        Q.    Denied?
17        A.    Right.
18        Q.    And that means payment denied, right?
19        A.    Right.
20        Q.    And then PIP suit --
21        A.    Right.
22        Q.    -- and date filed?
23        A.    Right.
24        Q.    And attorney representing for PIP suit,
25   right?
```



 1     A.   Right.

 2     Q.   So even in your standardized form that you

 3  use in your clinic, you have entries for whether there's

 4  been a PIP suit filed, the day it was filed and the

 5  attorney representing the clinic in the PIP suit, right?

 6     A.   Right.

 7     Q.   And that's because -- you have a standard

 8  form because you have a pretty standard practice of

 9  filing PIP suits if you don't get paid in full on the

10  charges, right?

11          MR. PIVNIK:  Objection to form.

12     A.   Right.

13  BY MR. HAZOURI:

14     Q.   Now, Mr. Schurr who is sitting here today,

15  Kenneth Schurr, is one of the attorneys that has filed a

16  lot of PIP suits on behalf of you and your clinic,

17  right?

18     A.   Right.

19     Q.   And how long has Mr. Schurr represented you

20  and your clinic?

21          THE WITNESS:  For how long?

22          MR. HAZOURI:  You can't ask him.

23  BY MR. HAZOURI:

24     Q.   Just give your best estimate.

25     A.   No, I don't know.  Because he can tell you,



```
 1   as I don't remember.
 2         Q.   Okay.  Let's just kind of break it down.
 3   It's been more than a year, right?
 4         A.   Yes.
 5         Q.   Has it been more than five years, you think,
 6   he's represented you?
 7         A.   Possibly.
 8         Q.   It's possible?  And I want to be clear on
 9   the questions that I'm asking you about your
10   relationship with Mr. Schurr.  I'm just telling you in
11   advance.  In response to my questions, I don't want you
12   to tell me about anything you have talked about with Mr.
13   Schurr.  I'm going to ask you some questions that might
14   sound like I'm getting close to that, but I don't want
15   you to tell me that; that's not what I'm asking.  So I'm
16   telling you that in advance; do you understand?
17         A.   Okay.
18         Q.   Okay.  Now, without telling me any
19   discussions you've had with Mr. Schurr, he is available
20   for you to call and discuss issues relating to PIP
21   benefits and the PIP system of insurance in Florida if
22   you feel the need to get legal advice on those issues,
23   right?
24               MR. PIVNIK:  No, I don't know how he could
25         answer that without revealing --
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                           284

1        MR. HAZOURI:  I'm asking if he's available.

2        MR. PIVNIK:  -- attorney-client privilege

3   communications.

4        MR. HAZOURI:  I'm asking if he's available

5   to have those discussions.  I'm not asking about

6   any past discussions.

7        MR. SCHURR:  I think I'm going to instruct

8   him not to answer, okay?

9        MR. HAZOURI:  That is an improper

10  instruction.  I'm asking if he's available.  I'm

11  not asking about any past conversations.

12       MR. SCHURR:  It's irrelevant.

13       MR. PIVNIK:  But you're not discussing --

14       MR. HAZOURI:  You can't instruct him not to

15  answer on relevance.

16       MR. PIVNIK:  Well, yeah, I'm not --

17       MR. HAZOURI:  And you're not -- go ahead.

18       MR. SCHURR:  I represent the witness.  I

19  have the right to instruct the witness --

20       MR. PIVNIK:  Well, I'm going to instruct him

21  anyway.  Let me just break down your question,

22  because maybe you can rephrase it.  You're not

23  just asking if he's available to answer legal

24  questions.  That I wouldn't have a problem with.

25  The specific questions that you're asking him, he



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                     285

```
 1    would only be able to answer if he had a

 2    conversation with Ken about what legal advice he

 3    could give.

 4         MR. HAZOURI:  That is --

 5         MR. PIVNIK:  That's the nature of my

 6    objection and instruction.

 7         MR. HAZOURI:  Okay, well, then that's -- he

 8    can answer.  That's not an invasion of the

 9    attorney-client privilege, so you can make that

10    objection, but he can answer the question.

11         MR. PIVNIK:  But see, that's where I

12    disagree.  There's no way he can answer that

13    without revealing communications he's had with

14    Mr. Schurr.

15         MR. HAZOURI:  That is not correct.

16         MR. SCHURR:  I would have had to tell him

17    what I can offer him for him to answer your

18    question.

19         MR. HAZOURI:  That's no correct.  He can

20    have experience -- his own personal experience

21    where he knows that he can pick up the phone and

22    call and talk to you.  I'm not asking about the

23    content of any past communications.

24         MR. PIVNIK:  But you are.

25         MR. HAZOURI:  That is not --
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                    286

```
 1            MR. PIVNIK:  I mean, it's included in the

 2       question.  So that's my instruction.  You could

 3       rephrase the question, is Mr. Schurr available to

 4       answer legal questions.

 5            MR. HAZOURI:  Okay, I will start there.

 6  BY MR. HAZOURI:

 7       Q.   Do you understand that Mr. Schurr is

 8  available to answer legal questions for you, if you have

 9  them?

10       A.   Yes.

11       Q.   Okay.  And do you understand that Mr. Schurr

12  is available to answer legal questions regarding PIP

13  benefits and the PIP system of insurance of Florida, if

14  you have those questions?

15            MR. PIVNIK:  Yeah, same instruction.

16       Don't -- please don't answer that question.

17            MR. HAZOURI:  That's an improper instruction

18       of the witness not to answer.

19  BY MR. HAZOURI:

20       Q.   Do you understand that Mr. Schurr is

21  available for you to call him to discuss the CPT codes

22  that the Feijoo, P.A. clinic -- let me stop.  I'm going

23  to stop the question and I'm going to make it very

24  clear.

25            I'm not asking you about any past
```



**Orange Legal**
**800-275-7991**

 1  conversations you have had with Mr. Schurr.  I don't

 2  want to know about that.  I don't want you to go there,

 3  okay?  I'm asking you in the future or tomorrow, if you

 4  wanted to have a conversation, what is your

 5  understanding about Mr. Schurr's availability?  Do you

 6  understand?

 7          MR. PIVNIK:  Same instruction.  Please don't

 8      answer that question.

 9          MR. HAZOURI:  I haven't asked the question

10      yet.

11          MR. SCHURR:  I'm going to instruct him not

12      to answer the question as well.

13          MR. HAZOURI:  Okay, well, I'm going to ask

14      the question.

15  BY MR. HAZOURI:

16      Q.  Mr. Schurr is available for you to discuss

17  the CPT codes that Feijoo, P.A. is billing PIP insurers

18  for your medical services, and whether the clinic should

19  make any changes to the CPT codes it uses, right?

20          MR. PIVNIK:  Instruction -- objection, same

21      objection.  Don't answer the question.

22          MR. HAZOURI:  You've made your objection.

23      You instructed him.  We reserve all arguments.

24          MR. PIVNIK:  Understood.

25  BY MR. HAZOURI:



1        Q.   Okay, I want to talk to you about a third

2   patient that we -- and this is a patient we talked about

3   with Ms. Castillo.  And so I'm handing you a copy of

4   Exhibit 4 to her deposition.

5              MR. HAZOURI:  I actually have an extra copy

6        if you want to look at it.

7   BY MR. HAZOURI:

8        Q.   All right, so what I've handed you is an

9   initial orthopedic evaluation of a patient that you

10  perform -- her initials here H.P. -- that you performed

11  on January 26th, 2017; you see that?

12       A.   Yes.

13       Q.   Okay.  And under history of present illness,

14  it says that this is a 10-year-old patient, correct?

15       A.   Right.

16       Q.   And under occupation it says she's in fourth

17  grade, correct?

18       A.   Right.

19       Q.   And I'll just let you -- we'll just go

20  through it.  You're -- well, why don't you just read for

21  yourself your findings on the cervical spine -- well,

22  read for yourself the findings of your physical

23  examination and let me know when you're done reading

24  that because we're going to discuss.

25       A.   You want me to read it?



**Orange Legal**
**800-275-7991**

1        Q.   I want you to read it to yourself --

2        A.   Oh, okay.

3        Q.   -- and let me know when you're ready.  And

4   also read your diagnosis.

5        A.   Yes, I'm good.

6        Q.   Okay.  So you diagnosed this 10-year-old

7   patient with cervical spine post-traumatic painful

8   syndrome, correct?

9        A.   I've --

10       Q.   Is that different from a sprain?

11       A.   Well, it encompasses a sprain and different

12   muscles spasming.  Everything that you have in post-

13   traumatic syndrome.

14       Q.   Well, is it another way of saying sprain or

15   is it something different from sprain?

16       A.   When you said post-traumatic painful

17   syndrome, that's known as a series of symptoms and signs

18   found in this patient, the cervical spine post-trauma,

19   post the accident.

20       Q.   Okay.  So if we look at the cervical spine

21   finding, it says there is pain on the posterior cervical

22   region at flexion, extension, lateral flexion and

23   rotation to the right and left with tenderness at

24   palpation on the paracervical muscles with slight

25   limited range of motion of the normal range, correct?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO
290

```
 1      A.   Right.
 2      Q.   How is that any different from the symptoms
 3  that you would expect to see for a cervical spine
 4  sprain?
 5      A.   No, that's the same.
 6      Q.   Okay.  So are there any other objective
 7  findings or subjective complaints that caused you to
 8  diagnose this patient with cervical spine post-traumatic
 9  painful syndrome as opposed to just a sprain?
10      A.   It's not -- it's more complete of everything
11  she had.  Findings and symptoms of the patient, because
12  post-traumatic painful syndrome relates to symptoms of
13  the findings, physical and also subjective findings
14  related to the automobile accident.  That's why it's
15  called post-traumatic painful syndrome.
16      Q.   Well, the other sprains that you diagnosed
17  in the other patient that we looked at were post-
18  traumatic also.
19      A.   Yeah, but I don't write post-traumatic
20  sprain most of the time.  I just put sprain, cervical
21  sprain.
22      Q.   Do you usually --
23      A.   I get that also from somebody who sprained.
24      Q.   Yeah, sir, I don't want to beat this horse,
25  although I probably already am.  But could you have just
```



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

291

```
 1   as easily wrote here cervical spine sprain and it would

 2   have been the same diagnosis?

 3        A.   Well, yes.

 4        Q.   Okay.  And then number 2 is lumbosacral

 5   spine post-traumatic painful syndrome, correct?

 6        A.   Right.

 7        Q.   Same question.  Is that essentially a

 8   lumbosacral spine sprain?

 9        A.   Right, um-hum.

10        Q.   Okay.  And then lumbosacral spine

11   radiculitis.  We spoke about radiculitis, correct?

12        A.   Yes.

13        Q.   And that diagnosis comes from the fact that

14   you've got a positive Lasegue Sign bilaterally to 45

15   degrees, right?

16        A.   Right.

17        Q.   Okay.  Now, down under paragraph 4, for this

18   10 year-old patient, you state, I, Manual V. Feijoo,

19   have examined the patient, H.P. -- I'm not going to say

20   her name -- for an accident that occurred on January

21   24th, 2017, and I have concluded that this patient has

22   an emergency medical condition which is defined as a

23   medical condition manifesting itself by acute symptoms

24   of sufficient severity which may include severe pain,

25   such that the absence of immediate medical attention
```



1  would reasonably be expected to result in any of the

2  following:  Serious jeopardy to the patient's health,

3  serious impairment of body function, and serious

4  dysfunction of any bodily organs or parts.

5          Did I read that correctly?

6      A.   Yes.

7      Q.   All right.  So in other words, you diagnosed

8  this 10-year-old patient with an emergency medical

9  condition as defined in what you wrote there?

10     A.   Right.

11     Q.   All right.  Which of these conditions or

12  which of these risks, I guess I should say, did the

13  patient have?  Serious jeopardy to the patient's health,

14  serious impairment of body function or serious

15  dysfunction of any body organs or parts?

16     A.   Well, when you have a cervical spine post-

17  traumatic painful syndrome, lumbosacral --

18     Q.   Sir, sir, sir, slow down and kind of look up

19  and talk to her.

20     A.   When you have a patient with cervical spine

21  post-traumatic painful syndrome, lumbosacral spine post-

22  traumatic painful syndrome, that injury is the result in

23  this case from automobile accident.  When you have those

24  symptoms you might have also lesion on soft tissues of

25  the disc, or the ligaments or the muscles.  That can



1 impair the -- what it says here, the health of the body

2 functions of the girl in this case.

3            THE COURT REPORTER:  The?

4     A.    Impairment of the body functions --

5            THE COURT REPORTER:  The hairless?

6            MR. HAZOURI:  The health.

7     A.    The health of the body functions, normal

8 body functions of the girl in this case.

9 BY MR. HAZOURI:

10     Q.    Okay, so if I understand your answer

11 correctly, and tell me if I'm wrong.  You selected B,

12 serious impairment of body function as what this patient

13 has a risk of, or has?

14     A.    Yeah, impairment to a patient health, too,

15 right.

16     Q.    I'm sorry?

17     A.    I'm impairment to the patient's health.

18     Q.    Okay.  Well, it says serious jeopardy to the

19 patient's health.

20     A.    Yeah, impairment to the patient's health.

21     Q.    Are you -- do you think impairment --

22     A.    And the other offers the same -- similar.

23     Q.    You have to let me finish the question.  Are

24 you saying that you believe impairment is the same as

25 serious jeopardy?



1      A.   Right.

2      Q.   All right.  And what you said when you were

3  answering my question, you said if a person has cervical

4  or lumbar post-traumatic painful syndrome, as you

5  diagnosed this patient as having, you believe that

6  constitutes serious -- put the patient's health in

7  serious jeopardy and constitutes a serious impairment of

8  body function, right?  That was your testimony?

9      A.   My -- because of the symptoms, yes.

10      Q.   All right.  And is it also your testimony

11  that a cervical spine sprain, that type of soft tissue

12  injury, constitutes an emergency medical condition under

13  these standards?

14      A.   After an accident, yes.

15      Q.   And a thoracic sprain following an

16  automobile accident constitutes an emergency medical

17  condition, in your opinion, under these standards?

18      A.   Right.

19      Q.   And a lumbar sprain, soft tissue injury

20  following an accident constitutes an emergency medical

21  condition?

22      A.   Right.

23      Q.   Under these standards?

24      A.   Yes.

25      Q.   And so every patient that you see that you



 1    diagnose any type of sprain in the spine, in the

 2    cervical, lumbar, thoracic area, you're going to assign

 3    that patient as having an emergency medical condition?

 4         A.   After an accident, yes.

 5              THE VIDEOGRAPHER:  Off the record 4:12.

 6              (A recess was taken.)

 7              THE VIDEOGRAPHER:  On record 4:19.

 8    BY MR. HAZOURI:

 9         Q.   I just have a few more questions for you.

10    Not a lot at all.  Could you pull out Exhibit 56, since

11    it's right here, and that is your clinic's bill for the

12    December 17, 2015 treatment or evaluation of patient,

13    J.A., correct?

14         A.   Yes.

15         Q.   And I've asked you a lot of questions about

16    the 95851 charge and your range of motion testing for

17    what you -- your clinic issues at charge.

18         A.   Right.

19         Q.   You understand?

20         A.   Yes.

21         Q.   And you've described for me the range of

22    motion testing that you perform on patients in your

23    evaluations?

24         A.   Right.

25         Q.   And you've explained to me in the patients



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    296

 1  that we've looked at, their bills, that range of motion

 2  testing is what the charge 95851 for $100 is for, right?

 3       A.   Yes.

 4       Q.   Is that -- so my question is -- I just want

 5  to broaden it out.  Is that your clinic's standard

 6  practice is to bill an insurer such as State Farm

 7  Mutual, the 95851 $100 charge for that type of range of

 8  motion testing that you perform in your evaluations that

 9  you've described for us here today?

10       A.   Yes, sir.

11       Q.   My last question for now, and I apologize

12  for having to ask you this.  It's just a standard

13  question we have to ask, which is have you ever been

14  convicted of a crime?

15       A.   No.

16            MR. HAZOURI:  I think I am done for now.

17       Thank you, sir.

18                      CROSS-EXAMINATION

19  BY MR. PIVNIK:

20       Q.   Dr. Feijoo, good afternoon.

21       A.   Good afternoon.

22       Q.   Well, I know that we have spent a -- really

23  almost the whole day discusses only three patients, so I

24  don't want to -- I don't want to belabor a few points,

25  but there's just a couple things that I did want to



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

297

 1  clarify.

 2          Going to the second page that Mr. Hazouri

 3  questioned you about, which I believe this is A.J., a

 4  gentleman weighing about 180 pounds, and I think those

 5  were -- his chart is contained in Exhibits 49 through 57

 6  of 58.  Let me draw your attention to that.  If we could

 7  go -- have you turn to Exhibit 49, which I believe is

 8  your initial -- your typewritten initial evaluation, and

 9  final evaluation for this gentleman, A.J. -- and I'll

10  show you my copy.

11          MR. PIVNIK:  I think it's J.A.

12          MR. HAZOURI:  Oh, J.A., thank you.

13          MR. PIVNIK:  It's last name first.

14          MR. HAZOURI:  Okay.

15          THE WITNESS:  Okay, yeah, it is.  It says

16      A.J. -- A.J. --

17          MR. PIVNIK:  Yeah, it's last name first.

18          THE WITNESS:  Yeah, yeah.

19          MR. HAZOURI:  Yeah, I was reading it in the

20      order it was up there.

21          MR. PIVNIK:  Yeah, sure.

22  BY MR. PIVNIK:

23      Q.  Anyway, you saw this patient for the first

24  and final time on December 17th of --

25      A.  2015.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO

298

1      Q.    -- 2015, correct?

2      A.    Right.

3      Q.    And how long after the accident was that?

4      A.    It was two months.

5      Q.    Okay.  And I know that one of the things

6   that Mr. Hazouri asked you was how could you determine

7   that this patient was at maximum medical improvement

8   necessary to come up with your disability rating for

9   him, having only seen him once.

10          So my question to you is, what is the

11   significance of the fact that you saw him two months

12   after the accident and he was exhibiting the symptoms

13   and limitations that you found in your report?

14      A.    Well, it means that after two months of

15   physical therapy treatment and all that what he went

16   through, he was still with a very limited range of

17   motion.  Besides that, the pain was in 40 percent of the

18   normal range on the lumbosacral spine.  The thoracic

19   spine was normal; the cervical spine was normal.

20          THE COURT REPORTER:  What was normal?

21      A.    The MRI --

22          THE COURT REPORTER:  The last one?

23      A.    The cervical and thoracic spine were normal.

24   The lumbosacral spine is painful with limited range of

25   motion to 40 percent of the normal range, and the MRI



**Orange Legal**
**800-275-7991**

 1    reports showed disc herniation of L5/S1, L4/L5 and

 2    L3/L4.

 3              THE COURT REPORTER:  Designation?

 4              THE WITNESS:  Disc herniation.  Disc

 5         herniations.

 6              THE COURT REPORTER:  Disc herniation.

 7         A.   L5/S1, L4/L5, L3/L4.  Disc herniation, I

 8    believe, is what gives this patient that pain and that

 9    limited range of motion in the lumbosacral region.

10         Q.   Okay.  And in determining the fact that he

11    had herniations, you looked at the MRI report, correct?

12         A.   Right.

13         Q.   And I believe that was marked as Exhibit No.

14    50.  And the findings in the MRI report, were they

15    consistent with your range of motion in your physical

16    examination of patient J.A. or A.J., however you want to

17    refer to him as?

18         A.   Yes, I believe so.

19         Q.   And your findings then were consistent with

20    the fact that you did find herniations?

21         A.   Right.

22         Q.   And you also made recommendations -- you

23    came to a diagnosis for this patient, correct?

24         A.   Yes.

25         Q.   And you made recommendations.



 1       A.   Okay, I advise him to use a low pillow,

 2  avoid heavy lifting, bend knees not back when picking

 3  anything from the floor.  He was to --

 4           THE COURT REPORTER:  Slow down.

 5       A.   To avoid heavy lifting, bend the knees not

 6  the back when picking up anything from the floor.

 7  patient was explained about the MRI results and advise
                                                       The

 8  that he might need surgical evaluation and treatment in

 9  the future to remove the disc herniation.  Because of

10  the surgery, including anesthesia and pain medications,

11  would be between 15,000 and 20,000.

**12       Q.   Okay.  And would agree -- well, let me**

**13  rephrase that.**

**14           Was reviewing the MRI report important, even**

**15  crucial, to making the recommendations that you made to**

**16  this patient for his continued health and treatment?**

17       A.   Right.

**18       Q.   So when Mr. Hazouri asked you did you just**

**19  bill State Farm $100 for taking the report and putting**

**20  it -- the MRI report in the findings of your report;**

**21  that's not correct is it?**

22           MR. HAZOURI:  Objection, leading.

23       A.   Well, I read the report and what it stated.

24  I informed the patient about this report and fully

25  explained about this, what it means for him.



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                           301

1   BY MR. PIVNIK:

2        Q.   That was important to the care and

3   treatment -- was that important to the care and

4   treatment of this patient?

5        A.   Sure.  It was the interpretation and the

6   advice of the patient regarding the MRI report.

7        Q.   So did you bill State Farm just for putting

8   the numbers and findings in that report into your

9   report, or did you bill them that because you had to

10  read the report to make recommendations to this patient

11  about his continued care and treatment?

12       A.   Right.

13       Q.   The latter?

14       A.   Yes.

15       Q.   And of course State Farm doesn't pay you

16  $100; they pay 80 percent of the bill?

17       A.   Yes.

18       Q.   Okay.  So you charged State Farm $80 to

19  review the MRI report and make your recommendations to

20  their insured, to the patient, about his continued

21  healthcare and treatment, correct?

22       A.   Yes.

23       Q.   And you don't know whether State Farm failed

24  to pay you or not, correct?

25            MR. HAZOURI:  Objection, leading; calls for



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                                    302

```
 1        speculation.  If you want to rephrase it, though.
 2   BY MR. PIVNIK:
 3        Q.   But you understand that State Farm doesn't
 4   want that $80 back?
 5        A.   Right.
 6        Q.   And in total you billed for this -- you saw
 7   this patient one time, you read his entire chart, which
 8   he brought with him, correct?
 9        A.   Yes.
10        Q.   You read the MRI report.  You don't know if
11   you had the actual MRIs, right?
12        A.   No.
13        Q.   Okay.  If you had them you would have
14   reviewed them --
15        A.   Yes.
16        Q.   -- if you could have?
17        A.   Yes.
18        Q.   And the other exhibits which we marked which
19   were part of his chart -- and you billed State Farm how
20   much according to the --
21             MR. HAZOURI:  I'm sorry, you're moving
22        really quick with your prior question about would
23        he have reviewed the -- it was a leading question
24        about reviewing the MRI consult.  Just --
25             MR. PIVNIK:  Your objection noted.
```

 1  BY MR. PIVNIK:

 2      Q.   All right, so I think the HCFA form or HCFA

 3  bill was marked as Exhibit 56.  So how much did you --

 4  how much in total was billed to State Farm for all the

 5  work you did for this patient, including recommendations

 6  and diagnosis you came to for this patient's care and

 7  treatment?

 8      A.   $675.

 9      Q.   And you would have been paid, if you were

10  paid properly, 80 percent of that?

11           MR. HAZOURI:  Objection, leading.

12           MR. PIVNIK:  All right.

13  BY MR. PIVNIK:

14      Q.   How much would you have been paid -- what

15  percentage of that would you have received from State

16  Farm if State Farm paid you?

17      A.   80 percent.

18      Q.   And Mr. Hazouri also asked you about a list

19  of PIP suits that you filed in your -- against State

20  Farm.  That's because they didn't pay, right?

21      A.   Right.

22      Q.   If they paid you you would have -- you

23  wouldn't have a suit, right?

24      A.   Right.

25      Q.   But you didn't sue them every time they



 1  didn't pay --

 2          MR. HAZOURI:  Objection, leading.

 3          MR. PIVNIK:  Yes, let me rephrase it.

 4  BY MR. PIVNIK:

 5      Q.   Do you know if there were times that State

 6  Farm declined to pay for whatever reason but -- the

 7  PIPs -- you know, benefits were exhausted or the

 8  deductible was high enough that you didn't sue State

 9  Farm?

10      A.   Right.

11      Q.   I'm sure that there are -- are there many

12  times that you didn't sue State Farm because you agreed

13  with their assessment?

14      A.   Yeah, right.

15      Q.   And in those 137 cases, do you know, were

16  all of them resolved?

17      A.   I don't know.

18      Q.   You don't know.  You would have to defer to

19  Ms. Castillo?

20      A.   Correct.

21      Q.   All right.  Or even Mr. Schurr if he was --

22      A.   Yes, yes.

23      Q.   -- involved in those?  All right.  All

24  right, just a couple more.  When it comes to doing a

25  history for patients in the final exam, you read the --



1  do you read the entire chart, including notes and

2  reports from the initial exam and any follow-up exams

3  and re-interview the patient?

4      A.   When I have those, yes.

5           MR. PIVNIK:  Nothing further.

6           MR. HAZOURI:  Okay, I just have a few follow

7      up and then we're all done.

8                   REDIRECT EXAMINATION

9  BY MR. HAZOURI:

10     Q.   First of all, when Mr. Pivnik asked you --

11 he pointed out the talk -- we're talking about patient

12 J.A. here and Mr. Pivnik pointed out the MRI report that

13 you looked at and read in the course of preparing your

14 initial/final evaluation report, correct?

15     A.   Yes.

16     Q.   And he asked you how -- he reiterated by

17 question which was something -- or he added to my

18 question or my questioning, which was something to the

19 effect of how did this MRI report help you arrive at an

20 MMI diagnosis, and also -- it's coming back to me now.

21 He said you saw the patient two months after the

22 accident; how did that help you place the patient to

23 MMI.  Do you remember that question generally?

24     A.   Yes.

25     Q.   That Mr. Pivnik just asked you?  Okay.  When



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                    306

1   you answered that question, you said after two months of

2   physical therapy, the patient had not gotten better.  Do

3   you recall giving that answer?

4        A.   Right.

5        Q.   How do you know what physical therapy this

6   patient received during those two months?

7        A.   Well, usually when the patient is sent to me

8   after two months of treatment it's because they have

9   (inaudible) physical therapy.  Probably I just talked to

10  the patient and he explain to me.  I didn't write down,

11  but usually I ask them how -- how is he feeling with the

12  therapy.  Apparently, he was feeling mostly it's too

13  much pain in the lower back as my physical exam found

14  out.

15       Q.   Okay.  First of all you -- remember when we

16  took -- we were on the record and then we took a break;

17  you looked through the entire patient's medical chart.

18  Do you remember that?

19       A.   Right.

20       Q.   There are no records in there of any

21  physical therapy given to -- or any other therapy given

22  to the patient, other than the MRI report, which is not

23  therapy; that's a test, right?

24       A.   Right.

25       Q.   So there was no records of therapy in the



**Orange Legal**
**800-275-7991**

 1   medical chart, correct?

 2        A.   No.

 3        Q.   And when we read history of present illness

 4   for this patient in Exhibit 49, you describe the auto

 5   accident?

 6        A.   Right.

 7        Q.   Right?  And it's fair to say that in your

 8   initial/final orthopedic evaluation there's no reference

 9   whatsoever to any prior therapy, right?

10        A.   No.

11        Q.   I'm right, there's no reference?

12        A.   No.

13        Q.   Okay.  My bad question, but you are agreeing

14   with me that there's no reference to physical therapy or

15   any therapy in your --

16        A.   No, I didn't see any, no.

17        Q.   Okay.  So how do you know whether this

18   patient had prior therapy and what was the nature of the

19   therapy that he had, as you sit here today?  How do you

20   know that?

21        A.   I usually ask the patient, even if I didn't

22   write it, what type of therapy he went through this

23   month.  They always tell me.

24        Q.   Okay.  But as you sit here today, you don't

25   know what therapy?



STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO
308

```
 1        A.   I didn't write it down, no.

 2        Q.   So you don't know.  In other words, if I say

 3   to you right now, Doctor, please tell me the type of

 4   physical therapy or the type of treatment that this

 5   patient had before he came to see you on December 17th,

 6   2015 following the October 19, 2015 auto accident, you

 7   couldn't tell me?

 8        A.   I didn't document it, no.

 9        Q.   So doesn't the fact that you don't know what

10   type of therapy the patient received prior to seeing you

11   on December 17th, 2015 and how the patient responded to

12   that therapy -- the fact that you don't know that,

13   doesn't that hinder your ability to place the patient at

14   MMI and give him an impairment rating?

15        A.   When we have a patient with an accident, he

16   goes for a physical therapy clinic evaluation and

17   treatment, they usually -- the physical therapist,

18   depending on the symptoms and pain of a patient, give

19   the -- the physical therapist, depending on the physical

20   and clinical findings of the patient, do the appropriate

21   therapy treatments to relieve the symptoms of that

22   patient.  So after two months of physical therapy and

23   with the MRI reports, I believe that he has gone through

24   physical therapy treatments.  I probably took -- like I

25   told you before.  It's not written, but how come that
```



**Orange Legal**
**800-275-7991**

STATE FARM vs MANUEL V. FEIJOO
MANUEL FEIJOO                                                                309

1  you go to a physical therapy treatment for evaluation

2  and treatment and you don't receive physical therapy?

3  After an automobile accident, every time --

4          THE COURT REPORTER:  I didn't get that.

5      A.   How come --

6          THE COURT REPORTER:  After relax?

7      A.   After an automobile accident, if you go to a

8  physical therapy clinic for treatment, you should

9  receive physical therapy, because there is a physical

10 therapist doing the therapy evaluation and the

11 treatment.

12 BY MR. HAZOURI:

13     Q.   Okay, I appreciate that, but I want to

14 restate my question to you, which is we've confirmed

15 that there's no record of the patient's therapy

16 following his accident on October 19th, 2015, and prior

17 to you seeing him on December 17th, 2015, there's no

18 record of that in the chart.

19     A.   Right, I didn't write it down.

20     Q.   Right.  And so didn't your -- the lack of

21 documentation of the therapy the patient may or may not

22 have had prior to seeing you and how the patient

23 responded to that therapy or did not respond to that

24 therapy -- not having that information, doesn't that

25 hinder your ability to place the patient at MMI and



 1   assign a permanent impairment rating?

 2           MR. PIVNIK:  Objection to form, compound.

 3       A.   I believe after two months of an accident,

 4   being the patient treated at the physical therapy

 5   rehabilitation center, he should have had physical

 6   therapy even if I didn't write it down.  And with the

 7   findings of MMI and the positive findings, that gives me

 8   the ability to make a final evaluation of impairment

 9   rate of that patient based on the findings, the

10   symptoms, objective, subjective, and the MRI.

11   BY MR. HAZOURI:

12       Q.   Okay, what if -- let's take this same

13   patient, J.A., that we're talking about here -- no,

14   strike that.

15           Okay.  Mr. Pivnik also asked you in the 137

16   PIP suits that we saw, that list that I showed you, that

17   he asked you if you filed suit against State Farm

18   because State Farm didn't pay you and you answered yes.

19       A.   Yes.

20       Q.   Do you remember that?

21       A.   Yeah.

22       Q.   Okay.  You weren't saying State Farm didn't

23   pay you anything, they paid you zero on all 137 of those

24   claims; that's not what you meant to say?

25       A.   No, I didn't say that.



1        Q.    Yeah.   He -- it's Mr. Pivnik's fault he

2  didn't make his question clear, but what you would have

3  meant to say is State Farm did not pay 80 percent of

4  your entire charge on a PIP only policy.   That's what

5  caused you to sue State Farm, right?

6        A.    Yeah, what we should pay -- be paid.

7        Q.    State Farm paid less than 80 percent of your

8  entire charge, some amount less; that's why you filed

9  the PIP suits?

10       A.    Yes.

11       Q.    And for an MPC policy, State Farm paid some

12  amount less than 100 percent of your clinic's charges;

13  that's why you filed those PIP suits?

14       A.    Right.

15       Q.    And finally, let's again look at Exhibit 49.

16  It's right here.   It's patient J.A.   This patient's

17  complaints and injuries were limited to his lumbar

18  spine, correct?

19       A.    Right.

20       Q.    And if we look at the cervical spine

21  findings it says, on page 2, flexion/extension, lateral

22  flexion and rotation to the right and left, all these

23  movements are normal with normal range of motion and

24  normal muscle tone, correct?

25       A.    Right.



1      Q.   So this patient had an absolutely normal

2  cervical spine?

3      A.   That's right.

4      Q.   Okay.  Why did you recommend that this

5  patient with a normal cervical spine use a low pillow?

6      A.   Usually, when I have a patient in an

7  accident, even if they don't have symptoms of the

8  cervical spine, I always tell them that it's better to

9  use a low, small pillow even if they don't have any

10  symptoms.  I myself, I'm not a patient of an accident; I

11  try to use to lower my head in the bed, the thinnest

12  pillow I can find.  I feel better when I do that.  If I

13  use a high pillow, most of the time feel pain in the

14  morning.

15      Q.   So isn't it fair to say that every single

16  auto accident patient you see in your clinic, regardless

17  of whether they have an injury to their neck or not, you

18  give a recommendation of use a low pillow?

19      A.   I usually do, yeah.

20           MR. HAZOURI:  I think I'm done.

21           THE WITNESS:  So that's my advice to you.

22  Use a small pillow to sleep.

23           MR. HAZOURI:  Well, thank you.

24           THE WITNESS:  You'll feel better.

25           MR. HAZOURI:  I actually like a thick pillow



1   with a little bit of heft to it.

2        THE WITNESS:  Well no TV in the bed, all

3   right?

4        MR. HAZOURI:  And I watch TV in bed, too.

5        THE WITNESS:  Don't do it.

6        MR. HAZOURI:  My wife would agree with you,

7   but.

8        MR. PIVNIK:  We're done, right?

9        MR. HAZOURI:  Yeah, let's go off.

10       MR. PIVNIK:  We'll read.

11       THE COURT REPORTER:  Would you like to order

12   the original?

13       MR. HAZOURI:  Yes.

14       THE COURT REPORTER:  That's a standard

15   order, not an expedite?

16       MR. HAZOURI:  Yes, correct.

17       THE COURT REPORTER:  Do you need to order a

18   copy?

19       MR. PIVNIK:  He needs to read it.

20       THE COURT REPORTER:  Yes, he's going to

21   read.

22       MR. PIVNIK:  Not yet.

23       THE COURT REPORTER:  Thank you.  No copy

24   orders at this time.

25       (The deposition concluded at 5:00 p.m.)



```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA

      COUNTY OF MIAMI-DADE

 4

 5          I, Jordann Williams, Court Reporter and Notary

 6    Public, State of Florida, certify that Manuel V. Feijoo, M.D.

 7    personally appeared before me and was duly sworn/affirmed.

 8          WITNESS my hand and official seal this 7th

 9    day of June, 2019.

10

11

12

13

14                          Jordann Williams
                      _____

                            Jordann Williams, Notary Public

15                          State of Florida, My Commission:

                            GG192069, Expires: March 4, 2022

16

17

18

19

20

21

22

23

24

25
```



```
 1                    CERTIFICATE OF TRANSCRIPTION

 2

       STATE OF FLORIDA

 3

       COUNTY OF PINELLAS

 4

 5        I, Nichole Ryan, certify that I was authorized to and

 6     transcribed the notes of Jordann Williams of the videotaped

 7     deposition of Manuel V. Feijoo, M.D.; and that the foregoing

 8     transcript, pages 6 through 313, is a true transcript of

 9     said to the best of my ability.

10        I FURTHER CERTIFY that I am not a relative, employee,

11     attorney, or counsel of any of the parties; nor am I a

12     relative or employee of any of the parties' attorney or

13     counsel connected with the action, nor am I financially

14     interested in the action.

15        Dated this 25th day of June, 2019.

16

17

18                              Nichole Ryan

19                         _____

                                Nichole Ryan

20

21

22

23

24

25
```



```
 1                     ERRATA SHEET
 2    IN RE:    STATE FARM MUTUAL VS. MANUEL V. FEIJOO, ET AL
      CASE NO:  1:18-CV-23329
 3    DEPONENT: MANUEL V. FEIJOO, M.D.
 4    PAGE LINE             CORRECTION
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    Under penalties of perjury, I declare that I have read
      the foregoing document and that the facts stated are
23    true.

