UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 18-cv-23329-RAR

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, an Illinois
corporation,

    Plaintiff,
v.

MANUEL V. FEIJOO,
MANUEL V. FEIJOO, M.D., P.A.,
a Florida professional association,

    Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Defendant, Manuel V. Feijoo, M.D. and Manuel V. Feijoo, M.D., P.A. ("Dr. Feijoo"), hereby submit this Response to the Statement of Material Facts submitted by State Farm:

1. Admitted.

2. Admitted.

3. Denied. Dr. Feijoo was mistaken in his testimony. Although Mrs. Feijoo is an officer of the corporation, she is not an owner.

4. Denied as conclusions of law.

5. Admitted.

6. Denied. It is denied that any testimony or facts have been adduced by State Farm which permit them to be applied "collectively" to State Farm "insureds." Dr. Feijoo testified specifically as to the treatment and records of exactly 2 patients. (See Tr. Of Dr. Feijoo Dep, Exhibits 31-34; 36-55). Moreover, State Farm refused to provide in discovery the insurance policies of the patients whose treatment is alleged to be at issue and any assertions as to the

1

contents of said policies are therefore denied.  (See State Farm's Objections to Defendants requests for Production of Documents (Set II), attached hereto as Exhibit "A").

7. Denied.  It is denied that Dr. Feijoo testified about his orthopedic evaluations "on the insureds".  Rather, he testified concerning the specifics of what his records demonstrate with respect to the 2 patients discussed in his deposition.  Outside of these two patients, Dr. Feijoo testified that he normally conducts the history portion of his evaluations at his desk but performs physical aspects of the examination standing and palpating the patient as necessary. (Tr. Of Dr. Feijoo Dep, pp. 86-89).

8. Denied.  Dr. Feijoo was not asked nor did he testify concerning orthopedic evaluations of "the insureds".  Rather, he testified concerning the 2 specific patients whose records were shown to him.  Dr. Feijoo was never asked, nor did he testify that ROM testing was "an integral and standard part" of his orthopedic evaluations.  Rather, he testified that he always conducts ROM testing in conjunction with his patient evaluations and creates an additional document listing his findings for the benefit of other providers.  (Tr. Of Dr. Feijoo Dep, pp. 98-105).

9. Denied.  Dr. Feijoo was not asked nor did he testify concerning orthopedic evaluations of "the insureds."  Rather, he testified concerning the 2 specific patients whose records were shown to him and how he performed ROM testing as reflected in his records of these 2 patients.

10. Denied.  Dr. Feijoo testified that it was not his general practice to use the inclinometer, not that he never used it.  (Tr. Of Dr. Feijoo Dep, pp. 106).

11. Denied.  Dr. Feijoo testified that although his examination reports included ROM findings, he also prepared a separate document in each instance listing the ROM findings.  (Tr. Of Dr. Feijoo Dep, pp. 98).

12. Admitted.

13. Denied.  Dr. Feijoo was not asked nor did he testify about his orthopedic examinations of "the insureds" nor what constituted "integral parts" of his evaluations of "the insureds."  He

testified, rather, concerning the findings and reports of 2 patients which were shown to him by State Farm's counsel.  Outside of these 2 patients, Dr. Feijoo testified that it is his general practice to obtain and review x-ray films or CD when indicated and necessary.  (Tr. Of Dr. Feijoo Dep, pp. 226).

14. Denied.  Neither Dr. Feijoo nor Ms. Castillo testified about anything which applies to "the insureds" nor did either testify that the Clinic required patients to execute Assignments of Benefits as a condition precedent to Dr. Feijoo's performance of orthopedic evaluations.  Dr. Feijoo testified merely that he was aware such a form exists and agreed with State Farm's counsel as to its wording when shown an example of one.  (Tr. Of Dr. Feijoo Dep, pp. 270-275).  Ms. Castillo merely acknowledged that in the event a patient does sign an Assignment of Benefits it permits the clinic to bill the insurance company directly.  (Tr. Of A. Castillo Dep, pp. 244).

