UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

STATE FARM MUTUAL AUTOMOBILE           Case No.:18-CV-23329 -RAR/Becerra
INSURANCE COMPANY, an Illinois Corp.

      Plaintiff,

v.

MANUEL V. FEIJOO, MANUEL V. FEIJOO,
M.D., P.A., a Florida Professional Association

      Defendants
_____/

**DEFENDANTS' OPPOSITION TO STATE FARMS' MOTION IN LIMINE**

Defendants, MANUEL V. FEIJOO, and MANUEL V. FEIJOO, M.D., P.A., oppose, in part, Plaintiff, State Farm's Motion in *Limine* [DE 73] and state:

State Farm's Motion has raised nine evidentiary arguments it asks the Court to preclude at trial, including:

1. Argument that State Farm has to prove reliance or that it should have known Feijoo "was committing Fraud."

2. Assertions that State Farm selected only certain files for this litigation.

3. Argument about State Farm's net worth, financial resources or market influence.

4. Argument that State Farm is a big, powerful company or "similar arguments."

5. Argument that Feijoo is not personally liable because he did not receive a direct benefit from his clinic.

6. Argument that no criminal charges were filed against Feijoo.

7. Evidence pertaining to State Farm's case evaluation tools.

8. Attacks on credibility of its expert by Defendants experts.

9. Any testimony of Defendants Experts - relying on its motion to extend deadlines re: Daubert Motion [DE 69].

1

### 1. Any Argument that State Farm has to prove Reliance or that it Should Have Known Feijoo was Committing Fraud.

First, Defendants' bills were not improper, were not deceptive and certainly were not fraudulent. Defendants will not be making the absurd argument that State Farm should have known that Dr. Feijoo was committing fraud, as he was not. Defendants will also not argue that State Farm has to prove reliance in order to recover on its FDUTPA claim.

Defendants will argue, however, as they do in their Motion for Summary Judgment, that State Farm has not and cannot prove that a consumer acting reasonably under the same circumstances as State Farm would have been deceived by a single one of Dr. Feijoo's bills.

What State Farm's Motion seeks to preclude the jury from hearing is the evidence which establishes the circumstances in which State Farm paid the bills it now claims were deceptive under FDUTPA. These circumstances, however, are critical to establishing the context against which the reasonable consumer's judgment has to be evaluated.

The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. City First Mortg. Corp. v. Barton, 988 So.2d 82, 86 (Fla.Dist.Ct.App.2008).

In order to prevail on its FDUTPA claim in this case, State Farm must prove that the alleged [deceptive or unfair] practice was "likely to deceive a consumer acting reasonably in the same circumstances." Cluck-U Chicken, Inc. v. Cluck-U Corp., , 2017 WL 10275957, at *9 (M.D. Fla. June 6, 2017), *citing* Cold Stone Creamery, Inc. v. Lenora Foods I, LLC, 332 F. App'x 565, 567 (11th Cir. 2009). This element of a FDUTPA claim is only satisfied by evaluating a reasonable consumer in the same circumstances as the plaintiff.' Deere Constr., LLC v. CEMEX Constr. Materials Fla., LLC, 2016 WL 8542540, at *3 (S.D. Fla. Dec. 1, 2016).

While it is not necessary for a plaintiff to show actual reliance in order to recover, "[t]he modification of acting reasonably by 'in the same circumstances' indicates a hybrid standard that may be objectively established as to mindset but subjectively established as to context." Id., *citing* In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices, 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010). Simply put, without the context in which the bills were paid, it would be impossible for the jury to determine whether a reasonable consumer in the same circumstances would have been deceived. *See* In re Motions to Certify, supra. at 1282 ("The subjective element that the circumstances must be similar necessitates inquiry into the context of the alleged offense; that is, one can only assess reasonableness when the inquiry requires consideration of the factual circumstances....").

The 11th Circuit has repeatedly affirmed the idea that evidence of the context within which payments were made is critical to the analysis of whether a FDUTPA violation has occurred. In Cold Stone Creamery, Inc. v. Lenora Foods I, LLC, 332 F. App'x 565, 56768 (11th Cir. 2009), the 11th Circuit affirmed the District Court's grant of summary judgment on Defendant's FDUTPA counterclaim that Cold Stone had misrepresented the prospects for success in operating a Cold Stone franchise. The District Court and the 11th Circuit held that the alleged misrepresentations must be viewed "in light of the circumstances as a whole in determining whether a consumer acting reasonably would have been deceived."