24    _____

25    DATE                            MANUEL V. FEIJOO, M.D.
```



June 25, 2019

Manuel V. Feijoo, M.D.
C/O Jerome Pivnik, Esquire
7700 North Kendall Drive, Suite 203
Miami, Florida  33156
pivniklaw@aol.com

IN RE:     DEPOSITION OF MANUEL V. FEIJOO, M.D.
           TAKEN ON JUNE 7, 2019
           STATE FARM MUTUAL VS. MANUEL V. FEIJOO, ET AL

Dear Dr. Feijoo,

This letter is to advise you that the transcript taken
in the above-referenced deposition has been transcribed.
Please contact our office at (800)275-7991 to make
arrangements to read and sign or sign below to waive
review of this transcript.

It is suggested that the review of this transcript be
completed within 30 days of your receipt of this letter,
as considered reasonable under Federal Rules*; however,
there is no Florida Statute to this regard.

The original of this transcript has been forwarded to
the ordering party and your errata, once received, will
be forwarded to all ordering parties for inclusion in
the transcript.

Sincerely,

Jordann Williams, Court Reporter
Orange Legal, Inc.


Waiver:

I, _____, hereby waive the reading and

signing of my deposition transcript.

_____
MANUEL V. FEIJOO, M.D.                        DATE

*Federal Civil Procedure Rule 30(e)/Florida Civil
Procedure Rule 1.310(e)



**Orange Legal**
**800-275-7991**

148:19,22 153:16

**Exhibits**

060719_M.Feijoo_
Exhibit 28 3:8
14:25

060719_M.Feijoo_
Exhibit 29 3:9
33:19,25 34:9,15
39:7,16

060719_M.Feijoo_
Exhibit 30 3:11
33:21 42:5

060719_M.Feijoo_
Exhibit 31 3:12
45:11,15 55:22
62:10 101:14

060719_M.Feijoo_
Exhibit 32 3:14
61:18,22 66:12
72:16 78:5 93:4,13,
22 94:11 95:19
97:12 99:22 101:22

060719_M.Feijoo_
Exhibit 33 3:17
98:22,25 101:24,25
102:22 103:23

060719_M.Feijoo_
Exhibit 34 3:18
126:9,11,14,15

060719_M.Feijoo_
Exhibit 35 3:20
129:21,25 181:4,5
240:14

060719_M.Feijoo_
Exhibit 36 3:21
146:7,11 190:14,15,
17,25

060719_M.Feijoo_
Exhibit 37 3:15
90:8,13 93:8,16,17
96:25 98:16 99:20
101:23 104:2 106:21
107:12 110:12

060719_M.Feijoo_
Exhibit 38 3:23
147:14,18 149:19

060719_M.Feijoo_
Exhibit 39 3:24

060719_M.Feijoo_
Exhibit 40 4:2
158:16,20

060719_M.Feijoo_
Exhibit 41 4:3
172:12

060719_M.Feijoo_
Exhibit 42 4:5
192:19,23

060719_M.Feijoo_
Exhibit 43 4:6
199:24 200:3 245:16
258:2

060719_M.Feijoo_
Exhibit 44 4:8
206:13,18,24 210:4
213:23,24

060719_M.Feijoo_
Exhibit 45 4:9
206:15 207:1,8
211:16 213:21

060719_M.Feijoo_
Exhibit 46 4:11
214:24 215:2 223:5
225:15 232:7

060719_M.Feijoo_
Exhibit 47 4:12
222:13 224:14
225:5,16

060719_M.Feijoo_
Exhibit 48 4:14
246:4,7

060719_M.Feijoo_
Exhibit 49 4:15
250:23 251:2 256:22
262:8 264:2 267:22,
24 297:7 307:4
311:15

060719_M.Feijoo_
Exhibit 50 4:17
257:10,13 258:8
262:12 268:7,16
299:13,14

060719_M.Feijoo_
Exhibit 51 4:18
259:17,19 262:22

060719_M.Feijoo_
Exhibit 52 4:20
259:21,23

060719_M.Feijoo_
Exhibit 53 4:21
260:2,4 263:11
264:14

060719_M.Feijoo_
Exhibit 54 4:23
260:19,21 264:14,15

060719_M.Feijoo_
Exhibit 55 4:24
260:23,25 265:13

060719_M.Feijoo_
Exhibit 56 5:2
261:6 265:17 295:10
303:3

060719_M.Feijoo_
Exhibit 57 5:3
261:13,19,20 262:2
265:22

060719_M.Feijoo_
Exhibit 58 5:5
269:15,19

060719_M.Feijoo_
Exhibit 59 5:6
280:15,20

---

**$**

$10,000 198:15

$100 228:17 232:8
268:13 269:5 296:2,
7 300:19 301:16

$475 58:1

$675 303:8

$80 301:18 302:4

---

**0**

0002 256:5

00043 256:7

04 58:4

040 256:16

05 58:4

070 256:16

---

**1**

1 25:16,21,22,23 26:2
48:4

10 63:17 110:17
172:5 250:19 291:18

10-year-old 288:14
289:6 292:8

100 31:5,22 32:12
33:9 40:13 54:3,10
276:3 278:4 279:10,
25 311:12

10:51 90:7

11 251:20 253:22
254:13,21 264:11
266:5

11:49 142:22

11:53 145:23

12 128:15 163:15

12/17/2015 268:13

12:59 145:25

13 193:22 196:5,11,
16 240:16,17 278:22

137 278:16 279:2,7,
21 304:15 310:15,23

14 128:15 193:18,21

15 206:22,25 207:24
211:13 215:5 228:18
232:19 239:3 242:9
245:6 278:24

15,000 300:11

1500 46:19

15th 200:8 219:6

16 128:14

17 128:15,16 173:5
255:20 259:18
261:21 263:3,8
266:12,21 295:12

17th 297:24 308:5,11
309:17

180 297:4

19 48:5 83:23 90:15
94:5 117:18 131:5,6
132:14,15,24 134:23
136:13 137:5,11
278:8 308:6

1962 15:12,19

1967 15:12,15,17,21
18:16

1970 16:13

1973 16:14,15

1983 18:17,19 19:7
21:6,12 30:6

1987 21:7

1989 21:7

1992 22:5,14 23:14
24:2

1994 43:13

19th 63:21 76:15
82:7 94:21 99:3
101:25 309:16

1:18-cv-23329 6:5

1:59 199:21

1st 15:12

---

**2**

2 48:4 111:10 148:13
149:17 193:18 207:8
251:19 267:24 291:4
311:21

2/2/16 264:25

20 9:25 119:18,19
165:8 168:7 169:2
171:12,19 172:6
234:2 275:21

20,000 300:11

2001 249:20

2002 249:20

2013 278:23 279:2

2015 255:20 259:18
261:21 263:3,8
265:2 266:13,21
279:2 295:12 297:25
298:1 308:6,11
309:16,17



**2016** 48:5 63:21
76:15 82:8 83:23
90:15 94:5,21 99:3
101:25 117:18 130:2
131:5,6 132:15,24
134:23 135:13
136:13 137:5,11
146:19 148:3 155:7,
8 158:23 159:17
163:15 167:7,22
173:13,21 179:9
181:24 182:11 183:8
184:13 185:17
190:3,13,21 193:5,8
200:8 206:23,25
207:11,25 211:13
215:6 219:6 228:18
232:19 239:3 242:9
245:6 247:9 264:25
265:4

**2017** 288:11 291:21

**2019** 6:11

**21827** 94:12

**24th** 291:21

**26th** 288:11

**28** 14:25

**29** 33:18,19,24,25
34:9,15 38:13 39:7,
16

**2:06** 199:23

**2:45** 238:6

**2:57** 238:8

**2nd** 264:25 265:4

---

**3**

**3** 62:16 148:12,13
196:7,12,14 207:5
240:14

**30** 33:21,25 42:5
79:22,23 89:9,12
91:10,12 142:14
152:11 153:12,17,20
159:2 171:15,20
258:24

**308** 6:10

**30th** 265:2

**31** 45:11,15 46:25
47:1,14 55:22 62:10
101:14

**32** 61:18,22 66:12
72:16 78:5 90:18
93:4,13,22 94:11
95:19 97:12 99:22
101:22 111:7

**33** 90:19 91:2 98:22,
25 101:25 102:22
103:23 111:8 145:5

**34** 126:9,11,15

**35** 129:21,25 181:5,6
240:8,12,13,14,15

**36** 146:7,11 190:15,
17,25

**37** 90:8,13,22,24
93:8,17 96:25 98:16
99:20 101:23 104:2
106:21 107:12
110:12 147:19,20,22

**38** 147:14,18,25
149:19

**388** 6:10

**39** 148:19,22 149:9
153:16 196:14,17
256:20 257:2,21

**3:00** 245:22

**3:27** 261:11

**3:33** 261:15

**3:43** 269:11

**3:44** 269:13

---

**4**

**4** 175:2 187:3,19
196:6,7,14,15,18
218:19 221:13
225:13,14 228:21,
22,24 232:7 268:25
288:4 291:17

**40** 44:17 158:16,20
161:8 192:4 210:25
211:3,6 212:2
215:20,22 254:11
256:17,21,22,24
298:17,25

**41** 172:12,15 256:21

**42** 192:18,19,23
256:17,23,24

**424** 246:1

**43** 199:24 200:3
245:14,16 258:2

**44** 206:13,18,19,24
210:4 213:24
257:16,22,23

**45** 44:17 83:5 111:15
112:3,24 113:15
136:21 142:16
206:15,19 207:1,8
211:16 213:21
233:25 291:14

**46** 214:24 215:2
223:5 225:15 232:7

**47** 222:13 224:14
225:5,16

**48** 246:4,7

**49** 250:21,22,23
251:2 256:22 262:8
264:2 267:22,24
297:5,7 307:4
311:15

**4:12** 295:5

**4:19** 295:7

---

**5**

**5** 162:8 268:24

**5/12** 149:3

**5/25** 149:2

**50** 32:14 154:4,7
155:3,6,14 159:5,8
165:9 168:8 169:3
234:3 257:10,13
258:8 262:12 268:7,
16 280:11 299:14

**51** 259:12,17,19
262:22

**52** 196:16,17 259:21,
23,25

**53** 260:2,4 263:11
264:14

**54** 260:19,21 264:15

**55** 260:23,25 261:2
265:13

**56** 261:4,6 265:17
295:10 303:3

**57** 261:13,20 262:2
265:22 297:5

**58** 269:14,15,19
297:6

**59** 280:11,14,15,18,
20

**5:00** 313:25

**5th** 146:19 148:3
155:7,8 158:23
159:17 167:7,22
173:13,21 179:9
181:24 182:11 183:8
184:13 185:17
190:3,13,21 193:5,8
207:11

---

**6**

**6** 128:15

**6303** 6:10

---

**7**

**70** 79:3 80:20 81:15
82:3 85:1 91:24 92:7

**76140** 201:12
228:16,25 232:8
247:8,18 249:13
268:13 269:6

**7th** 6:11

---

**8**

**80** 275:14,17 278:4
279:10 301:16
303:10,17 311:3,7

**80s** 21:9 22:3

**815** 148:7

**816** 148:8

**83** 19:8

---

**9**

**90** 92:13,15,23,24

**95** 43:13

**95851** 48:14 101:18
102:1 106:22 147:11
201:9 247:4,18
249:10 295:16
296:2,7

**97014** 195:14

**97112** 194:10

**99201** 57:4 58:10

**99202** 58:8 144:17
145:2,5

**99203** 57:2 58:6
137:15,19 138:11
139:3,13,23 141:13
142:10,25 143:6
144:10,14 145:3

**99204** 48:14 55:23
56:7 57:1,14 58:17
59:5,15 60:4,7,12,18
61:3,11 101:18
130:15,19 131:7,12
132:1,25 134:5,25
136:4,8,15 137:12
138:12 139:1,14,24
141:14,16 142:11
143:1,7 144:11,14
145:4 190:6 247:17

**99205** 57:1,25

**99212** 188:20

**99213** 184:5,8,20
188:7

**99214** 136:5 146:24
181:10,13 182:5,23
183:20 185:21 188:5
190:2,7,9,12,23,25
242:24 247:17

**99215** 136:5 200:10,
15 205:24 240:19
241:21 243:15
244:25 247:18

**9:00** 245:22

**9:02** 6:12

**9:14** 18:4



**9:16** 18:6

**9:39** 39:11

**9:43** 39:13

---

**A**

**A-N-I-E-L-K-A** 11:25

**A.G.A.** 94:20

**A.J.** 297:3,9,16 299:16

**abduction** 82:19 92:14,19,24

**abduction/adduction** 159:22

**ability** 86:9 177:1 308:13 309:25 310:8

**abnormality** 109:1

**above-referenced** 271:18

**absence** 291:25

**absolutely** 117:13 312:1

**accept** 34:24 274:6 278:17

**accepted** 34:25 35:1 36:18,24 37:7,19,20, 24 38:3,6,8

**accident** 10:13 42:25 43:3 64:25 65:1,4,5,6,7,8,9,11, 12,13,21,22 66:1,22, 24 68:18,22 69:6 70:19,22,23,25 73:19 101:5 104:19 105:6 108:11,23 112:16 118:5 120:4 122:18 131:15,17, 19,23 149:4,5 202:10,20 208:6,7 217:12 235:7 236:23 237:7,10 270:11 289:19 290:14 291:20 292:23 294:14,16,20 295:4 298:3,12 305:22 307:5 308:6,15 309:3,7,16 310:3

**accidents** 10:12 67:14 132:5 140:17 209:12 238:24

**accompanying** 274:2

**accordance** 134:9

**accuracy** 42:3

**accurate** 53:22 276:10

**accurately** 17:15 49:21 51:3,10 52:24 53:7 55:11,12,18 276:13

**active** 86:23 180:23

**actively** 86:20,21 87:2,10 89:3,4

**activities** 117:25 118:4,18 180:23 186:6

**actual** 64:23 221:16 226:8 229:5 231:5, 17 262:19 302:11

**acute** 143:25 235:13 291:23

**add** 128:4 132:16 144:15 185:11

**added** 46:4 224:5 305:17

**Additional** 120:23

**address** 45:17

**adduction** 82:20 92:15,16,19,25

**adjustments** 120:20

**Administration** 34:12,23 35:7 36:6

**admit** 37:18

**adult** 19:2

**adults** 19:3

**advance** 283:11,16

**advice** 118:25 119:9 283:22 285:2 301:6 312:21

**advisable** 165:10 209:5

**advise** 73:22 97:16 138:19 209:1 300:1, 7

**advised** 164:12 244:5 254:22

**affect** 75:1 120:12 126:2,7

**affected** 175:1

**affiliated** 30:15,21 43:22

**affirm** 6:22

**affliction** 78:23

**aforementioned** 181:21 241:10

**afraid** 67:5 232:24 233:16 237:12

**afternoon** 146:2,3 296:20,21

**age** 64:22 69:25 171:9 237:9

**agencies** 136:18

**agency** 30:19 34:12 35:6 36:6

**agree** 35:5 36:14 37:6,10 38:11 42:16 49:18,24 131:3 135:18 179:6 182:10,17,25 183:3 190:2,24 196:20 198:6 216:25 240:19 241:1 247:18 250:7 270:21 300:12 313:6

**agreed** 304:12

**agreeing** 307:13

**agreement** 274:6

**AHCA** 36:7,10 37:1, 8,25 38:4 39:18 40:8 42:2,12

**ahead** 8:1 51:21 98:21 108:2 140:14 154:12,13 164:2 170:25 175:10 210:17 241:16 258:14 284:17

**air** 202:18

**alert** 133:4,8

**allergies** 66:2 132:7 140:17,18

**alleviate** 198:24

**allowed** 16:12

**altogether** 187:11, 24

**AMA** 239:6,8,9,10

**ambiguous** 206:4

**amendment** 31:21, 23

**American** 191:9 192:10 216:13 239:9,10

**amount** 53:13 59:9, 12,17,23 168:5 169:1 184:18 242:18 249:8 274:7 275:14 276:2 278:3 279:9 311:8,12

**analyst** 22:17,18,19

**Analysts** 191:9 216:13

**and/or** 40:14 136:22

**anesthesia** 300:10

**Anielka** 11:18,19,25 32:25 51:18 53:9 58:19,22 206:11 248:9

**ankle** 28:21,25 29:4 109:16 110:4 142:5 157:24,25 158:11 213:9 234:19,20,21 235:5,16,20

**annulus** 177:20,21

**answering** 8:7,11 9:16 66:10 294:3

**answers** 9:14 79:16

**anterior** 127:22 128:1

**Anterior/posterior** 127:20

**anticipate** 8:6

**anymore** 157:3 220:13

**anytime** 123:14 164:15

**AP** 127:18

**apologize** 296:11

**Apparently** 306:12

**appearance** 6:14

**appears** 160:4

**application** 34:17, 21 38:14 39:17

**applies** 91:25

**apply** 92:2

**area** 81:6 86:17 87:21 100:24 141:20 178:1 215:9 223:12 254:10 273:7 295:2

**areas** 34:3 64:24 84:5 88:3 107:15 133:11 138:14 143:18,19,21,23 151:18 157:10,25 162:24 175:1 181:21 183:13,23,25 210:5, 7 213:7,10,13 234:8 241:10 242:14

**argumentative** 164:18 165:19 183:1 241:14 243:2 251:25 269:7

**arguments** 287:23

**arising** 238:24

**arm** 92:14

**arms** 82:14 159:24 178:9 183:15

**arrive** 305:19

**arrived** 93:9 239:2

**arriving** 239:14

**art** 35:23

**arthritic** 223:16

**arthritis** 218:25 219:1 223:16 237:5

**article** 30:5



**articles** 50:24

**assess** 172:11 255:7

**assessed** 253:25

**assessing** 220:1 253:13 254:2

**assessment** 304:13

**assign** 210:10 266:4 295:2 310:1

**assigned** 216:9 239:2 270:17 271:17

**assigning** 23:8

**assignment** 269:24 277:11

**assistant** 21:18 27:7, 11,14 50:21,24,25

**Associates** 260:3 263:17

**Association** 192:11 239:9,11

**assume** 9:6 53:18 242:5 256:6

**Assuming** 247:20

**attached** 262:12

**attempt** 106:21

**attention** 291:25 297:6

**attests** 246:19

**attorney** 265:1,3,8 281:24 282:5

**attorney-client** 284:2 285:9

**attorneys** 12:24 13:18,21 46:6,13 209:11 222:19 255:12 278:14 282:15

**Atypical** 180:17

**authored** 28:1 29:13

**authority** 199:2 250:10

**authorize** 19:10

**auto** 10:13 67:14 104:19 105:6 202:10

209:12 235:7 238:24 264:5 307:4 308:6 312:16

**automobile** 6:16 65:1,4,5,8,9 290:14 292:23 294:16 309:3,7

**availability** 287:5

**avoid** 69:4 118:7,9, 21 119:14 177:1 186:6 194:22 244:6, 9,10 254:22 255:2 300:2,5

**aware** 69:1,3

_____

**B**

**back** 9:22 16:10 35:12,14,25 52:22 55:9,21 63:19 72:14 74:1,4,6 87:18,19 90:11,24 102:22 107:11 108:4 112:2, 12,17 114:3 116:2 118:21,24 119:8 121:17 123:1,12,16 124:12,22 125:18 126:5,7 129:16 135:13 137:14 142:22 146:3,4 147:22 157:5,14 165:13,15 166:12 167:3,4,8,9 170:17 171:12,18 173:4 178:4,8 179:8 180:2 181:18 184:4 185:21 188:7 190:9 192:14 194:18,21 195:1 197:5 198:2 207:14 212:13 217:11,12 218:4,8 228:16 231:11,12,13 234:5 244:7,11,15 256:10 267:7,8,17 274:10 300:2,6 302:4 305:20 306:13

**backwards** 92:16

**bad** 27:1 307:13

**Banhan's** 13:13

**barely** 84:22 105:14

**barrels** 119:4

**base** 175:23 259:2

**based** 13:14 42:9 58:25 59:11 60:23 125:24 128:24 136:13 145:7 158:4 162:4 163:3 176:3 184:24 188:15 190:24 197:17 201:19 206:8,10,11 225:13 239:4,6 240:1,2 241:24 248:22 253:15 266:8 267:25 310:9

**baseline** 253:13 254:2 255:9,17 266:7

**basic** 135:23

**basically** 66:6 132:10 135:6

**basis** 40:7 61:10 93:13 205:10 248:12

**Bates** 46:12,14 94:12 148:6 222:17 255:23 256:5,11,16,22 257:15,20,23

**bath** 193:25 194:2

**baths** 194:3,7 198:12

**beat** 290:24

**bed** 73:20 118:11 122:15,20 312:11 313:2,4

**began** 249:18 271:9

**beginning** 32:22 133:12 248:18

**begins** 6:4

**behalf** 282:16

**belabor** 296:24

**belief** 134:3 242:8

**believed** 204:16 221:4

**believes** 199:2

**bend** 118:21,24 119:5,8 300:2,5

**benefits** 269:25

270:10,12,17 271:17,19,21,25 272:6,11,17 275:12 277:12,14 278:12 283:21 286:13 304:7

**Bicycle** 28:21,23,24

**bicycles** 29:3

**big** 71:5,6 230:6

**bigger** 230:6,13

**bilateral** 83:5

**bilaterally** 111:15 160:11 291:14

**bill** 43:5 45:20 47:9 48:22 54:24 55:18 56:7 57:19 59:5,14 60:4,18 61:2,11 62:9 131:7,12 132:1,25 134:25 146:17 188:5 190:25 200:5 201:17 205:16,20 206:12 232:8 245:1,10,13 250:12 258:16 261:4 265:17 268:11 274:15 275:12 295:11 296:6 300:19 301:7,9,16 303:3

**billed** 59:8 182:24 190:3,12 200:14 201:13 204:14,17 228:17 240:20 245:8 247:4,8 302:6,19 303:4

**billing** 42:15 43:8 45:7 46:22 51:17 53:9 57:17 58:22,24 59:12,19 134:5 136:15 137:12 206:11 248:9,24 249:18 250:3 287:17

**bills** 46:22 47:15,20 49:19,20 51:3,10 52:24 53:7,19 55:10, 11 59:19 137:18 247:16 271:21 296:1

**bit** 8:17 45:4 145:9 215:16 313:1

**blacked** 45:16

**blank** 72:23 150:21

**blanked** 210:6

**blood** 72:17,25 73:5, 6,10,11 74:14,18,25 75:2 110:7 141:24 214:2,5,10,14

**Blue** 6:10

**board** 16:4,8,12,20, 22 17:12 18:21 24:5, 8,16 25:17,19,22 191:9,14 192:7 216:13

**board-certified** 16:16,17 120:10 222:11

**bodies** 176:15,17,18 177:7

**bodily** 292:4

**body** 72:22 73:24 112:15 114:16 117:6 133:11 138:14 144:2 176:19 210:5 242:15 292:3,14,15 293:1,4, 7,8,12 294:8

**bone** 29:14 117:2,3 177:1,4,8,11 236:9

**bones** 237:8

**bony** 178:25

**book** 50:3,4,7,9,18 58:14,18 60:5,7 61:5,16 130:2 181:5 190:24 200:14,21 201:2,22 204:3 239:20 240:7

**books** 248:22

**bored** 106:12

**bothering** 233:24

**bottom** 15:7 39:23 94:10,11 148:6 184:5 193:3 246:18 281:13

**box** 46:25 47:14

**boxes** 193:12,18

**BP** 72:17

**break** 39:9,16,22 56:2 90:12 129:19 146:3 160:15 214:19



238:5 245:23
261:17,18 283:2
284:21 306:16

**breaks** 177:13,17,21
245:24

**briefer** 243:11

**bring** 230:24 231:5
270:16

**broaden** 296:5

**broader** 152:17

**broken** 204:21
205:3

**brought** 302:8

**Broward** 27:15

**building** 63:25
83:17

**bulging** 112:12
115:4 116:6,11,13
164:7 168:3,9 169:5,
6,10 170:7

**bullet** 162:8 221:13
228:22 232:7

**busy** 47:23

**buy** 66:25

————————————

**C**

————————————

**C-A-S-T-I-L-L-O**
12:1

**calculation** 239:14,
22

**calculator** 196:10

**call** 12:11 29:5 30:5,
24 48:7 72:6 113:22
176:1,21 180:5
187:12 220:11,24
221:1,4,9 278:11
283:20 285:22
286:21

**called** 36:7 46:9,19
48:16 50:21 52:4
57:7 82:10 91:16
126:15 161:11
177:21 197:6 216:22
221:3 236:3 245:7
246:13 262:24

264:15 290:15

**calling** 248:20

**calls** 301:25

**cap** 177:23

**capable** 267:2

**car** 42:25 65:15,16,
19 66:25 67:3,4,6
68:19 69:2,3 70:4,11
71:3,5,6,7,9 131:18,
19 202:19

**card** 281:6

**care** 28:6 136:17
138:21 189:24 203:8
220:5 301:2,3,11
303:6

**career** 202:15 240:4

**careful** 255:1 267:16

**carrier** 271:20

**cart** 51:12

**cartilage** 176:20
237:8

**case** 6:5 8:23 11:1
31:8 33:13 42:25
45:6 51:7,18 65:7
66:3 70:11 81:7,8
84:25 88:16 104:12
108:13 135:21
143:20 161:16
170:15 188:1 199:16
243:17 253:5 264:6
277:6 278:22 292:23
293:2,8

**cases** 10:10,12,13,23
12:7 23:22 164:7
178:6 304:15

**cast** 235:18

**Castillo** 11:18,19
12:1,24 13:18 32:25
42:14 50:3 51:18
53:18 54:17 55:7
58:23 59:5,15 60:8,
11,19 61:4,12
226:18 248:15
249:16 273:3 288:3
304:19

**Castillo's** 13:20
64:2 278:7

**category** 79:7,8

**caused** 73:17 112:11
115:6 165:1 290:7
311:5

**causing** 115:2,25
163:11 167:21 168:4
170:11

**caution** 177:8

**CD** 176:2 219:12,16,
17,18,21 220:12
221:17,19,21 222:2,
8 225:22,25 226:8,
15 227:4,16,24
228:2,12 229:7,9
231:21,24 232:3

**CDS** 120:7 222:12
225:17 226:25 227:3

**ceiling** 85:3

**cellphone** 187:8

**center** 30:18 44:15
176:21 177:6 310:5

**certificate** 34:18
37:2,3 38:14 42:1,3,
12

**certification** 18:21
23:5 42:9 191:21
192:1,7

**certified** 16:4,9,13,
20 24:5,9,16 25:17,
19,22 191:14 216:14

**certifies** 23:7

**certifying** 41:22

**cervical** 79:2,7,9,10
80:1 81:8 83:25
84:12 85:15 86:17
87:3 88:21 89:9 91:9
97:9 99:13,17
100:25 112:4 119:24
121:8,21 125:19
127:3,6,12,13 128:9
133:12 143:10,14,
17,21 150:7,8,17
151:22 152:6,8,14,
19 153:14,15,18
156:6,7,11 159:1
161:19 162:10,21
164:5,15,25 165:5,
15 166:13,19,20,25
167:15,20 168:6

169:1 170:16
171:13,20 172:6,16
176:18 178:7 181:18
183:13 184:2 185:16
192:13 194:16
199:5,12 202:11
203:1,20 210:12,18,
19 211:5,19 215:9,
10 216:2 218:16,22
222:23 223:1,6
232:15 233:7 234:7
235:20,23 236:2,15
241:6 243:20 288:21
289:7,18,20,21
290:3,8,20 291:1
292:16,20 294:3,11
295:2 298:19,23
311:20 312:2,5,8

**cetera** 57:2 116:7,14

**chain** 29:7,8

**chair** 64:5

**chairs** 64:7,9,10

**challenged** 13:14

**change** 31:21 32:6
73:18 118:9

**characteristics**
166:3

**charge** 36:11 57:23,
25 58:6,8,10 102:1
106:22 146:24 232:8
268:13 274:25
295:16,17 296:2,7
311:4,8

**charged** 269:5
301:18

**charges** 275:8,14
276:3,6,12,17 277:4
278:3 279:9 282:10
311:12

**charging** 248:22

**chart** 46:1 51:15
64:19 77:10,12,15,
16,21 104:3 120:9
222:18 225:25 226:4
227:18 228:2
255:10,11,21 256:3,
18 257:14,18,22
258:10,22 259:7
260:12,15 261:20,23
262:4 264:19,22

265:23,24 266:2
269:20 280:18,20
297:5 302:7,19
305:1 306:17 307:1
309:18

**charts** 46:8 75:22

**check** 75:2 107:20
111:1 199:13 214:2,
9,14

**checked** 199:5
246:22

**checking** 40:5,6
73:10

**checkmark** 40:1

**chest** 151:13

**child** 171:7,9

**children** 19:3 28:21
29:1,3,4,14,15

**children's** 19:1

**choose** 57:20 201:17

**chose** 47:19 204:2

**circle** 92:4

**circled** 79:23 93:22
155:17,20 212:1

**circles** 91:22

**cite** 61:9,14

**cited** 183:25

**claim** 40:24 45:6

**claims** 310:24

**clarify** 35:19 237:11
297:1

**clarifying** 72:12

**class** 23:4

**classic** 180:3

**claustrophobia**
233:17,19

**clear** 9:14,15 26:18
139:8 216:2 234:15
283:8 286:24 311:2

**clinic** 10:19 11:1
12:17 30:14,20
33:10 34:11,19,22
35:3,6,18 36:3,19,25



**Orange Legal**
**800-275-7991**

37:7,15 38:4,17 39:18 41:7 43:4,8 44:10,20,21,22 49:15,20 56:6 57:15, 18,25 58:6,8,10 59:10 75:17 77:2 97:17 102:15,16,19, 23 103:16 104:9,12 106:19 110:15 123:10 129:4,9,10, 12 132:24 137:18 146:18 182:23 190:12 200:6,14 201:13,17 228:17 240:19 248:7 250:9, 12 265:18 268:12 270:13 271:4,8 275:8,11 276:5 277:2,12 278:12 281:10 282:3,5,16, 20 286:22 287:18 295:17 308:16 309:8 312:16

**clinic's** 46:8 78:3 232:8 279:9 295:11 296:5 311:12

**clinical** 133:14 188:15 206:9 239:4 308:20

**clinics** 36:11,17,24 40:13 43:23 44:1,2, 4,9,13,22 248:20

**clinics'** 77:24

**clipped** 258:11

**close** 53:10 245:19 283:14

**CMS** 46:19

**co-** 31:14

**co-owner** 250:8

**Coastal** 44:15

**code** 50:12 51:7 55:24 57:19,22,23 59:7,19 60:18 61:3, 11 101:17 107:4,6 130:19 134:6 147:11 183:5 200:11,21 201:1,14,18 204:5, 13,17 205:12,16,20, 24 228:17 240:7 245:1 248:23

**codes** 48:17,20,21 49:7,8,13,18 50:9 51:3,10 52:23 53:6, 22 55:11,17 57:7,12 58:24 60:23 189:9, 12 247:17 248:2,7, 13,16,19,21 249:5,25 250:10 286:21 287:17,19

**coffee** 66:4

**cold/hot** 198:12

**collar** 235:21,23

**collision** 69:5

**combining** 91:19

**comeback** 240:15

**comfortable** 49:3

**common** 234:18,21

**commonly** 46:19

**communicate** 9:12

**communications** 284:3 285:13,23

**companies** 106:22

**company** 6:17 49:13

**compare** 202:18,19 204:20 255:17

**compared** 139:3 145:2

**compete** 255:10

**complained** 162:20 165:14

**complaining** 74:2 104:20 105:9 108:5, 25 133:12 143:10, 13,24 164:4 181:21 183:24 208:19 241:9 242:15

**complains** 164:15

**complaint** 241:6

**complaints** 62:21 64:23 131:15 134:9 149:24 150:2,8 158:5 213:11 214:12

249:10,13,14 276:17 277:4

**complete** 185:13 255:11 257:18 278:13 290:10

**completely** 101:1 238:14

**complex** 55:25 56:10,11,14 138:13, 15 141:8 145:9,16 184:21 185:2,7 189:10 201:20 202:25 203:13,14,18 229:14,17

**complexity** 51:13, 16 53:1,13 59:10 130:25 136:9,14 137:2,10 138:7 143:1,3,6,7 144:9,11 184:17,19 185:1,23 186:1,12,16 187:4, 20,23 188:5,9,11,12, 13 189:19 200:19 201:19,21 243:15 244:23

**compliance** 41:12, 19 42:10

**complicated** 20:20 106:11 204:1

**comply** 131:6

**component** 136:7,8

**components** 56:5 130:23 137:24 142:25 144:20 184:9 188:21 190:5 191:2 240:21

**compound** 60:13 206:3 310:2

**comprehensive** 130:23,24 131:12,25 132:3,15,18,22,23 134:4,24 135:4,5,19 138:11 139:13,24 141:3,13,16 142:10, 15 145:3 200:18 241:13,16,21 242:4, 7,10,12,25

**compressed** 114:1,7 177:12

**compresses** 112:17,

20,22 177:25

**compression** 112:5, 7,11 113:3,4 115:18, 25 164:8 177:22 178:2

**comprise** 52:19 178:3

**compute** 230:1

**computer** 227:4,18 229:9 230:2,14

**concede** 14:8

**concern** 173:23 174:1 205:10,11,23 220:8,15,16,18 233:11,13

**concerned** 14:5

**concerns** 204:1 207:19

**concerted** 8:10,12

**concluded** 291:21 313:25

**conclusion** 77:23 239:6 274:18

**condition** 108:18 109:12 124:1 133:3 163:7 164:24 171:10 180:22 210:10 218:3,5 220:2 253:13 254:3 255:1, 17 266:7 267:3 291:22,23 292:9 294:12,17,21 295:3

**conditions** 110:8 166:23 194:7,8 198:22 199:9 292:11

**confirm** 63:20 68:8 149:14

**confirmed** 39:21 83:22 309:14

**confused** 9:4,7 37:16 59:21 67:4

**confuses** 8:25

**confusion** 36:1

**conjunction** 193:7 231:25 262:15

20,22 177:25

**conscious** 57:18

**consecutive** 148:9

**conservative** 117:20 161:3

**consideration** 120:24

**consistent** 136:19 166:24 167:10,14,22 212:6 299:15,19

**constitutes** 294:6,7, 12,16,20

**consult** 302:24

**consultation** 106:18

**consulting** 203:17

**consuming** 106:5 139:17 142:16 144:3

**contained** 297:5

**content** 285:23

**continue** 172:3 174:25 175:5 177:19 186:10,13,20

**continued** 60:9 300:16 301:11,20

**continuing** 175:9 191:20 192:4,11 206:1

**continuous** 256:7

**continuously** 32:23 33:13 43:18

**contract** 84:21

**control** 73:8,9 74:25 214:8,9,11 280:18, 20

**conversation** 8:4,5 54:12 60:23 285:2 287:4

**conversations** 53:24 54:17 55:2,7 174:14 284:11 287:1

**convey** 274:20

**convicted** 296:14

**cooperative** 133:5,8

**coordination**



136:17

**copies** 228:5,7 231:9

**copy** 63:1,3,5 227:17
255:12,20 288:3,5
297:10 313:18,23

**corner** 67:1 184:5

**corporation** 31:17
32:4

**correct** 10:20 15:13
27:1 31:6 33:11 35:1
36:3 39:23 41:20
48:14 49:10,16
50:25 60:12,17,19
62:2 63:21 66:12
74:2 76:22 80:12
83:19 101:18 102:6
123:7 132:19 137:19
141:1 144:23 146:21
147:11 151:23
152:3,15 159:2,3,8,
24 160:2 161:20,22,
25 166:14,21,25
167:4,15 173:11
175:1,11,15 183:7,
17 192:24 193:19
205:24 211:9 216:19
217:4 218:12,17
219:24 225:6 237:18
240:21 245:2 246:20
247:9 251:21,24
256:8 262:2,10
263:11 265:15,19
266:22 268:13
273:11 275:9 276:6
285:15,19 288:14,17
289:8,25 291:5,11
295:13 298:1
299:11,23 300:21
301:21,24 302:8
304:20 305:14 307:1
311:18,24 313:16

**correctly** 41:16
53:15 97:24 131:1
271:23 274:8 292:5
293:11

**correspondence**
260:20 264:15

**corroborates** 267:7

**cost** 70:2,6,9,13
264:11

**counsel** 6:13,15
255:6

**counseling** 136:16

**count** 278:15,19

**counted** 193:18
278:15

**County** 27:15

**couple** 33:16 64:7
79:16 111:5,11
296:25 304:24

**courses** 16:7 20:11
21:13 22:24 24:3
58:20 248:23

**court** 6:7,21 7:13
11:20,22,24 17:6,9,
15,25 18:3 20:8
22:18 23:18 25:18,
21 26:4 27:9 28:19,
22,24 35:13,14,21
48:24 58:21 65:3
69:12,16 78:21,23
80:22 81:4 82:24
88:5 90:3,5,19
94:14,16 96:12,15,
18,20 103:11
105:16,19 112:6,10,
20 115:22 116:8,12
121:24 122:2,5
130:10 133:6,18
134:16 138:17
142:20 143:12 149:3
154:17 156:9 165:25
169:8,22 171:24
172:2 176:17,23
177:16,19 185:5
186:23 187:9
189:11,13 197:19
203:7 209:3 219:14
220:25 236:19 237:1
238:1 243:5 244:8,
13 245:14 250:18,21
252:23 253:6,18
259:12,15 266:17
267:11 270:16 271:1
279:16 293:3,5
298:20,22 299:3,6
300:4 309:4,6
313:11,14,17,20,23

**cover** 16:10 43:1
102:5 258:19 263:11
265:1

**coverage** 42:20,23
198:14,18 275:19,20
276:1

**CPT** 48:17,20 49:18
50:3,4,7,9,12,18,21,
24,25 51:2,7,9 52:23
53:6,22 55:11,17
58:14,18,24 60:5,7
61:3,11,16 101:17
130:2,4,19 181:5
190:24 200:14,21
201:1,22 204:2
240:7 248:6,13,19,
23 276:17 277:4
286:21 287:17,19

**craned** 122:11

**cream** 177:23

**created** 32:4 43:12
281:8

**crime** 296:14

**Cross** 23:15,23

**CROSS-EXAMINATION**
296:18

**crucial** 300:15

**Cuba** 15:11 16:5,18,
24 18:9,12,15,17,18
19:10 25:17,20 29:2,
20,21

**curious** 124:24

**current** 31:2 175:5

**cut** 67:15

_____

**D**

**damage** 70:23

**darn** 103:20

**data** 139:25 140:2,6,
20,22,23 141:2
248:10,24 281:7

**date** 15:17 48:3,4,7,
10 49:10 91:7
146:19 148:25
149:2,4,5 200:7
206:25 261:4 263:8
281:22

**dated** 149:9 193:5

**dates** 48:4,13 247:16

**day** 13:22 20:22
54:14 69:25 101:9
197:17 230:18
233:22 242:23
259:22 282:4 296:23

**day-to-day** 248:12

**days** 20:21,22 21:22
101:1 107:23 108:3
227:2 230:24

**December** 15:15,17,
20 200:8 206:22,25
207:24 211:12 215:5
219:6 228:18 232:19
239:3 242:9 245:6,
13 247:9 255:20
259:18 261:21
263:3,8 265:2
266:12,21 295:12
297:24 308:5,11
309:17

**decide** 173:6 189:1
250:10 259:10

**decided** 19:17

**deciding** 49:16

**decision** 57:19
130:25 136:8,12
137:1,10 138:6
143:1,2,5,6 144:9,
10,22 145:13 173:10
185:22,25 186:1
187:3,20,25 188:3,4,
8,10,11,22,25
189:18,19 200:19
201:20 202:24
203:17 204:25
206:10 243:14,18
244:1,22 245:5
248:6 249:4 266:22

**decisions** 173:7
174:22

**declined** 304:6

**decrease** 121:11
237:23

**decreased** 253:15

**decreases** 101:3,10

**dedication** 144:2

**deductible** 304:8

**deemed** 274:5

**Defendants** 6:19,20

**defer** 273:3 304:18

**defined** 291:22
292:9

**degree** 15:23 16:1,3,
4,11,14,15,16 75:24
98:6

**degrees** 83:5 92:13
95:24 111:15 112:4,
25 113:15 291:15

**delivered** 77:22

**demand** 271:19

**demonstrate** 88:22

**denied** 281:16,18

**department** 14:23
15:5 176:1

**Depend** 164:19

**depending** 86:14
124:8,15 180:22
249:7,8 308:18,19

**depends** 166:3
169:19 170:7 182:13
248:10

**depo** 42:6

**deposed** 7:21,22,25

**deposit** 274:4

**deposited** 274:3

**deposition** 6:4,9
7:10 9:13 10:3,7,11,
25 11:9 12:10,25
13:5,13,17,20 14:5
33:17,25 39:17
42:15 45:15,24
52:12 59:4 61:22
64:3 90:13 98:25
111:12 129:25
146:6,11 147:17
148:23 153:9 158:20
192:23 200:3
206:18,20 246:8
251:2 278:7 288:4
313:25

**depositions** 9:23,24
10:22