15. Admitted.

16. Denied.  In response to Defendants' Interrogatories (Set II), State Farm admitted that the claims identified in its Complaint are not all of the claims in which Defendants submitted bills to State Farm.  In fact, State Farm stated that it has no idea how many such claims have been omitted from its case and that it would be too hard to even figure out.  (See State Farm's Objections and Answers to Defendants' Interrogatories (Set II), attached as Exhibit "B").

17. Denied.  The Defendants submitted their bills on CMS 1500 forms in each instance *along with* the records and all supporting documentation detailing the services which were performed.  (See State Farm's Amended Complaint, Doc. #60, ¶55).

18. Denied.  The CPT Editorial Panel "Instructions for Use of the CPT Codebook" are only partially cited by Plaintiff's expert at ¶6 of his affidavit.  The portion omitted is underlined below and provided in its full context:

> Instructions, typically included as parenthetical notes with selected codes, indicate that a code should not be reported with another code or codes. These instructions are intended to prevent errors of significant probability **and are not all inclusive**. For example, the code with such instructions may be a component of another code

<u>and therefore it would be incorrect to report both codes even when the component service is performed. These instructions are not intended as a listing of **all possible code combinations** that should not be reported, nor do they indicate all possible code combinations that are appropriately reported.</u> When reporting codes for services provided, it is important to assure the accuracy and quality of coding through verification of the intent of the code by use of the related guidelines, parenthetical instructions, and coding resources, including CPT Assistant and other publications resulting from collaborative efforts of the American Medical Association with the medical specialty societies (ie, Clinical Examples in Radiology). (Emphasis added)

(<u>See</u> the Declaration of M. Miscoe, ¶¶27. A true and correct copy of Mr. Miscoe'e Declaration is attached as Ex. "C" hereto.).

19. Denied. The CPT Editorial Panel suggests reference to other documents such as the CPT Assistant Newsletter only when attempting to determine whether a service is a component of another service for reporting purposes. The Instructions, when actually considered in their totality, cannot not be construed as a requirement for medical practitioners to consult the opinions published in the CPT Assistant Newsletter, much less rely upon them as accurate or binding, when the provider has no question about the codes and has received no indication that his understanding of the codes he is using is somehow incorrect.

The CPT Assistant is not referenced by the Florida legislature as a relevant standard for code selection in first party automobile personal injury cases under the express language of Florida Statute §627.736(5)(d). To the extent that the CPT Manual references the CPT Assistant for some undefined purpose, the Florida legislature has specifically chosen not to do so.

The AMA's own CPT Education and Information Services division ("CPTEIS"), which actually publishes the CPT Assistant newsletter, itself disclaims the CPT Assistant as any kind of substitute for the CPT Codebook and, in fact, specifically disavows the CPT Assistant as a replacement for the CPT codebook:

"CPT® Assistant is designed to provide accurate, up-to-date coding information. We continue to make every **reasonable effort to ensure the accuracy of the**

4

**material presented. However, this newsletter does not replace the CPT codebook; it only serves as a guide**." [Emphasis added].

Articles published in the CPT Assistant are not drafted by the CPT Editorial Panel nor does the CPT Editorial Panel review or approve the content of those articles. Therefore, these articles are not instructions of the "***Current Procedural Terminology (CPT) Editorial Panel***" that are actually referenced by the Florida legislature at §627.736(5)(d).

The CPT Assistant Newsletter is a subscription publication available only at significant cost to subscribers and specific references to it are found only in the "Professional Edition" of the AMA CPT coding manual. These references are inserted by the AMA, not the CPT Editorial Panel, and are therefore not included in the Standard Version of the CPT coding manual. (See the Declaration of M. Miscoe, ¶¶27-33; 37-38. A true and correct copy of Mr. Miscoe'e Declaration is attached as Ex. "C" hereto.).