The 11th Circuit Court affirmed the order of summary judgment in Cold Stone because of the context within which the plaintiffs had operated. This context included having factually accurate information provided by Cold Stone, and performing an independent investigation before making payment. The Court found that a consumer in the same circumstances, acting reasonably, would not have been deceived by Cold Stone's alleged misrepresentations.

The context within which State Farm paid every bill alleged to be at issue in this is set forth in Defendants Statement of Facts in support of its summary judgment motion. On August 26, 2011, State Farm's Multi-Claims Investigations Unit, a subsection of its larger Special Investigations Unit, opened what it calls a Project' concerning Dr. Feijoo. (See SOF, ¶17). This was an investigation reviewing numerous claims involving Dr. Feijoo for the specific purpose of determining whether fraudulent activity was occurring, including with respect to Dr. Feijoo's use of CPT codes for examinations, range of motion testing, and x-ray film reviews. (See SOF, ¶18). In conjunction with attorneys from several law firms, including Ken Hazouri, Esquire, State Farm conducted its 2011 Feijoo Project by having numerous charts of Dr. Feijoo's reviewed by an expert and obtaining a report of the review from the expert. State Farm also hired Mr. Hazouri to perform a legal analysis and determine whether and what causes of action State Farm may have against Dr. Feijoo. Mr. Hazouri provided both a legal opinion and a draft lawsuit. (See SOF, ¶31).

On January 19, 2011, State Farm deposed Dr. Feijoo, inquiring specifically into the manner and circumstances under which Dr. Feijoo utilized codes 95981, 76140, and 99204. (SOF, ¶19). Dr. Feijoo testified that it was not his practice to use any sort of device when determining a patient's approximate range of motion nor to create a separate report regarding ROM findings when billing CPT code 95851. (See SOF, ¶20-22, Ex. E, Feijoo-D, pgs. 27-32 & 41-42.).

Dr. Feijoo testified that he believed it appropriate to bill CPT code 76140 (consultation on x-ray examination performed elsewhere) whether he reviewed the actual x-ray film or the report of another doctor who had interpreted the film, and that the person in his office who handled all billing was Anielka Castillo. See SOF, ¶10; Ex. E, Feijoo-D, pgs. 33-34 & 43-44, 55-58).

Dr. Feijoo also testified that he believed it was appropriate and it was his general practice to bill CPT code 95851 (ROM) separately from CPT code 99204 (Initial exam) even though he performed the range of motion determination as part of his initial examination. (See SOF, ¶22; Ex. E, Feijoo-D, pgs. 39-40 & 42).

On June 8, 2011, State Farm deposed Anielka Castillo, Dr. Feijoo's billing manager, who was interrogated on the definitions of CPT codes 99204, 76140, and 95851. (See SOF, ¶23; Ex. G, pg. 10). Ms. Castillo testified that it was Dr. Feijoo's practice to bill these codes separately even when the services are all performed as part of the initial exam with the explanation that they charge the same overall price which would be charged if just one code was utilized. (See SOF, ¶24; Ex. G, Castillo-D, pgs. 11-12).

On July 27, 2011, State Farm deposed Dr. Feijoo again. (See SOF, ¶25). Dr. Feijoo testified about his general billing practices regarding each of the codes at issue in this lawsuit. (See SOF, ¶28; Ex. H, Feijoo-D, pg. 51). On November 2, 2011, State Farm deposed Castillo in the same case. (See SOF, ¶29). Ms. Castillo testified truthfully as the exact manner in which Dr. Feijoo's office applied the codes at issue. (See SOF, ¶30; Ex. I, Castillo-D, pgs. 20-24). State Farm deposed Ms. Castillo again on October 17, 2012, November 26, 2013, April 25, 2016, June 24, 2016, August 24, 2016, May 3, 2017, and August 25, 2017. In each deposition, Ms. Castillo testified consistently with her and Dr. Feijoo's earlier depositions describing the manner in which the practice utilized CPT codes 99204, 76140 and 95851 and each was identified by State Farm in its Rule 26 Disclosures as a document which supports State Farm's claims. (See SOF, ¶33; Ex. J- State Farm's 2d Amended Disclosures).