**describe** 15:4 20:1 28:4,16 42:22 49:8, 21 55:18,24 61:23 84:3 111:18,21,23 132:21 133:17 176:10,13 200:11,17 276:13 307:4

**describes** 50:12 150:3

**describing** 84:12 85:22 130:18

**description** 52:19 84:9 132:12 174:18, 21

**descriptions** 50:10 56:17

**Designation** 299:3

**designed** 115:10 116:21 197:3

**desk** 64:3,5,8,11 85:23 86:5,10,19 87:4,8,10

**destroyed** 177:4

**destruction** 177:8

**detail** 140:11

**detailed** 138:5,10 139:12,16,23,25 141:2,11,12,15 142:9,13 143:25 145:2 182:8,12,13, 16,24 183:8,11,19 242:24 243:3

**determination** 128:22

**determine** 66:15 70:19 135:21 136:4 173:17 196:24 208:14 217:24 218:10 252:16 255:16 266:13 298:6

**determined** 253:25

**determining** 135:18 252:12 299:10

**develop** 220:20

**developed** 133:8

**diagnose** 115:11 116:21 166:13,16

**diagnosed** 114:25 160:19 163:1 170:16 198:1 202:14 234:6 289:6 290:16 292:7 294:5

**diagnosis** 113:9 117:8 120:23 156:5, 6 161:18 172:20,21 199:4 218:14 221:14 225:14 234:10 236:14 237:15 243:23 268:5 289:4 291:2,13 299:23 303:6 305:20

**diagnostic** 126:18

**diagnostics** 134:10, 11

**dictate** 12:7 52:8 81:5

**dictating** 223:21

**dictation** 52:13

**dies** 171:9

**difference** 88:20 138:10 139:12,14,22 141:6,11 142:9,18 143:5 144:8 145:1 171:10 181:3 188:10 189:17 212:18,22

**differences** 153:6

**difficult** 229:8,9 230:4 267:5

**difficulty** 114:11

**digital** 226:25 227:2, 3,12 229:19

**diminish** 198:13 202:11 203:19

**direct** 7:4 34:2 41:1 46:14 271:10 273:17

**directly** 268:6

**director** 17:3,4

**disability** 22:16,18, 19 23:1,8 191:9 208:4,6 216:13,15, 17 251:19,24 252:7

**disc** 112:12 114:22 115:4 116:5,6,10,11, 12,13 162:10,17,23 164:7,8 168:3,9,12, 15,18 169:5,6,10 170:6,7 176:16,20 177:2,6,9,11 178:24 179:16,17 180:16,17 197:3,4,24 198:5,7, 10 231:20 233:14 253:16 254:12,24 255:2 267:5,6,15,18 268:1,5,20,23 292:25 299:1,4,6,7 300:9

**discharge** 165:10 274:5

**disciplinary** 22:10 30:19

**disclosure** 45:25

**discovery** 46:9

**discrepancy** 215:16

**discretion** 273:25 274:13

**discuss** 13:17,20 34:2 249:25 279:21 283:20 286:21 287:16 288:24

**discussed** 54:19 199:19 238:19 248:16 249:1 265:11,14 277:11

**discusses** 296:23

**discussing** 215:5 228:22 284:13

**discussion** 54:5 232:20 233:5

**discussions** 175:21 249:9 283:19 284:5, 6

**Disease** 28:20

**dislocation** 224:16, 17 225:4

**displacement** 112:15 117:6 224:23

**dispute** 279:5

**distention** 234:17, 24

**District** 6:7

**Division** 6:8

**dizziness** 73:15,17

**dizzy** 73:21 84:16 85:7 118:9,13

**doctor** 15:24 17:5 22:4 39:15 56:15 71:12 146:2 178:11 182:19 209:6 221:18 222:11 231:16,18 254:14 261:17 280:12 308:3

**doctor's** 257:20 258:1

**doctors** 17:1 20:6 248:20

**document** 14:21 23:7 34:4 35:17 38:13 45:25 46:6,13 51:24 52:4 53:17 61:24 62:20 76:21 89:24 95:2,10 96:25 97:7,8 98:16 108:12 150:1 156:15 173:25 192:23 209:22 225:25 226:7 246:18 251:3 263:5 269:21 271:3 280:19 308:8

**documentation** 228:9 232:18 309:21

**documented** 53:2 54:18 55:2 75:7 83:13 91:14 92:6 97:4,11 101:21 102:5 104:17 113:8 126:23 151:14 153:12 155:11 161:20 173:1 174:1 184:14 215:8 226:3 228:24 232:7 241:4 242:3 244:21

**documenting** 54:19 55:6 91:12 109:1 131:10

**documents** 13:4 51:20 52:8,18 53:1, 2,8,17 66:18 77:10 82:5 126:22 135:9 155:22 215:20,22 255:15 258:10 261:23

**door** 53:10

**doubt** 42:3 238:15

**downloaded** 14:22

**drafted** 271:3

**drafting** 271:6

**draw** 297:6

**drinks** 66:4

**Drive** 6:10

**driver** 68:20,23 69:11

**driver's** 281:6

**driving** 65:9,15,16, 19 68:19,24,25 69:17,22 71:4,5,9 131:16,18,19

**drugs** 66:4

**duly** 7:2

**dysfunction** 292:4, 15

---

**E**

**E&m** 57:7,8,9,12 201:14,18

**E.A.G.** 146:14 222:20 269:21 280:24,25

**E.A.J.** 200:6

**E.g.a** 94:5

**E.G.A.** 62:5 90:16 94:15,19 99:2

**E.g.e** 94:14

**earlier** 52:12 153:8 220:21 251:10



**ears** 133:9

**easier** 12:11 100:12
166:7

**easily** 67:6 69:3
100:2 145:9 291:1

**easy** 63:9

**education** 15:8 18:8
191:20 192:4,11

**educational** 14:20
20:1

**effect** 305:19

**effort** 8:10,12 118:6
209:6

**elbow** 74:7,8 82:21
83:9 84:1 93:16,21,
22 94:6,7,19,20
95:12 96:1,6 109:19
127:18 128:12
143:23 156:16,23
158:4 213:3,9 219:3
224:14,20 234:11

**elderly** 28:10

**electrical** 193:15
195:12,19,20 198:6,
11

**electrical-type**
114:16

**electronic** 227:17

**elements** 150:25

**eligible** 24:8,16

**emergency** 122:24
291:22 292:8
294:12,16,20 295:3

**employee** 12:20

**encompasses**
187:25 289:11

**end** 220:5,20 256:7
257:22 278:23

**endings** 195:23

**ends** 148:7,8

**engaged** 137:9

**English** 71:24 72:2

**ensure** 51:2,9 52:23
55:10,17

**entire** 43:21 254:5
259:7 265:24 266:1
302:7 305:1 306:17
311:4,8

**entirety** 182:3
241:10 273:10

**entitled** 99:6,7
192:23 251:7 270:10

**entity's** 41:12 42:10

**entries** 282:3

**entry** 218:19

**equipment** 230:15

**error** 224:2

**essentially** 217:2
291:7

**establish** 266:3

**establishing** 255:16

**estimate** 43:15
110:19 282:24

**estimated** 264:11

**evaluate** 133:3
173:17 241:18

**evaluation** 51:25
54:22 55:25 56:10,
12,14 57:9,20 61:25
62:2 63:20 64:15
66:12 68:8 76:15,22
77:18,23,24 79:18
82:7 83:14,20 91:14
93:14 95:9,18 97:5,
12 99:21 101:22,24
102:21 104:11,14,19
105:6 116:2 120:16
122:24 128:24
130:22 131:3 137:23
140:7 142:12 144:19
148:2 151:4,15
153:2,4,22 155:11
157:18 158:22
173:8,13 175:10,14
181:15,24 188:1
197:13 206:22
208:1,5 209:7,22,24
210:4 212:9 215:4
216:10 218:9 233:6
234:6 237:16 238:12
239:3,5,6 241:5
244:22 245:6 251:8,
21 252:25 254:13

255:18,19 259:18
262:9,15,24 263:2,
15 264:9 288:9
295:12 297:8,9
300:8 305:14 307:8
308:16 309:1,10
310:8

**evaluation/
treatment** 123:6

**evaluations** 23:2
63:13,24 295:23
296:8

**event** 235:3

**evidence** 224:14

**exact** 167:8

**exam** 53:2 55:6
95:16,24 97:19
135:1,11 152:8
181:25 184:2,17
185:24 201:20,23
205:12 214:6 215:4
241:18,24 242:1
243:10 249:8 251:23
253:15 266:15,18
267:7 304:25 305:2
306:13

**examination** 7:4
51:13,16 52:9,20
53:17 54:20 56:12
59:10 63:20 66:7
68:5,11 74:12 75:7
77:1 78:11 83:9,23
97:22 99:2,8,10
100:19 129:2 130:24
131:11 132:19,23
133:1,15 134:5,24
135:5,20 138:6
139:6 141:12,13,14,
15,18 142:10,11,13,
14,15 143:9,25
144:1,22 145:7,8,12
149:14,21 150:20,21
151:1,7,13,17
158:25 183:11,20
184:10,12,15,16,20,
24 185:1,3,7,19
188:16 191:1 197:12
201:14 202:24
204:3,8,24 208:14
232:1 242:8,10,12,
14,22,24,25 243:3
253:3 288:23 299:16

305:8

**examination/
evaluation** 136:14

**examinations** 64:11
105:3,9 141:12

**examine** 51:24
111:25 133:16,18
139:18 143:18,23
144:2 183:23 188:14
210:6 243:4,6

**examined** 7:2 66:19
108:19,20,21 183:12
210:6 291:19

**examining** 81:7
110:9 143:11,15,19
167:13

**examples** 205:22

**exams** 305:2

**Excuse** 11:21

**exempt** 34:22 35:4
36:18

**exempted** 37:25
38:3,5

**exemption** 34:18
37:3,9 38:15 39:17
40:7,12 42:1,12

**exercise** 195:18,21

**exercises** 194:18
195:9 197:5,6

**exhausted** 304:7

**exhibit** 14:25 33:19,
21,25 34:9,15 39:7,
16 42:5 45:11,15
55:22 61:18,22
62:10 66:12 72:16
78:5 90:8,13 93:4,8,
13,16,22 94:11
95:19 96:25 97:12
98:16,22,25 99:20,
22 101:14,22,23,24
102:22 103:23 104:2
106:21 107:12
110:12 126:9,11,14
129:21,25 146:5,7,
11 147:14,17,18
148:19,22 149:19
153:16 158:16,20
172:12 181:4,8

190:5,14,17,25
192:19,23 199:24
200:3 206:13,15,18,
24 207:1,8 210:4
211:16 213:21,23
214:24 215:2 222:13
223:5 224:14 225:5,
13,15,16 232:7
240:9,14 245:16
246:4,7 250:23
251:2 256:9,16,22
257:10,13 258:2,8
259:17,19,21,23
260:2,4,19,21,23,25
261:6,13,19 262:2,8,
12,22 263:11 264:2,
14 265:13,17,22
267:22,24 268:7,16
269:15,19 278:7,8
280:15,20 288:4
295:10 297:7 299:13
303:3 307:4 311:15

**exhibiting** 298:12

**exhibits** 33:16,24
206:19 261:24
265:21 297:5 302:18

**exist** 56:6

**expanded** 144:21
145:1,12 184:9,14,
20,23 185:1,19

**expect** 13:13 123:20
135:12 175:17
199:15 202:23
228:1,2 290:3

**expectation** 123:21

**expected** 169:14
173:12 292:1

**expects** 275:13
276:1

**expedite** 313:15

**expenses** 43:1
270:11 272:9,10

**experience** 24:13
25:8,9,10,12 51:7
175:23 197:18
240:1,3 285:20

**experienced** 95:10

**experiencing** 100:3



**explain** 48:19 131:9, 22 136:21 138:9 139:10 141:8,10 194:13 236:24 237:7 239:1 242:3 248:5 254:25 272:21,23 306:10

**explained** 205:22 248:19 273:1,2 295:25 300:7,25

**explanation** 9:14 131:24 132:16 139:21 174:10 178:19 189:17 274:24

**extend** 85:3,4,5

**extension** 78:25 79:21 85:2 87:22 89:1,10 289:22

**extensive** 100:15 106:18 141:16 142:15 151:7 188:16

**external** 82:19 92:18,20,24 159:23

**extra** 288:5

**extremities** 82:11, 13 99:14,15 111:14 133:14 143:16 159:21 160:3 183:15,16 184:3 185:18

**eyes** 84:25 133:9

---

**F**

**F-E-I-J-O-O** 7:9

**FABER** 161:11,15

**face** 151:13 204:4

**face-to-face** 136:22

**fact** 10:19 246:19 291:13 298:11 299:10,20 308:9,12

**facts** 132:21 134:2, 22 142:8 144:6

**faculty** 27:21

**failed** 301:23

**fair** 50:23 117:14 123:12 168:17 170:14 175:20 186:18 201:25 215:19 218:11 240:3 277:17 307:7 312:15

**falling** 118:14 235:5

**false** 276:19 277:6

**familiar** 10:15,18 22:25 36:5 38:20 50:4,14,20 58:23 104:24 275:23 278:9

**family** 66:25 136:20, 22

**Farm** 6:6,16 46:23 49:14,19 146:18 205:23 228:17 240:20 265:19 268:12 269:5 273:14 274:15 275:9,12,13 276:2,18,19 277:5,7, 13,18,25 278:12 279:3,8 296:6 300:19 301:7,15,18, 23 302:3,19 303:4, 16,20 304:6,9,12 310:17,18,22 311:3, 5,7,11

**fascia** 169:20,22 170:2,3

**fashion** 100:2

**fast** 17:8,21 69:7 84:15 118:13

**faster** 169:3 198:25

**fault** 311:1

**fax** 102:5 174:8 260:2 263:11,13 265:1

**faxed** 263:20,24 264:8

**February** 264:25 265:4

**federal** 41:12,15,19 42:11

**feel** 64:24 73:21 74:24 84:14,15,16, 17,18 85:7,8 86:2,8 87:18,19,23 110:24

**114**:9,10 116:1 118:13 121:10 123:13 150:13 160:13 168:10 213:1 232:10 235:22 254:9 283:22 312:12,13,24

**feeling** 64:21 65:25 181:20 194:24 207:22 208:17 241:9 254:7,8 306:11,12

**feels** 85:5 87:21 112:2 116:3 144:1 150:10,11 267:16

**feet** 194:6

**Feijoo** 6:4,6,19 7:1,9 12:8,12,21 30:9,11, 23,24 31:3,6,9,15 32:2,11 33:3,6,9,14 34:11 36:2,23 37:7, 24 38:2,4 40:7,23 41:19 42:1,16 43:4, 12,23 44:1 45:5,21 46:21 47:13 49:19 51:3,10 52:24 55:10, 11 56:6 63:12 106:19 129:4 137:12 166:5 190:2 248:8 256:20 275:11,13 276:1,16 277:2,3 286:22 287:17 291:18 296:20

**fellowship** 24:21

**felt** 67:4 123:9 175:9

**female** 254:15

**fetal** 125:11

**fibrillator** 23:22

**fibrosus** 177:20,21

**file** 77:5 102:5 104:3 238:23 254:5 259:9, 10 277:12

**filed** 10:19 11:1 277:17,24 278:12, 23,24 279:2,8 281:22 282:4,15 303:19 310:17 311:8,13

**filing** 282:9

**fill** 62:19 75:14,20,21 76:7 208:17

**filled** 39:3,22 193:7

**fills** 64:20 76:1

**film** 220:12 221:17, 19,23 222:9 225:22, 23,25 226:8,22 227:1,8 228:2,12 231:17,18 232:3

**films** 120:6,7 128:16 219:12,16,18 221:16 225:17 226:18 227:3 229:5 230:25 231:6 262:19

**final** 104:10,13,23, 24 105:7 206:22 208:5 209:22,23 210:3 215:3 216:10 218:8 232:1 233:6 234:5 236:14 237:15 238:12 239:7 241:5 244:22 251:20 254:13 255:18 297:9,24 304:25 310:8

**finally** 9:9 115:15 234:6 245:17 311:15

**find** 84:19 85:12 98:6 109:13 114:13 156:20 157:15 166:3 178:9 208:17,19 231:14 245:15 299:20 312:12

**finding** 59:11 68:1 80:2 81:12 92:3,22 100:22 107:19 114:13 155:22 162:2,22 168:18 206:9 224:18,23 225:5 239:4 268:23 289:21

**findings** 52:19 62:21 68:2 79:16 81:25 82:16 83:13 89:8 93:1,2,6,17 95:17 99:11,19 100:15 125:20 134:8,10 135:24 151:21 154:1,14 155:9 159:11 162:15,16 179:10 180:21 188:15 206:9,10 210:10 221:11,13 222:12 225:12,14

**242**:5 253:16 254:11 262:20 266:9,14,18, 25 288:21,22 290:7, 11,13 299:14,19 300:20 301:8 308:20 310:7,9 311:21

**finds** 197:18

**fine** 9:12 34:5 35:20 202:7 247:25 259:11

**finger** 108:4,5,6,15, 19

**fingers** 194:5,6

**finish** 8:11,13,20 12:14 16:6 59:8 63:7 67:10 70:17 81:11 106:8 108:16 116:20 154:10 166:6 206:2 231:2,4 293:23

**finished** 261:19

**firm** 263:17,25 264:4 265:17

**fix** 70:9

**Flagler** 44:16

**flex** 84:13 93:24 244:6,10,14,15

**flexed** 125:11

**flexing** 267:17

**flexion** 78:25 79:1, 21 80:19 82:2 84:17 87:17,22 88:25 89:10 152:9 154:25 210:20,23 211:2 289:22 311:22

**flexion/extension** 78:20,24 80:18 82:1, 22,23 85:24 89:11 94:24 95:14,22 152:9 154:3,16,25 160:4 210:20,22 211:1 311:21

**flip** 110:24

**flipping** 111:2

**floor** 118:14,22,25 244:12,16 300:3,6

**Florida** 6:8,11 14:22 15:5 19:24 21:23 22:4,11,13 34:12,23



35:6 36:6,12,19
283:21 286:13

**Florida's** 10:15

**focused** 74:11,24
144:22 184:15,24
214:6

**focusing** 188:17

**follow** 51:14 105:7
113:2 151:2 190:19,
20 220:11 221:12
232:1 305:6

**follow-up** 104:23,24
116:2 129:16
146:23,25 148:2
149:13,21 152:22
153:22 155:11
158:22 163:15
173:1,13 181:15,24
185:23 187:25
201:14 202:21 204:3
205:4,5 218:5
232:16 245:1 305:2

**food** 66:25

**foot** 112:6 194:5

**force** 177:12

**form** 35:16 37:12
38:19 39:4,18,22
40:18 41:23 46:5,18,
19,21,22 47:10
60:13,20 62:13,17,
19,24,25 63:1,3,10,
13 75:21 76:7 100:6,
7,11 106:20,23
107:5,8,11 114:4,14
115:1 126:15,17,22
163:19 167:25
171:23 186:14 187:5
193:1,7 203:3 205:7
206:3 246:9,12,14
252:21 262:23
269:7,21 270:2,7,9
272:4,16,22 273:13
274:15,17,21 275:1
276:21 277:8,20
280:18,20,21 281:2,
8 282:2,8,11 303:2
310:2

**format** 227:17
229:19

**formation** 31:9

33:14

**formed** 31:10 43:9,
12

**forming** 114:6

**forms** 23:2 76:1

**forward** 13:14
84:13,17 87:17,21
122:12 145:13
177:10 188:25 189:8
278:23

**found** 79:20,21
97:20 100:22 108:9
115:7 128:21 220:23
221:1 268:20 289:18
298:13 306:13

**foundation** 275:5
277:8

**fourth** 288:16

**fracture** 28:7,9,17
115:5 128:3 220:24
221:2 224:14,22
225:3,4

**fractures** 28:6

**free** 160:13 213:1
232:10

**frequency** 196:6

**frequently** 112:16
113:19

**friction** 177:1

**front** 55:22 101:15
178:5 226:9 255:10
257:24

**Front/back** 127:21

**full** 26:7 45:25
189:17 274:7 275:14
276:2 278:3 279:9
282:9

**fully** 55:16 300:24

**function** 292:3,14
293:12 294:8

**functions** 293:2,4,7,
8

**future** 231:15,20,22
254:23 267:9,12,13
287:3 300:9

**G**

**G.A.** 57:18

**G.A.E.** 131:4

**gather** 279:1

**gave** 10:2,25 181:5
182:18 208:10
216:18 222:19
254:12

**gears** 45:3

**gel** 176:22 177:6,22
178:25

**general** 22:6 23:14
54:25 55:7 80:9 84:8
118:3 202:10 206:5
248:14 249:16

**generalities** 204:9,
10

**generally** 50:15
57:22 63:23 70:23
72:6 82:13 87:4,7
235:9 248:2,7,16
249:6 305:23

**generated** 33:10

**gentleman** 297:4,9

**gentlemen** 72:11

**gently** 9:19

**germane** 232:13

**get all** 26:3 115:21

**girl** 293:2,8

**give** 6:23 9:13 14:21
20:17 22:25 45:24
49:13 66:21 75:20
76:18 84:23 96:12
112:18,23 134:11,22
202:3,5 205:9
207:19 208:3 209:19
220:17 231:12,13
248:10 252:7 253:24
255:11 256:12
258:16 282:24 285:3
308:14,18 312:18

**giving** 202:2 205:17
208:22 256:2 270:13
272:21 306:3

**goal** 196:1 198:19

**goniometer** 106:16

**good** 6:3 7:6,7,8 9:9
17:24 108:21 110:23
118:25 119:9 146:2
154:19 181:14
217:11 245:16
255:24 256:1 272:20
289:5 296:20,21

**Gosh** 103:20

**government** 16:23
17:12 30:19

**grab** 112:1

**grade** 25:16,22,23,
25 26:1,2 288:17

**graduate** 15:17
18:16

**graduated** 15:14,23

**great** 140:11

**green** 67:2

**greet** 64:20

**ground** 8:2 147:4

**grounds** 25:6,14
26:9 255:9

**guess** 34:24 106:17
200:23 202:2,9
220:15 292:12

**guide** 239:11,13

**guides** 142:13 239:6

**guys** 149:1 224:5
245:12

**H**

**H.P.** 288:10 291:19

**habits** 132:7 140:17

**hairless** 293:5

**half** 106:15

**hand** 6:22 19:5
33:16 98:25 107:17,
20 108:25 109:5,9,
11,16 110:2 142:4
158:11 278:6

**handed** 15:3 33:24
126:14 129:24
146:10 147:25
149:1,8 192:22
200:2 206:19 222:16
251:1 269:18 280:19
288:8

**handing** 45:14
61:21 90:12 147:18
148:22 158:19
206:18 246:7 255:20
288:3

**hands** 49:4,5 64:21
69:18 86:10 107:20,
22 194:4,6

**handwriting** 52:5
62:13 80:14 127:11
152:2,6 210:1,15
213:24

**handwritten** 51:25
62:1 70:8 77:18 78:4
81:25 91:14 93:3,14
94:11 97:11 98:2
101:21 102:22
103:1,7,8,14,17,20
125:16 148:1
149:17,20 159:12
172:25 181:16
206:21 209:19,20
210:4 213:2 215:13
232:11 262:23
263:1,20,23

**happen** 64:25 65:7,
11,12 131:15 232:21
234:22 235:16

**happened** 66:22
67:5 68:18 80:6
131:16,17 148:3
161:5 163:16 173:13
207:10,21 268:15

**happening** 69:6
171:8 251:13

**happy** 246:2

**hard** 17:9 49:5 236:9

**harder** 229:19

**Havana** 15:11 16:1,
13

**Hazouri** 6:15 7:5,16
12:3 13:10,16 15:2
17:7,20,23 18:2,7



20:13 22:20 23:25
25:24 26:1,3,6
27:12,17 29:6 33:18,
23 35:19,24 37:13
39:10,14 40:20,21
45:13 47:12,25 49:2
59:2 60:15,16,25
61:20 66:8 69:24
71:19 72:1,6,8,11,
14,15 77:7 78:22,25
79:5 81:2,10 83:2,6
88:9,12,14 90:4,10,
21,23 91:1,5 94:15,
17 96:22 98:24
100:10 103:15
105:23 107:1,10
111:1,4 112:8 113:1
115:21,23 116:15
122:4,8 126:10,13
129:23 130:12
133:21 134:1,18,21
138:22 140:13,19
142:23 144:5 145:21
146:1,5,9 147:16
148:21,25 149:6,7
154:18,23 155:4
156:14 158:18
163:21 164:1,20
165:21 166:9,11
169:12,25 170:24
172:1,4,14 177:18
178:14,18,21 183:2
185:10 186:17,24
187:2,6,12,15
189:15 190:16
192:18,21 197:22
200:1 202:4,7,8
203:11,24 204:9,11,
15 205:8 206:6,17
209:9 214:17,19,23
215:1 219:19 221:7
222:15 233:23
234:3,4 237:2,14
238:5,9 240:9,13,17,
18,25 241:15 243:8
244:17 245:10,15,
19,21,23 246:1,6
247:21,25 248:1
250:16,19,22,25
252:1,24 253:10,23
254:18,20 255:5,24
256:1,4,8,14,17
257:1,3,6,9,12,17,24
258:3,8,11,19,25
259:4,11,13,17,21,25
260:2,9,12,16,19,23

261:2,4,8,16 266:19
267:21 269:9,14,17
271:2 274:19 275:2,
6 276:22 277:10,21
279:14,19,23,24
280:3,6,9,12,17
282:13,22,23 284:1,
4,9,14,17 285:4,7,15,
19,25 286:5,6,17,19
287:9,13,15,22,25
288:5,7 293:6,9
295:8 296:16 297:2,
12,14,19 298:6
300:18,22 301:25
302:21 303:11,18
304:2 305:6,9
309:12 310:11
312:20,23,25 313:4,
6,9,13,16

**Hazouri's** 260:8

**HCFA** 46:19 303:2

**head** 9:11,19 73:23
84:13,17 85:3,4,5,
10,11 86:18 87:3
118:8 122:11 125:2,
3 133:8 177:10
196:10 207:20
244:6,10 312:11

**headache** 78:18
79:7

**headaches** 73:15

**heal** 163:7 169:15
180:24

**healed** 156:24
163:16

**healing** 169:15

**heals** 169:18

**health** 14:23 15:5
272:10,12 281:5
292:2,13 293:1,6,7,
14,17,19,20 294:6
300:16

**healthcare** 34:12,
18,23 35:7,18 36:3,
6,11,19,25 37:7,25
38:4,17 39:18 41:7,
10 136:18 301:21

**hear** 49:5,6 69:13
274:23

**heard** 6:6 25:21
42:19 167:18 178:17
236:1 275:19,20

**heart** 151:13

**heavy** 118:6,20,21
119:3,14 134:13
186:6 189:3 244:6,
10,13 254:22 267:16
300:2,5

**heft** 313:1

**height** 133:10

**held** 6:9 27:10

**helped** 27:4,12

**helpful** 194:7

**helping** 21:18

**helps** 181:17 192:6
195:1,12,22 209:7

**hernia** 177:15 197:7
230:5

**herniated** 114:22

**herniation** 112:13
116:5,10,12 162:11,
17,23 163:11 164:8
168:4,10,12,15,18
169:5,6,9 170:6
176:11,13 177:9
178:24 179:8,11,17
180:4,17 197:3,4,24
198:6,7,10 199:16,
18 231:21 233:15
237:16,21 238:11,17
253:16 254:12,24,25
255:2 267:5,6,15,18
268:21,22 299:1,4,6,
7 300:9

**herniations** 179:16
268:1,5 299:5,11,20

**Hialeah** 44:15

**high** 73:5,6 74:18
126:1 137:6 201:21
214:10 217:12
243:15 244:23 304:8
312:13

**higher** 57:22,23
202:24 204:24 205:4

**highest** 57:15
201:13,18 204:2,5

205:11 245:1,6

**highlighted** 273:18

**highly** 174:25 186:9

**hinder** 308:13
309:25

**hip** 28:6,7,17 109:16
158:11 161:14
180:9,10,14 213:9

**hips** 19:5 28:9 160:4,
5 161:12,14 183:16

**history** 14:20 56:11
59:11 65:1,6,20
75:12 130:24
131:12,25 132:3,4,
10,12 135:1,4,19
138:5,11,12 139:7,
12,13,15,16,18,19,
23,24,25 140:16
141:2,3 144:21
145:1,2,3 181:19,23,
25 182:3,8,10,12,17,
18,22,25 183:8
200:18 201:20
202:23 217:21 218:9
220:17 241:4,5,7,11,
13,17,19,21 242:2,3,
4 243:11 253:1
266:8 288:13 304:25
307:3

**hit** 67:3 69:2,3 177:7

**hold** 24:24 25:3,6,14
49:5 171:24

**holding** 26:10 69:19

**Hollywood** 21:17
27:8,15,16

**home** 21:14

**Homestead** 44:18

**horse** 290:24

**hospital** 17:4 19:2
21:17 26:16 27:8,15
65:14,18 75:15
76:18,19 78:6,7,8,9
101:6 131:17

**hospitals** 19:2

**hot/cold** 193:15

**hour** 13:3 106:15
245:23

**hours** 122:17 192:4
245:20,21,25

**house** 21:15

**huh-uh** 9:12,18

**hypertension**
74:18,23

**hypertensive** 214:2

**Hypothetic** 202:22

**I**

**idea** 10:17 54:24
68:22 69:13 70:13
249:10 255:24 256:1

**identification** 15:1
33:20,22 45:12
61:19 90:9 98:23
126:12 129:22 146:8
147:15 148:20
158:17 172:13
192:20 199:25
206:14,16 214:25
222:14 246:5 250:24
255:23 257:11
259:9,20,24 260:5,
22 261:1,7,14
269:16 280:16

**identify** 69:6 90:2
97:1

**illness** 65:2,6 66:5
132:9 241:7 288:13
307:3

**illnesses** 140:18

**imagine** 16:23

**Imaging** 268:16,25
269:4

**immediately** 220:24
221:1

**immobilization**
235:21

**immobilized** 235:19

**impair** 255:1 293:1

**impairment** 23:8
208:11,23 209:7,12
210:10 216:10
238:20,23 239:2,7,
11,14 240:4 243:21



253:21 266:5 292:3, 14 293:4,12,14,17, 20,21,24 294:7 308:14 310:1,8

**important** 49:21 67:21 68:1,2,21,25 69:10,20 71:3 131:21,23 132:17 189:24,25 300:14 301:2,3

**impression** 268:20

**impressions** 268:19

**improper** 284:9 286:17

**improve** 117:20 195:1 237:23 267:6, 15,19

**improved** 164:9 165:8 172:10

**improvement** 156:15 216:20 217:1,2,4,18 218:11 243:19 244:2 266:4, 23 267:2,4 298:7

**improving** 124:2 252:15

**inaudible** 16:6 17:4, 5 19:4 23:20 28:7 29:13 47:24 53:23 56:13 59:16 63:2 66:3,23 73:16 75:14, 15 77:9 79:3 80:19 85:2,14 92:14 97:19, 22 100:23 106:1 108:4,9 115:4,17 122:7 127:24,25 129:11 133:15 134:13 136:21 142:12 152:12 154:3,16 164:8 170:5 174:12 176:20,21 177:3,5,6 188:1 195:25 197:7 200:18,19 206:12 221:10 227:9,15 229:24,25 230:14 234:1 267:18 306:9

**inclinometer** 105:12,14,18,19 106:14

**include** 141:17 291:24

**included** 106:24 107:2,4 108:9 151:9 183:15,16 247:12 286:1

**includes** 132:3 270:15

**including** 264:10 265:22 300:10 303:5 305:1

**incorrect** 276:18 277:6

**incorrectly** 37:18 147:20

**increase** 89:5

**increases** 101:3,10 194:20

**indication** 110:2,5 114:22 157:11 158:11 163:14

**indications** 114:21

**inflamed** 163:10

**inflammation** 235:10,11

**inform** 221:3

**informally** 9:11

**information** 49:13 61:10 62:25 64:19 66:18,22 68:11 97:15,20 120:23 141:3 151:22 248:22 281:5 309:24

**informed** 53:13 174:3 175:25 300:24

**initial** 55:25 56:10 57:20 61:25 62:1 63:13 64:15 66:11 76:14,22 77:1,18 78:3 79:18 81:18 82:7 83:9,13,20,23 91:14 93:14 95:9,18 97:5,11 99:1,21 101:24 102:20 104:10 105:6 120:15 126:24 128:24 131:3,10 140:7 146:14 148:1 151:5,

8,9,15 153:2 160:14 163:2 165:14 168:6 173:8 190:18 207:5 209:21 211:23 212:9 219:23 232:1 234:12 256:18 262:24 288:9 297:8 305:2

**initial/final** 251:7 252:22,25 255:19 262:9,15 263:2,20 264:9 265:1,3 305:14 307:8

**initially** 66:21 111:24

**initials** 57:18 62:5 79:11 81:21 90:16 200:6 222:20 251:4 288:10

**injured** 119:12 209:12 217:19 236:7

**injuries** 70:24 71:18,20 72:6,7,8,10 73:12 74:2,9,11,24 75:1 89:6 105:10 122:9 125:20,24 133:10 170:1,2 202:11 203:19 204:4 231:17 236:3,15 311:17

**injury** 42:19 71:16, 17 108:13,18,22,25 118:15 121:21 125:5,13,15,19 126:3 169:21 171:6 180:11,13,14 208:15 217:3 236:4 238:24 264:6 292:22 294:12,19 312:17

**inside** 83:17 178:25

**instituted** 30:19

**instruct** 13:8,12 284:7,14,19,20 287:11

**instructed** 287:23

**instructing** 271:20

**instruction** 284:10 285:6 286:2,15,17 287:7,20

**instruments** 105:20

106:2

**insurance** 6:16 10:16 42:24 43:8 49:13 106:22 272:10,12 281:5,6 283:21 286:13

**insured** 45:6 301:20

**insured's** 272:1

**insurer** 273:9,14 274:1,2,4,13,14,21, 24 275:12 276:1 277:13 296:6

**insurer's** 274:24

**insurers** 43:5 46:22 49:20 275:8 287:17

**intended** 37:17

**interest** 32:10 33:2,5

**interesting** 178:16

**internal** 75:25 82:20 92:16,18,19,25 159:23

**internet** 192:5

**internometer** 105:16

**internship** 16:6,7

**interpret** 78:18 81:24 82:17 92:11 127:10 150:5 152:6 154:1,13 156:5,23 210:18

**interpretation** 118:3 216:4 230:22 301:5

**interpreted** 155:10

**interpreting** 81:11

**interrupt** 195:7 247:24

**intervertebral** 176:16

**intubate** 23:20

**invasion** 285:8

**involved** 131:11 132:4 304:23

**involves** 138:14

**iron** 119:4

**irrelevant** 284:12

**island** 17:2

**issue** 37:21 43:2 45:6 49:16 135:21 230:8 277:5

**issued** 42:12 45:20 200:6 221:18 265:17,18 266:2 268:12 274:2

**issues** 140:18 150:16 249:8 275:8 283:20, 22 295:17

**item** 15:7 80:11 162:8 187:3,24

**items** 151:8,14 182:6 188:2,9,14 189:7 266:20,25

---

**J**

**J-I-S-E-L-A** 12:2

**J.A.** 251:4 261:21 262:13 264:5 295:13 297:11,12 299:16 305:12 310:13 311:16

**Jackson** 20:11

**January** 15:12,14, 15,19 288:11 291:20

**jelly** 177:14

**jeopardy** 292:2,13 293:18,25 294:7

**Jerry** 6:18 258:12 259:25 280:6

**Jisela** 11:18,19 12:1, 4,20 52:11

**job** 9:10 154:19 209:5

**jog** 177:7

**joint** 224:15

**joints** 234:18,22 237:9



**judicious** 198:20

**July** 146:19 148:3 155:7,8 158:23 159:17 167:7,22 173:13,21 179:8 181:24 182:11 183:8 184:13 185:17 190:3,12,21 193:5,8 207:11

**jump** 8:1 98:21

**June** 6:11

**justify** 106:21 204:5

## K

**Kaplan** 20:14,15,23

**Kaplan's** 20:4

**Ken** 6:15,20 246:2 285:2

**Kenneth** 282:15

**key** 130:23 137:24 144:20

**kill** 154:19

**kind** 7:17 50:6 66:10 68:18 78:18 140:11 156:10 212:15 234:10 283:2 292:18

**knee** 74:5,7 82:22 83:3,9 84:1 95:17, 18,20,21,25 96:1,2,6, 21 109:20 119:25 127:17 128:11 143:22 156:16,23 158:4 213:3,9 219:4 224:22,25 234:11

**knees** 118:21,24 119:5,6,8 160:5,6 183:17 244:7,11,14, 15 267:17 300:2,5

**knew** 248:19

**knock** 80:10 152:18

**knowledge** 60:17 100:3 218:9

**knowledged** 133:4

## L

**L-A-S-S-U-E-G-E** 83:4

**L3** 268:24

**L3/l4** 268:2 299:2,7

**L4** 268:24

**L4/l5** 268:1 299:1,7

**L5/s1** 268:1,24 299:1,7

**lack** 309:20

**lady** 250:2

**lag** 207:20

**Lagoon** 6:10

**language** 41:2 125:17 190:24 269:4 271:10 273:18 274:2

**Lasegue** 83:4,11 111:15,19 112:18,24 113:11 160:10,19 161:9 163:11 165:3 168:11 178:6 291:14

**Lasegue's** 160:15 162:4 163:3

**lateral** 79:1 80:18 82:1 87:24 127:24 152:9 154:25 210:20,23 211:2 289:22 311:21

**Latin** 176:25

**law** 41:12 263:17,25 264:4 270:16

**lawfully** 37:21

**laws** 41:15,20 42:11

**lawsuit** 46:4,7,9 209:13 264:12 276:17 277:1,4,13

**lawsuits** 238:24 278:11 279:22

**lawyers** 11:12,13

**layering** 177:2

**lead** 70:24 194:23

**leading** 300:22 301:25 302:23 303:11 304:2

**leave** 229:6

**leaves** 53:11 54:13

**left** 18:16,19 74:6,7,8 79:1 80:19 82:2,18, 19,21,22 83:3 85:10, 11 87:24 92:13,23 93:21,22 94:6,7,19, 20 95:11,20,21 96:2, 21 119:25 127:17,18 128:11,12 143:22 152:10 154:4 155:1 193:15 199:11 210:21,23 211:2 219:3,4 222:19 224:14,20,22,25 225:3,8 289:23 311:22

**left-hand** 130:14

**left/right** 85:24

**leftover** 265:23

**leg** 112:1,2,24 113:20 114:2,9,10,11 144:1 178:5

**legal** 6:10 274:17 283:22 284:23 285:2 286:4,8,12

**legally** 41:11 42:10

**legs** 82:14 107:22 125:12 178:5

**length** 56:18,20,22

**lesion** 71:6 72:5 108:10 118:14 120:5 125:9,13,15 161:14 180:7,9,10,16 292:24

**lesions** 28:21,24,25 68:22 69:14,16 71:13,14,15,20,24 72:1 169:19,20,23

**lesser** 70:25

**letters** 79:11

**level** 57:15,23 145:8 184:19,25 201:14,18 202:23 203:23 204:2,5,24 205:5

217:2,7,8,17 218:3 245:1,6

**levels** 56:24 57:12 114:8 268:2

**license** 19:9 21:23 22:5,8,11 23:14 24:2 37:8,15,17,19,20,25 38:4,5 40:8 191:24 192:1,3 281:6

**licensed** 19:23 22:4, 13 34:11,22 35:3,6, 8,10 36:18,25 41:9

**licensing** 36:11

**licensure** 34:18 36:2 38:15 39:18 40:13

**lift** 112:24 119:18

**lifting** 118:6,20,21 119:14 134:13 189:3 244:6,10,13 254:22 267:17 300:2,5

**ligaments** 234:17,24 235:1 236:6 292:25

**light** 67:1,2,3

**lightbox** 226:19,23 231:6

**limit** 84:25 117:24 154:4 186:5,18 187:16 198:15

**limitation** 79:22 89:9 91:13 92:7 94:22 95:1,2,23 98:7 99:19 154:7 155:6 168:25 171:19,20 211:6,7 212:3 215:23

**limitations** 89:8,23 97:1,4,9,15 98:2,6, 15 298:13

**limited** 79:3 80:1,5, 20 81:15 82:3,21 93:19,25 94:2,23 100:1,24 118:4 152:11 155:2 159:1, 4,7 165:5,9,15 166:20 167:3,9 168:5 169:11 170:6, 18 171:13 210:21,24 211:3 215:11,13 235:14 254:11

289:25 298:16,24 299:9 311:17

**lines** 48:4 107:12 109:15,16 157:8 158:7 212:15,22,23

**list** 111:2 278:11,13, 14,15 279:1 280:1,4 303:18 310:16

**listed** 40:22 47:14 49:19 51:3,10 52:23 139:12,13,23,24 141:13,14 142:10,11 144:10,11 145:3 182:6 183:20 190:5 191:1,11 193:12 200:10 201:7 240:21 242:24

**listen** 17:13 20:18 74:22 171:3

**listens** 52:12

**lists** 50:9

**located** 191:18

**location** 224:15

**log** 246:13 260:24 265:14

**Logically** 112:17,20

**long** 13:2 14:6 20:21 28:7 41:3,9 61:5 63:12,15 67:13,15, 20 105:15 106:13 110:15 271:8 281:10 282:19,21 298:3

**longer** 170:3

**looked** 50:17 58:13, 18 60:5,7 61:16 126:24 162:14 201:22 225:22 247:14 261:18 262:2 268:15 290:17 296:1 299:11 305:13 306:17

**lose** 73:9

**loss** 237:8

**lost** 272:1,6,12,18

**lot** 8:6 10:19 29:2 41:5 66:21 84:24 89:5 105:21 114:2



122:17 176:9 197:9
227:8 235:14
277:17,24 282:16
295:10,15

**loud** 147:1,2 154:23

**louder** 17:14,24

**loudly** 147:7

**Lourdes** 7:9 40:23

**love** 233:21

**low** 112:2 121:18,24
122:1,4,6,7 124:24
125:7,8,23 126:1
138:6 143:1,5 144:9
145:8 186:6 188:8,
10,13 189:19 244:5,
9 300:1 312:5,9,18

**lower** 49:6 74:6
87:18 99:15 111:14
112:12,16 114:3
125:2,3,9 126:5
133:13 143:11 160:3
165:15 167:3,4,8,9
178:4 179:8 180:2
181:18 183:16 184:3
185:18 192:14
218:22,24 219:3
223:6,15 224:11
267:7,8 306:13
312:11

**LROM** 80:3,5

**lumbar** 80:7 81:20,
25 82:6 83:25 87:6,
12 88:16,17 91:19,
23 92:3,8 97:9
115:11 125:6,19
126:2,5 128:11
150:17 151:22
152:19 154:14,15
155:5,18 163:7
164:15,25 166:14
167:10,15 170:17
172:7,17 192:14
199:6,13 202:12
203:1,20 210:12
211:6 212:1,4 213:7