20. Admitted.

21. Denied. While the CPT codebooks explain that varying levels of E/M have varying requirements relative to the amount of history, examination or the complexity of medical decision-making, it is not clear how a detailed history objectively differs from a comprehensive history or examination, or how moderately complex medical decision-making is objectively differentiated from medical decision-making of high complexity. The CPT Editorial Panel has provided guidance relative to E/M services in the CPT Coding Manual, but this guidance provides no objective basis for differentiating the various levels of history, examination or medical decision-making. (See the Expert Report of M. Miscoe, pg. 7, attached hereto as Exhibit "D").

22. Admitted.

23. Admitted.

24. Denied. Dr. Feijoo performs final evaluations of patients to see "how they are doing." Regarding permanent disability ratings, Dr. Feijoo was only shown the records of two

5

patients and he explained how he arrived at the ratings identified for those 2 patients. (Tr. Of Dr. Feijoo Dep, pp. 208-209; 252).

25. Admitted.

26. Denied. Dr. Feijoo testified that upon performing a final evaluation, he usually provides a disability rating to the extent applicable. (Tr. Of Dr. Feijoo Dep, pp. 208).

27-28. Denied. Defendants' response to paragraph 19 above explains why State Farm's attempted reliance on decades old, anonymously authored articles in the CPT Assistant is misplaced. Moreover, as explained by Defendants' expert, Michael Miscoe, the CPT Editorial Panel did not at any time revise its guidance regarding 76140 in CPT based on any material published in the CPT Assistant, which it presumably would have done if the articles were in any way viewed as authoritative or even necessary guidance. (See Ex. D, M. Miscoe Expert Report, pg. 21). Regardless, to the extent State Farm identifies a conflict between the CPT and the articles in the CPT Assistant, any such conflict would have to be resolved in favor of the CPT Editorial Panel guidance. Not only because the Florida statute expressly requires the use of the CPT Editorial Panel guidance, but also because the CPTEIS requires it. (See the Declaration of M. Miscoe, ¶¶39-41).

29. Denied. As detailed in the Expert Report and Declaration of Defendant' Expert, nothing in the CPT Coding Manual supports State Farm's assertion that a consultation on x-ray examination must be requested by another physician. (See Ex. D, M. Miscoe Expert Report, pg. 21; Ex. C, Declaration M. Miscoe, ¶39-42).

30. Admitted.

31-32. Denied. Defendants incorporate their responses to paragraphs 19 & 27-29 above. In addition, the CPT guidance for reports applicable to radiologic services provides no requirement that it be a separate report, and when the consultation regarding radiographs is performed the report of the service can be and often is incorporated into the narrative documentation of a 99204, 99214, or 99215 evaluation. (Id.).

33. Admitted.

34. Admitted.

35-39. Denied. Defendants incorporate their response to paragraph 19 above. Further, State Farm again curtails the relevant citation. The CPT section indicated goes on to state:

> **However, when a procedure or service that is designated as a "separate procedure" is carried out independently or considered to be unrelated or distinct from other procedures/services provided at that time, it may be reported by itself, or in addition to other procedures/services by appending modifier 59** to the specific "separate procedure" code to indicate that the procedure is not considered to be a component of another procedure, but is a distinct, independent procedure. This may represent a different session or patient encounter, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries).

As detailed by Defendants' coding expert, CPT 95851 is classified, by its description, as a "separate procedure". Nothing in the CPT defines 95851 as an integral part of any other service and Dr. Feijoo's reporting of the service, which he did without the use of the 59 modifier, was in all respects accurate and in conformance with CPT Editorial Panel guidance expressly adopted by the Florida legislature at §627.736(5)(d). (See Ex. D, M. Miscoe Expert Report, pg. 15; Ex. C, Declaration M. Miscoe, ¶44-46).

40. Admitted.

41-45. Denied. As exhaustively detailed by Defendants' expert in both his expert report and in his Declaration, Dr. Feijoo's reporting of 76140, 95851, 99204, 99214, and 99215 was appropriate and consistent with the CPT codebooks and CPT Editorial Panel guidance expressly adopted by the Florida legislature at §627.736(5)(d).