As detailed further by Defendants' SOF, in addition to all of the direct, truthful testimony Dr. Feijoo and Ms. Castillo provided to State Farm's Project lawyers from 2011 through 2017, State Farm opened a *second* Feijoo Project on December 3, 2015. (See SOF, ¶34). Once again (but this time over the course of nearly 3 years), State Farm's MCIU conducted hundreds of file reviews, diverted claims involving Dr. Feijoo to a specially assigned MCIU specialist steeped in suspicions about Dr. Feijoo's use of CPT codes, enlisted the same lawyers it used in its 2011 Project to depose Dr. Feijoo and Ms. Castillo in underlying claims, and hired Mr. Hazouri to come up with another lawsuit. (See SOF, ¶35-53).

By State Farm's own admission, in every individual file review conducted by State Farm from at least December 8, 2015 to the present, State Farm's claims handlers concluded contemporaneously with their review that the documentation submitted by Dr. Feijoo did not support the code submitted with it in a single instance. (See, e.g., SOF ¶34-53; Ex. N-Project Activity Log, pg. 1; Ex. O-Fuller Inv. Summ.).

By alleging that Dr. Feijoo's records "uniformly documented" in every instance the *absence* of information it now claims to have been necessary in order to support any CPT code billed, State Farm's own Amended Complaint admits that Dr. Feijoo never submitted any false description of the services he actually performed in connection with the codes he was billing. (SOF, Ex. B-Amended Complaint, ¶3, 66, 69, 72, 77, 80).

The facts of this case are most like those presented in Cold Stone. Even accepting as true that the codes submitted by Dr. Feijoo were incorrect, Dr. Feijoo provided voluminous additional

documentation contemporaneously with each code which was factually correct.[1] State Farm conducted not just one, but two massive, attorney-assisted, independent *fraud* investigations specifically looking into whether the codes utilized by Dr. Feijoo were justified by the services he otherwise accurately documented. State Farm's own pleading avers that it carefully reviewed all of the documentation in each claim in determining whether to issue payment.

Contrary to State Farm's argument, all of these facts are critically necessary to establish the context within which State Farm was operating every time it paid any of the bills at issue in this case. As articulated by the Court in Cold Stone, in determining whether Dr. Feijoo's choice of CPT codes was something a consumer acting reasonably in the same circumstances as State Farm would have been deceived by, the codes "must be viewed in light of the circumstances as a whole." Per the 11th Circuit, when the circumstances as a whole show that the consumer has been provided additional, factually accurate information which contradicts the alleged misrepresentation, and the consumer has conducted its own independent investigation of the facts, in such circumstances a consumer acting reasonably would not be deceived.

In this case, the circumstances as a whole demonstrate that, by State Farm's own admission and the report of its own expert, in order to "detect" that any code ever submitted was allegedly incorrect, all that was required of State Farm was to simply *read the records Dr. Feijoo had submitted*. The circumstances as a whole demonstrate that from 2011-2012 and again from 2015

---

[1] The truthfulness of Dr. Feijoo's notes in describing his services cannot be disputed as it is in fact the sole factual basis of State Farm's entire lawsuit. Consider the report of State Farm's own expert, who opines that Dr. Feijoo's records in every instance failed to include the information necessary to support the level of examination code used, failed to include a separate ROM report, and failed to include a separate report justifying the x-ray review code. See SOF, Ex. -Jacob Report.

7

to the present, State Farm's management, its claims specialists, its many lawyers, and multiple experts, were all of the opinion that Dr. Feijoo's use of the CPT codes at issue in this case was incorrect in every instance and *had been since at least 2010*. (See, e.g., SOF ¶45; Ex. P, pg. 10).