219:2 224:9 232:15
233:7 236:3,15
243:20 268:1 294:4,
19 295:2 311:17

**lumbosacral** 88:4,8,
11,12,13 99:14,18

112:4,5,6,11,23
113:9 114:25 119:25
125:10 127:16
133:13 143:16,22
150:7,9 154:24
155:16,17 156:12
159:7 161:13,24
162:10,16,18,21,22
163:1,16 164:5
165:2,6 167:2,21
168:7 169:2 171:21
176:19 178:1,2
179:23 183:14 184:2
185:17 194:17 211:1
215:22 218:16 234:7
241:7 254:10 291:4,
8,10 292:17,21
298:18,24 299:9

**lunch** 8:4 146:3
160:15

**luncheon** 145:24

---

### M

**M-C** 82:25 96:16

**M-E-D-R-A-N-O**
12:2

**M-U-R-R-A-Y**
83:1 96:19

**M.D.** 6:4,6,19 7:1
12:8 30:23 42:2

**machine** 129:5,11,
15 229:11 230:10

**made** 31:16 57:18
79:17 93:13 138:16
187:25 196:22
206:10 223:8
225:12,14 245:5
249:4 252:14 263:2
273:25 274:12
287:22 299:22,25
300:15

**main** 16:25 17:1
117:11 133:14

**maintaining** 180:24

**major** 215:17

**make** 8:10,12,15
12:11 13:11 26:7
53:21 67:19 94:4

115:10 118:9 122:18
132:2 136:12 139:8,
19 156:21 166:6
173:7 174:21 183:24
187:14 189:16
198:21 204:1 234:15
245:7 285:9 286:23
287:19 301:10,19
310:8 311:2

**makes** 49:4 59:12

**making** 53:6 120:20,
24 130:25 136:8,12
137:1,10 138:6
143:1,2,5,7 144:9,
10,23 145:13 150:13
173:10 185:22,25
186:1 187:3,20,25
188:3,4,8,10,11,22,
25 189:18,19 200:19
201:21 202:24
203:17 204:25
240:15 243:14,18
244:1,22 245:5
300:15

**male** 254:15,18,19

**management** 57:9
130:22 137:23
142:12 144:19

**mandatory** 49:24

**maneuvers** 143:9

**manifesting** 291:23

**manner** 153:1
159:19 265:10

**manual** 193:16
291:18

**manuals** 20:17

**Manuel** 6:4,6 7:1,9
12:8 30:23 42:1

**mark** 70:7 146:5
212:21 256:8,15
257:4 258:5,6,14,22
259:5,8 260:14

**marked** 14:25
33:19,21 42:5 45:11,
14 61:18,21 62:9
66:12 90:8,12 93:4,8
96:24 97:12 98:16,
22 99:20,21 101:22,
23,24 102:22

103:22,25 106:21
110:12 126:11,14
129:21,24 146:7,10
147:14,20 148:19,22
149:9 158:16,19
172:12 192:19,22
199:24 200:3
206:13,15,23 207:1,
8 210:4 214:24
222:13 223:5 225:15
246:4,7 250:23
251:2 257:10
259:19,23 260:4,21,
25 261:6,13,19,23
262:22 263:10 264:2
265:22 268:7,16
269:15,18 278:6
280:10,15,19 299:13
302:18 303:3

**Marking** 126:9

**Martinez** 17:3

**massage** 193:16
195:25 197:8

**match** 198:22

**matches** 211:22

**material** 236:10
262:5

**materials** 265:23
266:2

**math** 196:9

**mathematics** 171:5

**matter** 6:5

**maximum** 216:19,
25 217:4,17 218:11
243:19 244:2 266:4,
23 298:7

**Mc** 96:13

**Mcdonald** 96:16

**Mcdonalds** 82:25

**Mcmrurray** 96:14

**Mcmurray** 82:23
83:2,3 95:24 96:15,
19,21

**meaning** 72:2
177:20 211:20
247:22 274:20
278:22

**means** 34:24 37:15
46:5,13 79:13 86:23
107:14 112:14 180:6
210:6 212:2 217:1
254:25 261:22
281:18 298:14
300:25

**meant** 32:13 121:13
125:13 218:24
223:16,18 224:11
239:8 310:24 311:3

**measles** 171:7

**measurement**
89:12 105:13 106:14

**measurements**
106:6,9

**measures** 106:1

**measuring** 89:15

**med-pay** 279:11

**medical** 15:24 16:7
17:2 18:9 19:9 20:6
21:22 22:4,7,8,15
23:12,16,19 24:3
30:4 34:11 40:13,14
42:24 43:2,23 44:15,
16 45:20 46:1,8
49:21 51:4,11 55:18,
25 56:10,12,14
65:20 72:2 75:10,22
76:13,14,19 77:13,
22,24 78:8 102:15
122:24 130:24 132:4
136:8 137:1,10
138:6 139:19 140:4,
16,18,23 143:1,2,5,6
144:9,10,22 145:13
173:7 174:21
185:21,22,25 187:3
188:3,4,8,10,11,21,
25 189:18,19
191:24,25 192:2,4,
10,11 198:18
200:11,19 201:20
209:23 216:19 217:1
218:11 222:18
227:18 239:9,10
243:14,18,19 244:1,
2,22 255:10,11
264:18,22 266:4,7,
23 270:11 271:18
272:8,10 275:20
287:18 291:22,23,25



292:8 294:12,16,20 295:3 298:7 306:17 307:1

**medically** 128:21

**Medicare** 30:9,10, 12,16,18

**medication** 66:3,5 73:7 132:8 208:21

**medications** 300:10

**medicine** 15:11 19:10,18,23 20:7,10 21:2,3 22:14 28:2 171:5 180:6,20

**medium** 74:6

**Medrano** 11:19 12:2,4,20,24 52:11

**meet** 11:8,11 12:23 13:2 36:17 190:4 192:6

**meeting** 62:20 248:14 249:15

**meetings** 11:17 249:2,16,25

**meets** 201:23

**member** 191:8,13 216:13

**Memorial** 20:11 21:17 27:8,15

**memory** 29:17 110:21 239:17

**mentioned** 114:19 118:20 191:5 221:11

**messed** 91:4

**met** 136:5

**Miami** 6:8,9,11 19:13,15,24 20:7,9 21:1 44:16,17

**microfiber** 235:12

**mid** 223:7,8,11,13,18 224:1,7,11

**mid-90s** 43:15,16

**mid-back** 143:15

**mid/lower** 223:1,14 224:9

**mild** 218:22,23 219:3 223:4,6,9,15 224:10

**mind** 53:5 145:20 164:12 168:2 178:14 259:16

**minus** 256:18

**minutes** 136:21 142:14,16 233:25 234:2

**mischaracterizes** 35:17 40:19 60:21 107:9 163:20 170:23

**missing** 91:2 149:17 174:15 175:20 224:4 256:20 257:19

**mistake** 223:8

**MMI** 216:22 217:16, 24 220:6 252:5,10, 13,17 253:12 254:1 255:7,16 266:13 305:20,23 308:14 309:25 310:7

**mobile** 44:4,9,14,23

**moderate** 130:25 136:9,14 137:2,5,10 143:2,7 144:11 185:23,25 186:12, 16,22 187:4,19,22 188:4,11

**modification** 121:2

**modifications** 124:4,8

**modifying** 32:1

**moment** 18:1 35:13 70:8 142:20 199:2 266:12

**money** 70:6

**month** 123:6,12,17, 20 124:12 134:19 165:13 169:17 170:15,17 175:14,18 207:14 307:23

**months** 162:20 164:4,11,16,24 165:17 166:24 168:4,24,25 170:23 207:11,16 298:4,11,

14 305:21 306:1,6,8 308:22 310:3

**morning** 6:3 7:6 312:14

**motion** 52:4 68:9 79:3,12,13,17,22 80:1,5,20 81:14,16, 21 82:3,5,21 83:8, 12,24 84:4 85:12,16, 25 86:4,16,19 87:11 88:18 89:7,10,20,24 90:14 91:6,10,13 92:7 93:2,6,7,17,19, 20,23,24 94:3,6,18, 19,22 95:1,3,7,11,20 96:2,4,6,24 97:1,13, 14 98:1,7,11,15 99:19,20 100:1,4,22, 24 101:10,20,23 102:4 103:4,18,23 104:16 105:2 106:20 107:18 109:9,11 110:11 133:16,19,20 147:10 148:17,23 149:13 151:21 152:10,13,18,25 153:13,17,21,23 154:4,8 155:2,7,9, 12,23 157:4,6,18 159:2,5,8,10,11,13, 16 165:6,7,8,16 166:21 167:4,9 168:5,25 169:11 170:5,19 171:13 177:10 179:22 185:4,7 201:10 206:24 207:7 209:21 210:22,25 211:3,9, 11,17 212:3,10,11,14 215:8,10,25 232:12 235:14 237:23 239:17 242:16 244:6 246:25 247:3 254:11 259:22 263:5 289:25 295:16,22 296:1,8 298:17,25 299:9,15 311:23

**motions** 73:23,24 87:3,14 118:8 194:22 244:10

**mouth** 23:21 49:4 127:7,8,13 133:9

**move** 13:14 17:13

14 305:21 306:1,6,8 308:22 310:3

**morning** 6:3 7:6 312:14

84:17,22 177:3 194:21 214:23 235:22

**moved** 67:3 84:8

**movement** 177:3

**movements** 85:25 107:21 311:23

**moves** 87:2

**moving** 73:17 86:18 110:23 114:12 154:13 270:5 302:21

**MPC** 275:20 276:1 311:11

**MRI** 116:5,17 117:12,17 124:13 129:13 160:20 161:1 162:8,9,17 163:6 164:13,17 165:1,11, 17 167:24 168:1,16 170:13,19 171:21 172:7,9,11,16 175:11,12 179:17 188:1 189:22 229:24 232:20,25 233:16,23 237:24,25 238:3,12, 16 253:5,9,16 254:12,24 257:14 262:12,14,19 266:9, 11 267:25 268:6,16 269:4 298:21,25 299:11,14 300:7,14, 20 301:6,19 302:10, 24 305:12,19 306:22 308:23 310:10

**MRIS** 166:16 192:12,16 229:4,5,7, 13,17 232:14 233:7, 17,18 302:11

**Murray** 82:25 96:17

**muscle** 84:20,21,25 85:13 88:2 104:20 169:20 170:2 180:3 194:18,25 195:1,22, 23 198:11,12,13 311:24

**muscles** 81:6,7,9 154:6 155:2 210:24 234:18,25 235:1 236:5 289:12,24 292:25

**Mutual** 6:16 46:23 49:14,19 146:18 268:12 273:15 275:13 276:2 277:5, 7,13,18 279:3 296:7

**Mutual's** 205:23

---

**N**

**n-u-c-l-e-u-s** 176:24

**named** 44:23

**names** 256:9

**Naranja** 44:19,20

**nature** 136:19 242:23 285:5 307:18

**necessarily** 54:8

**neck** 73:18 74:4,6 84:22 122:9 124:22 125:6,8,20,21 165:15 166:20 178:7 179:8,22,25 180:2 192:13 194:18,21 195:1 235:16,20,21 312:17

**needed** 134:20 173:17 208:20

**needing** 252:5

**negative** 109:21 156:17 157:19,22 158:8,9 160:11 161:16,17 162:4 165:3,4 235:18

**negligence** 264:5

**nerve** 112:17,22 113:3,4,17,18,19 114:1,2,4,7,15,16 177:25 178:2,4 179:2 195:23

**nerves** 114:4,6 115:18,25 178:3

**network** 30:9,12,16

**neurologist** 203:5,7, 9

**neuromuscular** 194:10 195:8,15,17

**neurosurgeon**



203:6,8,10

**15**

**nice** 8:14

**no's** 147:7

**nod** 9:18

**nodding** 9:11

**noise** 187:14

**normal** 79:4 81:15 82:3,4 93:18,19,22, 24 95:4,5,11,22 96:2,7,10 107:13,15, 16 109:3,10 152:11 155:3 156:18 157:4, 12,13,15,18 159:2,5, 8,23 160:5 168:8 172:5 210:25 211:3 213:14 215:10,11,14 219:3,4 224:17,20, 23 225:1,5,9 289:25 293:7 298:18,19,20, 23,25 311:23,24 312:1,5

**nose** 133:9

**note** 93:16 100:13 103:17 156:5 255:23

**noted** 74:17 224:23 225:4 302:25

**notes** 93:13 94:11 103:7 148:1 149:17, 20 215:13 263:1 305:1

**noticed** 66:9

**noticing** 69:1

**Ns** 212:17

**nucleus** 176:21,23, 24 177:5,13,21

**number** 44:17 45:19 46:2,14 54:24 121:6 122:23 123:5 128:4, 7 175:2 240:10,15 245:11,12,14 256:5, 16,22 257:15,20 280:10,13 291:4

**numbers** 48:13 59:20 60:24 144:13 148:6 222:17 255:23 278:22 301:8

**numbness** 114:10,

**15**

**numeric** 49:8

---

**O**

**oath** 7:3

**obese** 180:25

**object** 140:10 166:6 202:1 204:10 254:4 274:16

**objected** 255:6

**objecting** 204:6 274:25

**objection** 13:8,11,15 35:16,20,22 37:12 40:18 47:10,22 60:13,20 100:6 106:23 107:8 163:19 164:18 165:19 167:25 170:21 171:23 183:1 186:14 187:5 203:3,22 205:7 206:1,2 240:23 241:14 243:1 251:25 252:21 269:7 274:17 275:1 276:21 277:20 279:13,17, 18,23 282:11 285:6, 10 287:20,21,22 300:22 301:25 302:25 303:11 304:2 310:2

**objective** 60:3 62:21 125:20 134:10 206:10 266:14,18 290:6 310:10

**objectively** 167:19

**objects** 273:24 274:11

**observation** 222:24

**observations** 252:14

**observe** 107:21

**observed** 153:21 155:6 167:18 255:18

**observing** 85:23 167:12

**obtain** 38:3

**obtained** 38:5 42:2

**occupation** 288:16

**occur** 54:13

**occurred** 291:20

**occurs** 54:12

**October** 308:6 309:16

**offer** 285:17

**offers** 293:22

**office** 12:5,8 20:4 53:10 63:24 75:13 83:16,17 90:15 123:5 130:21 137:11,22 144:18 146:25 151:8 153:9 155:7 158:23 159:12,17 163:2 167:7 174:7 175:13 176:1 190:3,12 193:1 200:24,25 206:24 207:10,25 211:12 220:11 221:8 225:18 226:19 234:12 240:20 246:10,14,22 247:8, 12 270:7 272:21 280:21

**open** 127:7,8,13 162:8 233:17,18 234:1

**operated** 43:17

**operating** 37:18,21

**opinion** 115:1 217:13 294:17

**opposed** 220:21 236:9 290:9

**Optimum** 268:16,25 269:4

**options** 197:13

**oral** 53:24 140:24

**Orange** 6:9

**order** 48:22 56:6 116:5,17 117:17 120:3,19 131:7 138:19 148:15

160:20 163:5 164:13 165:1,17 168:1 170:19 171:1 172:7, 9 194:3 196:24 197:9,23 198:24 208:20 233:18 252:16 256:6 262:8 271:21 297:20 313:11,15,17

**ordered** 119:24 120:16,17,21 124:9 127:12 136:23 161:1 162:8,9 171:21 173:5,14 175:10,12 189:22 197:20 198:24

**ordering** 124:13 139:6 172:11

**orders** 116:3 313:24

**organization** 16:23 36:8 191:14,18

**organs** 292:4,15

**orient** 190:11

**oriented** 133:4,8

**original** 46:5 125:17 313:12

**orthopedic** 16:4,5, 12,15,18,21,22,25 17:1,4,5 18:22 21:18 24:5,16,22,25 25:1, 16,18 44:14 61:25 62:1 63:13 66:11 68:8 73:12 74:2,9,24 75:1 76:22 77:1 93:14 99:21 101:24 140:7 149:21 153:22 155:11 158:22 181:15 206:22 209:22 210:3 214:6, 12 215:4 234:6 241:5 244:22 251:8 262:24 263:15 264:9 288:9 307:8

**orthopedic-type** 105:10

**orthopedics** 24:19 25:4,7,15 26:10

**osteo** 223:15

**osteoarthritic**

218:24

**osteoarthritis** 218:23 219:3 223:1, 6,14 224:10,11 236:17,21,22,25 237:5,6,11,12 243:20

**outcome** 120:12 124:15

**outpatient** 130:21 137:23 144:18

**overbroad** 279:13, 18

**owed** 277:14

**owned** 30:15,21 40:13 41:7

**owner** 31:5,15,22 43:17 250:8

**owners** 31:2,18 32:2,23 33:9 41:9

**ownership** 32:10,20 33:2,5

---

**P**

**P-E-R-T-H-E-S** 28:20

**p-u-l-p-o-s-u-s** 176:25

**P.A.** 6:19 12:8,12,21 30:9,24 31:3,6,11, 15,16,21 32:2,11 33:3,6,9 34:11 36:2, 24 37:7,24 38:2,4 42:2,16 43:4,12,23 44:1 45:5,21 46:21 47:13 56:6 63:12 106:19 129:4 190:3 248:8 275:11,13 276:1,16 277:3 286:22 287:17

**P.a.'s** 30:11 31:9 33:14 40:7 41:19 49:19 51:3,10 52:24 55:10,11 137:12

**p.m.** 313:25

**packs** 193:15



**Paez** 17:3

**pages** 77:6 110:25 130:1,6 181:5 258:24

**paid** 33:10 270:10,12 276:20 277:7 282:9 303:9,10,14,16,22 310:23 311:6,7,11

**pain** 64:24,25 75:15, 24 78:20,23,24,25 79:7,21 80:11,18 81:21 82:1,4,18,20 84:14,15,18,24 85:5, 8 86:2 87:18,19,21, 23 89:5 93:25 94:21 95:10,13,14,19,21 96:3 100:3 101:7,9 104:20 112:2 113:16,17,19,22,25 114:2,8,15,16 116:4 118:9 121:8 122:17 125:9 126:7 143:10, 13 144:1 152:9 154:2,15,24 158:1 161:12,13 162:20 164:4,15,25 165:4,6, 15 166:20 167:3,8 169:11 170:18 178:4,7 179:22,24 180:2,3 181:17,21 183:24 184:1 194:20,23 198:2 210:19,22 211:1 235:10,22 237:23 241:6,9 254:9 255:3 267:8 289:21 291:24 298:17 299:8 300:10 306:13 308:18 312:13

**painful** 82:22 94:23 96:5 168:8 289:7,16 290:9,12,15 291:5 292:17,21,22 294:4 298:24

**palpate** 84:19 86:3, 9,13 87:20 88:2

**palpation** 79:2 80:20,24,25 81:3,6,9 85:12,13 88:3 100:4 134:8 152:12 154:5 155:1 210:24 242:16 289:24

**paper** 98:10 100:14 153:25 212:10

**paracervical** 81:9 289:24

**paraffin** 193:25 194:2,3,7

**paragraph** 40:5,6 225:14 228:21,24 246:17 291:17

**paramedic** 101:5

**paramedics** 65:14, 17 67:7 131:18

**paraspinal** 155:2

**paravertebral** 81:7 88:4,6,7,8,9,10 210:24

**part** 42:11 46:8 75:11 83:7 91:23,24 104:18 105:5 110:12 114:16 139:7 151:25 195:10 210:5 227:18 302:19

**partial** 208:10,23 253:21 273:25 274:1,11,12

**participate** 30:11, 15 250:1 271:6

**participated** 248:6

**parts** 292:4,15

**pass** 21:25

**passenger** 65:10 68:20,24 69:5,11

**past** 7:24 9:24 17:10 65:20 132:3 140:16 207:16 213:7 258:15 277:18,25 284:6,11 285:23 286:25

**pathognomonic** 180:5,6,9,12

**patient** 23:1,20 28:8 45:17 48:11,25 49:9, 15 51:5,25 52:1,9,20 53:11,14 54:4,5,6,7, 8,13,18,23 55:6,19 56:12,13,14 57:17 59:9 62:5,9,11,12,20 63:21 64:12,16,18,

20 65:7,9,11,21 66:7,15,19,21 68:15, 17,23,24 69:14,18 71:4 73:4,5,14 74:1, 15,17,22 75:12,13,20 76:1,4,5,10,15,16,25 78:12 79:17 80:23 81:17 83:10,18 84:13,16,24 85:3,9, 23 86:9,11,14,18,20, 23 87:2,7,13 88:22 89:2,3,8,13 90:16 94:5,19,20 95:10,13 96:3,25 97:3,8,16, 17,22 99:2 100:19, 23 101:4,25 102:20 104:8,11,19,23 105:6 106:11 107:20,21,23 108:3, 24 111:25 113:14 114:25 116:1,2,3 117:18,19 118:4,7, 18 119:21 120:19,25 121:3,9 123:9,10,12, 19,24 124:12 125:1, 5,10,18,24 126:18,23 128:19,22,25 129:10,17 130:22 131:4,13,14,21,22 132:1,4,5,7,8,10,13, 24 133:2,3,7,11,23 134:9,12,14,15,16,24 135:13,16,20 136:13,20,22,24 137:5,24 138:15,16, 18,19,20 139:18,20 140:7,8,16,24 141:19 143:10,13, 20,24 144:19 145:7 146:13,21,24 148:2 150:2,13 151:1,9,18 152:20,25 156:2,22, 24 158:23 159:15,16 162:19 163:2,16 164:3,15,19 165:10, 12,13,16,18,23 166:2,13,24 167:6, 13,14,18,19,20 168:14 170:9,10,15 171:3,5,6,11,16 172:7,8,17 173:7,17 174:1,2,5,14,25 175:4,10,17,22,24 179:7,15 180:21 181:17,19 182:12, 14,18 183:13,24

184:1,13,17,18 185:15 186:10,13,19 188:15,16,17 189:2, 23 190:4 193:8,22 194:8,13,14,15,21,24 195:4 196:1,6,11,17, 25 197:7,14 198:5, 25 200:6 202:10,19, 21,25 203:1,4,9,18 204:3,20,21 205:2,3, 4 206:5,8,23,25 207:11,14,17 208:1, 4,10,17,23,24,25 209:4,8,24 211:12 213:2 214:2 215:5 216:18 217:1,6,15, 22 218:2,10 220:9, 10,13,17,19 221:3 222:19 232:14,16, 20,23,24 233:6 234:7 236:2,14,24 237:4 238:11,15,23 239:3,5 241:8,18,24 242:9,13,19 243:4,7, 18 244:2 245:5,18, 20 246:13,15 247:16 249:7 250:15 251:4, 14,17,20 252:5,13, 14,15,16,19,20 253:1,2,4,9,11,12,25 254:5,10,22 255:7,8, 16,19 259:18,22 260:23 261:21 262:10,13,16,23 263:3,6,21 264:5,12 265:14,19,24 266:2, 3,5,6,13,22 267:1,16, 19,25 269:20 270:5, 6,10,12 272:5,9,11, 16,21,24,25 280:23 281:5 288:2,9,14 289:7,18 290:8,11, 17 291:18,19,21 292:8,13,20 293:12, 14 294:5,25 295:3, 12 297:23 298:7 299:8,16,23 300:7, 16,24 301:4,6,10,20 302:7 303:5 305:3, 11,21,22 306:2,6,7, 10,22 307:4,18,21 308:5,10,11,13,15, 18,20,22 309:21,22, 25 310:4,9,13 311:16 312:1,5,6,10, 16

**patient's** 45:19 72:25 77:12 82:7 83:24 86:6 100:3 107:17 109:12 110:4 120:13 141:24 142:4 150:2 152:14 153:14 156:16 157:24 158:10 160:24 164:24 169:13 174:9,17,20 189:24 210:10 220:2,5 258:10 265:8 292:2, 13 293:17,19,20 294:6 303:6 306:17 309:15 311:16

**patient-to-patient** 248:12

**patients** 23:9 28:10 43:6 44:3,6 47:23 48:23 49:1,22 51:4, 11 52:25 66:23 69:21,22 73:22 121:20 168:12 180:21 198:17 227:13 230:24 231:5,21 232:24 235:22 246:2 248:25 254:25 276:14 295:22,25 296:23 304:25

**Patrick** 160:11 161:10,11,15 165:3 180:8

**Patrick's** 162:5

**pay** 42:24 198:18 271:21 272:1,6,10, 11 275:14 276:2 279:9 301:15,16,24 303:20 304:1,6 310:18,23 311:3,6

**payment** 49:16 274:1,7 281:13,18

**payments** 273:25 274:12 275:20 278:1,3

**pays** 275:17

**people** 29:2 67:13 119:3 122:9,15 209:11 229:6 233:16,24



**percent** 31:5,22
32:12,14 33:9 40:13
54:3,10 79:3,22
80:20 81:15 82:3
85:1 89:9,12 91:10,
13,24 92:7,15,23,24
152:11 153:13,17,20
154:4,7 155:3,6,14
159:2,5,8 165:8,9
168:7,8 169:3
171:13,15,19,20
172:5,6 208:11,12
210:25 211:3,6
212:2 215:20,23
216:9 238:20,23
239:2,7 243:21
251:20 253:22
254:11,13,21 264:11
266:5 275:14,17,21
276:3 278:4 279:10
298:17,25 301:16
303:10,17 311:3,7,
12

**percent/50** 32:14

**percentage** 32:10,
20 89:7,23 92:2
96:25 97:4,9 98:1,6,
15 99:18 303:15

**percentages** 89:20
93:9

**perfect** 117:22

**perform** 21:18
26:19 63:23 64:10
94:6,18 102:20
145:10 150:25
151:17 185:3 288:10
295:22 296:8

**performed** 19:1
26:21 27:2,18 41:11
43:25 49:22 51:4,11,
16 63:20 82:6 83:24
84:4 99:2 101:25
104:17 129:8 132:23
134:4,24 135:20
151:7 152:24 153:1
159:15,16 184:13,17
211:12 215:4 242:9,
14,23 288:10

**performing** 18:25
99:25 263:2

**period** 43:21 164:16
196:6 243:3,5,6
249:22

**periphery** 177:13,
17,18,20

**permanent** 208:10,
15,23 209:12
216:10,17 239:11
266:5 310:1

**permanently**
217:18

**person** 40:23 41:18
42:10 51:17 53:9
58:23 99:25 119:12
123:10 206:12
208:14,15 248:9
294:3

**person's** 72:20

**personal** 42:19
63:24 83:17 238:24
264:6 285:20

**Perthes** 28:17,20

**phone** 227:14
260:19 264:15
285:21

**phonetic** 13:13

**phrase** 188:13

**physical** 44:17
78:11 97:17,18,21
99:7,10 100:18
133:15 134:8,14
141:18 143:8 145:6
150:20,21 151:1,7
152:8 158:25 161:3
180:22 197:10,11,
12,18,20 199:1
201:20 208:18 209:7
242:14 243:10
253:3,15 266:14,18
267:7 288:22 290:13
298:15 299:15
306:2,5,9,13,21
307:14 308:4,16,17,
19,22,24 309:1,2,8,9
310:4,5

**physician** 18:11,14,
18 29:23 47:5 104:4,
7 245:7 250:9

**physicians** 136:17
203:17

**physiotherapy**
175:1 181:20
186:10,20 241:8

**pick** 285:21

**picking** 118:22,24
244:11,15 300:2,6

**Picks** 275:21

**picture** 227:14,15

**pictures** 229:15

**piece** 98:10 120:23
153:25

**pieces** 212:10

**pillow** 121:9,10,18,
25 122:1,4,6,7
124:24 125:2,7,8,12,
23 126:1,2,7 134:12
186:6 244:5,9 300:1
312:5,9,12,13,18,22,
25

**pillows** 122:16

**pin** 54:9

**pinching** 113:18,19

**PIP** 10:16,18,19,23
11:1 42:20,23 43:5,8
46:22 198:14,18
270:10,12,17
271:17,20,25 272:6,
11 273:14 275:12,
15,17,25 277:14,18,
24 278:11,16 279:3,
7,10 281:20,24
282:4,5,9,16 283:20,
21 286:12,13 287:17
303:19 310:16
311:4,9,13

**PIPS** 304:7

**Pivnik** 6:18 11:13
13:8 35:11 37:12
39:9 40:18 47:10,22
60:13,20 71:12,15,
17,23 90:18,22,25
96:14 100:6 106:23
107:8 110:24 126:9
140:9,14 163:19,25
164:18 165:19 166:5
167:25 170:21
171:23 178:12,16
183:1 186:14 187:5
190:14 202:1,5

**physiotherapy**

203:3,22 204:6,10
205:7 206:1 233:21,
24 234:2 240:8,15,
23 241:14 243:1
245:17 247:20,23
251:25 252:21
254:4,14,17 255:22,
25 256:2,5,12,15,19,
24 257:2,5,8,15,19
258:1,6,9,18,23
259:3,8 260:1,6,11,
14,18 261:3 269:7
274:17 275:1,5
276:21 277:8,20
279:13,18,21 280:11
282:11 283:24
284:2,13,16,20
285:5,11,24 286:1,
15 287:7,20,24
296:19 297:11,13,
17,21,22 301:1
302:2,25 303:1,12,
13 304:3,4 305:5,10,
12,25 310:2,15
313:8,10,19,22

**Pivnik's** 311:1

**place** 75:23 86:10
111:24 129:11 147:5
151:21 305:22
308:13 309:25

**Plaintiff** 6:16

**plaintiff's** 14:25
33:19,21 45:11
61:18 90:8 98:22
126:11 129:21 146:7
147:14 148:19
158:16 172:12
192:19 199:24
206:13,15 214:24
222:13 246:4 250:23
257:10 259:19,23
260:4,21,25 261:6,
13 269:15 280:15

**plan** 62:22 68:3
120:13,20 121:3
124:5,8 173:18
175:5 196:24 220:2,
20

**playing** 171:8

**plays** 35:14

**point** 22:2 31:14
46:12 72:17 77:13

97:13 108:21 156:2
162:13 164:23
174:13,17 199:19
202:14 213:8 217:15
221:13 228:22 232:7
248:15 266:21

**pointed** 305:11,12

**pointing** 94:10

**points** 296:24

**policy** 275:15,25
279:10 311:4,11

**portion** 272:6

**position** 73:18
111:25 125:11 209:5
276:17 277:1,4

**positions** 118:10

**positive** 83:3,5
95:25 96:21 111:15
112:4,18,24 113:11,
15 114:13 160:16,19
161:15 163:3,11
178:6 180:10 291:14
310:7

**possibility** 164:10
168:22

**possibly** 57:20 121:4
124:13 165:20,23
283:7

**post** 289:19

**post-** 156:7 289:12
290:17 292:16,21

**post-trauma** 289:18

**post-traumatic**
156:6,11,12,13
289:7,16 290:8,12,
15,19 291:5 292:21
294:4

**posterior** 127:22
289:21

**potentially** 124:7

**pounds** 119:18,19
297:4

**practical** 179:16

**practice** 19:10,18,23
22:14 24:25 47:13
54:16 55:1,8 89:16



176:4 232:8 248:3,7,
15 265:18 282:8
296:6

**practicing** 250:9

**practitioner** 15:4
41:8,10

**practitioner's**
23:14

**practitioners** 40:14

**precursor** 111:2

**prefer** 120:6 227:3
229:10,13,20 258:25

**preparation** 13:4

**prepare** 11:8 12:24
51:24 106:19 107:5

**prepared** 148:24

**preparing** 53:19
305:13

**prescribe** 126:23
164:16 193:24
194:2,17 198:20

**prescribed** 173:2
192:13 193:21,22
194:14 196:5,11,17
219:23 232:15 233:8

**prescribing** 194:12
198:22 199:8

**prescription** 172:16
196:22

**presence** 13:18,21

**present** 11:16 31:9
32:23 65:1,6 136:21
157:3 241:7 277:25
288:13 307:3

**presented** 137:5

**presently** 141:19

**presses** 179:1

**pressure** 72:18 73:1,
6,10,11 74:15,18
75:1,2 110:8 141:25
214:3,5,10,15

**pretty** 245:19 282:8

**prevent** 177:8

**previous** 66:1
108:22 132:5 140:17
162:22 164:12

**previously** 159:19,
22 160:8 254:1
255:8 265:10 266:6

**primary** 123:11
135:24 151:4

**principle** 17:1

**prints** 51:6

**prior** 77:22 107:9
137:15 158:4 211:14
218:10 252:13,16
255:6,17 271:18
302:22 307:9,18
308:10 309:16,22

**privacy** 45:20

**privilege** 13:9 284:2
285:9

**privileges** 26:15

**problem** 72:3
136:19 284:24

**problem-** 144:21
184:14,23

**problem-focused**
144:21 145:1,12
184:10,20 185:1,19

**problems** 136:20
137:4 156:22,24
188:17

**procedure** 54:4,16
55:1

**proceed** 85:9 206:12

**proceedings** 22:11
30:20

**process** 14:8 46:9
55:17

**produced** 255:12
265:24

**professionals**
136:18

**profile** 15:4

**profits** 33:9

**program** 16:8
192:11

**programs** 227:7

**promise** 187:16

**prone** 111:25

**proper** 54:24 69:4
136:15 138:21
180:24 205:15,20
275:9 276:8

**properly** 37:20,24
38:3 56:7 59:4,14
60:18 61:2 131:7
134:25 188:5 190:25
303:10

**property** 70:23

**proposal** 176:23

**protect** 71:6

**protection** 42:20

**protest** 274:4

**protrusion** 268:21,
24

**prove** 168:15,16

**provide** 9:15 43:6
44:8,10,14 52:25
55:12,19 59:18 60:2
134:3 144:7 199:3
216:15,17 239:13
248:24 251:23
276:13

**provided** 45:5 49:9,
15 59:23 136:18
251:19 253:2,4,7,8
276:14

**provider** 77:14
271:18 273:24
274:3,6,11

**providing** 48:21
123:10 254:5

**publication** 30:4
50:20

**publications** 28:1,
14 29:25

**published** 50:24

**pull** 101:13 181:4
295:10

**pulled** 261:22

**pulling** 202:18

**pulposus** 176:22,25
177:5,13,21

**pulse** 72:20 73:1,10,
11 74:15 75:4 142:2

**pumping** 119:4

**purpose** 49:12 96:23
126:17 207:24
208:3,13,16,22
209:8 251:23 281:2

**purposes** 241:21
255:22

**push** 177:24

**pushing** 86:24,25

**put** 29:4 49:4 52:5
53:6 75:24 90:23
92:15 109:2,19
122:16 127:6 151:21
156:7 205:4 226:6,9
227:4,8 229:25
231:6 235:18 269:1
290:20 294:6

**putting** 300:19
301:7

## Q

**quadriplegic**
202:20,25 203:4
204:20

**qualifications**
191:6

**qualified** 136:18

**quantify** 141:5

**quarter** 130:14

**question** 8:6,7,11,
13,14,20,22,24 9:5
12:15 14:10 17:10,
13 34:10 35:11,15
36:1 37:17 50:6
52:22 55:9 58:12
59:13 60:14 63:7
66:10 70:15,18 74:1
75:14 80:9 89:22
108:16 135:17 139:6
142:7 152:17 157:14
163:25 178:13
190:23 200:23 202:9
205:10 206:3,21

213:20 220:16 231:2
232:13 241:20
249:13 255:7 259:5,
6 260:8 266:2 273:6
277:1,3 284:21
285:10,18 286:2,3,
16,23 287:8,9,12,14,
21 291:7 293:23
294:3 296:4,11,13
298:10 302:22,23
305:17,18,23 306:1
307:13 309:14 311:2

**questioned** 297:3

**questioning** 149:14
205:11,17,24 305:18

**questionnaire**
75:18,19

**questions** 8:5 9:16
14:1,20 45:4 68:18
75:16 111:5 116:20
204:19 229:3 250:14
262:18 283:9,11,13
284:24,25 286:4,8,
12,14 295:9,15

**quick** 90:12 107:11
161:10 238:5 302:22

**quicker** 169:15

**quickly** 169:18

**quiet** 270:25

**quiz** 110:21

## R

**r-e-g** 25:24

**radiated** 178:8

**radical** 176:17

**radiculitis** 113:6,7,
10,16 114:14 115:1,
2,11,12 116:22
117:11,20 124:15
160:16,20,24 162:2,
22 163:2,12,17
165:2 168:11 291:11

**radiculopathy**
199:12,15

**radiologist** 120:8,10
220:22 221:2 222:10
229:13



**radiology** 222:11
229:10,20,21

**raise** 6:21

**ran** 67:3

**range** 52:4 68:9
79:3,4,12,13,17,22
80:1,5,20 81:14,15,
16,21 82:2,3,5,21
83:8,12,24 84:4
85:11,15,25 86:4,16,
18 87:3,10 88:18
89:7,9,19,24 90:14
91:6,10,13 92:7
93:2,6,7,17,19,23,24
94:3,6,18,19,22
95:1,2,3,7,11,19
96:2,4,6,24 97:1,13,
14 98:1,7,11,15
99:19,20 100:1,4,21,
24 101:10,20,22
102:3 103:4,17,23
104:16 105:2 106:20
107:18 109:9,11
110:11 133:16,19,20
147:10 148:17,23
149:13 151:21
152:10,11,13,18,24
153:13,17,21,23
154:4,8 155:2,3,6,9,
12,23 157:3,5,17
159:1,2,4,5,7,8,10,
11,13,16 165:5,7,8,
16 166:20 167:4,9
168:5,8,25 169:11
170:5,18 171:13
172:6 179:22 185:4,
7 201:10 206:24
207:7 209:21
210:21,24,25 211:3,
4,9,11,17 212:3,10,
11,14 215:8,10,25
232:12 235:14
237:23 239:17
242:16 246:25 247:3
253:17,20 259:21
263:5 289:25
295:16,21 296:1,7
298:16,18,24,25
299:9,15 311:23

**rapid** 100:7

**rate** 208:15 239:18
253:21 254:13 310:9

**rates** 239:7

**rating** 16:16 208:4,
11,23 209:5,7,13
210:10 216:18
238:20,23 251:20,24
252:7 264:10 266:5
298:8 308:14 310:1

**ratings** 23:8 216:15
240:4

**rays** 76:20 116:21
120:19 148:16 173:2
175:21 226:18
236:22

**re-ask** 260:9

**re-educate** 194:23

**re-education**
194:10,19,25 195:8,
16,17

**re-interview** 305:3

**reach** 77:23 112:3
266:22

**reached** 217:1,7
239:5 243:18

**Reactions** 29:15

**reacts** 171:6

**read** 22:24 34:4,5
35:11 40:11 41:15
61:5 79:6 100:12
130:17 131:1 137:22
193:14 228:22
247:21 271:15,23
272:24 273:10,21,22
274:8 276:24
288:20,22,25 289:1,
4 292:5 300:23
301:10 302:7,10
304:25 305:1,13
307:3 313:10,19,21

**readable** 100:2

**reading** 38:13
244:18 288:23
297:19

**ready** 34:1,7 78:16
289:3

**real** 107:11 161:10
230:13

**realized** 276:19

**reason** 8:24,25 37:9
42:3,12 47:19 70:21
98:9,12,18 100:11
106:25 107:3,5
110:7 132:6 158:13
165:1 209:15 264:8
274:24 279:5 304:6

**reasons** 24:15 48:1
98:14 109:24 124:11
132:2,22 137:9
170:19 232:25
242:17,20 243:9,12
279:22

**reassess** 123:24
218:5

**receipt** 273:10

**receive** 18:8 43:1
76:20 232:22 309:2,
9

**received** 22:5 23:12
65:23 77:13 104:11
217:6 232:14 271:22
278:2 281:14 303:15
306:6 308:10

**receiving** 181:19
241:8

**recess** 18:5 39:12
90:6 142:21 145:24
199:22 238:7 261:12
269:12 295:6

**recognize** 45:20
90:14 146:17 147:25
158:21 200:5 215:2
246:9 262:4 264:18

**recollection** 11:5
35:2 130:8 176:6
225:12

**recommend** 118:7
121:8 125:6,23
312:4

**recommendation**
118:2 134:14 186:9
207:13 312:18

**recommendations**
115:9,10 117:24
120:24 134:11 135:2

138:16,19 161:8
174:24 186:2,4
244:18 299:22,25
300:15 301:10,19
303:5

**recommended**
128:9 174:25 175:4
186:10,20

**record** 6:14 8:9
18:1,4,6 39:11,13
67:16 76:25 83:23
90:7,11 130:18
137:22 142:22
145:21,23,25
199:21,23 222:6
238:6,8 256:10
261:9,11 269:9,11,
13 271:15 273:21
295:5,7 306:16
309:15,18

**recording** 12:6

**records** 54:19 55:3,6
62:10,12 67:23
75:11 76:13 77:2,13,
22 78:3,8 104:18,22
131:10 140:4,22,23
162:14 163:14
173:25 182:11
183:8,12 184:14
202:2 204:7 209:23
213:2 232:19 239:23
247:15 255:15
258:15 306:20,25

**recover** 196:2 197:6
277:14

**recovery** 195:2

**red** 23:15,23 25:21
67:1,3

**redact** 258:22,23

**redacted** 45:17

**redaction** 259:1

**REDIRECT** 305:8

**reduce** 168:7

**reduced** 274:1,7,15,
25

**reducing** 169:2

**reductions** 273:25
274:12

**refer** 66:14 88:2
107:25 108:10
143:17 299:17

**reference** 77:2 78:3
137:15 160:13
172:20 232:10,14
237:16,18 246:25
247:3,7 307:8,11,14

**referenced** 52:12
111:12 251:10

**referencing** 51:21
200:14 220:4

**referral** 64:19
114:15 192:24

**referring** 72:9 97:17
104:4,6 139:1 206:4

**refers** 102:20 181:20
241:8

**reflect** 51:3,10 52:24
53:7 55:12 183:8
228:2

**reflected** 182:11
186:1 239:22

**reflects** 188:3 265:2

**refrain** 84:22 85:6

**refresh** 35:2 225:11

**Reg** 25:24

**region** 82:6 125:10
155:16,17 164:5
178:3 181:18 241:6,
7 289:22 299:9

**regions** 97:10
210:13 268:6

**rehabilitation**
310:5

**reiterated** 305:16

**related** 14:1 40:23
65:25 66:18 79:6
108:11,23 135:2
194:16 236:22
237:7,9 290:14

**relates** 277:2 290:12

**relating** 28:2 247:15
283:20

**relation** 231:16



**relationship** 283:10

**relax** 112:1 309:6

**relevance** 284:15

**relevant** 73:12 110:8 210:9 214:5, 11

**relied** 228:13

**relief** 169:4 170:4

**relies** 248:24

**relieve** 308:21

**rely** 68:13 174:9,17, 20 217:21 220:22 229:21 230:4,5,20 248:9 253:1 262:19 268:9

**remainder** 261:20, 22

**remember** 7:12,14, 15,19,21 10:1,9 11:2 13:19 21:8 24:4 29:16 31:10,12 32:3, 17 38:21,23 43:13 44:25 47:11 58:13, 18 60:5 61:8 63:6,9, 14,16 68:15 110:14, 16,20 130:7 135:12, 16 147:20 160:18,20 197:9 201:24 207:13,22 212:14 213:1 214:1 219:18, 23 221:19 222:8 238:16 249:14,21 250:2,5,6 252:4,12 254:6 271:7 281:12 283:1 305:23 306:15,18 310:20

**remind** 8:18,20 9:19 135:10 154:21

**remove** 254:24 300:9

**render** 48:22,25

**rendered** 246:20

**repair** 70:3

**repaired** 65:15,16, 17 70:5,6,11,12,13 131:20

**repeat** 165:25

217:16