### ADDITIONAL MATERIAL FACTS SUBMITTED BY DEFENDANTS PURSUANT TO LOCAL RULE 56.1

1. Defendants respectfully incorporate herein by reference each of the facts listed in Defendants' Statement of Facts submitted in support of Defendants' Motion for Summary Judgment (ECF Doc. #66).

2. Florida Statute §627.736(5)(d) provides that "[a]ll billings for such services rendered by providers shall, to the extent applicable, follow the Physicians' Current Procedural

Terminology (CPT) or Healthcare Correct Procedural Coding System (HCPCS), or ICD-9 in effect for the year in which services are rendered and comply with the Centers for Medicare and Medicaid Services (CMS) 1500 form instructions and the American Medical Association **Current Procedural Terminology (CPT) Editorial Panel** and Healthcare Correct Procedural Coding System (HCPCS).  (See Miscoe Declaration, Ex. C, ¶16).

3. The statutory provision also states that "[i]n determining compliance with applicable CPT and HCPCS coding, guidance shall be provided by the **Physicians' Current Procedural Terminology (CPT)** or the Healthcare Correct Procedural Coding System (HCPCS) in effect for the year in which services were rendered**, the Office of the Inspector General (OIG), Physicians Compliance Guidelines, and other authoritative treatises designated by rule by the Agency for Health Care Administration**."  (See Miscoe Declaration, Ex. C, ¶17).

4. Based on these statutory provisions, there are three (3) standards that govern code selection:
    a) "Physicians' Current Procedural Terminology (CPT) or the Healthcare Correct Procedural Coding System (HCPCS) in effect for the year in which services were rendered;"
    b) "the Office of the Inspector General (OIG), Physicians Compliance Guidelines;" and
    c) "other authoritative treatises designated by rule by the Agency for Health Care Administration."  (See Miscoe Declaration, Ex. C, ¶18).

5. Neither the OIG Compliance Guidance for Physician Practices nor the Agency for Health Care Administration provide guidance on appropriate standards for CPT code selection. (See Miscoe Declaration, Ex. C, ¶19).

6. The substantive content of "Physicians' Current Procedural Terminology (CPT)," while copyrighted by the American Medical Association ("AMA"), is drafted, as recognized in both the statutory provision cited above and the CPT manual introductory text, by the CPT Editorial Panel.  In addition to the content drafted by the CPT Editorial Panel, the AMA, as one of many publishers of this content, inserts other material into the various versions of the CPT Coding Manual (e.g. references to other AMA publications and

8

products).  (See Miscoe Declaration, Ex. C, ¶20).

7. Other publishers, including AAPC, publish CPT Coding Manuals under license from the AMA, which also have content that differs from the AMA CPT version.  Most notably, the AMA does not license republication of the "Instructions for Use of the CPT Codebook" to other publishers. (See Miscoe Declaration, Ex. C, ¶21).

8. CPT is also licensed by the AMA for distribution in electronic format. Examples include Optum Encoder Pro, AAPC Code Manager and others.  Each license agreement permits inclusion of slightly different content.  (See Miscoe Declaration, Ex. C, ¶22).

9. Florida Statute §627.736(5)(d) expressly incorporates the CPT Editorial Panel instructions that are published by the AMA or licensed for publication to others in Current Procedural Terminology, 4th edition. (See Miscoe Declaration, Ex. C, ¶23).

10. The legislature did not incorporate any other publication or reference relative to code selection by the AMA, AAPC, or any other provider trade association as a standard for determining whether a CPT code was appropriate for a given service.  (See Miscoe Declaration, Ex. C, ¶24).

11. The legislature did not incorporate or reference the CPT Assistant Newsletter, which is published by the CPT Education and Information Services ("CPTEIS") division of the AMA, as a standard for determining compliance with applicable CPT coding.  (See Miscoe Declaration, Ex. C, ¶25).

12. The CPT Editorial Panel "Instructions for Use of the CPT Codebook" expressly requires providers to "[s]elect the name of the procedure or service that accurately identifies the service performed.  Do not select a CPT code that merely approximates the service provided. If no such specific code exists, then report the service using the appropriate unlisted procedure or service code."  (See Miscoe Declaration, Ex. C, ¶26).