Contrast these facts with the case State Farm relies so heavily upon, Carriuolo v. Gen. Motors Co., 823 F.3d 977, 985 (11th Cir. 2016). In Carriuolo, a class of plaintiffs asserted FDUTPA claims because GM had placed window stickers on Cadillacs which falsely represented that safety ratings had been applied to aspects of the car's performance. The Court found that it was unnecessary under FDUTPA for any plaintiff to establish that they had relied on the information on the sticker in deciding to purchase the vehicle. Id. at 986 ("Because every class member here purchased or leased the same model vehicle with the same Monroney sticker attached, it does not matter that there may have been differences among the class members' subjective reliance".

The Carriuolo Court's findings are limited to its facts, wherein the only information each plaintiff had was that which was contained on the window sticker. If, however, next to each window sticker claiming safety ratings had been done was another equally prominent sticker saying that *no such ratings had been done*, State Farm would argue that the existence of this second sticker would be inadmissible evidence. State Farm would go even further, however, and argue that even if every plaintiff who bought a Cadillac with the offending sticker had conducted multiple years-long investigations with the assistance of lawyers and experts into whether safety ratings had been issued, and determined that they had not prior to purchasing the vehicle, such evidence would be inadmissible as well.

Carriuolo does not stand for such an absurd proposition, nor does it depart from the reasoning offered by the Court in Cold Stone. Facts which establish that a consumer has been provided information that contemporaneously contradicts an allegedly false representation are relevant to determining whether a consumer acting reasonably in the same circumstances would have been deceived.

In sum, the extensive evidence establishing State Farm years-long investigations and all of the information it had in its possession contemporaneous with each payment made to Dr. Feijoo would not be offered to establish that State Farm did not rely on Dr. Feijoo's coding in deciding to issue payments (there is no question State Farm did not). This evidence, rather, is relevant to the jury's determination of whether a consumer acting reasonably in the same circumstances would have been deceived. It is the reasonable consumer, not State Farm, whose mindset would be impacted by this evidence.

On the other hand, it is *Dr. Feijoo's* mindset which is the critical component of State Farm's *per se* FDUTPA claim. The fact that it took State Farm 8 years of investigations in which it deposed Dr, Feijoo and his staff 13 times and consulted multiple experts and lawyers before deciding that Dr. Feijoo's coding practices were incorrect, is relevant to establishing that the application of CPT codes is no black and white exercise. It is relevant to establishing that even if the jury determines the codes were incorrect, Dr. Feijoo did not act knowingly or fraudulently in utilizing them

A *per se* violation [of FDUTPA] is established in one of two ways: (1) if the law, statute, rule, regulation, or ordinance' expressly constitutes a violation of the FDUTPA, or (2) if the statute, rule or ordinance proscribes unconscionable, deceptive, or unfair acts or practices and therefore

9

operates as an implied FDUTPA predicate. State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC, 315 F. Supp. 3d 1291, 1306–08 (S.D. Fla. 2018).  When the statute at issue is a predicate statute, plaintiff need not allege the first element of the FDUTPA claim. Id. (None of the statutes listed by State Farm as predicate statutes expressly constitutes a violation of FDUTPA, so State Farm is obviously intending that they be considered implied FDUTPA predicates.).

Florida Statute §817.234 punishes "False and Fraudulent Insurance Claims" and clearly requires "the intent to injure, defraud, or deceive any insurer." Florida Statute §626.9541 prohibits the "knowing" submission of false claims.  Florida Statute §627.736 (the PIP statute), prohibits "knowingly" submitting a false claim but defines "knowingly" broadly as having "acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the information, and proof of specific intent to defraud is not required."  (See §627.732(10)).

Each of these statutes requires proof of Dr. Feijoo's state of mind, which was indisputably informed by State Farm's continued payments for his services after having been so often informed by Dr. Feijoo and his staff of how and why they utilized each code at issue.

The *absence* of any communication from State Farm (or any other insurer) that the codes he was using were even suspected to be inappropriate, especially in light of the Florida Statute 627.736(6)(b), which specifically allows an insurer to delay payment pending the receipt of additional information necessary to process a bill, is relevant to establishing that Dr. Feijoo simply had no reason to even question the accuracy of his office's coding.