**repeating** 133:24

**repetitive** 97:14

**rephrase** 9:1 17:19 284:22 286:3 300:13 302:1 304:3

**report** 28:6 29:13 30:3,4 51:6,12,15 52:4,8,14 66:17 68:9,10 76:17,20 77:19,20 78:4 90:15 91:7,10 93:3,7 95:3, 19 96:24 97:12,14 98:3,7,11 99:1,20,25 101:23 102:4,15,17, 22 103:4,14,18,22,23 106:20 110:11 111:6,9 117:9 120:7, 8 126:24 135:6,7,22 136:4 140:24 148:17,23 149:13 151:5,9,14 153:23 155:11,12 156:16 157:6 159:12,13 160:14 168:18 172:22,25 174:6 206:22,24 207:5,7 208:10 209:19 211:17,25 219:11 220:12 221:18,23, 24,25 222:6,9,16,21, 24 223:4,5,12,15 224:10,14,25 225:5, 8,13,15,20 226:11 228:14 229:10,14, 20,21,23 231:14,18, 21 232:3,11,12 242:3 257:14 259:22 262:9,13,14 263:6, 21,24 264:2,10 266:9,11 268:6,9,16, 25 269:1,4,5 298:13 299:11,14 300:14, 19,20,23,24 301:6,8, 9,10,19 302:10 305:12,14,19 306:22

**reported** 55:18 74:17,23 125:19

**reporter** 6:21 7:13 11:20,22,24 17:6,9, 15,25 18:3 20:8 22:18 23:18 25:18, 21 26:4 27:9 28:19,

22,24 35:13,14,21 48:24 58:21 65:3 69:12,16 78:21,23 80:22 81:4 82:24 88:5 90:3,5,19 94:14,16 96:12,15, 18,20 103:11 105:16,19 112:6,10, 20 115:22 116:8,12 121:24 122:2,5 130:10 133:6,18 134:16 138:17 142:20 143:12 149:3 154:17 156:9 165:25 169:8,22 171:24 172:2 176:17,23 177:16,19 185:5 186:23 187:9 189:11,13 197:19 203:7 209:3 219:14 220:25 236:19 237:1 238:1 243:5 244:8, 13 245:14 250:18,21 252:23 253:6,18 259:12,15 266:17 267:11 271:1 279:16 293:3,5 298:20,22 299:3,6 300:4 309:4, 6 313:11,14,17,20,23

**reporting** 171:12

**reports** 29:16,19,22, 25 44:11 76:19 120:6 140:12 174:4 175:25 176:2 181:17 209:20 212:14 253:3 262:20 299:1 305:2 308:23

**represent** 40:6 41:25 42:14 62:4,8 130:1 146:13 222:17 257:13 269:19 278:10,21 280:23 284:18

**represented** 256:3 261:20 282:19 283:6

**representing** 209:11 264:5 281:24 282:5

**request** 126:15 129:7

**requesting** 128:5

**require** 23:1 56:11, 13 58:25 144:13 192:3 203:5 220:23 226:25

**required** 136:7 142:25 190:4

**requirement** 36:25 38:6 49:25 56:21 59:7 143:2 192:7

**requirements** 36:17 56:5,9,16 58:17 59:4,14 60:3,6,12,18 61:2,11 131:7 136:4 201:4

**requires** 130:23 137:24 138:2 143:9 144:20 185:22 188:17,18 204:24

**reservation** 271:19 272:17

**reserve** 271:21 272:5 287:23

**residency** 16:8 24:18

**residual** 149:24 150:8,16

**resolved** 255:4 304:16

**respective** 32:13

**respond** 309:23

**responded** 117:19 308:11 309:23

**response** 171:25 205:14 283:11

**responsible** 41:11, 18 42:10

**rest** 189:14 213:6

**restate** 309:14

**restriction** 119:15, 16 153:13,17

**result** 121:2 153:20 202:20 217:3 270:11 292:1,22

**resulting** 159:11

**results** 174:21 300:7

**resuscitation** 23:16, 19,20,21

**return** 123:5 134:15, 18,19 175:13

**revealed** 236:18,19, 21

**revealing** 283:25 285:13

**review** 13:4,7 51:12, 15 53:5 75:11 77:24 188:14 206:8 218:21 219:12,16 221:13, 16,17 228:1,20,21,23 229:2,5 231:25 232:2 247:7 262:19 301:19

**reviewed** 77:3,13 172:21 209:23 226:7 227:22 228:24 262:14 266:1 302:14,23

**reviewing** 33:25 173:1 201:4 229:3 257:20 258:1 260:7 261:19 300:14 302:24

**rewrite** 98:14

**right-hand** 184:5 194:9

**rise** 207:19

**risk** 274:4 293:13

**risks** 292:12

**ROM** 79:11

**root** 112:5,8,9,11,17 113:3,4

**roots** 112:22 177:25 178:2

**rotate** 85:9

**rotation** 79:1 82:2, 19,20 87:25 92:16, 18,19,20,24,25 152:10 154:3,25 210:20,23 211:2 289:23 311:22

**rotations** 159:23

**row** 48:4



**rule** 116:5,8,10
162:10,17 237:20
238:11,14,17

**rules** 8:2 147:5

**run** 177:7

**ruptures** 178:25
235:12

---

**S**

**s-c-i** 113:23

**s-p-o-n-d-y-l-o-l-i-
s-t-h-e-s-i-s** 112:14

**sac** 112:17

**satisfaction** 274:5

**save** 227:17

**scholarly** 30:4

**school** 15:11 16:5
17:2 20:7,8,9 21:2,3
27:21 29:3 227:10

**Schurr** 6:20 11:14
35:16,23 71:16 77:4
245:20,22,25 246:3
256:22,25 257:22
258:21 280:1,4,8
282:14,15,19
283:10,13,19 284:7,
12,18 285:14,16
286:3,7,11,20 287:1,
11,16 304:21

**Schurr's** 287:5

**sciatic** 114:4,7 178:4

**sciatica** 113:22,23,
25

**scope** 243:10

**screen** 230:6,7,13

**seatbelt** 65:10
69:19,20,21,23
131:16

**second-** 57:14

**second-highest**
57:19

**secretary** 11:18
176:1 220:11

**section** 81:25 82:10
91:9,16 92:10,12
115:10 149:23
150:1,19,20,21
151:11,20 152:3,6
154:14 155:16 159:1
172:22 268:19

**sections** 72:17 91:25

**Security** 281:6

**select** 57:15

**selected** 293:11

**seminar-type** 23:4

**send** 22:23 76:16
97:18 98:11 99:25
102:11,12,14,16,21
103:4,6,8,16 104:9,
12 129:9,11 176:2
219:17,21 220:12
221:9,25 229:7,24

**sense** 8:15 67:20
202:10 248:14
249:16

**sentence** 274:10

**sentences** 182:17

**separate** 97:14 98:7,
10,16 100:11 106:20
153:25 176:20
192:16

**separated** 176:16
260:16

**separates** 178:24

**separation** 153:23

**series** 289:17

**service** 48:8,14
50:12 91:7 146:19
182:24 200:7,11
228:25 232:6 247:16
261:5 269:3 277:15

**services** 30:18 41:10
43:5,25 44:8,10,14,
16,18 49:14,16,22
51:4,11 52:24 53:7
55:12,19 59:18,22
60:2 246:19 247:11
248:17 249:5 276:13
287:18

**session** 146:3

**set** 53:8 93:2,3
246:19

**sets** 78:11 99:10

**settlement** 274:6

**severe** 70:22 73:15
169:6,10 204:22
255:3 291:24

**severity** 70:19,22
137:6 291:24

**shake** 64:21

**shaking** 9:11

**sheet** 102:5 260:3,20
263:13 264:15 265:1

**Shoot** 263:24

**short** 39:9 123:16
189:2

**shorten** 12:11

**shorter** 243:3,6

**shoulder** 19:5 74:5,
7 82:18,19 83:8,25
92:11,12,13,16,23
93:3 97:10 119:25
124:22 127:18
128:12 143:22
156:16,23 158:4
213:3,9 219:4 225:4,
8 234:11

**shoulders** 159:24
178:9 183:15

**show** 45:23 51:24
70:7 124:9 190:11
219:11 227:15
256:20 297:10

**showed** 37:4 62:9
94:21 167:19 280:1,
4 299:1 310:16

**showing** 46:7

**shown** 35:2

**shows** 135:7 152:9
159:1,4,7 243:5
268:1

**sic** 23:22 83:4 94:20
105:17

**side** 64:8,9,12 67:4
88:1 125:11 130:14
177:3 193:15 194:9

199:11

**sides** 155:20

**sign** 47:9,14,16,17,
20 66:7 82:23 83:3,4
95:24 111:15,19
112:3,18,24 113:11,
15 160:15,19 161:9,
15 163:12 165:3,4
168:11 178:6 180:6,
8,10 270:7 291:14

**signature** 39:6,7,23
47:5,7 62:16 191:11
193:3 246:18

**signed** 41:22

**significance** 298:11

**significant** 70:24

**signing** 246:15
272:22

**signs** 66:7 83:11
151:12 160:11
163:17 208:18
289:17

**similar** 44:9 153:4,5
293:22

**simpler** 140:5
142:13 200:23
258:21

**simply** 182:6
186:19

**single** 31:5 168:17
206:5 312:15

**sir** 7:6 11:15 15:3,9
16:2,19 18:13 19:12,
14,25 21:24 24:7,20,
23 25:1,5 27:20
29:24 30:2 33:24
43:24 90:11 126:10
142:24 146:10
152:4,21 153:4
154:9 158:24 179:6
184:6 192:17 200:2
238:10 240:7,17
290:24 292:18
296:10,17

**sit** 64:21 220:16
225:19,21 307:19,24

**site** 131:19

**sitting** 8:3,4 9:10
11:13 64:11 73:19
85:22 86:1,5,6,19
87:4,8 88:24 118:10
282:14

**situated** 21:15

**situation** 69:4 86:14
164:19 165:24 166:2

**situations** 69:1

**size** 230:8

**skin** 72:3

**skip** 91:1 122:25

**skipped** 121:15

**skips** 148:12 207:4

**skull** 151:12

**sleep** 125:10 312:22

**slight** 82:21 210:21
211:5,20,21 289:24

**slightly** 215:13
216:4

**slip-and-fall** 65:1,5

**slip-and-falls** 132:5

**slow** 115:20 154:18,
23 237:2,3 292:18
300:4

**slower** 17:23 78:22
127:15

**slowly** 73:22 84:14
85:6 87:17,19,25
88:1 118:11,12
147:7

**small** 71:4,7 121:9,
10 122:1,3,6,7 125:1
134:12 235:12 244:9
312:9,22

**smoke** 67:6

**smokes** 66:4

**so-and-** 46:14

**so-and-so** 67:1

**Social** 281:6

**soft** 7:17 17:8,20
115:24 236:3,4,6,15
292:24 294:11,19



**sole** 33:9 96:23

**someplace** 209:1

**sooner** 197:7

**sort** 23:4 235:3

**sound** 264:22 283:14

**source** 61:9

**Southern** 6:7

**Spanish** 71:16

**spasm** 84:20,25 85:13 198:11,13

**spasming** 84:20 289:12

**spasms** 88:2

**speak** 7:18 17:14 147:7 244:8 252:24

**speaking** 57:22 70:24 82:14

**special** 229:10

**specialist** 24:25 25:3,7,15,17,19 26:10

**specialize** 19:4

**specialties** 20:5 27:14

**specialty** 16:11 203:5

**specific** 133:11 249:9 284:25

**specifics** 141:6

**speculation** 203:3 206:3 302:1

**spell** 11:20,22

**spend** 122:16 138:15 143:11,14,18,24 145:6 185:8 233:22 234:2

**spent** 53:14 54:23 59:9 138:18 184:18 242:18 272:8 296:22

**spin** 67:4

**spinal** 154:5

**spine** 19:5 72:5 79:2,

9,10,11 80:1 81:8, 12,17,19 82:7 83:25 84:12 87:12 88:3,8, 13,17 91:9,17,18,20 92:8 97:10 99:13,14, 17,18 100:25 112:23 113:9 119:24,25 125:6 127:3,6,12,13, 14,16,17 128:9,10,11 133:12,13 143:10, 14,15,16,17,21,22 150:7,8,9,17 151:23 152:8,14,19 153:14, 15,18 154:2,10,14, 15,24 155:19 156:6, 7,11,12 159:1,4,7 161:19,22,24 162:16,18,21 163:1, 7,17 165:5,6 166:13, 14,19,20 167:2,10, 15,20,21 168:6,7 169:1,2 171:13,20, 21 172:6,16,17 176:18,19 177:10 178:1,7,8 179:23 183:13,14 185:17 192:13,14 194:16 199:5,6 202:12 203:20 210:19,22 211:1,5,6 212:3,4 215:10,19,22 216:2 218:22,23 219:2 222:23 232:15 243:20 254:10 268:1,2 288:21 289:7,18,20 290:3,8 291:1,5,8,10 292:16, 20,21 294:11 295:1 298:18,19,23,24 311:18,20 312:2,5,8

**spines** 155:6 162:10

**spoke** 291:11

**spokes** 29:10,11,12

**spondylolisthesis** 112:13,14 115:4 116:6,14 117:1,3,5, 8,9

**spot** 71:23 72:2

**spouse** 40:15,22 41:8

**sprain** 156:7,8,10, 11,12,13 161:19,22,

24 166:13,14,19,25 167:2,10,15,20,21, 23,24 168:2 169:3, 14,18 170:11 199:5, 6 202:12 203:20 204:4 218:16 234:8, 16,17,19,21 235:10, 13,24 243:19 289:10,11,14,15 290:4,9,20,21 291:1, 8 294:11,15,19 295:1

**sprain/strain** 170:17 204:22

**sprained** 290:23

**sprains** 166:16 169:19,23 170:4,5 194:4 198:3,4 203:2 236:2,16 290:16

**sprocket** 29:7,9

**spur** 117:2,3

**stamp** 46:12 90:23 94:12 278:8

**stamps** 222:17

**stand** 73:21 86:9 87:9,14 88:21,25 112:2 118:11,12

**standard** 46:22 104:18 105:5 176:4 282:7,8 296:5,12 313:14

**standardized** 282:2

**standards** 294:13, 17,23

**standing** 87:13 180:3 186:19 187:7, 19,20,22 189:8 208:20

**start** 8:7,11,17 15:6, 18 21:13,16 86:4 115:16 152:5 162:15 166:6 278:22 286:5

**started** 213:2

**starting** 271:11 273:18

**starts** 41:2 99:7 166:9

**state** 6:5,13,16 7:8 21:23 36:11,19 41:12,15,19 42:11 46:23 49:14,19 146:18 205:23 228:17 240:20 265:19 268:12 269:5 273:14 274:15 275:8,12,13 276:2, 18,19 277:5,6,13,18, 25 278:12 279:3,8 291:18 296:6 300:19 301:7,15,18,23 302:3,19 303:4,15, 16,19 304:5,8,12 310:17,18,22 311:3, 5,7,11

**stated** 143:6,7 145:2 160:1 190:5 300:23

**statement** 38:11

**states** 19:7,11,18,23 20:3 23:12 24:6,9, 19,22 26:22 27:2,19, 24 29:23 30:1,7 188:13

**stay** 260:6

**steering** 69:18

**step** 63:19 73:19,20 87:12

**steps** 51:2 55:9 69:4

**stick** 163:1 172:20 226:22

**stickers** 250:17

**stim** 193:16 198:7

**stimulates** 195:22

**stimulation** 195:12, 19,20 198:11,12

**stop** 17:7,11 27:9 28:12 67:8 85:9 138:23 140:20 160:5 166:9 178:15 286:22,23

**stopped** 67:2 81:13

**store** 66:24

**stories** 67:13,15 253:6

**story** 67:20

**straight** 107:12,14 145:12 157:8 188:24 189:8 212:15

**straightforward** 144:22 188:21 189:18

**Street** 44:16

**strengthen** 194:24

**strengthening** 194:17,25 195:8,18, 20 197:5

**stretched** 235:1

**stretching** 234:23, 24 235:9

**strike** 56:25 61:17 156:3 185:24 226:15 267:22 279:25 310:14

**studies** 126:15 129:7 253:4

**study** 233:1

**stuff** 227:12

**subjective** 62:21 134:10 150:2 206:9 266:11 290:7,13 310:10

**subjectively** 167:18

**submits** 275:11

**submitted** 146:18

**substantially** 172:10

**sudden** 73:17,18,23 118:9 177:10 194:22 244:6,10

**suddenly** 73:19,20

**sue** 303:25 304:8,12 311:5

**suffer** 43:2 66:5 68:23 72:4 73:5 118:13

**suffered** 69:14

**suffers** 132:9

**sufficient** 131:12 132:1,24 134:5,25



136:15 137:11 188:5
291:24

**suggest** 197:11

**suit** 270:16 281:20,
24 282:4,5 303:23
310:17

**Suite** 6:10

**suits** 10:19,20
277:18,24 278:11,16
279:3,7 282:9,16
303:19 310:16
311:9,13

**summarize** 40:11
92:21 116:17 178:22

**summarizing** 41:6

**supervising** 41:10

**supplier** 47:6

**support** 26:9 107:6
134:3,5,23 136:15
137:11 142:8 192:1

**suppose** 110:1

**supposed** 71:5
148:14 207:8 224:1

**surgeon** 16:5,16,18,
21 18:23 26:24
27:13,19 231:23

**surgeons** 16:22
21:18

**surgeries** 18:25 19:1
26:19,21 27:2,7,10,
18 140:17

**surgery** 16:12 18:22
21:19 24:6,16,22,25
25:2 27:4,5 28:9
231:22,23 254:23
264:11 267:20
300:10

**surgical** 21:17
27:11,14 66:2 132:6
255:4 267:9,13
300:8

**surprise** 237:6

**surprised** 69:21

**surprising** 69:25
70:1

**suspended** 30:12,16

**suspicion** 168:3,20

**suspicious** 168:19

**swear** 6:22

**swelling** 84:22
115:18,24 235:11,
14,17

**switch** 45:3

**swollen** 116:6

**sworn** 7:2

**symptomatology**
121:11

**symptoms** 64:23
65:25 100:24 101:3
108:3 109:13,17
114:8 115:15,17
116:4 121:11
124:18,19 131:14
133:23 134:11
141:19 143:17,21,24
164:9 166:19 167:3,
6,21 168:13 169:4,7,
11 170:3 179:7,10,
16,18,19 180:3,18
182:14 188:15
194:15,20 196:2
197:18 198:25 206:9
208:18 235:10
237:22 239:4
242:13,15 253:3,14
254:7 266:8,11
267:10,14,15 289:17
290:2,11,12 291:23
292:24 294:9 298:12
308:18,21 310:10
312:7,10

**syndrome** 289:8,13,
17 290:9,12,15
291:5 292:17,21,22
294:4

**system** 10:16 283:21
286:13

---

**T**

**table** 111:25

**takes** 105:15,21
141:17 142:14,15
227:8 243:3

**taking** 8:8 20:22
21:13 56:11 58:20
66:4 73:7 75:11
132:8 182:22 203:8
269:3 270:12
276:16,25 277:3
300:19

**talk** 8:18 12:11
14:11 17:20 30:23
34:9 53:11 54:4 55:4
59:6 60:22 66:21
78:10,17 111:11
122:24 131:21
201:12 208:9 285:22
288:1 292:19 305:11

**talked** 58:19,22
60:8,11 93:8 101:21
113:3 139:5 147:1
160:14 229:2 244:25
248:18 280:24
283:12 288:2 306:9

**talking** 8:17 9:11
12:18 17:8 36:2 52:1
67:19 76:3 109:5
139:15 140:21,23
141:12 146:14 166:9
167:14 182:23 191:5
193:9 200:7 204:9
205:22 234:16
248:11 249:17
258:13 269:20
305:11 310:13

**tapes** 20:18

**teach** 20:19 87:15

**teacher** 27:22

**technically** 90:20

**telephone** 45:19

**telling** 54:2 164:14
186:13 221:20
235:25 274:14
283:10,16,18

**tells** 64:24 65:11,22
73:14

**temperature** 72:22
73:1,12 74:15 75:4
142:2

**template** 62:24
110:13

**ten** 75:24

**tender** 80:19,24,25
81:2,9 85:13 88:3
133:18,23 210:24

**tenderness** 79:2
81:6 133:16,22,23
152:12 154:5 155:1
235:11 289:23

**tendon** 80:22

**tenosynovitis**
194:4,5

**term** 35:23 72:8
176:8,10 189:2
234:14

**test** 20:19,20,22
21:21,22,25 22:3,24
88:18 107:17
109:10,11,13,17,20
110:1,2,4,7 111:19,
21,22,24 116:18
117:11 142:4 155:23
157:10,14,15,16,17,
24 160:4 161:10,12
162:5 163:3 175:11
185:18 212:11
213:10 215:25
216:3,6 306:23

**tested** 107:14,15
109:9 158:1,3,10
171:19 185:16
213:13

**testified** 7:3 42:15
50:3 59:3 159:22
160:8 173:16

**testimony** 6:22
60:10,21 107:9
117:16 141:1 163:20
170:23 173:5 176:3
244:20 245:4,8
251:11 266:10 267:1
294:8,10

**testing** 79:17 81:16
82:6 83:8,12,24 84:4
86:5,16 87:6 89:24
93:10 94:6,20,21
98:1 101:20 104:16
105:2 126:18 147:11
152:13,19,25 153:21
155:10 159:11
167:13,19 201:10
211:9,11 215:8
247:1,4 295:16,22

**testings** 159:16

**tests** 21:20 75:11
76:14 77:14 111:11
158:13 185:3,6
209:23 253:8

**text** 99:7

**that'll** 222:7

**therapies** 193:12,19,
22 196:5,11,12,14,
16,17 197:3,20
199:8

**therapist** 97:18
98:11 100:8,12
102:4 197:10,11
199:1 308:17,19
309:10

**therapy** 44:18 97:17
100:1,19 104:10
115:16 116:1
117:19,21 134:14
136:23 138:20
150:10,11,13 161:3
162:20 164:4,10
168:4,24 189:3,6,7
192:24 194:12,14
196:4 197:21 254:8,
9 298:15 306:2,5,9,
12,21,23,25 307:9,
14,15,18,19,22,25
308:4,10,12,16,21,
22,24 309:1,2,8,9,10,
15,21,23,24 310:4,6

**thick** 312:25

**thing** 53:16 70:2
97:23 110:23 114:22
215:17 270:9

**things** 14:14 67:18
107:25 109:8 115:3
122:18 131:21,22
135:25 167:8 189:3
296:25 298:5

**thinking** 71:23

**thinks** 197:12

**thinnest** 312:11

**thoracic** 80:7,11
81:8,12,17 83:25
87:6,12 88:4,7,10,16
91:19 92:8 97:9

296:2,8

99:14,17 119:24 127:5,13,16 128:10 133:13 143:15,21 150:7,9,17 151:22 152:19 154:1,2,10 155:5,18 156:8,12 159:4 161:22 176:19 178:8 183:13 184:2 185:16 194:16 199:5 202:12 203:1,20 210:12,22 211:6,25 212:3 215:19 218:16,23,24 223:12,14,15 234:7 236:2,15 243:20 294:15 295:2 298:18,23

**thoracic/lumbar** 88:21

**thoraco** 91:23 92:3 212:1 213:7

**thoracolumbar** 91:16,18 155:19

**thought** 115:2 122:2 123:11 164:12 165:9 169:4,13 173:6 189:23,25 204:13 205:15,19,20 220:1, 19 260:13

**thousands** 202:15, 17 240:3

**three-day** 22:3

**throat** 133:9

**tilt** 85:10

**tilting** 87:24

**time** 6:12 7:24 10:2, 4,25 14:6 21:13 22:10 28:8 31:9,20 50:17 51:21 53:10, 12,13 54:3,6,23 56:18,20,22 58:13 59:9,12,18,23 61:6 63:15 69:8 70:14 73:8,9,22 91:4 101:5,12 105:4,21 106:5 120:19 138:15,18 139:17 141:17 142:16 143:11,15,19,25 144:3 145:6,16 157:17,19 163:6

173:10 175:24 184:18 185:8 188:18 205:15,19 214:7 215:3 217:5 219:21 226:24 234:11,15 239:21 242:18 243:4,6 249:8,22 251:14,16 256:14 265:6 266:12,21 290:20 297:24 302:7 303:25 309:3 312:13 313:24

**times** 8:6 28:11 29:4 69:5 84:19 101:4 105:25 106:9 113:20 114:2 117:9 161:13 168:9 170:22 174:7, 11 177:12,25 179:15 194:20 196:7,12,15 198:8 219:17 227:8 231:7,20 232:23 237:12 239:16 267:14 304:5,12

**tired** 14:7

**tiring** 14:8,13

**tissue** 163:10 236:3, 4,15 294:11,19

**tissues** 115:19,25 236:6 292:24

**title** 38:14

**today** 6:11,23 8:23 11:9 67:11 220:16 225:21 244:20 245:4 282:14 296:9 307:19,24

**toes** 114:11 194:5,6

**told** 13:22 14:9 26:11,12,18 32:3 55:14 58:12 78:7,9 87:19 98:9 115:3 117:5 118:7 124:13 135:6,24 136:24 137:8 140:15 141:20 148:7 163:5 164:3 168:2,19 170:7 171:18 174:5,11 179:21 180:8,20 182:14 191:8 194:22 199:1 214:7,11 219:25 226:24 229:8 233:9,14 238:15

262:18 308:25

**tomorrow** 287:3

**tone** 311:24

**tool** 89:15

**tools** 105:13

**toothbrush** 177:23

**top** 34:15 39:1 40:2 62:6 99:6 146:15 148:11 149:21 193:11 210:5 251:4 273:9

**total** 128:7,13 302:6 303:4

**touching** 84:23 89:3

**toxic** 132:7 140:17

**track** 147:23 260:6

**train** 19:3

**trained** 19:20

**training** 14:20 15:8 18:9 19:3,22 20:2,5, 16,25 21:4,21 22:15, 16,21,23 23:8,12,16, 19 24:1,3 191:6,25 192:2

**transcribed** 223:22

**transcribes** 52:13

**transcribing** 12:6

**transcript** 8:8,15 9:15

**translate** 53:6 80:17

**transmittal** 260:3 263:13

**trauma** 72:4 112:12 156:8

**traumas** 69:5

**traumatic** 235:3 289:13 290:18 292:17,22

**treat** 19:4 108:20 128:22 197:3,24 199:9

**treated** 108:19 246:15 310:4

**treating** 123:10 165:13 168:14

**treatise** 30:4

**treatment** 43:2 45:5,7 48:22,24 49:9 54:18 56:13 62:22 65:23,24 66:2 68:3 104:11 120:13,20 121:3 123:11 124:5, 8 138:20 160:24 163:8 164:11 168:10 170:4 173:7,18 175:1,5,14 186:13 192:24 196:24 197:13 198:18 208:19 217:5 218:4 220:2,20,21 244:3 253:2 255:4 267:9, 13 295:12 298:15 300:8,16 301:3,4,11, 21 303:7 306:8 308:4,17 309:1,2,8, 11

**treatments** 27:14 132:6 193:19 198:20,21 308:21,24

**true** 200:25

**truth** 6:23,24 89:16

**tumors** 29:14

**turn** 15:6 137:14 148:5,8 181:7 184:4 297:7

**TV** 122:15,20 313:2, 4

**Twisting** 235:5

**type** 65:19,22,24 68:22 69:13 71:3 113:16 114:14 132:9 249:7 265:13 294:11 295:1 296:7 307:22 308:3,4,10

**typed** 47:6 77:18 100:2 111:9,10

**types** 10:10 63:23 236:1 262:20

**typewritten** 62:25 68:10 99:1 100:13 102:17,24,25 103:3, 19,22 110:12 111:8,

9 126:24 135:5,7,22 136:3 151:14,25 152:3 158:21 181:15 199:12 215:3 223:5 226:10 232:11 262:9 263:22,23,24 297:8

**Typical** 179:10,13

**typically** 136:21 142:14,16 180:7,16

**typo** 223:9,10,21

---

**U**

**uh-huh** 9:12,18

**ultimate** 250:10

**ultrasound** 193:16 198:13

**um-hum** 201:16 275:24 291:9

**understand** 8:24 9:1,5 12:12,17 14:23 21:20 23:11 30:25 31:13,25 34:21 36:10,16,21 38:9 40:4,10 42:8 45:8 46:10,16,18 48:16 49:12 51:19,22,23 52:7 53:4,15 54:2 55:5 56:1,4,21,24 57:1,6,11,14 60:1, 10,11 64:2 67:17 74:4 94:4 96:23 97:24 103:10,13 116:16 117:23 125:17 129:4 130:18 141:1 151:16 156:21 171:11 182:19 183:5,6 195:7 198:14 201:13 205:12 209:10 238:22 262:13 269:24 270:17,19 271:25 272:5,14 273:13 283:16 286:7,11,20 287:6 293:10 295:19 302:3

**understanding** 37:24 38:7 42:22 48:19 59:3,14,17,22 61:2,10 134:4,23 136:11 138:10



139:11,22 141:11
142:9 143:4 144:8,
25 184:25 188:24
189:17,20 195:17
216:25 233:3,6
287:5

**understood** 23:3
117:16 264:4 287:24

**undertake** 19:22
22:14

**underwent** 132:6

**United** 6:7 19:6,10,
18,23 20:2 23:12
24:6,9,19,22 26:22
27:2,19,24 29:23
30:1,7

**University** 15:10
16:1,13 20:7,9,25

**upfront** 190:2

**upper** 80:22 87:18
99:14 114:11 127:24
133:13 143:11
159:21 178:8 181:18
183:14 184:2 185:18
241:6

**urgent** 28:6

—————————

**V**

—————————

**vaccines** 29:15

**Valles** 260:3 263:17

**vehicle** 70:3

**vertebra** 205:3

**vertebrae** 178:25
204:21

**vertebral** 88:7
112:15 117:6
176:15,18,19 177:7,
11

**viable** 266:22

**Vibrating** 187:8

**view** 128:1,2,13
215:17 229:9

**viewing** 230:15

**views** 127:2,5,6,13,
14,16,17,18 128:4,7,

10,11,12,17 173:5

**visible** 84:20 133:10

**visit** 90:15 104:23,25
116:18 129:16
130:21 137:11,23
144:18 146:23,25
151:1,5,8,18 152:14,
20,22 153:10 155:7
158:23 159:13,17
160:16 162:14
163:2,15 165:14
167:7 168:6 169:2
173:1 176:6 183:25
185:17 190:3,12,18
200:24,25 201:18
202:22 205:4,5
206:23,25 207:10,25
211:12 213:4 218:5
219:6,23 220:9
221:6 228:18
232:16,19 234:12
240:20 245:1 246:22
247:8,12 258:13
270:7

**visits** 104:24 172:9
211:14 218:10 247:4
252:14,16

**visual** 54:21,22

**visually** 89:13,14

**vital** 151:12

**voice** 7:17

**VW** 71:10

—————————

**W**

—————————

**wage-loss** 271:19

**wages** 272:1,6,12,18

**wait** 28:10 81:2
117:18 160:25 161:8
169:8 197:19

**waiting** 76:9

**waiver** 274:5

**wake** 73:21

**walk** 64:15 86:10
97:25 162:25 270:3

**walking** 66:10

**walks** 180:25

**wanted** 19:18
117:10,18,19 123:23
127:2 129:15 160:25
162:23 163:6 168:14
196:23 207:14,16
222:5 287:4

**watch** 122:15,20
313:4

**ways** 172:10 226:17

**weakness** 114:9

**wear** 131:16

**wearing** 65:10

**week** 28:8,10 196:7,
12,15,16,17

**weeks** 196:6,18
235:19

**weighing** 297:4

**weight** 64:22 119:15
133:10 180:23,24
209:6

**weightlifting** 119:3,
16 186:6

**well-** 133:3,7

**well-developed**
133:4

**well-knowledged**
133:7

**What'd** 90:21

**whatsoever** 307:9

**wheel** 69:18

**wholly** 41:7

**wife** 31:11,12,14,19
32:1,10,21 33:8,10
43:18 250:8 313:6

**William** 197:6

**withdrawing**
272:17

**withdrawn** 271:20

**wondering** 109:4
184:25

**word** 37:16,23 91:20
268:20,21

**words** 36:18 228:20
258:12 292:7 308:2

**work** 18:11,14 25:12
35:25 80:7 132:9
149:20 209:1,2,4
262:7 303:5

**work-product** 13:9,
11

**working** 18:18,22
21:17 24:14 26:8
142:24 234:10

**works** 12:5

**worse** 101:4 122:18

**wrist** 213:9

**write** 29:20 60:24
64:24 65:12 67:16,
21 81:5 93:19 94:2
96:9 98:2,5,10
108:7,22 122:21
135:23 156:17,20,22
157:19,22 174:4
220:13 223:7
227:20,21 228:4
231:14 233:1,9
240:9 250:17 290:19
306:10 307:22 308:1
309:19 310:6

**writes** 59:19

**writing** 38:21,25
39:1 41:6 78:18
150:6 269:4

**written** 23:23 28:1,5
29:22 52:8,13 53:17
66:17,20 67:19 68:8
76:17 92:12 95:18,
23 97:5 111:6,8,9
135:25 136:2
140:22,23 153:20,22
182:1 209:19
221:18,23,24,25
222:9 229:23 240:14
259:17 281:7 308:25

**wrong** 90:23 108:6
141:2 182:22 183:7
223:21,22 245:12
293:11

**wrote** 30:3 99:19
100:9 150:9 207:22
211:22 212:2,7
213:8 223:4,6,15

224:20,25 225:8
291:1 292:9

—————————

**X**

—————————

**x-** 76:19 116:20
120:18 148:15 173:1
175:20 226:17
236:21

**x-ray** 76:20 77:14
116:25 117:7,9
120:6 129:5,8,10
140:4 174:16,21
176:1 219:23 221:5,
13,16,18 222:24
228:20,21 231:25
232:2 235:17 247:7

**x-rays** 115:13
116:19 119:24
120:3,12,15 124:9
126:22 129:16
134:13 136:24
138:20 139:6 172:21
173:5,12,17,20
174:3,15 175:6,8,24
196:23 218:21
219:7,17 220:1,4,9,
12,18 222:11 226:9,
25 227:14 228:23
229:2,16 231:9
236:18,20

—————————

**Y**

—————————

**year** 10:5,8 11:3
16:8 65:19 283:3

**year-old** 291:18

**years** 16:7,9 18:14
20:21 21:3,7,12
24:13 25:8,9,10
43:22 63:17 108:7,
10 110:17 192:3
271:9 279:2 283:5

**Yesterday** 13:1



**Florida HEALTH** Department of Health

## MANUEL V FEIJOO

## License Number: ME63009

| | |
|---|---|
| Profession | Medical Doctor |
| ❷ License Status | CLEAR/ACTIVE |
| Year Began Practicing | 01/01/1992 |
| License Expiration Date | 01/31/2021 |
| ❷ Controlled Substance Prescriber (for the Treatment of Chronic Non-malignant Pain) | Yes |

### Primary Practice Address

MANUEL V FEIJOO
8370 SW 8 TH STREET
MIAMI, FL 33144
UNITED STATES

### Medicaid

This practitioner DOES participate in the Medicaid program.

### Staff Privileges

This practitioner has not indicated any staff privileges.

### Email Address

Please contact at: **manuelvfeijoomdpa@yahoo.com**

### Other State Licenses

This practitioner has not indicated any additional state licensures.

### Education and Training

| Institution Name | Degree Title | Dates of Attendance | Graduation Date |
|---|---|---|---|
| UNIV OF HAVANA SCH OF MEDICINE | M.D. | 1/1/1962 - 1/1/1967 | 01/01/1967 |
| UNIV. OF HAVANA SCH. OF MED. | MD | 1/1/1970 - 1/1/1973 | 01/01/1973 |

### Other Health Related Degrees

This practitioner does not hold any additional health related degrees.



EXHIBIT
Feijoo 28
6/7/19 JW

**Professional and Postgraduate Training**

This practitioner has completed the following graduate medical education:

| Program Name | Program Type | Specialty Area | Other Specialty Area | City | State or Country | Dates Attended From | Dates Attended To |
|---|---|---|---|---|---|---|---|
| UNIVERSITY OF MIAMI | INTERNSHIP | OTHER | GENERAL PRACTICE | MAIMI | FLORIDA | 01/01/1990 | 01/01/1991 |
| UNIVERSITY OF MIAMI SCHOOL OF MEDICINE | OTHER PROGRAM | OTHER | GRADUATE MEDICINE | MIAMI | FLORIDA | 01/01/0001 | 01/01/1990 |
| | OTHER PROGRAM | GS - HAND SURGERY | | HAVANA | CUBA | 01/01/0001 | 01/01/1977 |
| | RESIDENCY | ORS - ORTHOPAEDIC SURGERY | | HAVANA | CUBA | 01/01/1970 | 01/01/1973 |
| | OTHER PROGRAM | ORTHOPEDICS | | CAMAGUEY | CUBA | 01/01/1968 | 01/01/1970 |
| UNIVERSITY OF HAVANA | INTERNSHIP | ORS - ORTHOPAEDIC SURGERY | | HAVANA | CUBA | 01/01/1967 | 01/01/1968 |

## Graduate Medical Education

The practitioner did not provide this mandatory information.

## Academic Appointments

This practitioner does not currently hold faculty appointments at any medical/health related institutions of higher learning.

## Specialty Certification

This practitioner does not hold any certifications from specialty boards recognized by the Florida board which regulates the profession for which he/she is licensed.

## Financial Responsibility

I have elected not to carry medical malpractice insurance however, I agree to satisfy any adverse judgments up to the minimum amounts pursuant to s. 458.320(5) (g)1, F. S. I understand that I must either post notice in a sign prominently displayed in my reception area or provide a written statement to any person to whom medical services are being provided that I have decided not to carry medical malpractice insurance. I understand that such a sign or notice must contain the wording specified in s. 458.320(5) (g), F.S.

## Proceedings & Actions

**Criminal Offenses**

**The criminal history information, if any exists, may be incomplete; federal criminal history information is not available to the public. Information is verified by the Department at the time of initial licensure and renewal.**

This practitioner has indicated that he/she has no criminal offenses required to be published on this profile.

## Medicaid Sanctions and Terminations

This practitioner has not been sanctioned or terminated for cause from the Medicaid program.

## Final Disciplinary Actions Reported by the Department of Health within the last 10 years:

## The information below is self reported by the practitioner.

### Final disciplinary action taken by a specialty board within the last 10 years:

This practitioner has indicated that he/she has *NOT* had any final disciplinary action taken against him/her within the last 10 years by a specialty board.

### Final disciplinary action taken by a licensing agency within the last 10 years:

This practitioner has indicated that he/she has *NOT* had any final disciplinary action taken against him/her within the last 10 years by a licensing agency.

### Disciplinary action taken by a health maintenance organization, pre-paid health clinic, nursing home, licensed hospital or ambulatory surgical center within the last 10 years:

This practitioner has indicated that he/she has *NOT* had any final disciplinary action taken against him/her within the last 10 years by a health maintenance organization, pre-paid health clinic, nursing home, licensed hospital or ambulatory surgical center.

The following discipline has been reported as required under 456.041(5), F.S. within the previous 10 years.