13. CPT Assistant articles are available only with an expensive subscription, are referenced only in the Professional Edition of CPT, and Dr. Feijoo was unaware of them.  (See Miscoe Declaration, Ex. C, ¶43).

14. As required by Florida Statute §627.736(5)(d) and CPTEIS, conflicts between the express wording of the CPT coding manual or other unspecified publications must be resolved in favor of the CPT Editorial Panel Guidance contained in CPT.  (See Miscoe Declaration, Ex. C, ¶41).

15. Relative to CPT 76140, the binding CPT Editorial Panel guidance published in the CPT coding manual does not define the term "consultation" in the context of radiological services; does not, in any of the guidance pertaining to Evaluation and Management ("E/M") services indicate that the review of radiographs taken elsewhere is a component of an E/M service; and expressly indicates that such work is separately reportable from an E/M service.  (See Miscoe Declaration, Ex. C, ¶42).

16. Relative to 95851, the binding CPT Editorial Panel guidance published in the CPT coding manual merely indicates that the work involved includes performance of the "range of motion measurements and report," which work Dr. Feijoo performed each time the code was submitted.  (See Miscoe Declaration, Ex. C, ¶46; Tr. Of Dr. Feijoo Dep, pp. 98-106).

17. There is no objective basis to support the conclusion that Evaluation and Management ("E/M") services were improperly reported by Dr. Feijoo under the CPT Editorial Panel guidance published in the CPT Coding Manual when applied as required under Florida Statute §627.736(5). (See Expert Report of M. Miscoe, pg. 2, Ex. D).

18. State Farm's handling of the claims involving Dr. Feijoo fell below industry standards, failed to comply with Florida law or even State Farm's own internal standards, and was unreasonable.  (See Expert Report of J'Amy Kluender, attached hereto as Exhibit "E").

19. State Farm never discussed any global concerns about Dr. Feijoo's billing practices with Dr. Feijoo or his attorney because it needed "leverage" against Dr. Feijoo it could use to force him to bill for his services the way State Farm wished, which leverage was only provided once State Farm filed its lawsuit on August 16, 2018.  (See the deposition of Timothy Banahan, Vol. II, pg. 152-153, attached as Exhibit "F").

                                        RESPECTFULLY SUBMITTED,

**THE PIVNIK LAW FIRM**
7700 N. Kendal Drive, Suite 703
Miami, FL 33156
Tel: 305-670-0095
Email:Pivniklaw@aol.com
        Cdiezpivniklaw@aol.com
By: /s/ Jerome A. Pivnik
Jerome A. Pivnik, Esq.
Fla. Bar No.: 400408

**Andrew P. Baratta, Esq.**
Baratta, Russell & Baratta
3500 Reading Way
Huntingdon Valley, PA 19006
Tel: 215-914-2222
Email: Andrew@Barattarussell.com
(*pro hac vice*)

11

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on July 11, 2019, I have filed the foregoing document with the Clerk of Court using the CM/ECF system and that a copy was electronically served upon the following in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:  Kenneth P. Hazouri, Esq., and Andrew S. Ballentine, Esq., Mantzaris and Neal, LLP, 332 North Magnolia Avenue, Orlando, FL 32801. (Khazouri@dsklawgroup.com, ABallentine@dsklawgroup.com, Lquesada@dsklawgroup.com, Lmorales@dsklawgroup.com).

        **THE PIVNIK LAW FIRM**
        7700 N. Kendal Drive, Suite 703
        Miami, FL 33156
        Tel: 305-670-0095
        Email: Pivniklaw@aol.com
              Cdiezpivniklaw@aol.com
        By: /s/ Jerome A. Pivnik
        Jerome A. Pivnik, Esq.
        Fla. Bar No.: 400408

        **Andrew P. Baratta, Esq.**
        Baratta, Russell & Baratta
        3500 Reading Way
        Huntingdon Valley, PA 19006
        Tel: 215-914-2222
        Email: Andrew@Barattarussell.com
        (*pro hac vice*)