That Dr. Feijoo's belief in the accuracy of his office's coding practices was reasonable and in good faith is also confirmed by expert opinion.  The defendants have provided to State Farm the

comprehensive expert report of Michael Miscoe, JD, CPC, CASCC, CUC, CCPC, CPCO, CPMA, CEMA. (See SOF, ¶60; Ex. U). Mr. Miscoe opines that Dr. Feijoo's use of the codes at issue was entirely correct in each instance and that State Farm's expert is basing his opinion to the contrary on invalid sources.

State Farm argues that a *per se* violation of FDUTPA is established merely by evidence of a statement which turns out not to be true. This is not accurate. In order to establish a per se violation, State Farm must prove what was in Dr. Feijoo's mind. State Farm cannot avoid evidence of its years-long investigations and its own confusion about the codes as such evidence constructively and directly supports the sincerity off Dr. Feijoo's belief that the codes he was using were correct.

What State Farm knew and when it knew it is relevant to the jury's determination of whether a consumer acting reasonably under the same circumstances would have been deceived by the codes attached to Dr. Feijoo's records. Should the jury determine that Dr. Feijoo's codes were actually incorrect, the evidence of State Farm's extensive investigations would be relevant to whether Dr. Feijoo acted with the requisite mindset necessary to establish a *per se* violation of FDUTPA.

**2. Evidence that State Farm Selected Only Certain Files for this Litigation**

State Farm accuses Dr. Feijoo of blanket, intentional billing practices intended to defraud State Farm from August of 2014 through August of 2018. That Dr. Feijoo submitted numerous bills to State Farm within this time frame containing the same codes alleged to be at issue and State Farm has not included them in its lawsuit, is directly relevant to the credibility of State Farm's entire claim. That there were numerous claims submitted to State Farm in which it admits the

11

codes submitted by Dr. Feijoo were correct is direct evidence that Dr. Feijoo had no intentional or knowing plan to submit false codes.

**3 & 4    Argument about State Farm's Net Worth and that it is a Big, Powerful   Company**

State Farm has argued in response to Defendants' Motion for Summary Judgment that during the years 2014-2018, it received over 50,000 PIP claims and approximately 1,000,000 medical bills each year and, in that time frame, employed hundreds of individual claim handlers in multiple states who processed claims submitted in Florida.  See Ex. "B" to State Farm's response to Defendants' Motion for Summary Judgment, Affidavit of Tim Banahan.

State Farm also argues that it is so terrified of judgments for the payment of legal fees in PIP cases that it cannot afford to deny a doctor's bill even when it thinks the bill is deceptive and not compensable.  (See ECF Doc. #85, pg. 14).

State Farm wants to portray itself in a false light.  It wants to paint itself as the victim of a PIP system in which it was so overwhelmed by the sheer number of claims received and the time constraints of the PIP law that it was not able to actually review Dr. Feijoo's bills before paying them.  But according to its own corporate designee, State Farm has a net worth in the neighborhood of $100 billion.  There is no dispute that it is the largest property casualty insurance company in the U.S. by far.

The evidence of State Farm's net worth and size directly contradicts the arguments State Farm will raise at trial that it did not have the resources or ability to meaningfully review Dr. Feijoo's bills before issuing payment.

**5.    Argument that Feijoo is Not Personally Liable Because He Did Not Receive a Direct Benefit from his Clinic**

Magistrate Becerra sustained Dr. Feijoo's objections to State Farm's discovery related to

his personal bank accounts and other financial records because it was irrelevant. State Farm has to prove that Dr. Feijoo is personally liable for violation of FDUPTA and Defendants have the absolute right to argue that neither Defendant is liable.

### 6. Argument that No Criminal Charges were Filed against Feijoo

As stated above, in its amended complaint, State Farm, alleges a violation of predicate statutes §817.234, §626.9541, and §627.736). In order to establish a violation of any of its alleged predicate statutes, State Farm must prove intentional or knowing misconduct by Dr. Feijoo.

Defendants do not intend to argue lack of criminal prosecution unless State Farm opens the door to such argument by referring to any act of Dr. Feijoo's as a criminal act or as violative of a criminal statute. In such circumstances it would be critical to let the jury know that no criminal charges were filed.