### Resignation from or non-renewal of medical staff membership or the restriction or revocation of staff privileges within the last 10 years by a health maintenance organization, pre-paid health clinic, nursing home, licensed hospital or ambulatory surgical center in lieu of or in settlement of a pending disciplinary case related to competence or character.

This practitioner has indicated that he/she has *NEVER* been asked to or allowed to resign from or had any medical staff privileges restricted or revoked within the last 10 years by a health maintenance organization, pre-paid health clinic, nursing home, licensed hospital or ambulatory surgical center.

### Liability Claims Exceeding $100,000.00 Within last 10 years.

Settlement of a claim may occur for a variety of reasons that do not necessarily reflect negatively on the professional competence or conduct of the physician. A payment settlement of a medical malpractice action or claim should not be construed as creating a presumption that medical malpractice has occurred.

**Additional claims information may have been reported to the Department of Financial Services. To check their web site, please click here.**

There have not been any reported liability actions, which are required to be reported under section 456.049, F. S., within the previous 10 years.

## Committees/Memberships

This practitioner has not indicated any committees on which they serve for any health entity with which they are affiliated.

## Professional or Community Service Awards

This practitioner has not provided any professional or community service activities, honors, or awards.

## Publications

This practitioner has not provided any publications that he/she authored in peer-reviewed medical literature within the last ten years.

## Professional Web Page

This practitioner has not provided any professional web page information.

## Languages Other Than English

This practitioner has indicated that the following languages other than English are used to communicate with patients, or that a translation service is available for patients, at his/her primary place of practice.
SPANISH

## Other Affiliations

This practitioner has provided the following national, state, local, county, and professional affiliations:

Affiliation

AAARS

AMERICAN MEDICAL ASSOCIATION

NICA

PAN AMERICAN CUBAN HEALTH ASSOCIATION

PHYSICIAN ASSOCIATION OF CLINIC/HOSPITAL AND ANNEX





RECEIVED

FEB 2 8 2004

AHCA HCCU

**APPLICATION FOR**
**CERTIFICATE OF EXEMPTION FROM LICENSURE**
**AS A HEALTH CARE CLINIC**

As provided in subsection 400.9935(9), Florida Statutes (2003)("F.S."): (Please mail completed form and attachments to the Agency for Health Care Administration to the address below.)

I. Manuel V. Feijoo M.D. P.A.        Manuel V. Feijoo M.D. P.A.
(Applicant's Legal Name, e.g., ABC, Inc., XYZ, P.A.)    (Name of Clinic, d/b/a, or fictitious name, if any.)

8326 SW 89ct Miami Fl. 33144
(Address: Street, City, Zip Code)

305 265 7565                    Feijoo@Aol.com
(Daytime telephone)                (Email address)

**II.** The applicant requests a certificate of exemption affirming that the clinic is exempt from licensure as a Health Care Clinic under Part XIII, Ch. 400, F.S. The exemption sought is based on the provisions of s. 400.9905(3), F.S. (State reason for exempt status):

_____
(Attach practitioner and facility licenses, registrations and ownership documents that confirm an exempt status specified in III. (a) - (g), below.)

**III.** Issuance of a Certificate of Exemption is based on a determination that the entity identified above meets one of the following criteria for exemption from licensure in s. 400.9905(3) (a)-(g), F.S. **(Check one):**

☐ (3) (a). **For entities licensed or registered by the state under chapter 390** [Termination of Pregnancy], chapter 394 [Mental Health], chapter 395 [Hospitals], chapter 397 [Substance Abuse], chapter 400, chapter 463 [Optometry], chapter 465 [Pharmacy], chapter 466[Dentistry], chapter 478 [Electrolysis], chapter 480 [Massage Therapy], chapter 484 [Optical Devices and Hearing Aids], or chapter 651, F.S. [Continuing Care].
Please enter in the applicable chapter(s) _____.

☐ (3) (b). **For entities that own, directly or indirectly, entities licensed or registered by the state pursuant** to chapter 390, chapter 394, chapter 395, chapter 397, chapter 400, chapter 463, chapter 465, chapter 466, chapter 478, chapter 480, chapter 484, or chapter 651, F.S.
Please enter in the applicable chapter(s) _____.

☐ (3) (c). **For entities that are owned, directly or indirectly, by an entity licensed or registered by the state** pursuant to chapter 390, chapter 394, chapter, 395, chapter 397, chapter 400, chapter 463, chapter 465, chapter 466, chapter 478, chapter 480, chapter 484, or chapter 651, F.S.
Please enter in the applicable chapter(s) _____.

☐ (3) (d). **For entities that are under common ownership, directly or indirectly, with an entity licensed or** registered by the state pursuant to chapter 390, chapter 394, chapter 395, chapter 397, chapter 400, chapter 463, chapter 465, chapter 466, chapter 478, chapter 480, chapter 484, or chapter 651, F.S.
Please enter in the applicable chapter(s) _____.

☐ (3) (e). **An entity that is exempt from federal taxation under 26 U.S.C. s. 501(c)(3) and any community** college or university clinic.

**EXHIBIT**
Feijoo
29
6/7/19    JW

AHCA Form 3110-0014 Nov 03
Page 1 of 2

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1365
Form available at: www.fdhc.state.fl.us/MCHQ/Health_Facility_Regulation/index.shtml

☑ (3)(f). **A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners** under chapter 457 [Acupuncture], chapter 458 [Medical Practitioners], chapter 459 [Osteopathy], chapter 460 [Chiropractic], chapter 461 [Podiatry], chapter 462 [Naturopathy], chapter 463 [Optometry], chapter 466 [Pharmacy], chapter 467 [Midwifery], chapter 484 [Optical Devices and Hearing Aids], chapter 486 [Physical Therapy], chapter 490 [Psychology], chapter 491 [Clinical Counseling], or part I [Speech-Language Pathology and Audiology], part III [Occupational Therapy], part X [Dietetic and Nutrition], part XIII [Athletic Trainers], or part XIV [Orthotics, Prosthetics and Pedorthics] of chapter 468, F.S. or s. 464.012 [Advanced Registered Nurse Practitioners], which are wholly owned by a licensed health care practitioner, or the licensed health care practitioner and the spouse, parent, or child of a licensed health care practitioner, so long as one of the owners who is a licensed health care practitioner is supervising the services performed therein and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license. **Please enter in the applicable chapter(s)** 458 .

**\*If you seek an exemption under s. 400.9905 (3)(f), F.S., above, please provide the following information:**

**Wholly owned by health care practitioner:** List the names, addresses and license numbers (including prefixes and suffixes, if any), and the approximate percentage owned for all licensed health care practitioners having an ownership interest in the applicant's entity. (Please add additional pages if necessary)

| Name | Address | License Number | % Owned |
|---|---|---|---|
| Manuel V. Feijoo | 8326 SW 8ST Miami Fl.33194 | ME63009 | |
| | | | |
| | | | |

**Spouse, parent or child of health care practitioner:** For each health care practitioner owner, the spouse, child or parent of the health care practitioner having an ownership interest in the applicant entity, please provide the following information. (Please add additional pages if necessary.)

| Practitioner Name | Related Person | Address | Relationship |
|---|---|---|---|
| Manuel V. Feijoo | Lourdes Feijoo | 8326 SW Miami Fl 33194 | Wife |
| | | | |
| | | | |

**Name of owner and type of license (i.e., M.D., D.O., D.C.) who is a licensed health care practitioner and is supervising the services performed at the health care clinic and is legally responsible for the entity's compliance with all federal and state laws. Name:** Manuel V. Feijoo **Type of License:** M.D.

**Please affirm, if true, by checking "yes," that the supervising owner is supervising services within the scope of the practitioner's license. Yes** ☑ .

☐ (3)(g). **Clinical facilities affiliated with an accredited medical school** at which training is provided for medical students, residents, or fellows.

**IV.** Name of individual signing this application

Manuel V. Feijoo
(Printed Name)

305 265 7565
(Daytime telephone)

Feijoo@Aol.com
(Email address)

I hereby affirm, as witnessed by my signature below, that the clinic named above is eligible for exemption from licensure as provided in s. 400.9905(3), F.S. Signature and Office or Position held with Applicant.

**Reminder: attach a copy of all applicable license(s).**

AHCA Form 3110-0014 Nov 03
Page 2 of 2

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1365
Form available at: www.fdhc.state.fl.us/MCHO/Health_Facility_Regulationindex.shtml

CERTIFICATE #: 2440

EXEMPTION #: HCC2274

# State of Florida

## AGENCY FOR HEALTH CARE ADMINISTRATION
### DIVISION OF HEALTH QUALITY ASSURANCE

# HEALTH CARE CLINIC
## Certificate of Exemption

This is to confirm MANUEL V. FEIJOO, MD, PA has affirmed an exempt status according to Section 400.9905(3), Florida Statutes. This Certificate of Exemption is issued by the Agency for Health Care Administration to the holder identified below:

MANUEL V. FEIJOO, MD, PA
8326 SW 85TH STREET
MIAMI, FL 33144

**EXHIBIT**

File # 2407
EFFECTIVE DATE: 03/01/2004

Deputy Secretary, Division of Health Quality Assurance

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O BOX 106134

ATLANTA   GA 30348

| | PICA

PICA | |

**1. MEDICARE** (Medicare#)  **MEDICAID** (Medicaid#)  **TRICARE** (ID#/DoD#)  **CHAMPVA** (Member ID#)  **GROUP HEALTH PLAN** (ID#)  **FECA BLK LUNG** (ID#)  **OTHER** (ID#)

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1)
59874B689

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial)**
G▮▮▮▮ A▮▮▮ E▮▮▮

**3. PATIENT'S BIRTH DATE**  MM ▮▮ DD ▮▮ YY 1977  **SEX** M ▮ F ☒

**4. INSURED'S NAME (Last Name, First Name, Middle Initial)**
▮▮▮▮ A▮▮ E▮▮

**5. PATIENT'S ADDRESS (No., Street)**
▮▮▮▮▮▮▮▮

**6. PATIENT RELATIONSHIP TO INSURED**
Self ☒ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS (No., Street)**
▮▮▮▮▮

**CITY** MIAMI  **STATE** FL

**8. RESERVED FOR NUCC USE**
X

**CITY** MIAMI  **STATE** FL

**ZIP CODE** 33135  **TELEPHONE (Include Area Code)** (▮▮▮) ▮▮▮▮

**ZIP CODE** 33135  **TELEPHONE (Include Area Code)** (▮▮▮) ▮▮▮▮

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)**

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**
9457528C2559D4

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT? (Current or Previous)**  YES ☐ NO ☒

**a. INSURED'S DATE OF BIRTH**  MM ▮ DD ▮ YY  **SEX** M ☐ F ☐

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?**  YES ☒ NO ☐  **PLACE (State)**

**b. OTHER CLAIM ID (Designated by NUCC)**

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?**  YES ☐ NO ☒

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**
ANA PANDO ESQ

**10d. CLAIM CODES (Designated by NUCC)**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**  YES ☐ NO ☐  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  SIGNATURE ON FILE  DATE 06 17 16

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)**  MM 05 DD 12 YY 16  QUAL.

**15. OTHER DATE**  QUAL.  MM ▮ DD ▮ YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**  FROM MM▮ DD▮ YY▮  TO MM▮ DD▮ YY▮

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
EZ MEDICAL CENTER

**17a.**  **17b. NPI**

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**  FROM MM▮ DD▮ YY▮  TO MM▮ DD▮ YY▮

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)**

**20. OUTSIDE LAB?**  YES ☐ NO ☐  **$ CHARGES**

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)  ICD Ind.

A. M48 34  B.  C.  D.
E.  F.  G.  H.
I. S199XXA  J.  K.  L.

**22. RESUBMISSION CODE**  ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 05 19 16 | | 11 | 1 | 99204 | | M48 34 | 475 00 | 1 | | NPI | |
| 2 | 05 19 16 | | 11 | 1 | 95851 | | M48 34 | 100 00 | 1 | | NPI | |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

EXHIBIT
Feijoo
31
6/7/19 JW

**25. FEDERAL TAX I.D. NUMBER**  SSN EIN
650409050  ☒

**26. PATIENT'S ACCOUNT NO.**
G01909 1

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back)  YES ☒ NO ☐

**28. TOTAL CHARGE**  $ 575 00

**29. AMOUNT PAID**  $ 0 00

**30. Rsvd for NUCC Use**  575 00

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
FEIJOO MANUEL V MD
SIGNED ME63009  DATE 06 7 16

**32. SERVICE FACILITY LOCATION INFORMATION**
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI   FL 33144
a. 1811923105 b.

**33. BILLING PROVIDER INFO & PH #** (  )
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI   FL 33144
a. 1811923105 b.

NUCC Instruction Manual available at: www.nucc.org  **PLEASE PRINT OR TYPE**  CR061653  APPROVED OMB-0938-1197 FORM 1500 (02-12)

021783

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

BECAUSE THIS FORM IS USED BY VARIOUS GOVE    ENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARA    NSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if it is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured": i.e. items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee; 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services are not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

021784

*Manuel V. Feijoo M.D. P.A.*

ORTHOPEDIC

REPLY TO MIAMI OFFICE

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

8421 South Orange
Blossom Trail
Suite 104
Orlando, FL 32809
Tel: (407) 857-5686
Fax: (407) 857-5687

**Initial Orthopedic Evaluation**

Today's Date ___5/19/16___

Name: _____ Age: _29_ Sex: _F_ Status: ____

Weight _122_ Height _5_ B/P _____ Pulse _____ Temp: _____

Date of Accident: ___5/12/16___

Actual Complaints: _____

Past Medical History

Previous Accidents: _____

Surgeries: _____

Allergies: _____

Habits: ___ Alcohol: ___ Smoking: ✓ Drugs: ___ Coffee: ___

Is the patient taking any medications currently? _____

Diseases: ___ Hypertension: ___ Diabetes: ___ Heart Disease ___

Other: _____

If applicable, Date of patient's last menstruation: _____

To the patient's knowledge, is she pregnant at this time: Yes ___ No ___

_____
Patient's Signature                    Witness

EXHIBIT
32
6/7/19  JW

021826

Date of examination: _____     Pulse: _____
Date of Accident: _____       Resp: _____

### PHYSICAL EXAMINATION:

**Headache:**     occipital / frontal / temporal  (R) (L)
                  severe / significant / considerable / moderate / mild / some
Onset:            immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                  days
Dizziness:        frequent / occasional

**Cervical Pain:**  sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
Onset:              immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
R.O.M.              extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain

**Thoracic Pain:**  sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
Onset:              immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
R.O.M.              extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain

**Lumbar Pain:**    sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
Onset:              immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
R.O.M.              extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain

**Extremities:**    (R) (L) shoulder / (R) (L) elbow / (R) (L) wrist / (R) (L) hand /
                    (R) (L) hip / (R) (L) knee / (R) (L) thigh / (R) (L) ankle / (R) (L) foot
                    sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
Onset:              immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
R.O.M.              extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain

021827

Knee:          Drawer (   )   Apply compression (   ) Apply Distraction (   )

General Limitations:

(   ) Sedentary work          Lifting 10lbs. maximum
(   ) Moderate work           Lifting 20lbs. maximum
(   ) No lifting

Other limitations if indicated:
Patient can stand / walk in an 8 hr. day          (   ) none (   ) 1-4 hrs. (   ) 4-8 hrs.
In an 8 hr. day, patient can sit                  (   ) none (   ) 1-4 hrs. (   ) 4-8 hrs.
In an 8 hr. day, patient can drive               (   ) none (   ) 1-4 hrs. (   ) 4-8 hrs.

| Patient is able to: | frequently | intermediately | occasionally | not at all |
|---|---|---|---|---|
| Bend | (   ) | (   ) | (   ) | (   ) |
| Squat | (   ) | (   ) | (   ) | (   ) |
| Climb | (   ) | (   ) | (   ) | (   ) |
| Perform overhead work | (   ) | (   ) | (   ) | (   ) |

Impression: _____

R/O _____

Clinical course and treatment: _____

X-ray examination of the injured areas: _____

Recommended diagnosis procedures: _____

Orthopedic supports for injured regions: _____
Limit overall activities: _____
Therapeutic modalities: _____
Other recommendations: _____

Follow-up: _____

Doctor's Signature: _____

**MEDICAL OFFICE**
8370 S.W. 8th St.
MIAMI, FL. 33144

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

Tel: (305)265-7505
Fax: (305)265-7535

| | |
|---|---|
| **PATIENT NAME:** | G████████-A████████ |
| **DATE OF INJURY:** | 05/12/16 |
| **EXAMINATION DATE:** | 05/19/16 |

## INITIAL ORTHOPEDIC EVALUATION

### CHIEF COMPLAINT:
Pain on the cervical region, the upper/lower back, the left shoulder, left elbow and left knee.

### HISTORY OF PRESENT ILLNESS:
This is a 39-year-old female who was involved in an automobile accident on May 12th, 2016 she was driving wearing the seatbelt when another car ran a stop sign and hit her vehicle on the left rear side, suffering multiples traumas, but did not go to any hospital. The car a Hyundai '2015, she doesn't know how much could be the cost to fix it.

### PAST MEDICAL HISTORY:
Previous accident on 2011, which required treatment for back pain, she refers was feeling well when this second accident happened.

### SURGERIES:
Epigastric hernia, appendix and breast nodule.

### ILLNESSES:
High blood pressure and Asthma.

### ALLERGIES:
No.

### SOCIAL HABITS:
The patient drinks coffee, does not smoke, drink alcohol, or take drugs.

### MEDICATIONS:
Ibuprofen 800 mg for pain, I advised the patient to take it with meals.

### OCCUPATION: Works in a hotel.



EXHIBIT
Feijoo
83
6/7/19     JW

021819

**PATIENT NAME:**     G████████-A████ E█████
**DATE OF INJURY:**     05/12/16
**PAGE:**     2

## PHYSICAL EXAMINATION:

The patient is well-nourished, well-developed, oriented and alert, cooperative, head; eyes, ears, nose, mouth and throat are within normal limits.

**Weight:** 132 lbs.         **Height:** 5'00"

**CERVICAL SPINE:**  There is pain on the posterior cervical region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation on the paracervical muscles with limited range of motion to 30 percent of the normal range.

**THORACIC SPINE:**  There is pain on the mid-thoracic spine at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paravertebral muscles with limited range of motion to 70 percent of the normal range.

**LUMBOSACRAL SPINE:**  There is pain on the lumbosacral region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paralumbar muscles with limited range of motion to 70 percent of the normal range.

**UPPER EXTREMITIES:**  There is pain on the left shoulder at abduction and external rotation with limited range of motion to 90 degrees of abduction. There is also pain on the left shoulder at adduction and internal rotation with tenderness at palpation of the left acromioclavicular joint. The left elbow is also painful at flexion/extension with tenderness at palpation on the per olecranon region.

**LOWER EXTREMITIES:**  There is pain on the left knee at flexion/extension with tenderness at palpation on the peripatellar region with Lasegue's sign being positive bilaterally to 45 degrees. Mc. Murray's sign is positive.

## DIAGNOSIS:
1. Cervical spine post traumatic painful syndrome.
2. Thoracic spine trauma.
3. Lumbosacral spine post traumatic painful syndrome.
4. Left shoulder trauma.
5. Left knee trauma.
6. Lumbosacral spine radiculitis.

021820

**PATIENT NAME:** ▮▮▮▮▮▮▮▮▮▮ E▮▮▮
**DATE OF INJURY:** 05/12/16
**PAGE:** 3

**RECOMMENDATION'S:**

1. Limit overall activities.
2. Use a low pillow.
3. Avoid heavy weight lifting; bend the knees not the back when picking up anything from the floor.
4. I ordered x-rays of the cervical spine, thoracic spine, lumbosacral spine, left shoulder, and left knee.
5. I Manuel V. Feijoo, MD, have examined the patient ▮▮▮ G▮▮▮▮▮▮▮ for an accident that occurred on 05/12/16 and I have concluded that this patient has an emergency medical condition, which is defined as a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain such that the absence of immediate medical attention would reasonably be expected to result in any of the following a) serious jeopardy to the patient's health; b) serious impairment of body function; c) serious dysfunction of any bodily organs or parts. The patient should start medical treatment and care as soon as possible, as an emergency.
6. Return to the office in one month for further evaluation and treatment if necessary.


_____ , M.D.
Physician's Signature Required
MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                         05/26/16

021821

# Manuel V. Feijoo M.D. P.A.

**MEDICAL OFFICE**
8370 S.W. 8th St.
MIAMI, FL. 33144

**ORTHOPEDIC**

Tel: (305)265-7505
Fax: (305)265-7535

## STUDIES REQUEST

PATIENT'S NAME _____ SEX: ☐ M

DATE _____ CHART: _____ AGE: _____ ☐ F

REFERRING PHYSICIAN: _____

CLINICAL PHYSICIAN: _____

**X-RAY STUDIES:**

**HEAD:**
( ) SKULL
( ) FACIAL, BONES
( ) NASAL, BONES
( ) MASTOIDS
( ) PARANASAL, SINUSES
( ) MANDIBLE
( ) ORBITS
( ) T.M.J.S.

**CHEST:**
( ) CHEST AP & LATERAL
( ) CHEST AP
( ) STERNUM
( ) RIGHT RIB CAGE
( ) LEFT RIB CAGE

**SPINE:**
( ) CERVICAL
( ) THORACIC
( ) LUMBAR
( ) SACRUM COCCYX
( ) PELVIS

**EXTREMITIES:**          LT:      RT:
( ) BONE AGE       ( )     ( )
( ) FOOT           ( )     ( )
( ) ANKLE          ( )     ( )
( ) KNEE           (X)     ( )
( ) LEG            ( )     ( )
( ) FEMUR          ( )     ( )
( ) HIP            ( )     ( )
( ) HAND           ( )     ( )
( ) FINGER         ( )     ( )
( ) WRIST          ( )     ( )
( ) FOREARM        ( )     ( )
( ) ELBOW          (X)     ( )
( ) HUMERUS        ( )     ( )
( ) SHOULDER       (X)     ( )
( ) CLAVICLE       ( )     ( )

**GRASTROINTESTINAL:**
( ) ABDOMEN FLAT
( ) ORAL CHOLECYSTOGRAM
( ) ESOPHAGYS
( ) U G I SERIES
( ) SMALL BOWEL
( ) BARIUM ENEMA

**UROLOGICAL:**
( ) INTRAVENOUS PYELOGRAM
( ) CYSTOGRAM

**SONOGRAPHY:**
( ) LIVER
( ) GALLBLADDER
( ) KIDNEY
( ) PANCREAS
( ) SPLEEN
( ) ABDOMINCAL AORTA
( ) RETROPERITONEAL
( ) PROSTATE
( ) URINARY BLADDER
( ) PELVIC
( ) OB FOR FETAL AGE
( ) TESTICLE
( ) BREAST       ( ) LT( ) RT
( ) THYROID

**CARDIAC:**
( ) ECHOCARDIOGRAM
( ) E K G
( ) TRANSTELEPHONIC MONITOR
( ) HOLTER MONITOR

**VASCULAR STUDIES:**
( ) PERIORBITAL DOPPLER
( ) CAROTID DOPPLER          ( ) W/IMAGING
( ) DOPPLER STUDY ARTERIES ( ) U ( ) L
                    VEINS ( ) ( )
( ) QUANTITATIVE NEVOUS FLOW
( ) PERIPHERAL IMAGING DUPLEX DOPPLER
( ) PENILE FLOW

**NEUROLOGICAL:**
( ) E E G
( ) NERVE CONDUCTION
     ( ) UPPER    ( ) LT    ( ) RT
     ( ) LOWER    ( )       ( )
( ) EVOKED POTENTIAL:
     ( ) VEP    (visual)
     ( ) BAEP   (auditory)
     ( ) SEP    (somatosensory)

**LABORATORY:**
( ) URINALYSIS
( ) GLUCOMETER
( ) HEMOGROBINOMETER
( ) PREGNANCY TEST
( ) RESPIRATORY TESTS

**OTHERS:**
_____

Physician's Signature _____

**EXHIBIT**
Feijoo
34
6/7/19   JW

021823

# Evaluation and Management

## Office or Other Outpatient Services

The following codes are used to report evaluation and management services provided in the office or in an outpatient or other ambulatory facility. A patient is considered an outpatient until inpatient admission to a health care facility occurs.

To report services provided to a patient who is admitted to a hospital or nursing facility in the course of an encounter in the office or other ambulatory facility, see the notes for initial hospital inpatient care (page 15) or initial nursing facility care (page 25).

For services provided in the emergency department, see 99281-99285.

For observation care, see 99217-99226.

For observation or inpatient care services (including admission and discharge services), see 99234-99236.

--- *Coding Tip* ---

**Determination of Patient Status as New or Established Patient**

Solely for the purposes of distinguishing between new and established patients, **professional services** are those face-to-face services rendered by physicians and other qualified health care professionals who may report evaluation and management services reported by a specific CPT code(s). A new patient is one who has not received any professional services from the physician/qualified health care professional or another physician/qualified health care professional of the **exact** same specialty and subspecialty who belongs to the same group practice, within the past three years.

An established patient is one who has received professional services from the physician/qualified health care professional or another physician/qualified health care professional of the exact same specialty and subspecialty who belongs to the same group practice, within the past three years.

In the instance where a physician/qualified health care professional is on call for or covering for another physician/qualified health care professional, the patient's encounter will be classified as it would have been by the physician/qualified health care professional who is not available. When advanced practice nurses and physician assistants are working with physicians they are considered as working in the **exact** same specialty and exact same **subspecialties** as the physician.

*CPT Coding Guidelines, Evaluation and Management, Definitions of Commonly Used Terms, New and Established Patient*

## New Patient

**99201**    **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **A problem focused history;**
- **A problem focused examination;**
- **Straightforward medical decision making.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are self limited or minor. Typically, 10 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2011, 2013

➔ *CPT Assistant* Winter 91:11, Spring 92:13, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Jun 99:8, Feb 00:3, 9, 11, Aug 01:2, Oct 04:11, Mar 05:11, Apr 05:1, May 05:1, Jun 05:11, Dec 05:10, Feb 06:14, May 06:1, Jun 06:1, Aug 06:12, Oct 06:15, Apr 07:11, Sep 07:1, Nov 08:10, Mar 09:3, Aug 09:5, Dec 09:9, Jul 10:10, Jan 11:3, Jan 12:5, Mar 12:4, 8, Apr 12:10, Jan 13:9, Jun 13:3, Aug 13:13, 14, Aug 14:3, Oct 14:3, Nov 14:14, Jan 15:12

➔ *Clinical Examples in Radiology* Winter 12:9

**99202**    **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **An expanded problem focused history;**
- **An expanded problem focused examination;**
- **Straightforward medical decision making.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of low to moderate severity. Typically, 20 minutes are spent face-to-face with the patient and/or family.

➔ *CPT Changes: An Insider's View* 2013

➔ *CPT Assistant* Winter 91:11, Spring 92:13, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12

➔ *Clinical Examples in Radiology* Winter 12:9

**99203**    **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **A detailed history;**
- **A detailed examination;**
- **Medical decision making of low complexity.**

Evaluation/Management

tabbies

EXHIBIT 35

Evaluation/Management

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate severity. Typically, 30 minutes are spent face-to-face with the patient and/or family.

➔ CPT Changes: An Insider's View 2013

➔ CPT Assistant Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, Oct 04:10, Feb 05:9, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 08:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12

➔ Clinical Examples in Radiology Winter 12:9

**99204**   **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **A comprehensive history;**

- **A comprehensive examination;**

- **Medical decision making of moderate complexity.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 45 minutes are spent face-to-face with the patient and/or family.

➔ CPT Changes: An Insider's View 2013

➔ CPT Assistant Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:14, May 02:1, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jan 11:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12

➔ Clinical Examples in Radiology Winter 12:9

**99205**   **Office or other outpatient visit** for the evaluation and management of a new patient, which requires these 3 key components:

- **A comprehensive history;**

- **A comprehensive examination;**

- **Medical decision making of high complexity.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 60 minutes are spent face-to-face with the patient and/or family.

➔ CPT Changes: An Insider's View 2013

➔ CPT Assistant Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Aug 01:2, Apr 02:2, May 02:1, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, Oct 06:15, Apr 07:11, Sep 07:1, Mar 09:3, Aug 09:5, Dec 09:9, Jul 10:4, Jan 11:3, Jan 12:3, Mar 12:4, 8, Jan 13:9, Jun 13:3, Aug 13:13, 14, Jan 15:12

➔ Clinical Examples in Radiology Winter 12:9