### 7. Evidence Pertaining to State Farm's Case Evaluation Tools

The evidence in this case is that State Farm has such sophisticated computer systems that it can flag any bill of any doctor for any reason and it can impose system-wide blocks and diversions which prevent any payment from being issued without careful scrutiny of a bill. State Farm's systems are so sophisticated in fact that medical bills can be analyzed instantaneously for any concerns about coding. Evidence pertaining to State Farm's case evaluation tools is relevant and material to contradicting State Farm's argument that the volume of claims it receives and the time constraints of the PIP law make it impossible for State Farm to meaningfully review each bill of a doctor before it is paid.

### 8. Attacks on Credibility of its Expert by Defendants' Experts

It is proper for Defendant's experts to attack the methodology and presumptions of State

Farm's expert. When a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. Rink v. Cheminova, Inc., 400 F.3d 1286, 1291-92 (11th Cir. 2005); Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). In making the determination of whether expert testimony and any report prepared by the expert may be admitted, the Court engages in a three-part inquiry of whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).

The Eleventh Circuit refers to each of these requirements as the qualifications, reliability, and helpfulness' prongs. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. Id.

"Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Quiet Tech DC-8, Inc. v. Hurel-Dubois, UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Daubert,* 509 U.S. at 596). Courts must be careful not to conflate questions of *admissibility* of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder.' In re Trasylol Products Liab. Lit., No. 08 MD 01928, 2010 WL 1489793, at *7

(S.D. Fla. Feb. 24, 2010) (quoting Quiet Tech, 326 F.3d at 1341)(emphasis added).

"The reliability inquiry seeks to ensure that an expert's testimony rests on a reliable foundation." Frazier, 387 F.3d at 1261 (quoting Daubert, 509 U.S. at 597) (internal quotation marks omitted). To survive this requirement, proposed expert testimony must be supported by appropriate validation, *i.e.*, good grounds, based on what is known." Id. (*quoting* Daubert, 509 U.S. at 590).

In evaluating reliability in cases involving expert opinions allegedly rooted in science, the court considers, to the extent practicable, (1) whether the expert's theory can be tested and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.' Id. (quoting Quiet Tech. DC-8, Inc., 326 F.3d at 1341 (citations omitted)). As the Eleventh Circuit has noted, however, [t]hese factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion.' Id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150-52 (1999); Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999)).

Each side has the right to have challenge the experts' methodology and opinions on cross-examination. State Farm's Motion should be denied.

### 9. Any Testimony of Defendants Experts - Relying on its Motion to Extend Deadlines re: Daubert Motion [DE 69

The Court granted an extension of time as to expert depositions and *Daubert* motions, so this aspect of the motion should simply be denied as it will be addressed at that time, if necessary.

WHEREFORE, Defendants ask the motion in *limine* be denied as provided for above.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on **July 15, 2019**, I have filed the foregoing document with the Clerk of Court using the CM/ECF system and that a copy was electronically served upon the following in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing**: Bart Valdez, Esq.**, **Kenneth P. Hazouri, Esq.**, and **Andrew S. Ballentine, Esq**., deBeaubien, Simmons, Knight, Mantzaris and Neal, LLP, 332 North Magnolia Avenue, Orlando, FL 32801, (Khazouri@dsklawgroup.com ABallentine@dsklawgroup.com Lquesada@dsklawgroup.com Lmorales@dsklawgroup.com).

**THE PIVNIK LAW FIRM**
7700 N. Kendal Drive, Suite 703
Miami, FL 33156
Tel: 305-670-0095
Email: Pivniklaw@aol.com
Cdiezpivniklaw@aol.com

By: */s/ Jerome A. Pivnik*
Jerome A. Pivnik, Esq.
Fla. Bar No.: 400408

**Andrew P. Baratta, Esq.**
Baratta, Russell & Baratta
3500 Reading Way
Huntingdon Valley, PA 19006
Tel: 215-914-2222
Email: Andrew@Barattarussell.com

**Kenneth B. Schurr, Esq.**
Law Offices of Kenneth B. Schurr
2030 S. Douglas Rd., Ste. 105
Coral Gables, FL 33134-4615
Tel: 305-441-9031
Email: kbsservice@schurrlaw.com