# Established Patient

**99211**   **Office or other outpatient visit** for the evaluation and management of an established patient, that may not require the presence of a physician or other qualified health care professional. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

➔ CPT Changes: An Insider's View 2013

➔ CPT Assistant Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Oct 96:10, Feb 97:9, May 97:4, Jul 98:9, Sep 98:5, Oct 99:9, Feb 00:11, Aug 01:2, Jan 02:2, Oct 04:10, Feb 05:15, Mar 05:11, Apr 05:1, 3, May 05:1, Jun 05:11, Nov 05:1, Dec 05:10, Feb 06:14, May 06:1, Jun 06:1, Jul 08:19, Oct 06:15, Nov 06:21, Apr 07:11, Jul 07:1, Sep 07:1, Dec 07:9, Mar 08:3, Aug 08:13, Mar 09:3, Aug 09:5, Apr 10:10, Jan 11:3, Jan 12:3, Mar 12:4, 8, Apr 12:10, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Nov 13:3, Mar 14:14, Jan 15:12

**99212**   **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- **A problem focused history;**

- **A problem focused examination;**

- **Straightforward medical decision making.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are self limited or minor. Typically, 10 minutes are spent face-to-face with the patient and/or family.

➔ CPT Changes: An Insider's View 2013

➔ CPT Assistant Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jul 98:9, Sep 98:5, Feb 00:11, Jun 00:11, Aug 01:2, Jan 02:2, May 02:3, Apr 04:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Feb 10:13, Jul 10:4, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Apr 12:17, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Feb 14:11, Jan 15:12

**99213**   **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- **An expanded problem focused history;**

- **An expanded problem focused examination;**

- **Medical decision making of low complexity.**

Counseling and coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of low to moderate severity. Typically, 15 minutes are spent face-to-face with the patient and/or family.

➲ *CPT Changes: An Insider's View* 2013

➲ *CPT Assistant* Winter 91:11, Spring 92:14, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jan 97:10, Jul 98:9, Sep 98:5, Aug 01:2, May 02:3, Oct 03:5, Apr 04:14, Oct 04:10, Mar 05:11, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Jan 15:12

**99214**   **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- **A detailed history;**

- **A detailed examination;**

- **Medical decision making of moderate complexity.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family.

➲ *CPT Changes: An Insider's View* 2013

➲ *CPT Assistant* Winter 91:11, Spring 92:15, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, May 97:4, Jul 98:9, Sep 98:5, Aug 01:2, Jan 02:2, May 02:1-2, Oct 03:5, Apr 04:14, Oct 04:10, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Sep 10:4, Jan 11:3, Jun 11:3, Mar 12:4, 8, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Jan 15:12

**99215**   **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:

- **A comprehensive history;**

- **A comprehensive examination;**

- **Medical decision making of high complexity.**

Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 40 minutes are spent face-to-face with the patient and/or family.

➲ *CPT Changes: An Insider's View* 2013

➲ *CPT Assistant* Winter 91:11, Spring 92:15, 24, Summer 92:1, 24, Spring 93:34, Summer 93:2, Fall 93:9, Spring 95:1, Summer 95:4, Fall 95:9, Jan 97:10, Jul 98:9, Sep 98:5, Aug 01:2, Jan 02:2, May 02:1, 3, Apr 04:14, Oct 04:10, Mar 05:11, Apr 05:1, 3, Jun 05:11, Dec 05:10, May 06:1, Jun 06:1, 11, Sep 06:8, Oct 06:15, Apr 07:11, Jul 07:1, Sep 07:1, Mar 08:3, Mar 09:3, Aug 09:5, Jul 10:4, Sep 10:4, Jan 11:3, Jun 11:3, Jan 12:3, Mar 12:4, 8, Apr 12:10, Jan 13:9, Mar 13:13, Jun 13:3, Aug 13:13, 14, Nov 13:3, Aug 14:3, Oct 14:3, Nov 14:14, Jan 15:12

# **Hospital Observation Services**

The following codes are used to report evaluation and management services provided to patients designated/admitted as "observation status" in a hospital. It is not necessary that the patient be located in an observation area designated by the hospital.

If such an area does exist in a hospital (as a separate unit in the hospital, in the emergency department, etc.), these codes are to be utilized if the patient is placed in such an area.

For definitions of key components and commonly used terms, please see **Evaluation and Management Services Guidelines.**

—— *Coding Tip* ——

**The Significance of Time as a Factor in Selection of an Evaluation and Management Code**

The inclusion of time as an explicit factor beginning in CPT 1992 is done to assist in selecting the most appropriate level of E/M services. It should be recognized that the specific times expressed in the visit code descriptors are averages and, therefore, represent a range of times that may be higher or lower depending on actual clinical circumstances.

Intraservice times are defined as **face-to-face** time for office and other outpatient visits and as **unit/floor** time for hospital and other inpatient visits. This distinction is necessary because most of the work of typical office visits takes place during the face-to-face time with the patient, while most of the work of typical hospital visits takes place during the time spent on the patient's floor or unit.

**Unit/floor time (hospital observation services, inpatient hospital care, initial inpatient hospital consultations, nursing facility):**

For reporting purposes, intraservice time for these services is defined as unit/floor time, which includes the time present on the patient's hospital unit and at the bedside rendering services for that patient. This includes the time to establish and/or review the patient's chart, examine the patient, write notes, and communicate with other professionals and the patient's family.

In the hospital, pre- and post-time includes time spent off the patient's floor performing such tasks as reviewing pathology and radiology findings in another part of the hospital.

Evaluation/Management

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

STATE FARM INS
P O BOX 106134

ATLANTA   GA 30348

CARRIER

| PICA | | | | PICA |
|---|---|---|---|---|

| 1. | MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|

1a. INSURED'S I.D. NUMBER: 59874B689

2. PATIENT'S NAME (Last Name, First Name, Middle Initial): G___ A___ E___

3. PATIENT'S BIRTH DATE: MM __ DD __ YY 1977   SEX: F X

4. INSURED'S NAME (Last Name, First Name, Middle Initial): G___ A___ E___

5. PATIENT'S ADDRESS (No., Street): ___

6. PATIENT RELATIONSHIP TO INSURED: Self | Spouse X | Child | Other

7. INSURED'S ADDRESS (No., Street): ___

CITY: MIAMI   STATE: FL

8. RESERVED FOR NUCC USE: X

CITY: MIAMI   STATE: FL

ZIP CODE: 33135   TELEPHONE (Include Area Code): ( )

ZIP CODE: 33135   TELEPHONE (Include Area Code): ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial):

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER: 9457528C2559D4

a. OTHER INSURED'S POLICY OR GROUP NUMBER:

a. EMPLOYMENT? (Current or Previous): YES | NO X

a. INSURED'S DATE OF BIRTH: MM __ DD __ YY   SEX: M | F

b. RESERVED FOR NUCC USE:

b. AUTO ACCIDENT? YES X | NO   PLACE (State):

b. OTHER CLAIM ID (Designated by NUCC):

c. RESERVED FOR NUCC USE:

c. OTHER ACCIDENT? YES | NO

c. INSURANCE PLAN NAME OR PROGRAM NAME:

d. INSURANCE PLAN NAME OR PROGRAM NAME: ANA PANDO ESQ

10d. CLAIM CODES (Designated by NUCC):

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES | NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _SIGNATURE ON FILE_   DATE _07-26-16_

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _SIGNATURE ON FILE_

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP): MM 05 DD 12 YY 16   QUAL.

15. OTHER DATE: QUAL. MM __ DD __ YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION: FROM MM __ DD __ YY   TO MM __ DD __ YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE: EZ MEDICAL CENTER   17a. | 17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES: FROM MM __ DD __ YY   TO MM __ DD __ YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC):

20. OUTSIDE LAB? YES | NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind.

A. S134XXD   B.   C.   D.
E.   F.   G.   H.
I. S335XXD   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | CPT/HCPCS | MODIFIER | | | | | | |
| 1 | 07 | 05 | 16 | | | | 11 | 1 | 99214 | | S134XXD | 275 00 | 1 | | NPI |
| 2 | 07 | 05 | 16 | | | | 11 | 1 | 95851 | | S134XXD | 100 00 | 1 | | NPI |
| 3 | | | | | | | | | | | | | | | NPI |
| 4 | | | | | | | | | | | | | | | NPI |
| 5 | | | | | | | | | | | | | | | NPI |
| 6 | | | | | | | | | | | | | | | NPI |

25. FEDERAL TAX I.D. NUMBER: 650409050   SSN | EIN X

26. PATIENT'S ACCOUNT NO.: G01909 1

27. ACCEPT ASSIGNMENT? (For govt. claims, see back): YES X | NO

28. TOTAL CHARGE: $ 375 00

29. AMOUNT PAID: $ 0 00

30. Rsvd for NUCC Use: 375 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

FEIJOO  MANUEL V MD
SIGNED M263009   DATE 07-26-16

32. SERVICE FACILITY LOCATION INFORMATION:
MANUEL V FEIJOO MD PA
8370 SW 8TH STREET
MIAMI FL 33144
a. 1811923105   b.

33. BILLING PROVIDER INFO & PH #: ( )
MANUEL V FEIJOO MD PA
8370 SW 8 TH STREET
MIAMI FL 33144
a. 1811923105   b.

021781

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

EXHIBIT

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if it is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering such service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended. 12 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; F.O. 9397

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, "Carrier Medicare Claims Record," published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974 "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

021782

MEDICAL OFFICE
8326 S.W. 8th St.
MIAMI, FL 33144

**Manuel V. Feijoo M.D. P.A.**
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

### RANGE OF MOTION REPORT

PATIENT'S NAME E_____ 5/12/16

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| **CERVICAL SPINE:** | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | 30 |
| Lateral Flexion | 0—45 | |
| Rotation | 0—80 | 60 |
| **THORACOLUMBAR SPINE:** | | |
| Forward Flexion | 0—90 | 70 |
| Extension | 0—30 | |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| **SHOULDER:** | | |
| Forward Elevation | 0—150 | 144 |
| Backward Elevation | 0—40 | |
| Abduction | 0—150 | 90 |
| Adduction | 0—30 | |
| External Rotation | 0—90 | 90 |
| Internal Rotation | 0—40 | |
| **ELBOW:** | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| **WRIST:** | | |
| Dorsiflexion | 0—60 | |
| Palmar Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| **HAND:** | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| **HIP:** | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| **KNEE:** | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| **ANKLE:** | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking.
If an assitive device is used for ambulation , comment on its medical necessity and the patient's ability to walk without it.)

_____
PHYSICIAN'S SIGNATURE

5/19/16
DATE



EXHIBIT
Feijoo
37
6/7/19   JW

021829

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

**MEDICAL OFFICE**
8370 S.W. 8th St.
MIAMI, FL. 33144

Tel: (305)265-7505
Fax: (305)265-7535

### FOLLOW-UP ORTHOPEDIC EVALUATION

TODAY'S DATE: 7 | 5 | 16
NAME: _____
DATE OF LOSS: 5 | 12 | 16
RESIDUAL COMPLAINTS: _____

PHYSICAL EXAMINATION:
VITAL SIGNS: TEMP:_____ BP:___/____ PULSE:_____ /min. RESP:_____ /min.
HEADACHES: YES___ NO___ DIZZINESS: YES___ NO___ SWELLING: YES___ NO____

SKULL & FACE:_____
H.E.E.N.T:_____
THYROID/NECK GLANDS:_____
CHEST:_____
HEART:_____
LUNGS:_____
RIB CAGE:_____
ABDOMEN:_____
MUSCULOSKETAL EXAMINATION:
UPPER
EXTREMITIES:_____

LOWER
EXTREMITIES:_____

SPINE:      CURVATURE:        NORMAL        ABNORMAL.
CERVICAL SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUS PROCESSES:_____

| | | MUSCLES NORMAL |
|---|---|---|
| FLEXION | ____ DEGREES WITH / WITHOUT PAIN | 50 DEGREES |
| EXTENSION | ____ DEGREES WITH / WITHOUT PAIN | 60 DEGREES |
| LT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 80 DEGREES |
| RT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 80 DEGREES |
| LT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 45 DEGREES |
| RT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 45 DEGREES |

THORACIC SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS____
SPINOUS & INTERSPINOUSPROCESSES:_____    MUSCLES____

| FLEXION | ____ DEGREES WITH / WITHOUT PAIN | 50 DEGREES |
|---|---|---|
| EXTENSION | ____ DEGREES WITH / WITHOUT PAIN | 40 DEGREES |
| LT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 30 DEGREES |
| RT. ROTATION | ____ DEGREES WITH / WITHOUT PAIN | 30 DEGREES |

LUMBAR SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS_____
SPINOUS & INTERSPINOUS PROCESSES_____    MUSCLES____

| EXTENSION | ____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
|---|---|---|
| LT. LAT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| RT. LAT. BENDING | ____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| | ____ DEGREES WITH / WITHOUT PAIN | 60 DEGREES |

EXHIBIT
Feijoo
38
6|7|19   JW

021815

**FOLLOW-UP ORTHOPEDIC EVALUATION**                    PAGE 3

DIAGNOSIS:

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____
8. _____


COMMENTS / RECOMMENDATIONS:

_____
_____
_____
_____
_____
_____
_____


PHYSICIAN'S SIGNATURE                    PATIENT'S SIGNATURE

MEDICAL OFFICE
8326 S.W. 8th St.
MIAMI, FL 33144

*Manuel V. Feijoo M.D. P.A.*
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

**RANGE OF MOTION REPORT**

PATIENT'S NAME █████ ████ D/A: 5/12/16

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| **CERVICAL SPINE:** | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | |
| Lateral Flexion | 0—45 | |
| Rotation | 0—80 | |
| **THORACOLUMBAR SPINE:** | | |
| Forward Flexion | 0—90 | |
| Extension | 0—30 | |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| **SHOULDER:** | | |
| Forward Elevation | 0—150 | |
| Backward Elevation | 0—40 | |
| Abduction | 0—150 | |
| Adduction | 0—30 | |
| External Rotation | 0—90 | |
| Internal Rotation | 0—40 | |
| **ELBOW:** | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| **WRIST:** | | |
| Dorsiflexion | 0—60 | |
| Palmar Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| **HAND:** | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| **HIP:** | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| **KNEE:** | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| **ANKLE:** | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking
If an assistive device is used for ambulation , comment on its medical necessity and the patient's ability to walk without it.)

_____
PHYSICIAN'S SIGNATURE

**EXHIBIT**
Feijoo
39
6/7/19

DATE

021817

*Manuel V. Feijoo M.D. P.A.*

**MEDICAL OFFICE**
**8370 S.W. 8th St.**
**MIAMI, FL. 33144**

ORTHOPEDIC

Tel: (305)265-7505
Fax: (305)265-7535

**PATIENT NAME:** G████████-A████████████
**DATE OF INJURY:** 05/12/16
**EXAMINATION DATE:** 07/05/16

## FOLLOW-UP ORTHOPEDIC EVALUATION

**CHIEF COMPLAINT:**
Pain on the cervical region, the upper/lower back.

**HISTORY OF PRESENT ILLNESS:**
The patient has been receiving physiotherapy treatment and refers is feeling better, but still complaining of pain on the aforementioned areas.

**PHYSICAL EXAMINATION:**

**CERVICAL SPINE:** There is pain on the posterior cervical region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation on the paracervical muscles with limited range of motion to 30 percent of the normal range.

**THORACIC SPINE:** There is pain on the mid-thoracic spine at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paravertebral muscles with limited range of motion to 50 percent of the normal range.

**LUMBOSACRAL SPINE:** There is pain on the lumbosacral region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paralumbar muscles with limited range of motion to 50 percent of the normal range.

**UPPER EXTREMITIES:** Abduction/adduction, internal and external rotations are normal in both shoulders and arms.

**LOWER EXTREMITIES:** Flexion/extension, both hips and knees are normal with Lasegue and Patrick signs bilaterally being negative.

**DIAGNOSIS:**
1. Cervical spine sprain.
2. Thoracic spine sprain.
3. Lumbosacral spine sprain.



EXHIBIT
Feijoo
40
6/7/19   JW

021808





Oct 01 15 02:21p                                              30F^188997                    p.1

ORTHOPEDIC Manuel V. Feijoo, MD
8370 SW 8th ST Miami, FL 33144
Ph: (305) 265-7505 Fax: (305) 265-7535

REFERRAL FOR THERAPY TREATMENT

Patient Name:                                         Date: 7/05/16

## TREATMENT PLAN

| Procedure | CPT CODE | | PROCEDURE | CPT CODE | |
|---|---|---|---|---|---|
| Hot / Cold Packs | 97010 | ✓ | Manual Therapy | 97140 | ✓ |
| Electrical Stim. | 97014 | ✓ | Infrared | 97026 | ✓ |
| Ultrasound | 97035 | | Therapeutic Exercise | 97110 | ✓ |
| Manual Masage | 97124 | ✓ | Neuromus.Ree/Pos. Train. | 97112 | ✓ |
| Parafin Bath | 97018 | | Laser Therapy | 58948 | ✓ |
| Therapeutic Activities | 97530 | ✓ | Contrast Bath | 97034 | |
| Mech. Traction | 97012 | ✓ | ADL Training | 97535 | ✓ |

The prescription is valid for a period of ___4___ weeks at frecuency of __3-4__ visit(s) per week.

### Diagnosis

Acute post-traumatic headache__ G44.319
Pain in shoulder M25.511 RT /M25.512 LT.
Pain in elbow M25.521 RT / M25.522 LT.
Pain in wrist M25.531 RT/ M25.532 LT.
Pain hand M79.641 RT/ M79.642 LT.
Pain hip M25.551 RT/ M25.552 LT.
Pain in knee M25.561 RT/ M25.562 LT.
Pain in ankle/foot joints M25.571 RT/ M25.572 LT.
Pain in Foot RT M79.671/LT M79.672.
Cervicobrachial syndrome, diffuse M53.1.
Radiculopathy Cervical M54.12 .
Pain in thoracic spine M54.6 .
Radiculopathy Lumbar M54.16.
Lumbago with sciatica M54.41 RT/ M54.42 LT.
Low back pain M54.5.
Radiculopathy, thoracolumbar M54.15.
Other Dx:

_____

Backache, unspecified__ M54.9.
Post Traumatic pain/myositis__ M60.9.

Cervical spine sprain S13.4XX
Cervical spine strain S16.1XX__.
Thoracic spine sprain S23.3XX__.
Lumbar spine ligament sprain__S33.5XX
Lower back strain S39.012__.
Shoulder joint sprain RT S43.401__/ LT S43.402__.
Shoulder/upper arm strain RT S46.911__/LT S46.912__.
Shoulder strain (ROT CUFF) RT S46.011__/LT S46.012__.
Elbow/forearm sprain RT S53.491__/ LT S53.492__.
Elbow/forearm strain RT S46.111__/ LT S46.112__.
Wrist/ hand sprain RT S63.91X__/LT S63.92X__.
Wrist/ hand strain RT S66.811__/LT S66.812__.
Hip/Thigh sprain RT S73.111__/LT S73.112__.
Hip/Thigh strain RT S76.011__/LT S76.012__.
Knee/lower leg sprain RT S83.91X__/LT S83.92X__.
Knee/lower leg strain RT S86.911__/LT S86.912__.
Ankle/foot sprain RT S93.491__/LT S93.492__.
Ankle/foot strain RT S96.911__/LT S96.912__.
Sacroiliac joint sprain S33.6XX__.
Chest/Rib contusion S20.219__.
Hip contusion RT S70.01X__.

Please call our office for questions concerning a modality or the overall patiente treatment plan.

_____                                    7/05/16.
Dr. Manuel. Feijoo, MD.                                     Date


EXHIBIT
Feijoo
42
6/7/19   JW

021811

STATE FARM INS
P O  BOX 106134

ATLANTA  GA 30348

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| PICA | | | | | | | | | | PICA | |

**CARRIER**

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare#) | (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | (ID#) | 59874B689 | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE    SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|
| G████ A████  E██ | MM  DD  YY  1977  M  F [X] | G████  A████ |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| ███████████ | Self [X]  Spouse [ ]  Child [ ]  Other [ ] | ████████ |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|
| MIAMI | FL | X | MIAMI | FL |

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|
| 33135 | (███) | | 33135 | (███) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| | | 9457528C2559D4 |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous)   [ ] YES  [X] NO | a. INSURED'S DATE OF BIRTH    SEX   MM  DD  YY   M [ ]  F [ ] |
|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?   [X] YES  [ ] NO   PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT?   [ ] YES  [ ] NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| ANA PANDO ESQ | | [ ] YES  [ ] NO   If yes, complete items 9, 9a, and 9d. |

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED ___SIGNATURE ON FILE___  DATE __02 06 17__

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED __SIGNATURE ON FILE__

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY   05 12 16   QUAL. | 15. OTHER DATE   QUAL.   MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   MM DD YY   FROM      TO |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE   EZ MEDICAL CENTER | 17a. |  | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   MM DD YY   FROM      TO |
|---|---|---|---|
| | 17b. NPI | | |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?   [ ] YES  [ ] NO   $ CHARGES |
|---|---|

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind. |

| A. S134XX D | B. | C. | D. |
|---|---|---|---|
| E. | F. | G. | H. |
| I. S335XX D | J. | K. | L. |

| 22. RESUBMISSION CODE | ORIGINAL REF. NO. |
|---|---|
| 23. PRIOR AUTHORIZATION NUMBER | |

| 24. A  DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | | | To MM DD YY | | | | | CPT/HCPCS | MODIFIER | | | | | | | |
| 1 | 12 15 16 | | | | | 11 | 1 | 99215 | | S134XX D | 425 00 | | 1 | | NPI | |
| 2 | 12 15 16 | | | | | 11 | 1 | 95851 | | S134XX D | 100 00 | | 1 | | NPI | |
| 3 | 12 15 16 | | | | | 11 | 1 | 76140 | | S134XX D | 100 00 | | 1 | | NPI | |
| 4 | | | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | | NPI | |

EXHIBIT 43  Feijoo  7/11/19 Tabbies

| 25. FEDERAL TAX I.D. NUMBER   SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| 650409050  [X] | G01909 1 | [X] YES  [ ] NO | $ 625 00 | $ 0 00 | 625 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)   FEIJOO  MANUEL V MD   SIGNED ME63009   02 DATE 17 | 32. SERVICE FACILITY LOCATION INFORMATION   MANUEL V FEIJOO MD PA   8370 SW 8TH STREET   MIAMI  FL 33144   a. 1811923105  b. | 33. BILLING PROVIDER INFO & PH #   MANUEL V  FEIJOO MD PA   8370 SW 8 TH STREET   MIAMI  FL 33144   a. 1811923105 |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

02176?

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

**PATIENT AND INSURED INFORMATION**

**PHYSICIAN OR SUPPLIER INFORMATION**

BECAUSE THIS FORM IS USED BY VARIOUS GOVER      NT AND PRIVATE HEALTH PROGRAMS, SEE SEPARA      CTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

**NOTICE:** Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32)

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records

**FOR MEDICARE CLAIMS:** See the notice modifying system No. 09-70-0501, titled. 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

**FOR OWCP CLAIMS:** Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished

**FOR TRICARE CLAIMS:** PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

021768

*Manuel V. Feijoo M.D. P.A.*

**ORTHOPEDIC**

ot.
144
5-7505
)265-7535

FINAL ORTHOPEDIC EVALUATION

DISCHARGE DATE: _____

NAME: _____ DATE OF LOSS: _____

RESIDUAL COMPLAINTS: _____

PHYSICAL EXAMINATION:

VITAL SIGNS: TEMP: _____ BP: ___/___ PULSE: _____ /min. RESP: _____ /min.

HEADACHES: YES___ NO___ DIZZINESS: YES___ NO___ SWELLING: YES___ NO___

SKULL & FACE: _____
H.E.E.N.T: _____
THYROID/NECK GLANDS: _____
CHEST: _____
HEART: _____
LUNGS: _____
RIB CAGE: _____
ABDOMEN: _____
MUSCULOSKETAL EXAMINATION:
UPPER
EXTREMITIES: _____

LOWER
EXTREMITIES: _____

SPINE:     CURVATURE: _____ NORMAL _____ ABNORMAL _____

CERVICAL SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS _____

SPINOUS & INTERSPINOUS PROCESSES: _____ MUSCLES _____
NORMAL

| | | |
|---|---|---|
| FLEXION | _____ DEGREES WITH / WITHOUT PAIN | 50 DEGREES |
| EXTENSION | _____ DEGREES WITH / WITHOUT PAIN | 60 DEGREES |
| LT. ROTATION | _____ DEGREES WITH / WITHOUT PAIN | 80 DEGREES |
| RT. ROTATION | _____ DEGREES WITH / WITHOUT PAIN | 80 DEGREES |
| LT. BENDING | _____ DEGREES WITH / WITHOUT PAIN | 45 DEGREES |
| RT. BENDING | _____ DEGREES WITH / WITHOUT PAIN | 45 DEGREES |

THORACIC SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS _____

SPINOUS & INTERSPINOUSPROCESSES: _____ MUSCLES _____

| | | |
|---|---|---|
| FLEXION | _____ DEGREES WITH / WITHOUT PAIN | 50 DEGREES |
| EXTENSION | _____ DEGREES WITH / WITHOUT PAIN | 40 DEGREES |
| LT. ROTATION | _____ DEGREES WITH / WITHOUT PAIN | 30 DEGREES |
| RT. ROTATION | _____ DEGREES WITH / WITHOUT PAIN | 30 DEGREES |

LUMBAR SP: TENDERNESS UPON PALPATION YES___ NO___ STIFFNESS _____

SPINOUS & INTERSPINOUS PROCESSES _____ MUSCLES _____

| | | |
|---|---|---|
| EXTENSION | _____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| LT. LAT. BENDING | _____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| RT. LAT. BENDING | _____ DEGREES WITH / WITHOUT PAIN | 25 DEGREES |
| | _____ DEGREES WITH / WITHOUT PAIN | 60 DEGREES |

EXHIBIT
Feijoo
41

MEDICAL OFFICE
8326 S.W. 8th St.
MIAMI, FL 33144

*Manuel V. Feijoo M.D. P.A.*
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

## RANGE OF MOTION REPORT

PATIENT'S NAME E_____ G_____    D/A: _____

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| **CERVICAL SPINE:** | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | |
| Lateral Flexion | 0—45 | |
| Rotation | 0—80 | |
| **THORACOLUMBAR SPINE:** | | |
| Forward Flexion | 0—90 | |
| Extension | 0—30 | 40% |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| **SHOULDER:** | | |
| Forward Elevation | 0—150 | |
| Backward Elevation | 0—40 | |
| Abduction | 0—150 | |
| Adduction | 0—30 | |
| External Rotation | 0—90 | |
| Internal Rotation | 0—40 | |
| **ELBOW:** | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| **WRIST:** | | |
| Dorsiflexion | 0—60 | |
| Palmar Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| **HAND:** | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| **HIP:** | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| **KNEE:** | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| **ANKLE:** | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking
If an assistive device is used for ambulation , comment on its medical necessity and the patient's ability to walk without it.)

_____
_____
_____
_____

PHYSICIAN'S SIGNATURE

**EXHIBIT**
fcijoo
**45**
6/7/19   JW

12/15/16
DATE

021804

*Manuel V. Feijoo M.D. P.A.*

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144

ORTHOPEDIC

Tel: (305) 265-7505
Fax: (305) 265-7535

**PATIENT NAME:** G█████████ E█████
**DATE OF INJURY:** 05/12/16
**EXAMINATION DATE:** 12/15/16

## FINAL ORTHOPEDIC EVALUATION

**CHIEF COMPLAINT:**
Pain on the cervical region, upper and the lumbosacral region.

**HISTORY OF PRESENT ILLNESS:**
The patient has been receiving physiotherapy treatment and refers is feeling better, but still complaining of pain on the aforementioned areas.

**PHYSICAL EXAMINATION:**

**CERVICAL SPINE:** There is pain on the posterior cervical region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paracervical muscles with normal range of motion.

**THORACIC SPINE:** There is pain on the mid-thoracic spine at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paravertebral muscles with limited range of motion to 40 percent of the normal range.

**LUMBOSACRAL SPINE:** There is pain on the lumbosacral region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paralumbar muscles with limited range of motion to 40 percent of the normal range.

**UPPER EXTREMITIES:** Abduction/adduction, internal and external rotations are normal in both shoulders and arms.

**LOWER EXTREMITIES:** Flexion/extension, both hips and knees are normal with Lasegue and Patrick signs bilaterally being negative.

**DIAGNOSIS:**
1. Cervical spine sprain.
2. Thoracic spine sprain.
3. Lumbosacral spine sprain.
4. As per X-rays review; on the cervical spine, there is mild lower cervical osteoarthritis. On the thoracic spine, there is mild lower thoracic osteoarthritic.



EXHIBIT
Feijoo
46
6/7/19   JW

021799

**PATIENT NAME:** ███████████ ██ E███████
**DATE OF INJURY:** 05/12/16
**PAGE:** 2

## DIAGNOSIS:

On the lumbar spine, there is mild lower osteoarthritis. Left elbow is normal. Left knee is normal. Left shoulder is normal.

## RECOMMENDATION'S:

1. Use a low pillow.
2. Avoid heavy weight lifting; bend the knees not the back when picking up anything from the floor.
3. The patient was fully explained about the X-rays results.

## FINAL EVALUATION:

This patient was advised on this final evaluation that she has been left with a partial impairment of 5% of the body as a whole

_____, M.D.
Physician's Signature Required
MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                    12/20/16

6/7/2016                    F        /1720 EZ, May 27,2016, 20    1713031186

# Final Report

## Medical Pain Solutions, Inc.

45 Ponce de Leon Blvd.
Coral Gables, FL 33135
Phone: (305)456-1577  Fax: (305) 456-0205

Patient Name: E▮▮▮▮
G▮▮▮▮▮▮

Date of Birth: ▮▮▮1977

Patient ID: 1720 EZ

Sex: F

Date of Exam: May 27,2016 13:03  Referring Physician:

Study Description:

Interpreting Physician: Herb Pena, MD Diagnostic
Radiology

**EXHIBIT**
Peijoo 47
6/7/19   JW

## OBSERVATION

Four views of the cervical spine were obtained and submitted for interpretation.
There are mid lower degenerative anterior spur formations. No lysis or compression fracture is noted. The vertebrae alignment, height and shape are grossly preserved. The interdisc spaces are intact. No paraspinal calcification is present.
Impression: Mid lower cervical osteoarthritis.

Thoracic spine radiographs in AP and lateral views were obtained.
There are mid lower degenerative anterior spur formations consistent with degenerative osteoarthritis. The intervertebral disc spaces appear intact. No compression fracture or lysis is noted. No paraspinal calcification is revealed.
Impression: Mid lower thoracic osteoarthritis.

Four projections of the lumbar segment were obtained.
There are mid lower degenerative anterior spur formations. No lysis or compression fracture is noted. The intervertebral disc spaces are within normal limits. No paraspinal calcification is present.
Impression: Mid lower lumbar osteoarthritis.

Left elbow radiographs in AP and lateral projections were obtained and submitted for interpretation.
There is no evidence of fracture or joint dislocation. The joint spaces appear intact. No bone erosion or destruction is noted. The bony density is preserved. No soft tissue calcification is revealed.
Impression: No evidence of fracture or joint dislocation.

Left knee radiographs in AP and lateral projections were obtained and submitted for interpretation.
No fracture or displacement is noted. The tibiofemoral and patellofemoral joints show a normal radiological appearance. The bony density is preserved. No soft tissue calcification is present.
Impression: No fracture or displacement noted.

Left shoulder X-rays in external and internal rotations were obtained and submitted for interpretation.
No fracture or dislocation is noted. The acromioclavicular and glenohumeral joints as well as alignment

appear intact. The bony density is preserved. No periarticular calcification is revealed.
Impression: No gross bony or joint abnormality was noted.

## IMPRESSION

See above.

**Electronically signed**
**Reading and Interpretation Only**

**Herb Pena, MD Diagnostic Radiology**

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

*Manuel V. Feijoo M.D. P.A.*

ORTHOPEDIC

REPLY TO MIAMI OFFICE

8421 South Orange
Blossom Trail
Suite 104
Orlando, FL 32809
Tel: (407) 857-5686
Fax: (407) 857-5687

## PATIENT LOG

- ☑ Office Visit – Consulta de Oficina Medica
- ☐ Manual Therapy – Terapia Manual
- ☐ Therapeutic Exercises – Ejercicios Terapeuticos
- ☐ Therapeutic Ultrasound – Ultrasonido Terapeutico
- ☐ Massage Therapy – Terapia de Masaje
- ☐ Hot Pack – Pano Caliente
- ☐ Cold Pack – Pano Frio
- ☐ Electrical Stimulation – Estimulacion electrica
- ☐ Whirlpool – Bano de Agua
- ☐ Cervical Traction – Traccion Cervical
- ☐ X-Rays
- ☐ Etc.

Date: _____     Fecha _____

Patient Signature – Firma de Paciente __X_____

My signature on this document attests to the fact that the services set forth
herein were actually rendered.  The person rendering the medical services that
will be claimed and billed to the insurance company has explained the services to
me in detail.

Mi firma en este documento atestigua el hecho que los servicios medicos
puestos arriba en fueron rendidos verdaderamente.  La persona que rinde los
servicios médicos que se reclamarán y serán facturados a la compañia de
seguro, me ha explicado los servicios  a mí con todo detalle.



EXHIBIT

Feijoo

48

6/7/19    JW

021790



**MEDICAL OFFICE**
8370 S.W. 8th St.
MIAMI, FL 33144

*Manuel V. Feijoo M. D. P.A.*
**ORTHOPEDIC**

Tel: (305) 265-7505
Fax: (305) 265-7535

**PATIENT NAME:** A▇▇▇▇ J▇▇▇
**DATE OF INJURY:** 10/19/15
**EXAMINATION DATE:** 12/17/15

## INITIAL/FINAL ORTHOPEDIC EVALUATION

### CHIEF COMPLAINT:
Pain on the lower back region.

### HISTORY OF PRESENT ILLNESS:
This is a 48-year-old male who was involved in an automobile accident on October 19th, 2015 he was driving, wearing the seatbelt when making a U turn impacted his vehicle on the rear side, suffering multiples traumas, but did not go to any hospital. The car a Frontier, he doesn't know how much could be the cost to fix it.

### PAST MEDICAL HISTORY:
No previous accident.

### SURGERIES:
Left knee arthroscopy.

### ILLNESSES:
No.

### ALLERGIES:
No.

### SOCIAL HABITS:
The patient drinks coffee, does not smoke, does not drink alcohol, or take drugs.

### MEDICATIONS:
Ibuprofen 200 mg for pain, I advised him to take it always with food.

### OCUPATION: Nurse.

### PHYSICAL EXAMINATION:
The patient is well-nourished, well-developed, oriented and alert, cooperative, head; eyes, ears, nose, mouth and throat are within normal limits.
**Weight:** 183 lbs.        **Height:** 5'10"



EXHIBIT
Feijoo
49
6/7/19

000040

**PATIENT NAME:** A████ J████
**DATE OF INJURY:** 10/19/15
**PAGE:** 2

**CERVICAL SPINE:** Flexion/extension, lateral flexion and rotation to the right and left all these movements are normal with normal range of motion and normal muscle tone.

**THORACIC SPINE:** Flexion/extension, lateral flexion and rotation to the right and left all these movements are normal with normal range of motion and normal muscle tone.

**LUMBOSACRAL SPINE:** There is pain on the lumbosacral region at flexion/extension, lateral flexion and rotation to the right and left with tenderness at palpation of the paralumbar muscles with limited range of motion to 40 percent of the normal range.

**UPPER EXTREMITIES:** Abduction/adduction, internal and external rotations are normal in both shoulders and arms.

**LOWER EXTREMITIES:** Flexion/extension, both hips and knees are normal with Lasegue's sign positive on the left leg to 45 degrees.

### DIAGNOSIS:
1. Lumbosacral spine sprain.
2. MRI of lumbar spine shows disc herniation at L5-S1, L4-L5 and L3-L4.

### RECOMMENDATION'S:
1. Use a low pillow.
2. Avoid heavy weight lifting; bend the knees not the back when picking up anything from the floor.
3. The patient was fully explained about the MRIs results and advised that he might need surgical evaluation and treatment in the future to remove the disc herniations. The cost of the surgery including anesthesia and rehabilitation could be between $15000.00 and $20000.00.

### FINAL EVALUATION:
This patient was advised on this final evaluation that he has been left with a partial impairment of 11% of the body as a whole



**PATIENT NAME:** A███████ J█████
**DATE OF INJURY:** 10/19/15
**PAGE:** 3

_____, M.D.
Physician's Signature Required
MANUEL V. FEIJOO, M.D.
MEMBER OF THE AMERICAN BOARD OF DISABILITY & ANALYST
Signed, but not proof-read in order to avoid delays

MF: gm                                    12/30/15




# OPTIMUM IMAGING

2740 S.W. 97 Avenue, Suite 107
Miami, Fl 33165
Tel: (305) 220-9500 Fax: (305) 220-9577

| | |
|---|---|
| **Patient Name:** | J■■■A■ |
| **Date of Birth:** | 10/22/67 |
| **Exam Date:** | 12/05/15 |
| **Ref. Physician:** | NELINDA LOPEZ |

## MRI OF THE LUMBAR SPINE:

**INDICATION:** Lumbar sprain. MVA on 10/09/15.

**TECHNIQUE:** Sagittal T2, sagittal T1, and axial T2 STAR images were obtained.

**FINDINGS:** Alignment is satisfactory. Vertebral body heights are well maintained. There is narrowing at the L5-S1 disc space. There are prominent endplate changes at L4-5 and L5-S1. The conus is unremarkable at the L1 level.

The L1-2 disc space is unremarkable.

The L2-3 disc space is unremarkable.

At L3-4, there is a moderate-sized disc protrusion with mild spondylosis and hypertrophy of the ligamentum flavum. There is a moderate to moderate degree of spinal stenosis with bilateral nerve root effacement.

At L4-5, there is a moderate-sized disc protrusion with mild spondylosis and hypertrophy of the ligamentum flavum. There is a moderate degree of spinal stenosis with bilateral nerve root effacement.

At L5-S1, there is a moderate-sized disc protrusion with mild spondylosis and hypertrophy of the ligamentum flavum. There is bilateral nerve root effacement.

## IMPRESSION:

1. Moderate-sized disc protrusion at L5-S1 with mild spondylosis and hypertrophy of the ligamentum flavum. There is bilateral nerve root effacement. There are prominent endplate changes here.
2. Moderate-sized disc protrusion at L4-5 with mild spondylosis and hypertrophy of the ligamentum flavum. There is a moderate degree of spinal stenosis with bilateral nerve root effacement. There are prominent endplate changes here.
3. Moderate-sized disc protrusion at L3-4 with mild spondylosis and hypertrophy of the ligamentum flavum. There is a mild to moderate degree of spinal stenosis here with bilateral nerve root effacement.

James R. Zimmerman, M.D. JRZ/df
Board Certified Radiologist

The above report was electronically reviewed and approved by James R. Zimmerman, MD on 12/07/2015.



Reviewed pt · 12/10/15

000044

*Manuel V. Feijoo M.D. P.A.*

ORTHOPEDIC

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

REPLY TO MIAMI OFFICE

8421 South Orange
Blossom Trail
Suite 104
Orlando, FL 32809
Tel: (407) 857-5586
Fax: (407) 857-5687

## Initial Orthopedic Evaluation

Today's Date _12/17/15_

Name: _J_____ A_____ Age: _18_ Sex: _M_ Status: _____

Weight _182_ Height _5'10_ B/P _____ Pulse _____ Temp: _____

Date of Accident: _10-8-15_

Actual Complaints: _____

Past Medical History

Previous Accidents: _NO_

Surgeries: _L Knee surgery_

Allergies: _NO_

Habits: _____ Alcohol: _____ Smoking: _____ Drugs: _____ Coffee: _____

Is the patient taking any medications currently? _____

Diseases: _____ Hypertension: _____ Diabetes: _____ Heart Disease _____

Other: _____

If applicable, Date of patient's last menstruation: _____

To the pat[____] s she pregnant at this time: Yes _____ No _____

Patient's Signature _____ Witness _____

EXHIBIT
Feijoo
51
6/7/19 JW

000045

Date of examination: _____        Pulse: _____
Date of Accident: _____          Resp: _____

## PHYSICAL EXAMINATION:

**Headache:**       occipital / frontal / temporal  (R)  (L)
                    severe / significant / considerable / moderate / mild / some
**Onset:**          immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
**Dizziness:**      frequent / occasional


**Cervical Pain:**  sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
**Onset:**          immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
**R.O.M.**          extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain


**Thoracic Pain:**  sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
**Onset:**          immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
**R.O.M.**          extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain


**Lumbar Pain:**    sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
**Onset:**          immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
**R.O.M.**          extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain


**Extremities:**    (R) (L) shoulder / (R) (L) elbow / (R) (L) wrist / (R) (L) hand /
                    (R) (L) hip / (R) (L) knee / (R) (L) thigh / (R) (L) ankle / (R) (L) foot
                    sharp / dull / persistent / excessive / extreme / severe
                    significant considerable / moderate / mild / some
**Onset:**          immediately / 1 hour / 2 hours / 3 hours / few hours / next day / few
                    days
**R.O.M**           extension / flexion / right / left / both lateral flexion or rotation limited to
                    20 30 40 50 60 70 80% of normal with / without pain

000046

Knee:         Drawer ( )   Apply compression ( ) Apply Distraction ( )

General Limitations:

( ) Sedentary work          Lifting 10lbs. maximum
( ) Moderate work           Lifting 20lbs. maximum
( ) No lifting

Other limitations if indicated:
Patient can stand / walk in an 8 hr. day      ( ) none ( ) 1-4 hrs.  ( ) 4-8 hrs.
In an 8 hr. day, patient can sit              ( ) none ( ) 1-4 hrs.  ( ) 4-8 hrs.
In an 8 hr. day, patient can drive            ( ) none ( ) 1-4 hrs.  ( ) 4-8 hrs.

Patient is able to:     frequently    intermediately   occasionally    not at all
Bend                    ( )           ( )              ( )             ( )
Squat                   ( )           ( )              ( )             ( )
Climb                   ( )           ( )              ( )             ( )
Perform overhead work   ( )           ( )              ( )             ( )

Impression: _____

R/O _____

Clinical course and treatment: _____

X-ray examination of the injured areas: _____

Recommended diagnosis procedures: _____

Orthopedic supports for injured regions: _____
Limit overall activities: _____
Therapeutic modalities: _____
Other recommendations: _____

Follow-up: _____

Doctor's Signature: _____

MEDICAL OFFICE
8326 S.W. 8th St.
MIAMI, FL 33144

# Manuel V. Feijoo M.D. P.A.
ORTHOPEDIC

TEL: (305) 265 7505
FAX: (305) 265 7535

## RANGE OF MOTION REPORT

PATIENT'S NAME _____     D/A: 10/19/15

| MOTION | NORMAL ROM (Degrees) | PATIENT'S ROM (Degrees) |
|---|---|---|
| CERVICAL SPINE: | | |
| Forward Flexion | 0—45 | |
| Extension | 0—45 | |
| Lateral Flexion | 0—45 | |
| Rotation | 0—80 | |
| THORACOLUMBAR SPINE: | | |
| Forward Flexion | 0—90 | |
| Extension | 0—30 | |
| Lateral Flexion | 0—30 | |
| Rotation | 0—30 | |
| SHOULDER: | | |
| Forward Elevation | 0—150 | |
| Backward Elevation | 0—40 | |
| Abduction | 0—150 | |
| Adduction | 0—30 | |
| External Rotation | 0—90 | |
| Internal Rotation | 0—40 | |
| ELBOW: | | |
| Flexion | 0—150 | |
| Pronation | 0—80 | |
| Supination | 0—80 | |
| WRIST: | | |
| Dorsiflexion | 0—60 | |
| Palmar Flexion | 0—70 | |
| Ulnar Deviation | 0—30 | |
| Radial Deviation | 0—20 | |
| HAND: | | |
| Flexion-CMC joint of thumb | 0—15 | |
| Extension-CMC joint of thumb | 0—30 | |
| Flexion-MCP joints of fingers | 0—90 | |
| Flexion-PIP joints of fingers | 0—100 | |
| Flexion-DIP joints of fingers | 0—70 | |
| HIP: | | |
| Flexion | 0—100 | |
| Extension | 0—30 | |
| Abduction | 0—40 | |
| Adduction | 0—20 | |
| Internal Rotation | 0—40 | |
| External Rotation | 0—50 | |
| KNEE: | | |
| Flexion | 0—150 | |
| Extension | 0—180 | |
| ANKLE: | | |
| Dorsiflexion | 0—20 | |
| Plantarflexion | 0—40 | |
| Inversion | 0—30 | |
| Eversion | 0—20 | |

COMMENTS ON GAIT AND STATION- (Include supine and seated leg raising and heel to toe walking.
If an assitive device is used for ambulation, comment on its medical necessity and the patient's ability to walk without it.) :

_____
_____
_____
_____

PHYSICIAN'S SIGNATURE                    12/17/15
                                          DATE

EXHIBIT
Feijoo
52
6|7|19

000048

# *FAX TRANSMITTAL*



| TO: | VALLES AND ASSOCIATES | FROM: | **DR. MANUEL V. FEIJOO'S OFFICE** |
|---|---|---|---|
| **ATTENTION** | MEDICAL RECORD DPT | **PAGES:** | INCLUDING COVER SHEET |
| **FAX:** | (305) 233-7250 | **DATE:** | 12/30/15 |
| **PHONE:** | (305) 233-7035 | **CC:** | |
| **RE:** | A████ J████ | | |

_____ URGENT  _____ FOR REVIEW  _____ PLEASE REPLY  _____ PLEASE COMMENT

ORTHOPEDIC EVALUATION

THIS FAX IS INTENDED ONLY FOR THE USE OF THE PERSON OR OFFICE TO WHOM IT IS ADDRESSED, AND CONTAINS PRIVILEGED OR CONFIDENTIAL INFORMATION PROTECTED BY THE LAW. ALL RECIPIENTS ARE HEREBY NOTIFIED THAT UNAUTHORIZED RECEIPT DOES NOT WAIVE SUCH PRIVILEGE, AND THAT UNAUTHORIZED DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX AS AN ERROR, PLEASE DESTROY THE ATTACHED DOCUMENT (S) AND NOTIFY THE SENDER OF THE ERROR IMMEDIATELY BY CALLING (305) 265-7505.

THANK YOU. ☺



EXHIBIT
Feijoo 53
6/7/19  JW

# PHONE / CORRESPONDENCE SHEET

**SENT TO GISELA**

**SENT INTIAL LETTER** 12/23/15

**ENTERED IN COMPUTER** 1/13/16

2/2/16 Int'l Final Sent to Atty

4/27/16 Sent ledger to Atty.

EXHIBIT
Feijoo
54
6/7/19    JW

*Manuel V. Feijoo M.D. P.A.*

| MEDICAL OFFICE | | 8421 South Orange |
|---|---|---|
| 8370 S.W. 8th St. | ORTHOPEDIC | Blossom Trail |
| MIAMI, FL 33144 | | Suite 104 |
| Tel: (305) 265-7505 | **REPLY TO MIAMI OFFICE** | Orlando, FL 32809 |
| Fax: (305) 265-7535 | | Tel: (407) 857-5686 |
| | | Fax: (407) 857-5687 |

## PATIENT LOG

☑ Office Visit – Consulta de Oficina Medica
☐ Manual Therapy – Terapia Manual
☐ Therapeutic Exercises – Ejercicios Terapeuticos
☐ Therapeutic Ultrasound – Ultrasonido Terapeutico
☐ Massage Therapy – Terapia de Masaje
☐ Hot Pack – Pano Caliente
☐ Cold Pack – Pano Frio
☐ Electrical Stimulation – Estimulacion electrica
☐ Whirlpool – Bano de Agua
☐ Cervical Traction – Traccion Cervical
☐ X-Rays
☐ Etc.

Date: _____   Fecha 12/17/15

Patient Signature – Firma de Paciente X ███████

My signature on this document attests to the fact that the services set forth
herein were actually rendered. The person rendering the medical services that
will be claimed and billed to the insurance company has explained the services to
me in detail.

Mi firma en este documento atestigua el hecho que los servicios medicos
puestos arriba en fueron rendidos verdaderamente. La persona que rinde los
servicios médicos que se reclamarán y serán facturados a la compañia de
seguro, me ha explicado los servicios a mí con todo detalle.



Feijoo
**EXHIBIT**
**55**
6/7/19   JW

STATE FARM INS
P O BOX 106134

ATLANTA GA 30348

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

PICA

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
| (Medicare #) | (Medicaid #) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | (ID#) | 597H46888 | |

| | |
|---|---|
| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE: 1967  SEX: M / F[X] |
| A___ J___ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) A___ J___ |

| | |
|---|---|
| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED: Self [ ] Spouse [X] Child [ ] Other [ ] |
| | 7. INSURED'S ADDRESS (No., Street) |

| CITY: MIAMI | STATE: FL | 8. RESERVED FOR NUCC USE  X | CITY: MIAMI | STATE: FL |
|---|---|---|---|---|

| ZIP CODE: 33176 | TELEPHONE (Include Area Code) | ZIP CODE: 33176 | TELEPHONE (Include Area Code) |
|---|---|---|---|

| | |
|---|---|
| 9. OTHER INSURED'S NAME (Last Name First Name, Middle Initial) | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
| a. OTHER INSURED'S POLICY OR GROUP NUMBER | 10. IS PATIENT'S CONDITION RELATED TO: |
| | a. EMPLOYMENT? (Current or Previous) YES [ ] NO [X] |
| | a. INSURED'S DATE OF BIRTH MM DD YY  SEX M [ ] F [ ] |
| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? YES [X] NO [ ] PLACE (State) |
| | b. OTHER CLAIM ID (Designated by NUCC) |
| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? YES [ ] NO [ ] |
| | c. INSURANCE PLAN NAME OR PROGRAM NAME |
| d. INSURANCE PLAN NAME OR PROGRAM NAME  BERNSTEIN MARYOFF | 10d. CLAIM CODES (Designated by NUCC) |
| | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES [ ] NO [ ] If yes, complete items 9, 9a and 9d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

| | |
|---|---|
| 12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below. | 13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below. |
| SIGNED SIGNATURE ON FILE  DATE 01 19 16 | SIGNED SIGNATURE ON FILE |

| | |
|---|---|
| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM 10 DD 19 YY 15  QUAL. | 15. OTHER DATE MM DD YY  QUAL. |
| | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM MM DD YY  TO MM DD YY |
| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE  VALLES ASSOCIATES | 17a.  17b. NPI |
| | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM MM DD YY  TO MM DD YY |
| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? YES [ ] NO [ ]  $ CHARGES |
| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. Relate A-L to service line below (24E) ICD Ind. A. M54.16  B.  C.  D.  E.  F.  G.  H.  I.  J.  K.  L. | 22. RESUBMISSION CODE  ORIGINAL REF. NO.  23. PRIOR AUTHORIZATION NUMBER |

| 24. A. DATE(S) OF SERVICE From MM DD YY  To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Fam Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12 17 15 | | 11 | 1 | 99204 | | M54.16 | 475 00 | 1 | | NPI |
| 2 | 12 17 15 | | 11 | 1 | 95851 | | M54.16 | 100 00 | 1 | | NPI |
| 3 | 12 17 15 | | 11 | 1 | 76140 | | M54.16 | 100 00 | 1 | | NPI |
| 4 | | | | | | | | | | | NPI |
| 5 | | | | | | | | | | | NPI |
| 6 | | | | | | | | | | | NPI |

EXHIBIT

| | | | |
|---|---|---|---|
| 25. FEDERAL TAX I.D. NUMBER: 650409050  SSN[ ] EIN[X] | 26. PATIENT'S ACCOUNT NO. A01419 1 | 27. ACCEPT ASSIGNMENT? YES[X] NO[ ] | 28. TOTAL CHARGE $ 675 00 | 29. AMOUNT PAID $ 0 00 | 30. Rsvd for NUCC use 675 00 |

| | | |
|---|---|---|
| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  FEIJOO MANUEL V MD  SIGNED ME63009  DATE 01 19 16 | 32. SERVICE FACILITY LOCATION INFORMATION  MANUEL V FEIJOO MD PA  8370 SW 8TH STREET  MIAMI FL 33144  a. 1811923105 | 33. BILLING PROVIDER INFO & PH. #  MANUEL V FEIJOO MD PA  8370 SW 8 TH STREET  MIAMI FL 33144  a. 1811923105 |

NUCC Instruction Manual available at: www.nucc.org  PLEASE PRINT OR TYPE  APPROVED OMB 0938-1197 FORM 1500 (02-12)

PLEASE INDICATE ACCOUNT NUMBER WHEN MAKING PAYMENT

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS  A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and non-medical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services  1) they must be rendered under the physician's direct supervision by his/her employee; 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, "Carrier Medicare Claims Record" published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990. See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs  the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains  Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However  failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed  and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

000022

## Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.
8370 SW 8 Street - Miami, Florida 33144

### ASSIGNMENT OF INSURANCE BENEFITS, POWER OF ATTORNEY & RELEASE OF INFORMATION
Insurer Please Read the Following, in its Entirety, upon Receipt:

I, the undersigned patient/insured knowingly, voluntarily and intentionally assign the benefits of insurance and any overdue interest payments under the No-Fault Policy of Automobile Insurance, also known as Personal Injury Protection (P.I.P.), or Medical Payments policy of insurance from my automobile insurer or the responsible insurer to the above described medical providers (Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A.) for any and all services rendered to the undersigned patient/insured, including the right to bring suit in a court of law for any failure to pay PIP benefits / insurance benefits. The patient understands it is the express intention of the provider to accept drafts assignment of benefits in lieu of demanding full payment at the time services are rendered. The undersigned assigns any and all claims for statutory bad faith to the above medical providers. If the insurer disputes the validity of this assignment of benefits then the insurer is instructed to notify the provider in writing within five (5) days of receipt of this document. I understand this assignment will remain in full force and effect and will NOT be revoked unless the revocation is agreed to by both the medical providers and the undersigned patient or the patient's attorney. Since I have assigned my PIP benefits to the above-referenced medical provider, any prior reservation of benefits or demand for wage loss benefits is withdrawn. I am instructing the PIP carrier not to reserve any benefits and to pay all bills in the order received. This assignment applies to both past and future medical expenses and is valid even if undated. A photocopy of this assignment is to be considered as valid as the original. The undersigned patient/insured directs the insurer to pay the medical provider directly without including the patient's name on the check.

The insurer is directed by the provider and the patient/insured to not issue any checks or drafts in partial settlement of a claim that contain or are accompanied by language releasing the insurer or its insured/patient from liability unless there has been a prior written settlement agreed to by the medical provider and the insurer as to the amount payable under the insurance policy or contract. The provider hereby objects to any reductions or partial payments made at the discretion of the insurer. Any partial or reduced payment, regardless of the accompanying language, issued by the insurer and deposited by the provider shall be done so under protest, at the risk of the insurer, and the deposit shall not be deemed a waiver, accord, satisfaction, discharge, or settlement agreement by the provider to accept a reduced amount as payment in full. The insurer is hereby placed on notice that this provider reserves the right to seek the full amount of the bills submitted. Please acknowledge your acceptance of the foregoing terms by issuing a check for the services rendered by these medical providers payable to one or more of the medical provider(s) named herein, and not to the patient / claimant / insured.

In the event the subject medical benefits are disputed by the insurer for any reason, including but not limited to, medical reasonableness and/or necessity, the undersigned patient/insured hereby instructs the insurer to set aside any amount disputed (i.e. to escrow the money) and not pay the disputed amount to anyone, including myself, or any entity until the dispute is resolved. The insurer is instructed to immediately explain in writing to the above provider of any dispute. If the insurer schedules an IME or EUO the insurer is hereby requested and authorized to send a copy of said notification to this provider. The provider is not the agent of the insurer or the patient for any purpose. The undersigned patient/insured agrees to pay any applicable deductible and co-payments for services rendered.

#### Release of Information:

I hereby authorize the above named medical providers to: furnish my insurance company or companies and the patient's attorney with any and all information that may be contained in my medical records; to obtain coverage information telephonically from my insurer; to request a written non-redacted PIP payout sheet from the insurer; and to obtain copies of my medical records, including but not limited to, documents, reports, scans, notes, opinions, X-rays, and MRIs, from any other medical provider or any insurance company. The insurer is directed to keep the patient's medical records private and confidential. The insurer is NOT authorized to provide these medical records to anyone, including but not limited to, third party vendors without the patient's and the provider's prior express written permission.

I certify that I have not been solicited or promised anything in exchange for receiving medical care or that I have received any promises or guarantees from anyone as to the results that may be obtained by any medical treatment.
Caution! Please read before signing. If you do not completely understand this document please ask us to explain it to you. If you sign below we will assume you understand and agree to the terms.

Patient Signature X ▮▮▮▮▮

Date: _____

Patient Name (please print) _____

EXHIBIT 58

021789

*Manuel V. Feijoo M.D. P.A.*

MEDICAL OFFICE
8370 S.W. 8th St.
MIAMI, FL 33144
Tel: (305) 265-7505
Fax: (305) 265-7535

ORTHOPEDIC

REPLAY TO MIAMI OFFICE

8421 South Orange
Blossom Trail
Suite 104
Orlando, FL 32809
Tel: (407) 857-5686
Fax: (407) 857-5687

## CHART CONTROL FORM

Patient·Name: _____ Initial Visit Date: _____
Referred by: _____

Auto Insurance Card _____
Health Insurance Card _____
Social Security Card _____
Driver License _____
Registration of Car _____
Police Report _____
Registration Form Completed _____
All Office Forms Completed & signed _____
* Assignment of Benefits
* Affidavits of Ownership
* Authorization for Treatment
* Malpractice Ins. Notice
* No-Fault Application Form
* Medical Information Release Form
·* Financial Responsibility
* Letter of Protection

**Medical Records Requested:**
Dr. _____ Clinic _____ Hospital _____
Medical Records Received: _____
Insurance Verification/Eligibility _____
Initiation of Treatment Sent: _____
        Initiation of Treatment Rved by Ins. __
        Doctor's notes Dictated on _____

Notes/Comments: _____
_____
_____
_____
_____
_____

Checked Control Form on: _____ Signed: _____

Transcription Reports Faxed: Dr. _____ Clinic _____ Attorney _____ Date: _____
Mailed: _____ Green Card Received: _____
Letter of Protection mailed on: _____ to Attorney: _____
Green Card Dated: _____ Received signed by Attorney on: _____
Copies to be submitted with claim form to Billing Agency and Sent on: _____
* Physician Notes (Transcriptions) _____                *Initiation of Treatment _____
*Occupational/Professional and Clinic Licenses ____    * Assignment of Benefits ____
* Therapy Modalities & Progress notes signed _____     * Affidavit of Ownership _____
* No-Fault Application Form _____
Billing Submitted to Ins. Co. on: _____ Green Card/ Received at Ins. On _____
2nd Bill _____ Green Card/ Received at Ins. On _____ 3rd Bill _____
Green Card/ Received at Ins. On _____

Notes/Comments: _____
_____
Processed/Signed by: _____

Payment Received _____ Denied _____ PIP SUIT _____ Date Filed _____
Attorney Representing for PIP SUIT: _____

**EXHIBIT**
Feijoo
59
6|7|19      JW

021776